**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHAUN SIVERD, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CAMPING WORLD HOLDINGS, INC., MARCUS A. LEMONIS, MATTHEW D. WAGNER, and THOMAS E. KIRN,<br><br>Defendants. | Case No. 1:26-cv-02710<br><br>Hon. LaShonda A. Hunt<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**LEAD PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS


I. INTRODUCTION ....1

II. JURISDICTION AND VENUE ....5

III. PARTIES ....5

A. Lead Plaintiff ....5

B. Defendants ....6

IV. SUBSTANTIVE ALLEGATIONS ....7

A. Camping World Background ....7

B. After a Covid-Era Boom, Camping World's Earnings Fall Sharply in 2023 and 2024....9

C. In Late October 2024, Defendants Announce Plans to Increase Earnings Based on the Company's Purported Status as a "Market Maker" and Ability to "Prudent[ly]" Grow Used RV Sales Based on Its Data-Driven Procurement Model ....10

D. Immediately After the 3Q 2024 Earnings Call, Defendants Raised $333 Million in a Secondary Public Offering....12

E. Throughout the Class Period, Defendants Continue to Falsely Tout Their Purportedly "Prudent" and "Very Intelligent" Procurement Approach and Strong Inventory Practices....13

F. Mismanaged Used RV Inventory Posed a Serious Threat to Camping World......14

G. Unbeknownst to Investors, Defendants' "Market Maker" Auctions Were Little More Than Fire Sales to Sell the Company's Unsold Used RV Inventory ....16

H. Unbeknownst to Investors, Camping World's Used RV Operations Were in Disarray Throughout the Class Period....18

V. MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS IN VIOLATION OF THE SECURITIES LAWS....28

A. October 29, 2024 Earnings Call....28

B. October 30-31, 2024 SPO Offering Documents....32

C. February 26, 2025 Earnings Call ....33

D. April 30, 2025 Earnings Call ....34

E. July 29-30, 2025 Press Release & Earnings Call....36

F. August 12, 2025 J.P.Morgan Auto Conference ....................39

G. October 29, 2025 Earnings Call ....................40

H. December 9, 2025 Raymond James Technology, Media, & Telecom and Consumer Conference ....................41

VI. THE TRUTH GRADUALLY EMERGES IN SUCCESSIVE EARNINGS RELEASES ....................43

A. Partial Corrective Disclosure No. 1: April 29-30, 2025 ....................43

B. Partial Corrective Disclosure No. 2: July 29-30, 2025 ....................45

C. Partial Corrective Disclosure No. 3: October 28-29, 2025 ....................47

D. Final Corrective Disclosure: February 24-25, 2026 ....................50

VII. ADDITIONAL SCIENTER ALLEGATIONS ....................53

A. The FEs Confirm Defendants' Direct, Hands-On Involvement in Camping World's Procurement and Inventory Operations, Including Their Access and Review of the Company's Data Platforms ....................53

B. Defendants Repeatedly Emphasized Their Close Monitoring and Extensive Knowledge of Camping World's Procurement, Inventory Management System, and Auction Business ....................55

C. Camping World's Inventory Management Failures Were Too Central and Widespread to Escape Defendants' Knowledge ....................56

D. Defendants Were Motivated to Mislead Investors to Effectuate the October 31, 2024 SPO ....................57

E. In 2020, Camping World and Lemonis Defended a Previous Securities Suit Alleging Inventory Deficiencies ....................57

VIII. LOSS CAUSATION/ECONOMIC LOSS ....................58

IX. CLASS ACTION ALLEGATIONS ....................59

X. APPLICABILITY OF THE FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE (AS TO CLAIMS BROUGHT UNDER THE EXCHANGE ACT) ....................61

XI. NO SAFE HARBOR ....................63

XII. COUNTS ....................64

A. Securities Act Claims ....................64

B. Exchange Act Claims ....................67

XIII. PRAYER FOR RELIEF ..........72

XIV. JURY TRIAL DEMANDED ..........73

Lead Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("CPERS" or "Lead Plaintiff"), by and through its attorneys and on behalf of all others similarly situated, alleges the following upon information and belief, except as to the allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, its counsel's investigation, including without limitation, its review and analysis of public filings made by Defendant Camping World Holdings, Inc. ("Camping World" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); press releases and other statements disseminated by Defendants (defined below) and other persons; news articles, shareholder communications, and conference calls concerning Defendants' public statements, and other publicly available information such as analyst reports concerning the Company and the industry within which it operates, as well as discussions with former Camping World employees.

## I. INTRODUCTION

1. Lead Plaintiff brings this federal securities class action on behalf of itself and a class (the "Class") consisting of all persons and entities that purchased or otherwise acquired Camping World's Class A common stock ("Camping World common stock") between October 29, 2024 and February 24, 2026, inclusive (the "Class Period"), and a sub-class (the "Sub-Class") consisting of all persons and entities that purchased or otherwise acquired Camping World common stock pursuant or traceable to the registration statement and prospectus (the "Offering Documents") issued in connection with Camping World's October 31, 2024 secondary public offering ("SPO" or the "Offering"), and were damaged thereby. Lead Plaintiff brings claims against Camping World and three of its officers and directors—former Chief Executive Officer ("CEO") Marcus A. Lemonis, current CEO Matthew D. Wagner, and current Chief Financial Officer ("CFO") Thomas E. Kirn (collectively, "Defendants")—under §§11 and 15 of the

Securities Act of 1933 (the "Securities Act"), and under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Camping World is the U.S.'s largest retailer of recreational vehicles ("RVs"), operating approximately 200 dealerships across the country that sell new and used RVs and provide related financing, insurance, parts, and service. RV sales are the economic engine of the Company, accounting for a majority of Camping World's revenue.

3. Camping World rode a wave of unprecedented consumer demand as the Covid pandemic came to a close, posting strong results in 2021 and 2022. But in 2023, the RV market contracted sharply, leading Camping World's earnings to decline and remain depressed into 2024, and putting the Company under significant pressure to demonstrate a path back to earnings growth.

4. Against that backdrop, on October 29, 2024, Defendants announced an ambitious strategy to rapidly expand Camping World's high-margin used RV business and increase the Company's RV market share. The strategy involved leveraging Camping World's purported status as a data-driven "market maker" that was supposedly well-positioned to acquire used RVs at a discount and then quickly resell them at a premium through its national auction network. Defendants assured investors that this approach relied on its "calculated" and "risk averse" procurement process backed by 15 years of proprietary pricing data.

5. The announcement had an immediate effect, as Camping World's stock rose almost 7% that day. Over the next two days, Defendants seized on the stock price momentum, issuing Offering Documents on October 30 and 31, 2024 to immediately raise approximately $333 million in net proceeds via the SPO. Camping World then promptly deployed the freshly raised funds largely to acquire more RVs pursuant to the used RV acquisition-and-resale expansion strategy they had just described to investors. As detailed below, however, the Offering Documents were materially misleading and incomplete, as they failed to disclose the serious, then-existing

deficiencies in Camping World's procurement operations and inventory management system that rendered the Company's plans to further expand its used RV business vastly more risky than Defendants disclosed.

6. Over the next 16 months, Defendants repeatedly told investors that their strategy was working as promised. They described Camping World's used RV procurement process as "prudent" and "laser-focused"; represented that the Company was "surgically manag[ing]" inventory through "sophisticated data analytics"; claimed that its balance sheet had "never been stronger"; and asserted that Defendants Lemonis, Wagner, and Kirn were constantly reviewing a "dashboard" of metrics that allowed management to track inventory in "real-time."

7. In reality, as multiple former Camping World employees have confirmed, Defendants continued to dramatically misstate the Company's abilities. *First*, Camping World's procurement approach was the antithesis of "calculated," "risk averse," and "laser-focused," as management directed employees to offer 110% to 120% of market value to acquire used RVs—the opposite of buying at a discount—thereby flooding the Company's dealership lots with overpriced inventory. Equally bad, the majority of the Company's increased used RV inventory had significant quality issues including mold, water, and structural damage, requiring costly reconditioning that occupied labor and service bays that otherwise would have been used to generate revenue from Camping World's existing paying customers. Indeed, these quality issues placed demands on the Company's servicing abilities that it could not meet, causing the Company either to sell significant numbers of poor-quality RVs "as is"—without any reconditioning whatsoever—or where reconditioning was performed, to direct employees to "[s]lap a Band-Aid over it and hope [customers] don't notice."

8. *Second*, the Company's touted inventory management system did not enable "real-time" tracking of key metrics. Instead, it was a patchwork of inaccurate, poorly functioning

platforms that routinely failed to account for as much as 20% of the Company's used RV inventory, leaving millions of dollars of units sitting undetected on lots for weeks at a time, with management blind to conditions on the ground at the very dealerships they claimed to be monitoring continuously.

9. *Third*, the Company's vaunted "market maker" auction network was, in reality, a vehicle for unloading excess, aged inventory at fire-sale prices, with RV units listed at $30,000 selling for as little as $10,000 and losses of up to $100,000 per auction day, with all units selling at a loss at region-wide events, and sale prices on newly acquired used RV inventory slashed to as low as 70% of the original asking price after 90 days on the lot.

10. The truth concerning the chaotic and deteriorated state of Camping World's business and operations gradually emerged through a series of partial corrective disclosures, at first manifesting as mere symptoms of Defendants' underlying misstatements in the form of news about how rising reconditioning costs were diverting service resources from paying customers, and successive quarterly declines in used RV average selling prices. But by late 2025, Defendant Lemonis admitted that the Company had suffered from a "bit of a delusion" and had been forced to "discount . . . to get rid of inventory that we miscalculated." And in early 2026, the full picture came into view, as used RV revenue and gross profit collapsed, and Defendants committed to "improved efficiency of used RV procurement" and "centralize[d]" inventory management, which constituted de facto admissions that the sophisticated, data-driven operation they had repeatedly touted to investors had never existed.

11. On these corrective events, Camping World common stock fell sharply. Lead Plaintiff CPERS, on behalf of itself and the Class, now seeks recovery under the federal securities laws for the substantial losses it has suffered.

## II. JURISDICTION AND VENUE

12. The Exchange Act claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). The Securities Act claims asserted herein arise under §§11 and 15 of the Securities Act (15 U.S.C. §§77k and §77o).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §27 of the Exchange Act (15 U.S.C. §78aa), and §22 of the Securities Act (15 U.S.C. §77v).

14. Venue is proper in this District under 28 U.S.C. §1391(b), §27 of the Exchange Act (15 U.S.C. §78aa), and §22 of the Securities Act (15 U.S.C. §77v). At all relevant times, Camping World was headquartered and conducted business in this District at 2 Marriott Drive, Lincolnshire, IL 60069 and substantial acts in furtherance of the acts and omissions charged herein occurred in this District, including the dissemination of materially false and misleading statements to the investing public, including statements that omitted material information.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

16. Lead Plaintiff CPERS, as set forth in its revised certification (attached at Exhibit A), purchased Camping World common stock in Camping World's SPO pursuant and traceable to the Offering Documents, and at other times also during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

**B. Defendants**

17. Defendant Camping World is incorporated under the laws of Delaware with its principal executive offices located in Lincolnshire, IL. Its common stock trades on the New York Stock Exchange ("NYSE") under the symbol "CWH." Throughout the Class Period, Camping World, through its officers and directors, published periodic filings with the SEC, and made additional public statements that were materially false, misleading, and/or omitted material information required to be stated therein, in violation of the federal securities laws.

18. Defendant Marcus A. Lemonis ("Lemonis") became Camping World's CEO in 2006 and Chairman of its Board of Directors in 2016, and served in both roles until his retirement on December 31, 2025. Throughout the Class Period, Lemonis made statements on the Company's earnings calls, at investor conferences, and in press releases that the Company filed with the SEC, which, as alleged herein, violated the federal securities laws and contained materially false and/or misleading statements and omissions.

19. Defendant Matthew D. Wagner ("Wagner") succeeded Lemonis as Camping World CEO effective January 1, 2026. Wagner joined Camping World in 2007, became Chief Operating Officer in 2023 and President in 2024, and retains both titles. Throughout the Class Period, Wagner made statements on the Company's earnings calls, which, as alleged herein, violated the federal securities laws and contained materially false and/or misleading statements and omissions.

20. Defendant Thomas E. Kirn ("Kirn") has served as Camping World's CFO since July 2024. Throughout the Class Period, Kirn made statements on the Company's earnings calls and at investor conferences, and signed press releases that the Company filed with the SEC, which, as alleged herein, violated the federal securities laws and contained materially false and/or misleading statements and omissions.

21. Lemonis, Wagner, and Kirn are collectively referred to herein as the "Individual Defendants." Camping World and the Individual Defendants are referred to collectively herein as the "Defendants."

22. The Individual Defendants, because of their positions with Camping World, had the power and authority to control the contents of the Company's reports to the SEC, its press releases, and its other statements to investors, analysts, and other market participants. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be materially false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected before they were issued. Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that contrary representations that Defendants made were materially false, misleading, and/or contained material omissions. The Individual Defendants are liable for the false and misleading statements and omissions alleged herein.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Camping World Background

23. Camping World is the largest RV retailer in the U.S., operating a national network of about 200 dealerships and service centers. New and used RV sales are the driver of Camping World's earnings, accounting for over 70% of its $6-plus billion in revenue in both 2024 and 2025. When Camping World sells an RV, as CEO Lemonis stated in a July 2025 earnings call, it seeks to generate further profits by bringing the purchaser into its "ecosystem," and having the customer also obtain financing, insurance, parts, service, camping equipment, roadside assistance subscriptions, protection plans, and campground access through Camping World or its "Good

Sam" subsidiary. The goal, as Lemonis put it, is to "get lifetime value out of people" from each RV sale and then have them "trade in again and do it all over again."

24. There are two types of RVs: towables, which hitch to the back of another vehicle; and motorhomes, which operate under their own power. Camping World sells both types, including both new and used RVs (also known as campers). A typical camper includes a kitchen, bathroom, sleeping area, and living space.

25. Since at least 2016,[1] the vast majority of Camping World's sales have consisted of sales of the relatively less expensive towable "Travel Trailers," which typically sell new for under $30,000. During the Class Period, new and used Travel Trailer sales accounted for about 80% and 60%, respectively, of Camping World's total new and used RV sales.

26. Most of the remainder of Camping World's new and used RV sales have consisted of the more expensive "Fifth Wheel" towables, which made up about 20% of new and used sales (with new units retailing for about $68,000), and motorhomes, which accounted for 10% to 15% of the Company's new and used sales (with new units retailing for over $100,000).

27. Each year since 2016, Camping World sold more new than used RVs. In 2023, the gap was relatively narrow—the Company sold 58,731 new RVs vs. 56,823 used RVs. In 2024, the gap widened to 70,484 new RVs against 51,032 used RVs. As discussed below, however, during the Class Period Defendants were determined to reverse that trend by expanding the portion of the Company's business that was devoted to acquiring and re-selling used RVs.

28. The Company acquires new RVs directly from manufacturers (like Thor Industries and Forest River). By contrast, the Company typically acquires used RVs (for subsequent resale) through customer trade-ins and in-person and online purchases from existing RV owners.

---

[1] Camping World began disclosing sales figures in 2016 when it became a public company.

29. In 2024, Camping World sold 11.2% of all U.S. RVs, which represented 20% of all U.S. new RV sales and 7% of all U.S. used RV sales.

**B. After a Covid-Era Boom, Camping World's Earnings Fall Sharply in 2023 and 2024**

30. Fiscal year ("FY") 2021 proved to be a windfall for Camping World. As pandemic-era lockdowns eased and Americans sought more domestic travel options (including those that lessened their potential exposure to Covid), RV demand and prices surged, and significant improvement in the Company's financial performance followed. For example, from FY 2020 to FY 2021, Camping World's revenue jumped from $5.4 billion to $6.9 billion, its gross profit soared from $1.7 billion to $2.45 billion, and its Adjusted EBITDA nearly doubled from $565 million to $942 million. Camping World's total RV sales climbed above 126,000, driven almost entirely by an over 30% increase in its sales of used RV units.

31. The boom continued into FY 2022, when the Company hit nearly $7 billion in revenue (an all-time high), earned gross profits of $2.26 billion, and registered Adjusted EBITDA of $653 million.

32. But FY 2022 proved to be a high-water mark. A decline in RV sales and prices the next year caused FY 2023 revenue to fall over $740 million to $6.2 billion; similarly, the Company's gross profit fell 17% to $1.88 billion, and its Adjusted EBITDA plummeted 56% to $286 million.

33. Camping World's earnings contraction continued into FY 2024, as 1Q, 2Q, and 3Q 2024 revenue, gross profit, and Adjusted EBITDA figures all fell as compared to their already-reduced FY 2023 figures.

### C. In Late October 2024, Defendants Announce Plans to Increase Earnings Based on the Company's Purported Status as a "Market Maker" and Ability to "Prudent[ly]" Grow Used RV Sales Based on Its Data-Driven Procurement Model

34. As the Company began 4Q 2024, and analysts and investors turned their attention to FY 2025, Defendants were desperate to persuade the market that Camping World was capable of turning the page on its earnings contraction.

35. To that end, on an earnings call held before the market opened on October 29, 2024—the first day of the Class Period—Defendants touted a bold plan to drive Camping World's earnings back up by dominating the used RV market. This approach had two prongs: leaning on Camping World's supposed status as a "market maker," and selling more used RVs.

36. With respect to its "market maker" status, Defendants described in detail how Camping World had purportedly become an RV "market maker" through its recently launched national RV auction business, which operated both in-person and online, and focused primarily on used RVs. According to Wagner, since December 2023, the Company had hosted almost 20 auctions, averaging two or three per month "somewhere in the country." According to Lemonis, this was a highly sophisticated, data-driven operation based on "15 years" of Camping World "accumulating and dissecting proprietary data." As a result, the Company claimed to have "real-time market-based new and used pricing," and had "supplant[ed] others as the authority or marker around vehicle values, particularly on the used side of the industry." Beyond setting market prices, Defendants also claimed that Camping World's auction network allowed the Company to resell its recently purchased used RVs at a profit—or, as Lemonis put it, "any time we can buy something for one price and sell it for more than what we bought it for, we're going to extract as many opportunities as we can."

37. With respect to its business expansion, Defendants also announced on this October 29, 2024 call that they aimed to increase Camping World's domestic RV market share to over 15%

in 2025. At that point, just weeks into 4Q 2024, Camping World was on track to sell about 11.2% of all RVs in the U.S. in FY 2024. To increase their RV market share by four percentage points (and "exceed[] 15%"), Defendants determined that they needed to sell substantially more used RVs. In 2024, Camping World's 20% market share of all new RV sales in the U.S. was almost triple its 7% share of the domestic used RV market, so there appeared to be more room for growth in used RV sales. Indeed, the used RV market in the U.S. is roughly twice as large as the new RV market; for example, in 2024, roughly 750,000 used RVs were sold compared to 350,000 new units sold.

38. The prospect of increasing used RV sales was also attractive to investors because a used RV sale has traditionally translated into greater profit than a new RV sale. Historically, Camping World's used RV sales generated gross margins of 18.5-20%, significantly higher than the 13-14% margins generated from new RV sales. In fact, in a February 2024 earnings call discussion about used and new RV margins, Lemonis described "the used business [as] the secret sauce of this company," and in March 2025 he represented that the Company's rationale for increasing used RV sales was that "we make more money on used," and added that "[t]he worst-performing margin on used on a transaction is still better than the best-performing transaction on new."

39. While touting their plans to increase market share, including by increasing "used unit volumes" in 2025 by levels "in excess of low double-digit growth year-over-year," during their October 2024 call Defendants also emphasized that their strategy was built on their cautious approach to ramping up used RV procurement. For example, Wagner represented that the Company "began to *thoughtfully* procure used assets" as part of a "*calculated* replenishment," and that it was "*risk averse* in the used segment." [Emphasis added.] Similarly, CFO Kirn represented

that "we continue to bring fresh used inventory back into the system at a more accelerated, *but prudent* pace." [Emphasis added.]

40. Analysts responded positively to these statements. For example, in an October 30, 2024 analyst report, Raymond James & Associates ("Raymond James") upgraded Camping World common stock and labeled its renewed focus on higher-margin used RVs as a "key idiosyncratic growth driver[]." Similarly, Roth Capital Partners ("Roth Capital") raised its Camping World price target, declaring in its header: "Used RV Effort Providing NT [Near-Term] Trough in Biz Toward a Better '25," explaining in the report that its "bullishness" was based, at least in part, on "a well-developed used RV business."

41. The market also responded positively. That day, October 29, 2024, Camping World's stock closed at $22.89, up almost 7% compared to the prior day's closing price.

### D. Immediately After the 3Q 2024 Earnings Call, Defendants Raised $333 Million in a Secondary Public Offering

42. Defendants moved quickly to capitalize on the positive analyst commentary and the Company's stock price jump caused by their October 29, 2024 statements. Specifically, over the next two days, Defendants filed a registration statement on Form S-3 (the "Registration Statement") and prospectus supplement on Form 424B5 ("Prospectus," and collectively with the Registration Statement, the "Offering Documents") with the SEC for its October 31, 2024 SPO. In total, Defendants sold 16,829,267 shares of Camping World common stock to the investing public for $345 million in the SPO pursuant to the Offering Documents, with Camping World netting total proceeds, after underwriting fees, of roughly $333 million.

43. However, the Offering Documents for the SPO were materially misleading and incomplete because, like their October 29, 2024 conference call statements, they also failed to disclose the serious, then-existing deficiencies in Camping World's procurement operations, inventory management system, and auction business (as further detailed in §§IV.G & H below)

that rendered the Company's plans to further expand its used RV business vastly more risky than Defendants disclosed.

44. Defendants nonetheless then proceeded to promptly deploy the SPO proceeds largely to acquire more used RVs. Indeed, on the Company's February 26, 2025 earnings call, Lemonis confirmed that the SPO proceeds raised in October were being deployed "across growing our used inventory," and represented that, as a result, Defendants "are reaffirming our [October 29, 2024] guidepost to deliver 10%- to-15%-unit growth on use[d]" and "significant improvement in total gross profit."

### E. Throughout the Class Period, Defendants Continue to Falsely Tout Their Purportedly "Prudent" and "Very Intelligent" Procurement Approach and Strong Inventory Practices

45. With the SPO proceeds in hand, over the first three quarters of 2025 Camping World's procurement of used RVs surged to record levels, with used RV inventory reaching a reported all-time high of $595 million by the end of the third quarter.

46. Camping World's ramp up in used RV procurement required not just capital to buy the units, but effective employment of a multi-step process that depended on reliable inventory management capabilities and well-managed and disciplined procurement practices. For example, unless a seller walked in or otherwise contacted Camping World, the Company had to first identify and contact potential "leads" through its dealership network, or via a centralized call center in Arizona (which CFO Kirn referred to as a "boiler room") that went operational beginning in late 2024 or early 2025. Then the Company needed to inspect and appropriately value prospective RV units before purchasing them. Once acquired, the Company would have to send each used RV to a Camping World dealership lot, and then perform reconditioning—a process that consumed technician time and service bay capacity that could otherwise have been used to generate revenue from paying customers who sought servicing for their existing RVs.

47. In each quarterly earnings report from 4Q 2024 through 3Q 2025, Defendants disclosed the record used RV inventory valuation. Yet, while doing so, Defendants also went to great pains throughout the Class Period to continue to assure investors that the Company was executing its used RV strategy responsibly, and in accordance with a disciplined, data-driven process. For example, during the Company's February 26, 2025 earnings call, Defendants assured investors that they were "*judiciously* reestablishing" their used RV business at a "*prudent* pace," and were being "*very intelligent* about the kind of units" they were buying, and were doing so consistent with their daily review of a "dashboard" of "different metrics" that allowed them to appropriately adjust their used RV orders in "real-time." [Emphasis added.] Similarly, on the Company's April 30, 2025 earnings call, Wagner described the used RV procurement as a "laser-focused effort."

48. On the July 30, 2025 earnings call, Defendants raised the Company's overall (combined used and new) RV market share goal again, from 15% to 20%, with Wagner declaring that Camping World had "further developed and enhanced our used procurement methodology, resulting in a record amount of used RVs purchased within the quarter," while Lemonis assured investors that "quite frankly" the Company's balance sheet, which included a then-record $536 million-worth of used RVs, "has never been stronger."

49. On the same July 30, 2025 call, Lemonis also assured investors that the Company was reconditioning the vehicles in its used RV inventory before looking to re-sell them—and emphasized that proper reconditioning was essential to margin performance because "any shortcut in reconditioning the unit leads to aging and leads to poor margin performance."

### F. Mismanaged Used RV Inventory Posed a Serious Threat to Camping World

50. Deficient inventory management presented a serious risk to Camping World. Used RV inventory is effectively perishable, as units lose value the longer they sit unsold on a dealership

lot. Resale delays—for example, extended time spent reconditioning RVs or delays caused by a deficient inventory management system that loses track of existing stock and/or presents management with inaccurate RV counts—reduce earnings because the longer a used RV sits unsold, the older it gets and the deeper the discount required to sell it, thereby substantially shrinking the margins on used RVs.

51. Defendants had long understood that used RV procurement depends on strong inventory management. For example, on a February 22, 2024 earnings call, Lemonis emphasized that "[w]e have been disciplined since the beginning of this company on how we manage our used inventory" because "*we know that the #1 thing that could kill a business is poor inventory management.*" [Emphasis added.] Later, on a February 25, 2026 earnings call, Wagner described "how inventory is like an ice cube sitting on your lot," explaining that "[w]ith every day that it sits, you have different profitability as well as cost of mass and your profitability starts to melt with each day that passes and it starts to evaporate."

52. A key metric that Camping World used to assess inventory performance was its "inventory turnover" metric—often referred to by Defendants as "turns"—which is designed to track how many times the Company sold through its entire inventory over the course of a full year.[2] Immediately prior to the Class Period, Camping World had a used turnover rate of 3.2, meaning that, on average, it sold and replaced its entire used RV inventory a little over three times in the prior 12 months, and that the average used RV unit sat on a dealership lot for no longer than 115 days (i.e., 365 days divided by a turnover rate of 3.2). On the October 29, 2024 earnings call, as

[2] Camping World's Class Period SEC filings stated that the inventory turnover metric "is calculated as vehicle costs applicable to revenue over the last twelve months divided by the average quarterly ending vehicle inventory over the last twelve months."

part of the new focus on used RV sales, Lemonis also announced that Defendants were now "target[ing]" at least a "3.5 turn on used."

53. Moreover, in discussing Camping World's new emphasis on used RVs and its related commitment to significantly ramping-up its procurement of such vehicles for re-sale purposes, throughout the Class Period Defendants repeatedly emphasized the Company's data-driven inventory management systems to minimize any investor concerns that weaknesses in such systems might (as Lemonis put it) "kill" Camping World's business. For example, on the Company's April 30, 2025 earnings call, Lemonis assured investors that Camping World's "inventory procurement and management system" allowed the Company to build a sophisticated, data-driven "matrix" for every RV customer (and potential RV buyer), and thereby determine customer affordability, while the Company's "pricing algorithm" ensured that Camping World hit its profitability "marks." Similarly, in a July 29, 2025 press release, Lemonis again assured investors that the Company used "sophisticated data analytics" and "continue[d] to surgically manage" inventory, and on the following day's earnings call described the Company's "nimbleness and our knowledge of inventory." And at an August 12, 2025 conference, Lemonis further stressed that "[w]e don't expect the collection of data and the usage of data for us to get any less sophisticated."

### G. Unbeknownst to Investors, Defendants' "Market Maker" Auctions Were Little More Than Fire Sales to Sell the Company's Unsold Used RV Inventory

54. Defendants described their auction business as a sophisticated, data-driven process to become used RV "market makers," whereby the Company would "buy something for one price and sell it for more than what we bought it for." As of October 29, 2024, Camping World had held about two or three domestic used RV auctions per month during the prior 11-month period.

55. In reality, however, multiple Camping World former employees ("FEs") have confirmed that these auctions were actually *fire sales* that Defendants utilized to sell unsold used RVs at prices below what they had paid for them.

56. For example, FE1 worked at multiple Camping World dealerships in Oklahoma, including in Oklahoma City and Van Buren, from June 2024 through early 2025. FE1 had initially been hired as a Sales Representative but had been quickly promoted to General Manager, with responsibility for overseeing all sales efforts—which included buying and selling used RVs. As a result, FE1 attended Camping World's "auctions," which FE1 characterized as "fire sales."

57. Tellingly, according to FE1, the auctions were a tool to rid Camping World of surplus inventory that had built up at the Company's dealerships. At the auctions FE1 attended, used RVs from Texas and Oklahoma dealerships were sold, and FE1 stated that at these auctions the Company "sold all [of my dealership's] units and took losses on them all." FE1 also added that a typical auction would result in the sale of "80 to 90 units," and would cause Camping World losses of "up to $100,000 in one day."

58. FE2 worked for Camping World from April 2014 through February 2025, initially as a Regional Finance Director and later as a Vice President of Regional Finance. FE2's responsibilities included overseeing RV sales paperwork and hiring and training finance managers for all dealerships in the western part of the U.S. As a result, FE2 was intimately familiar with the profit margins Camping World earned from its used RV sales.

59. FE2 also confirmed that in 2023 and 2024 Camping World organized "big auctions" at which dealerships from across several states would all send their used RV inventory to the auction site for sale. In particular, FE2 recalled auctions in Arizona and Washington State, where between 80 and 100 used RVs were sold—and where "every unit was sold at a loss."

According to FE2, these losses were caused largely by Camping World having bought used RVs "at too high a price."

60. FE3 confirmed they also had similar experiences. FE3 had two stints working for Camping World, the first from December 2018 through June 2020, and the second from March 2024 through May 2025 at Company dealerships in Illinois and Wisconsin. FE3's final title was Internet Sales Manager and was responsible for handling incoming internet used RV leads for the dealership.

61. According to FE3, Camping World's Deforest, Wisconsin dealership held an online and in-person used RV auction between June and August 2024, and which offered for sale approximately 100 campers brought in from across the country. FE3 characterized the auction as "100%" a fire sale designed to "get rid of stock they [Camping World] were buried in and couldn't move." According to FE3, customers purchased units listed at $30,000 for as little as $10,000 because "[t]hese were campers that were sitting there a long time and they [Camping World] just needed to get rid of them."

**H. Unbeknownst to Investors, Camping World's Used RV Operations Were in Disarray Throughout the Class Period**

62. Throughout the Class Period, but undisclosed to investors, Camping World's used RV operations were in disarray in at least two critical respects. *First*, instead of being "prudent" or data-driven, Camping World's used RV procurement process was anything but, as employees were directed to pay above-market prices for units, a majority of which had significant quality issues. *Second*, and compounding its undisciplined procurement processes, the Company operated and relied on a deficient inventory management system that routinely failed to accurately track as much as 20% of Camping World's used RV inventory.

63. As a result of its undisciplined procurement process and deficient inventory management system, Camping World once again had to resort to significant discounting to rid itself of excess used RV inventory.

**1. Camping World's Used RV Procurement Operations Were Undisciplined Prior to and Throughout the Class Period, as Defendants Directed Camping World Employees to Significantly Overpay to Acquire Used RVs and Acquire Low Quality Used RVs**

64. Throughout the Class Period, Defendants repeatedly characterized Camping World's used RV procurement operations using terms such as "calculated," "prudent," and "risk averse." In reality, however—and as confirmed by multiple FEs—prior to and throughout the Class Period Camping World management directed its employees to overpay for used RVs, a majority of which possessed significant quality issues that either required substantial reconditioning time and expenses or would have to be sold to consumers "as is." As a result, throughout 2025, Camping World dealership lots were overflowing with used, poor-quality RVs that predictably resulted in significant losses.

65. According to FE1, the Oklahoma-based General Manager, when assigning an offer price for a particular used RV, Camping World management often instructed employees, including FE1, to offer 110% to 120% of market value to purchase the vehicle. FE1 recalled this practice occurring during the Class Period. FE1, who had previously worked for other RV companies, explained that it is standard practice in the industry to review a vehicle's value in the National Automobile Dealers Association ("NADA") database, which tracks new and used vehicle values, and offer a customer 80% of its value, given the expenses involved in reconditioning vehicles to make them appropriate for resale. At Camping World, FE1 would log each potential used RV target's NADA actual cash value and email it "to corporate," who routinely responded with an inflated value for FE1 to use. According to FE1, this overpayment policy was set at a national level by Defendants Lemonis and Wagner—a fact FE1 was aware of because s/he attended

regional company calls run by Lemonis and Wagner where the Company's policy was explained and its employees were instructed by Lemonis to inflate purchasing prices.

66. As a result, FE1 explained, the amount of used RVs Camping World acquired shot up dramatically, causing the three dealerships at which FE1 worked to hit "an all-time high" in inventory, something FE1 had never experienced in FE1's "whole career." According to FE1, Camping World's Poteau dealership had more than 400 vehicles on its lot, and "something close in Oklahoma City," a level of inventory FE1 characterized as "insane," before adding that "[w]e were just buried in our used units." FE1 also attended company-wide calls at which Lemonis and Wagner assured employees that "the books were full," meaning that anticipated demand was sufficient to absorb the added inventory.

67. One significant consequence of the dramatic ramp-up in used inventory procurement, FE1 explained, was a serious deterioration in the quality of Camping World's used RV inventory. Among other problems, FE1 explained that during this period, Camping World acquired a significant number of used RVs with quality issues like rot, torn roofs needing repairs costing as much as $10,000, and floor damage needing repairs costing between $3,000 and $5,000. Faced with high reconditioning costs, according to FE1, Camping World opted to sell many of its damaged used RVs at auction. As a result, FE1 explained, Camping World was "rare to profit" from its used RV inventory.

68. FE1 also explained that these overstocking and quality issues were not localized to FE1's Oklahoma dealerships. FE1 participated in calls with other Camping World General Managers who made similar observations and "would vent about not having any control over their jobs."

69. FE3, the Wisconsin-based Internet Sales Manager, confirmed that during the Class Period, the system that FE3's dealership utilized routinely prompted Camping World employees

to make offers for more than the used RV was worth. This overvaluation problem, FE3 explained, was compounded by the fact that at least 80% of the used RVs FE3's dealership acquired during the procurement ramp-up suffered from costly quality issues like mold and water damage, and made worse by a routine lack of inspections by Camping World prior to acquisition. According to FE3, used RV targets would be assigned "grade A" values when "they should not have been." As a result, the locations FE3 was familiar with bulged with used RV inventory. For example, FE3 recalled that the Madison, Wisconsin dealership had between 200 and 250 campers on location during the Class Period, but would not sell even 100 in a month.

70. FE3 also confirmed that some defective used RVs were never reconditioned and instead were sold "as is" at auction. And while other units were repaired, much of the work was inadequate, owing in part to the sheer volume of the procurement of RVs that needed reconditioning. Instead, FE3 stated, it was Camping World's practice to "[s]lap a Band-Aid over it and hope they don't notice." For example, FE3 recalled a specific incident in which FE3's dealership sold an RV with black mold intentionally covered up—a sale the dealership's General Manager insisted on completing, despite the condition of the unit.

71. FE4 was an Assistant Acquisitions Manager in Camping World's Arizona "boiler room" from March through October 2025. The "boiler room" was set up at the end of 2024 or beginning of 2025 and was responsible for purchasing used RVs from customers and transporting them to the Company's dealerships for resale. FE4's role involved negotiating directly with customers to acquire RVs and preparing and sending daily lists of used RVs scheduled to arrive at a set of 30 nationwide Camping World dealerships.

72. According to FE4, Camping World management assigned FE4's Arizona acquisitions department the ambitious quota of overseeing the delivery of approximately 20 to 30 used RVs per day. As a result of the Company's ambitious procurement policy, throughout FE4's

time with Camping World, used RV inventory was being acquired at a pace that exceeded Camping World's ability to properly process or sell it and that many of the dealerships the Arizona acquisitions department worked with "ran out of space."

73. FE4 also confirmed that during the Class Period Camping World routinely overpaid for used RVs, and as with the other FEs, FE4 similarly explained that "[a] huge amount" of the acquired units were damaged: "[i]t was almost always a damage issue." By FE4's estimation, between 65% to 75% of the used RVs FE4 facilitated the acquisition and delivery of had quality issues, like water damage or missing furniture.

74. FE5 was employed as a Customer Service Director at a Camping World corporate office in Bowling Green, Kentucky from 1988 through February 2026 and oversaw retail customer service, which included online RV sales and coordinating with dealerships for customer pickup for online RV purchases. FE5 confirmed that throughout the Class Period it was well-known at the Company that Camping World was "significantly overstocked" with used RVs, and that the problem worsened in 2025. FE5 explained that dealership lots were so full that customers could not find parking. The Bowling Green dealership across the street from FE5's corporate office, for example, was so "overwhelmed [that] they had to rent a secondary lot" to store used RVs. FE5 was made aware of similar overstocking complaints from managers at other Camping World locations.

75. FE5 also corroborated the other FEs' quality allegations, as he confirmed that in 2025, Camping World frequently rushed or did not even perform inspections on used RV acquisitions. As a result, FE5 fielded "frequent, frequent customer complaints on damaged units"—including problems with mold, water damage, flooring issues resulting from leaks, missing furniture, damage to furniture (e.g., sofas that would not recline), and missing parts. FE5

also explained that these quality issues were exacerbated by the extended periods of time that used RVs sat on dealership lots.

76. FE5 also confirmed that Lemonis "absolutely knew about [used RV] quality issues," explaining that "nothing [at Camping World] occurred without [Lemonis's] approval," adding that Lemonis wanted insight into everything "to the extent of ridiculousness" and "there was nothing he was not aware of." FE5 also added that Lemonis regularly flew to dealerships to tour them personally—including visiting the Bowling Green location on a quarterly basis—making it even more implausible that he was unaware of the overstocking and quality inventory conditions.

77. FE6 worked at Camping World's Newport News, Virginia location as an internal service advisor from October 2023 through January 2026, and whose primary responsibility was ensuring that new and used RV units were ready for sale. By mid-2025, the Newport News location was overflowing with over 300 used RVs, FE6 stated, forcing the dealership to park them on the street, which sometimes blocked traffic, leading the dealership to turn away new prospective customers looking to sell their RV to Camping World.

78. According to FE6, used RV quality was always a serious issue, but in 2025 "[a]ll of them"—"[e]very single one"—of the used RVs the Newport News location acquired had quality issues like water damage, a broken slide-out floor, or a roof requiring replacement because it was the Company's practice that year to "buy anything." Additionally, FE6 explained, Lemonis encouraged Camping World employees to cut corners when repairing used RVs. For example, FE6 attended a virtual, Company-wide meeting where Lemonis stated that Camping World should not spend more than $4,000 on repairs on trade-in used RVs, when in reality, repairs could cost far more. This message filtered down to the Newport News General Manager, who in turn encouraged FE6 to perform cheaper "patch" repairs—e.g., filling a gap in a broken roof instead of replacing the roof—leading FE6 to explain that Camping World is "selling shit" used RVs.

### 2. Camping World's Inventory Management System Was Defective and Failed to Accurately Keep Track of the Company's Ballooning Used RV Inventory

79. Throughout the Class Period, Camping World's inventory management system consisted of a patchwork of unreliable, poorly functioning platforms that left the Company and its employees blind to the composition and location of its own used RV inventory—the very information defendants claimed to be able to track in real time. These deficiencies only worsened the problems associated with Camping World's used RV overstocking.

80. For example, FE4, the Arizona-based Assistant Acquisitions Manager at Camping World's "boiler room," worked with the Company's inventory management system, including platforms Salesforce and HappyFox, during the Class Period, and confirmed the Company's dismal inventory tracking capabilities and how "[t]he process was broken between [acquisition and] getting the units to the dealerships." According to FE4, after the Arizona team delivered used RVs to dealerships, "a lot of times" those units were "not being put into [the] inventory" system upon arrival, despite physically sitting on dealership lots. By FE4's estimation, dealerships were holding as many as "20 to 40 units not in the system," and that Company-wide "around 20%" of used RVs were effectively unaccounted for, totaling millions of dollars' worth of "missing" RV units "not in the inventory system." To compensate for these inventory management system failures, FE4 had to resort to keeping a manual Excel sheet, which FE4 could then use to identify and quantify discrepancies (including the value of inventory not being recorded) in the Company's own inventory systems. As a result, as FE4 described, dealerships would "get a bunch of units that never made it to the inventory [system] and just sat there [on the dealership lots]."

81. Unsurprisingly, these inventory management system problems further worsened Camping World's overstocking problems and undisciplined procurement practices. As FE4 explained, for example, there were times when Camping World was unable to bring RV units onto

Company lots "because they were full" despite "[m]anagement look[ing] at Salesforce and it sa[ying] there is all this space, but that was not true because all this inventory was not accounted for."

82. According to FE4, the inventory tracking failures and resulting overstocking issues went unresolved throughout FE4's entire tenure with the Company and "was still an issue by the time [he] left" in late 2025. FE4 stated that Lemonis and Wagner would have known about these issues not only because they had access to Camping World's main data platforms, but because FE4 raised these serious untracked inventory issues in internal meetings with FE4's supervisor, who "frequently met with" Lemonis and Wagner. FE4 also confirmed that Camping World's C-Suite visited the Arizona office "every other month" and "were going to dealerships all over the country" on a regular basis.

83. FE7 worked as Sales and Finance Manager for Camping World's Katy, Texas dealership from October 2024 to October 2025, where FE7 was responsible for used RV sales and training others on the sales team.[3] FE7 worked with Camping World's inventory management system, specifically its IDS platform, which FE7 characterized as "old and antiquated, cheap and complicated to use." Indeed, FE7 confirmed that the inventory system was frequently inaccurate and struggled to keep track of used RVs. As a result, FE7 confirmed, Camping World was to a significant extent "flying blind" when it came to the accuracy of the data from its inventory management system, which in turn meant that inventory often "went unnoticed" and sat on dealership lots for as long as two weeks before the Company even realized it was there. As a result, FE7 confirmed that they also had to resort to manually checking inventory on the lot to create accurate inventory information that could not be found in the Company's unreliable and

---

[3] FE7 took a brief hiatus from the Company in mid-2025 before rejoining.

incomplete inventory management system—and that this problem only worsened as the Class Period progressed and the pace of Defendants' undisciplined used RVs acquisition program ramped up dramatically.

84. These inventory management issues made selling used RVs increasingly difficult, FE7 explained, noting that the Katy dealership would often receive used RVs from other Camping World dealerships but would "not have any idea where [they] came from." As a result, dealership staff would sometimes end up selling used RV units without clear titles on them, and/or without obtaining reasonable proof that outstanding amounts due on the RV had actually been paid off. As FE7 further noted, in such cases, sales staff would end up having to ask customers to bring units back. According to FE7, these system defects and resulting problems existed throughout his/her time at the Company.

85. FE3, the Wisconsin-based Internet Sales Manager, also worked with Camping World's inventory management system, including its Salesforce platform. FE3 confirmed that during the Class Period Camping World's system depended on manual data entry, and recalled how, for example, other deficiencies also included the failure to accurately reflect the condition of used RVs that had significant damage. FE3 also confirmed that dealership management sent monthly reports to corporate through the Salesforce system, including metrics such as inbound and outbound calls, sales performance, and losses.

86. FE8 worked as a Business Development Representative at Camping World's Wauconda, Illinois dealership from March 2024 to April 2025 and was responsible for reaching out to potential used RV customers. FE8 also worked with Camping World's inventory management system, specifically its VinSolutions platform, which contained logs of vehicle identification numbers, makes, and models. According to FE8, Camping World's inventory logs were inaccurate, including showing used RVs in stock that, in fact, were not in the Company's

inventory. This inclusion of phantom inventory, as FE8 explained, also adversely impacted sales because there were times when Camping World personnel "told people that [they] had something in stock when [they] didn't."

87. FE5, the Kentucky-based Customer Service Director, also worked with Camping World's inventory management system, specifically its Oracle platform, and confirmed further accuracy issues. Specifically, FE5 noted that Camping World's inventory build-up coincided with increasing thefts of RVs and RV parts, which would not often be reflected in the Company's inventory system for months.

88. FE9 was a Performance Management Specialist at Camping World's Salt Lake City, Utah location from July 2022 through September 2025, and supervised a team of RV parts sales agents. FE9 worked with Camping World's inventory management system, specifically its IDS platform, which was "extremely disorganized." FE9 explained that the Company's parts inventory management system only updated when Camping World employees manually logged sold RV parts, meaning that the system was, at minimum, "always a day or so behind." As FE9 stated, this problem "became unmanageable" by late 2024, forcing dealership employees to conduct manual inventory checks.

### 3. Camping World's Undisciplined Procurement and Deficient Inventory Management System Forces the Company to Significantly Discount Its Used RV Inventory Over the Course of the Class Period

89. Faced with a glut of aging and unsold used RVs—as multiple FEs described—as the Class Period progressed Defendants were, predictably, again forced to resort to deep discounting to rid Camping World of inventory, with predictable adverse consequences for the Company's investors as the truth concerning the deterioration of Camping World's business would later gradually emerge.

90. For example, as FE5 confirmed, Camping World made significant price reductions in 4Q 2025 in order to shed excess inventory, and "[i]t was obvious" that Camping World was selling used RVs at or near costs and, when factoring in labor and time, a loss on those sales.

91. FE4 and FE7 also reported similar heavy discounting throughout the Class Period. According to FE4, after a unit sat for approximately 90 days, dealerships would reduce prices down to as low as 70% of the original asking price, and in 4Q 2025, the Company held auctions in Arizona, one or two of which FE4 attended. According to FE7, the Company's corporate office, which had access to inventory prices via the IDS system, routinely forced the Katy dealership to significantly discount used RVs, and there were periods during FE7's tenure where as many as 25% of all used RVs sold at the Katy dealership were for a loss. And, as FE6 reported, in the spring of 2025, Camping World sent approximately 30 to 40 used RVs from the Newport News location to auctions elsewhere in Virginia and sold them all at a discount.

## V. MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS IN VIOLATION OF THE SECURITIES LAWS

92. Rather than adequately disclose the nature, extent, and magnitude of the Company's problems, throughout the Class Period, the Defendants instead repeatedly misrepresented and failed to disclose the true state of Camping World's procurement operations, inventory management system, and "market making" auctions business.

### A. October 29, 2024 Earnings Call

93. On the 3Q 2024 earnings call held before trading began on the morning of October 29, 2024, Wagner described how Camping World had, allegedly, already begun to implement a "thoughtful," "calculated," and "judicious" approach to significantly expanding the Company's used RV market share:

> Throughout the quarter, we also gained confidence in the stabilization of the used marketplace. We began to *thoughtfully procure* used assets in specific segments to fulfill localized dealership needs. . . . This *calculated replenishment* of our used

> inventory is yielding improved trend lines. . . . As we drive towards 2025, we remain focused on *judiciously re-establishing* our used business, maintaining our dominance as the market maker in the RV industry[.]

[Emphasis added.]

On the same call, Wagner also sought to downplay any investor fears that the Company might be engaging in an overly aggressive approach to expanding its used RV procurement, stating that, "[w]e feel very confident with what we've put out there in the atmosphere given the fact that really we are so *risk averse* in the used segment." [Emphasis added.]

94. Similarly, on the call, Kirn emphasized that the Company's procurement ramp-up efforts were "prudent" and "deliberate":

> Used vehicle margins of 18.2% were in line with plan as we continue to bring fresh used inventory back into the system at a more accelerated, but *prudent pace*. . . . Our adjusted EBITDA was $67.5 million with the primary driver of the year-over-year variance again stemming from our *deliberate actions* around used inventory procurement earlier in the year.

[Emphasis added.]

95. However, unbeknownst to investors, the statements in ¶¶93-94 above were materially false or misleading, because, as alleged herein, Camping World's used RV procurement approach was anything but "thoughtful," "calculated," "prudent," or "risk averse." Instead, as set forth above, Camping World had embarked on an extraordinarily risky policy and practice of paying far above market price (to the tune of 110% to 120% of market value, as compared to the industry-standard practice of offering 80% of value) to acquire used RVs and increase its used RV market share, resulting in dealership lots that were increasingly overflowing with overpriced, largely damaged inventory that the Company could not reasonably hope to profit from, and that it would ultimately be forced to sell at deep discounts to be rid of.

96. On the same call, in describing Camping World's supposed status as a "market maker" and how its "proprietary data" advantage was purportedly enabling the Company to

implement a data-driven ramp-up in its procurement of an expanded used RV inventory which it could profitably resell, Lemonis stated:

> [A]s distribution is the key to industry influence and product is the path to consumer acquisition, being a *market maker* is the cornerstone of value creation for Camping World. Over the last 15 years, our company has invested in accumulating and dissecting proprietary data.
>
> This highly customized data is used to initiate demand, increase lead generation, improve conversion metrics, modernize product design, create efficient inventory ordering, launch real-time market-based new and used pricing and find the white space both geographically as well as by product segment. When identifying white space, nothing is more clear than the used RV market with over 750,000 units being sold both via dealers and private party transactions. *Between the Good Sam Valuator tool and our recently launched national CW auction business, we see tremendous value informally supplanting others as the authority or marker around vehicle values, particularly on the used side of the industry***.** Taken all together, we are essentially creating liquidity in the RV market through the buying or selling of inventory or the identification and capitalization of underserved markets.

[Emphasis added.]

97. Similarly, Wagner also represented that Camping World's recently launched expansion of its used RV procurement was based on the "arbitrage" opportunities that it had allegedly been able to identify and exploit through its "success[ful]" auction network, with Camping World buying units at one price and reselling at a markup:

> I do see actually an opportunity for us to buy in the open market from consumers and just as well resell to wholesalers *and we've seen the success of that through our auction network.*
>
> In fact I mean we could reflect upon a number of anecdotes most recently *where we're able to go to other different auctions, buy units, turn around and resell them through our auction and pick up the arbitrage to other wholesalers.*

[Emphasis added.]

98. Echoing Wagner's point about reselling for profit, Lemonis described how Camping World's auction network confirmed its "market maker" status by allowing the Company to profit by buying at one price and then reselling at a premium:

> The second proof point is our achievement of a high percentage of NADA [National Automobile Dealers Association] when other dealers and banks drive units through our auctions. The example that Matt [Wagner] was mentioning around auctions is we went to a particular auction and were buying something at 65% or 70% or 71% of what is this so-called book. And then that same unit 1 week later in the same geographic area is running through our auction and bringing 8 points to 12 points more 1 week later selling the same unit. When we see banks validate that position, in our mind that is the definition of being a market maker. . . .
>
> We're expecting to continue to ratchet that up because our online auction business and our physical auction business give us the ability. *But because we're capitalist, any time we can buy something for one price and sell it for more than what we bought it for, we're going to extract as many opportunities as we can.* And when we look at driving volume and driving market share, one of the principles of getting to 15%, which is an incremental, we'll call it for this discussion, 40,000, 50,000 units; one of the ways that we have to do that is to find all the different avenues in which we can buy and sell new and used units. This is really us shooting for a goal, making sure that it's profitable and recording the transaction.

[Emphasis added.]

99. Unbeknownst to investors, however, the statements in ¶¶96-98 above were materially false or misleading because as alleged herein, Camping World's procurement approach was not "judicious[]," its inventory was not being managed in "real-time," and it was not a "market maker." Instead, as confirmed by multiple FEs and set forth above, as of this call, the Company's procurement operations were already riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales; the Company's inventory management system was little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in turn predictably caused the

Company to sell off excess units at deep discounts; and the Company's touted "market maker" auction business was little more than a vehicle for disposing of excess, aging inventory at a loss.

**B. October 30-31, 2024 SPO Offering Documents**

100. On October 30 and 31, 2024, Defendants issued the Offering Documents for the SPO, pursuant to which they sold over 16 million shares of Camping World common stock to the investing public. While the written Offering Documents did not describe Camping World's procurement model, inventory management system, or auction business, they incorporated by reference the following risk warning from the Company's 3Q 2024 Quarterly Report filed on Form 10-Q on October 29, 2024, namely, that the Company's success was "subject to a number of risks, uncertainties, and assumptions, including, but not limited to . . . our ability to successfully order and manage our inventory to reflect consumer demand in a volatile market and anticipate changing consumer preferences and buying trends."

101. However, the risk warning in ¶100 above was materially false or misleading because, as alleged herein, the risk it purported to warn investors about (in particular, the risk of it being unable to successfully manage inventory) had already materialized by the time the Offering Documents were issued. Indeed, as of the SPO, Camping World's inventory management system was already a patchwork of inaccurate, poorly functioning platforms that routinely failed to track as much as 20% of the Company's own used RV inventory—leaving millions of dollars of inventory effectively unaccounted for, and further contributed to the Company's overstocking of used RVs (which in turn predictably caused the Company to sell off excess units at deep discounts to the (often inflated) prices that it had paid to acquire them.

102. Further, under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), Defendants had an affirmative duty to disclose in the Offering Documents any known trends or uncertainties that had had, or that the registrant reasonably expects would have, a material

favorable or unfavorable impact on its net sales, revenues, income from continuing operations, profitability, liquidity, or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition. As of the SPO, each of the three pillars of Defendants' used RV strategy was already failing in ways that Defendants were obligated to disclose: namely, the Company's procurement operations were already riddled by undisciplined and high-risk processes and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales; the Company's inventory management system was little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in turn predictably caused the Company to sell off its excess inventory at deep discounts; and the Company's touted "market maker" auction business was little more than a vehicle for disposing of excess, aging inventory at a loss. The foregoing conditions each constituted a material adverse known trend or uncertainty known to management within the meaning of Item 303 of Regulation S-K which Defendants were obligated, but failed, to disclose in the Offering Documents.

### C. February 26, 2025 Earnings Call

103. On the 4Q & FY 2024 earnings call held before trading began on the morning of February 26, 2025, Defendants continued to tout Camping World's supposedly cautious procurement approach and data-driven inventory management system, as well as its status as a "market maker." For example, on the call, Wagner represented that "[a]s we enter 2025, we remain

focused on *judiciously* reestablishing our used business, maintaining our dominance as the *market maker* in the RV industry," while Kirn emphasized that "we continue to bring *fresh* used inventory back into the system at a more accelerated but *prudent* pace." Similarly, Lemonis represented that

> [W]hen we wake up every single day and we're looking at the *dashboard of all of those different metrics*, we are modifying the inventory on order and modifying the units that we purchase on a daily basis to be *real-time responsive* to what the consumer is telling us.

[Emphasis added.]

104. Unbeknownst to investors, however, the statements in ¶103 above were materially false or misleading because as alleged herein, Camping World's procurement approach was not "judicious[]," its inventory was not being managed in "real-time," and it was not a "market maker." Instead, as confirmed by multiple FEs and set forth above, as of this call, the Company's procurement operations were already riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales; the Company's inventory management system was little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in turn predictably caused the Company to sell off excess units at deep discounts; and the Company's touted "market maker" auction business was little more than a vehicle for disposing of excess, aging inventory at a loss.

**D. April 30, 2025 Earnings Call**

105. Defendants held an earnings call in the pre-market hours on April 30, 2025 to discuss 1Q 2025 results. On the call, Lemonis represented that "[w]e have a *very healthy* balance

sheet," including the "used inventory that we own free and clear." Relatedly, Wagner emphasized Camping World's "laser-focused" procurement efforts, stating:

> [W]e achieved record levels of used inventory procurement in March, and we are on pace to set another record in April. This *laser-focused effort* ensures we have an adequate supply of used inventory to sustain our comps into the peak selling season.

[Emphasis added.]

106. Later on the call, Lemonis further assured investors that Camping World's "inventory procurement and management system" allowed the Company to maintain a sophisticated, data-driven "matrix," that enabled it to understand what was affordable for its customers, while also employing a "pricing algorithm" to ensure that Camping World hit its profitability "marks":

> When people come to our company, we don't really sell them on anything other than what can you afford and who's traveling with your family? How many people, how many animals. And *we build that matrix to understand how to build affordability and the right floor plan at the exact same time.* Now the people in the stores probably don't think about it that way. *But when you look at what Matt [Wagner] has built from an inventory procurement and management system, it essentially fills that chart every single day and then the pricing algorithm ensures that we hit those marks.*

[Emphasis added.]

107. Unbeknownst to investors, however, the statements in ¶105-106 above were materially false or misleading because, as alleged herein, Camping World's balance sheet was not "healthy," its used inventory was not being procured through any "laser-focused effort," and its "inventory procurement and management system" was not the sophisticated, data-driven operation Lemonis described. Instead, as confirmed by multiple FEs and set forth above, as of this call, the Company's procurement operations were already riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense

and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales; and the Company's inventory management system was little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in turn predictably caused the Company to sell off excess units in fire sales at deep discounts. In addition, Lemonis's statements that touted Camping World's use of a "matrix" and a "pricing algorithm" to ensure that Camping World hit its profitability "marks" were materially false and misleading, as they failed to disclose that the effectiveness of such analytics was impaired by the inability of the Company's patchwork of deficient platforms to routinely accurately track its used RV inventory.

**E. July 29-30, 2025 Press Release & Earnings Call**

108. After the market closed on July 29, 2025, Camping World issued a press release reporting 2Q 2025 earnings in which Lemonis emphasized that the Company "surgically manage[s]" inventory and utilizes "sophisticated data analytics":

> We continue to *surgically manage* our inventory to find volume and gross profit opportunities leveraging our new and used supply chains, our contract manufacturing relationships, *our sophisticated data analytics*, and the strength of our balance sheet to put the right inventory on the ground at the right time and the right price.

[Emphasis added.]

109. The following morning, July 30, 2025, Defendants hosted a pre-market earnings call, in which Lemonis cited the Company's purported "*nimbleness and our knowledge of inventory* and our ability to act quickly has put the right kind of inventory on the ground on both the new side and the used side," before further representing that "our balance sheet, quite frankly, *has never been stronger*." Similarly, Wagner represented that "we feel like we've played a much more competitive and *intelligent* game in terms of our inventory management." [Emphasis added.]

110. Later on the call, in response to a question about the Company's dramatically increased inventory per location, Lemonis downplayed concerns, emphasizing the Company's ability to make adjustments in "real-time":

> [I]f we wanted to just reduce our used inventory, nothing cataclysmic has to happen. We just pulled back a little bit on the marketing spend on used acquisitions, sell that inventory down, see if we've hit the turn level that we want to be at and then adjust the toggle from there. It is very much of *a real-time thing*.

[Emphasis added.]

111. Unbeknownst to investors, however, the statements in ¶¶108-110 above were materially false or misleading because as alleged herein, Camping World was not "surgically managing" its inventory through "sophisticated data analytics," its balance sheet was not "strong," and its inventory adjustments were not being made in "real-time." In reality, as multiple FEs confirmed and as set forth above, the Company's inventory management system was a patchwork of inaccurate, poorly functioning platforms that routinely failed to track millions of dollars of used RV inventory—leaving management blind to the very conditions Lemonis claimed to be monitoring and adjusting in "real-time." Moreover, any suggestion that the Company's balance sheet was strong was at best highly misleading, as it failed to disclose that in reality the Company's procurement operations were riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales; and the Company's inventory management system was little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in turn predictably caused the Company to

have to sell off excess units in fire sales, at deeply discounted prices for a loss, to clear them from the Company's books.

112. On the same call, Wagner announced a new target of "20% market share of all new and used retail sales as a very realistic medium-term goal," given that the Company had allegedly "further developed and enhanced [its] used procurement methodology, resulting in a record amount of used RVs purchased within the quarter." And Lemonis—while stating that cutting corners on reconditioning used RVs before trying to resell them was precisely the kind of mistake that can cripple margins—indicated that the Company was being diligent in not cutting such reconditioning corners:

> [A]s we've grown our used inventory, *we also have to be sure that we're reconditioning our units because the assets that we're selling need to be properly valued and we need to maximize our margin. Any shortcut in reconditioning the unit leads to aging and leads to poor margin performance.*

[Emphasis added.]

113. Unbeknownst to investors, however, the statements in ¶112 above were materially false or misleading because as alleged herein, Camping World had not "further developed and enhanced" its "procurement methodology," and failed to disclose that in reality the Company's procurement operations continued to be riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales; and the Company's inventory management system continued to be little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in

turn predictably caused the Company to have to sell off excess units in fire sales, at deeply discounted prices for a loss, to clear them from the Company's books. Indeed, far from carefully reconditioning its used RV inventory before resale, as multiple FEs confirmed, the Company routinely rushed or skipped inspections entirely, sold units with significant quality issues (including mold and water damage) as is, and where reconditioning was performed, it frequently amounted to no more than a "[s]lap a Band-Aid over it and hope they don't notice" approach that was the antithesis of the margin-maximizing reconditioning discipline Lemonis emphasized.

### F. August 12, 2025 J.P.Morgan Auto Conference

114. On August 12, 2025, Lemonis presented at the J.P.Morgan Auto Conference, attributing Camping World's record "market share" directly to its "sophisticated" data collection and analytics:

> [O]ur market share is the highest it's ever been, but it's largely because it's the most data that we've ever had as a company. *We don't expect the collection of data and the usage of data for us to get any less sophisticated.* And we think the market share opportunity, both on the new and used side, particularly with how we're integrating AI into pricing modules and predictor models could only get stronger.

[Emphasis added.]

And when further asked about the "significant market share gains that [Camping World] experienced year to date," Lemonis explained the purportedly complex "scientific way to think about how [the Company] manage[s] the business" as follows:

> ". . . we start with the most important part of the consumers' decision-making, which is the monthly payment. And we reverse engineer understanding what the monthly payment is. We reverse engineer the entire strata of new and used inventory based on price, based on term for financing and based on interest rate to understand where that price band is going to live."

115. Lemonis further described the system as so advanced that it can "reverse engineer the entire strata of new and used inventory based on price, based on term for financing and based

on interest rate," and adding that the Company's "collection of data and the usage of data" would not "get any less sophisticated."

116. Unbeknownst to investors, however, the statements in ¶114-115 above were materially false or misleading because, as alleged herein, Camping World's "market share" was not the product of "sophisticated" data collection and analytics, but of procurement operations that were riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales, and that caused its dealership lots to be flooded with overpriced and largely damaged used RV inventory. Similarly, far from being "sophisticated," the Company's inventory management system continued to be little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in turn predictably caused the Company to have to sell off excess units in fire sales, at deeply discounted prices for a loss, to clear them from the Company's books, and left the Company exposed to inventory-control weaknesses that Lemonis had previously warned were a threat to the Company's business.

## G. October 29, 2025 Earnings Call

117. On the October 29, 2025 earnings call held pre-market to discuss the Company's 3Q 2025 results, Lemonis reiterated that:

> [W]e've been very *thoughtful* in how we've allocated capital in the last 12 months to growing that used business, and quite frankly, don't see any barriers of any kind that would prevent us from continuing to grow that used business as much as high-single digits to low-double digits every single year for the next several years.

[Emphasis added.]

Similarly, later on the call, he represented that "if you look at the stocking of used, we've become far better at that side of the supply chain."

118. The statements in ¶117 above were materially false or misleading because as alleged herein, Camping World had been anything but "thoughtful" in allocating capital to its used RV business and had not "become far better" at managing the used supply chain. Instead, in reality the Company's procurement operations continued to be riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's increased inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales; and the Company's inventory management system continued to be little more than a patchwork of inaccurate, poorly functioning platforms that was routinely unable to track millions of dollars of used RV inventory, and further contributed to the Company's overstocking of used RVs, which in turn predictably caused the Company to have to sell off excess units in fire sales, at deeply discounted prices for a loss, to clear them from the Company's books.

### H. December 9, 2025 Raymond James Technology, Media, & Telecom and Consumer Conference

119. On December 9, 2025, Defendants presented at the Raymond James Technology, Media, & Telecom and Consumer Conference, at which Kirn, in response to a question about used RV market share, represented that:

> The biggest strategic advantage that we have as a company really is our balance sheet. . . .

> Two is the service base, right? So, you think about, reconditioning them to add value to those units. We have over 2,000 or 2,500, service bays across the business. And then, the last would be our buying power. So, when we think about, the ability to procure basically what we call off the street, we essentially have a boiler room in Arizona where all of our leads come in and then that team basically focuses on procuring those units. *That really makes us unique in the sense that we're able to tactically move around and manage that inventory and buy that much quicker than, I guess someone coming up to a dealership.*

[Emphasis added.]

120. The statements in ¶119 above were materially false or misleading because as alleged herein, Camping World's "biggest strategic advantage" was not its balance sheet, and its "boiler room" in Arizona was not part of a sophisticated procurement operation that allowed the Company to "tactically move around and manage that inventory." Instead, as detailed herein, the Company's procurement operations continued to be riddled by undisciplined and high-risk policies and practices, with employees directed to overpay for used RVs (including poor quality used RVs) at above-market prices, resulting in a majority of the Company's newly-acquired used RV inventory also having significant quality issues that had to be either substantially reconditioned (at significant expense and at the cost of diverting the Company's servicing employees from existing opportunities to generate profits from servicing existing customers), or simply re-sold "as is" in fire sales, and that caused its dealership lots to be flooded with overpriced and largely damaged used RV inventory. Similarly, far from being able to "tactically" manage that inventory, the Company's patchwork of inaccurate, poorly functioning platforms routinely failed to track as much as 20% of its used RV inventory—leaving the Company with millions of dollars of units unaccounted for and exposed to inventory control weaknesses that Lemonis had previously warned were a threat to the Company's business.

## VI. THE TRUTH GRADUALLY EMERGES IN SUCCESSIVE EARNINGS RELEASES

121. The truth gradually emerged through several partial corrective events, as Defendants continued to obscure and minimize the truth by mixing partial disclosures with further materially misleading statements and omissions.

### A. Partial Corrective Disclosure No. 1: April 29-30, 2025

122. After the market closed on April 29, 2025, Camping World issued a press release announcing its financial results for 1Q 2025 that disclosed elevated reconditioning costs and a decline in the average selling price ("ASP") of Camping World's used RVs. Specifically, the press release stated that 1Q 2025 revenue from "[p]roducts, service and other revenue"—which encompassed repairs of customer RVs—had declined $12.9 million, or 7.3%, as compared to 1Q 2024, "driven primarily by the divestiture of our RV furniture business in May 2024 *and a reallocation of service labor toward used inventory reconditioning*." [Emphasis added.] In other words, the reconditioning of used RVs that the Company had purchased for resale—for which Camping World recognized no revenue—was diverting service bay and technician time from work it would have otherwise been providing to paying customers who wanted their already-owned RVs serviced. Further, the press release revealed that the Company's used RV ASP had dropped 4.0% against 1Q 2024 pricing.

123. The following morning, Defendants held a pre-market earnings call in which Lemonis also conceded the existence of "a little bit of softness in ASP."

124. These disclosures partially revealed the false and misleading nature of Defendants' prior "procurement" and "market maker" auction representations, and the extent of the previously undisclosed deficiencies in Camping World's used RV operations (as referenced in §§IV.G & H above). In particular, the disclosure that reconditioning work on acquired used RV inventory was diverting the Company's servicing resources away from work that would otherwise be generating

revenue from paying customers (i.e., customers who wanted to service their already-owned RVs) contradicted Defendants' prior assurances that the Company's procurement approach was "thoughtful," "calculated," and "prudent"—and also partially disclosed that the used RVs Camping World had been acquiring at record levels required significantly more remediation than Defendants had let on. In addition, the disclosure of a 4.0% decline in used RV ASP began to partially reveal the false and misleading nature of Defendants' prior "market maker" representations (as referenced in §IV.G above). In particular, it partially disclosed the extent to which, rather than buying used RVs at a discount and reselling them at a premium, Camping World was being forced to sell its used RV inventory at declining prices—and also partially disclosing that the "successful" auction "arbitrage" operations that Defendants had described to investors was, in reality, little more than a vehicle for unloading excess, aging inventory at a loss.

125. On this news, Camping World's stock fell $2.02 from $14.08 to close at $12.06 on April 30, 2025, a drop of 14.35%.

126. However, that same day, Wagner also tried to downplay the decline in ASP by assuring investors that "ASPs will have to go up from here." Accordingly, Camping World's stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the undisclosed problems (*see* §V.D above) that were plaguing the Company. Similarly, while analysts connected the stock drop to the ASP revelation, they minimized the drop and continued to emphasize Defendants' procurement-driven approach. For example, on May 1, 2025, J.P.Morgan reported that:

> [Camping World] shares declined -14.4% Wednesday vs. the S&P 500 +0.1%, seemingly in reaction (in our view, overreaction) to a softer trend to 1Q Average Selling Prices (ASPs) despite numerous other aspects of the firm's performance indicating the beginning stages of an expected sharp profit pivot driven by largely idiosyncratic factors remains on track.

### B. Partial Corrective Disclosure No. 2: July 29-30, 2025

127. After the market closed on July 29, 2025, Camping World issued a press release announcing its financial results for 2Q 2025 that disclosed further increases in reconditioning expenses, another drop in the Company's used RV ASP, and two additional negative changes in its performance metrics—all of which had the effect of further partially revealing the false and misleading nature of the Defendants' prior "procurement" and "market maker" auction representations, and the extent of the previously undisclosed deficiencies in Camping World's used RV operations (as referenced in §§IV.G and H above). First, the press release revealed a $13.1 million, or 5.5%, decrease in the Company's "[p]roducts, service and other revenue" against 2Q 2024, again "driven primarily by a reallocation of service labor toward used inventory reconditioning and the divestiture of our RV furniture business in May 2024." Second, the press release revealed that used RV ASP had fallen 1.2% against 2Q 2024. Third, the press release disclosed that the company's used RV inventory turnover had slowed from 3.5 in 1Q 2025 to 3.3 in 2Q 2025. Finally, the press release also revealed that the Company's used vehicle inventory per dealer location—a rough approximation of how much used RV inventory was sitting on each Camping World lot—shot up 61.8% year-over-year to $2.68 million per dealer, as compared to the year-earlier quarter (2Q 2024). By contrast, Defendants had reported that these metrics had only increased year-on-year by 5.8%, to $1.95 million per dealer, in the prior quarter (1Q 2025 compared against 1Q 2024).

128. Moreover, on the pre-market earnings call the following morning, Lemonis referenced the Company's inventory problems when he disclosed that the Company was "probably slightly over inventoried on the used side."

129. These disclosures further partially revealed the false and misleading nature of Defendants' prior "procurement" and "market maker" auction representations, and the previously

undisclosed deficiencies in Camping World's used RV operations (as referenced in §§IV.G and H above). The continued diversion of service labor to reconditioning—now for a second consecutive quarter—reinforced what the 1Q 2025 disclosure had begun to show: namely, that the used RVs that Camping World was acquiring in record volumes required far more remediation than Defendants had previously let on, and that the Company's procurement approach was in fact not "thoughtful," "calculated," or "prudent." The further 1.2% decline in used RV ASP also further partially revealed the false and misleading nature of Defendants' prior "market maker" representations (as referenced in §IV.G above). In particular, the decline further partially disclosed the extent to which, rather than buying used RVs at a discount and reselling them at a premium, Camping World was being forced to sell its used RV inventory at declining prices—and also further partially revealed that the "successful" auction "arbitrage" operations that Defendants had described to investors was, in reality, little more than a vehicle for unloading excess, aging inventory at a loss. More generally, the metrics also confirmed the previously undisclosed continuing deterioration in the Company's business, as they showed that inventory turnover had slipped to 3.3 (as compared to the 3.5 target that Defendants had set at the start of the Class Period), even as used RV inventory per dealer location had surged, and thereby further signaling that, contrary to Defendants' assurances, the Company's procurement ramp was generating a dangerously high glut of used RV inventory (and not the disciplined, margin-enhancing expansion that it had touted).

130. On this news, Camping World's stock fell $2.71 on July 30, 2025, a drop of 15.36%, as analysts focused on the reported further decline in ASP and other negative disclosures. However, the full truth remained concealed as, for example, Wagner announced that Camping World was raising its prior 15% market share target to "20% market share of all new and used retail sales" (which he characterized "as a very realistic medium-term goal"), and helped avert

further market declines by (a) falsely assuring investors that any current "over inventor[y]" issues were transitory and not problematic in the context of the Defendants' program of "surgically manag[ing] inventory," and (b) continuing to not disclose the full nature and magnitude of the problems that continued to plague the business (as referenced in §§IV.G & H above). As a result, many market participants remained bullish on the Company's condition and approach, with Roth Capital in a July 29, 2025 report, for example, describing the Company's effort to "continue[] to take advantage of its best-in-industry Used offering," despite the ASP decline.

131. Accordingly, Camping World common stock remained artificially inflated, as Defendants' misrepresentations and omissions continued to conceal the full truth regarding the undisclosed problems the Company was facing.

**C. Partial Corrective Disclosure No. 3: October 28-29, 2025**

132. After the market closed on October 28, 2025, Camping World issued a press release announcing its financial results for 3Q 2025. The Company reported that its used RV ASP had fallen again, by 0.9%, as compared to 3Q 2024. Defendants also disclosed that "[p]roducts, services and other revenue" had fallen by $16.2 million, or 7.2%, as compared to 3Q 2024, "primarily due to increased allocation of labor towards used reconditioning and away from customer pay work as used vehicle sales volumes increased." They also disclosed that used RV turnover had declined again, from 3.3 to 3.2, while used RV inventory per location had increased 47.2% year-on-year as compared to 3Q 2024, to $3.04 million.

133. On the following morning's pre-market earnings call, Lemonis partially disclosed the extent to which Camping World's business was suffering from its inventory problems, and that it had forced the Company to try to "discount [its] way" out of over-supply and needed to adopt "a more tempered approach to stocking":

> And when we look back on what happened over history, we may have gone into the years with just because we were outperforming everybody else, a little bit of a

> ***delusion*** about what was happening, and we would go for it on the inventory side and then find out 18 months later *that we have to discount our way out of stuff*. So what you're hearing from us today is just *a more tempered approach to stocking* and to forecasting and that we know that if we outperform like we always do, it's easy for us to get more inventory. It's really hard to get rid of inventory that we miscalculated.

[Emphasis added.]

134. Later on the same call, Lemonis added the following further comments regarding how Camping World had begun disposing of excess used inventory:

> On the used side, we're continuing to see performance there. I have sort of laid down the gauntlet with the team on wanting to make sure that we're going into 2026 with, again, clean inventory, no excuses in 2026. *So I've been a little bit more aggressive in pushing them to liquidate out of inventory, and that's probably a little dangerous of a word, liquidate, sell-through a little inventory just to make sure we go in a little cleaner.*

[Emphasis added.]

135. These disclosures further partially revealed the false and misleading nature of the Defendants' prior "procurement" and "market maker" auction representations, and the extent of the previously undisclosed deficiencies in Camping World's used RV operations (as referenced in §§IV.G & H above). For the third consecutive quarter, reconditioning labor continued to cannibalize service revenue—further partially exposing what the prior two quarters' disclosures had begun to show: namely, that the used RVs that Camping World was acquiring in record volumes required far more remediation than Defendants had previously let on, and that the Company's procurement approach was in fact not "thoughtful," "calculated," or "prudent." The further 0.9% decline in used RV ASP also partially revealed the false and misleading nature of Defendants' prior "market maker" representations (as referenced in §IV.G above). In particular, the decline further partially disclosed the extent to which, rather than buying used RVs at a discount and reselling them at a premium, Camping World was being forced to sell its used RV inventory at declining prices—and also further partially disclosing that the "successful" auction

"arbitrage" operations that Defendants had described to investors was, in reality, little more than a vehicle for unloading excess, aging inventory at a loss. More generally, the new metrics also further partially disclosed the continuing deterioration in the Company's business, as they showed that inventory turnover had slipped to 3.2 (as compared to the 3.5 target that Defendants had set at the start of the Class Period)—and that inventory per dealer location had continued to surge by 47.2% year-on-year to $3.04 million—and thereby further signaling that, contrary to Defendants' prior assurances, the Company's procurement ramp was generating a dangerously high glut of poor-quality and hard-to-sell used RV inventory (and was not the disciplined, margin-enhancing expansion that it had touted). Lemonis's own partial admission on the earnings call—that the Company may have suffered from "a little bit of a delusion" and had been forced to "discount our way out of stuff" and that Defendants had "miscalculated"—also partially disclosed that his prior repeated assurances that Camping World's procurement was "thoughtful" and "calculated," and the claims that Company's data-driven systems allowed it to manage inventory with precision in "real-time," had been false or misleading.

136. In response to these partial disclosures, on October 29, 2025 Camping World's stock fell $4.17 (from $16.82 to $12.65), a drop of almost 25%. However, as further discussed immediately below, the full truth concerning the extent to which Camping World was suffering from excess inventory remained concealed, as Defendants helped avert further market declines by: (a) continuing to not disclose the full nature and magnitude of the problems that continued to plague the business (as referenced in §§IV.G & H above); and (b) acting to downplay fears of future earnings shocks by declaring a projected "floor" of $310 million in adjusted EBITDA for FY 2026. The newly announced "floor" was particularly notable as Defendants had repeatedly reminded investors in prior earnings calls that the Company's practice was to not issue earnings guidance at all, and the announced EBITDA "floor" of $310 million for FY 2026 would have

represented a substantial improvement compared to prior fiscal years, especially given that FY 2025 was headed to EBITDA of only $243 million. *See* chart below.




137. Accordingly, the price of Camping World common stock continued to be artificially inflated.

**D. Final Corrective Disclosure: February 24-25, 2026**

138. After the market closed on February 24, 2026, Camping World issued a press release announcing its financial results for 4Q and full year 2025. That release disclosed that Camping World's used RV ASP had fallen yet again, by 2.5% year-on-year as compared to 4Q 2024, and to a level that was less than $30,000 for the first time since 1Q 2021. "Products, service and other revenue" continued to suffer in 4Q 2025, down $21 million, or 11.6%, against 4Q 2024, again "due in part to increased mix of labor towards used reconditioning as used vehicle sales volumes increased, as well as a reduction in appointments for customer pay work." And again, used RV turnover ticked down, now at 3.1 in 4Q 2025.

139. Defendants also disclosed that the Company's earnings had dropped substantially, dragged down by a collapse in used RV sales. Total quarterly revenue (down $632.6 million) and gross profit (down $178.8 million) each fell by roughly 35%, as compared to 3Q 2025. Used RV

revenue fell sequentially by 34%, from $589 million in 3Q 2025 to $386.5 million in 4Q 2025, with used RV gross profit falling 43% (from $107.9 million to $61.7 million).

140. The press release also disclosed that the Company's used RV gross margins had fallen to 16%, well below what Defendants had previously described as the historical range of 18.5% to 20%, and reflecting the Company's further deep discounting of prices on its used RV sales. The press release also disclosed that the Company had sold only 12,035 used RVs, a sharp drop from the prior recent quarters. *See* chart below:




Further, the press release also disclosed a sharp drop in "finance and insurance" revenue, which fell from $178.3 million in 3Q 2025 to $111.4 in 4Q 2025, a knock-on effect of fewer RV sales.

141. In addition, the press release announced that Camping World would be suspending payment of its quarterly cash dividend, and was reducing its FY 2026 Adjusted EBITDA guidance to between $275 million to $325 million—thereby effectively repudiating Defendants' prior assurances that this metric would be no lower than the $310 million "floor" they had announced just three months earlier.

142. Moreover, the press release quotes Wagner as announcing that Camping World had "implemented strict, corrective inventory management objectives to structurally improve our

turnover rates," and on the following morning's pre-market earnings call Defendants made further statements that finally revealed the severe extent of the fundamental problems that had plagued the Company's inefficient procurement and deficient inventory management operations throughout the Class Period. For example:

(a) Wagner was forced to commit the Company to "improved efficiency of used RV procurement," meaning "less inventory" and a "strict and at times, aggressive approach to move through certain aged and noncore RV assets";

(b) Kirn belatedly and explicitly confirmed the Company had been forced to engage in heavy discounting, and admitted that the largest driver of the 4Q 2025's dismal results shortfall was "the December hit to vehicle margins as we accelerated the cleansing of our inventory";

(c) Wagner finally admitted that Camping World's inventory glut problems were so great that the Company would have to continue to take "decisive action in 2026 to *cleanse* and optimize our inventory portfolio" [emphasis added]; and

(d) Wagner also made clear that the Company's inventory—long posited by Defendants as an asset—was simultaneously a liability:

> <u>*[A]s a dealership business, generally, your inventory is your greatest risk, but also your greatest opportunity for growth.*</u>
>
> So when explaining this turnover number, I've oftentimes spoken about how inventory is like an ice cube sitting on your lot. With every day that it sits, you have different profitability as well as cost of mass and your profitability starts to melt with each day that passes and it starts to evaporate. So we know we need to accelerate that inventory turnover.

143. Taken together, these disclosures—from the continued reconditioning costs, the collapse in used RV ASP, the drop in margins to 16%, Defendants' admission they needed to "improve[] efficiency of used RV procurement" and "centralize" Camping World's inventory management system, and the forced RV "cleansing"—finally adequately revealed the true nature

and extent of the problems that Defendants had concealed through their false, and/or misleading statements and omissions throughout the Class Period, namely that: (a) the Company's procurement had not been "thoughtful" or "prudent"; (b) its auctions had not been a "success[ful]" vehicle to "buy something for one price and sell it for more than what we bought it for"; and (c) its inventory management system had not provided the "real-time" visibility Defendants had assured investors they possessed. These admissions also effectively revealed that the Company's Class Period woes could be directly traced to defective inventory management controls and undisciplined procurement practices that had gone undisclosed throughout the Class Period, and that Defendants never had a "risk-averse" or "laser-focused" approach to building their used RV inventory during the Class Period.

144. In response, on February 25, 2026 Camping World's stock fell $1.79, from $10.85 to $9.06, a drop of 16.50%.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

145. For Lead Plaintiff's §10(b) claim, multiple factors, particularly when viewed holistically, support a strong inference that each Defendant acted with scienter, as set forth below.

### A. The FEs Confirm Defendants' Direct, Hands-On Involvement in Camping World's Procurement and Inventory Operations, Including Their Access and Review of the Company's Data Platforms

146. Multiple FEs confirm that Defendants were directly and personally involved in setting and driving the procurement policies and inventory practices, including by accessing relevant databases and receiving monthly reports; directing overpayment; visiting locations and observing overstocking; and through Lemonis' practice of micromanaging Camping World's business.

147. The FEs confirmed that Defendants had direct access to the inventory management system and dealership-level data they repeatedly touted as sophisticated and reliable. For example,

FE7 confirmed that Camping World's corporate division had access to IDS, which included inventory data and sales prices at every dealership location. FE4 confirmed that Lemonis and Wagner had access to inventory levels across all locations via Salesforce, and that FE4 reported inventory discrepancies to his/her supervisor, who frequently met with Lemonis and Wagner. Similarly, FE3 confirmed that dealership management sent monthly reports to corporate through Salesforce, including sales performance and losses. And FE5 confirmed that Wagner received inventory and financial reporting from Oracle.

148. The FEs also confirmed that Lemonis and Wagner personally directed that Company representatives pay up to 110% to 120% of NADA value to build up the Company's used RV inventory. For example, FE1 attended regional calls during the Class Period at which Lemonis and Wagner instructed every dealership to offer inflated purchase prices to secure the inventory expansion that Defendants had committed the Company to.

149. Defendants also personally visited dealerships, from which they would have observed the overstocking firsthand. For example, FE5 confirmed that Lemonis regularly flew to dealerships to tour them personally, and visited the Bowling Green location on a quarterly basis—where he would have seen the lot so overwhelmed with used RV inventory that the dealership had to rent a secondary lot. Similarly, FE4 confirmed that different C-Suite officers visited the Arizona "boiler room" every other month, and visited dealerships across the country on a regular basis.

150. FE5 also described Lemonis as a micromanager who demanded he be involved in every aspect of Camping World's business. According to FE5, "nothing [at Camping World] occurred without his [Lemonis's] approval," and that Lemonis wanted insight into everything "to the extent of ridiculousness," adding that Lemonis "absolutely knew about quality issues, there was nothing he was not aware of." And FE6 confirmed that Lemonis instructed Camping World

employees on a virtual, Company-wide meeting not to spend more than $4,000 repairing used RVs.

### B. Defendants Repeatedly Emphasized Their Close Monitoring and Extensive Knowledge of Camping World's Procurement, Inventory Management System, and Auction Business

151. Defendants repeatedly represented that they exercised close, hands-on oversight of Camping World's auction network, the procurement process, and the inventory management system.

152. Defendants touted their personal, active, daily oversight into Camping World's procurement process and inventory management system. On February 26, 2025, Lemonis described how "every single day" Defendants reviewed a "dashboard" of "different metrics" to modify inventory orders to be "real-time responsive." Similarly, on April 30, 2025, Lemonis praised the "inventory procurement and management system" that "Matt [Wagner] has built," further confirming his knowledge of them. Similarly, on July 29, 2025, Lemonis stated in a press release that the Defendants continued to "surgically manage" inventory through "sophisticated data analytics" to put "the right inventory on the ground at the right time and the right price," and on the following day's earnings call reiterated that inventory adjustments were "a real-time thing."

153. In addition to his roles at Camping World, from 2013 through 2021, Lemonis starred in CNBC's television show "The Profit," on which he presented himself as an expert in diagnosing and correcting operational failures of struggling businesses. Inventory management was among his professed specialties. For example, in Season 4, Episode 2 (August 30, 2016), Lemonis warned business owners that a disciplined system for tracking sales and inventory was an absolute necessity: "If you can't track what's selling or not selling, [then] you can't do any forecasting to build inventory. You can't even monitor trends or customer behavior. You have ***no shot at success***." [Emphasis added.] In fact, Lemonis repeatedly emphasized that inventory

failures threatened the survival of the entire business, stating that "[b]ad inventory management can bankrupt your business," Season 1, Episode 4 (August 20, 2013), and "[i]nventory management is what kills people," Season 4, Episode 9 (October 18, 2016).

### C. Camping World's Inventory Management Failures Were Too Central and Widespread to Escape Defendants' Knowledge

154. The centrality of the alleged misconduct regarding Camping World's core operations further supports a strong inference of scienter. RV sales were Camping World's economic engine, generating more than 70% of its revenue, and Defendants made expansion of the higher margin used RV business the centerpiece of the Company's plans and operations that were in place prior to and throughout the Class Period. Defendants expressly recognized that effective inventory management was critical to the Company's success; indeed, Lemonis himself stated that poor inventory management was the "#1 thing that could kill a business." The Company's serious, but undisclosed (or partially and inadequately disclosed) problems—including its undisciplined and decidedly non-"risk averse" procurement practices and operations (including senior management's instructions to pay up 110% to 120% of market value to acquire predominantly poor-quality used RVs); its diversion of limited servicing resources to (limited) reconditioning of its burgeoning used RV inventory (and resulting loss of revenue that it could have derived from providing services to paying, existing RV owners); its overflowing dealership lots; its deficient inventory systems that failed to account for as much as 20% of used-RV inventory; and the fact that its touted auctions were typically little more than fire sales to dump excess inventory at deeply discounted prices—plainly concerned neither peripheral operations, nor obscure technical matters. Rather, they were all fundamental and pervasive problems that went to the core of Camping World's business and the execution of Defendants' flagship initiative to grow the Company by "prudent[ly]" expanding its used RV resale operations.

### D. Defendants Were Motivated to Mislead Investors to Effectuate the October 31, 2024 SPO

155. After two years of earnings contractions, Defendants sought to turn Camping World's fortunes around by pursuing a used RV procurement approach that required the Company to spend an amount of capital then-unavailable. At the end of 3Q 2024, Camping World had just $28.4 million in cash and cash equivalents. As a result, Defendants had every incentive to conceal the true state of their used RV strategy and operations—from overpayment to a deficient inventory management system to the truth about the Company's "market maker" status—in order to inflate (or at least maintain) Camping World common stock price. The false narrative they presented on the October 29, 2024 earnings call pumped the stock nearly 7% that day, enabling Defendants to raise $333 million in the SPO just two days later pursuant to Offering Documents that continued to conceal the true state of affairs at the Company.

### E. In 2020, Camping World and Lemonis Defended a Previous Securities Suit Alleging Inventory Deficiencies

156. In 2020, multiple plaintiffs filed an amended class action complaint in *Ronge v. Camping World Holdings, Inc.*, No. 1:18-cv-07030, ECF No. 117 (N.D. Ill Mar. 12, 2020), a similar case in which Camping World and Lemonis were alleged to have violated Securities Act §§11, 12, and 15 and Exchange Act §§10(b) and 20(a). In *Ronge*, plaintiffs alleged Defendants made misstatements concerning the Company's inventory management practices. There, as here, Lemonis was alleged to have described Camping World's inventory practices using phrases like "calculated" and "disciplined," when in truth, the Company's systems required manual entry of thousands of SKUs, lost inventory records, created backlogs, delayed store openings, and impaired margins. The amended complaint also alleged that Lemonis personally visited an important distribution center, reviewed daily reports, and recognized that bad inventory management can destroy a business. As a result, *Ronge* put Camping World and Lemonis on specific notice that

inventory system failures could obscure the Company's true inventory position and render contrary public assurances misleading.[4]

## VIII. LOSS CAUSATION/ECONOMIC LOSS

157. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Lead Plaintiff and members of the Class. During the Class Period, Lead Plaintiff and Class members purchased or otherwise acquired Camping World common stock at artificially inflated prices caused by Defendants' misconduct. The price of Camping World common stock declined significantly when the substantial problems and risks concealed by Defendants were disclosed and/or materialized, and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

158. Before the end of the Class Period on February 24, 2026, investors had been unaware of the following material facts about Camping World that had been known to Defendants:

A. Camping World was not a used RV "market maker" and its touted auction business was merely a method to dispose of aged inventory at discount prices;

B. Camping World's used RV procurement model was undisciplined, routinely overpaying for used RVs, and a majority of its acquired used RVs suffered from quality issues; and

C. Camping World's inventory management system was inaccurate, routinely failing to account for as much as 20% of the Company's used RV inventory, and leaving millions of dollars of units sitting undetected on dealership lots for weeks at a time.

159. Defendants' misrepresentations and omissions and fraudulent statements, as alleged in herein, misrepresented and concealed the true adverse material facts from the market

---

[4] *Ronge* settled shortly after the filing of the 2020 amended complaint, with the Court granting final approval in August.

during the Class Period, misleading investors about the true state of Camping World's business and the obstacles it was facing.

160. As alleged in §VI, *supra*, these material facts were revealed to investors via partial corrective disclosures and the materialization of the undisclosed risks.

161. The market reacted swiftly and negatively to each of these disclosures, resulting in significant losses for investors.

## IX. CLASS ACTION ALLEGATIONS

162. Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3): (i) for violations of the Exchange Act on behalf of itself and a Class consisting of all persons and entities that purchased or otherwise acquired Camping World common stock between October 29, 2024 and February 24, 2026, inclusive; and (ii) for violations of the Securities Act on behalf of itself and a Sub-Class consisting of all persons and entities that purchased or otherwise acquired Camping World common stock pursuant or traceable to the Offering Documents issued in connection with Camping World's October 31, 2024 SPO. Excluded from the Class and Sub-Class are Defendants; Camping World's officers and directors at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or have had a controlling interest.

163. The members of the Class and Sub-Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Camping World common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, millions of shares of Camping World common stock were actively traded on the NYSE (an open and efficient market) under the symbol "CWH." Record owners and other Class members

may be identified from records maintained by Camping World or its transfer agent, and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

164. Lead Plaintiff's claims are typical of the claims of Class and Sub-Class members, all of whom were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws, as complained of herein.

165. Lead Plaintiff will fairly and adequately protect the interests of Class members, and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class and Sub-Class.

166. Common questions of law and fact exist as to all members of the Class and Sub-Class, and predominate over any questions solely affecting individual members of the Class (or Sub-Class). Among the questions of law and fact common to the Class are:

A. whether Defendants violated the federal securities laws;

B. whether statements made by Defendants to the investing public and Camping World's shareholders during the Class Period omitted or misstated material facts about the Company's business, operations, and prospects;

C. whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period omitted or misstated material facts about Camping World's business, operations, and prospects;

D. whether statements made in the Offering Documents for the SPO contained materially untrue or misleading statements, or omitted to include any material facts required to be stated therein;

E. whether the Defendants knew or recklessly disregarded that their statements were false and misleading;

F. whether the price of Camping World common stock was artificially inflated; and

G. to what extent Class members have sustained damages and the proper measure of damages.

167. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class and Sub-Class members may be relatively small, the expense and burden of individual litigation would make it impossible for them to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF THE FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE (AS TO CLAIMS BROUGHT UNDER THE EXCHANGE ACT)

168. The market for Camping World common stock was open, well developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, Camping World common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to Camping World. Lead Plaintiff and Class members have been damaged thereby.

169. During the Class Period, the artificial inflation of the value of Camping World common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Lead Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements and omissions about the Company's business, prospects,

and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times. When the truth was disclosed and/or materialized, it drove down the value of the Company's common stock, causing Plaintiff and other Class members that had purchased or otherwise acquired Camping World common stock at artificially inflated prices to be damaged as a result.

170. At all relevant times, the market for Camping World common stock was efficient for the following reasons, among others:

A. Camping World common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

B. as a regulated issuer, Camping World filed periodic public reports with the SEC and/or the NYSE;

C. Camping World regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D. Camping World was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

171. Based on the foregoing, during the Class Period, the market for Camping World common stock promptly digested information regarding the Company from all publicly available sources and reflected such information in the price of Camping World common stock. Under these circumstances, the market for Camping World common stock was efficient during the Class Period

and, therefore, investors' purchases and acquisitions of Camping World common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

172. A Class-wide presumption of reliance is also appropriate as to the Exchange Act claims asserted in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions, which concealed, throughout the Class Period, the undisclosed information set forth herein, including in §§IV.G & H, *supra*.

173. Because the Exchange Act claims asserted in this action involve Defendants' failure to disclose and their omission of material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here with respect to the Exchange Act claims asserted (and it is further noted that there is no reliance requirement at all for the separate Securities Act claims being asserted on behalf of the Sub-Class).

## XI. NO SAFE HARBOR

174. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be untrue or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein.

175. To the extent that statements alleged to be untrue or misleading might be characterized as forward-looking, the statutory safe harbor also does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made; there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements; and the speaker had actual knowledge that the forward-looking statements were materially untrue or misleading at the time each such statement was made, and/or the forward-looking statement was authorized or approved by an executive officer of Camping World who knew that the statement was untrue, misleading, or omitted relevant information when made.

## XII. COUNTS

### A. Securities Act Claims

**COUNT I**
**Violation of §11 of the Securities Act**
**(Against All Defendants)**

176. Lead Plaintiff realleges every allegation contained above as if fully alleged in this Count, but only does so to the extent, however, that such allegations do not allege fraud, scienter, or an intent by Defendants to defraud Lead Plaintiff or the Sub-Class members.

177. This Count is based on Camping World and the Individual Defendants' strict liability under §11 for any untrue or materially misleading statements in the Offering Documents, or any omissions of material fact required to be stated therein. This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the Offering Documents are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the SPO.

178. This Count is asserted against Camping World and the Individual Defendants for violation of §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons and entities that purchased or otherwise acquired Camping World common stock pursuant or traceable to the Offering Documents issued in connection with Camping World's October 31, 2024 SPO.

179. As alleged in §V.B., *supra*, the Offering Documents contained false and misleading statements and omissions of material fact.

180. As an issuer of the registered securities, Camping World is strictly liable for the untrue and misleading statements of material fact in, and material omissions from, the Offering Documents as alleged in this Count.

181. To the extent that any Individual Defendant may later seek to interpose or plead an affirmative "due diligence" to liability under the relevant provisions of Section 11 of the Securities Act, none of the Individual Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count. As stated in the immediately preceding paragraph, inasmuch as Camping World was the issuer of the securities at issue under this Count, Camping World is strictly liable for any untrue and misleading statements of material fact in, and material omissions from, the Offering Documents as alleged herein, and therefore has no "due diligence" defense to the claims asserted under this Count.

182. The Sub-Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements identified above not misleading when they purchased or acquired Camping World shares pursuant

or traceable to the SPO. As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of the Securities Act, the Sub-Class suffered substantial damages in connection with its purchase and/or acquisition of Camping World common stock sold through the SPO.

183. This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates.

184. By reason of the foregoing, the Defendants named in this Count are liable under §11 of the Securities Act to the members of the Sub-Class who purchased or otherwise acquired Camping World common stock pursuant or traceable to the Offering Documents.

**COUNT II**
**Violation of §15 of the Securities Act**
**(Against the Individual Defendants)**

185. Lead Plaintiff realleges every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Lead Plaintiff or the Sub-Class.

186. This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions are specifically excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the SPO.

187. This Count is asserted against the Individual Defendants for violations of §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons and entities that purchased or otherwise acquired Camping World common stock pursuant or traceable to the Offering Documents issued in connection with Camping World's October 31, 2024 SPO.

188. Camping World is strictly liable under §11 for materially false and/or misleading statements and omissions of material fact in the October 31, 2024 SPO Offering Documents.

189. During their tenures as officers or directors of Camping World, the Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act. By reason of their positions of control and authority as officers or directors of Camping World, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to make or issue the materially misleading, or incomplete statements in the October 31, 2024 SPO Offering Documents, as alleged in this Count.

190. As more fully described above, the Individual Defendants caused Camping World to conduct the SPO, and signed the Offering Documents pursuant to which the SPO was conducted. Moreover, in their capacities as senior corporate officers of the Company, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and in the SPO. As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Camping World within the meaning of §15 of the Securities Act.

191. By virtue of the conduct alleged in this Complaint, the Individual Defendants are liable for Camping World's aforesaid violations of §11 and are liable to members of the Sub-Class who purchased or otherwise acquired Camping World common stock pursuant or traceable to the Offering Documents.

### B. Exchange Act Claims

**COUNT III**
**Violation of §10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

192. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against Camping World and the Individual Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of all persons and entities that purchased or otherwise

acquired Camping World common stock between October 29, 2024 and February 24, 2026, inclusive.

193. Throughout the Class Period, Camping World and the Individual Defendants: (i) knowingly, or with reckless disregard, deceived the investing public, including Lead Plaintiff and Class members, as alleged herein; (ii) artificially inflated and/or maintained the market price of Camping World common stock; and (iii) caused Lead Plaintiff and Class members to purchase or otherwise acquire Camping World common stock at artificially inflated prices.

194. Each of the listed Defendants here, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Lead Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of Camping World common stock during the Class Period. Defendants' material misrepresentations and omissions are alleged in §V, *supra*.

195. As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Camping World and the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

196. As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously

issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

197. Camping World and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth herein, or with reckless disregard failed to ascertain and disclose truthful facts, even though such facts were available to them.

198. The facts alleged herein give rise to a strong inference that Camping World and the Individual Defendants each acted with scienter. Camping World and the Individual Defendants each knew, or recklessly disregarded, that the Class Period statements set forth in §V, *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

199. By virtue of the Individual Defendants' positions of management and control within Camping World, they had access to undisclosed adverse information about the Company and its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents; conversations and connections with corporate officers and employees; attendance at conferences and management and Board of Directors meetings, including committees thereof; and reports and other information provided to them in connection with their roles and duties as Camping World officers and directors.

200. The Individual Defendants were aware of, or recklessly disregarded, that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements in violation of the federal securities laws.

201. As a result of the Individual Defendants' dissemination of the materially false or misleading information, and their failure to disclose material facts, as alleged herein, the market

price of Camping World common stock was artificially inflated throughout the Class Period. Unaware that the market price of Camping World common stock was artificially inflated, relying directly or indirectly on the false or misleading statements made by Camping World and the Individual Defendants, at the times such statements were made, or relying upon the integrity of the market in which Camping World common stock traded, and in the absence of material adverse information that was known, or recklessly disregarded, by Camping World and the Individual Defendants, but not disclosed to the public, Lead Plaintiff and Class members purchased or otherwise acquired Camping World common stock at artificially inflated prices.

202. Had Lead Plaintiff and the other Class members known the truth regarding the problems that Camping World was experiencing, which were not disclosed by Camping World or the Individual Defendants, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Camping World common stock during the Class Period, or, if they had acquired such securities, they would not have done so at the artificially inflated prices which they paid.

203. As a direct and proximate result of Camping World and the Individual Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their respective purchases and sales of Camping World common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Camping World and the Individual Defendants' conduct was revealed and/or the undisclosed risks materialized, causing the price of Camping World common stock to decline, resulting in economic losses to Lead Plaintiff and the Class.

204. By reason of the foregoing, Camping World and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and are liable to Lead Plaintiff and the Class for damages suffered in connection with their purchases of Camping World common stock during the Class Period.

**COUNT IV**
**Violation of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

205. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against the Individual Defendants for violations of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of all persons and entities that purchased or otherwise acquired Camping World common stock between October 29, 2024 and February 24, 2026, inclusive.

206. Camping World is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

207. During their tenures as officers or directors of Camping World, the Individual Defendants were controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Camping World, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of in this Complaint.

208. As more fully described above, in their capacities as senior corporate officers of the Company, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and are therefore presumed to have had the power to control or influence, and during the Class Period did exercise that power to control and influence, the conduct giving rise to the violations of the Exchange Act alleged herein. The Individual Defendants prepared, or were responsible for preparing, the Company's Offering Documents and other Class Period press releases, SEC filings, and other statements to the market in the form of annual reports, press releases, news articles, and statements during Camping World's earnings calls and at investor conferences. The Individual Defendants controlled Camping World and each of its employees.

As a result of the foregoing, the Individual Defendants, together and individually, were controlling persons of Camping World within the meaning of §20(a) of the Exchange Act.

209. The Individual Defendants were able to, and did, control the content of the Offering Documents and the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents, as alleged herein, containing material misrepresentations and omissions prior to their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the Company's SEC filings, press releases, and other public statements.

210. By virtue of their positions as controlling persons of Camping World, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other Class members suffered damages in connection with their purchases or acquisitions of Camping World common stock during the Class Period.

## XIII. PRAYER FOR RELIEF

211. WHEREFORE, Lead Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

A. declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. awarding compensatory damages in favor of Lead Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Exchange Act, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C. awarding compensatory damages in favor of Lead Plaintiff and all other Sub-Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the Securities Act, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

D. awarding Lead Plaintiff and the Class and Sub-Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

E. awarding such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

212. Lead Plaintiff demands a trial by jury.

DATED: July 24, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ William C. Fredericks*_______________
William C. Fredericks (*pro hac vice*)
Brian M. Hogan (Bar No. 6286419)
Kassandra A. Nelson (*pro hac vice*)
Jeffrey P. Jacobson (*pro hac vice*)
Logan Rudman (*pro hac vice*)
230 Park Ave, 24th Floor
New York, NY 10169
Tel.: 212-223-6444
Fax: 212-223-6334
wfredericks@scott-scott.com
brian.hogan@scott-scott.com
knelson@scott-scott.com
jjacobson@scott-scott.com
lrudman@scott-scott.com

*Lead Counsel for Lead Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge*

**KOPECKY SCHUMACHER ROSENBURG LLC**
James L. Kopecky
120 North LaSalle St., Suite 2000
Chicago, IL 60601
Tel.: 312-380-6552
jkopecky@ksrlaw.com

*Local Liaison Counsel for Lead Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge*