# EXHIBIT A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2024

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to_____

Commission file number: 001-37908

# CAMPING WORLD HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of incorporation or organization)

**81-1737145**
(I.R.S. Employer Identification No.)

**2 Marriott Drive**
**Lincolnshire, IL 60069**
(Address of principal executive offices) (Zip Code)

**Telephone: (847) 808-3000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, $0.01 par value per share | CWH | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐ Smaller reporting company ☐ Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☒

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting stock held by non-affiliates of the Registrant, as of June 30, 2024, the last business day of the Registrant's most recently completed second fiscal quarter, was approximately $749,458,912. Solely for purposes of this disclosure, shares of common stock held by executive officers and directors of the Registrant as of such date have been excluded because such persons may be deemed to be affiliates.

As of February 21, 2025, the registrant had 62,541,422 shares of Class A common stock outstanding, 39,466,964 shares of Class B common stock outstanding, and one share of Class C common stock outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Proxy Statement relating to its 2025 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year ended December 31, 2024 are incorporated herein by reference in Part III.

**Camping World Holdings, Inc.**
**Form 10-K**
**For the Fiscal Year Ended December 31, 2024**

**INDEX**


| | | Page |
|---|---|---|
| | **PART I** | |
| Item 1 | Business | 7 |
| Item 1A | Risk Factors | 15 |
| Item 1B | Unresolved Staff Comments | 46 |
| Item 1C | Cybersecurity | 47 |
| Item 2 | Properties | 48 |
| Item 3 | Legal Proceedings | 49 |
| Item 4 | Mine Safety Disclosures | 49 |
| | **PART II** | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| Item 6 | [Reserved] | 55 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 56 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 91 |
| Item 8 | Financial Statements and Supplementary Data | 92 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 157 |
| Item 9A | Controls and Procedures | 157 |
| Item 9B | Other Information | 160 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 160 |
| | **PART III** | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 161 |
| Item 11 | Executive Compensation | 161 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 161 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 162 |
| Item 14 | Principal Accountant Fees and Services | 162 |
| | **PART IV** | |
| Item 15 | Exhibits and Financial Statement Schedules | 163 |
| Item 16 | Form 10-K Summary | 166 |
| Signatures | | 167 |

Table of Contents

## Summary of Principal Risk Factors

We operate in a rapidly changing environment that involves a number of risks, some of which are beyond our control. In evaluating our company, you should consider carefully this summary of risks and uncertainties described below together with the other information included in this Annual Report on Form 10-K ("Form 10-K"), including our consolidated financial statements and related notes included in Part II, Item 8, "Financial Statements and Supplementary Data" in this Form 10-K. The occurrence of any of the following risks may materially and adversely affect our business, financial condition, results of operations and future prospects:

- Our business model is impacted by general economic conditions in our markets, including inflation and interest rates, as well as the health of the RV industry, and ongoing economic and financial uncertainties could cause a decline in consumer spending that could adversely affect our business, financial condition and results of operations.
- Our business is affected by the availability and cost of financing to us and our customers.
- Fuel shortages, high prices for fuel, or changes in energy sources could have a negative effect on our business.
- Our success depends to a significant extent on the well-being, as well as the continued popularity and reputation for quality, of our manufacturers, particularly Thor Industries, Inc. and Forest River, Inc.
- Changes in consumer preferences for our products or our failure to gauge those preferences could lead to reduced sales and increased cost of sales and selling, general and administrative expenses.
- Competition in the market for services, protection plans, products and resources targeting the RV lifestyle or RV enthusiast could reduce our revenues and profitability.
- Our expansion into new, unfamiliar markets, businesses, product lines or categories presents increased risks that may prevent us from being profitable in these new markets, businesses, product lines or categories. Delays in opening new store locations, including greenfield locations and acquisitions, on anticipated timelines or at all, could have a material adverse effect on our business, financial condition and results of operations.
- Unforeseen expenses, difficulties, and delays encountered in connection with acquisitions could inhibit our growth and negatively impact our profitability.
- Failure to maintain the strength and value of our brands could have a material adverse effect on our business, financial condition and results of operations.
- Our failure to successfully order and manage our inventory to reflect consumer demand in a volatile market and anticipate changing consumer preferences and buying trends has, and may continue to have, an adverse effect on our business, financial condition and results of operations.
- Our same store revenue may fluctuate and may not be a meaningful indicator of future performance.
- Our business is seasonal and this leads to fluctuations in revenues.
- Our ability to operate and expand our business and to respond to changing business and economic conditions will depend on the availability of adequate capital.
- Our Senior Secured Credit Facilities and our Floor Plan Facility contain restrictive covenants that may impair our ability to access sufficient capital and operate our business.
- We may not successfully execute or achieve the expected benefits of our cost cutting initiatives. Previous restructuring initiatives may result in asset impairment charges and could adversely affect the Company's business.

Table of Contents

- We primarily rely on our fulfillment and distribution centers for our retail, e-commerce and catalog businesses, and, if there is a natural disaster or other serious disruption at any such facility, we may be unable to deliver merchandise effectively to our stores or customers.

- Natural disasters, whether or not caused by climate change, unusual weather conditions, epidemic outbreaks, terrorist acts and political events could disrupt business and result in lower sales and otherwise adversely affect our financial performance.

- We depend on our relationships with third-party providers of services, protection plans, products and resources and a disruption of these relationships or of these providers' operations could have an adverse effect on our business and results of operations.

- Because certain of the products that we sell are manufactured abroad, we may face delays, new or increased tariffs, increased cost or quality control deficiencies in the importation of these products, which could reduce our net sales and profitability.

- A portion of our net income is related to financing, insurance and extended service contracts, which depend on third-party lenders and insurance companies. We cannot assure you that third-party lending institutions will continue to provide financing for RV purchases.

- If we are unable to retain senior executives and attract and retain other qualified employees, our business might be adversely affected.

- We are subject to risks associated with leasing substantial amounts of space.

- Our private brand offerings expose us to various risks.

- We could incur asset impairment charges for goodwill, intangible assets or other long-lived assets.

- Our business is subject to numerous federal, state and local regulations and litigation risks, and we have been named in litigation, which has resulted in substantial costs and may result in reputational harm and divert management's attention and resources.

- A failure in our e-commerce operations, security breaches and cybersecurity risks could disrupt our business and lead to reduced sales and growth prospects and reputational damage.

- If we are unable to maintain or upgrade our information technology systems or if we are unable to convert to alternate systems in an efficient and timely manner, our operations may be disrupted or become less efficient.

- Disruptions or breaches involving our or our third-party providers' IT Systems or Confidential Information (as defined herein) or our failure to meet increasingly demanding regulatory requirements could interrupt our operations, compromise our reputation, expose us to litigation, government enforcement actions and costly response measures and could have a material adverse effect on our business, financial condition and results of operations.

- Material weaknesses in our internal control over financial reporting could have a significant adverse effect on our business and the price of our common stock.

- We are subject to risks associated with our organizational structure.

- There are risks associated with ownership of our Class A common stock.

Table of Contents

## BASIS OF PRESENTATION

As used in this Form 10-K, unless the context otherwise requires, references to:

- "we," "us," "our," "CWH," the "Company," "Camping World" and similar references refer to Camping World Holdings, Inc., and, unless referenced as "CWH" or otherwise stated, all of its subsidiaries, including CWGS Enterprises, LLC, which we refer to as "CWGS, LLC" and, unless otherwise stated, all of its subsidiaries.
- "Active Customer" refers to a customer who has transacted with us in any of the eight most recently completed fiscal quarters prior to the date of measurement. Unless otherwise indicated, the date of measurement is December 31, 2024, our most recently completed fiscal quarter.
- "Continuing Equity Owners" refers collectively to ML Acquisition, funds controlled by Crestview Partners II GP, L.P. and the Former Profits Unit Holders and each of their permitted transferees that own common units in CWGS, LLC and who may redeem at each of their options their common units for, at our election (determined solely by our independent directors within the meaning of the rules of the New York Stock Exchange who are disinterested), cash or newly-issued shares of our Class A common stock. Direct exchanges of common units in CWGS, LLC by the Continuing Equity Owners with CWH for Class A common stock are included in the reference to "redemptions" in relation to common units in CWGS, LLC.
- "Crestview" refers to Crestview Advisors, L.L.C., a registered investment adviser to private equity funds, including funds affiliated with Crestview Partners II GP, L.P.
- "CWGS LLC Agreement" refers to CWGS, LLC's amended and restated limited liability company agreement, as amended.
- "Former Equity Owners" refers to those Original Equity Owners controlled by Crestview Partners II GP, L.P. that have exchanged their direct or indirect ownership interests in CWGS, LLC for shares of our Class A common stock in connection with the consummation of our initial public offering ("IPO").
- "Former Profits Unit Holders" refers collectively to Brent L. Moody, Andris A. Baltins and K. Dillon Schickli, who are members of our Board of Directors, and certain other current and former non-executive employees, former executive officers, and former directors, in each case, who held common units of CWGS, LLC pursuant to CWGS, LLC's equity incentive plan that was in existence prior to our IPO and received common units of CWGS, LLC in exchange for their profits units in CWGS, LLC.
- "ML Acquisition" refers to ML Acquisition Company, LLC, a Delaware limited liability company that is indirectly controlled by our Chairman and Chief Executive Officer, Marcus A. Lemonis.
- "ML Related Parties" refers to ML Acquisition and its permitted transferees of common units.
- "ML RV Group" refers to ML RV Group, LLC, a Delaware limited liability company, wholly-owned by our Chairman and Chief Executive Officer, Marcus A. Lemonis.
- "Original Equity Owners" refers to the direct and certain indirect owners of interests in CWGS, LLC, collectively, prior to the Reorganization Transactions and Recapitalization (as defined in Note 1 – Summary of Significant Accounting Policies and Note 19 – Stockholders' Equity to our consolidated financial statements included in Part II, Item 8 of this Form 10-K, respectively) conducted in conjunction with our IPO, including ML Acquisition, funds controlled by Crestview Partners II GP, L.P. and the Former Profits Unit Holders.
- "RV" refers to recreational vehicles.
- "Tax Receivable Agreement" refers to the tax receivable agreement that the Company entered into with CWGS, LLC, each of the Continuing Equity Owners and Crestview Partners II GP, L.P. in connection with the Company's IPO.

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. All statements other than statements of historical facts contained in this Form 10-K may be forward-looking statements. Statements regarding our future results of operations and financial position, business strategy and plans and objectives of management for future operations, including, among others, statements regarding expected new store location openings and closures, including greenfield locations and acquired locations; sufficiency of our sources of liquidity and capital and potential need for additional financing; our stock repurchase program; future capital expenditures and debt service obligations; refinancing, retirement or exchange of outstanding debt; expectations regarding industry trends and consumer behavior and growth; our product offerings and strategy; inventory management; volatility in sales and potential impact of miscalculating the demand for our products or our product mix; expectations regarding increase of certain expenses in connection with our growth and new or increased tariffs; expectations regarding our acquisition of RV dealerships from Lazydays Holdings, Inc.; cost reduction and restructuring initiatives and expected cost savings; benefits of the disposition of our RV furniture business; our human capital initiatives; expectations regarding our pending litigation, and our plans related to dividend payments, are forward-looking statements. In some cases, you can identify forward-looking statements by terms such as “anticipate,” “believe,” “can,” “continue,” “could,” “designed,” “estimate,” “expect,” “forecast,” “goal,” “intend,” “may,” “might,” “plan,” “possible,” “potential,” “predict,” “project,” “should,” “target,” “will,” “would” or the negative of these terms or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including the important factors described in this Form 10-K under Item 1A. Risk Factors and in our other filings with the Securities and Exchange Commission (“SEC”), that may cause our actual results, performance or achievements to differ materially and adversely from those expressed or implied by the forward-looking statements.

Any forward-looking statements made herein speak only as of the date of this Form 10-K, and you should not rely on forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that the future results, performance, or achievements reflected in the forward-looking statements will be achieved or occur. We undertake no obligation to update any of these forward-looking statements for any reason after the date of this Form 10-K or to conform these statements to actual results or revised expectations. Additionally, our discussion of ESG issues herein is informed by various standards (including standards for the measurement of underlying data), and the interests of various stakeholders. As such, this discussion may not necessarily be “material” under the federal securities laws for SEC reporting purposes. Furthermore, parts of this information are subject to methodological considerations or information, including from third-parties, that are still evolving and subject to change. For example, our disclosures based on any standards may change due to revisions in framework requirements, availability of information, changes in our business or applicable government policies, or other factors, some of which may be beyond our control.

Table of Contents

# PART I

## ITEM 1. BUSINESS

### Overview

Camping World Holdings, Inc. (together with its subsidiaries) is the world's largest retailer of RVs and related products and services. Through our Camping World and Good Sam brands, our vision is to build a business that makes RVing and other outdoor activities fun and easy. We strive to build long-term value for our customers, employees, and stockholders by combining a unique and comprehensive assortment of RV products and services with a national network of RV dealerships, service centers and customer support centers along with the industry's most extensive online presence and a highly-trained and knowledgeable team of associates serving our customers, the RV lifestyle, and the communities in which we operate. We also believe that our Good Sam organization and family of highly specialized services and plans, including roadside assistance, protection plans and insurance, uniquely enable us to connect with our customers as stewards of an outdoor and recreational lifestyle. On December 31, 2024, we operated a total of 206 store locations, with all locations selling and/or servicing RVs.

### Business Strategy

Key elements of our business strategy are:

*Offer a Unique and Comprehensive Assortment of RV Products and Services.* We believe our product and service offerings represent the best and most comprehensive assortment of services, protection plans, products and resources in the RV industry. We also believe our used RV offering and reconditioning program are best in class and provide us with a unique strategic advantage in the market. Many of our offerings, including our Good Sam services and plans, our private label RVs, our digital retail experience through RVs.com, our RV manufacturer exclusive dealership locations, and our private label accessories, are unique to us and have been developed in collaboration with leading industry suppliers and RV enthusiasts. We believe our size and scale allow us to deliver exceptional value to our customers.

*Operate a National Network of RV Dealerships and Service Centers.* As of December 31, 2024, we operated a national network of 206 RV dealerships and/or service centers. The majority of these RV dealerships and service centers are conveniently located off major interstates and highways in key RV markets, staffed with knowledgeable local team members offering expert advice and a comprehensive assortment of RV-related products and services. Our RV dealerships and service centers are a one-stop-shop for everything RV and give RV consumers peace of mind that they can find what they need when they need it in their local market or while traveling throughout the country.

*Focus on Customer Service.* We believe customer service is a critical component of our business. Our dealerships and service centers are staffed with knowledgeable local team members offering expert advice and a wide assortment of products and services to approximately 4.5 million Active Customers. We currently operate call centers in Denver, CO, Bowling Green, KY, Greenville, NC, and Island Lake, IL. All team members at our call centers have been cross trained, and the call centers have redundant services and systems in place in the event of a power or connectivity disruption at one of our call center locations. Our goal is that every call to one of our call centers or to a store will be answered promptly by a live person. Our call center specialists are extensively trained to assist customers with complex orders and provide a level of service that leads to an exceptional customer experience and long-term customer relationships. In 2024, our call centers handled approximately 2.4 million calls and responded to approximately 400,000 emails and social media communications.

*Leverage Our Resources and Synergies.* Our unique and comprehensive assortment of RV products and services, our national network of RV dealerships and service centers, our network of customer service and contact centers, and our online and e-commerce platforms all work together to service our customers and make RVing fun and easy. When a new customer engages with us across any of our business areas, the new customer enters our database and we leverage customized customer relationship management ("CRM")

Table of Contents

platforms and proprietary tools, such as the RV Valuator, to actively and intelligently engage, service and promote our wide range of products and services for the RV lifestyle.

*Good Sam Mission.* Our Good Sam mission is to clear the path ahead and empower our customer's joy of travel. We aim to accomplish this through the following four pillars:

| Our Travel Point of View | Our Products and Services | Our Customer Experience | Our Emotional Benefit |
| --- | --- | --- | --- |
| We believe that road trips and outdoor adventures don't need to feel complex. We believe travel experiences should feel effortless and accessible, aided by our services and plans that simplify the journey for our customers. | We design products and services that think ahead to support every part of the journey. Our products and services are built to ensure that our customers have everything they need for a seamless travel experience, enabling our mission to empower joy in travel. | We inspire confidence by being clear about our offerings. We aim to build trust through transparency and consistency, to ensure our customers feel confident and cared for at every step. | Curiosity, connection, and joy are what we strive to instill in our customers' travel experience. |

**Background and Recent Developments**

Founded in 1966, our Good Sam and Camping World brands have been serving RV owners and outdoor enthusiasts for more than 50 years. Good Sam combined with Camping World in 1997, when the Good Sam Club had approximately 911,000 members and Camping World had 26 store locations. In 2011, Camping World and Good Sam combined with FreedomRoads, a successful RV dealership business founded in 2003, to form the largest provider of products and services for RVs in North America. From 2011 to date, we have continued to expand our footprint of RV dealerships through new store openings, including greenfield locations and acquisitions.

On January 17, 2024, we announced that we were reviewing potential strategic alternatives for our Good Sam business. In conducting that review, we came to the conclusion that the greatest value to the Company can be achieved through retaining the Good Sam business. We have deepened our appreciation for the non-cyclical nature of the business and also recognize the large growth potential of the business over multiple vectors in the outdoor and recreational space. Going forward, we expect that Good Sam will continue to capitalize on the mutually beneficial relationship with the Camping World brand and store footprint but will be empowered to operate independently to drive growth.

In May 2024, we closed on the sale of certain assets of the RV and Outdoor Retail segment's RV furniture business ("CWDS") and, in connection with the sale, entered into an approximately ten-year supply agreement with the buyer and the sublease of certain properties and equipment to the buyer. We believe that we have gained operational efficiencies by exiting the manufacture of RV furniture and focusing our resources on the sourcing and sale of our RV and aftermarket accessory products.

**Segments and Offerings**

We operate two reportable segments: (i) Good Sam Services and Plans and (ii) RV and Outdoor Retail. See Note 23 — Segment Information to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for further information regarding our reportable segments.

Table of Contents

The following table presents revenue and gross profit details for our product and service offerings for the year ended December 31, 2024:

| | Year Ended December 31, 2024 | | | | |
|---|---|---|---|---|---|
| ($ in thousands) | Revenue[(1)] | Percent of Revenue | Gross Profit[(2)] | Percent of Gross Profit | Gross Margin |
| Good Sam Services and Plans | $ 194,575 | 3.2% | $ 123,849 | 6.8% | 63.7% |
| New vehicles | 2,825,640 | 46.3% | 407,471 | 22.3% | 14.4% |
| Used vehicles | 1,613,849 | 26.5% | 296,697 | 16.3% | 18.4% |
| Products, service and other | 820,111 | 13.4% | 356,471 | 19.5% | 43.5% |
| Finance and insurance, net | 599,718 | 9.8% | 599,718 | 32.9% | 100.0% |
| Good Sam Club | 46,081 | 0.8% | 41,290 | 2.3% | 89.6% |
| Total | $ 6,099,974 | 100.0% | $ 1,825,496 | 100.0% | 29.9% |

(1) Components of revenue are presented after intersegment eliminations.
(2) Gross profit is presented exclusive of depreciation and amortization, which is presented separately in operating expenses.

**Good Sam Services and Plans**

Our Good Sam Services and Plans segment consists of programs, plans and services that are geared towards protecting, insuring and promoting the RV & travel lifestyles, and include services such as extended vehicle service contracts, vehicle roadside assistance, property and casualty insurance, travel protection, travel planning and directories, and publications. Because our Good Sam protection plans and programs are often purchased to cover a multiple-year period and are renewable, this area of our business tends to generate high-margin, recurring revenue that is driven both by new and used RV purchases, the installed base of RV owners in the United States, and, more broadly, travelers across any vehicle type. We believe this highly specialized product offering has significant potential to penetrate broader parts of the recreational market, including other powersports such as boating or ATVs, to further empower our customers' joy of travel, recreation and the outdoors.

Our Good Sam Services and Plans segment offerings include:

| Protection Programs<br>Ensuring travelers' safety and financial security with comprehensive assistance and protection plans. | | |
|---|---|---|
| **Emergency Programs**<br>Provide immediate aid in critical situations, including Roadside Assistance and Tire Rescue for on-the-road issues and TravelAssist for medical emergencies during travel. | **Financial Protection Programs**<br>Offer financial security against unexpected events, encompassing Extended Service Plans for RV maintenance, Good Sam Insurance Agency for tailored insurance solutions, GAP Insurance, Windshield Protection, and Product Protection Plans for various assets. | **Tire & Maintenance Programs**<br>Focus on preventative maintenance and tire care, featuring Paint & Fab to maintain the visual aesthetic and Tire & Wheel Protection to safeguard against tire-related mishaps and tire sales for replacement needs. |

Table of Contents

| Campgrounds & Destinations<br>Dedicated to enhancing the RV and outdoor experience by providing access to an extensive network of campgrounds and unique destinations. | |
|---|---|
| **Good Sam Campgrounds**<br>Offers access to North America's largest network of campgrounds and RV parks, promoting a community-driven travel experience. | **Coast to Coast Resorts**<br>Provides exclusive access to a selection of premium resort destinations, catering to diverse traveler preferences. |

***RV and Outdoor Retail***

Our RV and Outdoor Retail segment consists of all aspects of our RV dealership operations, which includes selling new and used RVs, assisting with the financing of new and used RVs, selling protection and insurance related services and plans for RVs, servicing and repairing new and used RVs, installing RV parts and accessories, and selling RV and outdoor related products, parts and accessories. Within our RV and Outdoor Retail business, we also operate the Good Sam Club, which we believe is the largest membership-based RV organization in the world, with approximately 1.8 million members as of December 31, 2024, excluding the free basic tier members. Membership benefits include, among other benefits, a loyalty program where points can be redeemed for Camping World products and RV service, a variety of discounts at Camping World and Good Sam, in addition to partner campgrounds, fuel stations, and more, all of which we believe enhance the RV experience, drive customer engagement and loyalty, and provide cross-selling opportunities for our other products and services. A map depicting our national network of 206 RV dealerships and service centers as of December 31, 2024 is provided below:



Table of Contents

RV and Outdoor Retail segment offerings include:

- ***New and Used Vehicles***. A wide selection of new and used RVs across a range of price points, classes and floor plans. The table below contains a breakdown of our new RV unit sales and average selling price by RV class for 2024. Sales of new vehicles represented 46.3%, 41.4% and 46.3% of total revenue for 2024, 2023 and 2022, respectively. Sales of used vehicles represented 26.5%, 31.8% and 26.9% of total revenue for 2024, 2023, and 2022, respectively.

| Towables | | | | Motorhomes | | | |
|---|---|---|---|---|---|---|---|
| | | Average New Unit Price | % New Unit 2024 Sales | | | Average New Unit Price | % New Unit 2024 Sales |
| Travel Trailer |  | $29,000 | 77.7% | Class C |  | $111,000 | 4.1% |
| Fifth Wheels |  | $65,000 | 14.2% | Class B |  | $114,000 | 1.4% |
| Fold Downs |  | $14,000 | < 1.0% | Class A Gas |  | $135,000 | 1.3% |
| Truck Camper |  | $49,000 | < 1.0% | Class A Diesel |  | $317,000 | < 1.0% |

- ***Vehicle financing.*** Through arrangements with third-party lenders we are able to facilitate financing for most of the new and used RVs we sell through our store locations. Generally, our financing transactions are structured through long-term retail installment sales contracts with terms of up to 20 years, which we enter into with our customers on behalf of our third-party lenders. The retail installment sales contracts are then assigned on a non-recourse basis, with the third-party lender assuming underwriting and credit risk. In 2024, we facilitated financing transactions for approximately 80.9% of our total new units sold and 71.7% of our total used units sold for which we earn a commission from the third-party lender.

- ***Protection Plans.*** We offer and sell a variety of protection plans and services to the purchasers of our RVs as part of the delivery process, as well as gap, tire and wheel, roof, extended service, and paint and fabric protection plans. These products are primarily underwritten and administered by independent third parties, and we are primarily compensated on a commission basis.

- ***Repair and Maintenance.*** We offer RV repair and maintenance services at the majority of our store locations. With over 2,800 RV service bays across our national footprint, we are equipped to offer comprehensive repair and maintenance services for most RV components. We also offer our Good Sam RV ProCare mobile RV service.

- ***RV parts, accessories and installation services.*** We offer a wide range of RV parts, equipment, supplies and accessories at our store locations and through our e-commerce business. These products include towing and hitching products, satellite and GPS systems, electrical and lighting products, appliances and furniture, and other products for inside the RV, at the campsite, and around the campground. Our full-service repair facilities enable us to install all parts and accessories that we sell in our store locations. We believe our ability to both sell and install parts and accessories affords us a competitive advantage over online and big box retailers that do not have service centers designed to accommodate RVs, and over RV dealerships that do not offer a comprehensive selection of parts and accessories. While we do continue to offer some non-RV

outdoor products and accessories, our focus is on providing products and services that are targeted toward RV enthusiasts and owners.

- ***Collision repair and restoration.*** We offer collision repair services, including fiberglass front and rear cap replacement, windshield replacement, interior remodel solutions, and paint and body work, at many of our store locations, including numerous with full body paint booths. We perform collision repair services for a number of insurance carriers.

- ***Good Sam Club.*** The Good Sam Club is a prepaid subscription membership organization that offers a points-based loyalty program, where points can be earned from purchases of our products and services and redeemed for savings on future purchases of our products and services. The Good Sam Club also offers savings on a variety of products and services, including discounts on nightly rates at affiliated Good Sam RV parks and other benefits related to the RV lifestyle. We believe the Good Sam Club is the largest membership-based RV enthusiast organization in the world. As of December 31, 2024, there were approximately 1.8 million members in our Good Sam Club, excluding the free basic tier members. Additionally, a free basic tier of the Good Sam Club was introduced in 2024, which does not include most of the paid membership benefits, but allows these members to earn points at a lower rate compared to the paid membership.

- ***Co-branded credit cards.*** We contract with Visa and Comenity Capital Bank to offer a Good Sam Rewards Visa® branded credit card, as well as a Good Sam private label credit card. Cardholders receive enhanced rewards points, which are referred to as Good Sam Rewards, for money spent at our retail locations, on our e-commerce platforms, at gas stations and at campgrounds across the U.S. and Canada. As of December 31, 2024, we had approximately 168,000 issued and open co-branded credit card accounts.

- ***RV Rentals.*** We facilitate an RV rental platform that connects travelers with RV owners, allowing for a flexible and personal RV experience.

**Vehicle Sourcing and Dealer Agreements**

We acquire new RVs for retail sale directly from the original equipment manufacturer. Our strategy is to partner with financially sound manufacturers that make high quality products, have adequate manufacturing capacity and distribution, and maintain an appropriate product mix. We have strategic relationships with leading RV manufacturers, including Thor Industries, Inc. and Forest River, Inc. As of December 31, 2024, Thor Industries and Forest River accounted for approximately 61.4% and 30.2%, respectively, of our new RV inventory. In certain instances, our manufacturing partners produce private label products exclusively available at our RV dealerships and through our e-commerce platforms. In 2023, we began opening manufacturer-exclusive RV dealership locations that are operated by us and provide our typical offerings of used vehicles, service, parts, and finance and insurance, but they bear the name of a particular RV manufacturer and sell that manufacturer's new RV line.

Our supply arrangements with manufacturers are typically governed by dealer agreements, which are customary in the RV industry, made on a location-by-location basis, and each store location typically enters into multiple dealer agreements with multiple manufacturers. Dealer agreements generally give us the right to sell certain RV makes and models within an exclusive designated area. The terms of these dealer agreements typically require us to, among other things, meet all the requirements and conditions of the manufacturer's applicable programs, maintain certain minimum inventory requirements and meet certain retail sales objectives, perform services and repairs for all owners of the manufacturer's RVs (regardless from whom the RV was purchased) that are still under warranty, stock certain of the manufacturer's parts and accessories needed to service and repair the manufacturer's RVs, actively advertise and promote the manufacturer's RVs, and indemnify the manufacturer under certain circumstances.

We primarily acquire used RVs through customer trade-ins, as well as private party purchases and consignments, and we generally recondition used RVs acquired for retail sale in our parts and service departments. Historically, used RVs that we have not sold at our RV-centric store locations generally have been

sold through other channels at wholesale prices. In 2023, we introduced our first CW Auction as another means to sell RVs to individuals or wholesale to other dealerships and held 14 CW Auctions in 11 states in 2024.

We finance the purchase of substantially all of our new RV inventory from manufacturers through our Floor Plan Facility. Used vehicles may also be financed from time to time through our Floor Plan Facility. For more information on our Floor Plan Facility, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Description of Senior Secured Credit Facilities and Floor Plan Facility" included in Part II, Item 7 of this Form 10-K and Note 4 — Inventories and Floor Plan Payables to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

**Marketing and Advertising**

The lifestyle element of the RV industry and the multi-year nature of many of our products and services provides the opportunity to build long-term relationships with our customers. Our marketing strategies are focused on developing awareness around our brands, products and services, and driving traffic to our stores and websites, and we utilize a combination of digital, social, email, direct mail, print materials, and traditional media, as well as online inventory listings to accomplish this. As part of our marketing efforts, we maintain a proprietary database of individuals and customer purchasing data that we utilize for direct mail, email, text messaging and telemarketing campaigns. As of December 31, 2024, this database contained over 34 million unique contacts. In addition, we enter into sporting event sponsorships, such as professional bull riders with the PBR Camping World Team Series, where we believe there to be a significant demographic overlap with RV and outdoor enthusiasts. Our Ultimate RV Show has evolved to be a multi-channel experience that is both online and in store locations. These shows provide a strategic opportunity to expose first-time buyers and existing RV and outdoor sports enthusiasts to our products and services.

**Trademarks and Other Intellectual Property**

We own a variety of registered trademarks and service marks related to our brands and our services, protection plans, products and resources, including Good Sam, Camping World, and Overton's. We also own the copyrights to certain articles in our publications and numerous domain names, including www.goodsamclub.com, www.campingworld.com, www.rv.com, www.rvs.com, www.rvrentals.com, www.rvprocare.com, and www.wildsam.com, among others. We believe that our trademarks and other intellectual property have significant value and are important to our marketing efforts. We do not know of any material pending claims of infringement or other challenges to our right to use our intellectual property in the United States or elsewhere. For additional information regarding our intellectual property, see Note 8 – Goodwill and Intangible Assets to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

**Human Capital Resources**

***Our Talent***

As of December 31, 2024, we had 12,701 full-time and 359 part-time or seasonal employees. None of our employees are represented by a labor union or are party to a collective bargaining agreement, and we have had no labor-related work stoppages. We believe that our employee relations are generally good.

***Development***

We operate an entity-wide online training platform with a curriculum that is tailored to each employee's job function. This program includes interactive courses such as communication, management, critical thinking, software skills, and workplace harassment and discrimination. Our learning and development team continues to create proprietary content for this training library. We have also invested in learning labs at the majority of our locations that provide for a dedicated space with the appropriate technology for employees to engage in their training programs. In addition to job specific training that regularly occurs at our dealerships, retail locations, and call centers, in 2024, we launched new in-person training for certain dealership roles to align to a best-in-class adult learning experience. We expect to expand our offerings in 2025.

Table of Contents

Our service technicians are critical to providing the high-quality installation and repair services that our customers expect. Our Camping World Technical Institute ("CWTI") includes full-time instructors at three dedicated campuses and one part-time campus as of December 31, 2024. The CWTI offers monthly 10-day training sessions to our service technicians either in-person or virtually. In both 2024 and 2023, we provided Level 1 training to approximately 1,100 service technicians through CWTI.

***Inclusion and Belonging***

We believe that our Company and our brand should be welcoming to the wide array of outdoor enthusiasts and our culture should promote respect and dignity of all humans. While it is our policy to not make decisions regarding hiring, promotion or compensation on the basis of any legally protected characteristics, including race or gender, we seek to promote inclusion of individuals, regardless of background, through legally compliant manners.

***Community Engagement***

Since 2013, we have operated the Project Good Samaritan initiative, which encourages our associates to perform eight hours of volunteer work per quarter for a cause that is meaningful to that associate, such as local soup kitchens, food pantries, home building, meal distribution, recycling programs, homeless shelters, veteran programs, and nursing homes. Associates receive paid time off for these volunteer hours. In 2019, prior to the COVID-19 pandemic, 3,364 associates volunteered 51,680 hours in their communities under the program. During January and February of 2020, 840 associates volunteered 6,268 hours in their communities under the program, before the program was suspended as a safety precaution as a result of the COVID-19 pandemic. We reactivated the program in March 2024 and had 1,248 associates volunteer 11,391 hours in their communities under the program during 2024.

***Health and Safety***

We maintain a safety program to provide a safe and healthful workplace for our associates. We strive to comply with all health and safety standards that pertain to our operations. We have created and implemented processes to identify, reduce or eliminate physical hazards from the work environment, improve safety communication and train employees on safe work practices.

**Competition**

We face competition in all areas of our business. We believe that the principal competitive factors in the RV industry are breadth and depth of products and services, quality, pricing, availability, convenience, and customer service. Our competitors vary in size and breadth of their product offerings.

We compete directly or indirectly with the following types of companies:

- other RV dealers selling new and used RVs;
- major national insurance and warranty companies, providers of roadside assistance and providers of extended vehicle service contracts;
- multi-channel retailers and mass merchandisers, warehouse clubs, discount stores, department stores and other retailers, such as Wal-Mart, Target and Amazon;
- online retailers; and
- independent, local specialty stores.

Additional competitors may enter the businesses in which we currently operate. Moreover, some of our mass merchandising competitors do not currently compete in many of the product categories we offer but may choose to offer a broader array of competing products in the future.

## Seasonality

Historically, our business has been seasonal. Since RVs are primarily used by vacationers and campers during times of warmer weather, demand for our products and services tends to be highest in the spring and summer months and lowest in the winter months. As a result, our revenue and profitability has historically been higher in the second and third quarters than in the first and fourth quarters. On average over the last three years ended December 31, 2024, we generated 30.5% and 27.5% of our annual revenue in the second and third quarters, respectively, and 23.4% and 18.6% in the first and fourth quarters, respectively. For further discussion, see "Management's Discussion and Analysis of Financial Condition and Results of Operations — Seasonality" in Item 7 of Part II of this Form 10-K.

## Laws and Regulations

See "Risk Factors — Risks Related to Our Business — Our business is subject to numerous federal, state and local regulations," "— Our failure to comply with certain environmental regulations could adversely affect our business, financial condition and results of operations," "—Fuel shortages, high prices for fuel, or changes in energy sources could have a negative effect on our business," "Our operations are subject to a series of risks related to climate change and other environmental, social, and governance ("ESG") matters," and "— Climate change legislation or regulations restricting emission of "greenhouse gases" could result in increased operating costs and reduced demand for RVs we sell" in Item 1A of Part I of this Form 10-K. Although we incur costs to comply with applicable laws and regulations in the ordinary course of our business, we do not presently anticipate that such costs will have a material effect on our capital expenditures, earnings and competitive position.

### *Environmental, Health and Safety Regulations*

Our operations involve the use, handling, storage and contracting for recycling and/or disposal of materials such as motor oil and filters, transmission fluids, antifreeze, refrigerants, paints, thinners, batteries, cleaning products, lubricants, degreasing agents, tires and propane. Consequently, our business is subject to a complex variety of federal, state and local requirements that regulate the environment and public health and safety. We do not have any material known environmental commitments or contingencies.

## Additional Information

We were incorporated in the State of Delaware in 2016. Our principal executive offices are located at 2 Marriott Drive, Lincolnshire, IL 60069 and our telephone number is (847) 808-3000. We make available our public filings, including annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and any amendments to those reports with the SEC free of charge through our website at www.campingworld.com in the "Investor Relations" section under "Financial Info" as soon as reasonably practicable after we electronically file such material with, or furnish such material to, the SEC. The information contained in, or accessible through, our website does not constitute a part of this Form 10-K.

We intend to use our official Facebook, X (formerly known as Twitter), and Instagram accounts, each at the handle @CampingWorld, as a distribution channel of material information about the Company and for complying with our disclosure obligations under Regulation FD. The information we post through these social media channels may be deemed material. Accordingly, investors should subscribe to these accounts, in addition to following our press releases, SEC filings and public conference calls and webcasts. These social media channels may be updated from time to time. The information we post through these channels is not a part of this Annual Report on Form 10-K.

## ITEM 1A. RISK FACTORS

*Investing in our Class A common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below, together with the other information included in this Form 10-K. The occurrence of any of the following risks may materially and adversely affect our business, financial condition, results of operations and future prospects. In these circumstances, the market price of our Class A common*

*stock could decline. Other events that we do not currently anticipate or that we currently deem immaterial may also affect our business, prospects, financial condition and results of operations.*

**Risks Related to Our Business**

***Our business model is impacted by general economic conditions in our markets, including inflation and interest rates, as well as the health of the RV industry, and ongoing economic and financial uncertainties could cause a decline in consumer spending that could adversely affect our business, financial condition and results of operations.***

As a business that relies on consumer discretionary spending, we have in the past and may in the future be adversely affected if our customers reduce, delay or forego their purchases of our services, protection plans, products and resources as a result of:

- job losses, lower income levels or other population and employment trends;
- bankruptcies;
- higher consumer debt and interest rates;
- reduced access to credit;
- higher energy and fuel costs;
- relative or perceived cost, availability and comfort of RV use versus other modes of travel, such as air travel and rail;
- falling home prices;
- lower consumer confidence or discretional consumer spending;
- higher inflation rates;
- uncertainty or changes in tax policies and tax rates;
- uncertainty or changes in import/export policies, including tariffs;
- uncertainty due to national or international security concerns; or
- other general economic conditions, including deflation and recessions.

We also rely on our store locations to attract and retain customers and to build our customer database. If we close store locations, are unable to open new store locations, including greenfield locations and acquisitions, on the timelines we anticipate or at all due to general economic conditions or otherwise, or experience declines in customer transactions in our existing store locations due to general economic conditions or otherwise, our ability to maintain and grow our customer database and our Active Customers will be limited, which could have a material adverse effect on our business, financial condition and results of operations.

In addition, political conditions, including new and changing laws or tariffs, regulations, executive orders and enforcement priorities, may create uncertainty about how such laws and regulations will be interpreted and applied and, consequently, may create market uncertainty. This may adversely impact customer demand, increase our costs and adversely impact our business.

Decreases in Active Customers, average spend per customer, or retention and renewal rates for our Good Sam services and plans has, at times, negatively affected and could in the future negatively affect our financial performance, and a prolonged period of depressed consumer spending could have a material adverse

effect on our business. For instance, our Active Customers declined in 2024. In prior years and to some extent in 2024, promotional activities and decreased demand for consumer products affected our profitability and margins, and this negative impact could return or worsen in future periods. In addition, adverse economic conditions may result in an increase in our operating expenses due to, among other things, higher costs of labor, energy, equipment and facilities, as well as higher tariffs. Due to fluctuations in the U.S. economy, our sales, operating and financial results for a particular period are difficult to predict, making it difficult to forecast results for future periods. Additionally, we are subject to economic fluctuations in local markets that may not reflect the economic conditions of the U.S. economy. Any of the foregoing factors could have a material adverse effect on our business, financial condition and results of operations.

In addition, the success of our recurring Good Sam services and plans, as well as our RV and outdoor retail business, depends, in part, on our customers' use of certain RV websites and/or the purchase of services, protection plans, products and resources through participating merchants, as well as the health of the RV industry generally.

In addition, during recent periods we have faced, and may continue to face, increased competition from other businesses with similar product and service offerings. For example, our competitors have listed RVs at or below cost. As a result, we responded and may need to further respond by establishing pricing, marketing and other programs or by seeking out additional strategic alliances or acquisitions that may be less favorable to us than we could otherwise establish or obtain in more favorable economic environments. Such programs have adversely impacted our gross margin, operating margin and selling, general and administrative expenses. In addition, declines in the national economy could cause partners and/or advertising customers who participate in our programs to go out of business. Should the number of partners and/or advertising customers entering bankruptcy rise, it is likely that the number of uncollectible accounts would also rise. These factors could have a material adverse effect on our business, financial condition and results of operations.

***Our business is affected by the availability and cost of financing to us and our customers.***

Our business is affected by the availability of financing to us and our customers. Generally, RV dealers, including us, finance their purchases of inventory. As of December 31, 2024, we had up to $1.85 billion in maximum borrowing capacity under our Eighth Amended and Restated Credit Agreement for floor plan financing (the "Floor Plan Facility") (see Note 4 — Inventories and Floor Plan Payables to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). A decrease in the availability of this type of wholesale financing or an increase in the cost of such wholesale financing could prevent us from carrying adequate levels of inventory, which may limit product offerings and could lead to reduced revenues.

Furthermore, many of our customers finance their RV purchases. Consumer credit market conditions continue to influence demand, especially for RVs, and may continue to do so. There continue to be fewer lenders, more stringent underwriting and loan approval criteria, and greater down payment requirements than in the past. Deteriorating economic conditions as a result of federal government action to control inflation, such as higher interest rates, increased unemployment, financial market uncertainty, decreases in disposable income, declines in consumer confidence, economic slowdowns or recessions has negatively impacted and may in the future negatively impact credit conditions or credit worthiness of our customers, and adversely affect the ability of consumers to finance potential purchases at acceptable terms and interest rates. For instance, the higher interest rates have limited the amount of financing that certain customers qualify for when purchasing a new or used RV. This has resulted and could in the future result in a decrease in sales of our products and have a material adverse effect on our business, financial condition and results of operations.

***Fuel shortages, high prices for fuel, or changes in energy sources could have a negative effect on our business.***

Gasoline or diesel fuel is currently required for the operation of RVs. There can be no assurance that the supply of these petroleum products will continue uninterrupted, that rationing will not be imposed or that the price of or tax on these petroleum products will not significantly increase in the future. Shortages of gasoline and diesel fuel have had a material adverse effect on the RV industry as a whole in the past and any such shortages or substantial increases in the price of fuel could have a material adverse effect on our business, financial condition or results of operations.

In the future, new government regulations could require us to sell RVs and other products that rely on alternative energy sources or prohibit consumers from purchasing products that rely on fuel or other traditional energy sources. For example, regulations passed in December 2021 by the California Air Resources Board ("CARB") will prohibit the sale of gas-powered generators in California beginning in 2028. Additionally, CARB approved the Advanced Clean Trucks regulation in March 2021, which places requirements on RV manufacturers that are expected to prevent many new diesel RV models from being sold in California (and in states that have adopted the California standard) beginning with the 2024 model year. However, President Trump's January 20, 2025 executive order titled "Unleashing American Energy" directs the United States Environmental Protection Agency ("EPA") to revoke certain federal waivers that previously allowed California to adopt the Advanced Clean Truck regulation and other greenhouse gas ("GHG") emissions regulations that are stricter than what is currently provided under federal law. In addition, Trump's executive order also calls for creation of a new, and likely less stringent, federal vehicle emissions standard and also preventing individual states from implementing regulations on vehicle and GHG emissions that are more stringent than the federal standard. It is currently unclear whether such regulations implementing the executive order will be proposed or adopted and, if adopted, whether they would survive likely judicial challenges. However, if current EPA and CARB regulations relating to vehicle emissions and energy sources remain in place, or become more stringent in the future, we may not have offerings available to satisfy such requirements or such alternative energy sources could be less desirable to our customers or result in reduced towing capacity, which may reduce demand or lower margins and adversely affect our business, financial condition or results of operations.

***Our success depends to a significant extent on the well-being, as well as the continued popularity and reputation for quality, of our manufacturers, particularly Thor Industries, Inc. and Forest River, Inc.***

Thor Industries, Inc. and Forest River, Inc. supplied approximately 61.4% and 30.2%, respectively, of our new RV inventory as of December 31, 2024. We depend on our manufacturers to provide us with products that compare favorably with competing products in terms of quality, performance, safety and advanced features. Any adverse change in the production efficiency, product development efforts, technological advancement, marketplace acceptance, reputation, marketing capabilities or financial condition of our manufacturers, particularly Thor Industries, Inc. and Forest River, Inc., could have a substantial adverse impact on our business. Any difficulties encountered by any of these manufacturers, resulting from economic, financial, or other factors, could adversely affect the quality and amount of products that they are able to supply to us, and the services and support they provide to us.

The interruption or discontinuance of the operations of Thor Industries, Inc. and Forest River, Inc. or other manufacturers could cause us to experience shortfalls, disruptions, or delays with respect to needed inventory. Although we believe that adequate alternate sources would be available that could replace any manufacturer as a product source, those alternate sources may not be available at the time of any interruption, and alternative products may not be available at comparable quality and prices.

Our supply arrangements with manufacturers are typically governed by dealer agreements, which are customary in the RV industry. Our dealer agreements with manufacturers are generally made on a location-by-location basis, and each store location typically enters into multiple dealer agreements with multiple manufacturers. These dealer agreements may contain affirmative obligations that we must comply with. Our dealer agreements also generally provide for a one-year term, which is typically renewed annually. For more information on our dealer arrangements, see "Item 1. Business — Vehicle Sourcing and Dealer Arrangements" under Part I of this Form 10-K.

In addition, certain of our dealer agreements contain stocking level requirements and certain of our dealer agreements contain contractual provisions concerning minimum advertised product pricing for current model year units. Wholesale pricing is generally established on a model year basis and is subject to change at the manufacturer's sole discretion. In certain cases, manufacturers have, and may continue to establish a suggested retail price, below which we cannot advertise that manufacturer's RVs. Any change, non-renewal, unfavorable renegotiation or termination of these arrangements for any reason could adversely affect product availability and cost and our financial performance.

Table of Contents

***Changes in consumer preferences for our products or our failure to gauge those preferences could lead to reduced sales and increased cost of sales and selling, general and administrative expenses.***

We cannot be certain that historical consumer preferences for RVs in general, and any related products, will remain unchanged. RVs are generally used for recreational purposes, and demand for our products may be adversely affected by competition from other activities that occupy consumers' leisure time and by changes in consumer lifestyle, usage pattern, or taste. Similarly, an overall decrease in consumer leisure time may reduce consumers' willingness to purchase our products. During the COVID-19 pandemic, we experienced significant acceleration in our in-store traffic and revenue trends in May 2020 continuing into the quarter ended June 30, 2021 and demand for new and used vehicles remained elevated through the remainder of 2021 and into the beginning of 2022. The industry saw an influx of new first-time participants because RVs allowed people to travel in a safe and socially distant manner during the COVID-19 crisis. These trends are no longer prevalent and may not recur in the future. Over the past several years, we have seen a shift in our overall sales mix towards new travel trailer vehicles, which, prior to the COVID-19 pandemic, had led to declines in our average selling price of a new vehicle unit. From 2015 to 2024, new vehicle travel trailer units as a percent of total new vehicles increased from 62% to 77% of total new vehicle unit sales. From 2015 to 2024, our average selling price of a new vehicle unit increased 1%, from $39,853 to $40,089, as inflation over that period was partially offset by the higher mix of lower priced travel trailers. As a result of the lower industry supply of travel trailers and motorhomes for much of 2021, both average cost and average sales price increased in 2022 and 2021, but average selling price began to decrease in 2023 and continued in 2024.

***Competition in the market for services, protection plans, products and resources targeting the RV lifestyle or RV enthusiast could reduce our revenues and profitability.***

The markets for services, protection plans, products and resources targeting RV owners and enthusiasts are highly fragmented and competitive. Major competitive factors that drive the RV, outdoor and active sports markets are price, product and service features, technology, performance, reliability, quality, availability, variety, delivery and customer service. We compete directly or indirectly with the following types of companies:

- other RV dealers selling new and used RVs;
- major national insurance and warranty companies, providers of roadside assistance and providers of extended vehicle service contracts;
- multi-channel retailers and mass merchandisers, warehouse clubs, discount stores, department stores and other retailers, such as Wal-Mart, Target and Amazon;
- online retailers; and
- independent, local specialty stores.

Additional competitors may enter the businesses in which we currently operate. Moreover, some of our mass merchandising competitors do not currently compete in many of the product categories we offer, but may choose to offer a broader array of competing products in the future. Some of our competitors may build new stores in or near our existing locations and certain RV and accessory manufacturers may choose to expand their direct to consumer offerings. In addition, an increase in the number of aggregator and price comparison sites for insurance products may negatively impact our sales of these products. If any of our competitors successfully provides a broader, more efficient or attractive combination of services, protection plans, products and resources to our target customers, our business results could be materially adversely affected. Our inability to compete effectively with existing or potential competitors could have a material adverse effect on our business, financial condition and results of operations.

Table of Contents

***Our expansion into new, unfamiliar markets, businesses, product lines or categories presents increased risks that may prevent us from being profitable in these new markets, businesses, product lines or categories. Delays in opening new store locations, including greenfield locations and acquisitions, on anticipated timelines or at all, could have a material adverse effect on our business, financial condition and results of operations.***

As a result of any future expansion into new, unfamiliar markets, businesses, product lines or categories, we may have less familiarity with local consumer preferences and less business, product or category knowledge with respect to new businesses, product lines or categories, and could encounter difficulties in attracting customers due to a reduced level of consumer familiarity with our brands or reduced product or category knowledge. Other factors that may impact our ability to open new store locations, including greenfield locations and acquisitions, in new markets and to operate them profitably or acquire new businesses, product lines or categories, many of which are beyond our control, include:

- our ability to identify suitable acquisition opportunities or new locations, including our ability to gather and assess demographic and marketing data to determine consumer demand for our products in the locations we select or accurately assess profitability;
- our ability to negotiate favorable lease agreements;
- our ability to secure product lines;
- delays in the entitlement process, the availability of construction materials and labor for new store locations and significant construction delays or cost overruns;
- our ability to secure required third-party or governmental permits and approvals;
- our ability to hire and train skilled store operating personnel, especially management personnel;
- our ability to provide a satisfactory mix of merchandise that is responsive to the needs of our customers living in the geographic areas where new store locations are built or acquired;
- our ability to supply new store locations with inventory in a timely manner;
- our competitors building or leasing store locations near our store locations or in locations we have identified as targets; and
- regional economic and other factors in the geographic areas where we expand.

Our expansion into new markets, businesses, products or categories may not be supported adequately by our current resources, personnel and systems, and may also create new distribution and merchandising challenges, including additional strain on our distribution centers, an increase in information to be processed by our management information systems and diversion of management attention from existing operations. To the extent that we are not able to meet these additional challenges, our sales could decrease, and our operating expenses could increase, which could have a material adverse effect on our business, financial condition and results of operations.

Finally, the size, timing, and integration of any future new store location openings, including greenfield locations and acquisitions, or the acquisition of new businesses, product lines or categories may cause substantial fluctuations in our results of operations from quarter to quarter. Consequently, our results of operations for any quarter may not be indicative of the results that may be achieved for any subsequent quarter or for a full fiscal year. These fluctuations could adversely affect the market price of our common stock.

As a result of the above factors, we cannot assure you that we will be successful in operating our store locations in new markets or acquiring new businesses, product lines or categories on a profitable basis, and

our failure to do so could have a material adverse effect on our business, financial condition and results of operations.

***Unforeseen expenses, difficulties, and delays encountered in connection with acquisitions could inhibit our growth and negatively impact our profitability.***

Our ability to continue to grow through the acquisition of additional store locations will depend upon various factors, including the following:

- the availability of suitable acquisition candidates at attractive purchase prices;
- the ability to compete effectively for available acquisition opportunities;
- the availability of cash on hand, borrowed funds or Class A common stock with a sufficient market price to finance the acquisitions;
- the ability to obtain any requisite third-party or governmental approvals; and
- the absence of one or more third parties attempting to impose unsatisfactory restrictions on us in connection with their approval of acquisitions.

As a part of our strategy, we occasionally engage in discussions with various dealerships and other outdoor lifestyle businesses regarding their potential acquisition by us. In connection with these discussions, we and each potential acquisition candidate exchange confidential operational and financial information, conduct due diligence inquiries, and consider the structure, terms, and conditions of the potential acquisition. Potential acquisition discussions frequently involve difficult business integration and other issues, including in some cases, management succession and related matters. As a result of these and other factors, a number of potential acquisitions that from time to time have been announced or appear likely to occur do not result in binding legal agreements or are not consummated. In addition, we may have disagreements with potential acquisition targets, which could lead to litigation. Acquisitions that have closed may not have the intended benefit. Any of these factors or outcomes could result in a material adverse effect on our business, financial condition and results of operations.

***Failure to maintain the strength and value of our brands could have a material adverse effect on our business, financial condition and results of operations.***

Our success depends on the value and strength of our key brands, including Good Sam and Camping World. These brands are integral to our business as well as to the implementation of our strategies for expanding our business. Maintaining, enhancing, promoting and positioning our brands, particularly in new markets where we have limited brand recognition, will depend largely on the success of our marketing and merchandising efforts and our ability to provide high quality services, protection plans, products and resources and a consistent, high quality customer experience. Our brands could be adversely affected if we fail to achieve these objectives, if we fail to comply with local laws and regulations, if we are subject to publicized litigation or if our public image or reputation were to be tarnished by negative publicity. Some of these risks may be beyond our ability to control, such as the effects of negative publicity regarding our manufacturers, suppliers or third-party providers of services or negative publicity related to members of management. Any of these events could result in decreases in revenues. Further, maintaining, enhancing, promoting and positioning our brands' image may require us to make substantial investments, which could adversely affect our cash flow, and which may ultimately be unsuccessful. These factors could have a material adverse effect on our business, financial condition and results of operations.

***Our failure to successfully order and manage our inventory to reflect consumer demand in a volatile market and anticipate changing consumer preferences and buying trends has, and may continue to have, an adverse effect on our business, financial condition and results of operations.***

Our success depends upon our ability to successfully manage our inventory and to anticipate and respond to merchandise trends and consumer demands in a timely manner. Our products are intended to

appeal to consumers who are, or could become, RV owners and enthusiasts across North America. The preferences of these consumers cannot be predicted with certainty and are subject to change. Further, the retail consumer industry, by its nature, is volatile and sensitive to numerous economic factors, including consumer preferences, competition, market conditions, general economic conditions and other factors outside of our control. We typically order merchandise well in advance of the following selling season making it difficult for us to respond rapidly to new or changing product trends, increases or decreases in consumer demand or changes in prices. Additionally, we may not be able to adjust proprietary pricing tools, such as the RV Valuator, to respond to changes in consumer demand or pricing until after a trend is established. If we misjudge either the market for our merchandise or our consumers' purchasing habits in the future, our revenues may decline significantly, and we may not have sufficient quantities of merchandise to satisfy consumer demand or sales orders, or we may be required to discount excess inventory, either of which could have a material adverse effect on our business, financial condition and results of operations. For example, in the normal course of business, we periodically will implement discounting to reduce our excess RV inventory. During 2023 and early 2024, we discounted 2022 and 2023 model year RVs to reduce the mix of those model years compared to 2024 model year RVs that we had procured at a lower cost, which also resulted in the need for us to discount certain used RVs. This discounting resulted in a decrease in average selling prices of new and used vehicles in 2023 and early 2024. During the fourth quarter of 2022 and in connection with restructuring activities during 2023, we used clearance and discounted pricing on certain categories within our products, services, and other offerings to reduce our retail inventory levels. In addition, we have exited certain non-RV retail categories because we felt those categories did not have sufficient demand or sales margins to justify our inventory levels. These activities have negatively impacted our gross margin, operating margin and selling, general and administrative expenses and could materially adversely affect our future results of operations and financial condition.

***Our same store revenue may fluctuate and may not be a meaningful indicator of future performance.***

Our same store revenue may vary from period to period. In addition to the above risk factors a number of additional factors have historically affected, and will continue to affect, our same store revenue results, including:

- changes or anticipated changes to regulations related to some of the products we sell or to the localities in which we operate, such as the regulations passed in December 2021 by CARB that will prohibit the sale of gas-powered generators in California beginning in 2028 or the Advanced Clean Trucks regulation approved by CARB in March 2021, which places requirements on RV manufacturers that are expected to prevent many new diesel RV models from being sold in states that have adopted the regulation beginning with the 2024 model year;
- our ability to provide quality customer service that will increase our conversion of shoppers into paying customers;
- atypical weather patterns;
- changes in our product mix; and
- changes in pricing and average unit sales.

An unanticipated decline in revenues or same store revenue may cause the price of our Class A common stock to fluctuate significantly.

***Our business is seasonal and this leads to fluctuations in revenues.***

We have experienced, and expect to continue to experience, variability in revenue, net income and cash flows as a result of annual seasonality in our business. The RV outdoor and active sports specialty retail industries are cyclical and, because RVs are used primarily by vacationers and campers, demand for services, protection plans, products and resources generally declines during the winter season, while sales and profits are generally highest during the spring and summer months. In addition, unusually severe weather conditions in some geographic areas may impact demand.

Table of Contents

On average, over the three years ended December 31, 2024, we generated 30.5% and 27.5% of our annual revenue in the second and third fiscal quarters, respectively, which include the spring and summer months. We have historically incurred additional expenses in the second and third fiscal quarters due to higher purchase volumes, increased staffing in our store locations and program costs. If, for any reason, we miscalculate the demand for our products or our product mix during the second and third fiscal quarters, our sales in these quarters could decline, resulting in higher labor costs as a percentage of sales, lower margins and excess inventory, which could have a material adverse effect on our business, financial condition and results of operations. Additionally, selling, general, and administrative ("SG&A") expenses as a percentage of gross profit tend to be higher in the first and fourth quarters due to the seasonality of our business.

Due to our seasonality, the possible adverse impact from other risks associated with our business, including atypical weather, consumer spending levels and general business conditions, is potentially greater if any such risks occur during our peak sales seasons.

***Our ability to operate and expand our business and to respond to changing business and economic conditions will depend on the availability of adequate capital.***

The operation of our business, the rate of our expansion and our ability to respond to changing business and economic conditions depend on the availability of adequate capital, which in turn depends partly on cash flow generated by our business. We also require sufficient cash flow to meet our obligations under our existing debt agreements. (See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Description of Senior Secured Credit Facilities and Floor Plan Facility" in Item 7 of Part II of this Form 10-K). We cannot assure you that our cash flow from operations or cash available under our financing agreements, including our $65.0 million revolving credit facility (the "Revolving Credit Facility") or our floor plan financing through the Floor Plan Facility, will be sufficient to meet our needs. If we are unable to generate sufficient cash flows from operations in the future, and if availability under our Revolving Credit Facility or our Floor Plan Facility is not sufficient, or if additional borrowings under our Real Estate Facilities (as defined in Note 10 — Long-Term Debt to our consolidated financial statements included in Item 8 of Part II of this Form 10-K) are unavailable, we may have to obtain additional financing. If we obtain additional capital by issuing equity, the interests of our existing stockholders will be diluted. If we incur additional indebtedness, that indebtedness may contain significant financial and other covenants that may significantly restrict our operations.

***Our Senior Secured Credit Facilities and our Floor Plan Facility contain restrictive covenants that may impair our ability to access sufficient capital and operate our business.***

Our senior secured credit facilities, comprised of our Revolving Credit Facility and our $1.4 billion term loan facility (the "Term Loan Facility" and together with the Revolving Credit Facility, the "Senior Secured Credit Facilities") and our Floor Plan Facility contain various provisions that limit our ability to, among other things:

- incur additional indebtedness;
- incur certain liens;
- consolidate or merge;
- alter the business conducted by us and our subsidiaries;
- make investments, loans, advances, guarantees and acquisitions;
- sell assets, including capital stock of our subsidiaries;
- pay dividends on capital stock or redeem, repurchase or retire capital stock or certain other indebtedness;
- engage in transactions with affiliates; and

- enter into agreements restricting our subsidiaries' ability to pay dividends.

In addition, the restrictive covenants in our Senior Secured Credit Facilities and our Floor Plan Facility require us to maintain specified financial ratios and provide for acceleration of the indebtedness thereunder in the case of certain events of default, which could have a material adverse effect on our business, financial condition and results of operations. See "Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Description of Senior Secured Credit Facilities and Floor Plan Facility" in Item 7 of Part II of this Form 10-K and Note 10 — Long-Term Debt to our consolidated financial statements included in Item 8 of Part II of this Form 10-K. Our ability to comply with those financial ratios may be affected by events beyond our control, and our failure to comply with these ratios could result in an event of default. In an event of default, we may not have sufficient funds available, or we may not have access to sufficient capital from other sources, to repay any accelerated debt and our lenders could foreclose on liens which cover substantially all of our assets.

***Future pandemics or health crises may have negative impacts on our business, including disruptions to our operations that could have a material adverse effect on our results of operations, financial condition and cash flows.***

Future pandemics or health crises may have negative impacts on our business, including, without limitation, the following:

- delays in the delivery of certain products from our vendors as a result of shipping delays;
- temporary facility closures, production slowdowns and disruption to operations;
- increased product costs or shortages;
- reduced traffic at our store locations or reduced demand for our products and services;
- labor shortages including for key positions;
- financial impacts that could cause one or more of our counterparty financial institutions to fail or default on their obligations to us or for us to default on one or more of our credit agreements;
- potential significant impairment charges with respect to noncurrent assets, including goodwill, other intangible assets, and other long-lived assets, as well as inventory whose fair values may be negatively affected; and
- heightened cybersecurity risks during periods of increased remote working.

These and other disruptions to our business could have a material adverse effect on our results of operations, financial condition and cash flows.

***We may not successfully execute or achieve the expected benefits of our cost cutting initiatives.***

From time to time, we engage in cost cutting or restructuring initiatives to try to streamline our organizational footprint. These initiatives may not have the intended benefits and may result in unintended consequences and costs, such as the loss of institutional knowledge and expertise, attrition beyond the intended number of employees impacted by any reduction in force, and decreased morale among our remaining employees. We also may be unable to terminate or sublet applicable leases related to such initiatives, which has occurred in connection with recent restructuring initiatives. If we are unable to realize the anticipated benefits from our cost cutting or restructuring initiatives, or if we experience significant adverse consequences from such initiatives, our business, financial condition, and results of operations may be materially adversely affected.

Table of Contents

***We primarily rely on our fulfillment and distribution centers for our retail, e-commerce and catalog businesses, and, if there is a natural disaster or other serious disruption at any such facility, we may be unable to deliver merchandise effectively to our stores or customers.***

We handle almost all of our e-commerce and catalog orders and distribution to our retail stores through fulfillment and distribution facilities (see "Item 2. Properties" under Part I of this Form 10-K). Any natural disaster or other serious disruption at any such facility due to fire, tornado, earthquake, flood or any other cause could damage our on-site inventory or impair our ability to use such distribution and fulfillment center. While we maintain business interruption insurance, as well as general property insurance, the amount of insurance coverage may not be sufficient to cover our losses in such an event. Any of these occurrences could impair our ability to adequately stock our stores or fulfill customer orders and harm our results of operations.

***Natural disasters, whether or not caused by climate change, unusual weather conditions, epidemic outbreaks, terrorist acts and political events could disrupt business and result in lower sales and otherwise adversely affect our financial performance.***

The occurrence of one or more natural disasters, such as tornadoes, hurricanes, fires, droughts, floods, hail storms and earthquakes, unusual weather conditions, epidemic outbreaks such as Ebola, Zika virus, bird flu, novel coronavirus or measles, or other public health crises, terrorist attacks or disruptive political events in certain regions where our stores are located could adversely affect our business and result in lower sales, or could impact the degree to which travel and recreational activities remain attractive, either of which could have a material adverse effect on our business, financial condition, and results of operations. Severe weather, such as heavy snowfall or extreme temperatures, may discourage or restrict customers in a particular region from traveling to our stores or utilizing our products, thereby reducing our sales and profitability. Natural disasters including tornadoes, hurricanes, droughts, floods, hailstorms and earthquakes may damage our stores or other operations, which may materially adversely affect our consolidated financial results. In addition to business interruption, our retail business is subject to substantial risk of property loss due to the concentration of property at our store locations. Climate change and other environmental and social pressures may impact the frequency and/or intensity of such events as well as cause chronic changes, such as changes in temperature or precipitation patterns or sea-level rise, that may also have an adverse impact on our operations, including but not limited to a change in consumer behavior, including with respect to the degree to which travel and recreational activities remain attractive. To the extent these events also impact one or more of our key suppliers or result in the closure of one or more of our distribution centers or our corporate headquarters, we may be unable to maintain inventory balances, maintain delivery schedules or provide other support functions to our stores. Our insurance coverage may also be insufficient to cover all losses related to such events, or changing climatic conditions may make it so that we are not able to obtain sufficient insurance coverage on terms that we find acceptable. Any of these events could have a material adverse effect on our business, financial condition and results of operations.

***We depend on our relationships with third-party providers of services, protection plans, products and resources and a disruption of these relationships or of these providers' operations could have an adverse effect on our business and results of operations.***

Our business depends in part on developing and maintaining productive relationships with third-party providers of services, protection plans, products and resources that we market to our customers. During the year ended December 31, 2024, we sourced our products from over 2,800 domestic and international vendors. Additionally, we rely on certain third-party providers to support our services, protection plans, products and resources, including insurance carriers for our property and casualty insurance and extended service contracts, banks and captive financing companies for vehicle financing and refinancing, Comenity Capital Bank as the issuer of our co-branded credit card, and a tow provider network for our roadside assistance programs. We cannot accurately predict when, or the extent to which, we will experience any disruption in the supply of products from our vendors or suppliers or services from our third-party providers. Any such disruption could negatively impact our ability to market and sell our services, protection plans, products and resources, which could have a material adverse effect on our business, financial condition and results of operations. In addition, Comenity Capital Bank could decline to renew our services agreement or become insolvent and unable to perform our contract, and we may be unable to timely find a replacement bank to provide these services.

We depend on merchandise purchased from our vendors to obtain products for our store locations. We have no contractual arrangements providing for continued supply from our key vendors, and our vendors may discontinue selling to us at any time. Changes in commercial practices of our key vendors or manufacturers, such as changes in vendor support and incentives or changes in credit or payment terms, could also negatively impact our results. If we lose one or more key vendors or are unable to promptly replace a vendor that is unwilling or unable to satisfy our requirements with a vendor providing equally appealing products at comparable prices, we may not be able to offer products that are important to our merchandise assortment.

We also are subject to risks, such as the price and availability of raw materials, shipping delays, labor disputes, trade restrictions, union organizing activity, strikes, inclement weather, natural disasters, war and terrorism and adverse general economic and political conditions that might limit our vendors' ability to provide us with quality merchandise on a timely and cost-efficient basis. We may not be able to develop relationships with new vendors, and products from alternative sources, if any, may be of a lesser quality and more expensive than those we currently purchase. Any delay or failure in offering quality products and services to our customers could have a material adverse effect on our business, financial condition and results of operations.

We offer emergency roadside assistance to our customers at a fixed price per year and we pay our tow provider network based on usage. If the amount of emergency roadside claims substantially exceeds our estimates or if our tow provider is unable to adequately respond to calls, it could have a material adverse effect on our business, financial condition or results of operations.

With respect to the insurance programs that we offer, we are dependent on the insurance carriers that underwrite the insurance to obtain appropriate regulatory approvals and maintain compliance with insurance regulations. If such carriers are out of compliance, we may be required to use an alternative carrier or products or cease marketing certain products in certain states, which could have a material adverse effect on our business, financial condition and results of operations. If we are required to use an alternative carrier or change our products, it may materially increase the time required to bring an insurance related product to market. Any disruption in our service offerings could harm our reputation and result in customer dissatisfaction.

Additionally, we provide financing to qualified customers through a number of third-party financing providers. If one or more of these third-party providers ceases to provide financing to our customers, provides financing to fewer customers or no longer provides financing on competitive terms, or if we were unable to replace the current third-party providers upon the occurrence of one or more of the foregoing events, it could have a material adverse effect on our business, financial condition and results of operations.

***Because certain of the products that we sell are manufactured abroad, we may face delays, new or increased tariffs, increased cost or quality control deficiencies in the importation of these products, which could reduce our net sales and profitability.***

A portion of the products that we purchase for resale, including those purchased from domestic suppliers, is manufactured abroad in China, Mexico and other countries. In addition, we believe most of our non-RV private label merchandise is manufactured abroad. Additionally, many of our U.S.-based suppliers source some of their components from these countries, which could result in higher procurement costs from U.S.-based suppliers. In 2024, our costs applicable to revenue included the costs of directly sourced inventory from China, Mexico, and Canada of approximately $27.0 million, $10.0 million and $2.0 million, respectively.

Trade tensions between the United States and China, Mexico, Canada, Russia and other countries has escalated in recent years. We may not be able to mitigate the impacts of any future tariffs or trade restrictions, and our business, results of operations and financial position would be materially adversely affected. As a result, our foreign imports, in particular imports from China and Mexico, subject us to the risks of changes in, or the imposition of new import tariffs, duties or quotas, new restrictions on imports, loss of "most favored nation" status with the United States for a particular foreign country, antidumping or countervailing duty orders, retaliatory actions in response to illegal trade practices, work stoppages, delays in shipment, trade route challenges due to global political tensions, freight expense increases, product cost increases due to foreign currency fluctuations or revaluations and economic uncertainties. If any of these or other factors were to cause a disruption of trade from the countries in which our vendors or the suppliers of our vendors are located or

impose additional costs in connection with the purchase of our products, we may be unable to obtain sufficient quantities of products to satisfy our requirements and our results of operations could be adversely affected.

Additionally, there are increasing expectations that companies monitor the environmental and/or social performance of their suppliers, including compliance with a variety of labor practices. There is also increased attention regarding the end of life considerations for products like ours, and we could experience increased expectations and regulations that effect our ability to sell our products. Compliance with emerging expectations and regulations can be costly, require us to establish or augment programs to diligence or monitor our suppliers, or, in the case of legislation such as the Uyghur Forced Labor Prevention Act, to design supply chains to avoid certain regions altogether. To the extent that any foreign manufacturers which supply products to us directly or indirectly utilize quality control standards, labor practices or other practices that vary from those legally mandated or commonly accepted in the United States, we could be hurt by a variety of adverse impacts, including but not limited to any resulting negative publicity or, in some cases, face potential liability or a denial of import for our products.

***A portion of our net income is related to financing, insurance and extended service contracts, which depend on third-party lenders and insurance companies. We cannot assure you that third-party lending institutions will continue to provide financing for RV purchases.***

A portion of our net income comes from the fees we receive from lending institutions and insurance companies for arranging financing and insurance coverage for our customers unless customers prepay the financing within a specified period (generally within six months of making the loan), in which case we are required to rebate (or “chargeback”) all or a portion of the commissions paid to us by the lending institution. Our revenues from financing fees and vehicle service contract fees are recorded net of a reserve for estimated future chargebacks based on historical operating results. Lending institutions may change the criteria or terms they use to make loan decisions, which could reduce the number of customers for whom we can arrange financing, or may elect to not continue to provide these products with respect to RVs. Our customers may also use the internet or other electronic methods to find financing alternatives. If any of these events occur, we could lose a significant portion of our income and profit. Our arrangements with lending institutions are typically governed by retail dealer agreements, which are customary in the RV industry. Our retail dealer agreements with lenders are generally made on a location by location basis, and each store location typically enters into multiple retail dealer agreements with multiple lending institutions. These retail dealer agreements may contain affirmative obligations that we must comply with.

Furthermore, new and used vehicles may be sold and financed through retail installment sales contracts entered into between us and third-party purchasers. Prior to entering into a retail installment sales contract with a third-party purchaser, we typically have a commitment from a third-party lender for the assignment of such retail installment sales contract, subject to final review, approval and verification of the retail installment sales contract, related documentation and the information contained therein. Retail installment sales contracts are typically assigned by us to third-party lenders simultaneously with the execution of the retail installment sales contracts. Contracts in transit represent amounts due from third-party lenders from whom pre-arranged assignment agreements have been determined, and to whom the retail installment sales contracts have been assigned. We recognize revenue from the sale of new and used vehicles upon completion of the sale to the customer. Conditions to completing a sale include having an agreement with the customer, including pricing, whereby the sales price must be reasonably expected to be collected and having control transferred to the customer. Funding from the third-party lender is provided upon receipt, final review, approval and verification of the retail installment sales contract, related documentation and the information contained therein. Retail installment sales contracts are typically funded within ten days of the initial approval of the retail installment sales contract by the third-party lender. Contracts in transit are included in current assets in our consolidated financial statements included in Item 8 of Part II of this Form 10-K and totaled $61.2 million and $60.2 million as of December 31, 2024 and December 31, 2023, respectively. Any defaults on these retail installment sales contracts could have a material adverse effect on our business, financial condition and results of operations.

Table of Contents

***If we are unable to retain senior executives and attract and retain other qualified employees, our business might be adversely affected.***

Our success depends in part on our ability to attract, hire, train and retain qualified managerial, sales, marketing, and service personnel. Competition for these types of personnel is high. We may be unsuccessful in attracting and retaining the personnel we require to conduct our operations successfully and, in such an event, our business could be materially and adversely affected. Our success also depends to a significant extent on the continued service and performance of our senior management team, including our Chairman and Chief Executive Officer, Marcus A. Lemonis. The loss of any member of our senior management team, or our failure to successfully manage any retirements or transitions in senior management or the integration of senior management into new roles could impair our ability to execute our business plan and could therefore have a material adverse effect on our business, results of operations and financial condition.

For example, on June 1, 2024, Brent L. Moody, our President at the time, and Karin L. Bell, our Chief Financial Officer at the time, announced their resignations from their respective roles effective July 1, 2024, following which each transitioned to a role of Senior Advisor through their retirement dates of December 31, 2024 (for Mr. Moody) and the date that we file our Form 10-K with the SEC for the year ended December 31, 2024 (for Ms. Bell). Mr. Moody continues to serve as a member of our Board of Directors following his retirement. Effective July 1, 2024, Matthew D. Wagner was appointed as our President and will continue to serve as our principal operating officer. Additionally, effective July 1, 2024, Thomas E. Kirn was appointed as our Chief Financial Officer and principal financial officer. He will continue to serve as our principal accounting officer.

Additionally, certain members of our management team, including Mr. Lemonis, currently pursue and may continue to pursue other business ventures, which could divert their attention from executing on our business plan and objectives. For example, Mr. Lemonis currently serves as the Executive Chairman of Beyond, Inc., a publicly traded company. We do not currently maintain key-man life insurance policies on any member of our senior management team or other key employees.

***We are subject to risks associated with leasing substantial amounts of space.***

We lease the majority of the real properties where we have retail operations as well as certain corporate offices and distribution centers. Our leases generally provide for fixed monthly rentals with escalation clauses and range from five to twenty years. The profitability of our business is in part dependent on renewing leases for stores in desirable locations and, if necessary, identifying and closing underperforming stores or relocating these stores to alternative locations in a cost-effective manner. Typically, a large portion of a store’s operating expense is the cost associated with leasing the location.

Additionally, over time our current store locations may not continue to be desirable because of changes in demographics within the surrounding area or a decline in shopping traffic, including traffic generated by other nearby stores. Although we have the right to terminate some of our leases under specified conditions by making certain payments, we may not be able to terminate a particular lease if or when we would like to do so. If we decide to close stores, we are generally required to either continue to pay rent and operating expenses for the balance of the lease term or, for certain locations, pay exercise rights to terminate, which in either case could be expensive. Even if we are able to assign or sublease vacated locations where our lease cannot be terminated, we may remain liable on the lease obligations if the assignee or sublessee does not perform.

If we are unable to service our lease expenses or are unable to, on favorable terms, negotiate renewals of leases at desirable locations or identify and close underperforming locations, we may be forced to seek alternative sites in our target markets, which may be difficult and have a material adverse effect on our business, financial condition and results of operations.

Table of Contents

***Our private brand offerings expose us to various risks.***

We expect to continue to grow our exclusive private brand offerings, sometimes referred to as contract manufacturing, through a combination of brands that we own and brands that we license from third parties. We have invested in our development and procurement resources and marketing efforts relating to these private brand offerings. Although we believe that our private brand products offer value to our customers at each price point and provide us with higher gross margins than comparable third-party branded products we sell, the expansion of our private brand offerings also subjects us to certain specific risks in addition to those discussed elsewhere in this section, such as:

- potential mandatory or voluntary product recalls;
- our ability to successfully protect our proprietary rights (including defending against counterfeit, knock offs, grey-market, infringing or otherwise unauthorized goods);
- our ability to successfully navigate and avoid claims related to the proprietary rights of third parties;
- our ability to successfully administer and comply with obligations under license agreements that we have with the licensors of brands, including, in some instances, certain minimum sales requirements that, if not met, could cause us to lose the licensing rights or pay damages; and
- other risks generally encountered by entities that source, sell and market exclusive branded offerings for retail.

An increase in sales of our private brands may also adversely affect sales of our vendors' products, which may, in turn, adversely affect our relationship with our vendors. Our failure to adequately address some or all of these risks could have a material adverse effect on our business, results of operations and financial condition.

***We could incur asset impairment charges for goodwill, intangible assets or other long-lived assets.***

We have a significant amount of goodwill, intangible assets and other long-lived assets. At least annually, we review goodwill for impairment. Long-lived assets, operating lease assets, identifiable intangible assets and goodwill are also reviewed for impairment whenever events or changes in circumstances indicate the carrying amount of an asset may not be recoverable from future cash flows. These events or circumstances could include a significant change in the business climate, legal factors, operating performance indicators, competition, sale or disposition of a significant portion of the business or other factors. If the carrying value of a long-lived asset is considered impaired, an impairment charge is recorded for the amount by which the carrying value of the long-lived asset exceeds its fair value. Our determination of future cash flows, future recoverability and fair value of our long-lived assets as well as the reporting unit fair value used in our goodwill analysis include significant estimates and assumptions. Changes in those estimates or assumptions or lower than anticipated future financial performance may result in the identification of an impaired asset and a noncash impairment charge, which could be material. See Note 5 — Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Item 8 of Part II of this Form 10-K for a discussion of impairment charges for the year ended December 31, 2024. We may in the future identify additional impairment charges and any such charges could adversely affect our business, financial condition and results of operations.

**Risks related to Regulation and Litigation**

***Our business is subject to numerous federal, state and local regulations.***

Our operations are subject to varying degrees of federal, state and local regulation, including our RV sales, RV financing, outbound telemarketing, direct mail, roadside assistance programs, insurance activities, and the sale of extended service contracts. New regulatory efforts may be proposed from time to time that have a material adverse effect on our ability to operate our businesses or our results of operations. For example, in the past a principal source of leads for our direct response marketing efforts was new vehicle registrations

Table of Contents

provided by motor vehicle departments in various states. Currently, all states restrict access to motor vehicle registration information.

We receive, store, handle, transmit, use, and otherwise process information that relates to individuals and/or constitutes “personal data,” “personal information,” “personally identifiable information,” or similar terms under applicable data privacy laws (collectively, “Personal Information”), as well as Personal Information from and about actual and prospective customers, club members, associates, employees, suppliers and service providers and proprietary information belonging to our business or to our business partners (collectively, “Confidential Information”). We also depend on a number of third party vendors in relation to the operation of our business, a number of which process Confidential Information on our behalf. We, and our vendors, are subject to a number of laws, regulations, industry standards, and other requirements relating to consumer protection, information security and, data protection and privacy, including those that apply generally to the handling of Confidential Information about individuals, and those that are specific to certain industries, sectors, contexts, or locations. Many of these laws and regulations are still evolving and could be interpreted in ways that could harm our business or limit the services we are able to offer.

For example, the Federal Trade Commission and state regulators enforce a variety of data privacy issues, such as promises made in privacy policies or failures to appropriately protect information about individuals, as unfair or deceptive acts or practices in or affecting commerce in violation of the Federal Trade Commission Act or similar state laws. Moreover, certain states in the United States and most countries have adopted privacy and security laws that apply to our business. These laws generally require companies to implement specific privacy and information security controls and legal protections to protect certain types of Personal Information and to collect or use it subject to disclosures. Additional compliance investment and potential business process changes may continue to be required as these laws and others go into effect. Further, in order to comply with the varying state laws around data breaches, we must maintain adequate security measures, which require significant investments in resources and ongoing attention.

Further, laws, regulations, and standards covering marketing, advertising, and other activities conducted by telephone, email, mobile devices, and the internet may be or become applicable to our business, such as the Federal Communications Act, the Federal Wiretap Act, the Electronic Communications Privacy Act, the Telephone Consumer Protection Act, the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, and similar state consumer protection and communication privacy laws, such as California’s Invasion of Privacy Act.

Additionally, we may be considered a “financial institution” under the Gramm-Leach Bliley Act (the “GLBA”). The GLBA regulates, among other things, the use of certain information about individuals (“non-public personal information”) in the context of the provision of financial services, including by banks and other financial institutions. The GLBA includes both a “Privacy Rule,” which imposes obligations on financial institutions relating to the use or disclosure of non-public personal information, and a “safeguards rule,” which imposes obligations on financial institutions and, indirectly, their service providers to implement and maintain physical, administrative and technological measures to protect the security of non-public personal financial information. Any failure to comply with the GLBA could result in substantial financial penalties.

Even though we believe we and our vendors are generally in compliance with applicable laws, rules and regulations relating to privacy and data security, these laws are in some cases relatively new and the interpretation and application of these laws are uncertain. Any failure or perceived failure by us to comply with data privacy laws, rules, regulations, industry standards and other requirements could result in proceedings or actions against us by individuals, consumer rights groups, governmental agencies, or others. We could incur significant costs in investigating and defending such claims and, if found liable, pay significant damages or fines or be required to make changes to our business. Further, these proceedings and any subsequent adverse outcomes may subject us to significant negative publicity and an erosion of trust. If any of these events were to occur, our business, results of operations, and financial condition could be materially adversely affected.

We are also subject to federal and numerous state consumer protection and unfair trade practice laws and regulations relating to the sale, transportation and marketing of motor vehicles, including so-called “lemon laws.” Federal, state and local laws and regulations also impose upon vehicle operators various restrictions on the length and width of motor vehicles that may be operated in certain jurisdictions or on certain roadways.

Certain jurisdictions also prohibit the sale of vehicles exceeding length restrictions. Federal and state authorities also have various environmental control standards relating to air, water, noise pollution and hazardous waste generation and disposal which affect our business and operations.

We and the RVs we sell are subject to environmental regulations that may adversely impact us. For example, regulations passed in December 2021 by the CARB will prohibit the sale of gas-powered generators in California beginning in 2028. Additionally, CARB approved the Advanced Clean Trucks regulation in March 2021, which places requirements on RV manufacturers that are expected to prevent many new diesel RV models from being sold in states that have adopted the regulation beginning with the 2024 model year. See Item 1A, "Risk Factors — Fuel shortages, high prices for fuel, or changes in energy sources could have a negative effect on our business." for additional information on these regulations and recent executive orders impacting such regulations. We may not have offerings available to satisfy any such requirements or such alternative energy sources could be less desirable to our customers or result in reduced towing capacity, which may reduce demand or lower margins and adversely affect our business, financial condition or results of operations.

Our business is also affected by other laws and regulations including, but not limited to, labor (including federal and state minimum wage and overtime requirements), advertising, real estate, promotions, quality of services, intellectual property, tax, import and export, anti-corruption, anti-competition, environmental, health and safety.

Furthermore, our property and casualty insurance programs, and our extended service contracts that we offer through third-party insurance carriers are subject to various federal and state laws and regulations governing the business of insurance, including, without limitation, laws and regulations governing the administration, underwriting, marketing, solicitation, liability obligations or sale of insurance programs. Any failure by us or our third-party insurance providers to comply with current licensing and approval requirements could result in such regulators denying their initial or renewal applications for such licenses, modifying the terms of licenses or revoking licenses that they currently possess, which could severely inhibit our ability to market these products. Additionally, certain state laws and regulations govern the form and content of certain disclosures that must be made in connection with the sale, advertising or offer of any insurance program to a consumer. If we fail to comply with these regulations, we may be ordered to pay fines or penalties by regulators or to discontinue certain products.

We offer extended service contracts and gap insurance that may be purchased as a supplement to the original purchaser's warranty. These products are subject to complex federal and state laws and regulations. There can be no assurance that regulatory authorities in the jurisdictions in which these products are offered will not seek to regulate or restrict these products. Failure to comply with applicable laws and regulations, including with respect to the transfer of administration and liability obligations associated with these extended service contracts to a third party upon purchase by the customer, could result in fines or other penalties including orders by state regulators to discontinue sales of the warranty products in one or more jurisdictions. Such a result could materially and adversely affect our business, results of operations and financial condition.

State dealer laws generally provide that a manufacturer may not terminate or refuse to renew a dealer agreement unless it has first provided the dealer with written notice setting forth good cause and stating the grounds for termination or non-renewal. If such dealer laws are repealed in the states in which we operate, manufacturers may be able to terminate our dealer agreements without providing advance notice, an opportunity to cure or a showing of good cause. Without the protection of state dealer laws, it may also be more difficult for our dealerships to renew their dealer agreements upon expiration.

Several states currently have laws in effect that are similar to, and in certain cases, more restrictive than, these federal laws. Compliance with these regulations is costly and time-consuming. Inadvertent violation of any of these regulations could cause us to incur fines and penalties and may also lead to restrictions on our ability to manufacture and sell our products and services and to import or export the products we sell.

We have instituted various and comprehensive policies and procedures to address compliance. However, there can be no assurance that we or our employees, contractors, vendors or our agents will not violate such laws and regulations or our policies and procedures. Compliance with these laws and others may

be onerous and costly, at times, and may be inconsistent from jurisdiction to jurisdiction which further complicates compliance efforts. The Company is subject to litigation related to these laws and others and has experienced an increase in wage and hour litigation. Any non-compliance with these laws and others could lead to further litigation or fines, which could adversely affect our business, results of operations and financial condition.

For more information on the various regulations applicable to our business, see “Item I. Business—Laws and Regulations” under Part I of this Form 10-K.

***We are subject to environmental, health and safety laws and regulations, violations of which could adversely affect our business, financial condition and results of operations.***

Our operations involve the use, handling, storage and contracting for recycling and/or disposal/discharge of materials such as motor oil and filters, transmission fluids, antifreeze, refrigerants, paints, thinners, batteries, cleaning products, lubricants, degreasing agents, tires and propane. Consequently, our business is subject to a complex variety of federal, state and local requirements that regulate the environment, public health and safety, and we may incur significant costs to comply with such requirements, which costs may increase if existing laws and regulations are revised or reinterpreted or if new laws and regulations become applicable to our operations. Certain of our operations may also require permits or other approvals, which may delay our ability to execute on portions of our business strategy. Our failure to comply with these regulations could cause us to become subject to fines and penalties or otherwise have an adverse impact on our business. In addition, we indemnify certain of our landlords for any hazardous waste which may be found on or about property we lease that may become the subject of a claim arising during or after our lease term. Certain environmental laws impose liability on us, as the owner or operator, for environmental contamination at our properties without regard to whether we knew of or caused the contamination or the legality of the release or disposal action at the time of its occurrence. If any such hazardous waste were to be found on property that we occupy, a claim giving rise to our liability could have a negative effect on our business, financial condition and results of operations.

***Our operations are subject to a series of risks related to climate change and other environmental, social, and governance (“ESG”) matters.***

There is scrutiny from investors, customers, policymakers, and other stakeholders regarding companies’ management of ESG matters, such as climate change and human capital. For example, regulatory, market, and other changes to respond to climate change, such as the fuel economy and GHG emissions regulations promulgated by EPA and CARB (see above "—Fuel shortages, high prices for fuel, or changes in energy sources could have a negative effect on our business”), may adversely impact our business, financial condition, or results of operations. We may not have offerings available to satisfy such requirements or such alternative energy sources could be less desirable to our customers or result in reduced towing capacity, which may reduce demand or lower margins and adversely affect our business, financial condition or results of operations.

Developing alternatives that satisfy the market’s evolving expectations of, among other things, vehicle emissions profiles may require us to incur significant costs. Additionally, there are several competing alternatives to replace petroleum-based fuels for vehicles, including but not limited to: electricity, hydrogen, and compressed and/or renewable gas. To the extent potential customers prefer technologies different from those used in the vehicles we offer for sale, or are prohibited by law in certain jurisdictions from purchasing vehicles that we sell (i.e., new vehicles that use gasoline fuel), then demand for such vehicles may not develop or may not develop as quickly as we expect.

Expectations around the company’s management of ESG matters continues to evolve rapidly, in many instances due to factors that are out of our control. Any voluntary efforts we engage in (including disclosures, certifications, goals, or others) to improve the ESG profile of our company and/or products may be costly and may not have the desired effect. Moreover, various stakeholders have different, and at times conflicting, expectations. For example, while some policymakers (such as the State of California) have adopted requirements for various disclosures or actions on environmental and social matters, policymakers in other jurisdictions have sought to constrain companies’ consideration of such matters in certain circumstances. Both

advocates and opponents to certain ESG matters are increasingly resorting to a range of activism forms, including media campaigns and litigation, to advance their perspectives. We may be required to incur costs to manage ESG matters or navigate stakeholder expectations regarding same, and any failure to sufficiently or appropriately do so, including any divergent legal requirements or novel interpretations of existing requirements, may result in reputational damage, as well as impacts to our ability to attract and retain employees or customers, regulatory or investor engagement, or other adverse impacts. This and other stakeholder expectations will likely lead to increased costs as well as scrutiny that could heighten all of the risks identified in this risk factor. All of these risks may also impact our suppliers or customers, which may indirectly impact our business, financial condition, or results of operations.

***A failure in our e-commerce operations, security breaches and cybersecurity risks could disrupt our business and lead to reduced sales and growth prospects and reputational damage.***

Consumers are increasingly embracing shopping online and through mobile commerce applications. As a result, a growing portion of total consumer expenditures with retailers is occurring online and through mobile commerce applications and a declining portion of total consumer expenditures is occurring at brick and mortar store locations. Our e-commerce business is an important element of our brands and relationship with our customers, and we expect it to continue to grow. In addition to changing consumer preferences and shifting traffic patterns and buying trends in e-commerce, we are vulnerable to additional risks and uncertainties associated with e-commerce sales, including rapid changes in technology, website downtime and other technical failures, security breaches, cyber-attacks, consumer privacy concerns, changes in state tax regimes and government regulation of internet activities (for additional discussion of security breaches and cyber attacks, *see* – “Disruptions or breaches involving our or our third-party providers’ information technology systems or network security could interrupt our operations, compromise our reputation, expose us to litigation, government enforcement actions and costly response measures and could have a material adverse effect on our business, financial condition and results of operations”). Our failure to successfully respond to these risks and uncertainties could reduce our e-commerce sales, increase our costs, diminish our growth prospects and damage our brands, which could negatively impact our results of operations and stock price.

In addition, there is no guarantee that we will be able to expand our e-commerce business. Our competitors may have e-commerce businesses that are substantially larger and more developed than ours, which places us at a competitive disadvantage. Although we continually update our websites, we may not be successful in implementing improved website features and there is no guarantee that such improvements will expand our e-commerce business. If we are unable to expand our e-commerce business, our growth plans will suffer, and the price of our common stock could decline.

***We may be unable to enforce our intellectual property rights and we may be accused of infringing the intellectual property rights of third parties which could have a material adverse effect on our business, financial condition and results of operations.***

We own a variety of registered trademarks and service marks for the names of our clubs, magazines and other publications. We also own the copyrights to certain articles in our publications. We believe that our trademarks and copyrights have significant value and are important to our marketing efforts. If we are unable to continue to protect the trademarks and service marks for our proprietary brands, if such marks become generic or if third parties adopt marks similar to our marks, our ability to differentiate our products and services may be diminished. In the event that our trademarks or service marks are successfully challenged by third parties, we could lose brand recognition and be forced to devote additional resources to advertising and marketing new brands for our products.

From time to time, we may be compelled to protect our intellectual property, which may involve litigation. Such litigation may be time-consuming, expensive and distract our management from running the day-to-day operations of our business, and could result in the impairment or loss of the involved intellectual property. There is no guarantee that the steps we take to protect our intellectual property, including litigation when necessary, will be successful. The loss or reduction of any of our significant intellectual property rights could diminish our ability to distinguish our products from competitors’ products and retain our market share for our proprietary products. Our inability to effectively protect our proprietary intellectual property rights could have a material adverse effect on our business, results of operations and financial condition.

Table of Contents

Other parties also may claim that we infringe their proprietary rights. Such claims, whether or not meritorious, may result in the expenditure of significant financial and managerial resources, injunctions against us or the payment of damages. These claims could have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to maintain or upgrade our information technology systems or if we are unable to convert to alternate systems in an efficient and timely manner, our operations may be disrupted or become less efficient.***

We depend on a variety of information technology systems for the efficient functioning of our business. We rely on certain hardware, telecommunications and software vendors to maintain and periodically upgrade many of these systems so that we can continue to support our business. Various components of our information technology systems, including hardware, networks, and software, are licensed to us by third-party vendors. We rely extensively on our information technology systems to process transactions, summarize results and manage our business. Additionally, because we accept debit and credit cards for payment, we are subject to the Payment Card Industry Data Security Standard ("PCI-DSS"), issued by the Payment Card Industry Security Standards Council. Costs and potential problems and interruptions associated with the implementation of new or upgraded systems and technology such as those necessary to maintain compliance with the PCI-DSS or with maintenance or adequate support of existing systems could also disrupt or reduce the efficiency of our operations (for additional discussion of risks related to PCI-DSS, *see* – "Disruptions or breaches involving our or our third-party providers' IT Systems or Confidential Information could interrupt our operations, compromise our reputation, expose us to litigation, government enforcement actions and costly response measures and could have a material adverse effect on our business, financial condition and results of operations"). Any material interruptions or failures in our payment-related systems could have a material adverse effect on our business, financial condition and results of operations.

***Disruptions or breaches involving our or our third-party providers' IT Systems or Confidential Information could interrupt our operations, compromise our reputation, expose us to litigation, government enforcement actions and costly response measures and could have a material adverse effect on our business, financial condition and results of operations.***

We rely on the integrity, security and successful functioning of our computer systems, hardware, software, technology infrastructure, and online sites and networks (collectively, "IT Systems") across our operations. While we own and operate certain parts of our IT Systems, we also rely on critical third-party service providers for an array of IT Systems and related products and services. We use IT Systems for external and internal functions, such as to support product sales, our Good Sam services and plans, manage procurement and our supply chain, track inventory information at our store locations, and to communicate customer information, aggregate daily sales, margin and promotional information. We also use IT Systems to report and audit our operational results. In addition, we and our third-party providers have access to, collect, process, use and maintain Confidential Information.

We and our third-party providers experience cyberattacks and security incidents. For example, we previously experienced a security incident in February 2022 (the "Cybersecurity Incident"), that resulted in a temporary disruption to our operations and caused the Company to incur costs, including legal and other professional fees and investments related to the security of our IT Systems. Additionally, we were subject to certain litigation, including class action lawsuits, arising out of the Cybersecurity Incident which we settled for an immaterial amount.

Both we and our vendors continue to face numerous and evolving cybersecurity risks that threaten the confidentiality, integrity, and availability of our IT Systems and Confidential Information. We are vulnerable to cybersecurity risks from diverse threat actors such as state sponsored organizations and opportunistic hackers and hacktivists, as well as through diverse attack vectors, (for example, ransomware, viruses, advanced persistent threats, misconduct by external or inside actors, social engineering/phishing, human error by associates and contractors, and malicious code embedded in open source software), as well as from bugs, misconfigurations and vulnerabilities in commercial software that is integrated into our (or our suppliers' or service providers') IT Systems, products, or services. Thus, we and our vendors remain vulnerable to further successful cyberattacks, security breaches and disruptions to our IT Systems and our Confidential Information,

in addition to damage or interruption to our IT Systems and Confidential Information from earthquakes, acts of war or terrorist attacks, floods, fires, tornadoes, hurricanes, power loss and outages, computer and telecommunications failures and similar incidents. Some of our systems are not fully redundant, and our disaster recovery planning cannot account for all eventualities. Remote employees and vendors located in foreign countries also present additional operational and cybersecurity risks.

We expect cyberattacks to accelerate going forward. Threat actors are becoming more sophisticated and difficult to anticipate or deflect as they increasingly use tools and techniques, including artificial intelligence designed to circumvent security controls, to avoid detection, and to remove forensic evidence that may be needed to effectively identify, investigate and remediate attacks. As a result, we may be unable to detect, investigate, remediate or recover from future attacks or incidents, or to avoid a material adverse impact to our IT Systems, Confidential Information, or business. There can also be no assurance that our cybersecurity risk management program and processes, including our policies, controls or procedures, will be fully implemented, complied with or effective in protecting our IT Systems and Confidential Information. Because we make extensive use of third party suppliers and service providers, such as cloud services that support our internal and customer-facing operations, successful cyberattacks that disrupt or result in unauthorized access to third party IT Systems can materially impact our operations and financial results.

Any adverse impact to the availability, integrity, or confidentiality of our IT Systems, or Confidential Information could result in interruptions in our services, noncompliance with dynamic laws and regulations, substantial negative media attention, damage to our club member, customer and supplier relationships and our reputation, exposure to litigation (including class actions), regulatory investigations, and lost sales, fines, penalties, lawsuits, and increased remediation costs, any or all of which could have a material adverse effect on our business, financial condition and results of operations. We cannot guarantee that any costs and liabilities incurred in relation to an attack or incident will be covered by our existing insurance policies or that applicable insurance will be available to us in the future on economically reasonable terms or at all. Finally, there can be no assurance that our cybersecurity risk management program and processes, including our policies, controls or procedures, will be fully implemented, complied with or effective in protecting our systems and information.

In addition, we may be subject to specific data security frameworks and/or laws that require us to maintain a certain level of security, and the regulatory environment surrounding information security and privacy is increasingly demanding, with the frequent imposition of new and constantly changing requirements across our business. For example, amendments to the Safeguards Rule of the GLBA require covered financial institutions to adopt specific data security measures as of June 9, 2023. In addition, customers have a high expectation that we will adequately protect their Personal Information from cyberattacks or other security breaches. Any failure to comply with current or contemplated cybersecurity and data protection laws and regulations or a significant breach of Confidential Information could attract a substantial amount of negative media attention, damage our club member, customer and supplier relationships and our reputation, and result in lost sales, fines and/or lawsuits, and laws such as the California Consumer Privacy Act impose statutory damages for certain types of data breaches that affect the Personal Information of consumers.

Moreover, as we accept debit and credit cards for payment, we are subject to the PCI-DSS, issued by the Payment Card Industry Security Standards Council. PCI-DSS contains compliance guidelines with regard to our security surrounding the physical and electronic storage, processing and transmission of cardholder data. If we or our service providers are unable to comply with the security standards established by banks and the payment card industry, we may be subject to fines, restrictions and expulsion from card acceptance programs, which could materially and adversely affect our business.

***We may be subject to product liability claims if people or property are harmed by the products we sell.***

Some of the products we sell may expose us to product liability claims relating to personal injury, death, or environmental or property damage, and may require product recalls or other actions. Although we maintain liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms, or at all. In addition, some of our agreements with our vendors and sellers do not indemnify us from product liability. Even if a product liability claim is not successful or is not fully pursued, the negative publicity surrounding a product recall or any assertion that our products caused property damage or personal injury could damage our brand identity and our

Table of Contents

reputation with existing and potential consumers and have a material adverse effect on our business, financial condition and results of operations.

Any increase in the frequency and size of these claims, as compared to our experience in prior years, may cause the premium that we are required to pay for insurance to increase significantly and may negatively impact future insurance costs. It may also increase the amounts we pay in punitive damages, not all of which may be covered by our insurance.

***We have been named in litigation, which has resulted in substantial costs and may result in reputational harm and divert management's attention and resources.***

We face legal risks in our business, including claims from disputes with our employees and our former employees and claims associated with general commercial disputes, product liability and other matters. Risks associated with legal liability often are difficult to assess or quantify and their existence and magnitude can remain unknown for significant periods of time.

We have been named in the past, are currently named and may be named in the future as defendants of class action lawsuits. We have been subject to securities class action litigation and may be subject to similar or other litigation in the future. For information regarding these lawsuits, refer to Note 14, Commitments and Contingencies – Litigation of our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

The results of the securities class action lawsuits, stockholder derivative lawsuits, and any other current or future legal proceedings cannot be predicted with certainty. Regardless of their subject matter or merits, such legal proceedings have resulted in and are likely to continue to result in significant cost to us, which may not be covered by insurance, may divert the attention of management or may otherwise have an adverse effect on our business, financial condition and results of operations. Negative publicity or negative outcomes from litigation, whether or not resulting in a substantial cost, could materially damage our reputation, could limit our operations and could have a material adverse effect on our business, financial condition, results of operations, and the price of our Class A common stock. In addition, such legal proceedings may make it more difficult to finance our operations.

**Risks Relating to Our Organizational Structure**

***Marcus A. Lemonis, through his beneficial ownership of our shares directly or indirectly held by ML Acquisition and ML RV Group, has substantial control over us, including over decisions that require the approval of stockholders, and his interests, along with the interests of our other Continuing Equity Owners, in our business may conflict with yours.***

We entered into a voting agreement in connection with our IPO with ML Acquisition Company, LLC, a Delaware limited liability company, which is indirectly owned by each of the estate of our former director, Stephen Adams, and our Chairman and Chief Executive Officer, Marcus A. Lemonis ("ML Acquisition"), ML RV Group, LLC, a Delaware limited liability company, wholly owned by our Chairman and Chief Executive Officer, Marcus A. Lemonis ("ML RV Group"), CVRV Acquisition LLC and CVRV Acquisition II LLC (the "Voting Agreement"). Subject to the Voting Agreement, Marcus A. Lemonis, through his beneficial ownership of our shares directly or indirectly held by ML Acquisition and ML RV Group, may approve or disapprove substantially all transactions and other matters requiring approval by our stockholders, such as a merger, consolidation, dissolution or sale of all or substantially all of our assets, the issuance or redemption of certain additional equity interests, and the election of directors including transactions that may not be in the best interests of holders of our Class A common stock or, conversely, prevent the consummation of transactions that may be in the best interests of holders of our Class A common stock. We have been made aware of the potential dissolution of ML Acquisition and its wholly-owned subsidiary, CWGS Holding, LLC ("CWGS Holding"), although the date of any such dissolution has not been determined. If a dissolution occurs, the Company expects that Common Units of CWGS Enterprises, LLC and Class B Common Stock of the Company held by CWGS Holding would be distributed to the members of ML Acquisition (such distributees, the "ML Related Parties" and such transactions, the "Distribution").

In addition, pursuant to the Voting Agreement, Crestview Advisors, L.L.C., a registered investment adviser to private equity funds, including funds affiliated with Crestview Partners II GP, L.P. ("Crestview") currently has the right to designate one of our directors (the "Crestview Director"). Each of ML Acquisition and ML RV Group has agreed to vote, or cause to vote, all of their outstanding shares of our Class A common stock, Class B common stock and Class C common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of the Crestview Director. In addition, the ML Related Parties also currently have the right to designate four of our directors (the "ML Acquisition Directors"). Moreover, ML RV Group has the right to designate one director for as long as it holds our one share of Class C common stock (the "ML RV Director"). As described in the Voting Agreement, these designation rights are subject to change based on the relevant parties' ownership of Class A common stock. Funds controlled by Crestview Partners II GP, L.P. have agreed to vote, or cause to vote, all of their outstanding shares of our Class A common stock and Class B common stock at any annual or special meeting of stockholders in which directors are elected, so as to cause the election of the ML Acquisition Directors and the ML RV Director. Additionally, pursuant to the Voting Agreement, we are required to take commercially reasonable action to cause (i) the Board of Directors to be comprised at least of nine directors absent an appropriate waiver or approval to increase or decrease the size of the Board (which the Company obtained to set the Board at eight directors); (ii) the individuals designated in accordance with the terms of the Voting Agreement to be included in the slate of nominees to be elected to the Board of Directors at the next annual or special meeting of stockholders of the Company at which directors are to be elected and at each annual meeting of stockholders of the Company thereafter at which a director's term expires; (iii) the individuals designated in accordance with the terms of the Voting Agreement to fill the applicable vacancies on the Board of Directors; and (iv) a ML Acquisition Director or the ML RV Director to be the chairperson of the Board of Directors (as defined in our amended and restated bylaws). The Voting Agreement allows for the Board of Directors to reject the nomination, appointment or election of a particular director if such nomination, appointment or election would constitute a breach of the Board of Directors' fiduciary duties to the Company's stockholders or does not otherwise comply with any requirements of our amended and restated certificate of incorporation or our amended and restated bylaws or the charter for, or related guidelines of, the Board of Directors' Nominating and Corporate Governance Committee. Based on current beneficial ownership of the Company's securities by ML Acquisition, immediately following any Distribution, the ML Related Parties collectively would continue to be entitled to designate four (4) directors to the Board. The ML Related Parties would no longer be obligated to vote, or cause to be voted, all outstanding shares of Class B Common Stock previously held by ML Acquisition at any annual or special meeting of stockholders of the Company at which directors of the Company are to be elected so as to cause the election of the director designated to serve by Crestview. However, ML RV Group would be required to vote, or cause to be voted, its share of Class C Common Stock at any annual or special meeting of stockholders of the Company at which directors of the Company are to be elected so as to cause the election of the Crestview Director. In addition, the ML Related Parties would not have any voting obligations relating to the directors designated by the ML Related Parties. While the Crestview Stockholders would still be obligated to vote for the ML Acquisition Directors and the director designated to serve on the Board by ML RV Group, there would no longer be an individual, group or company that holds more than 50% of the voting power for the election of the Company's directors and the Company would therefore no longer qualify as a "controlled company" under the rules of the New York Stock Exchange, absent an agreement between the ML Acquisition Members and Crestview as to future director elections. For additional information, see *"We are a "controlled company" within the meaning of the NYSE listing requirements and, as a result, qualify for exemptions from certain corporate governance requirements. Our stockholders do not have the same protections afforded to stockholders of companies that are subject to such corporate governance requirements."*

The Voting Agreement further provides that, for so long as the ML Related Parties, directly or indirectly, beneficially own, in the aggregate, 22.5% or more of our Class A common stock (assuming that all outstanding common units in CWGS, LLC are redeemed for newly-issued shares of our Class A common stock on a one-for-one basis), the approval of ML Acquisition will be required for certain corporate actions. These actions include: (1) a change of control; (2) acquisitions or dispositions of assets above $100 million; (3) the issuance of securities of Camping World Holdings, Inc. or any of its subsidiaries (other than under equity incentive plans that have received the prior approval of our Board of Directors); (4) material amendments to our certificate of incorporation or bylaws; and (5) any change in the size of the Board of Directors. The Voting Agreement also provides that, for so long as the ML Related Parties, directly or indirectly, beneficially own, in the aggregate, 27.5% or more of our Class A common stock (assuming that all outstanding common units of CWGS, LLC are redeemed for newly-issued shares of our Class A common stock, on a one-for-one basis), the approval of ML

Table of Contents

Acquisition, as applicable, will be required for the hiring and termination of our Chief Executive Officer; provided, however, that the approval of the ML Related Parties is only required at such time as Marcus A. Lemonis no longer serves as our Chief Executive Officer. These rights may prevent the consummation of transactions that may be in the best interests of holders of our Class A common stock. Following any Distribution, the ML Related Parties would no longer have the foregoing consent rights described above that are currently held by ML Acquisition.

***Our amended and restated certificate of incorporation provides that the doctrine of "corporate opportunity" does not apply with respect to any director or stockholder who is not employed by us or our affiliates.***

The doctrine of corporate opportunity generally provides that a corporate fiduciary may not develop an opportunity using corporate resources, acquire an interest adverse to that of the corporation or acquire property that is reasonably incident to the present or prospective business of the corporation or in which the corporation has a present or expectancy interest, unless that opportunity is first presented to the corporation and the corporation chooses not to pursue that opportunity. The doctrine of corporate opportunity is intended to preclude officers or directors or other fiduciaries from personally benefiting from opportunities that belong to the corporation. Our amended and restated certificate of incorporation provides that the doctrine of "corporate opportunity" does not apply with respect to any director or stockholder who is not employed by us or our affiliates. Any director or stockholder who is not employed by us or our affiliates therefore has no duty to communicate or present corporate opportunities to us, and has the right to either hold any corporate opportunity for their (and their affiliates') own account and benefit or to recommend, assign or otherwise transfer such corporate opportunity to persons other than us, including to any director or stockholder who is not employed by us or our affiliates.

As a result, certain of our stockholders, directors and their respective affiliates are not prohibited from operating or investing in competing businesses. We therefore may find ourselves in competition with certain of our stockholders, directors or their respective affiliates, and we may not have knowledge of, or be able to pursue, transactions that could potentially be beneficial to us. Accordingly, we may lose a corporate opportunity or suffer competitive harm, which could negatively impact our business or prospects.

***We are a "controlled company" within the meaning of the NYSE listing requirements and, as a result, qualify for exemptions from certain corporate governance requirements. Our stockholders do not have the same protections afforded to stockholders of companies that are subject to such corporate governance requirements.***

Pursuant to the terms of the Voting Agreement, Marcus A. Lemonis, through his beneficial ownership of our shares directly or indirectly held by ML Acquisition and ML RV Group, and certain funds controlled by Crestview Partners II GP, L.P., in the aggregate, have more than 50% of the voting power for the election of directors, and, as a result, we are considered a "controlled company" for the purposes of the New York Stock Exchange (the "NYSE") listing requirements. As such, we qualify for, and may rely on, exemptions from certain corporate governance requirements, including the requirements to have a majority of independent directors on our Board of Directors, an entirely independent Nominating and Corporate Governance Committee, an entirely independent Compensation Committee or to perform an annual performance evaluation of the Nominating and Corporate Governance and Compensation Committees.

The corporate governance requirements and specifically the independence standards are intended to ensure that directors who are considered independent are free of any conflicting interest that could influence their actions as directors. We have utilized, and may continue to utilize, certain exemptions afforded to a "controlled company." As a result, we are not subject to certain corporate governance requirements, including that a majority of our Board of Directors consists of "independent directors," as defined under the rules of the NYSE. In addition, we are not required to have a Nominating and Corporate Governance Committee or Compensation Committee that is composed entirely of independent directors with a written charter addressing the committee's purpose and responsibilities or to conduct annual performance evaluations of the Nominating and Corporate Governance and Compensation Committees. Accordingly, our stockholders may not have the same protections afforded to stockholders of companies that are subject to all of the corporate governance requirements of the NYSE.

Table of Contents

Following any Distribution, the Company anticipates that it would no longer be considered a “controlled company” under the rules of the NYSE, and therefore we would no longer be able to rely on the exemptions from corporate governance requirements that are afforded to controlled companies.

***Our principal asset is our interest in CWGS, LLC, and accordingly, we depend on distributions from CWGS, LLC to pay dividends, taxes and expenses, including payments under the Tax Receivable Agreement. CWGS, LLC’s ability to make such distributions may be subject to various limitations and restrictions.***

We are a holding company and had no material assets as of December 31, 2024, other than our ownership of 62,502,096 common units, representing a 61.0% economic interest in the business of CWGS, LLC, an affiliate loan receivable with CWGS Group, LLC of $6.0 million, and cash of $10.1 million. We have no independent means of generating revenue or cash flow, and our ability to pay dividends in the future, if any, will be dependent upon the financial results and cash flows of CWGS, LLC and its subsidiaries and distributions we receive from CWGS, LLC. There can be no assurance that our subsidiaries will generate sufficient cash flow to dividend or distribute funds to us or that applicable state law and contractual restrictions, including negative covenants in our debt instruments, will permit such dividends or distributions.

CWGS, LLC is treated as a partnership for U.S. federal income tax purposes and, as such, generally is not subject to any entity-level U.S. federal income tax. Instead, taxable income is allocated to holders of its common units, including us. As a result, we incur income taxes on our allocable share of any net taxable income of CWGS, LLC. Under the terms of the CWGS LLC Agreement, CWGS, LLC is obligated to make tax distributions to holders of its common units, including us, except to the extent such distributions would render CWGS, LLC insolvent or are otherwise prohibited by law or our Senior Secured Credit Facilities, our Floor Plan Facility or any of our future debt agreements. In addition to tax expenses, we will also incur expenses related to our operations, our interests in CWGS, LLC and related party agreements, including payment obligations under the Tax Receivable Agreement, and expenses and costs of being a public company, all of which could be significant. We intend, as its managing member, to cause CWGS, LLC to make distributions in an amount sufficient to allow us to pay our taxes and operating expenses, including any ordinary course payments due under the Tax Receivable Agreement. However, CWGS, LLC’s ability to make such distributions may be subject to various limitations and restrictions including, but not limited to, restrictions on distributions that would either violate any contract or agreement to which CWGS, LLC is then a party, including debt agreements, or any applicable law, or that would have the effect of rendering CWGS, LLC insolvent. If CWGS, LLC does not have sufficient funds to pay tax distributions or other liabilities to fund our operations, we may have to borrow funds, which could materially adversely affect our liquidity and financial condition and subject us to various restrictions imposed by any such lenders. To the extent that we are unable to make payments under the Tax Receivable Agreement for any reason, such payments will be deferred and will accrue interest until paid; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement and therefore may accelerate payments due under the Tax Receivable Agreement. If CWGS, LLC does not have sufficient funds to make distributions, our ability to declare and pay cash dividends may also be restricted or impaired. See “— Risks Relating to Ownership of Our Class A Common Stock.”

***Our Tax Receivable Agreement with the Continuing Equity Owners and Crestview Partners II GP, L.P. requires us to make cash payments to them in respect of certain tax benefits to which we may become entitled, and the amounts that we may be required to pay could be significant.***

In connection with our IPO, we entered into a Tax Receivable Agreement with CWGS, LLC, each of the Continuing Equity Owners and Crestview Partners II GP, L.P. which confers certain benefits upon the Continuing Equity Owners and Crestview Partners II GP, L.P. that do not benefit the holders of our Class A common stock to the same extent as it benefits such Continuing Equity Owners and Crestview Partners II GP, L.P. Pursuant to the Tax Receivable Agreement, we are required to make cash payments to the Continuing Equity Owners and Crestview Partners II GP, L.P. equal to 85% of the tax benefits, if any, that we actually realize, or in some circumstances are deemed to realize as a result of (i) increases in tax basis resulting from the purchase of common units from Crestview Partners II GP, L.P. in exchange for Class A common stock in connection with the consummation of the IPO and the related corporate reorganization transactions and any

future redemptions that are funded by Camping World Holdings, Inc. or redemption of common units and (ii) certain other tax benefits attributable to payments under the Tax Receivable Agreement.

The payment obligation is an obligation of us and not of CWGS, LLC. The amount of the cash payments that we may be required to make under the Tax Receivable Agreement could be significant. Payments under the Tax Receivable Agreement will be based on the tax reporting positions that we determine, which tax reporting positions are subject to challenge by taxing authorities. Any payments made by us to the Continuing Equity Owners and Crestview Partners II GP, L.P. under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us. To the extent that we are unable to make timely payments under the Tax Receivable Agreement for any reason, the unpaid amounts will be deferred and will accrue interest until paid by us. Nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement and therefore may accelerate payments due under the Tax Receivable Agreement. Furthermore, our future obligation to make payments under the Tax Receivable Agreement could make us a less attractive target for an acquisition, particularly in the case of an acquirer that cannot use some or all of the tax benefits that may be deemed realized under the Tax Receivable Agreement. The payments under the Tax Receivable Agreement are also not conditioned upon the Continuing Equity Owners or Crestview Partners II GP, L.P. maintaining a continued ownership interest in CWGS, LLC.

Additional liabilities under the Tax Receivable Agreement may be required to be recorded when CWGS, LLC units are redeemed in the future. Such amounts of cash payments that the Company may be required to make under the Tax Receivable Agreement for such future redemptions could be significant. The amount of liabilities to be recorded in the future for such redemptions is dependent on a variety of factors including future stock prices, tax rates in effect, and the Company's ability to utilize the tax benefits created as a result of the future redemptions of CWGS, LLC units. The significance of these factors and related uncertainty associated with the related liabilities makes estimation of future potential amounts under the Tax Receivable Agreement impractical to determine.

***The amounts that we may be required to pay to the Continuing Equity Owners and Crestview Partners II GP, L.P. under the Tax Receivable Agreement may be accelerated in certain circumstances and may also significantly exceed the actual tax benefits that we ultimately realize.***

The Tax Receivable Agreement provides that if certain mergers, asset sales, other forms of business combination, or other changes of control were to occur, if we materially breach any of our material obligations under the Tax Receivable Agreement or if, at any time, we elect an early termination of the Tax Receivable Agreement, then the Tax Receivable Agreement will terminate and our obligations, or our successor's obligations, to make payments under the Tax Receivable Agreement would accelerate and become immediately due and payable. The amount due and payable in those circumstances is determined based on certain assumptions, including an assumption that we would have sufficient taxable income to fully utilize all potential future tax benefits that are subject to the Tax Receivable Agreement. We may need to incur debt to finance payments under the Tax Receivable Agreement to the extent our cash resources are insufficient to meet our obligations under the Tax Receivable Agreement as a result of timing discrepancies or otherwise.

As a result of the foregoing, (i) we could be required to make cash payments to the Continuing Equity Owners and Crestview Partners II GP, L.P. that are greater than the specified percentage of the actual benefits we ultimately realize in respect of the tax benefits that are subject to the Tax Receivable Agreement and (ii) we would be required to make an immediate cash payment equal to the present value of the anticipated future tax benefits that are the subject of the Tax Receivable Agreement, which payment may be made significantly in advance of the actual realization, if any, of such future tax benefits. In these situations, our obligations under the Tax Receivable Agreement could have a substantial negative impact on our liquidity and could have the effect of delaying, deferring or preventing certain mergers, asset sales, other forms of business combination, or other changes of control. There can be no assurance that we will be able to finance our obligations under the Tax Receivable Agreement.

Table of Contents

***We will not be reimbursed for any payments made to the Continuing Equity Owners and Crestview Partners II GP, L.P. under the Tax Receivable Agreement in the event that any tax benefits are disallowed.***

We will not be reimbursed for any cash payments previously made to the Continuing Equity Owners and Crestview Partners II GP, L.P. pursuant to the Tax Receivable Agreement if any tax benefits initially claimed by us are subsequently challenged by a taxing authority and are ultimately disallowed. Instead, any excess cash payments made by us to a Continuing Equity Owner or Crestview Partners II GP, L.P. will be netted against any future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement. However, a challenge to any tax benefits initially claimed by us may not arise for a number of years following the initial time of such payment or, even if challenged early, such excess cash payment may be greater than the amount of future cash payments that we might otherwise be required to make under the terms of the Tax Receivable Agreement and, as a result, there might not be future cash payments from which to net against. The applicable U.S. federal income tax rules are complex and factual in nature, and there can be no assurance that the IRS or a court will not disagree with our tax reporting positions. As a result, it is possible that we could make cash payments under the Tax Receivable Agreement that are substantially greater than our actual cash tax savings.

***Our organizational structure may cause us to be subject to IRS audit, which may result in the assessment of interest and penalties.***

We consolidate CWGS, LLC, which, as a limited liability company, generally is not subject to U.S. federal income taxes. Rather, as a partnership for U.S. tax purposes, CWGS, LLC's taxable income flows through to the owners, including us, who are responsible for paying the applicable income taxes on the income allocated to them. However, the Company is subject to partnership audit rules enacted as part of the Bipartisan Budget Act of 2015 (the "Centralized Partnership Audit Regime"). Under the Centralized Partnership Audit Regime, any IRS audit of CWGS, LLC would be conducted at the CWGS, LLC level, and if the IRS determines an adjustment is necessary, the default rule is that CWGS, LLC would pay an "imputed underpayment" including interest and penalties, if applicable. CWGS, LLC may instead elect to make a "push-out" election, in which case the members or partners for the year that is under audit would be required to take into account the adjustments on their own personal income tax returns.

Our operating agreement stipulates that CWGS, LLC is indemnified by members for any payment made to relevant taxing authorities under the Centralized Partnership Audit Regime. It is intended that any payment CWGS, LLC makes on behalf of its current members will be reflected as a distribution, rather than tax expense, at the time that such distribution is declared.

**Risks Relating to Ownership of Our Class A Common Stock**

***The Continuing Equity Owners (through common units) own interests in CWGS, LLC, and the Continuing Equity Owners have the right to redeem their interests in CWGS, LLC pursuant to the terms of the CWGS LLC Agreement for newly-issued shares of Class A common stock or cash.***

At December 31, 2024, we had an aggregate of 187,497,904 shares of Class A common stock authorized but unissued, including 39,895,393 shares of Class A common stock issuable, at our election, upon redemption of CWGS, LLC common units held by the Continuing Equity Owners. In connection with our IPO, CWGS, LLC entered into the CWGS LLC Agreement, and subject to certain restrictions set forth therein, the Continuing Equity Owners are entitled to have their common units redeemed from time to time at each of their options for, at our election (determined solely by our independent directors (within the meaning of the rules of the NYSE) who are disinterested), newly-issued shares of our Class A common stock on a one-for-one basis or a cash payment equal to a volume weighted average market price of one share of Class A common stock for each common unit redeemed, in each case in accordance with the terms of the CWGS LLC Agreement; provided that, at our election (determined solely by our independent directors (within the meaning of the rules of the NYSE) who are disinterested), we may effect a direct exchange of such Class A common stock or such cash, as applicable, for such common units. The Continuing Equity Owners may exercise such redemption right for as long as their common units remain outstanding. In connection with our IPO, we also entered into a Registration Rights Agreement pursuant to which the shares of Class A common stock issued upon such

redemption and the shares of Class A common stock issued to the Former Equity Owners in connection with the corporate reorganization transactions entered into in connection therewith will be eligible for resale, subject to certain limitations set forth therein. The market price of shares of our Class A common stock could decline as a result of these redemptions or sales, or as a result of the perception that they could occur.

***You may be diluted by future issuances of additional Class A common stock or common units in connection with our incentive plans, acquisitions or otherwise; future sales of such shares in the public market, or the expectations that such sales may occur, could lower our stock price.***

Our amended and restated certificate of incorporation authorizes us to issue shares of our Class A common stock and options, rights, warrants and appreciation rights relating to our Class A common stock for the consideration and on the terms and conditions established by our Board of Directors in its sole discretion, whether in connection with acquisitions or otherwise.

We have reserved shares for issuance under our 2016 Incentive Award Plan (the “2016 Plan”) in an amount equal to 8,473,492 shares of Class A common stock as of December 31, 2024, including shares of Class A common stock issuable pursuant to 155,029 stock options and 1,651,929 restricted stock units that were granted to certain of our directors and certain of our employees. Any Class A common stock that we issue, including under our 2016 Plan or other equity incentive plans that we may adopt in the future, would dilute the percentage ownership of holders of our Class A common stock.

In the future, we may also issue additional securities if we need to raise capital, including, but not limited to, in connection with acquisitions, which could constitute a material portion of our then-outstanding shares of Class A common stock.

***Our ability to pay dividends on our Class A common stock is subject to the discretion of our Board of Directors and may be limited by our structure and statutory restrictions.***

We have paid a regular cash dividend using distributions from CWGS, LLC, including all or a portion of the Excess Tax Distribution (as defined under “Dividend Policy” included in Part II, Item 5 of this Form 10-K), to the holders of our Class A common stock from time to time, subject to the discretion of our Board of Directors. However, the payment of future dividends on our Class A common stock will be subject to our discretion as the sole managing member of CWGS, LLC, the discretion of our Board of Directors and will depend on, among other things, our results of operations, financial condition, level of indebtedness, capital requirements, contractual restrictions, restrictions in our debt agreements and in any preferred stock, business prospects and other factors that our Board of Directors may deem relevant. Additionally, our ability to distribute any Excess Tax Distribution will also be subject to no early termination or amendment of the Tax Receivable Agreement, as well as the amount of tax distributions actually paid to us and our actual tax liability, which is affected by the conversion of certain subsidiaries, including Camping World, Inc., to limited liability companies (see Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). As a consequence of these limitations and restrictions, we may not be able to make, or may have to reduce or eliminate, the payment of dividends on our Class A common stock. Additionally, any change in the level of our dividends or the suspension of the payment thereof could adversely affect the market price of our Class A common stock. For additional information on our payments of dividends, see “Item 5. Market for Registrant’s Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities—Dividend Policy” under Part II of this Form 10-K.

***Delaware law and certain provisions in our amended and restated certificate of incorporation may prevent efforts by our stockholders to change the direction or management of our company.***

We are a Delaware corporation, and the anti-takeover provisions of Delaware law impose various impediments to the ability of a third party to acquire control of us, even if a change of control would be beneficial to our existing stockholders. In addition, our amended and restated certificate of incorporation and our amended

and restated bylaws contain provisions that may make the acquisition of our Company more difficult without the approval of our Board of Directors, including, but not limited to, the following:

- our Board of Directors is classified into three classes, each of which serves for a staggered three-year term;

- a majority of our stockholders or a majority of our Board of Directors may call special meetings of our stockholders, and until such time as the ML Related Parties, directly or indirectly, beneficially own in the aggregate, less than 27.5% of all of the outstanding common units of CWGS, LLC, only the chairperson of our Board of Directors or a majority of our Board of Directors may call special meetings of our stockholders;

- we have authorized undesignated preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- any action required or permitted to be taken by our stockholders at an annual meeting or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a written consent is signed by the holders of our outstanding shares of common stock representing not less than the minimum number of votes that would be necessary to authorize such action at a meeting at which all outstanding shares of common stock entitled to vote thereon, and at such time as the ML Related Parties, directly or indirectly, beneficially own in the aggregate, less than 27.5% of all of the outstanding common units of CWGS, LLC, any action required or permitted to be taken by our stockholders at an annual meeting or special meeting of stockholders may not be taken by written consent in lieu of a meeting;

- our amended and restated certificate of incorporation may be amended or repealed by the affirmative vote of a majority of the votes which all our stockholders would be eligible to cast in an election of directors and our amended and restated bylaws may be amended or repealed by a majority vote of our Board of Directors or by the affirmative vote of a majority of the votes which all our stockholders would be eligible to cast in an election of directors, and at such time as the ML Related Parties, directly or indirectly, beneficially own in the aggregate, less than 27.5% of all of the outstanding common units of CWGS, LLC, our amended and restated certificate of incorporation and our amended and restated bylaws may be amended or repealed by the affirmative vote of the holders of at least $66^{2}/_{3}$% of the votes which all our stockholders would be entitled to cast in any annual election of directors and our amended and restated bylaws may also be amended or repealed by a majority vote of our Board of Directors;

- we require advance notice for stockholder proposals and nominations; and

- we have opted out of Section 203 of the Delaware General Corporation Law of the State of Delaware (the "DGCL"), however, our amended and restated certificate of incorporation contains provisions that are similar to Section 203 of the DGCL (except with respect to ML Acquisition and Crestview and any of their respective affiliates and any of their respective direct or indirect transferees of Class B common stock).

These provisions could discourage, delay or prevent a transaction involving a change in control of our company. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and cause us to take other corporate actions you desire, including actions that you may deem advantageous, or negatively affect the trading price of our Class A common stock. In addition, because our Board of Directors is responsible for appointing the members of our management team, these provisions could in turn affect any attempt by our stockholders to replace current members of our management team.

Please see "— Risks Relating to Our Organizational Structure — Certain of our stockholders have significant control over us, including with respect to the election of directors, and the interests of our other Continuing Equity Owners in our business may conflict with yours."

Table of Contents

***Our amended and restated certificate of incorporation provides, subject to certain exceptions, that the Court of Chancery of the State of Delaware will be the sole and exclusive forum for certain stockholder litigation matters, and our amended and restated bylaws designate the federal district courts of the United States as the exclusive forum for actions arising under the Securities Act of 1933, as amended, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or stockholders.***

Our amended and restated certificate of incorporation provides, subject to limited exceptions, that the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf; (ii) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to us or our stockholders; (iii) any action asserting a claim against us, any director or our officers or employees arising pursuant to any provision of the DGCL, our amended and restated certificate of incorporation or our amended and restated bylaws; or (iv) any action asserting a claim against us, any director or our officers or employees that is governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock are deemed to have notice of and to have consented to the provisions of our amended and restated certificate of incorporation described above. In addition, our amended and restated bylaws provide that the federal district courts of the United States are the exclusive forum for any complaint raising a cause of action arising under the Securities Act of 1933, as amended. These choice of forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders which may discourage lawsuits with respect to such claims. Alternatively, if a court were to find the choice of forum provisions in our amended and restated certificate of incorporation or our amended and restated bylaws to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could materially adversely affect our business, financial condition and results of operations.

***We may issue shares of preferred stock in the future, which could make it difficult for another company to acquire us or could otherwise adversely affect holders of our Class A common stock, which could depress the price of our Class A common stock.***

Our amended and restated certificate of incorporation authorizes us to issue one or more series of preferred stock. Our Board of Directors will have the authority to determine the preferences, limitations and relative rights of the shares of preferred stock and to fix the number of shares constituting any series and the designation of such series, without any further vote or action by our stockholders. Our preferred stock could be issued with voting, liquidation, dividend and other rights superior to the rights of our Class A common stock. The potential issuance of preferred stock may delay or prevent a change in control of us, discouraging bids for our Class A common stock at a premium to the market price, and materially and adversely affect the market price and the voting and other rights of the holders of our Class A common stock.

**General Risk Factors**

***Material weaknesses in our internal control over financial reporting could have a significant adverse effect on our business and the price of our common stock.***

As a public reporting company, we are subject to the rules and regulations established from time to time by the SEC and NYSE. These rules and regulations require, among other things, that we have, and periodically evaluate, procedures with respect to our internal control over financial reporting. Reporting obligations as a public company are likely to continue to place a considerable strain on our financial and management systems, processes and controls, as well as on our personnel.

In addition, as a public company we are required to document and test our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act so that our management can certify as to the effectiveness of our internal control over financial reporting. Likewise, our independent registered public accounting firm is required to provide an attestation report on the effectiveness of our internal control over financial reporting.

Table of Contents

In connection with the preparation of our financial statements and the audit of our financial results for the year ended December 31, 2024, we identified a material weakness in our internal controls in the design and operation of our controls over the review of the measurement of the realizable portion of the Company's outside basis difference deferred tax asset in the operating partnership, CWGS, LLC. This material weakness remained unremediated as of December 31, 2024. As a result, management concluded that our internal control over financial reporting as of December 31, 2024 was not effective. As described in Part II, Item 9A of this Form 10-K, management is taking steps to remediate the material weakness in our internal controls. There can be no assurance that any measures we take will remediate the material weakness identified, nor can there be any assurance as to how quickly we will be able to remediate this material weakness.

In future periods, if our senior management is unable to remediate the material weakness such that they cannot conclude that we have effective internal control over financial reporting, or to certify the effectiveness of such controls, or if our independent registered public accounting firm cannot render an unqualified opinion on management's assessment and the effectiveness of our internal control over financial reporting, or if additional material weaknesses in our internal control over financial reporting are identified, we may be required to restate our financial statements and could be subject to regulatory scrutiny, a loss of public and investor confidence, and litigation from investors and stockholders, which could have a material adverse effect on our business and the price of our Class A common stock.

Furthermore, the steps to remediate any such material weaknesses, including the ones noted above, could require additional remedial measures, including additional personnel, which could be costly and time-consuming. In addition, we may encounter problems or delays in completing the implementation of any required improvements and receiving a favorable attestation report from our independent registered public accounting firm. In addition, if we do not maintain adequate financial and management personnel, processes and controls, we may not be able to manage our business effectively or accurately report our financial performance on a timely basis, which could cause a decline in our common stock price and adversely affect our results of operations and financial condition. Failure to comply with the Sarbanes-Oxley Act could potentially subject us to sanctions or investigations by the SEC, the NYSE or other regulatory authorities, which would require additional financial and management resources.

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our operating results and financial condition.***

We are subject to income taxes in the United States, and our tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;
- expected timing and amount of the release of any tax valuation allowances;
- tax effects of stock-based compensation;
- costs related to intercompany restructurings; or
- changes in tax laws, regulations or interpretations thereof.

In addition, we may be subject to audits of our income, sales and other transaction taxes by U.S. federal and state authorities. We are currently under New York state audit (see Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). Outcomes from these audits could have an adverse effect on our operating results and financial condition.

***Our Class A common stock price may be volatile or may decline regardless of our operating performance.***

Volatility in the market price of our Class A common stock may prevent you from being able to sell your shares at or above the price you paid for such shares. Many factors, which are outside our control, may cause

the market price of our Class A common stock to fluctuate significantly, including those described elsewhere in this "Risk Factors" section and this Form 10-K, as well as the following:

- our operating and financial performance and prospects;
- our quarterly or annual earnings or those of other companies in our industry compared to market expectations;
- conditions that impact demand for our services;
- future announcements concerning our business or our competitors' businesses;
- the public's reaction to our press releases, other public announcements and filings with the SEC;
- the size of our public float;
- coverage by or changes in financial estimates by securities analysts or failure to meet their expectations;
- market and industry perception of our success, or lack thereof, in pursuing our growth strategy;
- strategic actions by us or our competitors, such as acquisitions or restructurings;
- changes in laws or regulations which adversely affect our industry or us;
- changes in accounting standards, policies, guidance, interpretations or principles;
- changes in senior management or key personnel;
- issuances, exchanges or sales, or expected issuances, exchanges or sales of our capital stock;
- changes in our dividend policy;
- adverse resolution of new or pending litigation against us; and
- changes in general market, economic and political conditions in the United States and global economies or financial markets, including those resulting from international trade policy, natural disasters, terrorist attacks, acts of war and responses to such events.

***If securities analysts do not publish research or reports about our company, or if they issue unfavorable commentary about us or our industry or downgrade our Class A common stock, the price of our Class A common stock could decline.***

The trading market for our Class A common stock depends in part on the research and reports that third-party securities analysts publish about our company and our industry. If one or more analysts cease coverage of our company, we could lose visibility in the market. In addition, one or more of these analysts could downgrade our Class A common stock or issue other negative commentary about our company or our industry. As a result of one or more of these factors, the trading price of our Class A common stock could decline.

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

None.

**ITEM 1C. CYBERSECURITY**

Cybersecurity Risk Management and Strategy

We have developed and implemented a cybersecurity risk management program designed to protect the confidentiality, integrity, and availability of our critical systems and information. Our cybersecurity risk management program includes a cybersecurity incident response plan.

We design and assess our program based on the National Institute of Standards and Technology Cybersecurity Framework ("NIST CSF"). This does not imply that we meet any particular technical standards, specifications, or requirements, only that we use the NIST CSF as a guide to help us identify, assess, and manage cybersecurity risks relevant to our business.

Our cybersecurity risk management program is integrated into our overall enterprise risk management program, and shares common methodologies, reporting channels and governance processes that apply across the enterprise risk management program to other legal, compliance, operational, and financial risk areas.

Our cybersecurity risk management program includes:

- risk assessments designed to help identify material cybersecurity risks to our critical systems, information, products, services, and our broader enterprise IT environment;

- a security team principally responsible for managing (1) our cybersecurity risk assessment processes, (2) our security controls, (3) our cybersecurity operations center and third party service providers responsible for monitoring and measuring threats, and (4) our response to cybersecurity incidents;

- the use of external service providers, where appropriate, to assess, test or otherwise assist with aspects of our security controls;

- regular testing of our critical systems to identify and address potential vulnerabilities;

- cybersecurity awareness training of our employees, incident response personnel, and senior management;

- a cybersecurity incident response plan that includes procedures for responding to cybersecurity incidents; and

- a third party risk management process for certain service providers, suppliers, and vendors.

There can be no assurance that our cybersecurity risk management program and processes, including our policies, controls or procedures, will be fully implemented, complied with or effective in protecting our systems and information.

We regularly experience cyberattacks and other incidents and will continue to experience varying degrees of attacks and incidents in the future. To date, we have not identified risks from known cybersecurity threats, including as a result of any prior cybersecurity incidents (including the Cybersecurity Incident), that have materially affected or are reasonably likely to materially affect us, including our operations, business strategy, results of operations, or financial condition, however we cannot guarantee that material incidents will not occur in the future.

Table of Contents

Cybersecurity Governance

Our Board considers cybersecurity risk as part of its risk oversight function and has delegated to the Audit Committee ("Committee") oversight of cybersecurity and other information technology risks. The Committee oversees management's implementation of our cybersecurity risk management program.

The Committee receives briefings from our information security team ("Information Security") on our cybersecurity risks no less than annually. In addition, management updates the Committee in addition to the full Board, as necessary, regarding any material cybersecurity incidents, as well as any incidents with lesser impact potential.

Information Security is responsible for leading enterprise-wide cybersecurity strategy, policy, standards, architecture, and processes. Information Security reports to the Chief Administrative and Legal Officer, who, together with other members of our management team, including the Chief Financial Officer and President, is responsible for assessing and managing our material risks from cybersecurity threats based on regular reports from Information Security and information technology ("IT") teams. Management receives periodic reporting on the status of projects to strengthen the security of our IT systems and efforts regarding the prevention, detection, mitigation, and remediation of cybersecurity events. Reports may include briefings that have been informed by internal security personnel, threat intelligence and other information obtained from governmental, public, or private sources in addition to alerts and reports produced by security tools deployed in the IT environment.

Information Security has significant experience in incident response, forensics, vulnerability management, network security administration, fraud prevention, and other governance, risk, and compliance areas. Information Security maintains subject matter expert level knowledge in cybersecurity frameworks and governance organizations such as NIST, ISO 27001, and PCI-DSS, along with industry certifications commensurate with their roles.

**ITEM 2. PROPERTIES**

We typically lease the real properties where we have operations. Our real property leases generally provide for fixed monthly rentals with annual escalation clauses. The table below sets forth certain information concerning our offices and distribution centers as of December 31, 2024, and the lease expiration dates include all stated option periods.

| | Square Feet | Acres | Lease Expiration[1] | Owned |
|---|---|---|---|---|
| **Office Facilities:** | | | | |
| Lincolnshire, Illinois (Corporate headquarters and RV and Outdoor Retail headquarters) | 42,845 | | | X |
| Englewood, Colorado (Good Sam Services and Plans operations, customer contact and service center and information system functions) | 59,704 | | 2054 | |
| Bowling Green, Kentucky (RV and Outdoor Retail administrative and information systems functions) | 33,947 | | 2054 | |
| Oxnard, California (Good Sam Services and Plans publishing and administrative)[2] | 10,254 | | 2025 | |
| Lakeville, Minnesota (RV and Outdoor Retail administrative and information systems functions) | 11,961 | | 2047 | |
| Chicago, Illinois (Administrative and information systems functions) | 15,976 | | 2039 | |
| **Retail Distribution Centers:** | | | | |
| Lebec, CA (RV and Outdoor Retail) | 389,160 | 32.9 | 2026 | |
| Lebanon, Indiana (RV and Outdoor Retail) | 707,952 | 32.3 | 2040 | |

Table of Contents

(1) Assumes exercise of applicable lease renewal options.

(2) The Company will relocate this office in March 2025 to a new lease in Oxnard, California of approximately 5,000 square feet and a lease expiration[1] of 2028.

As of December 31, 2024, we had 206 store locations in 43 states of which we lease 165 locations. These locations generally range in size from approximately 20,000 to 80,000 square feet and are typically situated on approximately 8 to 50 acres. The leases for our store locations typically have terms of 10 years, with multiple renewal terms of five years each. These leases are typically “triple net leases” that require us to pay real estate taxes, insurance and maintenance costs.

## ITEM 3. LEGAL PROCEEDINGS

For information regarding legal proceedings, refer to Note 14 – Commitments and Contingencies – Litigation of our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

We are also engaged in various other legal actions, claims and proceedings arising in the ordinary course of business, including claims related to employment-related matters, breach of contracts, products liabilities, consumer protection and intellectual property matters resulting from our business activities. We do not believe that the ultimate resolution of such matters will have a material adverse effect on our business, financial condition or results of operations. However, litigation is subject to many uncertainties, and the outcome of certain of such individual litigated matters may not be reasonably predictable and any related damages may not be estimable. Certain of these litigation matters could result in an adverse outcome to us, and any such adverse outcome could have a material adverse effect on our business, financial condition and results of operations.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

**Information About Our Executive Officers and Directors**

The following table provides information regarding the Company's executive officers and directors (ages are as of February 28, 2025):

| Name | Age | Position(s) |
|---|---|---|
| Marcus A. Lemonis | 51 | Chairman and Chief Executive Officer |
| Matthew D. Wagner | 39 | President and Chief Operating Officer |
| Thomas E. Kirn | 38 | Chief Financial and Accounting Officer |
| Lindsey J. Christen | 44 | Chief Administrative and Legal Officer and Secretary |
| Andris A. Baltins | 79 | Director |
| Brian P. Cassidy | 51 | Director |
| Mary J. George | 74 | Director |
| Kathleen S. Lane | 67 | Director |
| Michael W. Malone | 66 | Director |
| Brent L. Moody | 63 | Director |
| K. Dillon Schickli | 71 | Director |

Set forth below is a description of the background of each of the Company's executive officers and directors.

*Marcus A. Lemonis* has served as Camping World Holdings, Inc.'s Chairman and Chief Executive Officer and on the Board of Directors of Camping World Holdings, Inc. since March 2016, as the President and Chief Executive Officer and on the Board of Directors of CWGS, LLC since February 2011, as the Chief Executive Officer and on the Board of Directors of Good Sam Enterprises, LLC since January 2011, as President and Chief Executive Officer and on the Board of Directors of Camping World, Inc. since September 2006 and as the President and Chief Executive Officer and on the Board of Directors of FreedomRoads, LLC since May 1, 2003. Mr. Lemonis received a B.A. from Marquette University. Mr. Lemonis' extensive experience in retail, RV and automotive, business operations and entrepreneurial ventures makes him well qualified to serve on our Board of Directors.

*Matthew D. Wagner* has served as Camping World Holdings, Inc.'s President since July 2024. Mr. Wagner previously served as Chief Operating Officer from January 2023 to June 2024, Executive Vice President from August 2019 to December 2022, Senior Vice President, Sales, Marketing, and Corporate Development, from December 2018 to August 2019, and the Vice President of Inventory Operations for FreedomRoads, LLC from May 2016 to December 2018. Mr. Wagner joined the Company in 2007 as an inventory analyst. Mr. Wagner received a B.S. degree in Finance and Operations and Supply Chain from Marquette University.

*Thomas E. Kirn* has served as the Company's Chief Financial Officer since July 2024 and has served as the Company's Chief Accounting Officer since September 2020. Mr. Kirn joined the Company in September 2019 as the Chief Financial Officer for FreedomRoads, LLC ("FreedomRoads"), an indirect subsidiary of the Company. Prior to joining FreedomRoads, Mr. Kirn held various roles at Ernst & Young, LLP from 2009 to 2019. Mr. Kirn holds a B.A. in Accounting and a B.A. in Hispanic Studies from Illinois Wesleyan University.

*Lindsey J. Christen* has served as Chief Administrative and Legal Officer of Camping World Holdings, Inc. and CWGS, LLC and its subsidiaries since July 2023. Ms. Christen previously served as Executive Vice President of CWGS LLC and its subsidiaries from February 2022 until July 2023 and General Counsel and Secretary of Camping World Holdings, Inc. and CWGS, LLC and its subsidiaries since June 2020. Ms. Christen previously served as Senior Vice President of CWGS, LLC and its subsidiaries from June 2020 to February 2022, as Assistant General Counsel of Good Sam Enterprises, LLC, Camping World, Inc. and FreedomRoads, LLC from 2011 until June 2020 and Corporate Counsel of Camping World, Inc. and FreedomRoads, LLC from 2008 to 2011. Ms. Christen received a J.D. from Brooklyn Law School in 2007 and a B.A. from Villanova University.

Table of Contents

*Andris A. Baltins* has served on the Board of Directors of Camping World Holdings, Inc. since March 2016, on the Board of Directors of CWGS, LLC since February 2011 and on the Board of Directors of Good Sam Enterprises, LLC since February 2006. He has been a member of the law firm of Kaplan, Strangis and Kaplan, P.A. since 1979. Mr. Baltins serves as a director of various private and nonprofit corporations. Mr. Baltins previously served as a director of Polaris Industries, Inc. from 1995 until 2011. Mr. Baltins received a J.D. from the University of Minnesota Law School and a B.A. from Yale University. Mr. Baltins' over 40-year legal career as an advisor to numerous public and private companies and his experience in the areas of complex business transactions, mergers and acquisitions and corporate law make him well qualified to serve on our Board of Directors.

*Brian P. Cassidy* has served on the Board of Directors of Camping World Holdings, Inc. since March 2016 and on the Board of Directors of CWGS, LLC since March 2011. Mr. Cassidy is the president and a partner at Crestview, which he joined in 2004, and currently serves as head of Crestview's media and communications strategy. Mr. Cassidy currently serves as a director of WideOpenWest, Inc., since December 2015, and Pursuit Attractions and Hospitality Inc. (formerly Viad Corp), since August 2020, and currently serves as a director of various private companies, including Saber Interactive since September 2024, Journey Beyond since July 2024, Hornblower Holdings since April 2018, Congruex LLC since November 2017, FC3 since November 2020 and Digicomm since August 2020. Mr. Cassidy previously served as a director of Cumulus Media, Inc., a public company, from May 2014 until March 2017, served as a director of various private companies, including Industrial Media from October 2016 to February 2022, ICM Partners from December 2019 to June 2022, NEP Group, Inc. from December 2012 to October 2018, Interoute Communications Holdings from April 2015 until May 2018, OneLink Communications from May 2007 until November 2012 and ValueOptions, Inc. from December 2007 until December 2014, and served as chairman of TenCate Grass from September 2021 to February 2024. He was also involved with Crestview's investments in Charter Communications, Inc. and Insight Communications, Inc. Prior to joining Crestview, Mr. Cassidy worked in private equity at Boston Ventures, where he invested in companies in the media and communications, entertainment and business services industries. Previously, he worked as the acting chief financial officer of one of Boston Ventures' portfolio companies. Prior to that time, Mr. Cassidy was an investment banking analyst at Alex. Brown & Sons, where he completed a range of financing and mergers and acquisitions assignments for companies in the consumer and business services sectors. Mr. Cassidy received an M.B.A. from the Stanford Graduate School of Business and an A.B. in Physics from Harvard College. Mr. Cassidy's private equity investment and company oversight experience and background with respect to acquisitions, debt financings and equity financings make him well qualified to serve on our Board of Directors.

*Mary J. George* has served on the Board of Directors of Camping World Holdings, Inc. since January 2017. She has also served on the board of ASP Conair Holdings LP, owner of Conair Corporation, a private U.S.-based company that sells small appliances, personal care, and health and beauty products, since January 2022. She has also served on the board of Hyduro, Inc., a private company and developer of a mobile connected smart water bottle cap, designed to optimize personal hydration by providing timely feedback, since March 2022. Ms. George also served as executive chairman of Ju-Ju-Be, a private company and retailer of premium diaper bags and other baby products from January 2018 to September 2022. Ms. George has been a founding partner of Morningstar Capital Investments, LLC, an investment firm, since 2001. Ms. George served as chief executive officer and a director at Easton Hockey Holdings Inc., a private manufacturer of ice hockey equipment, from August 2014 to December 2016. From 2002 to 2015, Ms. George held various positions, including co-chairman (2002 to 2009) and vice chairman (2009 to 2015), at Bell Automotive Products, Inc., a private manufacturer of automotive accessories. From 1994 to 2004, Ms. George held various positions, including chief operating officer (1995 to 1998), chief executive officer (1998 to 2000), and chairman (2000 to 2004), at Bell Sports Inc., a formerly public helmet manufacturer. Ms. George also currently serves or previously served as a director of various public and private companies, including Image Entertainment, Inc., a formerly public independent distributor of home entertainment programming, from 2010 to 2012, Oakley, Inc., a public sports equipment and lifestyle accessories manufacturer, from 2004 to 2007, BRG Sports Inc. since 2013, 3 Day Blinds Inc. from 2007 to 2015, and Oreck Corporation from 2008 to 2012. Ms. George's experience in sales, marketing and general management in the consumer products industry, as well as success in the development of internationally renowned branded products, provides our Board of Directors with greater insight in the areas of product branding and strategic growth in the consumer products industry, and make her well-qualified to serve on our Board of Directors.

Table of Contents

*Kathleen S. Lane* has served on the Board of Directors of Camping World Holdings, Inc. since March 2024. Ms. Lane served as the Chief Information Officer at TJX Companies, a multinational off-price department store corporation, from 2008 to 2013. She also served as Chief Information Officer at National Grid, a multi-national electricity and gas provider for commercial and residential applications from 2006 to 2008. She has also had a breadth of experience within the consumer products industry, having started her career at The Proctor & Gamble Company. Ms. Lane then served as Chief Information Officer at Gillette and as director, technology services of Pepsi Cola International. She has served on the Board of Directors of Hanover Insurance Group, Inc., an insurance company, since September 2018. Ms. Lane previously served as a director of Bob Evans Farms, Inc., a publicly traded operator of over 500 restaurants and a producer and distributer of food products, from 2014 to 2018, Armstrong Flooring, Inc., a formerly publicly traded leading global producer of flooring products, from 2016 to 2023, and EarthLink Holdings, LLC, a managed network, security and cloud services provider, from 2013 to 2017. Ms. Lane's experience in retail industries and as a Chief Information Officer provides our Board of Directors with valuable expertise in key focus areas and makes Ms. Lane well qualified to serve on our Board of Directors.

*Michael W. Malone* has served on the Board of Directors of Camping World Holdings, Inc. since May 2019. Mr. Malone was Vice President, Finance and Chief Financial Officer of Polaris Industries Inc. ("Polaris"), a manufacturer of power sports vehicles, from January 1997 to July 2015 and retired from Polaris in March 2016. From January 1997 to January 2010, Mr. Malone also served as Corporate Secretary. Mr. Malone was Vice President and Treasurer of Polaris from December 1994 to January 1997 and was Chief Financial Officer and Treasurer of a predecessor company of Polaris from January 1993 to December 1994. Mr. Malone joined Polaris in 1984 after four years with Arthur Andersen LLP. Mr. Malone has served on the board and on the Audit (chair), Finance and Nominating and Governance Committees of Armstrong Flooring, Inc., a formerly publicly traded leading global producer of flooring products, since October 2016 as well as the boards of various nonprofit organizations. Mr. Malone has served on the board of Don Stevens, LLC, a private company, since May 2021. Mr. Malone previously served on the board of Stevens Equipment Supply LLC, a private company, from May 2011 until October 2020. Mr. Malone received a B.A. in accounting and business administration from St. John's University (Collegeville, Minnesota). Mr. Malone's experiences as the former Chief Financial Officer of a public company, his public company board experience, and his in-depth knowledge of the outdoor lifestyle industry make him well qualified to serve on our Board of Directors.

*Brent L. Moody* served as a Senior Advisor to Camping World Holdings, Inc. from July 1, 2024 through December 31, 2024, as President of Camping World Holdings, Inc. and President of CWGS Enterprises, LLC from September 2018 to June 30, 2024, and on the Board of Directors of Camping World Holdings, Inc. since May 2018. Mr. Moody previously served as Camping World Holdings, Inc.'s Chief Operating and Legal Officer from March 2016 to September 2018, as the Chief Operating and Legal Officer of CWGS, LLC and its subsidiaries since January 2016, as the Executive Vice President and Chief Administrative and Legal Officer of CWGS, LLC from February 2011 to December 31, 2015, as the Executive Vice President and Chief Administrative and Legal Officer of Good Sam Enterprises, LLC from January 2011 to December 2015, as the Executive Vice President and Chief Administrative and Legal Officer of FreedomRoads, LLC and Camping World, Inc. from 2010 until December 2015, as Executive Vice President/General Counsel and Business Development of Camping World, Inc. and FreedomRoads, LLC from 2006 to 2010, as Senior Vice President/General Counsel and Business Development of Camping World, Inc. and Good Sam Enterprises, LLC from 2004 to 2006 and as Vice President and General Counsel of Camping World, Inc. from 2002 to 2004. From 1998 to 2002, Mr. Moody was a shareholder of the law firm of Greenberg Traurig, P.A. From 1996 to 1998, Mr. Moody served as vice president and assistant general counsel for Blockbuster, Inc. Mr. Moody received a J.D. from Nova Southeastern University, Shepard Broad Law Center and a B.S. from Western Kentucky University. Mr. Moody's extensive legal experience, his experience in various areas of complex business transactions and mergers and acquisitions, and his extensive knowledge of the Company's operations make him well qualified to serve on our Board of Directors.

*K. Dillon Schickli* has served on the Board of Directors of Camping World Holdings, Inc. since March 2016 and on the Board of Directors of CWGS, LLC since August 2011. Mr. Schickli previously served on the Board of Directors of CWGS, LLC from 1990 until 1995 and was chief operating officer of Affinity Group, Inc., the predecessor of Good Sam Enterprises, LLC, from 1993 until 1995. Previously, Mr. Schickli was a co-investor with Crestview in DS Waters Group, Inc. ("DS Waters") and served as vice chairman of its board of directors until it was sold to Cott Corporation in December 2014. Prior to that time, Mr. Schickli was the chief executive officer of DS Waters from June 2010 until February 2013 and subsequently led the buyout of the business by Crestview. Mr. Schickli also previously led the buyout of DS Waters from Danone Group & Suntory Ltd. in November 2005 and was also a co investor in DS Waters with Kelso & Company. Mr. Schickli served as co-chief executive officer and chief financial officer of DS Waters from November 2005 until June 2010, when he became the sole chief executive officer. Mr. Schickli started his business career in the capital planning and acquisitions group of the Pepsi Cola Company after he received his M.B.A. from the University of Chicago. Mr. Schickli received a B.A. from Carleton College in 1975. Mr. Schickli's long association with, and knowledge of, the Company, extensive experience serving as a director of other businesses, operating experience as a chief executive officer and chief financial officer and his experience as a private equity investor with respect to acquisitions, debt financings, equity and financings make him well qualified to serve on our Board of Directors.

# PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### Market Information

Our Class A common stock is traded on the New York Stock Exchange under the symbol "CWH." There is no public trading market for our Class B common stock and Class C common stock.

### Holders of Record

As of February 7, 2025, there were 10 and 44,813 stockholders of record and beneficial holders, respectively, of our Class A common stock. As of February 7, 2025, there were two and one stockholders of record of our Class B common stock and Class C common stock, respectively.

### Dividend Policy

Since 2023, we have made a regular quarterly cash dividend of $0.125 per share of Class A common stock and intend to continue to do so, subject to the discretion of our Board of Directors and the other factors described below. CWGS, LLC is required to make cash distributions in accordance with the CWGS LLC Agreement in an amount sufficient for us to pay any expenses incurred by us in connection with the regular quarterly cash dividend, along with any of our other operating expenses and other obligations. Holders of our Class B common stock and Class C common stock are not entitled to participate in any dividends declared by our Board of Directors. We believe that our cash and cash equivalents and cash provided by operating activities will be sufficient for CWGS, LLC to make this regular quarterly cash distribution for at least the next twelve months.

In addition, the CWGS LLC Agreement requires pro rata tax distributions to be made by CWGS, LLC to its members, including us. In general, tax distributions are made on a quarterly basis, to each member of CWGS, LLC, including us, based on such member's allocable share of the taxable income of CWGS, LLC (which, in our case, will be determined without regard to any Basis Adjustments described in our Tax Receivable Agreement) and an assumed tax rate based on the highest combined federal, state, and local tax rate that may potentially apply to any one of CWGS, LLC's members (46.70% in 2024, 2023 and 2022), regardless of the actual final tax liability of any such member. Typically, based on the current applicable effective tax rates, we expect that (i) the assumed tax rate that will be used for purposes of determining tax distributions from CWGS, LLC will exceed our actual combined federal, state and local tax rate (assuming no changes in corporate tax rates) and (ii) the annual amount of tax distributions paid to us will exceed the sum of (A) our actual annual tax

Table of Contents

liability and (B) the annual amount payable by us under the Tax Receivable Agreement (assuming no early termination of the Tax Receivable Agreement) (such excess in clauses (A) and (B), collectively referred to herein as the "Excess Tax Distribution").

Our ability to pay cash dividends on our Class A common stock depends on, among other things, our results of operations, financial condition, level of indebtedness, capital requirements, contractual restrictions, restrictions in our debt agreements and in any preferred stock, restrictions under applicable law, any Excess Tax Distributions, the extent to which such distributions would render CWGS, LLC insolvent, our business prospects and other factors that our Board of Directors may deem relevant. Additionally, our ability to distribute any Excess Tax Distribution will also be contingent on no early termination or amendment of the Tax Receivable Agreement, as well as the amount of tax distributions actually paid to us, which will be affected by the LLC Conversion, and our actual tax liability. Furthermore, because we are a holding company, our ability to pay cash dividends on our Class A common stock depends on our receipt of cash distributions from CWGS, LLC and, through CWGS, LLC, cash distributions and dividends from its operating subsidiaries, which may further restrict our ability to pay dividends as a result of the laws of their jurisdiction of organization, agreements of our subsidiaries or covenants under any existing and future outstanding indebtedness we or our subsidiaries incur. In particular, our ability to pay any cash dividends on our Class A common stock is limited by restrictions on the ability of CWGS, LLC and our other subsidiaries and us to pay dividends or make distributions to us under the terms of our Senior Secured Credit Facilities and Floor Plan Facility. We do not currently believe that the restrictions contained in our existing indebtedness will impair the ability of CWGS, LLC to make the distributions or pay the dividends as described above. Our dividend policy has certain risks and limitations, particularly with respect to liquidity, and we may not pay future dividends according to our policy, or at all. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources" and "Risk Factors—Risks Relating to Ownership of Our Class A Common Stock—Our ability to pay regular and special dividends on our Class A common stock is subject to the discretion of our Board of Directors and may be limited by our structure and statutory restrictions" in this Form 10-K.

**Issuer Purchases of Equity Securities**

The following table presents information related to our repurchases of Class A common stock for the periods indicated:

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs(1) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Programs(1) |
|---|---|---|---|---|
| October 1, 2024 to October 31, 2024 | — | $— | — | $120,166,000 |
| November 1, 2024 to November 30, 2024 | — | — | — | 120,166,000 |
| December 1, 2024 to December 31, 2024 | — | — | — | 120,166,000 |
| Total | — | $— | — | $120,166,000 |

(1) On October 30, 2020, our Board of Directors authorized a stock repurchase program for the repurchase of up to $100.0 million of the Company's Class A common stock, expiring on October 31, 2022. In August 2021 and January 2022, our Board of Directors authorized increases to the stock repurchase program for the repurchase of up to an additional $125.0 million and $152.7 million of the Company's Class A common stock, respectively. Following these extensions, the stock repurchase program now expires on December 31, 2025. This program does not obligate the Company to acquire any particular amount of Class A common stock and the program may be extended, modified, suspended or discontinued at any time at the board's discretion.

The table above excludes shares net settled by the Company in connection with tax withholdings associated with the vesting of restricted stock units as these shares were not issued and outstanding.

Table of Contents

### Stock Performance Graph

The following graph and table illustrate the total return for the five years ended December 31, 2024 for (i) our Class A common stock, (ii) the Standard and Poor's ("S&P") 500 Index, and (iii) the S&P 500 Consumer Discretionary Distribution & Retail Index. The comparisons reflected in the graph and table are not intended to forecast the future performance of our stock and may not be indicative of future performance. The graph and table assume that $100 was invested on December 31, 2019 in each of our Class A common stock, the S&P 500 Index, and S&P 500 Consumer Discretionary Distribution & Retail Index and that any dividends were reinvested.




| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Camping World Holdings, Inc. Class A common stock | $ 100.00 | $ 189.50 | $ 305.10 | $ 184.58 | $ 230.89 | $ 189.48 |
| S&P 500 Index | $ 100.00 | $ 118.40 | $ 152.39 | $ 124.79 | $ 157.59 | $ 197.02 |
| S&P 500 Consumer Discretionary Distribution & Retail Index | $ 100.00 | $ 146.42 | $ 174.69 | $ 114.80 | $ 163.48 | $ 217.64 |

Source: Zacks Investment Research, Inc. Used with permission. All rights reserved Copyright 1980-2025.
Index Data: Copyright Standard and Poor's, Inc. Used with permission. All rights reserved.

### Recent Sales of Unregistered Securities

None.

### ITEM 6. [Reserved]

Table of Contents

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read together with our Consolidated Financial Statements and related notes included in Part II, Item 8 of this Form 10-K. This discussion contains forward-looking statements based upon current plans, expectations and beliefs involving risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various important factors, including those set forth under "Risk Factors" included in Part I, Item 1A of this Form 10-K, the "Cautionary Note Regarding Forward-Looking Statements" and in other parts of this Form 10-K. Except to the extent that differences among reportable segments are material to an understanding of our business taken as a whole, we present the discussion in Management's Discussion and Analysis of Financial Condition and Results of Operations on a consolidated basis.*

*For purposes of this Form 10-K, we define an "Active Customer" as a customer who has transacted with us in any of the eight most recently completed fiscal quarters prior to the date of measurement. Unless otherwise indicated, the date of measurement is December 31, 2024, our most recently completed fiscal quarter.*

### Overview

Camping World Holdings, Inc. (together with its subsidiaries) is the world's largest retailer of recreational RVs and related products and services. Through our Camping World and Good Sam brands, our vision is to build a business that makes RVing and other outdoor adventures fun and easy. We strive to build long-term value for our customers, employees, and stockholders by combining a unique and comprehensive assortment of RV products and services with a national network of RV dealerships, service centers and customer support centers along with the industry's most extensive online presence and a highly-trained and knowledgeable team of associates serving our customers, the RV lifestyle, and the communities in which we operate. We also believe that our Good Sam organization and family of highly-specialized services and plans, including roadside assistance, protection plans and insurance, uniquely enables us to connect with our customers as stewards of an outdoor and recreational lifestyle. On December 31, 2024, we operated a total of 206 store locations, with all of them selling and/or servicing RVs. See Note 1 — Summary of Significant Accounting Policies — Description of the Business to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

A summary of the changes in quantities and types of retail stores and changes in same stores from December 31, 2023 to December 31, 2024, are in the table below:

| | RV Dealerships | RV Service & Retail Centers | Total | Same Store[1] |
|---|---|---|---|---|
| Number of store locations as of December 31, 2023 | 198 | 4 | 202 | 166 |
| Opened | 17 | — | 17 | — |
| Closed | (11) | (2) | (13) | (7) |
| Achieved designation of same store [1] | — | — | — | 16 |
| Number of store locations as of December 31, 2024 | 204 | 2 | 206 | 175 |

(1) Our same store revenue and unit sales calculations for a given period include only those stores that were open both at the end of the corresponding period and at the beginning of the preceding fiscal year. See "Results of Operations" below for same store revenue and unit sales.

During the first quarter of 2025, we expect to open twelve RV dealerships, convert one RV service and retail center into an RV dealership, and close two RV dealerships.

### Segments

We operate two reportable segments: (i) Good Sam Services and Plans, and (ii) RV and Outdoor Retail. We identify our reporting segments based on the organizational units used by management to monitor performance and make operating decisions. See Note 1 — Summary of Significant Accounting Policies —

Description of the Business and Note 23 — Segment Information to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for further information regarding our reportable segments.

The following table presents percentages of total revenue and total Segment Adjusted EBITDA for our two reportable segments:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| As percentage of total revenue: | | | |
| Good Sam Services and Plans | 3.2% | 3.1% | 2.8% |
| RV and Outdoor Retail | 96.8% | 96.9% | 97.2% |
| As percentage of total Segment Adjusted EBITDA: | | | |
| Good Sam Services and Plans | 49.0% | 37.1% | 14.2% |
| RV and Outdoor Retail | 51.0% | 62.9% | 85.8% |

**Strategic Review**

On January 17, 2024, we announced that we were reviewing potential strategic alternatives for our Good Sam business. In conducting that review, we came to the decision that the greatest value to the Company can be achieved through retaining the Good Sam business. We have deepened our appreciation for the non-cyclical nature of the business and recognize the large growth potential of the business over multiple vectors in the outdoor and recreational space. Going forward, we expect that Good Sam will continue to benefit from its relationship with the Camping World brand and store footprint but will be empowered to operate independently to drive growth.

**Key Performance Indicators**

We evaluate the results of our overall business based on a variety of factors, including the number of Active Customers and Good Sam members, revenue and same store revenue, vehicle units, and same store vehicle units, gross profit and gross profit per vehicle sold, gross margin, finance and insurance per vehicle ("PV"), vehicle inventory turnover, Adjusted EBITDA and Adjusted EBITDA margin, and selling, general and administrative expenses ("SG&A") excluding stock-based compensation ("SBC").

*Same store revenue.* Same store revenue measures the performance of a store location during the current reporting period against the performance of the same store location in the corresponding period of the previous year. Our same store revenue calculations for a given period include only those stores that were open both at the end of the corresponding period and at the beginning of the preceding fiscal year. As of December 31, 2024 and 2023, we had a base of 175 and 166 same stores, respectively. For the years ended December 31, 2024 and 2023, our aggregate same store revenue was $5.2 billion and $5.5 billion, respectively. With same store revenue driven by the number of transactions and the average transaction price, changes in our mix of new vehicle sales has in the past negatively impacted, and in the future is likely to negatively impact, our new vehicle same store revenue. Over the past several years, we have seen a shift in our overall mix of new RV sales towards travel trailer vehicles, which tend to carry lower average selling prices than other classes of new RV vehicles. From 2015 to 2024, total new vehicle travel trailer units have increased from 62% to 78% of total new vehicle unit sales. From 2015 to 2024 our average selling price of a new vehicle unit increased 1% from $39,853 to $40,089, as inflation over that period was partially offset by the higher mix of lower priced travel trailers.

*Gross Profit and Gross Margins.* Gross profit is our total revenue less our total costs applicable to revenue. Our total costs applicable to revenue primarily consists of the cost of goods and cost of sales, exclusive of depreciation and amortization. Gross margin is gross profit as a percentage of revenue.

Our gross profit is variable in nature and generally follows changes in our revenue. Sales of new vehicles generally result in a lower gross margin than other areas of our business, including used vehicles, repair service and installation work, RV equipment and accessories, outdoor equipment and accessories and finance and insurance products. While gross margins for our RV and Outdoor Retail segment are lower than

gross margins for our Good Sam Services and Plans, this segment generates significant gross profit and is our primary means of acquiring new customers, to whom we then cross sell our higher margin products and services with recurring revenue. We believe the overall growth of our RV and Outdoor Retail segment will allow us to continue to drive growth in gross profit due to our ability to cross sell our Good Sam Services and Plans to our Active Customer base.

*Adjusted EBITDA and Adjusted EBITDA Margin.* Adjusted EBITDA and Adjusted EBITDA Margin are some of the primary metrics management uses to evaluate the financial performance of our business. Adjusted EBITDA and Adjusted EBITDA Margin are also frequently used by analysts, investors, and other interested parties to evaluate companies in our industry. Adjusted EBITDA and Adjusted EBITDA Margin are non-GAAP metrics. We use Adjusted EBITDA and Adjusted EBITDA Margin to supplement GAAP measures of performance as follows:

- as a measurement of operating performance to assist us in comparing the operating performance of our business on a consistent basis, and remove the impact of items not directly resulting from our core operations;
- for planning purposes, including the preparation of our internal annual operating budget and financial projections; and
- to evaluate the performance and effectiveness of our operational strategies.

For the definitions of Adjusted EBITDA and Adjusted EBITDA Margin, a reconciliation of Adjusted EBITDA to net income, a reconciliation of Adjusted EBITDA Margin to net income margin, and a further discussion of how we utilize these non-GAAP financial measures and their limitations, see "Non-GAAP Financial Measures" below.

*SG&A Excluding SBC as a Percentage of Gross Profit.* SG&A Excluding SBC is a significant component of our Adjusted EBITDA and Adjusted EBITDA Margin. SBC is excluded from the determination of Adjusted EBITDA and Adjusted EBITDA Margin. Our ability to control costs within SG&A Excluding SBC and the extent to which these expenses are variable with gross profit are a significant focus of our management and we believe they are a focus of analysts, investors, and other interested parties to evaluate companies in our industry.

For a definition of SG&A Excluding SBC, a reconciliation of SG&A Excluding SBC to SG&A, and a further discussion of how we utilize this non-GAAP financial measure and its limitations, see "Non-GAAP Financial Measures" below.

**Industry Trends**

According to the RV Industry Association's survey of manufacturers, which almost entirely focuses on North America, wholesale shipments of new RVs for 2024 were 333,733 units, 6.6% greater than in 2023. This positive trend is highlighted by a 7.6% rise in December 2024 shipments with 23,153 units shipped compared to 21,522 units shipped in the same period in 2023.

The per unit cost of new vehicles in fiscal year 2023 was significantly higher than we experienced prior to the COVID-19 pandemic, due to the RV manufacturers' supply constraints during the pandemic, strong demand for new vehicles during the pandemic, higher inflation, and higher interest rates. These higher costs were partially mitigated by the higher average selling prices on new vehicles initially, but we experienced a decrease in new vehicle gross margins during the year ended December 31, 2023, as a result of these higher costs. We experienced a 4.3% decrease in the average sale price of new vehicles during fiscal year 2023 compared to 2022, driven by more price sensitive customers in a higher interest rate environment.

Since certain of our RV manufacturers had indicated that they expected new towable vehicle average manufacturer selling prices to decline by up to 10% for 2024 model year vehicles, we focused on clearing out a significant portion of our pre-2024 model year new vehicles primarily during the fourth quarter of 2023 and early 2024 to improve the mix of our new vehicle inventory toward the lower cost 2024 model year vehicles. These new vehicle cost decreases further decreased average selling prices of new vehicles in 2024. For the year ended December 31, 2024, overall new vehicle gross margins decreased 112 basis points to 14.4%, as our average selling price per vehicle decreased 8.6% while our average cost per vehicle decreased 7.4%.

Additionally, these new vehicle price pressures have resulted, and may continue to result, in a decline in residual values of used vehicles, which led us to discount used vehicle pricing in order to maintain used vehicles as a lower cost alternative to new vehicles, which has negatively impacted used vehicle gross margins. We also experienced lower used vehicle inventory levels in 2024 as we slowed procurement to allow RV owner pricing expectations to adjust as a result of 2024 model year pricing declines. During the fourth quarter of 2024, we took steps to reverse the trend of decreasing used vehicle revenue and unit sales, which resulted in an 8.2% increase in used vehicle revenue and 11.4% increase in used vehicle unit sales in the fourth quarter of 2024.

We are closely monitoring U.S. trade policy developments with countries from which we source product and equipment, such as China, Mexico, and Canada. There is uncertainty as to the extent and duration of additional tariffs that have or may be imposed on imports from these countries. We have made adjustments to our procurement practices to partially mitigate certain of the potential negative effects that additional tariffs may impose on the sourcing of our inventory and equipment. Additionally, many of our U.S.-based suppliers source some of their components from these countries, which could result in higher procurement costs from U.S.-based suppliers. In 2024, our costs applicable to revenue included the costs of directly sourced inventory from China, Mexico, and Canada of approximately $27.0 million, $10.0 million and $2.0 million, respectively.

**Financial Institutions**

The Company maintains the majority of its cash and cash equivalents in accounts with major U.S. and multi-national financial institutions, and our deposits at certain of these institutions exceed insured limits. Market conditions can impact the viability of these institutions. In the event of failure of any of the financial institutions where we maintain our cash and cash equivalents, there can be no assurance that we will be able to access uninsured funds in a timely manner or at all.

**Inflation**

As noted in “Industry Trends” above, we have experienced, and continue to experience, reduced cost and average selling prices with respect to new vehicles and, as a byproduct of the new vehicle pricing decrease, used vehicles. New and used vehicles regularly represent a majority of our costs. However, inflationary factors, such as increases to our product cost, overhead costs, or tariffs on imported product or components used by RV manufacturers, have in the past adversely affected and may in the future adversely affect our operating results if the selling prices of our products and services do not increase proportionately with those increased costs or if demand for our products and services declines as a result of price increases to address inflationary costs. We finance substantially all of our new vehicle inventory and certain of our used vehicle inventory through revolving floor plan arrangements. Inflationary increases in the costs of new and/or used vehicles financed through the revolving floor plan arrangement result in an increase in the outstanding principal balance of the revolving floor plan arrangement. Additionally, our leases require us to pay taxes, maintenance, repairs, insurance and utilities, all of which are generally subject to inflationary increases. Further, the cost of remodeling acquired RV dealership locations and constructing new RV dealership locations is subject to inflationary increases in the costs of labor and material, which results in higher rent expense on new RV dealership locations. Finally, our credit agreements include interest rates that vary based on various benchmarks. Such rates have historically increased during periods of increasing inflation.

**Restructuring**

In 2019, we made a strategic decision to refocus our business around our core RV competencies (the “2019 Strategic Shift”), which was substantially complete by December 31, 2021. On March 1, 2023, our

management determined to implement plans (the “Active Sports Restructuring”), which were substantially complete by December 31, 2023. For the 2019 Strategic Shift the remaining potential ongoing charges related to lease termination costs and other associated costs relating to the leases of certain previously closed locations and facilities. The timing of sublease and/or termination negotiations will vary as both are contingent on landlord approvals. We expect that the ongoing lease-related costs relating to the 2019 Strategic Shift, net of associated sublease income, will be less than $3.5 million per year. During the year ended December 31, 2024, the Company terminated the final significant lease under the Active Sports Restructuring that included a $1.5 million lease termination fee that was paid in October 2024. The Company does not expect any further costs under the Active Sports Restructuring beyond insignificant lease costs of less than $0.2 million per year. See Note 5 — Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

**Our Corporate Structure Impact on Income Taxes**

Our corporate structure is commonly referred to as an “Up-C” structure and typically results in a different relationship between income before income taxes and income tax expense than would be experienced by most public companies with a more traditional corporate structure. More traditional structures are typically comprised predominately of Subchapter C corporations (“C-Corps”) and/or lacking significant non-controlling interests with holdings through limited liability companies or partnerships. Typically, most of our income tax expense is recorded at the CWH level, our public holding company, based on its allocation of taxable income from CWGS, LLC.

More specifically, CWH is organized as a C-Corp and, as of December 31, 2024, is a 61.0% owner of CWGS, LLC. CWGS, LLC is organized as a limited liability company and treated as a partnership for U.S. federal and most applicable state and local income tax purposes and, as such is generally not subject to any U.S. federal entity-level income taxes (“Pass-Through”), with the exception of Americas Road and Travel Club, Inc. and FreedomRoads RV, Inc., and their wholly-owned subsidiaries, which are active C-Corps embedded within the CWGS, LLC structure. As discussed below, prior to 2023, Camping World, Inc. (“CW”) and its wholly-owned subsidiaries were also C-Corps embedded within the CWGS, LLC structure.

By January 2, 2023, the “LLC Conversion” (see Note 12 — Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K) was completed. Beginning with the year ended December 31, 2024, the LLC Conversion has allowed and we expect will continue to allow certain losses that previously would have been confined within the C-Corp portion of CWGS, LLC to instead offset a portion of income generated by the Pass-Through portion of CWGS, LLC, which reduces the amount of income tax expense recorded by CWH. The LLC Conversion has and we expect will continue to reduce the amount of tax distributions required to be paid by CWGS, LLC to CWH and the non-controlling interest holders under the CWGS LLC Agreement beginning with the year ended December 31, 2023.

CWH receives an allocation of its share of the net income of CWGS, LLC based on CWH’s weighted-average ownership of CWGS, LLC for the period. CWH recognizes income tax expense on its pre-tax income including its portion of this income allocation from CWGS, LLC primarily relating to Pass-Through entities. The income tax relating to the net income of CWGS, LLC allocated to CWH that relates to separately taxed C-Corp entities is recorded within the consolidated results of CWGS, LLC. No income tax expense is recognized by the Company for the portion of net income of CWGS, LLC allocated to non-controlling interests other than income tax expense recorded by CWGS, LLC. Rather, tax distributions are paid to the non-controlling interest holders, which are recorded as distributions to holders of LLC common units in the consolidated statements of cash flows. CWH is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income of CWGS, LLC and is taxed at the prevailing corporate tax rates. For the years ended December 31, 2024, 2023 and 2022, the Company used blended statutory tax rate assumptions between 25.0% and 25.4%, for income adjustments applicable to CWH when calculating the adjusted net income attributable to Camping World Holdings, Inc. — basic and diluted (see “Non-GAAP Financial Measures” in Part II, Item 7 of this Form 10-K). CWGS, LLC may be liable for various other state and local taxes.

Table of Contents

The following table presents the allocation of CWGS, LLC's C-Corp and Pass-Through net income to CWH, the allocation of CWGS, LLC's net (loss) income to non-controlling interests, income tax benefit (expense) recognized by CWH, and other items:

| | Year Ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2024 | 2023 | 2022 |
| C-Corp portion of CWGS, LLC net income allocated to CWH | $ 2,876 | $ 3,776 | $ (37,500) |
| Pass-Through portion of CWGS, LLC net (loss) income allocated to CWH | (56,318) | 17,687 | 252,771 |
| CWGS, LLC net (loss) income allocated to CWH | (53,442) | 21,463 | 215,271 |
| CWGS, LLC net (loss) income allocated to noncontrolling interests | (40,243) | 19,557 | 214,084 |
| CWGS, LLC net (loss) income | (93,685) | 41,020 | 429,355 |
| Tax Receivable Agreement liability adjustment | — | 2,442 | 114 |
| Income tax benefit (expense) recorded by CWH | 13,533 | 8,064 | (92,253) |
| Other incremental CWH net income | 1,272 | 1,403 | 616 |
| Net (loss) income | $ (78,880) | $ 52,929 | $ 337,832 |

The following table presents further information on income tax benefit (expense):

| | Year Ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2024 | 2023 | 2022 |
| Income tax benefit (expense) recorded by CWH[(1)] | $ 13,533 | $ 8,064 | $ (92,253) |
| Income tax expense recorded by CWGS, LLC[(2)] | (2,156) | (4,537) | (20,030) |
| Income tax benefit (expense) | $ 11,377 | $ 3,527 | $ (112,283) |

(1) During the year ended December 31, 2024, this amount included $11.4 million of income tax benefit related to federal net operating losses and $5.5 million related to state net operating losses. During the year ended December 31, 2023, this amount included $3.1 million of net income tax benefit related to the LLC Conversion and the realization of a portion of outside basis in CWGS, LLC, which previously had a valuation allowance. Additionally, the Company recorded an income tax benefit of $4.1 million related to an entity classification election, which was filed in the third quarter of 2023 with an effective date of January 2, 2023. During the year ended December 31, 2022, this amount included $13.3 million of income tax expense related to the LLC Conversion. This income tax expense was primarily from the write-off of deferred tax assets, which was partially offset by the release of valuation allowance. During the years ended December 31, 2023 and 2022, the Company recorded $15.3 million of income tax benefit and $12.5 million of income tax expense, respectively, related to changes in the valuation allowance on the Company's outside basis difference deferred tax asset in CWGS, LLC. See Note 1 – Summary of Significant Accounting Policies – Revisions to Prior Period Consolidated Financial Statements and Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(2) During the year ended December 31, 2023, this amount included $2.9 million of income tax benefit related to CW state unitary net operating losses. During the year ended December 31, 2022, this amount included $15.2 million of income tax expense related to the LLC Conversion. This income tax expense was primarily from the write-off of deferred tax assets, which was partially offset by the release of valuation allowance. See Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

Table of Contents

## Results of Operations

***Year Ended December 31, 2024 Compared to the Year Ended December 31, 2023***

The following tables set forth information comparing the components of net income for the years ended December 31, 2024 and 2023.

| | Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2024 | | December 31, 2023 | | Favorable/ (Unfavorable) | |
| ($ in thousands) | Amount | Percent of Revenue | Amount | Percent of Revenue | $ | % |
| Revenue: | | | | | | |
| Good Sam Services and Plans | $ 194,575 | 3.2% | $ 193,827 | 3.1% | $ 748 | 0.4% |
| RV and Outdoor Retail | | | | | | |
| New vehicles | 2,825,640 | 46.3% | 2,576,278 | 41.4% | 249,362 | 9.7% |
| Used vehicles | 1,613,849 | 26.5% | 1,979,632 | 31.8% | (365,783) | (18.5%) |
| Products, service and other | 820,111 | 13.4% | 870,038 | 14.0% | (49,927) | (5.7%) |
| Finance and insurance, net | 599,718 | 9.8% | 562,256 | 9.0% | 37,462 | 6.7% |
| Good Sam Club | 46,081 | 0.8% | 44,516 | 0.7% | 1,565 | 3.5% |
| Subtotal | 5,905,399 | 96.8% | 6,032,720 | 96.9% | (127,321) | (2.1%) |
| Total revenue | 6,099,974 | 100.0% | 6,226,547 | 100.0% | (126,573) | (2.0%) |
| | | | | | | |
| Gross profit (exclusive of depreciation and amortization shown separately below): | | | | | | |
| Good Sam Services and Plans | 123,849 | 2.0% | 134,436 | 2.2% | (10,587) | (7.9%) |
| RV and Outdoor Retail | | | | | | |
| New vehicles | 407,471 | 6.7% | 400,459 | 6.4% | 7,012 | 1.8% |
| Used vehicles | 296,697 | 4.9% | 405,394 | 6.5% | (108,697) | (26.8%) |
| Products, service and other | 356,471 | 5.8% | 336,413 | 5.4% | 20,058 | 6.0% |
| Finance and insurance, net | 599,718 | 9.8% | 562,256 | 9.0% | 37,462 | 6.7% |
| Good Sam Club | 41,290 | 0.7% | 39,691 | 0.6% | 1,599 | 4.0% |
| Subtotal | 1,701,647 | 27.9% | 1,744,213 | 28.0% | (42,566) | (2.4%) |
| Total gross profit | 1,825,496 | 29.9% | 1,878,649 | 30.2% | (53,153) | (2.8%) |
| | | | | | | |
| Operating expenses: | | | | | | |
| SG&A | 1,573,117 | 25.8% | 1,538,988 | 24.7% | (34,129) | (2.2%) |
| Depreciation and amortization | 81,190 | 1.3% | 68,643 | 1.1% | (12,547) | (18.3%) |
| Long-lived asset impairment | 15,061 | 0.2% | 9,269 | 0.1% | (5,792) | (62.5%) |
| Lease termination | (2,297) | (0.0%) | (103) | (0.0%) | 2,194 | n/m |
| Loss (gain) on sale or disposal of assets | 9,855 | 0.2% | (5,222) | (0.1%) | (15,077) | n/m |
| Total operating expenses | 1,676,926 | 27.5% | 1,611,575 | 25.9% | (65,351) | (4.1%) |
| Income from operations | 148,570 | 2.4% | 267,074 | 4.3% | (118,504) | (44.4%) |
| Other expense | | | | | | |
| Floor plan interest expense | (95,121) | (1.6%) | (83,075) | (1.3%) | (12,046) | (14.5%) |
| Other interest expense, net | (140,444) | (2.3%) | (135,270) | (2.2%) | (5,174) | (3.8%) |
| Tax Receivable Agreement liability adjustment | — | 0.0% | 2,442 | 0.0% | (2,442) | (100.0%) |
| Other expense, net | (3,262) | (0.1%) | (1,769) | (0.0%) | (1,493) | (84.4%) |
| Total other expense | (238,827) | (3.9%) | (217,672) | (3.5%) | (21,155) | (9.7%) |
| (Loss) income before income taxes | (90,257) | (1.5%) | 49,402 | 0.8% | (139,659) | n/m |
| Income tax benefit | 11,377 | 0.2% | 3,527 | 0.1% | 7,850 | 222.6% |
| Net (loss) income | (78,880) | (1.3%) | 52,929 | 0.9% | (131,809) | n/m |
| Less: net (loss) income attributable to non-controlling interests | 40,243 | 0.7% | (19,557) | (0.3%) | 59,800 | n/m |
| Net (loss) income attributable to Camping World Holdings, Inc. | $ (38,637) | (0.6%) | $ 33,372 | 0.5% | $ (72,009) | n/m |

n/m- not meaningful

Table of Contents

**Supplemental Data**

| | Year Ended December 31, 2024 | 2023 | Increase (decrease) | Percent Change |
|---|---|---|---|---|
| Unit sales | | | | |
| New vehicles | 70,484 | 58,731 | 11,753 | 20.0% |
| Used vehicles | 51,032 | 56,823 | (5,791) | (10.2%) |
| Total | 121,516 | 115,554 | 5,962 | 5.2% |
| | | | | |
| Average selling price | | | | |
| New vehicles | $ 40,089 | $ 43,866 | $ (3,777) | (8.6%) |
| Used vehicles | 31,624 | 34,839 | (3,215) | (9.2%) |
| | | | | |
| Same store unit sales[1] | | | | |
| New vehicles | 62,915 | 54,692 | 8,223 | 15.0% |
| Used vehicles | 46,063 | 53,928 | (7,865) | (14.6%) |
| Total | 108,978 | 108,620 | 358 | 0.3% |
| | | | | |
| Same store revenue[1] ($ in 000s) | | | | |
| New vehicles | $ 2,527,743 | $ 2,408,770 | $ 118,973 | 4.9% |
| Used vehicles | 1,448,546 | 1,876,020 | (427,474) | (22.8%) |
| Products, service and other | 648,245 | 675,446 | (27,201) | (4.0%) |
| Finance and insurance, net | 537,293 | 530,815 | 6,478 | 1.2% |
| Total | $ 5,161,827 | $ 5,491,051 | $ (329,224) | (6.0%) |
| | | | | |
| Average gross profit per unit | | | | |
| New vehicles | $ 5,781 | $ 6,819 | $ (1,038) | (15.2%) |
| Used vehicles | 5,814 | 7,134 | (1,320) | (18.5%) |
| Finance and insurance, net per vehicle unit | 4,935 | 4,866 | 69 | 1.4% |
| Total vehicle front-end yield[2] | 10,730 | 11,840 | (1,110) | (9.4%) |
| | | | | |
| Gross margin | | | | |
| Good Sam Services and Plans | 63.7% | 69.4% | (571) bps | |
| New vehicles | 14.4% | 15.5% | (112) bps | |
| Used vehicles | 18.4% | 20.5% | (209) bps | |
| Products, service and other | 43.5% | 38.7% | 480 bps | |
| Finance and insurance, net | 100.0% | 100.0% | unch | |
| Good Sam Club | 89.6% | 89.2% | 44 bps | |
| Subtotal RV and Outdoor Retail | 28.8% | 28.9% | (10) bps | |
| Total gross margin | 29.9% | 30.2% | (25) bps | |
| | | | | |
| Retail locations | | | | |
| RV dealerships | 204 | 198 | 6 | 3.0% |
| RV service & retail centers | 2 | 4 | (2) | (50.0%) |
| Total | 206 | 202 | 4 | 2.0% |
| | | | | |
| RV and Outdoor Retail inventories ($ in 000s) | | | | |
| New vehicles | $ 1,241,533 | $ 1,378,403 | $ (136,870) | (9.9%) |
| Used vehicles | 413,546 | 464,833 | (51,287) | (11.0%) |
| Products, parts, accessories and misc. | 166,495 | 199,261 | (32,766) | (16.4%) |
| Total RV and Outdoor Retail inventories | $ 1,821,574 | $ 2,042,497 | $ (220,923) | (10.8%) |
| | | | | |
| Vehicle inventory per location ($ in 000s) | | | | |
| New vehicle inventory per dealer location | $ 6,086 | $ 6,962 | $ (876) | (12.6%) |
| Used vehicle inventory per dealer location | 2,027 | 2,348 | (321) | (13.7%) |
| | | | | |
| Vehicle inventory turnover[3] | | | | |
| New vehicle inventory turnover | 1.8 | 1.8 | 0.0 | 2.0% |
| Used vehicle inventory turnover | 3.3 | 2.9 | 0.4 | 14.9% |
| | | | | |
| Other data | | | | |
| Active Customers[4] | 4,487,313 | 4,959,723 | (472,410) | (9.5%) |
| Good Sam Club members[5] | 1,753,798 | 2,027,353 | (273,555) | (13.5%) |
| Service bays[6] | 2,812 | 2,757 | 55 | 2.0% |
| Finance and insurance gross profit as a % of total vehicle revenue | 13.5% | 12.3% | 117 bps | n/a |
| Same store locations | 175 | n/a | n/a | n/a |

Table of Contents

unch -unchanged

bps- basis points

n/a- not applicable

(1) Our same store revenue and units calculations for a given period include only those stores that were open both at the end of the corresponding period and at the beginning of the preceding fiscal year.

(2) Front end yield is calculated as gross profit from new vehicles, used vehicles and finance and insurance (net), divided by combined new and used vehicle unit sales.

(3) Inventory turnover calculated as vehicle costs applicable to revenue over the last twelve months divided by the average quarterly ending vehicle inventory over the last twelve months.

(4) An Active Customer is a customer who has transacted with us in any of the eight most recently completed fiscal quarters prior to the date of measurement.

(5) Excludes Good Sam Club members under the free basic plan, which was introduced in November 2023 and provides for limited participation in the loyalty point program without access to the remaining member benefits.

(6) A service bay is a fully-constructed bay dedicated to service, installation, and/or collision offerings.

## *Revenue and Gross Profit*

### *Good Sam Services and Plans*

Good Sam Services and Plans revenue increased slightly as increased contracts in force for our Good Sam Insurance Agency programs and the introduction of our new tire rescue roadside assistance program were partially offset by reduced contracts in force for our traditional roadside assistance programs.

Good Sam Services and Plans gross profit and gross margin decreased primarily due to the nonrecurrence in 2024 of $5.5 million in savings from finalizing contract negotiations to exit an arrangement with a service partner in 2023, incremental roadside assistance claims costs in 2024 and reduced policies in force for our roadside assistance programs, partially offset by increased contracts in force for our Good Sam Insurance Agency programs.

### *RV and Outdoor Retail*

#### New vehicles

New vehicles revenue increased primarily due to a 20.0% increase in the number of new vehicles sold, partially offset by an 8.6% decrease in the average selling price per new vehicle sold driven primarily by the lower cost of 2024 model year travel trailers and discounting of pre-2024 model year new vehicles. On a same store basis, new vehicles revenue increased 4.9% to $2.5 billion with an increase in the number of new vehicles sold of 15.0%, which was partially offset by an 8.8% decrease in the average selling price per new vehicle sold (see Industry Trends above in Item 7 of Part II of this Form 10-K for further discussion of new vehicle average selling prices and cost).

New vehicles gross profit increased primarily due to the increase in new vehicles sold, partially offset by the lower gross profit per new vehicle. The lower gross profit per new vehicle and 112 basis point decrease in new vehicle gross margin was driven by the 8.6% decrease in average selling price per new vehicle sold, which was mostly offset by a 7.4% decrease in average cost per new vehicle sold resulting primarily from the lower cost 2024 model year travel trailers.

#### Used vehicles

Used vehicles revenue decreased primarily due to a 10.2% reduction in the number of used vehicles sold and a 9.2% decrease in the average selling price per used vehicle sold. The decrease in used vehicles sold was due in large part to slowed procurement of used vehicles. This reduced availability and decrease in average selling price of used vehicles were largely a byproduct of the lower cost and selling price of 2024 model year new vehicles, which impacted used vehicles as discussed in “Industry Trends” above. On a same store

basis, used vehicles revenue decreased 22.8% to $1.4 billion, resulting from a 14.6% decrease in used vehicles sold and a 9.6% decrease in average sales price per used vehicle sold.

Used vehicles gross profit decreased primarily due to the decrease in used vehicles sold and the lower gross profit per used vehicle sold. The lower gross profit per used vehicle and a 209 basis point decrease in used vehicle gross margin was driven by the 9.2% decrease in average selling price per used vehicle sold, partially offset by the 6.8% decrease in average cost per used vehicle sold.

Products, service and other

Products, service and other revenue decreased primarily due to a reduction in sales activity resulting from our Active Sports Restructuring, the divestiture of our RV furniture business, and fewer used vehicles sold leading to a decline in retail product attachment to vehicle sales, as used vehicles experience higher retail product attachment than new vehicles. This revenue decrease was partially offset by increases in RV service revenue. On a same store basis, products, service and other revenue decreased 4.0% to $648.2 million.

Products, service and other gross profit increased primarily due to higher labor billing rates and billable hours. The increase in products, service and other gross margin was primarily due to higher labor billing rates resulting from increased demand and increased technician wages, a higher proportion of billable labor, product discounting associated with restructuring of our Active Sports business in 2023, and margin improvement associated with the sale of our RV furniture business in the second quarter of 2024.

Finance and insurance, net

Finance and insurance revenue and gross profit is recorded net, since the Company is acting as an agent in the transaction, and commission is recognized when a finance and insurance product contract payment has been received or financing has been arranged. Finance and insurance, net revenue increased $37.5 million, which was primarily a result of an increased number of contracts sold from the increased vehicles sold. Finance and insurance, net revenue as a percentage of new and used vehicle revenue was 13.5%, an increase from 12.3%. On a same store basis, finance and insurance, net revenue increased 1.2%.

Good Sam Club

Good Sam Club revenue increased mostly due to an additional $2.8 million of favorable adjustments to our loyalty point liability from changes in our estimates of breakage and point value, an additional $1.7 million of revenue from enhancements to the co-branded credit card program in late 2023 to incorporate our loyalty points program into the credit card rewards, and an increased rate per annual membership, partially offset by a decrease in Good Sam Club enrollment, excluding free basic plan members. The decrease in Good Sam Club members resulted from an increase in the standard membership price and the introduction of the free basic plan in late 2023 that provides for limited participation in the loyalty point program without access to the remaining member benefits.

*Operating Expenses and Other*

SG&A

SG&A increased primarily due to $29.4 million of additional advertising expenses, and $7.3 million of additional employee compensation costs, consisting of a $9.3 million increase in employee cash compensation expenses partially offset by a $2.0 million decrease in SBC expenses.

Depreciation and amortization

Depreciation and amortization increased primarily from $7.9 million of additional amortization of finance lease assets that included the conversion of six property operating leases to finance leases. The remaining

increase was primarily from additional depreciation on property and equipment for new store locations added in 2024 and late 2023.

Long-lived asset impairment

As discussed in Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K, we recognized $15.1 million of long-lived asset impairments in 2024, relating to operating lease assets, leasehold improvements, and buildings and improvements. We recognized $9.3 million of long-lived asset impairments in 2023, of which $6.6 million related to the 2023 Active Sports Restructuring.

Lease Termination

We recognized a $2.3 million gain from lease terminations in 2024, which represented $6.8 million from the derecognition of the operating lease assets and liabilities and other lease costs relating to the terminated leases, partially offset by $4.5 million of cash payments to terminate those leases.

Loss (gain) on sale or disposal of assets

The increased loss on sale or disposal of assets in 2024 was driven primarily by the divestiture of our RV furniture business that resulted in a loss of $7.1 million (see Note 6 – Assets Held for Sale and Business Divestiture to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). Additionally, the gain on sale or disposal of assets in 2023 related primarily to the sale of properties.

Floor plan interest expense

The significant increase in floor plan interest expense was primarily due to increased average floor plan balances and a 60 basis point increase in the average floor plan borrowing rate. The average interest rates for the Floor Plan Facility for the years ended December 31, 2024 and 2023 were 7.63% and 7.03%, respectively.

Other interest expense, net

Other interest expense, net increased primarily due to a higher average principal balance from increased borrowings with higher average interest rates on the Company's Real Estate Facilities, and a 20 basis point increase in the Term Loan Facility average interest rate (see Note 10 – Long-Term Debt to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). The average interest rate for the Term Loan Facility for the years ended December 31, 2024 and 2023 was 7.80% and 7.60%, respectively. The average interest rate on the M&T Real Estate Facility for years ended December 31, 2024 and 2023 was 7.45% and 7.10%, respectively

Other expense, net

Other expense, net primarily represents loss and impairment on investments in equity securities which included impairment on investments in equity securities of $0.9 million and $1.3 million in 2024 and 2023, respectively.

Table of Contents

Tax Receivable Agreement Liability adjustment

The Tax Receivable Agreement Liability adjustment for 2023 consisted of a $2.4 million benefit, related to a remeasurement from changes in blended state income tax rates.

Income tax benefit

Income tax benefit increased primarily due to the reduction in earnings generated from CWGS, LLC for which the Company is subject to U.S. federal and state taxes on its allocable share and changes in deferred tax assets, net of valuation allowance.

***Segment Results***

The following tables set forth information comparing select components of Segment Adjusted EBITDA for the years ended December 31, 2024 and 2023 (see Note 23 — Segment Information of our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information on our segments).

| | Year Ended December 31, | | | | Favorable / (Unfavorable) | |
|---|---|---|---|---|---|---|
| | 2024 | | 2023 | | | |
| ($ in thousands) | Amount | Percent of Revenue | Amount | Percent of Revenue | $ | % |
| **Good Sam Services and Plans:** | | | | | | |
| Revenue: | | | | | | |
| External revenue | $ 194,575 | 99.5% | $ 193,827 | 99.5% | $ 748 | 0.4% |
| Intersegment revenue(1) | 1,055 | 0.5% | 1,000 | 0.5% | 55 | 5.5% |
| Total revenue before intersegment eliminations | 195,630 | 100.0% | 194,827 | 100.0% | 803 | 0.4% |
| Segment expenses: | | | | | | |
| Adjusted costs applicable to revenue(2) | 70,557 | 36.1% | 58,765 | 30.2% | (11,792) | (20.1%) |
| Intersegment costs applicable to revenue(3) | 784 | 0.4% | 909 | 0.5% | 125 | 13.8% |
| Adjusted selling, general and administrative(4) | 29,774 | 15.2% | 24,273 | 12.5% | (5,501) | (22.7%) |
| Segment Adjusted EBITDA | $ 94,515 | 48.3% | $ 110,880 | 56.9% | $ (16,365) | (14.8%) |
| **RV and Outdoor Retail:** | | | | | | |
| Revenue: | | | | | | |
| External revenue | $ 5,905,399 | 99.8% | $ 6,032,720 | 99.8% | $ (127,321) | (2.1%) |
| Intersegment revenue(1) | 11,358 | 0.2% | 12,154 | 0.2% | (796) | (6.5%) |
| Total revenue before intersegment eliminations | 5,916,757 | 100.0% | 6,044,874 | 100.0% | (128,117) | (2.1%) |
| Segment expenses: | | | | | | |
| Adjusted costs applicable to revenue(2) | 4,203,549 | 71.0% | 4,283,700 | 70.9% | 80,151 | 1.9% |
| Intersegment costs applicable to revenue(3) | 9,780 | 0.2% | 9,814 | 0.2% | 34 | 0.3% |
| Adjusted selling, general and administrative(4) | 1,509,557 | 25.5% | 1,479,642 | 24.5% | (29,915) | (2.0%) |
| Floor plan interest expense | 95,121 | 1.6% | 83,075 | 1.4% | (12,046) | (14.5%) |
| Other segment items(5) | 188 | 0.0% | 314 | 0.0% | 126 | 40.1% |
| Segment Adjusted EBITDA | $ 98,562 | 1.7% | $ 188,329 | 3.1% | $ (89,767) | (47.7%) |

n/m – not meaningful

(1) Intersegment revenue consist of segment revenue that is eliminated in our consolidated statements of operations.

(2) Adjusted costs applicable to revenue excludes stock-based compensation expense, restructuring costs, and intersegment costs applicable to revenue.

(3) Intersegment costs applicable to revenue consist of segment costs applicable to revenue that are eliminated in our consolidated statements of operations.

(4) Adjusted selling, general, and administrative expenses excludes stock-based compensation expense, restructuring costs, and intersegment operating expenses.

(5) Other segment items include (i) intersegment operating expenses, which are eliminated in our consolidated statements of operations, and (ii) other expense, net excluding loss and/or impairment on investments in equity securities.

*Good Sam Services and Plans Segment*

See the "Revenue and Gross Profit" section above for a discussion of impacts to revenue for Good Sam Services and Plans. Adjusted costs applicable to revenues increased primarily from the nonrecurrence in 2024 of the $5.5 million in savings from finalizing contract negotiations to exit an arrangement with a service partner in 2023 and incremental roadside assistance claims costs in 2024. Adjusted selling, general and administrative expense increased primarily from $2.6 million of additional employee cash compensation expense. The Good Sam Services and Plans Segment Adjusted EBITDA decrease was driven primarily by the increases to adjusted costs applicable to revenue and adjusted selling, general and administrative expense discussed above. Intersegment revenue and intersegment costs applicable to revenue did not have a significant impact on the decrease in Segment Adjusted EBITDA.

*RV and Outdoor Retail Segment*

See the "Revenue and Gross Profit" section above for a discussion of impacts to revenue for RV and Outdoor Retail and "Floor plan interest expense" section above for a discussion of the increase in floor plan interest expense. Adjusted costs applicable to revenue decreased from (i) lower total vehicle costs of $14.7 million driven by 5.3% lower cost per total vehicle units, which was partially offset by 5.2% higher total unit sales, and (ii) lower products, service and other costs applicable to revenue from the decrease in revenue, additional costs applicable to revenue in 2023 from the discounting associated with restructuring of our Active Sports business in 2023, and the sale of our RV furniture business in the second quarter of 2024. Adjusted selling, general and administrative expense increased primarily from $28.9 million of additional advertising expenses. The RV and Outdoor Retail Segment Adjusted EBITDA decreased from the reductions in revenue and increases in segment expenses discussed above. Intersegment revenue, intersegment costs applicable to revenue, and intersegment operating expenses did not have a significant impact on the decrease in Segment Adjusted EBITDA.

Table of Contents

***Year Ended December 31, 2023 Compared to the Year Ended December 31, 2022***

The following tables set forth information comparing the components of net income for the years ended December 31, 2023 and 2022.

| | Year Ended | | | | | |
|---|---|---|---|---|---|---|
| | December 31, 2023 | | December 31, 2022 | | Favorable/ (Unfavorable) | |
| ($ in thousands) | Amount | Percent of Revenue | Amount | Percent of Revenue | $ | % |
| Revenue: | | | | | | |
| Good Sam Services and Plans | $ 193,827 | 3.1% | $ 192,128 | 2.8% | $ 1,699 | 0.9% |
| RV and Outdoor Retail: | | | | | | |
| New vehicles | 2,576,278 | 41.4% | 3,228,077 | 46.3% | (651,799) | (20.2%) |
| Used vehicles | 1,979,632 | 31.8% | 1,877,601 | 26.9% | 102,031 | 5.4% |
| Products, service and other | 870,038 | 14.0% | 999,214 | 14.3% | (129,176) | (12.9%) |
| Finance and insurance, net | 562,256 | 9.0% | 623,456 | 8.9% | (61,200) | (9.8%) |
| Good Sam Club | 44,516 | 0.7% | 46,537 | 0.7% | (2,021) | (4.3%) |
| Subtotal | 6,032,720 | 96.9% | 6,774,885 | 97.2% | (742,165) | (11.0%) |
| Total revenue | 6,226,547 | 100.0% | 6,967,013 | 100.0% | (740,466) | (10.6%) |
| | | | | | | |
| Gross profit (exclusive of depreciation and amortization shown separately below): | | | | | | |
| Good Sam Services and Plans | 134,436 | 2.2% | 120,162 | 1.7% | 14,274 | 11.9% |
| RV and Outdoor Retail: | | | | | | |
| New vehicles | 400,459 | 6.4% | 651,801 | 9.4% | (251,342) | (38.6%) |
| Used vehicles | 405,394 | 6.5% | 459,548 | 6.6% | (54,154) | (11.8%) |
| Products, service and other | 336,413 | 5.4% | 368,204 | 5.3% | (31,791) | (8.6%) |
| Finance and insurance, net | 562,256 | 9.0% | 623,456 | 8.9% | (61,200) | (9.8%) |
| Good Sam Club | 39,691 | 0.6% | 39,113 | 0.6% | 578 | 1.5% |
| Subtotal | 1,744,213 | 28.0% | 2,142,122 | 30.7% | (397,909) | (18.6%) |
| Total gross profit | 1,878,649 | 30.2% | 2,262,284 | 32.5% | (383,635) | (17.0%) |
| | | | | | | |
| Operating expenses: | | | | | | |
| Selling, general and administrative expenses | 1,538,988 | 24.7% | 1,606,984 | 23.1% | 67,996 | 4.2% |
| Depreciation and amortization | 68,643 | 1.1% | 80,304 | 1.2% | 11,661 | 14.5% |
| Long-lived asset impairment | 9,269 | 0.1% | 4,231 | 0.1% | (5,038) | (119.1%) |
| Lease termination | (103) | (0.0%) | 1,614 | 0.0% | 1,717 | n/m |
| Loss (gain) on sale or disposal of assets | (5,222) | (0.1%) | 622 | 0.0% | 5,844 | n/m |
| Total operating expenses | 1,611,575 | 25.9% | 1,693,755 | 24.3% | 82,180 | 4.9% |
| Income from operations | 267,074 | 4.3% | 568,529 | 8.2% | (301,455) | (53.0%) |
| Other expense: | | | | | | |
| Floor plan interest expense | (83,075) | (1.3%) | (42,031) | (0.6%) | (41,044) | (97.7%) |
| Other interest expense, net | (135,270) | (2.2%) | (75,745) | (1.1%) | (59,525) | (78.6%) |
| Tax Receivable Agreement liability adjustment | 2,442 | 0.0% | 114 | 0.0% | 2,328 | n/m |
| Other expense, net | (1,769) | (0.0%) | (752) | (0.0%) | (1,017) | (135.2%) |
| Total other expense | (217,672) | (3.5%) | (118,414) | (1.7%) | (99,258) | (83.8%) |
| Income before income taxes | 49,402 | 0.8% | 450,115 | 6.5% | (400,713) | (89.0%) |
| Income tax benefit (expense) | 3,527 | 0.1% | (112,283) | (1.6%) | 115,810 | n/m |
| Net income | 52,929 | 0.9% | 337,832 | 4.8% | (284,903) | (84.3%) |
| Less: net income attributable to non-controlling interests | (19,557) | (0.3%) | (214,084) | (3.1%) | 194,527 | 90.9% |
| Net income attributable to Camping World Holdings, Inc. | $ 33,372 | 0.5% | $ 123,748 | 1.8% | $ (90,376) | (73.0%) |

n/m- not meaningful

Table of Contents

**Supplemental Data**

| | Year Ended December 31, 2023 | 2022 | Increase (decrease) | Percent Change |
|---|---|---|---|---|
| Unit sales | | | | |
| New vehicles | 58,731 | 70,429 | (11,698) | (16.6%) |
| Used vehicles | 56,823 | 51,325 | 5,498 | 10.7% |
| Total | 115,554 | 121,754 | (6,200) | (5.1%) |
| | | | | |
| Average selling price | | | | |
| New vehicles | $ 43,866 | $ 45,834 | $ (1,969) | (4.3%) |
| Used vehicles | 34,839 | 36,583 | (1,744) | (4.8%) |
| | | | | |
| Same store unit sales[1] | | | | |
| New vehicles | 51,858 | 66,610 | (14,752) | (22.1%) |
| Used vehicles | 51,072 | 48,648 | 2,424 | 5.0% |
| Total | 102,930 | 115,258 | (12,328) | (10.7%) |
| | | | | |
| Same store revenue[1] ($ in 000s) | | | | |
| New vehicles | $ 2,296,811 | $ 3,090,711 | $ (793,900) | (25.7%) |
| Used vehicles | 1,791,352 | 1,803,943 | (12,591) | (0.7%) |
| Products, service and other | 635,670 | 691,044 | (55,374) | (8.0%) |
| Finance and insurance, net | 504,315 | 599,435 | (95,120) | (15.9%) |
| Total | $ 5,228,148 | $ 6,185,133 | $ (956,985) | (15.5%) |
| | | | | |
| Average gross profit per unit | | | | |
| New vehicles | $ 6,819 | $ 9,255 | $ (2,436) | (26.3%) |
| Used vehicles | 7,134 | 8,954 | (1,819) | (20.3%) |
| Finance and insurance, net per vehicle unit | 4,866 | 5,121 | (255) | (5.0%) |
| Total vehicle front-end yield[2] | 11,840 | 14,248 | (2,409) | (16.9%) |
| | | | | |
| Gross margin | | | | |
| Good Sam Services and Plans | 69.4% | 62.5% | 682 bps | |
| New vehicles | 15.5% | 20.2% | (465) bps | |
| Used vehicles | 20.5% | 24.5% | (400) bps | |
| Products, service and other | 38.7% | 36.8% | 182 bps | |
| Finance and insurance, net | 100.0% | 100.0% | unch | |
| Good Sam Club | 89.2% | 84.0% | 511 bps | |
| Subtotal RV and Outdoor Retail | 28.9% | 31.6% | (271) bps | |
| Total gross margin | 30.2% | 32.5% | (230) bps | |
| | | | | |
| Retail locations | | | | |
| RV dealerships | 198 | 189 | 9 | 4.8% |
| RV service & retail centers | 4 | 7 | (3) | (42.9%) |
| Subtotal | 202 | 196 | 6 | 3.1% |
| Other retail stores | — | 1 | (1) | (100.0%) |
| Total | 202 | 197 | 5 | 2.5% |
| | | | | |
| RV and Outdoor Retail inventories ($ in 000s) | | | | |
| New vehicles | $ 1,378,403 | $ 1,411,016 | $ (32,613) | (2.3%) |
| Used vehicles | 464,833 | 464,311 | 522 | 0.1% |
| Products, parts, accessories and misc. | 199,261 | 247,906 | (48,645) | (19.6%) |
| Total RV and Outdoor Retail inventories | $ 2,042,497 | $ 2,123,233 | $ (80,736) | (3.8%) |
| | | | | |
| Vehicle inventory per location ($ in 000s) | | | | |
| New vehicle inventory per dealer location | $ 6,962 | $ 7,466 | $ (504) | (6.8%) |
| Used vehicle inventory per dealer location | 2,348 | 2,457 | (109) | (4.4%) |
| | | | | |
| Vehicle inventory turnover[3] | | | | |
| New vehicle inventory turnover | 1.8 | 1.9 | (0.2) | (8.6%) |
| Used vehicle inventory turnover | 2.9 | 3.4 | (0.5) | (14.1%) |
| | | | | |
| Other data | | | | |
| Active Customers[4] | 4,959,723 | 5,265,939 | (306,216) | (5.8%) |
| Good Sam Club members[5] | 2,027,353 | 2,026,215 | 1,138 | 0.1% |
| Service bays[6] | 2,757 | 2,693 | 64 | 2.4% |
| Finance and insurance gross profit as a % of total vehicle revenue | 12.3% | 12.2% | 13 bps | n/a |
| Same store locations | 166 | n/a | n/a | n/a |

unch -unchanged
bps- basis points
n/a- not applicable

(1) Our same store revenue and units calculations for a given period include only those stores that were open both at the end of the corresponding period and at the beginning of the preceding fiscal year.

(2) Front end yield is calculated as gross profit from new vehicles, used vehicles and finance and insurance (net), divided by combined new and used vehicle unit sales.

(3) Inventory turnover calculated as vehicle costs applicable to revenue over the last twelve months divided by the average quarterly ending vehicle inventory over the last twelve months.

(4) An Active Customer is a customer who has transacted with us in any of the eight most recently completed fiscal quarters prior to the date of measurement.

(5) Excludes Good Sam Club members under the free basic plan, which was introduced in November 2023 and provides for limited participation in the loyalty point program without access to the remaining member benefits.

(6) A service bay is a fully-constructed bay dedicated to service, installation, and/or collision offerings.

*Revenue and Gross Profit*

*Good Sam Services and Plans*

Good Sam Services and Plans revenue increased primarily due to increased contracts in force from the Good Sam Insurance Agency, extended vehicle warranty and roadside assistance programs, partially offset by an enrollment reduction from the Good Sam TravelAssist programs and reduced magazine ad revenue.

Good Sam Services and Plans gross profit and gross margin increased primarily due to a nonrecurring $5.5 million in savings from finalizing contract negotiations to exit an arrangement with a service partner in 2023 and increased contracts in force from the roadside assistance, extended vehicle warranty, and Good Sam Insurance Agency programs, in addition to our efforts to reduce expenses.

*RV and Outdoor Retail*

New Vehicles

New vehicle revenue decreased primarily due to a 16.6% decrease in new vehicles sold, and, to a lesser extent, a 4.3% decrease in the average selling price per new vehicle sold. On a same store basis, new vehicle revenue decreased 25.7% to $2.3 billion, and new vehicle units sold decreased 22.1%.

New vehicle gross profit decreased primarily due to the above mentioned factors impacting new vehicle revenue and a 1.3% increase in the average cost per new vehicle sold. New vehicle gross margin decreased 465 basis points primarily due to compression from the higher cost per new unit sold and the lower average selling price of new vehicles (see Industry Trends in Item 7 of Part II of this Form 10-K for further discussion of new vehicle average selling prices and cost).

Used Vehicles

Used vehicle revenue increased primarily due to a 10.7% increase in used vehicles sold, driven by an increase in demand for used vehicles, as they are a lower-cost alternative to new vehicles, partially offset by a 4.8% decrease in average selling price per used vehicle sold. On a same store basis, used vehicle revenue decreased 0.7% to $1.8 billion and used vehicle units sold increased 5.0%.

Used vehicle gross profit decreased primarily due to a 4.8% decrease in average price per used vehicle sold and a 0.3% increase in the cost per used vehicle sold, partially offset by a 10.7% increase in used vehicles sold. Used vehicle gross margin decreased 400 basis points primarily due to the decrease in the average selling price per used vehicle and compression from the slightly higher cost per used vehicle sold.

Table of Contents

Products, Service and Other

Products, service and other revenue decreased primarily due to lower demand and lower stocking levels of lifestyle and activities, and design and home products, as well as a reduction in demand for our RV furniture distribution business as RV manufacturers slowed RV production. Revenues were also impacted negatively by our Active Sports Restructuring. On a same store basis, products, service and other revenue decreased 8.0% to $635.7 million in 2023 from $691.0 million in 2022.

Products, service and other gross profit decreased primarily due to the demand trends noted above, discounting to reduce inventory levels, discounting of Active Sports merchandise in conjunction with the Active Sports Restructuring, and compression from higher costs. Products, service and other gross margin increased primarily due to higher labor billing rates.

Finance and Insurance, net

Finance and insurance revenue and gross profit is recorded net, since the Company is acting as an agent in the transaction, and commission is recognized when a finance and insurance product contract payment has been received or financing has been arranged. Finance and insurance, net revenue decreased primarily due to the 5.1% decrease in total vehicles sold, and lower average sales prices, partially offset by $6.0 million of favorable adjustments to cancellation reserve assumptions. Finance and insurance, net revenue as a percentage of new and used vehicle revenue was 12.3% for the year ended December 31, 2023, an increase from 12.2% for the year ended December 31, 2022. On a same store basis, finance and insurance, net revenue decreased 15.9%, or $95.1 million, to $504.3 million versus the year ended December 31, 2022.

Good Sam Club

Good Sam Club revenue decreased 4.3% primarily due to reduced marketing fee revenue from the Good Sam Club branded credit card, and reduced Good Sam Club membership fees resulting primarily from reduced retail traffic.

Good Sam Club gross profit and gross margin increased primarily due to reduced marketing expenses.

*Operating Expenses and Other*

Selling, general and administrative

Selling, general and administrative expenses decreased primarily due to approximately $49.2 million of reduced advertising expenses, $35.1 million of reduced commissions costs, and $10.0 million of reduced equity-based compensation, partially offset by increased facility costs related to the net six additional store locations added during the year ended December 31, 2023.

Equity-based compensation expenses decreased $10.0 million (See Note 21 — Stock-Based Compensation Plans to our consolidated financial statements included in Part II, Item 8 of this Form 10-K) resulting primarily from (i) $2.7 million less expense, compared to 2022, related to the modification of restricted stock units to accelerate and/or continue vesting under employee separation agreements, post-termination consulting arrangements, and/or transition agreements, and (ii) fewer weighted-average restricted stock units outstanding from significantly fewer restricted stock units granted in 2022 and 2023 compared to any of the years from 2017 to 2021.

Depreciation and amortization

Depreciation and amortization decreased primarily from $8.8 million of incremental accelerated amortization during the year ended December 31, 2022 from the adjustment of the useful lives of certain trademark and trade name intangible assets associated with brands not traditionally associated with RVs that we were phasing out, and reduced capital expenditures. These trademark and trade name intangible assets were fully amortized as of March 31, 2022.

Table of Contents

Long-lived asset impairment

As discussed in Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K, we recognized $9.3 million of long-lived asset impairments in 2023 of which $6.6 million related to the 2023 Active Sports Restructuring, and $4.2 million of long-lived asset impairments in 2022, of which $1.6 million related to the 2019 Strategic Shift discussed above.

Floor plan interest expense

The significant increase in floor plan interest expense was primarily due to a 345 basis point increase in the average floor plan borrowing rate. The average interest rates for the Floor Plan Facility for the year ended December 31, 2023 and 2022 were 7.03% and 3.59%, respectively.

Other interest expense, net

Other interest expense, net increased primarily due to a 329 basis point increase in the Term Loan Facility average interest rate and a higher average principal balance from increased borrowings on the Company's Real Estate Facilities (see Note 10 – Long-Term Debt to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). The average interest rates for the Term Loan Facility for the years ended December 31, 2023 and 2022 were 7.60% and 4.31%, respectively.

Other expense, net

Other expense, net increased primarily as a result of a $1.3 million impairment of an equity method investment.

Tax Receivable Agreement Liability adjustment

The Tax Receivable Agreement Liability adjustment for 2023 and 2022 consisted of $2.4 million benefit and $0.1 million benefit, respectively, related to a remeasurement from changes in blended state income tax rates.

Income tax benefit (expense)

Income tax expense decreased primarily due to lower income generated from CWGS, LLC for which the Company is subject to U.S. federal and state taxes on its allocable share in 2023 and 2022. Income tax expense decreased from changes in deferred tax assets, net of valuation allowance as a result of the LLC Conversion and certain entity classification elections in 2023. Income tax recorded in 2022 included a $28.4 million decrease in deferred tax assets, net of release of valuation allowance, as a result of the LLC Conversion recorded in 2022. Additionally, during the years ended December 31, 2023 and 2022, the Company recorded $15.3 million of income tax benefit and $12.5 million of income tax expense, respectively, related to changes in the valuation allowance on the Company's outside basis difference deferred tax asset in CWGS, LLC.

Table of Contents

## *Segment Results*

The following tables set forth information comparing select components of Segment Adjusted EBITDA for the years ended December 31, 2023 and 2022 (see Note 23 — Segment Information of our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information on our segments).

| | Fiscal Year Ended | | | | Favorable/ (Unfavorable) | |
|---|---|---|---|---|---|---|
| | December 31, 2023 | | December 31, 2022 | | | |
| ($ in thousands) | Amount | Percent of Revenue | Amount | Percent of Revenue | $ | % |
| **Good Sam Services and Plans:** | | | | | | |
| Revenue: | | | | | | |
| External revenue | $ 193,827 | 99.5% | $ 192,128 | 99.7% | $ 1,699 | 0.9% |
| Intersegment revenue(1) | 1,000 | 0.5% | 494 | 0.3% | 506 | 102.4% |
| Total revenue before intersegment eliminations | 194,827 | 100.0% | 192,622 | 100.0% | 2,205 | 1.1% |
| Segment expenses: | | | | | | |
| Adjusted costs applicable to revenue(2) | 58,765 | 30.2% | 71,518 | 37.1% | 12,753 | 17.8% |
| Intersegment costs applicable to revenue(3) | 909 | 0.5% | 244 | 0.1% | (665) | (272.5%) |
| Adjusted selling, general and administrative(4) | 24,273 | 12.5% | 25,856 | 13.4% | 1,583 | 6.1% |
| Segment Adjusted EBITDA | $ 110,880 | 56.9% | $ 95,004 | 49.3% | $ 15,876 | 16.7% |
| **RV and Outdoor Retail:** | | | | | | |
| Revenue: | | | | | | |
| External revenue | $ 6,032,720 | 99.8% | $ 6,774,885 | 99.6% | $ (742,165) | (11.0%) |
| Intersegment revenue(1) | 12,154 | 0.2% | 28,393 | 0.4% | (16,239) | (57.2%) |
| Total revenue before intersegment eliminations | 6,044,874 | 100.0% | 6,803,278 | 100.0% | (758,404) | (11.1%) |
| Segment expenses: | | | | | | |
| Adjusted costs applicable to revenue(2) | 4,283,700 | 70.9% | 4,632,523 | 68.1% | 348,823 | 7.5% |
| Intersegment costs applicable to revenue(3) | 9,814 | 0.2% | 24,174 | 0.4% | 14,360 | 59.4% |
| Adjusted selling, general and administrative(4) | 1,479,642 | 24.5% | 1,529,087 | 22.5% | 49,445 | 3.2% |
| Floor plan interest expense | 83,075 | 1.4% | 42,031 | 0.6% | (41,044) | (97.7%) |
| Other segment items(5) | 314 | 0.0% | 1,502 | 0.0% | 1,188 | 79.1% |
| Segment Adjusted EBITDA | $ 188,329 | 3.1% | $ 573,961 | 8.4% | $ (385,632) | (67.2%) |

n/m – not meaningful

(3) Intersegment revenue consist of segment revenue that is eliminated in our consolidated statements of operations.

(4) Adjusted costs applicable to revenue excludes stock-based compensation expense, restructuring costs, and intersegment costs applicable to revenue.

(6) Intersegment costs applicable to revenue consist of segment costs applicable to revenue that are eliminated in our consolidated statements of operations.

(7) Adjusted selling, general, and administrative expenses excludes stock-based compensation expense, restructuring costs, and intersegment operating expenses.

(8) Other segment items include (i) intersegment operating expenses, which are eliminated in our consolidated statements of operations, and (ii) other expense, net excluding loss and/or impairment on investments in equity securities.

### *Good Sam Services and Plans Segment*

See the “Revenue and Gross Profit” section above for a discussion of impacts to revenue for Good Sam Services and Plans. Adjusted costs applicable to revenues decreased primarily from the nonrecurring $5.5 million in savings from finalizing contract negotiations to exit an arrangement with a service partner in 2023 and our efforts to reduce expenses. Adjusted selling, general and administrative expense decreased primarily from $1.3 million of reduced employee cash compensation expense. The Good Sam Services and Plans Segment Adjusted EBITDA increase was driven primarily by the decrease to adjusted costs applicable to revenue and adjusted selling, general and administrative expense and increase to external revenue discussed above.

Table of Contents

Intersegment revenue and intersegment costs applicable to revenue did not have a significant impact on the increase in Segment Adjusted EBITDA.

*RV and Outdoor Retail Segment*

See the “Revenue and Gross Profit” section above for a discussion of impacts to revenue for RV and Outdoor Retail and “Floor plan interest expense” section above for a discussion of the increase in floor plan interest expense. Adjusted costs applicable to revenue decreased from (i) lower total vehicle costs of $244.3 million driven by 5.1% lower total unit sales and 1.1% lower cost per total vehicle units, and (ii) lower products, service and other costs applicable to revenue primarily from the decrease in revenue discussed above. Adjusted selling, general and administrative expense decreased primarily due to approximately $48.9 million of reduced advertising expenses and $35.1 million of reduced commissions costs, partially offset by increased facility costs related to the net six additional store locations added during the year ended December 31, 2023. The RV and Outdoor Retail Segment Adjusted EBITDA decreased from the reductions in revenue, which was partially offset by the decreases in segment expenses discussed above. Intersegment revenue, intersegment costs applicable to revenue, and intersegment operating expenses did not have a significant impact on the decrease in Segment Adjusted EBITDA.

**Non-GAAP Financial Measures**

To supplement our consolidated financial statements, which are prepared and presented in accordance with accounting principles generally accepted in the United States (“GAAP”), we use the following non-GAAP financial measures: EBITDA, Adjusted EBITDA, Adjusted EBITDA Margin, Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Basic, Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Diluted, Adjusted (Loss) Earnings Per Share – Basic, Adjusted (Loss) Earnings Per Share – Diluted, and SG&A Excluding SBC (collectively the "Non-GAAP Financial Measures"). We believe that these Non-GAAP Financial Measures, when used in conjunction with GAAP financial measures, provide useful information about operating results, enhance the overall understanding of past financial performance and future prospects, and allow for greater transparency with respect to the key metrics we use in our financial and operational decision making. Certain of these Non-GAAP Financial Measures are also frequently used by analysts, investors and other interested parties to evaluate companies in the Company’s industry and are used by management to evaluate our operating performance, to evaluate the effectiveness of strategic initiatives, and for planning purposes. By providing these Non-GAAP Financial Measures, together with reconciliations, we believe we are enhancing investors’ understanding of our business and our results of operations, as well as assisting investors in evaluating how well we are executing our strategic initiatives. In addition, our Senior Secured Credit Facilities use Adjusted EBITDA, as calculated for our subsidiary CWGS Group, LLC, to measure our compliance with covenants such as the consolidated leverage ratio. The Non-GAAP Financial Measures have limitations as analytical tools, and the presentation of this financial information is not intended to be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP. They should not be construed as an inference that the Company’s future results will be unaffected by any items adjusted for in these Non-GAAP Financial Measures. In evaluating these Non-GAAP Financial Measures, it is reasonable to expect that certain of these items will occur in future periods. However, we believe these adjustments are appropriate because the amounts recognized can vary significantly from period to period, do not directly relate to the ongoing operations of our business and complicate comparisons of our internal operating results and operating results of other companies over time. Each of the normal recurring adjustments and other adjustments described in this section and in the reconciliation tables below help management with a measure of our core operating performance over time by removing items that are not related to day-to-day operations.

For periods beginning after December 31, 2022 for the 2019 Strategic Shift and for periods beginning after December 31, 2023 for the Active Sports Restructuring, we are no longer including the other associated costs category of expenses relating to those restructuring activities as restructuring costs for purposes of our Non-GAAP Financial Measures, since these costs are not expected to be significant in future periods. For a

Table of Contents

discussion of restructuring activities, see Note 5 — Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

The Non-GAAP Financial Measures that we use are not necessarily comparable to similarly titled measures used by other companies due to different methods of calculation.

*EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin*

We define "EBITDA" as net income before other interest expense, net (excluding floor plan interest expense), provision for income tax expense and depreciation and amortization. We define "Adjusted EBITDA" as EBITDA further adjusted for the impact of certain noncash and other items that we do not consider in our evaluation of ongoing operating performance. These items include, among other things, long-lived asset impairment, lease termination, gains and losses on sale or disposal of assets, net, SBC, Tax Receivable Agreement liability adjustment, restructuring costs, loss and/or impairment on investments in equity securities, and other unusual or one-time items. We define "Adjusted EBITDA Margin" as Adjusted EBITDA as a percentage of total revenue. We caution investors that amounts presented in accordance with our definitions of EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin may not be comparable to similar measures disclosed by our competitors, because not all companies and analysts calculate EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin in the same manner. We present EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin because we consider them to be important supplemental measures of our performance and believe they are frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry. Management believes that investors' understanding of our performance is enhanced by including these Non-GAAP Financial Measures as a reasonable basis for comparing our ongoing results of operations.

The following table reconciles Segment Adjusted EBITDA to consolidated Adjusted EBITDA:

| | Year Ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2024 | 2023 | 2022 |
| Good Sam Services and Plans Segment Adjusted EBITDA | $ 94,515 | $ 110,880 | $ 95,004 |
| RV and Outdoor Retail Segment Adjusted EBITDA | 98,562 | 188,329 | 573,961 |
| Total Segment Adjusted EBITDA | 193,077 | 299,209 | 668,965 |
| Corporate and Other Adjusted EBITDA | (14,234) | (12,996) | (15,575) |
| Total Adjusted EBITDA | $ 178,843 | $ 286,213 | $ 653,390 |

The following table reconciles EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin to the most directly comparable GAAP financial performance measures:

| | Year Ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2024 | 2023 | 2022 |
| **EBITDA and Adjusted EBITDA:** | | | |
| Net (loss) income | $ (78,880) | $ 52,929 | $ 337,832 |
| Other interest expense, net | 140,444 | 135,270 | 75,745 |
| Depreciation and amortization | 81,190 | 68,643 | 80,304 |
| Income tax (benefit) expense | (11,377) | (3,527) | 112,283 |
| Subtotal EBITDA | 131,377 | 253,315 | 606,164 |
| Long-lived asset impairment (a) | 15,061 | 9,269 | 4,231 |
| Lease termination (b) | (2,297) | (103) | 1,614 |
| Loss (gain) on sale or disposal of assets, net (c) | 9,855 | (5,222) | 622 |
| SBC (d) | 21,585 | 24,086 | 33,847 |
| Tax Receivable Agreement liability adjustment (e) | — | (2,442) | (114) |
| Restructuring costs (f) | — | 5,540 | 7,026 |
| Loss and/or impairment on investments in equity securities (g) | 3,262 | 1,770 | — |
| Adjusted EBITDA | $ 178,843 | $ 286,213 | $ 653,390 |

Table of Contents

| (as percentage of total revenue) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| **Adjusted EBITDA margin:** | | | |
| Net (loss) income margin | (1.3%) | 0.9% | 4.8% |
| Other interest expense, net | 2.3% | 2.2% | 1.1% |
| Depreciation and amortization | 1.3% | 1.1% | 1.2% |
| Income tax (benefit) expense | (0.2%) | (0.1%) | 1.6% |
| Subtotal EBITDA margin | 2.2% | 4.1% | 8.7% |
| Long-lived asset impairment (a) | 0.2% | 0.1% | 0.1% |
| Lease termination (b) | (0.0%) | (0.0%) | 0.0% |
| Loss (gain) on sale or disposal of assets, net (c) | 0.2% | (0.1%) | 0.0% |
| SBC (d) | 0.4% | 0.4% | 0.5% |
| Tax Receivable Agreement liability adjustment (e) | — | (0.0%) | (0.0%) |
| Restructuring costs (f) | — | 0.1% | 0.1% |
| Loss and/or impairment on investments in equity securities (g) | 0.1% | 0.0% | — |
| Adjusted EBITDA margin | 2.9% | 4.6% | 9.4% |

(a) Represents long-lived asset impairment charges related to the RV and Outdoor Retail segment. See Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(b) Represents the gains and losses on the termination of operating leases resulting from lease termination fees and the derecognition of the operating lease assets and liabilities. See Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(c) Represents an adjustment to eliminate the gains and losses on the disposal and sales of various assets.

(d) Represents noncash SBC expense relating to employees, directors, and consultants of the Company.

(e) Represents an adjustment to eliminate the gains on remeasurement of the Tax Receivable Agreement primarily due to changes in our blended statutory income tax rate. See Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(f) Represents restructuring costs relating to the Active Sports Restructuring during the year ended December 31, 2023 and our 2019 Strategic Shift for periods that ended on or before December 31, 2022. These restructuring costs include one-time employee termination benefits, incremental inventory reserve charges, and other associated costs. These costs exclude lease termination costs, which are presented separately above. See Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(g) Represents loss and/or impairment on investments in equity securities and interest income relating to any notes receivables with those investments for periods beginning after December 31, 2022. Amounts relating to periods prior to 2023 were not significant. These amounts are included in other expense, net in the consolidated statements of operations. During the years ended December 31, 2024 and 2023, these amounts included a $0.9 million and a $1.3 million impairment on investments in equity securities, respectively.

*Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. and Adjusted (Loss) Earnings Per Share*

We define "Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Basic" as net income attributable to Camping World Holdings, Inc. adjusted for the impact of certain noncash and other items that we do not consider in our evaluation of ongoing operating performance. These items include, among other things, long-lived asset impairment, lease termination, gains and losses on sale or disposal of assets, net, SBC, Tax Receivable Agreement liability adjustment, restructuring costs, loss and/or impairment on investments in equity securities, other unusual or one-time items, the income tax expense effect of these adjustments, income tax expense impact from the LLC Conversion, and the effect of net income attributable to non-controlling interests from these adjustments.

We define "Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Diluted" as Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Basic adjusted for the reallocation of net income attributable to non-controlling interests from stock options and restricted stock units, if dilutive, or the assumed redemption, if dilutive, of all outstanding common units in CWGS, LLC for shares of newly-issued Class A common stock of Camping World Holdings, Inc.

Table of Contents

We define "Adjusted (Loss) Earnings Per Share – Basic" as Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. - Basic divided by the weighted-average shares of Class A common stock outstanding. We define "Adjusted (Loss) Earnings Per Share – Diluted" as Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Diluted divided by the weighted-average shares of Class A common stock outstanding, assuming (i) the redemption of all outstanding common units in CWGS, LLC for newly-issued shares of Class A common stock of Camping World Holdings, Inc., if dilutive, and (ii) the dilutive effect of stock options and restricted stock units, if any. We present Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Basic, Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Diluted, Adjusted (Loss) Earnings Per Share – Basic, and Adjusted (Loss) Earnings Per Share – Diluted because we consider them to be important supplemental measures of our performance and we believe that investors' understanding of our performance is enhanced by including these Non-GAAP financial measures as a reasonable basis for comparing our ongoing results of operations.

The following table reconciles Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Basic, Adjusted Net (Loss) Income Attributable to Camping World Holdings, Inc. – Diluted, Adjusted (Loss) Earnings Per Share – Basic, and Adjusted (Loss) Earnings Per Share – Diluted to the most directly comparable GAAP financial performance measure:

| | Year Ended December 31, | | |
|---|---|---|---|
| (In thousands except per share amounts) | 2024 | 2023 | 2022 |
| **Numerator:** | | | |
| Net (loss) income attributable to Camping World Holdings, Inc. | $ (38,637) | $ 33,372 | $ 123,748 |
| Adjustments related to basic calculation: | | | |
| Long-lived asset impairment (a): | | | |
| Gross adjustment | 15,061 | 9,269 | 4,231 |
| Income tax expense for above adjustment (b) | (2,033) | (1,233) | (99) |
| Lease termination (c): | | | |
| Gross adjustment | (2,297) | (103) | 1,614 |
| Income tax benefit for above adjustment (b) | 301 | 13 | — |
| Loss (gain) on sale or disposal of assets (d): | | | |
| Gross adjustment | 9,855 | (5,222) | 622 |
| Income tax (expense) benefit for above adjustment (b) | (1,310) | 690 | (46) |
| SBC (e): | | | |
| Gross adjustment | 21,585 | 24,086 | 33,847 |
| Income tax expense for above adjustment (b) | (2,963) | (3,228) | (3,810) |
| Tax Receivable Agreement liability adjustment (f): | | | |
| Gross adjustment | — | (2,442) | (114) |
| Income tax benefit for above adjustment (b) | — | 613 | 29 |
| Restructuring costs (g): | | | |
| Gross adjustment | — | 5,540 | 7,026 |
| Income tax expense for above adjustment (b) | — | (736) | — |
| Loss and/or impairment on investments in equity securities (h): | | | |
| Gross adjustment | 3,262 | 1,770 | — |
| Income tax expense for above adjustment (b) | (473) | (237) | — |
| Income tax benefit impact from LLC Conversion (i): | — | (2,008) | 28,402 |
| Adjustment to net income attributable to non-controlling interests resulting from the above adjustments (j) | (21,635) | (16,683) | (31,065) |
| Adjusted net (loss) income attributable to Camping World Holdings, Inc. – basic | (19,284) | 43,461 | 164,385 |
| Adjustments related to diluted calculation: | | | |
| Reallocation of net income attributable to non-controlling interests from the dilutive effect of stock options and restricted stock units (k) | — | — | 1,479 |
| Income tax on reallocation of net income attributable to non-controlling interests from the dilutive effect of stock options and restricted stock units (l) | — | — | (405) |
| Reallocation of net income attributable to non-controlling interests from the dilutive redemption of common units in CWGS, LLC (k) | — | 36,240 | — |
| Income tax on reallocation of net income attributable to non-controlling interests from the dilutive redemption of common units in CWGS, LLC (l) | — | (8,341) | — |
| Adjusted net (loss) income attributable to Camping World Holdings, Inc. – diluted | $ (19,284) | $ 71,360 | $ 165,459 |

Table of Contents

| (In thousands except per share amounts) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| **Denominator:** | | | |
| Weighted-average Class A common shares outstanding – basic | 48,005 | 44,626 | 42,386 |
| Adjustments related to diluted calculation: | | | |
| Dilutive redemption of common units in CWGS, LLC for shares of Class A common stock (m) | — | 40,045 | — |
| Dilutive options to purchase Class A common stock (m) | — | 20 | 56 |
| Dilutive restricted stock units (m) | — | 281 | 412 |
| Adjusted weighted average Class A common shares outstanding – diluted | 48,005 | 84,972 | 42,854 |
| | | | |
| Adjusted (loss) earnings per share - basic | $ (0.40) | $ 0.97 | $ 3.88 |
| Adjusted (loss) earnings per share - diluted | $ (0.40) | $ 0.84 | $ 3.86 |
| | | | |
| **Anti-dilutive amounts (n):** | | | |
| **Numerator:** | | | |
| Reallocation of net income attributable to non-controlling interests from the anti-dilutive redemption of common units in CWGS, LLC (k) | $ (18,608) | $ — | $ 243,670 |
| Income tax on reallocation of net income attributable to non-controlling interests from the anti-dilutive redemption of common units in CWGS, LLC (l) | $ 5,323 | $ — | $ (67,150) |
| Assumed income tax benefit of combining C-Corps with full or partial valuation allowances with the income of other consolidated entities after the anti-dilutive redemption of common units in CWGS, LLC (o) | $ — | $ — | $ 12,280 |
| **Denominator:** | | | |
| Anti-dilutive redemption of common units in CWGS, LLC for shares of Class A common stock (n) | 40,007 | — | 42,045 |
| Anti-dilutive options to purchase Class A common stock (n) | 9 | — | — |
| Anti-dilutive restricted stock units (n) | 268 | — | — |
| | | | |
| **Reconciliation of per share amounts:** | | | |
| (Loss) earnings per share of Class A common stock — basic | $ (0.80) | $ 0.75 | $ 2.92 |
| Non-GAAP Adjustments (p) | 0.40 | 0.22 | 0.96 |
| Adjusted (loss) earnings per share - basic | $ (0.40) | $ 0.97 | $ 3.88 |
| | | | |
| (Loss) earnings per share of Class A common stock — diluted | $ (0.80) | $ 0.57 | $ 2.91 |
| Non-GAAP Adjustments (p) | 0.40 | 0.23 | 0.96 |
| Dilutive redemption of common units in CWGS, LLC for shares of Class A common stock (q) | — | 0.04 | — |
| Dilutive options to purchase Class A common stock and/or restricted stock units (q) | — | — | (0.01) |
| Adjusted (loss) earnings per share - diluted | $ (0.40) | $ 0.84 | $ 3.86 |

(a) Represents long-lived asset impairment charges related to the RV and Outdoor Retail segment. See Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(b) Represents the current and deferred income tax expense or benefit effect of the above adjustments. This assumption uses blended statutory tax rates between 25.0% and 25.4% for the adjustments for 2024, 2023 and 2022, which represents the estimated tax rate that would apply had the above adjustments been included in the determination of our non-GAAP metric.

(c) Represents the gains and losses on the termination of operating leases resulting from lease termination fees and the derecognition of the operating lease assets and liabilities. See Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(d) Represents an adjustment to eliminate the gains and losses on disposal and sales of various assets.

(e) Represents noncash SBC expense relating to employees, directors, and consultants of the Company.

(f) Represents an adjustment to eliminate the gains on remeasurement of the Tax Receivable Agreement primarily due to changes in our blended statutory income tax rate. See Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(g) Represents restructuring costs relating to Active Sports Restructuring during the year ended December 31, 2023 and our 2019 Strategic Shift for periods that ended on or before December 31, 2022. These restructuring costs include one-time employee termination benefits, incremental inventory reserve charges, and other associated costs. These costs exclude lease termination costs, which are presented separately above. See Note 5 – Restructuring and Long-Lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(h) Represents loss and/or impairment on investments in equity securities and interest income relating to any notes receivables with those investments for periods beginning after December 31, 2022. Amounts relating to periods prior to 2023 were not significant. These amounts are included in other expense, net in the consolidated statements of operations. During the years ended December

31, 2024 and 2023, these amounts included a $0.9 million and a $1.3 million impairment on investments in equity securities, respectively.

(i) Represents income tax (benefit) expense relating to the LLC Conversion, which was primarily from adjustments for certain deferred tax assets that were written off or had changes in their valuation allowance. See Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(j) Represents the adjustment to net income attributable to non-controlling interests resulting from the above adjustments that impact the net income of CWGS, LLC. This adjustment uses the non-controlling interest's weighted average ownership of CWGS, LLC of 45.5%, 47.3% and 49.8% for the years ended December 31, 2024, 2023 and 2022, respectively.

(k) Represents the reallocation of net income attributable to non-controlling interests from the impact of the assumed change in ownership of CWGS, LLC from stock options, restricted stock units, and/or common units of CWGS, LLC.

(l) Represents the income tax expense effect of the above adjustment for reallocation of net income attributable to non-controlling interests. This assumption uses effective tax rates between 25.0% and 25.4% for the adjustments for 2024, 2023 and 2022.

(m) Represents the impact to the denominator for stock options, restricted stock units, and/or common units of CWGS, LLC.

(n) The below amounts have not been considered in our adjusted (loss) earnings per share – diluted amounts as the effect of these items are anti-dilutive.

(o) Typically represents adjustments to reflect the income tax benefit of losses of consolidated C-Corps that under the Company's equity structure, prior to the LLC Conversion, could not be used against the income of other consolidated subsidiaries. The adjustment reflects the income tax benefit assuming effective tax rates between 25.0% and 25.4% for the adjustments for 2024, 2023 and 2021 for the losses experienced by the consolidated C-Corps for which valuation allowances have been recorded. Beginning in 2023, these C-Corp losses offset income of other consolidated subsidiaries as a result of LLC Conversion at or around December 31, 2022. See Note 12 – Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

(p) Represents the per share impact of the Non-GAAP adjustments to net income detailed above (see (a) through (j) above).

(q) Represents the per share impact of stock options, restricted stock units, and/or common units of CWGS, LLC from the difference in their dilutive impact between the GAAP and Non-GAAP (loss) earnings per share calculations.

As discussed under "Our Corporate Structure Impact on Income Taxes" in Part II, Item 7 of this Form 10-K, our "Up-C" corporate structure may make it difficult to compare our results with those of companies with a more traditional corporate structure. There can be a significant fluctuation in the numerator and denominator for the calculation of our adjusted earnings per share – diluted depending on if the common units in CWGS, LLC are considered dilutive or anti-dilutive for a given period. To improve comparability of our financial results, users of our financial statements may find it useful to review our (loss) earnings per share assuming the full redemption of common units in CWGS, LLC for all periods, even when those common units would be anti-dilutive. The relevant numerator and denominator adjustments have been provided under "Anti-dilutive amounts" in the table above (see (n) above).

*SG&A Excluding SBC*

We define "SG&A Excluding SBC" as SG&A before SBC relating to SG&A. We caution investors that amounts presented in accordance with our definition of SG&A Excluding SBC may not be comparable to similar measures disclosed by our competitors, because not all companies and analysts calculate SG&A Excluding SBC in the same manner. We present SG&A Excluding SBC because we believe that investors' understanding of our performance and drivers of our other Non-GAAP Financial Measures, such as Adjusted EBITDA, is enhanced by including this Non-GAAP Financial Measure. We believe it provides a reasonable basis for comparing our ongoing results of operations.

The following table reconciles SG&A Excluding SBC to the most directly comparable GAAP financial performance measure:

| | Year Ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2024 | 2023 | 2022 |
| **SG&A Excluding SBC:** | | | |
| SG&A | $ 1,573,117 | $ 1,538,988 | $ 1,606,984 |
| SBC - SG&A | (21,213) | (23,191) | (33,158) |
| SG&A Excluding SBC: | $ 1,551,904 | $ 1,515,797 | $ 1,573,826 |
| As a percentage of gross profit | 85.0% | 80.7% | 69.6% |

## Liquidity and Capital Resources

### *General*

Our primary requirements for liquidity and capital have been working capital, inventory management, acquiring and building new store locations, the improvement and expansion of existing store locations, debt service, distributions/dividends to holders of equity interests in CWGS, LLC and our Class A common stock, and general corporate needs. These cash requirements have historically been met through cash provided by operating activities, cash and cash equivalents, proceeds from registered offerings of our Class A common stock, borrowings under our Senior Secured Credit Facilities (as defined in Part II, Item 8 of this Form 10-K), borrowings under our Floor Plan Facility (as defined in Part II, Item 8 of this Form 10-K), and borrowings under our Real Estate Facilities (as defined in Part II, Item 8 of this Form 10-K).

Our additional liquidity needs are expected to include public company costs, payment of cash dividends, any exercise of the redemption right by the Continuing Equity Owners from time to time (should we elect to redeem common units for a cash payment), our stock repurchase program as described below, payments under the Tax Receivable Agreement, and state and federal taxes to the extent not reduced as a result of the tax deductions generated by (i) payments under the Tax Receivable Agreement and (ii) redemptions of common units by the Continuing Equity Owners. The Continuing Equity Owners may exercise such redemption right for as long as their common units remain outstanding. Although the actual timing and amount of any payments that may be made under the Tax Receivable Agreement will vary, we expect that the payments that we will be required to make to the Continuing Equity Owners, Former Profits Unit Holders, and Crestview Partners II GP, L.P. will be significant. Any payments made by us to Continuing Equity Owners, Former Profits Unit Holders, and Crestview Partners II GP, L.P. under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us or to CWGS, LLC and, to the extent that we are unable to make payments under the Tax Receivable Agreement for any reason, the unpaid amounts generally will be deferred and will accrue interest until paid by us; provided, however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement and therefore may accelerate payments due under the Tax Receivable Agreement. For a discussion of the Tax Receivable Agreement, see Note 12 — Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

*November 2024 Public Offering*

In November 2024, we completed a public offering (the “November 2024 Public Offering”) in which the Company sold 16,829,267 shares of our Class A common stock, including 2,195,121 under the exercised underwriter’s option, at a public offering price of $20.50 per share (or $19.81 per share after underwriting discounts and commissions). We received $333.4 million in proceeds, net of underwriting discounts and commissions, which were used to purchase 16,829,267 common units from CWGS, LLC at a price per unit equal to the public offering price per share of Class A common stock in the November 2024 Public Offering, less underwriting discounts and commissions. We incurred approximately $1.0 million of offering costs related to the November 2024 Public Offering and have used the net proceeds from the sale of common units to CWH for general corporate purposes, including strengthening the balance sheet, working capital for growth and pay down of debt.

*Stock Repurchase Program*

In October 2020, our Board of Directors initially authorized a stock repurchase program for the repurchase of up to $100.0 million of our Class A common stock, expiring on October 31, 2022. In August 2021 and January 2022, our Board of Directors authorized increases to the stock repurchase program for the repurchase of up to an additional $125.0 million and $152.7 million, respectively, of our Class A common stock. Following these extensions, the stock repurchase program now expires on December 31, 2025. Repurchases under the program are subject to any applicable limitations on the availability of funds to be distributed to the Company by CWGS, LLC to fund the repurchase and may be made in the open market, in privately negotiated transactions or otherwise, with the amount and timing of repurchases to be determined at our discretion,

depending on market conditions and corporate needs. Open market repurchases will be structured to occur in accordance with applicable federal securities laws, including within the pricing and volume requirements of Rule 10b-18 under the Securities Exchange Act of 1934, as amended. We may also, from time to time, enter into Rule 10b5-1 plans to facilitate repurchases of our shares under this authorization. This program does not obligate us to acquire any particular amount of Class A common stock and the program may be extended, modified, suspended or discontinued at any time at the Board's discretion. We expect to fund the repurchases using cash on hand.

During the years ended December 31, 2024 and 2023, we did not repurchase shares of Class A common stock. As of December 31, 2024, $120.2 million was available under the stock repurchase program to repurchase additional shares of our Class A common stock.

*Dividends*

Since December 2016, we have paid a quarterly cash dividend to holders of Class A common stock. Since September 2023, the quarterly cash dividend has been $0.125 per share of Class A common stock that was funded entirely from the Excess Tax Distribution (as defined under "Dividend Policy" included in Part II, Item 5 of this Form 10-K), with no portion funded by other common unit cash distributions from CWGS, LLC. Since CWGS, LLC has not funded these recent quarterly cash dividends with dividend distributions outside of required tax distributions, we believe that this will help us utilize our capital to continue to execute our expansion plans through accretive RV dealership acquisitions.

During the first half of 2023, we paid a quarterly cash dividend on our Class A common stock of $0.625 per share, which was funded with a $0.15 per common unit cash distribution from CWGS, LLC and the remaining $0.475 per share of Class A common stock funded with all or a portion of the Excess Tax Distribution.

Our ability to pay cash dividends on our Class A common stock depends on, among other things, our results of operations, financial condition, level of indebtedness, capital requirements, contractual restrictions, restrictions in our debt agreements and in any preferred stock, restrictions under applicable law, the extent to which such distributions would render CWGS, LLC insolvent, our business prospects and other factors that our Board of Directors may deem relevant. Our dividend policy has certain risks and limitations particularly with respect to liquidity, and we may not pay future dividends according to our policy, or at all. See "Dividend Policy" included in Part II, Item 5 of this Form 10-K and "Risk Factors — Risks Relating to Ownership of Our Class A Common Stock — "Our ability to pay regular and special dividends on our Class A common stock is subject to the discretion of our Board of Directors and may be limited by our structure and statutory restrictions" included in Part I, Item 1A of this Form 10-K.

*Acquisitions and Capital Expenditures*

During the year ended December 31, 2024, the RV and Outdoor Retail segment purchased real property for an aggregate purchase price of $9.6 million.

In November 2024, we entered into an agreement with Lazydays Holdings, Inc. ("Lazydays") to acquire the assets and certain real estate of seven RV dealerships from Lazydays, which is expected to close in the first quarter of 2025. In November 2024, we paid a $10.0 million deposit to Lazydays that is expected to convert to 9.7 million shares of Lazydays common stock upon closing of the transaction. During the first quarter of 2025, the net cash to be paid for the acquisition of RV dealerships and real estate from Lazydays is expected to be an additional $10.0 million to $15.0 million, which is net of $65.0 million to $80.0 million of floor plan financing of inventory and $40.0 million to $50.0 million of related real estate. We intend to pursue sale-leaseback arrangements with third parties for the related real estate, subject to mutually agreeable terms.

Over the next twelve months, in addition to the Lazydays acquisition discussed above, our expansion of existing and new dealerships through construction and acquisition is expected to cost between $53.0 million and $91.0 million from a combination of business acquisitions and capital expenditures relating to land, buildings, and improvements. Included in this range is $6.7 million related to business acquisitions where, at a minimum, we have already signed a letter of intent with the seller. These cost estimates exclude amounts for

acquired inventories, which are primarily financed through our Floor Plan Facility. Additionally, the cost estimates do not consider potential funding received through sale leaseback transactions or other means for real estate and construction activities. We are in the early stages of evaluating additional dealership acquisition opportunities and will update our cost estimates in future periodic reports, if necessary, as there are further developments. Factors that could impact the quantity of future locations or the cost to acquire or open those locations include, but are not limited to, our ability to locate potential acquisition targets or greenfield locations in a geographic area and at a cost that meets our success criteria; continued strong cash flow generation to fund these acquisitions and new locations; and availability of financing.

*Tax Receivable Agreement Liability*

The aggregate estimated payments under the Tax Receivable Agreement at December 31, 2024, were as follows (in thousands):

| | As of December 31, 2024 |
|---|---|
| 2025 | $ — |
| 2026 | 11,870 |
| 2027 | 12,654 |
| 2028 | 13,091 |
| 2029 | 13,550 |
| Thereafter | 99,207 |
| Total | $ 150,372 |

See Note 12 — Income Taxes to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for additional information.

*2019 Strategic Shift and Active Sports Restructuring*

See “Restructuring” above for a summary of the ongoing cash requirements related to our restructuring activities.

*Supplier Agreement*

In connection with the divestiture of its RV furniture business (“CWDS”), we entered into a supplier agreement (“Supplier Agreement”) with the buyer that requires us to purchase an aggregate $250.0 million of product over the approximately 10-year term of the Supplier Agreement. See Note 6 — Assets Held for Sale and Business Divestiture to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for a discussion of the divestiture of CWDS.

*Other Cash Requirements or Commitments*

Substantially all of our new RV inventory and, at times, certain of our used RV inventory is financed under our Floor Plan Facility (defined in Note 4 – Inventories and Floor Plan Payables to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). See “Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements” for a summary of the cash requirements related to our indebtedness.

See Note 11 ─ Lease Obligations to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for a discussion of cash requirements relating to operating and finance lease obligations.

See Note 14 — Commitments and Contingencies to our consolidated financial statements included in Part II, Item 8 of this Form 10-K for a discussion of cash requirements relating to service and marketing sponsorship agreements, a supplier agreement and other contractual arrangements.

*Sources of Liquidity and Capital*

We believe that our sources of liquidity and capital including cash provided by operating activities, equity offerings and borrowings under our various credit facilities, other long-term debt, and finance lease arrangements (see Liquidity and Capital Resources — Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements in Part II, Item 7 of this Form 10-K), including additional borrowing capacity where applicable, will be sufficient to finance our continued operations, growth strategy, including the opening of any additional store locations, quarterly cash dividends (as described above), required payments for our obligations under the Tax Receivable Agreement, and additional expenses we expect to incur for at least the next twelve months.

However, we cannot assure you that our cash provided by operating activities, cash and cash equivalents, registered offerings of equity under our Registration Statement on Form S-3, or cash available under our Revolving Credit Facility, our Floor Plan Facility, and our Real Estate Facilities, will be sufficient to meet our future needs. If we are unable to generate sufficient cash flows from operations in the future and if availability under our Revolving Credit Facility, our Floor Plan Facility, and our Real Estate Facilities is not sufficient, we may have to obtain additional financing. If we obtain additional capital by issuing equity, the interests of our existing stockholders will be diluted. If we incur additional indebtedness, that indebtedness may impose significant financial and other covenants that may significantly restrict our operations. We cannot assure you that we could obtain refinancing or additional financing on favorable terms or at all, including the expected additional borrowings noted above and particularly in light of the current macroeconomic uncertainty. See "Risk Factors — Risks Related to our Business — Our ability to operate and expand our business and to respond to changing business and economic conditions will depend on the availability of adequate capital" included in Part I, Item 1A of this Form 10-K.

As of December 31, 2024 and 2023, we had working capital of $590.3 million and $401.3 million, respectively, including $208.4 million and $39.6 million, respectively, of cash and cash equivalents. The increase in working capital and cash and cash equivalents was primarily from the remaining net proceeds from our public offering of Class A common stock in November 2024 (see "November 2024 Public Offering" above). Within current liabilities, which are deducted from current assets to calculate our working capital, we had deferred revenues of $92.1 million and $92.4 million as of December 31, 2024 and 2023, respectively. Deferred revenues primarily consists of cash collected for club memberships and roadside assistance contracts in advance of services to be provided, which is deferred and recognized as revenue over the life of the membership, deferred revenues for the annual campground guide, and our Good Sam Club loyalty points liability. We use net proceeds from this deferred membership revenue to lower our long-term borrowings and finance our working capital needs. Our Floor Plan Facility includes a flooring line aggregate interest reduction ("FLAIR") offset account that allows us to transfer cash as an offset to the payables under the Floor Plan Facility. At December 31, 2024, and 2023, the FLAIR offset account was $79.5 million and $145.0 million, respectively, of which $79.5 million and $73.2 million, respectively, could have been withdrawn while remaining in compliance with the financial covenants of the Floor Plan Facility.

***Seasonality***

We have experienced, and expect to continue to experience, variability in revenue, net income, and cash flows as a result of annual seasonality in our business. See Note 1 — Summary of Significant Accounting Policies — Seasonality to our consolidated financial statements included in Part II, Item 8 of this Form 10-K, Part I, Item 1 of this Form 10-K and "Risk Factors — Risks Related to our Business — Our business is seasonal and this leads to fluctuations in revenues" included in Part I, Item 1A of this Form 10-K.

Table of Contents

***Cash Flow***

The following table shows summary cash flow information for the years ended December 31, 2024, 2023, and 2022, respectively:

| (In thousands) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Net cash provided by operating activities | $ 245,159 | $ 310,807 | $ 189,783 |
| Net cash used in investing activities | (88,175) | (369,406) | (422,535) |
| Net cash provided by (used in) financing activities | 11,791 | (31,885) | 95,551 |
| Net increase (decrease) in cash and cash equivalents | $ 168,775 | $ (90,484) | $ (137,201) |

*Operating activities.* Our cash flows from operating activities are primarily collections from contracts in transit and customers following the sale of new and used vehicles, as well as from the sale of retail products and services and Good Sam services and plans. Contracts in transit represent amounts due from third-party lenders from whom pre-arranged agreements have been determined, and to whom the retail installment sales contracts have been assigned. Our primary uses of cash from operating activities are repayments of vehicle floor plan payables, payments to retail product suppliers, personnel-related expenditures, payments related to leased property, advertising, and various consumer services program costs.

Net cash provided by operating activities was $245.2 million for the year ended December 31, 2024, a decrease of $65.6 million from $310.8 million of net cash provided by operating activities for the year ended December 31, 2023. The decrease was primarily due to a $131.8 million reduction in net income, a $25.9 million decrease in the working capital adjustment for prepaid expenses and other assets, a $9.2 million decrease in the working capital adjustment for accounts payable and accrued expenses, a $6.7 million increase in gain on lease termination, a $4.4 million decrease in noncash lease expense, and a $2.5 million decrease in stock-based compensation, partially offset by a $34.1 million increase in the working capital adjustment for accounts receivable and contracts in transit, a $27.1 million increase in the working capital adjustment for inventory, a $15.1 million increase in loss on sale or disposal of assets, a $12.5 million increase in depreciation and amortization, a $12.5 million increase in the working capital adjustment for other, net, a $5.8 million increase in long-lived asset impairment, and a $3.4 million increase in deferred revenues.

Net cash provided by operating activities was $310.8 million for the year ended December 31, 2023, an increase of $121.0 million from $189.8 million of net cash provided by operating activities for the year ended December 31, 2022. The increase was primarily due to a $455.3 million increase in the working capital adjustment for inventory, a $42.6 million increase in the working capital adjustment for accounts payable and accrued expenses, a $21.2 million increase in the working capital adjustment for prepaid expenses and other assets, a $7.1 million increase in the working capital adjustment for operating lease liabilities, and a $5.0 million increase in long-lived asset impairment, partially offset by a $284.9 million reduction in net income, a $70.7 million decrease in deferred income taxes, a $19.8 million decrease in the working capital adjustment for accounts receivable and contracts in transit, an $11.7 million decrease in depreciation and amortization, a $9.8 million decrease in equity-based compensation, an $8.2 million decrease in deferred revenue, a $5.8 million increase in gain on sale or disposal of assets, and a $1.7 million increase in gain on lease termination.

*Investing activities.* Our investment in business activities primarily consists of expanding our operations through organic growth and the acquisition of store locations. Substantially all of our new store locations and capital expenditures have been financed using cash provided by operating activities and borrowings under our various credit facilities, other long-term debt, and finance lease arrangements, as applicable (see Liquidity and Capital Resources — Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements in Item 7 of Part II of this Form 10-K).

Table of Contents

The table below summarizes our capital expenditures for the years ended December 31, 2024, 2023, and 2022 respectively:

| (In thousands) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| IT hardware and software | $ 20,414 | $ 14,889 | $ 15,145 |
| Greenfield and acquired dealership locations | 25,798 | 41,968 | 66,353 |
| Existing store locations | 39,877 | 57,591 | 71,336 |
| Corporate and other | 4,748 | 16,632 | 2,092 |
| Total capital expenditures | $ 90,837 | $ 131,080 | $ 154,926 |

Our capital expenditures consist primarily of investing in acquired and greenfield retail and RV dealership locations, existing store locations, information technology, hardware and software. The expected minimum capital expenditures relating to new dealerships and real estate purchases for the year ending December 31, 2025 are discussed above. As of December 31, 2024, we had entered into contracts for construction of new and existing dealership buildings for an aggregate future commitment of capital expenditures of $31.9 million. There were no other material commitments for capital expenditures as of December 31, 2024.

Net cash used in investing activities was $88.2 million for the year ended December 31, 2024. The $88.2 million of cash used in investing activities was comprised of $90.8 million of capital expenditures primarily related to retail locations, $72.3 million for the acquisition of RV dealerships and a tire delivery service business, net of cash acquired, $9.6 million for the purchase of real property, and $0.2 million for the purchase of intangible assets, partially offset by $58.2 million of proceeds from the sale of real property, $20.0 million in proceeds from the divestiture of a business, $4.0 million of proceeds from the sale of property and equipment and $2.6 million of proceeds from the sale of intangible assets. See Note 16 – Acquisitions to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

Net cash used in investing activities was $369.4 million for the year ended December 31, 2023. The $369.4 million of cash used in investing activities was comprised of $209.5 million for the acquisition of RV dealerships, net of cash acquired, $131.1 million of capital expenditures primarily related to store locations, $67.2 million for the purchase of real property, $3.4 million for purchase of and loans to other investments, and $2.2 million for the purchase of intangible assets, partially offset by proceeds from the sale of real property of $40.8 million and proceeds of $3.2 million from the sale of property and equipment. See Note 16 – Acquisitions to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

Net cash used in investing activities was $422.5 million for the year ended December 31, 2022. The $422.5 million of cash used in investing activities was comprised of $154.9 million of capital expenditures primarily related to store locations, $217.0 million for the purchase of RV and outdoor retail businesses and a publication business, $55.7 million for the purchase of real property, $3.0 million for purchase of other investments, and $0.9 million for the purchase of intangible assets, partially offset by proceeds from the sale of real property of $7.4 million and proceeds of $1.6 million from the sale of property and equipment. See Note 16 – Acquisitions to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

*Financing activities.* Our financing activities primarily consist of proceeds from the offering of Class A common stock, the issuance of debt, and the repayment of principal and debt issuance costs.

Our net cash provided by financing activities was $11.8 million for the year ended December 31, 2024. The $11.8 million of cash provided by financing activities was primarily due to $332.9 million of proceeds from issuance of Class A common stock sold in a public offering, net of underwriter discount and commissions, $55.6 million of proceeds from long-term debt, $43.0 million from borrowings on our revolving line of credit under the Floor Plan Facility and $0.5 million of proceeds from exercise of stock options, partially offset by $217.9 million of net payments on borrowings under the Floor Plan Facility, $80.9 million of payments on long-term debt, $63.9 million of payments on the revolving line of credit, $24.7 million of dividends paid on Class A common stock, $18.7 million of member distributions, $7.5 million of payments on finance leases, $5.4 million of withholding

Table of Contents

taxes paid upon the vesting of restricted stock units, $1.1 million for debt issuance costs payments and $0.2 million of payments on sale-leaseback arrangement.

Our net cash used in financing activities was $31.9 million for the year ended December 31, 2023. The $31.9 million of cash used in financing activities was primarily due to $66.8 million of dividends paid on Class A common stock, $39.0 million of payments on long-term debt, $31.5 million of member distributions, $6.9 million of withholding taxes paid upon the vesting of restricted stock units, $5.5 million of payments on finance leases, $0.9 million for debt issuance costs payments and $0.2 million of payments on sale-leaseback arrangement, partially offset by $59.3 million of net proceeds from borrowings under the Floor Plan Facility, $59.2 million of proceeds from long-term debt and $0.4 million of proceeds from exercise of stock options.

Our net cash provided by financing activities was $95.6 million for the year ended December 31, 2022. The $95.6 million of cash provided by financing activities was primarily due to $314.1 million of net proceeds from borrowings under the Floor Plan Facility (as defined below), $127.8 million of proceeds from long-term debt under our Real Estate Facilities (as defined below), $28.0 million of proceeds from a sale-leaseback arrangement, $6.0 million of proceeds from landlord funded construction on finance leases, and $0.5 million of proceeds from exercise of stock options, partially offset by $163.0 million of member distributions, $105.4 million of dividends paid on Class A common stock, $79.8 million for the repurchase of Class A common stock, $12.3 million of payments on long-term debt, $11.1 million of withholding taxes paid upon the vesting of restricted stock units (“RSUs”), $6.0 million for finance lease payments, and $3.2 million of debt issuance costs.

***Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements***

As of December 31, 2024 and 2023, we had outstanding debt in the form of our Senior Secured Credit Facilities, our Floor Plan Facility, our Real Estate Facilities, other long-term debt, and finance lease obligations. We may from time to time seek to refinance, retire or exchange our outstanding debt. Such refinancings, repayments or exchanges, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors. The amounts involved may be material. For additional information regarding our interest rate risk and interest rate hedging instruments, see “Quantitative and Qualitative Disclosures About Market Risk” in Part II, Item 7A of this Form 10-K.

The following table shows a summary of the outstanding balances, current portion, and remaining available borrowings under our credit facilities, other long-term debt and finance lease arrangements. See definitions and further details in Note 4 – Inventories and Floor Plan Payables, Note 10 – Long-Term Debt, and Note 11 – Lease Obligations to our consolidated financial statements included in Part II, Item 8 of this Form 10-K) at December 31, 2024:

| (In thousands) | Outstanding | Current Portion | Remaining Available |
|---|---|---|---|
| Floor Plan Facility: | | | |
| Notes payable - floor plan | $ 1,161,713 | $ 1,161,713 | $ 566,323 (1) |
| Revolving line of credit | — | — | 70,000 (2) |
| Senior Secured Credit Facilities: | | | |
| Term Loan Facility | 1,335,535 | 14,015 | — |
| Revolving Credit Facility | — | — | 22,750 (3) |
| Other: | | | |
| Real Estate Facilities | 173,132 (4) | 8,924 | 57,390 (4) |
| Other long-term debt | 7,926 | 336 | — |
| Finance lease obligations | 138,048 | 7,044 | — |
| | $ 2,816,354 | $ 1,192,032 | $ 716,463 |

(1) The unencumbered borrowing capacity for the Floor Plan Facility represents the additional borrowing capacity less any accounts payable for sold inventory and less any purchase commitments. Additional borrowings are subject to the vehicle collateral requirements under the Floor Plan Facility. The Floor Plan Facility also includes an accordion feature allowing us, at our option, to request to increase the aggregate amount of the floor plan notes payable in $50.0 million increments up to a maximum amount of $300.0 million. The Floor Plan Lenders are not under any obligation to provide commitments in respect of any future increase under the accordion feature.

(2) The revolving line of credit borrowings are subject to a borrowing base calculation but were not limited as of December 31, 2024.

Table of Contents

(3) The Revolving Credit Facility remaining available balance was reduced by outstanding undrawn letters of credit. The Credit Agreement requires compliance with a Total Net Leverage Ratio covenant when borrowings on the Revolving Credit Facility (excluding certain amounts relating to letters of credit) is over a 35%, or $22.8 million, threshold (Note 10 – Long-Term Debt to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). The otherwise remaining available borrowings of $60.1 million were reduced by $37.3 million to $22.8 million in light of this financial covenant at December 31, 2024.

(4) Additional borrowings on the Real Estate Facilities are subject to a debt service coverage ratio covenant and to the property collateral requirements under the Real Estate Facilities. In August 2024, we amended the M&T Real Estate Facility to increase the borrowing capacity by $50.0 million, which was not deducted from our option to request an additional $100.0 million of principal capacity. The lenders under the M&T Real Estate Facility are not under any obligation to provide commitments in respect of any such increase.

We have experienced an increase in interest rates, which had begun to decrease by the end of 2024 and may continue to decrease during 2025. As of December 31, 2024 and 2023, the applicable interest rate for the floor plan notes payable under the Floor Plan Facility was 6.72% and 7.28%, respectively. As of December 31, 2024 and 2023, the average interest rate for the Term Loan Facility was 6.97% and 7.97%, respectively. The previous increase in interest rates and, to a lesser extent, a higher average outstanding floor plan balance have resulted in a combined year-over-year increase of our floor plan interest expense and other interest expense, net of $17.2 million for 2024 compared to 2023.

*Other Long-Term Debt*

Other long-term debt is comprised of a mortgage on a property, which matures in December 2026, and a promissory note assumed as part of a real estate purchase. See Note 10 – Long-Term Debt to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

*Finance Lease Obligation*

From time to time, we enter into finance leases typically for real estate and/or information technology equipment. See Note 11 – Leases to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

***Sale/Leaseback Arrangements***

We have in the past and may in the future enter into sale-leaseback transactions to finance certain property acquisitions and capital expenditures, pursuant to which we sell property and/or leasehold improvements to third parties and agree to lease those assets back for a certain period of time. Such sales generate proceeds which vary from period to period.

In 2024, we entered into sale-leaseback transactions for three properties associated with store locations in the RV and Outdoor Retail segment. We received consideration of $37.7 million of cash and recorded a gain of $0.4 million that is included in loss (gain) on sale or disposal of assets in the consolidated statements of income for the year ended December 31, 2024. We entered into 20-year lease agreements for two of the properties and a 17-year lease agreement for one of the properties.

On February 8, 2022, FRHP Lincolnshire, LLC sold three properties for a total sale price of $28.0 million. Concurrent with the sale of these properties, we entered into three separate twenty-year lease agreements, whereby we will lease back the properties from the acquiring company. Under each lease agreement, FR has four consecutive options to extend the lease term for additional periods of five years for each option. This transaction is accounted for as a financing transaction. We recorded a liability for the amount received, will continue to depreciate the non-land portion of the assets, and have imputed an interest rate so that the net carrying amount of the financial liability and remaining non-land assets will be zero at the end of the initial lease terms. The financial liability is included in other long-term liabilities in the consolidated balance sheet as of December 31, 2024.

Table of Contents

***Deferred Revenues***

Deferred revenues consist of our sales for products and services not yet recognized as revenue at the end of a given period. Our deferred revenues as of December 31, 2024 were $155.8 million. Deferred revenues are expected to be recognized as revenue as set forth in the following table (in thousands):

| | As of December 31, 2024 |
|---|---|
| 2025 | $ 92,124 |
| 2026 | 31,678 |
| 2027 | 16,911 |
| 2028 | 8,453 |
| 2029 | 4,174 |
| Thereafter | 2,426 |
| Total | $ 155,766 |

**Recent Accounting Pronouncements**

See discussion of recently adopted and recently issued accounting pronouncements in Note 1 — Summary of Significant Accounting Policies to our consolidated financial statements in Part II, Item 8 of this Form 10-K.

**Critical Accounting Estimates**

We prepare our consolidated financial statements in conformity with GAAP. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates. We base our estimates on historical experience, outside advice from parties believed to be experts in such matters, and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Judgments and uncertainties affecting the application of those policies may result in materially different amounts being reported under different conditions or using different assumptions. Our significant accounting policies can be found in Note 1 — Summary of Significant Accounting Policies to our consolidated financial statements included in Part II, Item 8 of this Form 10-K.

***Revenue Recognition — Finance and Insurance Chargebacks***

Finance and insurance revenue is recorded net, since we are acting as an agent in the transaction, and is recognized when a finance and insurance product contract payment has been received or financing has been arranged. The proceeds that the Company receives for arranging financing contracts, selling extended service contracts, and selling other insurance products, are subject to chargebacks if the customer terminates the respective contract earlier than a stated period. In the case of insurance products and extended service contracts, the stated period typically extends from one to seven years with the refundable revenue declining over the contract term. These proceeds are recorded as variable consideration, net of estimated chargebacks. Chargebacks are estimated based on ultimate future cancellation rates by product type and year sold using a combination of actuarial methods and leveraging our historical experience using data extending back to 2014, adjusted for new consumer trends. The chargeback liabilities included in the estimate of variable consideration totaled $65.4 million and $68.2 million as of December 31, 2024 and December 31, 2023, respectively, which are recorded as part of other current liabilities and other long-term liabilities on our consolidated balance sheets. If cancellation rates on products sold during 2024 and 2023 were to increase by 100 basis points, our chargeback liabilities would have increased by $5.7 million as of December 31, 2024 and finance and insurance, net revenue for the year ended December 31, 2024, would have decreased by the same amount.

***Long-Lived Assets — Impairment***

Our long-lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The evaluation of potential impairment triggering events requires judgment and we consider factors such as a change in the use of the assets, changes in overall business strategy, significant negative industry or economic trends, and/or a greater than expected loss generated by our store locations. Our long-lived asset groups exist predominantly at the individual store location level and the associated impairment analysis involves the comparison of an asset group's estimated future undiscounted cash flows over its remaining useful life to its respective carrying value, which primarily includes furniture, equipment, leasehold improvements, and operating lease assets. For long-lived asset groups identified with carrying values not recoverable by future undiscounted cash flows, impairment charges are recognized to the extent the sum of the discounted future cash flows from the use of the asset group is less than the carrying value. The impairment charge is allocated to the individual long-lived assets within an asset group; however, an individual long-lived asset is not impaired below its individual fair value, if readily determinable. The measurement of any impairment loss includes estimation of the fair value of the asset group's respective operating lease assets, which includes estimates of market rental rates based on comparable lease transactions. The estimated future cash flows require judgment and include significant assumptions for revenue growth, gross margin, and SG&A as a percentage of gross profit. We believe our estimated cash flows are sufficient to support the carrying value of our long-lived assets. If estimated cash flows or market rental rates significantly differ in the future, we may be required to record additional asset impairments. For the years ended December 31, 2024, 2023, and 2022, we recorded long-lived asset impairment of $15.1 million, $9.3 million, and $4.2 million, respectively (see Note 5 – Restructuring and Long-lived Asset Impairment to our consolidated financial statements included in Part II, Item 8 of this Form 10-K).

***Deferred Tax Assets and Tax Receivable Agreement Liability — Valuation***

When Continuing Equity Owners redeemed common units in CWGS, LLC for Class A common stock, CWH received an equal number of common units to the quantity of shares of Class A common stock issued to the Continuing Equity Owners. When CWH acquired this additional ownership in CWGS, LLC in the form of common units, it received a significant step-up in outside tax basis on the underlying assets held by CWGS, LLC. The step-up was principally equivalent to the difference between (1) the fair value of the underlying assets on the date of the redemption and (2) the tax basis in the underlying assets, multiplied by the percentage of common units acquired. The majority of the step-up in basis was related to intangible assets, primarily goodwill, and is included within deferred tax assets on our consolidated balance sheets. The computation of the step-up required valuations of the intangible assets of CWGS, LLC and has the same complexities and estimates as our purchase accounting on acquisitions (see Note 16 – Acquisitions to our consolidated financial statements included in Part II, Item 8 of this Form 10-K). In addition, the step-up is governed by complex IRS rules that limit which class and amount of step-up is deductible. Given the magnitude of the deferred tax assets and complexity of the calculations, small adjustments to our model used to calculate these deferred tax assets can result in material changes to the amounts recognized, especially in years that include redemptions by Continuing Equity Owners. If more common units of CWGS, LLC are redeemed by Continuing Equity Owners, the percentage of CWH's ownership of CWGS, LLC will increase, and additional deferred tax assets will be created as additional tax basis step-ups occur and such amounts are likely to be material.

Pursuant to the Tax Receivable Agreement, CWH makes annual payments to the Original Equity Owners that had previously redeemed common units in CWGS, LLC equivalent to 85% of any tax benefits CWH realizes on each year's tax return from the additional tax deductions arising from the step-up in tax basis. As of December 31, 2024 and 2023, we had recorded Tax Receivable Agreement liabilities of $150.4 million and $162.8 million, respectively, for the future cash obligations expected to be paid under the Tax Receivable Agreement, which were not discounted. The calculation of this liability is a function of the step-up described above and, therefore, has the same complexities and estimates. Similar to the deferred tax assets, these liabilities would likely increase materially if Continuing Equity Owners redeem additional common units of CWGS, LLC. As of December 31, 2024, if there was a 100 basis point increase or decrease in the estimated income tax rate, the Tax Receivable Agreement liability would increase or decrease by $6.0 million, respectively.

Table of Contents

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES OF MARKET RISK

We are exposed to market risk from changes in interest rates. This market risk arises in the normal course of business, as we do not engage in speculative trading activities. The following analysis provides quantitative information regarding this risk.

*Interest Rate Risk*

Our operating results are subject to risk from interest rate fluctuations on our Senior Secured Credit Facilities, our Floor Plan Facility, and our Real Estate Facilities, which carry variable interest rates. Interest rate risk is the exposure to loss resulting from changes in the level of interest rates and the spread between different interest rates. Because our Senior Secured Credit Facilities, Floor Plan Facility, and Real Estate Facilities bear interest at variable rates, we are exposed to market risks relating to changes in interest rates. Interest rate risk is highly sensitive due to many factors, including U.S. monetary and tax policies, U.S. and international economic factors and other factors beyond our control.

Based on December 31, 2024 debt levels (see Liquidity and Capital Resources — Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements in Part II, Item 7 of this Form 10-K), an increase or decrease of 100 basis points in the effective interest rate would cause an increase or decrease in interest expense:

- under our Term Loan Facility of $13.7 million over the next 12 months;
- under our Floor Plan Facility of approximately $11.8 million over the next 12 months;
- under our Real Estate Facilities of approximately $1.8 million over the next 12 months; and
- under our Other Long-Term Debt would be immaterial.

The interest rate exposure on the Floor Plan Facility was the only significant change from the quantitative analysis performed as of December 31, 2023, since the outstanding balance of the notes payable — Floor plan, net decreased $209.4 million during the year ended December 31, 2024.

See “Results of Operations” and “Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements” in Part II, Item 7 of this Form 10-K for a discussion of interest expense for the year ended December 31, 2024 compared to the year ended December 31, 2023.

We do not use derivative financial instruments for speculative or trading purposes, but this does not preclude our adoption of specific hedging strategies in the future.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

**Camping World Holdings, Inc. and Subsidiaries**
**Consolidated Financial Statements**

**Years Ended December 31, 2024, 2023, and 2022**

**Contents**


| | |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID No. 34) | 93 |
| Consolidated Financial Statements | |
| Consolidated Balance Sheets | 96 |
| Consolidated Statements of Operations | 97 |
| Consolidated Statements of Stockholders' Equity | 98 |
| Consolidated Statements of Cash Flows | 100 |
| Notes to Consolidated Financial Statements | 102 |

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the stockholders and the Board of Directors of Camping World Holdings, Inc. and subsidiaries

### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Camping World Holdings, Inc. and subsidiaries (the "Company") as of December 31, 2024, and December 31, 2023, the related consolidated statements of operations, stockholders' equity, and cash flows, for each of the three years in the period ended December 31, 2024, and the related notes and the schedules listed in the Index at Item 15(a)(1) (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2024, and December 31, 2023, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2024, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2024, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 28, 2025, expressed an adverse opinion on the Company's internal control over financial reporting because of a material weakness.

### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

### Critical Audit Matters

The critical audit matters communicated below are matters arising from the current-period audit of the financial statements that were communicated or required to be communicated to the audit committee and that (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

Table of Contents

***Revenue Recognition — Chargebacks related to Extended Service Contracts and Other Insurance Products - Refer to Note 1 to the consolidated financial statements***

*Critical Audit Matter Description*

The Company acts as an agent in selling certain extended service contracts and other insurance products ("insurance product contracts") with multi-year terms to customers on behalf of third-party insurance providers. The proceeds the Company receives for selling insurance product contracts are subject to chargebacks if the customer terminates the respective contract earlier than a stated period. The proceeds are recorded as variable consideration, net of estimated chargebacks. The Company estimates chargebacks by developing an estimate of ultimate future cancellation rates using a combination of actuarial methods which leverage the Company's historical chargeback experience.

Given the judgment involved in developing an estimate of ultimate future cancellation rates used to estimate the chargeback liabilities, auditing this assumption required a high degree of auditor judgment, including the use of our actuarial specialists, in performing audit procedures to evaluate the reasonableness of management's estimate. Therefore, we identified this as a critical audit matter.

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to the ultimate future cancellation rates used to estimate the chargeback liabilities included the following, among others:

- Testing the design and operating effectiveness of controls over the calculation of the chargeback liabilities, which includes the estimation of future cancellation rates.
- Inspecting standard insurance product contracts for each contract type to evaluate whether the arrangements in effect were consistent with the assumptions used to calculate the chargeback liabilities.
- Testing the underlying data that served as the basis for the actuarial analyses, to evaluate whether the inputs to the actuarial estimate were accurate and complete.
- With the assistance of our actuarial specialists we:
  - Developed a range of the chargeback liabilities based on independently estimated ultimate future cancellation rates, which we compared to the liabilities estimated by management.
  - Evaluated the Company's ability to estimate the ultimate future cancellation rates by comparing its historical estimates with actual chargeback payments.

***Long-Lived Asset Impairment — Refer to Notes 1 and 5 to the consolidated financial statements***

*Critical Audit Matter Description*

The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Its long-lived asset groups exist predominantly at the individual store location level and the associated impairment analysis involves the comparison of an asset group's estimated future undiscounted cash flows over its remaining useful life to its respective carrying value, which primarily includes furniture, equipment, leasehold improvements, and operating lease assets.

Management exercises significant judgment in identifying whether events or changes in circumstances indicate that an asset group's long-lived asset carrying amount may not be recoverable and in the estimation of an asset group's future cash flows. As a result, a high degree of auditor judgment and an increased extent of effort is required. Therefore, we have identified this as a critical audit matter.

Table of Contents

*How the Critical Audit Matter Was Addressed in the Audit*

Our audit procedures related to management's identification of impairment indicators and estimation of an asset group's future cash flows included the following, among others:

- Testing the design and operating effectiveness of controls over i) the identification of impairment indicators of long-lived asset groups and ii) the estimation of future cash flows for asset groups that had impairment indicators.
- Evaluating the methodology and assumptions used by management to identify impairment indicators by:
  - Inspecting the Company's impairment indicator analysis to determine if contradictory evidence existed as to the completeness of the population of potentially impaired store locations.
  - Evaluating the accuracy of long-lived assets recorded to individual asset groups, as well as the identification of store level cash flows attributable to each asset group.
  - Comparing individual store level current and historical operating results to the general ledger to assess the reliability of information used.
  - Reading board of director meeting minutes, while considering available industry information and macroeconomic trends.
- Evaluating the reasonableness of the methodology used by management and the assumptions used in the estimation of future cash flows by performing the following procedures for selected store locations:
  - Comparing the minimum projected cash flows required to recover the carrying amount of the store location to historical chain-wide average cash flows for comparable locations with similar economic circumstances and relevant location characteristics.
  - Analyzing the duration of projected cash flows used to assess store profitability.
  - Evaluating the consistency of projected cash flows with other relevant information obtained in our audit, such as internal forecasts and industry information.

/s/ Deloitte & Touche LLP

Chicago, Illinois
February 28, 2025

We have served as the Company's auditor since 2018.

Table of Contents

Camping World Holdings, Inc. and Subsidiaries
Consolidated Balance Sheets
(In Thousands Except Per Share Amounts)

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 208,422 | $ 39,647 |
| Contracts in transit | 61,222 | 60,229 |
| Accounts receivable, net | 120,412 | 128,070 |
| Inventories | 1,821,837 | 2,042,949 |
| Prepaid expenses and other assets | 58,045 | 48,353 |
| Assets held for sale | 1,350 | 29,864 |
| Total current assets | 2,271,288 | 2,349,112 |
| | | |
| Property and equipment, net | 846,760 | 834,426 |
| Operating lease assets | 739,352 | 740,052 |
| Deferred tax assets, net | 215,140 | 201,094 |
| Intangible assets, net | 19,469 | 13,717 |
| Goodwill | 734,023 | 711,222 |
| Other assets | 37,245 | 39,829 |
| Total assets | $ 4,863,277 | $ 4,889,452 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 145,346 | $ 133,516 |
| Accrued liabilities | 118,557 | 149,096 |
| Deferred revenues | 92,124 | 92,366 |
| Current portion of operating lease liabilities | 61,993 | 63,695 |
| Current portion of finance lease liabilities | 7,044 | 17,133 |
| Current portion of Tax Receivable Agreement liability | — | 12,943 |
| Current portion of long-term debt | 23,275 | 22,121 |
| Notes payable – floor plan, net | 1,161,713 | 1,371,145 |
| Other current liabilities | 70,900 | 68,536 |
| Liabilities related to assets held for sale | — | 17,288 |
| Total current liabilities | 1,680,952 | 1,947,839 |
| | | |
| Operating lease liabilities, net of current portion | 764,113 | 763,958 |
| Finance lease liabilities, net of current portion | 131,004 | 97,751 |
| Tax Receivable Agreement liability, net of current portion | 150,372 | 149,866 |
| Revolving line of credit | — | 20,885 |
| Long-term debt, net of current portion | 1,493,318 | 1,498,958 |
| Deferred revenues | 63,642 | 66,780 |
| Other long-term liabilities | 94,927 | 85,440 |
| Total liabilities | 4,378,328 | 4,631,477 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01 per share – 20,000 shares authorized; none issued and outstanding | — | — |
| Class A common stock, par value $0.01 per share – 250,000 shares authorized; 62,502 and 49,571 shares issued, respectively; 62,502 and 45,020 shares outstanding, respectively | 625 | 496 |
| Class B common stock, par value $0.0001 per share – 75,000 shares authorized; 39,466 and 39,466 shares issued, respectively; 39,466 and 39,466 shares outstanding, respectively | 4 | 4 |
| Class C common stock, par value $0.0001 per share – 0.001 share authorized, issued and outstanding | — | — |
| Additional paid-in capital | 193,692 | 131,665 |
| Treasury stock, at cost; none and 4,551 shares, respectively | — | (159,440) |
| Retained earnings | 132,241 | 195,627 |
| Total stockholders' equity attributable to Camping World Holdings, Inc. | 326,562 | 168,352 |
| Non-controlling interests | 158,387 | 89,623 |
| Total stockholders' equity | 484,949 | 257,975 |
| Total liabilities and stockholders' equity | $ 4,863,277 | $ 4,889,452 |

*See accompanying Notes to Consolidated Financial Statements*

Table of Contents

Camping World Holdings, Inc. and Subsidiaries
Consolidated Statements of Operations
(In Thousands Except Per Share Amounts)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Revenue: | | | |
| Good Sam Services and Plans | $ 194,575 | $ 193,827 | $ 192,128 |
| RV and Outdoor Retail | | | |
| New vehicles | 2,825,640 | 2,576,278 | 3,228,077 |
| Used vehicles | 1,613,849 | 1,979,632 | 1,877,601 |
| Products, service and other | 820,111 | 870,038 | 999,214 |
| Finance and insurance, net | 599,718 | 562,256 | 623,456 |
| Good Sam Club | 46,081 | 44,516 | 46,537 |
| Subtotal | 5,905,399 | 6,032,720 | 6,774,885 |
| Total revenue | 6,099,974 | 6,226,547 | 6,967,013 |
| Costs applicable to revenue (exclusive of depreciation and amortization shown separately below): | | | |
| Good Sam Services and Plans | 70,726 | 59,391 | 71,966 |
| RV and Outdoor Retail | | | |
| New vehicles | 2,418,169 | 2,175,819 | 2,576,276 |
| Used vehicles | 1,317,152 | 1,574,238 | 1,418,053 |
| Products, service and other | 463,640 | 533,625 | 631,010 |
| Good Sam Club | 4,791 | 4,825 | 7,424 |
| Subtotal | 4,203,752 | 4,288,507 | 4,632,763 |
| Total costs applicable to revenue | 4,274,478 | 4,347,898 | 4,704,729 |
| Operating expenses: | | | |
| Selling, general, and administrative | 1,573,117 | 1,538,988 | 1,606,984 |
| Depreciation and amortization | 81,190 | 68,643 | 80,304 |
| Long-lived asset impairment | 15,061 | 9,269 | 4,231 |
| Lease termination | (2,297) | (103) | 1,614 |
| Loss (gain) on sale or disposal of assets | 9,855 | (5,222) | 622 |
| Total operating expenses | 1,676,926 | 1,611,575 | 1,693,755 |
| Income from operations | 148,570 | 267,074 | 568,529 |
| Other expense: | | | |
| Floor plan interest expense | (95,121) | (83,075) | (42,031) |
| Other interest expense, net | (140,444) | (135,270) | (75,745) |
| Tax Receivable Agreement liability adjustment | — | 2,442 | 114 |
| Other expense, net | (3,262) | (1,769) | (752) |
| Total other expense | (238,827) | (217,672) | (118,414) |
| (Loss) income before income taxes | (90,257) | 49,402 | 450,115 |
| Income tax benefit (expense) | 11,377 | 3,527 | (112,283) |
| Net (loss) income | (78,880) | 52,929 | 337,832 |
| Less: net income (loss) attributable to non-controlling interests | 40,243 | (19,557) | (214,084) |
| Net (loss) income attributable to Camping World Holdings, Inc. | $ (38,637) | $ 33,372 | $ 123,748 |
| | | | |
| (Loss) earnings per share of Class A common stock: | | | |
| Basic | $ (0.80) | $ 0.75 | $ 2.92 |
| Diluted | $ (0.80) | $ 0.57 | $ 2.91 |
| Weighted average shares of Class A common stock outstanding: | | | |
| Basic | 48,005 | 44,626 | 42,386 |
| Diluted | 48,005 | 84,972 | 42,854 |

*See accompanying Notes to Consolidated Financial Statements*

Table of Contents

## Camping World Holdings, Inc. and Subsidiaries
## Consolidated Statements of Stockholders' Equity
(In Thousands)

| | Class A Common Stock | | Class B Common Stock | | Class C Common Stock | | Additional Paid-In Capital | Treasury Stock | | Retained Earnings | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | Shares | Amounts | Shares | Amounts | | Shares | Amounts | | | |
| Balance at January 1, 2022 | 47,521 | $ 475 | 41,466 | $ 4 | — | $ — | $ 97,562 | (3,390) | $ (130,006) | $ 210,725 | $ 75,837 | $ 254,597 |
| Stock-based compensation | — | — | — | — | — | — | 13,897 | — | — | — | 16,830 | 30,727 |
| Exercise of stock options | — | — | — | — | — | — | (349) | 25 | 890 | — | — | 541 |
| Non-controlling interest adjustment for capital contribution of proceeds from the exercise of stock options | — | — | — | — | — | — | (245) | — | — | — | 245 | — |
| Vesting of restricted stock units | — | — | — | — | — | — | (35,831) | 1,211 | 42,640 | — | (6,600) | 209 |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | — | — | — | — | — | — | 2,371 | (383) | (13,499) | — | — | (11,128) |
| Repurchases of Class A common stock to treasury stock | — | — | — | — | — | — | 27,561 | (2,593) | (79,757) | — | (37,774) | (89,970) |
| Redemption of LLC common units for Class A common stock | 50 | 1 | — | — | — | — | 41,844 | — | — | — | (45) | 41,800 |
| Disgorgement of short-swing profits by Section 16 officer | — | — | — | — | — | — | 58 | — | — | — | — | 58 |
| Distributions to holders of LLC common units | — | — | — | — | — | — | — | — | — | — | (162,963) | (162,963) |
| Dividends[1] | — | — | — | — | — | — | — | — | — | (105,387) | — | (105,387) |
| Establishment of liabilities under the Tax Receivable Agreement and related changes to deferred tax assets associated with that liability | — | — | — | — | — | — | 294 | — | — | — | — | 294 |
| Non-controlling interest adjustment | — | — | — | — | — | — | (242) | — | — | — | 242 | — |
| Net income | — | — | — | — | — | — | — | — | — | 123,748 | 214,084 | 337,832 |
| Balance at December 31, 2022 | 47,571 | $ 476 | 41,466 | $ 4 | — | $ — | $ 146,920 | (5,130) | $ (179,732) | $ 229,086 | $ 99,856 | $ 296,610 |
| Stock-based compensation | — | — | — | — | — | — | 9,458 | — | — | — | 11,391 | 20,849 |
| Exercise of stock options | — | — | — | — | — | — | (238) | 18 | 627 | — | — | 389 |
| Non-controlling interest adjustment for capital contribution of proceeds from the exercise of stock options | — | — | — | — | — | — | (485) | — | — | — | 161 | (324) |
| Vesting of restricted stock units | — | — | — | — | — | — | (25,080) | 844 | 29,542 | — | (4,024) | 438 |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | — | — | — | — | — | — | 3,016 | (283) | (9,877) | — | — | (6,861) |
| Redemption of LLC common units for Class A common stock | 2,000 | 20 | (2,000) | — | — | — | 1,169 | — | — | — | (4,739) | (3,550) |
| Distributions to holders of LLC common units | — | — | — | — | — | — | — | — | — | — | (31,510) | (31,510) |
| Dividends[1] | — | — | — | — | — | — | — | — | — | (66,831) | — | (66,831) |
| Establishment of liabilities under the Tax Receivable Agreement and related changes to deferred tax assets associated with that liability | — | — | — | — | — | — | (4,164) | — | — | — | — | (4,164) |
| Non-controlling interest adjustment | — | — | — | — | — | — | 1,069 | — | — | — | (1,069) | — |
| Net income | — | — | — | — | — | — | — | — | — | 33,372 | 19,557 | 52,929 |
| Balance at December 31, 2023 | 49,571 | $ 496 | 39,466 | $ 4 | — | $ — | $ 131,665 | (4,551) | $ (159,440) | $ 195,627 | $ 89,623 | $ 257,975 |

Table of Contents

| | Class A Common Stock | | Class B Common Stock | | Class C Common Stock | | Additional Paid-In | Treasury Stock | | Retained | Non-Controlling | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | Shares | Amounts | Shares | Amounts | Capital | Shares | Amounts | Earnings | Interest | Total |
| Public offering of Class A common stock, net of underwriting discounts and commissions | 12,601 | 126 | — | — | — | — | 185,080 | 4,229 | 148,150 | — | — | 333,356 |
| Offering costs related to public offering of Class A common stock | — | — | — | — | — | — | (980) | — | — | — | — | (980) |
| Non-controlling interest adjustment for capital contribution of proceeds from the public offering of Class A common stock | — | — | — | — | — | — | (118,798) | — | — | — | 118,798 | — |
| Stock-based compensation | — | — | — | — | — | — | 11,764 | — | — | — | 9,842 | 21,606 |
| Exercise of stock options | — | — | — | — | — | — | (345) | 25 | 894 | — | — | 549 |
| Non-controlling interest adjustment for capital contribution of proceeds from the exercise of stock options | — | — | — | — | — | — | (239) | — | — | — | 239 | — |
| Vesting of restricted stock units | 280 | 3 | — | — | — | — | (13,097) | 437 | 15,320 | — | (2,226) | — |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | (99) | (1) | — | — | — | — | (487) | (140) | (4,924) | — | — | (5,412) |
| Redemption of LLC common units for Class A common stock | 149 | 1 | — | — | — | — | 1,531 | — | — | — | (682) | 850 |
| Distributions to holders of LLC common units | — | — | — | — | — | — | — | — | — | — | (18,682) | (18,682) |
| Dividends[(1)] | — | — | — | — | — | — | — | — | — | (24,749) | — | (24,749) |
| Establishment of liabilities under the Tax Receivable Agreement and related changes to deferred tax assets associated with that liability | — | — | — | — | — | — | (684) | — | — | — | — | (684) |
| Non-controlling interest adjustment | — | — | — | — | — | — | (1,718) | — | — | — | 1,718 | — |
| Net loss | — | — | — | — | — | — | — | — | — | (38,637) | (40,243) | (78,880) |
| Balance at December 31, 2024 | 62,502 | $ 625 | 39,466 | $ 4 | — | $ — | $ 193,692 | — | $ — | $ 132,241 | $ 158,387 | $ 484,949 |

[(1)] The Company declared dividends per share of Class A common stock of $0.50, $1.50 and $2.50 per share in 2024, 2023, and 2022, respectively.

*See accompanying Notes to Consolidated Financial Statements*

Table of Contents

Camping World Holdings, Inc. and Subsidiaries
Consolidated Statements of Cash Flows
(In Thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Operating activities** | | | |
| Net (loss) income | $ (78,880) | $ 52,929 | $ 337,832 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 81,190 | 68,643 | 80,304 |
| Stock-based compensation | 21,585 | 24,086 | 33,847 |
| (Gain) loss on lease termination | (6,813) | (103) | 1,614 |
| Long-lived asset impairment | 15,061 | 9,269 | 4,231 |
| Loss (gain) on sale or disposal of assets | 9,855 | (5,222) | 622 |
| Provision for losses on accounts receivable | 754 | (892) | 669 |
| Noncash lease expense | 56,685 | 61,045 | 59,647 |
| Accretion of original debt issuance discount | 2,416 | 2,207 | 2,602 |
| Noncash interest | 3,109 | 2,846 | 2,077 |
| Deferred income taxes | (12,946) | (14,208) | 56,500 |
| Tax Receivable Agreement liability adjustment | — | (2,442) | (114) |
| Change in assets and liabilities, net of acquisitions: | | | |
| Receivables and contracts in transit | 10,173 | (23,957) | (4,111) |
| Inventories | 228,024 | 200,940 | (254,319) |
| Prepaid expenses and other assets | (9,824) | 16,070 | (5,104) |
| Accounts payable and other accrued expenses | (8,908) | 287 | (42,303) |
| Payment pursuant to Tax Receivable Agreement | (13,350) | (10,937) | (11,322) |
| Deferred revenues | (3,380) | (6,796) | 1,451 |
| Operating lease liabilities | (59,150) | (60,033) | (67,097) |
| CARES Act deferral of payroll taxes | — | — | (14,706) |
| Other, net | 9,558 | (2,925) | 7,463 |
| Net cash provided by operating activities | 245,159 | 310,807 | 189,783 |
| **Investing activities** | | | |
| Purchases of property and equipment | (90,837) | (131,080) | (154,926) |
| Proceeds from sale of property and equipment | 4,025 | 3,204 | 1,623 |
| Purchases of real property | (9,602) | (67,194) | (55,666) |
| Proceeds from the sale of real property | 58,153 | 40,785 | 7,352 |
| Purchases of businesses, net of cash acquired | (72,323) | (209,459) | (217,034) |
| Proceeds from divestiture of business | 19,957 | — | — |
| Purchases of and loans to other investments | — | (3,444) | (3,000) |
| Purchases of intangible assets | (143) | (2,218) | (884) |
| Proceeds from sale of intangible assets | 2,595 | — | — |
| Net cash used in investing activities | $ (88,175) | $ (369,406) | $ (422,535) |

Table of Contents

Camping World Holdings, Inc. and Subsidiaries
Consolidated Statements of Cash Flows (continued)
(In Thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| **Financing activities** | | | |
| Proceeds from long-term debt | 55,624 | 59,227 | 127,759 |
| Payments on long-term debt | (80,939) | (38,958) | (12,322) |
| Net (payments) proceeds on notes payable – floor plan, net | (217,857) | 59,280 | 314,061 |
| Borrowings on revolving line of credit | 43,000 | — | — |
| Payments on revolving line of credit | (63,885) | — | — |
| Proceeds from landlord funded construction on finance leases | — | — | 6,028 |
| Payments on finance leases | (7,485) | (5,497) | (5,977) |
| Proceeds from sale-leaseback arrangement | — | — | 27,951 |
| Payments on sale-leaseback arrangement | (198) | (187) | (132) |
| Payment of debt issuance costs | (1,123) | (937) | (3,181) |
| Proceeds from issuance of Class A common stock sold in a public offering, net of underwriter discounts and commissions | 333,356 | — | — |
| Payments of stock offering costs | (408) | — | — |
| Dividends on Class A common stock | (24,749) | (66,831) | (105,387) |
| Proceeds from exercise of stock options | 549 | 389 | 541 |
| RSU shares withheld for tax | (5,412) | (6,861) | (11,128) |
| Repurchases of Class A common stock to treasury stock | — | — | (79,757) |
| Disgorgement of short-swing profits by Section 16 officer | — | — | 58 |
| Distributions to holders of LLC common units | (18,682) | (31,510) | (162,963) |
| Net cash provided by (used in) financing activities | 11,791 | (31,885) | 95,551 |
| | | | |
| Increase (decrease) in cash and cash equivalents | 168,775 | (90,484) | (137,201) |
| Cash and cash equivalents at beginning of the period | 39,647 | 130,131 | 267,332 |
| Cash and cash equivalents at end of the period | $ 208,422 | $ 39,647 | $ 130,131 |

*See accompanying Notes to Consolidated Financial Statements*

**Camping World Holdings, Inc. and Subsidiaries**

**Notes to Consolidated Financial Statements**

**December 31, 2024**

## 1. Summary of Significant Accounting Policies

### Principles of Consolidation and Basis of Presentation

The consolidated financial statements include the accounts of Camping World Holdings, Inc. ("CWH") and its subsidiaries (collectively, the "Company") and are presented in accordance with accounting principles generally accepted in the United States ("GAAP"). All intercompany accounts and transactions of the Company and its subsidiaries have been eliminated in consolidation.

CWH was formed on March 8, 2016 as a Delaware corporation for the purpose of facilitating an initial public offering (the "IPO") and other related transactions in order to carry on the business of CWGS Enterprises, LLC ("CWGS, LLC"). CWGS, LLC was formed in March 2011 when it received, through contribution from its then parent company, all of the membership interests of Affinity Group Holding, LLC and FreedomRoads Holding Company, LLC ("FreedomRoads"). The IPO and related reorganization transactions that occurred on October 6, 2016 resulted in CWH as the sole managing member of CWGS, LLC, with CWH having sole voting power in and control of the management of CWGS, LLC (see Note 19 — Stockholders' Equity). As of December 31, 2024, 2023, and 2022, CWH owned 61.0%, 52.9% and 50.2%, respectively, of CWGS, LLC. Accordingly, the Company consolidates the financial results of CWGS, LLC and reports a non-controlling interest in its consolidated financial statements.

The Company does not have any components of other comprehensive income recorded within its consolidated financial statements and, therefore, does not separately present a statement of comprehensive income in its consolidated financial statements.

### Description of the Business

Camping World Holdings, Inc., together with its subsidiaries, is the world's largest retailer of RVs and related products and services. As noted above, CWGS, LLC is a holding company and operates through its subsidiaries. The Company has the following two reportable segments: (i) Good Sam Services and Plans and (ii) RV and Outdoor Retail. See Note 23 – Segments Information for further information about the Company's segments. Within the Good Sam Services and Plans segment, the Company primarily derives revenue from the sale of the following offerings: emergency roadside assistance plans; commissions on property and casualty insurance programs; travel assist programs; extended vehicle service contracts; vehicle financing and refinancing assistance; and consumer publications and directories. Within the RV and Outdoor Retail segment, the Company primarily derives revenue from the sale of new and used RVs; commissions on the finance and insurance contracts related to the sale of RVs; the sale of RV service and collision work; the sale of RV parts, accessories, and supplies; the sale of outdoor products, equipment, gear and supplies; and the sale of Good Sam Club memberships and co-branded credit cards. The Company operates a national network of RV dealerships and service centers as well as a comprehensive e-commerce platform, primarily under the Camping World brand, and markets its products and services primarily to RV and outdoor enthusiasts.

### Revisions to Prior Period Consolidated Financial Statements

Subsequent to the issuance of the Company's consolidated financial statements for the year ended December 31, 2023, the Company's management identified prior period misstatements related to the measurement of the realizable portion of the Company's outside basis difference deferred tax asset in CWGS, LLC, including the associated valuation allowance. As a result, deferred tax assets, net, additional paid-in capital, and income tax benefit (expense) have been revised from the amounts previously reported as of and for the years ended December 31, 2023 and 2022. The misstatements affecting additional paid-in capital and income tax benefit (expense) as of and for the year ended December 31, 2021, are reflected as adjustments to additional paid-in capital and retained earnings, respectively, as of January 1, 2022. The Company evaluated

Table of Contents

the materiality of these errors both qualitatively and quantitatively in accordance with Staff Accounting Bulletin ("SAB") No. 99, Materiality, and SAB No. 108, Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements, and determined the effect of these revisions was not material to the previously issued financial statements. However, correcting the cumulative error during the year ended December 31, 2024 would have been material to the current period. Therefore, the Company has revised the consolidated financial statements for the prior periods presented, including the comparative prior period amounts in the applicable notes to the consolidated financial statements. The Company will also revise previously reported financial information for such immaterial misstatements in future consolidated financial statements, as applicable. These immaterial misstatements did not impact the Company's reportable segments, since they only related to the public holding company, CWH.

The following table presents the effect of the immaterial misstatements on the Company's consolidated balance sheet for the period indicated:

| | As of December 31, 2023 | | |
|---|---|---|---|
| ($ in thousands) | As Previously Reported | Adjustment | As Revised |
| Deferred tax assets, net | $ 157,326 | $ 43,768 | $ 201,094 |
| Total assets | 4,845,684 | 43,768 | 4,889,452 |
| Additional paid-in capital | 98,280 | 33,385 | 131,665 |
| Retained earnings | 185,244 | 10,383 | 195,627 |
| Total stockholders' equity attributable to Camping World Holdings, Inc. | 124,584 | 43,768 | 168,352 |
| Total stockholders' equity | 214,207 | 43,768 | 257,975 |
| Total liabilities and stockholders' equity | 4,845,684 | 43,768 | 4,889,452 |

The following table presents the effect of the immaterial misstatements on the consolidated statements of operations for the periods indicated:

| | Year Ended December 31, 2023 | | | Year Ended December 31, 2022 | | |
|---|---|---|---|---|---|---|
| ($ in thousands except per share amounts) | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised |
| Income tax benefit (expense) | $ 1,199 | $ 2,328 | $ 3,527 | $ (99,084) | $ (13,199) | $ (112,283) |
| Net income | 50,601 | 2,328 | 52,929 | 351,031 | (13,199) | 337,832 |
| Net income attributable to Camping World Holdings, Inc. | 31,044 | 2,328 | 33,372 | 136,947 | (13,199) | 123,748 |
| Earnings per share of Class A common stock: | | | | | | |
| Basic | $ 0.70 | $ 0.05 | $ 0.75 | $ 3.23 | $ (0.31) | $ 2.92 |
| Diluted | $ 0.55 | $ 0.02 | $ 0.57 | $ 3.22 | $ (0.31) | $ 2.91 |

Table of Contents

The following table presents the effect of the immaterial misstatements on the consolidated statements of stockholders' equity for the periods indicated:

| | Additional Paid-In Capital | | | Retained Earnings | | | Total Stockholders' Equity | | |
|---|---|---|---|---|---|---|---|---|---|
| ($ in thousands) | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised |
| Balance at January 1, 2022 | $ 98,113 | $ (551) | $ 97,562 | $ 189,471 | $ 21,254 | $ 210,725 | $ 233,894 | $ 20,703 | $ 254,597 |
| Stock-based compensation | 13,897 | — | 13,897 | — | — | — | 30,727 | — | 30,727 |
| Exercise of stock options | (349) | — | (349) | — | — | — | 541 | — | 541 |
| Non-controlling interest adjustment for capital contribution of proceeds from the exercise of stock options | (245) | — | (245) | — | — | — | — | — | — |
| Vesting of restricted stock units | (35,831) | — | (35,831) | — | — | — | 209 | — | 209 |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | 2,371 | — | 2,371 | — | — | — | (11,128) | — | (11,128) |
| Repurchases of Class A common stock to treasury stock | 27,561 | — | 27,561 | — | — | — | (89,970) | — | (89,970) |
| Redemption of LLC common units for Class A common stock | 424 | 41,420 | 41,844 | — | — | — | 380 | 41,420 | 41,800 |
| Disgorgement of short-swing profits by Section 16 officer | 58 | — | 58 | — | — | — | 58 | — | 58 |
| Distributions to holders of LLC common units | — | — | — | — | — | — | (162,963) | — | (162,963) |
| Dividends | — | — | — | (105,387) | — | (105,387) | (105,387) | — | (105,387) |
| Establishment of liabilities under the Tax Receivable Agreement and related changes to deferred tax assets associated with that liability | 294 | — | 294 | — | — | — | 294 | — | 294 |
| Non-controlling interest adjustment | (242) | — | (242) | — | — | — | — | — | — |
| Net income | — | — | — | 136,947 | (13,199) | 123,748 | 351,031 | (13,199) | 337,832 |
| Balance at December 31, 2022 | $ 106,051 | $ 40,869 | $ 146,920 | $ 221,031 | $ 8,055 | $ 229,086 | $ 247,686 | $ 48,924 | $ 296,610 |
| Stock-based compensation | 9,458 | — | 9,458 | — | — | — | 20,849 | — | 20,849 |
| Exercise of stock options | (238) | — | (238) | — | — | — | 389 | — | 389 |
| Non-controlling interest adjustment for capital contribution of proceeds from the exercise of stock options | (485) | — | (485) | — | — | — | (324) | — | (324) |
| Vesting of restricted stock units | (25,080) | — | (25,080) | — | — | — | 438 | — | 438 |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | 3,016 | — | 3,016 | — | — | — | (6,861) | — | (6,861) |
| Redemption of LLC common units for Class A common stock | 8,653 | (7,484) | 1,169 | — | — | — | 3,934 | (7,484) | (3,550) |
| Distributions to holders of LLC common units | — | — | — | — | — | — | (31,510) | — | (31,510) |
| Dividends | — | — | — | (66,831) | — | (66,831) | (66,831) | — | (66,831) |
| Establishment of liabilities under the Tax Receivable Agreement and related changes to deferred tax assets associated with that liability | (4,164) | — | (4,164) | — | — | — | (4,164) | — | (4,164) |
| Non-controlling interest adjustment | 1,069 | — | 1,069 | — | — | — | — | — | — |
| Net income | — | — | — | 31,044 | 2,328 | 33,372 | 50,601 | 2,328 | 52,929 |
| Balance at December 31, 2023 | $ 98,280 | $ 33,385 | $ 131,665 | $ 185,244 | $ 10,383 | $ 195,627 | $ 214,207 | $ 43,768 | $ 257,975 |

The following table presents the effect of the immaterial misstatements on the consolidated statements of cash flows for the periods indicated. These immaterial misstatements resulted in no change in net cash provided from operating activities for the periods indicated:

| | Year Ended December 31, 2023 | | | Year Ended December 31, 2022 | | |
|---|---|---|---|---|---|---|
| ($ in thousands) | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised |
| Net income | $ 50,601 | $ 2,328 | $ 52,929 | $ 351,031 | $ (13,199) | $ 337,832 |
| Deferred income taxes | (11,880) | (2,328) | (14,208) | 43,301 | 13,199 | 56,500 |

## Use of Estimates

The preparation of these consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results may differ from those estimates. In preparing these consolidated financial statements, management has made its best estimates and judgments of certain amounts included in the consolidated financial statements, giving due consideration to

materiality. The Company bases its estimates and judgments on historical experience and other assumptions that management believes are reasonable. However, application of these accounting policies involves the exercise of judgment and use of assumptions as to future uncertainties and, as a result, actual results could differ materially from these estimates. The Company periodically evaluates estimates and assumptions used in the preparation of the consolidated financial statements and makes changes on a prospective basis when adjustments are necessary. Significant estimates made in the accompanying consolidated financial statements include certain assumptions related to accounts receivable, inventory, goodwill, intangible assets, long-lived assets, long-lived asset impairments, program cancellation reserves, chargebacks, accruals related to estimated tax liabilities, product return reserves, and other liabilities.

**Cash and Cash Equivalents**

The Company considers all short-term, highly liquid investments purchased with an original maturity date of three months or less to be cash equivalents. The carrying amount approximates fair value because of the short-term maturity of these instruments. Outstanding checks that are in excess of the cash balances at certain banks are included in accrued liabilities in the accompanying consolidated balance sheets, and changes in the amounts are reflected in operating cash flows in the accompanying consolidated statement of cash flows.

**Contracts in Transit, Accounts Receivable and Current Expected Credit Losses**

Contracts in transit consist of amounts due from non-affiliated financing institutions on retail finance contracts from vehicle sales for the portion of the vehicle sales price financed by the Company's customers. These retail installment sales contracts are typically funded within ten days of the initial approval of the retail installment sales contract by the third-party lender.

Accounts receivable are stated at realizable value, net of an allowance for credit losses. Accounts receivable balances due in excess of one year were $7.4 million at December 31, 2024 and $8.8 million at December 31, 2023, which are included in other assets in the accompanying consolidated balance sheets.

The allowance for credit losses is based on management's assessment of the collectability of its customer accounts. The Company regularly reviews the composition of the accounts receivable aging, historical bad debts, changes in payment patterns, customer creditworthiness, current economic trends, and reasonable and supportable forecasts about the future. Relevant risk characteristics include customer size and historical loss patterns. Management has evaluated the expected credit losses related to contracts in transit and determined that no allowance for credit losses was required at December 31, 2024 and 2023. Management additionally has evaluated the expected credit losses related to accounts receivable and determined that allowances for credit losses of approximately $2.7 million as of December 31, 2024 and $3.0 million as of December 31, 2023 were required.

The following table details the changes in the allowance for credit losses relating to current receivables (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2024 | 2023 |
| Allowance for credit losses: | | |
| Balance, beginning of period | $ 2,978 | $ 4,222 |
| Charged to bad debt expense | 754 | (954) |
| Deductions [(1)] | (984) | (290) |
| Balance, end of period | $ 2,748 | $ 2,978 |

(1) These amounts primarily relate to the write off of uncollectable accounts after collection efforts have been exhausted.

**Concentration of Credit Risk**

The Company's most significant industry concentration of credit risk is with financial institutions from which the Company has recorded receivables and contracts in transit. These financial institutions provide financing to the Company's customers for the purchase of a vehicle in the normal course of business. These

receivables are short-term in nature and are from various financial institutions located throughout the United States.

The Company has cash deposited in various financial institutions that is in excess of the insurance limits provided by the Federal Deposit Insurance Corporation. The amount in excess of FDIC limits at December 31, 2024 and 2023 was approximately $231.5 million and $47.4 million, respectively.

The Company is potentially subject to concentrations of credit risk in accounts receivable. Concentrations of credit risk with respect to accounts receivable are limited due to the large number of customers and their geographic dispersion.

**Inventories**

New and used RV inventories consist primarily of new and used recreational vehicles held for sale valued using the specific-identification method and valued at the lower of cost or net realizable value. Cost includes purchase costs, reconditioning costs, dealer-installed accessories, freight, and rebates. For vehicles accepted in trades, the cost is the fair value of such used vehicles at the time of the trade-in plus reconditioning costs. Products, parts, accessories, and other inventories primarily consist of installable parts, as well as retail travel and leisure specialty merchandise and are stated at lower of cost, including freight and rebates, or net realizable value using the first in, first out method. Prior to the divestiture of the RV and Outdoor Retail segment's RV furniture business in May 2024 (see Note 6 — Assets Held for Sale and Business Divestiture for further details), a portion of the products, parts, accessories and other inventory included capitalized labor relating to assembly.

**Assets Held for Sale**

The Company continually evaluates its portfolio for non-strategic assets and classifies assets and liabilities to be sold ("Disposal Group") as held for sale in the period in which all specified GAAP criteria are met. Upon determining that a Disposal Group meets the criteria to be classified as held for sale, but does not meet the criteria for discontinued operations, the Company reports the assets and liabilities of the Disposal Group, if material, as separate line items on the consolidated balance sheets and ceases to record depreciation and amortization relating to the Disposal Group.

The Company initially measures a Disposal Group that is classified as held for sale at the lower of its carrying value or fair value less any costs to sell. Any loss resulting from this measurement is recognized in the period in which the held for sale criteria are met. Conversely, gains are not recognized on the sale of a Disposal Group until the date of sale. The estimated fair value for Disposal Groups comprised of properties are typically based on appraisals and/or offers from prospective buyers.

**Property and Equipment, net**

Property and equipment is recorded at historical cost, net of accumulated depreciation and amortization, and, if applicable, impairment charges. Depreciation of property and equipment is provided using the straight-line method over the following estimated useful lives of the assets:

| | Years |
|---|---|
| Building and improvements | 40 |
| Leasehold improvements | 3-40 |
| Furniture, fixtures and equipment | 3-12 |
| Software | 3-5 |

Leasehold improvements are amortized over the useful lives of the assets or the remaining term of the respective lease, whichever is shorter.

Table of Contents

**Leases**

Leases are recorded in accordance with Accounting Standards Codification (“ASC”) 842, Leases (“ASC 842”) (see Note 11 — Lease Obligations). The Company leases property and equipment throughout the United States primarily under finance and operating leases. For leases with initial lease terms at commencement that are greater than 12 months, the Company records the related asset and obligation at the present value of lease payments over the term. Many of the Company’s leases include rental escalation clauses, renewal options and/or termination options that are factored into the determination of lease payments when appropriate. The Company aggregates non-lease components with the related lease components when evaluating the accounting treatment for property, equipment, and billboard leases.

Many of the Company’s lease agreements include fixed rental payments. Certain of its lease agreements include fixed rental payments that are adjusted periodically for changes in the Consumer Price Index (“CPI”). Payments based on a change in an index or a rate, rather than a specified index or rate, are not considered in the determination of lease payments for purposes of measuring the related lease liability. While lease liabilities are not remeasured as a result of changes to the CPI, changes to the CPI are typically treated as variable lease payments and recognized in the period in which the obligation for those payments is incurred. Common area maintenance, property tax, and insurance associated with triple net leases, as well as payments based on revenue generated at certain leased locations, are included in variable lease costs, but are not included in the measurement of the lease liability.

Most of the Company’s real estate leases include one or more options to renew, with renewal terms that can extend the lease term from one to five years or more. The exercise of lease renewal options is at the Company’s sole discretion. If it is reasonably certain that the Company will exercise such options, the periods covered by such options are included in the lease term and are recognized as part of the operating lease assets and operating lease liabilities. The depreciable life of assets and leasehold improvements are limited to the shorter of the lease term or useful life if there is a transfer of title or purchase option reasonably certain of exercise.

The Company cannot readily determine the rate implicit in its leases. Therefore, the Company must estimate its incremental borrowing rate to discount the lease payments based on information available at lease commencement. The Company estimates its incremental borrowing rate using a yield curve based on the credit rating of its collateralized debt and maturities that are commensurate with the lease term at the applicable commencement or remeasurement date.

**Goodwill and Other Intangible Assets**

Goodwill is evaluated for impairment on an annual basis as of the beginning of the fourth quarter, or more frequently if events or changes in circumstances indicate that the Company’s goodwill might be impaired. The Company has the option to assess qualitative factors to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If the Company determines it is more likely than not that the fair value of a reporting unit is less than its carrying amount or the Company elects to not perform a qualitative analysis, then it is required to perform a quantitative impairment test by calculating the fair value of the reporting unit and comparing the fair value with the carrying amount of the reporting unit. If the carrying amount of a reporting unit exceeds its fair value, then the Company records an impairment of goodwill equal to the amount that the carrying amount of a reporting unit exceeds its fair value. (see Note 8 – Goodwill and Intangible Assets). Finite-lived intangibles are recorded at cost, net of accumulated amortization and, if applicable, impairment charges.

**Long-Lived Assets**

Long lived assets are included in property and equipment, which also includes capitalized software costs to be held and used. For the Company’s major software systems, such as its accounting and membership systems, its capitalized costs may include some internal or external costs to configure, install and test the software during the application development stage. The Company does not capitalize preliminary project costs, nor does it capitalize training, data conversion costs, maintenance or post development stage costs. The Company’s long-lived assets are reviewed for impairment whenever events or changes in circumstances

indicate that the carrying amount of an asset may not be recoverable. The Company's long-lived asset groups exist predominantly at the individual location level and the associated impairment analysis involves the comparison of an asset group's estimated future undiscounted cash flows over its remaining useful life to its respective carrying value, which primarily includes furniture, equipment, leasehold improvements, and operating lease assets. For long-lived asset groups identified with carrying values not recoverable by future undiscounted cash flows, impairment charges are recognized to the extent the sum of the discounted future cash flows from the use of the asset group is less than the carrying value. The impairment charge is allocated to the individual long-lived assets within an asset group; however, an individual long-lived asset is not impaired below its individual fair value, if readily determinable. The measurement of any impairment loss includes estimation of the fair value of the asset group's respective operating lease assets, which includes estimates of market rental rates based on comparable lease transactions.

**Long-Term Debt**

The fair value of the Company's long-term debt is estimated based on the quoted market prices for the same or similar issues or on the current rates offered for debt of the same or similar remaining maturities.

**Revenue Recognition**

Revenues are recognized by the Company when control of the promised goods or services is transferred to its customers in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services. Sales and other taxes collected from the customer concurrent with revenue-producing activities are excluded from revenue. Incidental items that are immaterial in the context of the contract are recognized as expense. The Company's contracts with customers may include multiple performance obligations. For such arrangements, the Company allocates revenue to each performance obligation based on its relative stand-alone selling price. The Company generally determines stand-alone selling prices based on the prices charged to customers or using the adjusted market assessment approach. The Company presents disaggregated revenue on its consolidated statements of operations.

The Company does not adjust the promised amount of consideration for the effects of a significant financing component if the Company expects, at contract inception, that the period of time between payment and transfer of the promised goods or services will be one year or less. The Company expenses sales commissions when incurred in cases where the amortization period of those otherwise capitalized sales commissions would have been one year or less. The Company does not disclose the value of unsatisfied performance obligations for revenue streams for (i) contracts with an original expected length of one year or less and (ii) contracts for which the Company recognizes revenue at the amount to which it has the right to invoice for services performed. The Company accounts for shipping and handling as activities to fulfill the promise to transfer the good to the customer and does not evaluate whether shipping and handling is a separate performance obligation.

*Good Sam Services and Plans*

Good Sam Services and Plans revenue consists primarily of revenue from publications and marketing fees from various consumer services and plans. Roadside Assistance ("RA") revenues are deferred and recognized over the contractual life of the membership. RA claim expenses are recognized when incurred. Marketing fees for finance, insurance, extended service and other similar products are recognized as variable consideration, net of estimated cancellations, if applicable, when a product contract payment has been received or financing has been arranged. These marketing fees are recorded net as the Company acts as an agent in the transaction. The related estimate for cancellations on the marketing fees for multi-year finance and insurance products utilize actuarial analysis to estimate the exposure. Promotional expenses consist primarily of direct mail advertising expenses and renewal expenses and are expensed at the time related materials are mailed. Newsstand sales of publications and related expenses are recorded as variable consideration at the time of delivery, net of estimated returns. Subscription sales of publications are reflected in income over the lives of the subscriptions. The related selling expenses are expensed as incurred. Advertising revenues and related expenses are recorded at the time of delivery.

*New and Used Vehicles*

RV vehicle revenue consists of sales of new and used recreational vehicles, sales of RV parts and services, and commissions on the related finance and insurance contracts. Revenue from the sale of recreational vehicles is recognized upon completion of the sale to the customer. Conditions to completing a sale include having an agreement with the customer, including pricing, whereby the sales price must be reasonably expected to be collected and having control transferred to the customer.

*Products, Service and Other*

Revenue from RV-related parts, service and other products sales is recognized over time as work is completed, and when parts or other products are delivered to the Company's customers. For service and parts revenues recorded over time, the Company utilizes a method that considers total costs incurred to date and the applicable margin in relation to total expected efforts to complete our performance obligation in order to determine the appropriate amount of revenue to recognize over time.

The remaining RV and Outdoor retail revenue consists of sales of products, service and other, including RV accessories and supplies; outdoor products, equipment, gear and supplies; and, prior to the divestiture of RV and Outdoor Retail segment's RV furniture business in May 2024 (see Note 6 — Assets Held for Sale and Business Divestiture for further details), the distribution of RV furniture. Revenue from products, service and other is recognized over time as work is completed, and when parts or other products are delivered to the Company's customers. E-commerce sales are recognized when the product is shipped and recorded as variable consideration, which is net of anticipated merchandise returns that reduce revenue and cost of sales in the period that the related sales are recorded.

When points are awarded to customers under the Good Sam Club program for purchases of products or services, a portion of the product or service revenue is allocated to the points liability based on the relative standalone selling price of the points, net of estimated breakage. The resulting point liability is deferred until the revenue is recognized (i) when the points are redeemed by the customer as a reduction of the purchase price of future purchases of the Company's products or services or (ii) when the point liability is adjusted to reflect changes in breakage estimates. Points generally expire twelve months after the date that they are credited to a customer's account.

*Finance and Insurance, net*

Finance and insurance revenue is recorded net, since the Company is acting as an agent in the transaction, and is recognized when a finance and insurance product contract payment has been received or financing has been arranged. The proceeds the Company receives for arranging financing contracts, selling extended service contracts, and selling other insurance products, are subject to chargebacks if the customer terminates the respective contract earlier than a stated period. In the case of insurance products and extended service contracts, the stated period typically extends from one to seven years with the refundable revenue declining over the contract term. These proceeds are recorded as variable consideration, net of estimated chargebacks. Chargebacks are estimated based on ultimate future cancellation rates by product type and year sold using a combination of actuarial methods and leveraging the Company's historical experience from the past ten years, adjusted for new consumer trends. The chargeback liabilities included in the estimate of variable consideration totaled $65.4 million and $68.2 million as of December 31, 2024 and December 31, 2023, respectively, which are recorded as part of other current liabilities and other long-term liabilities on the Company's consolidated balance sheets.

*Good Sam Club*

Good Sam Club revenue consists of revenue from club membership fees and royalty fees from co-branded credit cards. Membership revenue is generated from annual, multiyear and lifetime memberships. The revenue and expenses associated with these memberships are deferred and amortized over the membership period. Unearned revenue and profit are subject to revisions as the membership progresses to completion. Revisions to membership period estimates would change the amount of income and expense amortized in future accounting periods. For lifetime memberships, an 18-year period is used, which is the actuarially

Table of Contents

determined estimated fulfillment period. Royalty revenue is earned under the terms of an arrangement with a third-party credit card provider based on a percentage of the Company's co-branded credit card portfolio retail spending with such third-party credit card provider and for acquiring new cardholders.

When points are awarded to cardholders under the co-branded credit card program relating to sign-up or card activity, a portion of the revenue from the third-party credit card provider is allocated to the points liability based on the relative standalone selling price of the points, net of estimated breakage. The resulting point liability is deferred until the revenue is recognized (i) when the points are redeemed by the cardholder as a reduction of the purchase price of future purchases of the Company's products or services, (ii) as a credit to their credit card balance, (iii) or when the point liability is adjusted to reflect changes in breakage estimates. Points generally expire twelve months after the date that they are credited to a customer's account.

**Advertising Expenses**

Advertising expenses are expensed as incurred. Advertising expenses for the years ended December 31, 2024, 2023 and 2022 were $127.0 million, $101.1 million and $150.7 million, respectively. Advertising expenses relating to RV and Outdoor Retail segment were included in selling, general and administrative expenses in the consolidated statements of operations. Advertising expenses relating to the Good Sam Services and Plans segment were included in costs applicable to revenues in the consolidated statements of operations, since, by the nature of those revenue streams, they are integral to the generation of those revenues.

**Vendor Allowances**

As a component of the Company's consolidated procurement program, the Company frequently enters into contracts with vendors that provide for payments of rebates or other allowances. These vendor payments are reflected in the carrying value of the inventory when earned or as progress is made toward earning the rebate or allowance and as a component of cost of sales as the inventory is sold. Certain of these vendor contracts provide for rebates and other allowances that are contingent upon the Company meeting specified performance measures such as a cumulative level of purchases over a specified period of time. Such contingent rebates and other allowances are given accounting recognition at the point at which achievement of the specified performance measures are deemed to be probable and reasonably estimable.

**Shipping and Handling Fees and Costs**

The Company reports shipping and handling costs billed to customers as a component of revenues, and related costs are reported as a component of costs applicable to revenues. For the years ended December 31, 2024, 2023, and 2022, $2.9 million, $4.4 million, and $7.2 million of shipping and handling fees, respectively, were included in the RV and Outdoor Retail segment as revenue.

**Income Taxes**

The Company recognizes deferred tax assets and liabilities based on the asset and liability method, which requires an adjustment to the deferred tax asset or liability to reflect income tax rates currently in effect. When income tax rates increase or decrease, a corresponding adjustment to income tax expense is recorded by applying the rate change to the cumulative temporary differences. The Company recognizes the tax benefit from an uncertain tax position in accordance with accounting guidance on accounting for uncertainty in income taxes. The Company classifies interest and penalties relating to income taxes as income tax expense. See Note 12 — Income Taxes for additional information.

**Seasonality**

The Company has experienced, and expects to continue to experience, variability in revenue, net income, and cash flows as a result of annual seasonality in its business. Because RVs are used primarily by vacationers and campers, demand for services, protection plans, products, and resources generally declines during the winter season, while sales and profits are generally highest during the spring and summer months. In addition, unusually severe weather conditions in some geographic areas may impact demand.

Table of Contents

The Company generates a disproportionately higher amount of its annual revenue in its second and third fiscal quarters, which include the spring and summer months. The Company incurs additional expenses in the second and third fiscal quarters due to higher sale volumes, increased staffing in its store locations and program costs. If, for any reason, the Company miscalculates the demand for its products or its product mix during the second and third fiscal quarters, its sales in these quarters could decline, resulting in higher labor costs as a percentage of gross profit, lower margins and excess inventory, which could cause the Company's annual results of operations to suffer and its stock price to decline.

Additionally, selling, general, and administrative ("SG&A") expenses as a percentage of gross profit tend to be higher in the first and fourth quarters due to the seasonality of the Company's business.

Due to the Company's seasonality, the possible adverse impact from other risks associated with its business, including atypical weather, consumer spending levels and general business conditions, is potentially greater if any such risks occur during the Company's peak sales seasons.

**Recently Adopted Accounting Pronouncements**

In March 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2023-01, Leases (Topic 842): Common Control Arrangements. For public companies, this standard requires the amortization of leasehold improvements associated with common control leases over the useful life to the common control group. The standard is effective for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2023, with early adoption permitted. The Company's adoption of the provisions of this ASU as of January 1, 2024 did not materially impact the Company's consolidated financial statements.

In August 2023, the FASB issued ASU 2023-05, Business Combinations—Joint Venture Formations (Subtopic 805-60): Recognition and Initial Measurement. This ASU requires joint ventures to recognize a new basis of accounting for contributed net assets as of the formation date, to measure the contributed identifiable net assets at fair value on the formation date using the business combination guidance in ASC 805-20 (with certain exceptions) regardless of whether an investor contributes a business, to measure the net assets' fair value based on 100% of the joint venture's equity immediately following formation, to record goodwill (or an equity adjustment, if negative) for the difference between the fair value of the joint venture's equity and its net assets and to provide disclosures about the nature and financial effect of the formation transaction. The standard is effective prospectively for all joint venture formations with a formation date on or after January 1, 2025, with early adoption permitted. Additionally, for joint ventures that were formed before January 1, 2025, the Company may elect to apply the standard retrospectively. The Company's early adoption of the provisions of this ASU as of January 1, 2024 did not materially impact the Company's consolidated financial statements.

In November 2023, the FASB issued ASU 2023-07, Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures. This ASU requires public entities to disclose significant segment expenses that are regularly provided to the chief operating decision maker (CODM) and included within each reported measure of segment profit or loss. The title and position of the CODM must be disclosed with an explanation of how the CODM uses the reported measure(s) of segment profit or loss in assessing segment performance and deciding how to allocate resources. If the CODM uses more than one measure of a segment's profit or loss in assessing segment performance, and deciding how to allocate resources, an entity may report one or more of those additional measures of segment profit. Additionally, public entities must disclose an amount for "other segment items" by reportable segment representing the difference between segment revenue less the significant expenses disclosed and each reported measure of segment profit or loss, and a description of its composition. Moreover, all annual disclosures about a reportable segment's profit or loss and assets are to be presented in interim periods. The standard should be applied retrospectively to all prior periods presented in the financial statements. Upon transition, the segment expense categories and amounts disclosed in the prior periods should be based on the significant expense categories identified and disclosed in the period of adoption. The standard is effective for fiscal years beginning after December 15, 2023 and interim periods within fiscal years beginning after December 15, 2024, with early adoption permitted. The Company adopted the provisions of this ASU as of January 1, 2024, with respect to the annual disclosures beginning with the year ended December 31, 2024 and interim disclosures beginning with the three months ending March 31, 2025, including

the presentation of the comparable prior periods. The adoption of this ASU resulted in additional segment reporting disclosures and did not otherwise have a material impact on the Company's consolidated financial statements.

**Recently Issued Accounting Pronouncements**

In December 2023, the FASB issued ASU 2023-09, Income Taxes (Topic 740): Improvements to Income Tax Disclosures. This ASU requires that public business entities on an annual basis disclose (1) consistent categories and greater disaggregation of information in the rate reconciliation, and (2) income taxes paid disaggregated by jurisdiction. The standard is effective for fiscal years beginning after December 15, 2024, with early adoption permitted. The Company expects that the adoption of this ASU will impact certain of its income tax disclosures and will not otherwise have a material impact on the Company's consolidated financial statements.

In November 2024, the FASB issued ASU 2024-03, Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses. This ASU requires that at each interim and annual reporting period entities present a new tabular disclosure in the notes to the financial statements, presenting disaggregation of the amounts of purchases of inventory, employee compensation, depreciation, intangible asset amortization and depletion. Furthermore, the ASU requires entities to include certain amounts that are already required to be disclosed under GAAP in the same disclosure as other disaggregation requirements and disclose a qualitative description of the amounts remaining in relevant expense captions that are not separately disaggregated quantitatively. Additionally, entities are required to disclose the total amount of selling expenses and, in annual reporting period, an entity's definition of selling expenses. The standard is effective for fiscal years beginning after December 15, 2026 and interim periods within fiscal years beginning after December 15, 2027, with early adoption permitted. The Company is currently evaluating the impact that the adoption of the provisions of the ASU will have on its consolidated financial statements.

**2. Revenue**

**Contract Assets and Capitalized Costs to Acquire a Contract**

As of December 31, 2024 and 2023, contract assets of $10.0 million and $16.1 million, respectively, related to RV service revenues were included in accounts receivable in the accompanying consolidated balance sheets. As of December 31, 2024 and 2023, the Company had capitalized costs to acquire a contract consisting of $4.4 million and $4.5 million, respectively, from the deferral of sales commissions expenses relating to multi-year consumer services and plans and the recording of such expenses over the same period as the recognition of the related revenues.

**Deferred Revenues**

The Company records deferred revenues when cash payments are received or due in advance of the Company's performance, net of estimated refunds that are presented separately as a component of accrued liabilities. For the year ended December 31, 2024, $90.3 million of revenues recognized were included in the deferred revenues balance at the beginning of the period. For the year ended December 31, 2023, $92.6 million of revenues recognized were included in the deferred revenues balance at the beginning of the period.

Table of Contents

As of December 31, 2024, the Company had unsatisfied performance obligations primarily relating to plans for its roadside assistance, Good Sam Club memberships, Good Sam Club loyalty program, Coast to Coast memberships, the annual campground guide, and magazine publication revenue streams. The total unsatisfied performance obligations for these revenue streams at December 31, 2024 and the periods during which the Company expects to recognize the amounts as revenue are presented as follows (in thousands):

| | As of December 31, 2024 |
|---|---|
| 2025 | $ 92,124 |
| 2026 | 31,678 |
| 2027 | 16,911 |
| 2028 | 8,453 |
| 2029 | 4,174 |
| Thereafter | 2,426 |
| Total | $ 155,766 |

The Company's payment terms vary by the type and location of its customer and the products or services offered. The term between invoicing and when payment is due is not significant. For certain products or services and customer types, the Company requires payment before the products or services are delivered to the customer.

### 3. Accounts Receivable

Accounts receivable consisted of the following at December 31, 2024 and 2023 (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Good Sam Services and Plans | $ 14,373 | $ 17,589 |
| RV and Outdoor Retail | | |
| New and used vehicles | 2,310 | 2,830 |
| Parts, service and other | 34,210 | 35,748 |
| Trade accounts receivable | 38,313 | 27,773 |
| Due from manufacturers | 22,008 | 37,190 |
| Other | 11,946 | 9,365 |
| Corporate | — | 553 |
| | 123,160 | 131,048 |
| Allowance for credit losses | (2,748) | (2,978) |
| | $ 120,412 | $ 128,070 |

As of December 31, 2024 and 2023, the Company had Good Sam Services and Plans receivables that were expected to be collected after one year of $7.4 million and $8.8 million, respectively, which were included in other assets in the consolidated balance sheets.

Table of Contents

#### 4. Inventories and Floor Plan Payables

Inventories consisted of the following at December 31, 2024 and 2023 (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Good Sam services and plans | $ 263 | $ 452 |
| New RVs | 1,241,533 | 1,378,403 |
| Used RVs | 413,546 | 464,833 |
| Products, parts, accessories and other | 166,495 | 199,261 |
| | $ 1,821,837 | $ 2,042,949 |

Substantially all of the Company's new RV inventory and certain of its used RV inventory, included in the RV and Outdoor Retail segment, is financed by a floor plan credit agreement with a syndication of banks ("Floor Plan Lenders"). The borrowings under the floor plan credit agreement are collateralized by substantially all of the assets of FreedomRoads, LLC ("FR"), a wholly-owned subsidiary of FreedomRoads, which operates the RV dealerships. The floor plan borrowings are tied to specific vehicles and principal is due upon the sale of the related vehicle or upon reaching certain aging criteria.

As of December 31, 2024 and 2023, FR maintained floor plan financing through the Eighth Amended and Restated Credit Agreement (as amended from time to time, the "Floor Plan Facility") entered into in September 2021. The Floor Plan Facility at December 31, 2024 allowed FR to borrow (a) up to $1.85 billion under a floor plan facility of which 30% may be used to finance used RV inventory, (b) up to $30.0 million under a letter of credit facility and (c) up to a maximum amount outstanding of $70.0 million under the revolving line of credit.

The Floor Plan Facility also includes an accordion feature allowing FR, at its option, to request to increase the aggregate amount of the floor plan notes payable in $50.0 million increments up to a maximum amount of $300.0 million. The Floor Plan Lenders are not under any obligation to provide commitments in respect of any future increase under the accordion feature.

As of December 31, 2024 and 2023, the applicable interest rate for the floor plan notes payable under the Floor Plan Facility was 6.72% and 7.28%, respectively. As of December 31, 2024, under the Floor Plan Facility, at the Company's option, the floor plan notes payable, and borrowings for letters of credit, in each case, bear interest at a rate per annum equal to (a) the floating Secured Overnight Financing Rate ("SOFR"), plus a SOFR adjustment of 0.11%, plus the applicable rate of 1.90% to 2.50% determined based on FR's consolidated current ratio, or, (b) the base rate (as described below) plus the applicable rate of 0.40% to 1.00% determined based on FR's consolidated current ratio.

The outstanding balance of the revolving line of credit under the Floor Plan Facility was paid off in November 2024 and there was no balance outstanding as of December 31, 2024. As of December 31, 2023, the applicable interest rate for revolving line of credit borrowings under the Floor Plan Facility was 7.63%. As of December 31, 2024, under the Floor Plan Facility, revolving line of credit borrowings bear interest at a rate per annum equal to, at the Company's option, either: (a) a floating SOFR rate, plus a SOFR adjustment of 0.11%, plus 2.25%, in the case of floating SOFR rate loans, or (b) a base rate determined by reference to the greatest of: (i) the federal funds rate plus 0.50% or (ii) the prime rate published by Bank of America, N.A., plus 0.75%, in the case of base rate loans. Additionally, under the Floor Plan Facility, the revolving line of credit borrowings are subject to a borrowing base calculation, which did not limit the borrowing capacity at December 31, 2024 and 2023.

The Floor Plan Facility includes a flooring line aggregate interest reduction ("FLAIR") offset account that allows the Company to transfer cash to the Floor Plan Lenders as an offset to the payables under the Floor

Table of Contents

Plan Facility. These transfers reduce the amount of liability outstanding under the floor plan borrowings that would otherwise accrue interest, while retaining the ability to withdraw amounts from the FLAIR offset account subject to the financial covenants under the Floor Plan Facility. As a result of using the FLAIR offset account, the Company experiences a reduction in floor plan interest expense in its consolidated statements of operations. As of December 31, 2024 and 2023, FR had $79.5 million and $145.0 million, respectively, in the FLAIR offset account. The maximum FLAIR percentage of outstanding floor plan borrowings is 35% under the Floor Plan Facility. The FLAIR offset account does not reduce the outstanding amount of loans under the Floor Plan Facility for purposes of determining the unencumbered borrowing capacity under the Floor Plan Facility.

Management has determined that the credit agreement governing the Floor Plan Facility includes subjective acceleration clauses, which could impact debt classification. Management believes that no events have occurred at December 31, 2024 that would trigger a subjective acceleration clause. Additionally, the credit agreement governing the Floor Plan Facility contains certain financial covenants. FR was in compliance with all financial debt covenants at December 31, 2024 and 2023.

In February 2025, FR entered into an amendment to the Floor Plan Facility (the “Floor Plan Amendment”), which (a) increased the commitment for floor plan borrowings by $300.0 million to $2.15 billion, (b) increased the commitment for the letter of credit facility by $15.0 million to $45.0 million, and (c) extended the maturity date from September 30, 2026 to the earlier of, if applicable, (i) February 18, 2030 or (ii) March 5, 2028, if the Company’s Term Loan Facility (as defined and discussed in Note 10 — Long-Term Debt) has not been repaid, refinanced, or defeased and the maturity has not been extended by at least 180 days after February 18, 2030.

The following table details the outstanding amounts and available borrowings under the Floor Plan Facility as of December 31, 2024 and December 31, 2023 (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Floor Plan Facility: | | |
| Notes payable — floor plan: | | |
| Total commitment | $ 1,850,000 | $ 1,850,000 |
| Less: borrowings, net of FLAIR offset account | (1,161,713) | (1,371,145) |
| Less: FLAIR offset account(1) | (79,472) | (145,047) |
| Additional borrowing capacity | 608,815 | 333,808 |
| Less: short-term payable for sold inventory(2) | (33,152) | (41,577) |
| Less: purchase commitments(3) | (9,340) | (27,420) |
| Unencumbered borrowing capacity | $ 566,323 | $ 264,811 |
| | | |
| Revolving line of credit | $ 70,000 | $ 70,000 |
| Less: borrowings | - | (20,885) |
| Additional borrowing capacity | $ 70,000 | $ 49,115 |
| | | |
| Letters of credit: | | |
| Total commitment | $ 30,000 | $ 30,000 |
| Less: outstanding letters of credit | (14,300) | (12,300) |
| Additional letters of credit capacity | $ 15,700 | $ 17,700 |

(1) Flooring line aggregate interest reduction (“FLAIR”) offset account that allows the Company to transfer cash to the Floor Plan Lenders as offset to the payables under the Floor Plan Facility. The FLAIR offset account does not reduce the outstanding amount of loans under the Floor Plan Facility for purposes of determining the unencumbered borrowing capacity under the Floor Plan Facility.

(2) The short-term payable represents the amount due for sold inventory. A payment for any floor plan units sold is due within three to ten business days of sale. Due to the short term nature of these payables, the Company reclassifies the amounts from notes payable–floor plan, net to accounts payable in the Consolidated Balance Sheets. Changes in the vehicle floor plan payable are reported as cash flows from financing activities in the Consolidated Statements of Cash Flows.

(3) Purchase commitments represent vehicles approved for floor plan financing where the inventory has not yet been received by the Company from the supplier and no floor plan borrowing is outstanding.

The following table rolls forward the Company's outstanding supplier finance program obligations confirmed as valid under its Floor Plan Facility for the year ended December 31, 2024 (in thousands):

| | Year Ended December 31, 2024 |
|---|---|
| Notes payable - floor plan, net, beginning of year | $ 1,371,145 |
| Add: FLAIR offset account, beginning of year | 145,047 |
| Add: short-term payable for sold inventory, beginning of year | 41,577 |
| Confirmed obligations outstanding, beginning of year | 1,557,769 |
| Add: new obligations confirmed during the period | 2,292,615 |
| Less: confirmed obligations paid during the period | (2,576,047) |
| Confirmed obligations outstanding, end of period | 1,274,337 |
| Less: FLAIR offset account, end of period | (79,472) |
| Less: short-term payable for sold inventory, end of period | (33,152) |
| Notes payable - floor plan, net, end of period | $ 1,161,713 |

**5. Restructuring and Long-Lived Asset Impairment**

**Restructuring – 2019 Strategic Shift**

On September 3, 2019, the Board of Directors of CWH approved a plan (the “2019 Strategic Shift”) to strategically shift its business away from locations where the Company does not have the ability or where it is not feasible to sell and/or service RVs at a sufficient capacity (the “Outdoor Lifestyle Locations”). Of the Outdoor Lifestyle Locations in the RV and Outdoor Retail segment operating at September 3, 2019, the Company has closed or divested 39 Outdoor Lifestyle Locations, two distribution centers, and 20 specialty retail locations relating to the 2019 Strategic Shift. As of December 31, 2020, the Company had completed the store closures and divestitures relating to the 2019 Strategic Shift. During the year ended December 31, 2021, the Company completed its analysis of its retail product offerings that were not RV-related.

As of December 31, 2021, the activities under the 2019 Strategic Shift were completed with the exception of certain lease termination costs and other associated costs relating to the leases of previously closed locations under the 2019 Strategic Shift. The process of identifying subtenants and negotiating lease terminations has been delayed, which initially was in part due to the COVID-19 pandemic. The timing of these negotiations will vary as both subleases and terminations are contingent on landlord approvals. The Company expects that the ongoing lease-related costs relating to the 2019 Strategic Shift, net of associated sublease income, will be less than $3.5 million per year.

As of December 31, 2024, the Company had incurred total restructuring costs associated with the 2019 Strategic Shift of $128.0 million. The breakdown of these costs is as follows:

- one-time employee termination benefits relating to retail store or distribution center closures/divestitures of $1.2 million;
- lease termination costs of $23.1 million;
- incremental inventory reserve charges of $57.4 million; and
- other associated costs of $46.3 million.

Table of Contents

The following table details the costs incurred associated with the 2019 Strategic Shift for the periods presented (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| 2019 Strategic Shift restructuring costs: | | | |
| Lease termination costs[1] | (1,575) | — | 1,316 |
| Other associated costs[2] | 3,368 | 3,965 | 7,026 |
| Total 2019 Strategic Shift restructuring costs | $ 1,793 | $ 3,965 | $ 8,342 |

(1) These costs were included in lease termination charges in the consolidated statements of operations. This reflects termination fees paid, net of any gain from derecognition of the related operating lease assets and liabilities.

(2) Other associated costs primarily represent lease and other operating expenses incurred during the post-close wind-down period for the locations related to the 2019 Strategic Shift. For the years ended December 31, 2024, 2023 and 2022, these costs were included in selling, general, and administrative expenses in the consolidated statements of operations.

The following table details changes in the restructuring accrual associated with the 2019 Strategic Shift (in thousands):

| | Lease Termination Costs [1] | Other Associated Costs [2] | Total |
|---|---|---|---|
| Balance at December 31, 2021 | $ — | $ 926 | $ 926 |
| Charged to expense | 6,097 | 7,026 | 13,123 |
| Paid or otherwise settled | (6,097) | (7,083) | (13,180) |
| Balance at December 31, 2022 | — | 869 | 869 |
| Charged to expense | — | 3,965 | 3,965 |
| Paid or otherwise settled | — | (3,676) | (3,676) |
| Balance at December 31, 2023 | — | 1,158 | 1,158 |
| Charged to expense | 1,860 | 3,368 | 5,228 |
| Paid or otherwise settled | (1,860) | (4,526) | (6,386) |
| Balance at December 31, 2024 | $ — | $ — | $ — |

(1) Lease termination costs exclude the $7.6 million and $4.8 million of gains from the derecognition of the operating lease assets and liabilities relating to the terminated leases as part of the 2019 Strategic Shift for the thirty months ended December 31, 2021 and for the year ended December 31, 2022, respectively.

(2) Other associated costs primarily represent labor, lease and other operating expenses incurred during the post-close wind-down period for the locations related to the 2019 Strategic Shift.

The Company evaluated the requirements of ASC No. 205-20, Presentation of Financial Statements – Discontinued Operations relative to the 2019 Strategic Shift and determined that discontinued operations treatment is not applicable. Accordingly, the results of operations of the locations impacted by the 2019 Strategic Shift are reported as part of continuing operations in the accompanying consolidated financial statements.

Table of Contents

**Restructuring – Active Sports**

On March 1, 2023, management of the Company determined to implement plans (the “Active Sports Restructuring”) to exit and restructure operations of its indirect subsidiary, Active Sports, LLC, a specialty products retail business (“Active Sports”) as part of its review of underperforming assets and business lines. Upon liquidating a significant amount of inventory and exiting the related distribution centers, the Company reevaluated its exit plan and concluded instead that it would integrate the remaining operations into its existing distribution and fulfillment infrastructure while maintaining lower inventory levels and a smaller fixed cost structure. These plans have resulted in a much smaller operation and included the closure of the specialty retail location. The incremental inventory reserve charges were based, in part, on the Company’s estimates of the discounting necessary to liquidate the Active Sports inventory.

The activities under the Active Sports Restructuring were substantially completed by December 31, 2023. Certain lease costs continued to be incurred until the termination of the last remaining significant lease during the year ended December 31, 2024.

As of December 31, 2024, the total restructuring costs associated with the Active Sports Restructuring were $8.1 million. The breakdown of these restructuring costs is as follows:

- one-time employee termination benefits relating to the specialty retail store and distribution center closures of $0.2 million;
- incremental inventory reserve charges of $4.3 million;
- lease termination charges of $1.7 million; and
- other associated costs of $1.9 million.

The following table details the costs incurred associated with the Active Sports Restructuring (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Active Sports Restructuring costs: | | | |
| One-time termination benefits[1] | $ — | $ 193 | $ — |
| Incremental inventory reserve charges[1] | — | 4,344 | — |
| Lease termination costs [2] | 1,343 | 375 | — |
| Other associated costs[3] | 868 | 1,003 | — |
| Total Active Sports Restructuring costs | $ 2,211 | $ 5,915 | $ — |

(1) These costs were included in costs applicable to revenues – products, service and other in the consolidated statements of operations.

(2) These costs were included in lease termination charges in the consolidated statements of operations. This reflects termination fees paid or to be paid, net of any gain from derecognition of the related operating lease assets and liabilities. The Company paid $1.5 million lease termination fee for a lease terminated during the year ended December 31, 2024.

(3) Other associated costs primarily represent labor, lease and other operating expenses incurred during the post-close wind-down period for the Active Sports Restructuring for the periods presented and were included primarily in selling, general, and administrative expenses in the consolidated statements of operations.

Table of Contents

The following table details changes in the restructuring accrual associated with the Active Sports Restructuring (in thousands):

| | One-time Termination Benefits | Lease Termination Costs [(1)] | Other Associated Costs [(2)] | Total |
|---|---|---|---|---|
| Balance at March 31, 2023 | $ — | $ — | $ — | $ — |
| Charged to expense | 193 | — | 1,003 | 1,196 |
| Paid or otherwise settled | (193) | — | (1,003) | (1,196) |
| Balance at December 31, 2023 | — | — | — | — |
| Charged to expense | — | 1,492 | 868 | 2,360 |
| Paid or otherwise settled | — | (1,492) | (868) | (2,360) |
| Balance at December 31, 2024 | $ — | $ — | $ — | $ — |

(1) Lease termination costs exclude the $0.1 million of gain from the derecognition of the operating lease assets and liabilities relating to the terminated leases as part of the Active Sports Restructuring for the year ended December 31, 2024.

(2) Other associated costs primarily represent labor, lease and other operating expenses incurred during the post-close wind-down period for the specialty retail location and distribution centers related to the Active Sports Restructuring.

**Long-Lived Asset Impairment**

During the three months ended March 31, 2023, the Company recorded an impairment charge totaling $6.6 million related to the Active Sports Restructuring, of which $4.5 million related to intangible assets, and $2.1 million related to other long-lived asset categories.

During the years ended December 31, 2024, 2023 and 2022, the Company had indicators of impairment of the long-lived assets for certain locations, which were unrelated to the Active Sports Restructuring. Such indicators primarily included decreases in market rental rates or market value of real property for closed locations, or based on the Company's review of location performance in the normal course of business. As a result of updating certain assumptions in the long-lived asset impairment analysis for these locations, the Company determined that the fair value of certain long-lived assets were below their carrying value and were impaired.

The long-lived asset impairment charges were calculated as the amount that the carrying value of these locations exceeded the estimated fair value, except that individual assets cannot be impaired below their individual fair values when that fair value can be determined without undue cost and effort. Estimated fair value is typically based on estimated discounted future cash flows, while property appraisals or market rent analyses are utilized for determining the fair value of certain assets related to properties and leases.

Table of Contents

The following table details long-lived asset impairment charges by type of long-lived asset and by restructuring activity, all of which relate to the RV and Outdoor Retail segment (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Long-lived asset impairment charges by type of long-lived asset: | | | |
| Leasehold improvements | $ 4,032 | $ 1,857 | $ 2,557 |
| Operating lease right of use assets | 7,242 | 1,107 | 1,613 |
| Building and improvements | 3,787 | — | — |
| Furniture and equipment | — | 329 | 61 |
| Software | — | 1,362 | — |
| Construction in progress and software in development | — | 113 | — |
| Intangible assets | — | 4,501 | — |
| Total long-lived asset impairment charges | $ 15,061 | $ 9,269 | $ 4,231 |
| Long-lived asset impairment charges by restructuring activity: | | | |
| 2019 Strategic Shift | — | — | 1,614 |
| Active Sports Restructuring | — | 6,648 | — |
| Unrelated to restructuring activities | 15,061 | 2,621 | 2,617 |
| Total long-lived asset impairment charges | $ 15,061 | $ 9,269 | $ 4,231 |

**6. Assets Held for Sale and Business Divestiture**

As of December 31, 2024, two properties from the RV and Outdoor Retail segment relating to real estate met the criteria to be classified as held for sale.

The following table presents the components of assets held for sale and liabilities related to assets held for sale at December 31, 2024 and 2023 (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Assets held for sale: | | |
| Property and equipment, net | $ 1,350 | $ 29,864 |
| | $ 1,350 | $ 29,864 |
| Liabilities related to assets held for sale: | | |
| Current portion of long-term debt | $ — | $ 864 |
| Long-term debt, net of current portion | — | 16,424 |
| | $ — | $ 17,288 |

Additionally, on May 3, 2024, the Company closed on the sale of certain assets of the RV and Outdoor Retail segment's RV furniture business ("CWDS") and, in connection with the sale, entered into a supply agreement ("Supplier Agreement") with the buyer and the sublease of certain properties and equipment to the buyer. The approximately $30.4 million fair value of consideration received from the divestiture were comprised of approximately $20.0 million of cash consideration, $9.5 million of an intangible asset for the Supplier Agreement, and $0.9 million of cash consideration as a holdback to be released by the buyer after one year less any offset for expenditures that were indemnified by the Company. The divested net assets of CWDS were comprised primarily of approximately $28.8 million of products, parts, accessories and other inventories, $0.9 million of net intangible assets, $1.2 million of accounts payable assumed and $8.9 million of goodwill allocated from the RV and Outdoor Retail segment based on the relative fair value of CWDS. This divestiture transaction resulted in a loss of $7.1 million and is included in loss (gain) on sale or disposal of assets in the consolidated statements of operations for the year ended December 31, 2024. The Company believes that it has gained operational efficiencies by exiting the manufacture of RV furniture and focusing its resources on the sourcing and sale of its RV and aftermarket accessory products. The fair value of the Supplier Agreement intangible asset was estimated as the present value of the estimated benefits that a market participant would receive

Table of Contents

under the Supplier Agreement, such as favorable pricing and rebates, over the term of the agreement, which is categorized as a Level 3 measurement. This Supplier Agreement intangible asset is expected to be amortized over the term of the agreement of approximately 10 years.

**7. Property and Equipment, net**

Property and equipment consisted of the following at December 31, 2024 and 2023 (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Land | $ 133,984 | $ 142,020 |
| Buildings and improvements | 348,315 | 321,054 |
| Leasehold improvements | 369,791 | 339,439 |
| Furniture and equipment | 277,801 | 261,114 |
| Software | 93,769 | 90,835 |
| Construction in progress and software in development | 45,682 | 59,954 |
| | 1,269,342 | 1,214,416 |
| Less: accumulated depreciation | (422,582) | (379,990) |
| Property and equipment, net | $ 846,760 | $ 834,426 |

**8. Goodwill and Intangible Assets**

**Goodwill**

The following is a summary of changes in the Company's goodwill by business line for the years ended December 31, 2024 and 2023 (in thousands):

| | Good Sam Services and Plans | RV and Outdoor Retail | Consolidated |
|---|---|---|---|
| Balance at December 31, 2022 (excluding impairment charges) | $ 71,118 | $ 793,142 | $ 864,260 |
| Accumulated impairment charges | (46,884) | (194,953) | (241,837) |
| Balance at December 31, 2022 | 24,234 | 598,189 | 622,423 |
| Acquisitions | — | 88,799 | 88,799 |
| Balance at December 31, 2023 | 24,234 | 686,988 | 711,222 |
| Acquisitions | 1,561 | 30,140 | 31,701 |
| Divestiture (1) | — | (8,900) | (8,900) |
| Balance at December 31, 2024 | $ 25,795 | $ 708,228 | $ 734,023 |

(1) See Note 6 — Assets Held for Sale and Business Divestiture.

In the fourth quarter of 2024 and 2023, the Company performed its annual goodwill impairment test of the RV and Outdoor Retail, the Good Sam Show, Good Sam Media, and GSS Enterprise reporting units by performing a quantitative analysis. The RV and Outdoor Retail reporting unit is comprised of the entire RV and Outdoor Retail segment. The Good Sam Show, GSS Enterprise, Good Sam Media, and Good Sam RA and Tire Rescue reporting units are comprised of a portion of the Good Sam Services and Plans segment. These annual goodwill impairment tests resulted in the determination that the estimated fair value of these reporting units exceeded their carrying value. Therefore, no impairment charge was recorded during the years ended December 31, 2024 and 2023. The Company estimated the fair value of these reporting units using a combination of the guideline public company method under the market approach and the discounted cash flow analysis method under the income approach.

Table of Contents

**Intangible Assets**

Finite-lived intangible assets and related accumulated amortization consisted of the following at December 31, 2024 and 2023 (in thousands):

| | December 31, 2024 | | | |
|---|---|---|---|---|
| | Carrying Value | Accumulated Amortization | Net | Wtd. Average Useful Life (in years) |
| Good Sam Services and Plans: | | | | |
| Membership, customer lists and other | $ 9,740 | $ (9,537) | $ 203 | 5.3 |
| Trademarks and trade names | 2,132 | (379) | 1,753 | 15.0 |
| Websites and developed technology | 3,650 | (1,614) | 2,036 | 6.7 |
| RV and Outdoor Retail: | | | | |
| Customer lists, domain names and other | 4,154 | (2,752) | 1,402 | 5.5 |
| Supplier lists and agreements | 9,500 | (594) | 8,906 | 11.0 |
| Trademarks and trade names | 26,526 | (22,005) | 4,521 | 15.0 |
| Websites and developed technology | 6,348 | (5,700) | 648 | 10.1 |
| | $ 62,050 | $ (42,581) | $ 19,469 | 11.6 |

| | December 31, 2023 | | | |
|---|---|---|---|---|
| | Carrying Value | Accumulated Amortization | Net | Wtd. Average Useful Life (in years) |
| Good Sam Services and Plans: | | | | |
| Membership, customer lists and other | $ 9,640 | $ (9,246) | $ 394 | 5.4 |
| Trademarks and trade names | 2,132 | (238) | 1,894 | 15.0 |
| Websites and developed technology | 3,050 | (1,118) | 1,932 | 7.0 |
| RV and Outdoor Retail: | | | | |
| Customer lists and domain names | 5,543 | (3,269) | 2,274 | 5.3 |
| Supplier lists and agreements | 1,696 | (1,102) | 594 | 5.0 |
| Trademarks and trade names | 27,251 | (21,390) | 5,861 | 15.0 |
| Websites and developed technology | 6,325 | (5,557) | 768 | 10.0 |
| | $ 55,637 | $ (41,920) | $ 13,717 | 11.2 |

Amortization expense related to finite-lived intangibles for the years ended December 31, 2024, 2023, and 2022 was $3.6 million, $3.8 million and $13.5 million, respectively. The aggregate future five-year amortization of finite-lived intangibles at December 31, 2024, was as follows (in thousands):

| | |
|---|---|
| 2025 | $ 3,643 |
| 2026 | 3,519 |
| 2027 | 3,479 |
| 2028 | 1,950 |
| 2029 | 1,173 |
| Thereafter | 5,705 |
| | $ 19,469 |

Table of Contents

**9. Accrued Liabilities**

Accrued liabilities consisted of the following at December 31, 2024 and 2023 (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Compensation and benefits | $ 42,652 | $ 51,999 |
| Other accruals | 75,905 | 97,097 |
| | $ 118,557 | $ 149,096 |

**10. Long-Term Debt**

The following reflects outstanding long-term debt as of December 31, 2024 and 2023, (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Term Loan Facility [(1)] | $ 1,335,535 | $ 1,346,229 |
| Real Estate Facilities [(2)] | 173,132 | 166,604 |
| Other Long-Term Debt | 7,926 | 8,246 |
| Subtotal | 1,516,593 | 1,521,079 |
| Less: current portion | (23,275) | (22,121) |
| Total | $ 1,493,318 | $ 1,498,958 |

(1) Net of $9.6 million and $12.0 million of original issue discount at December 31, 2024 and 2023, respectively, and $3.8 million and $4.7 million of finance costs at December 31, 2024 and 2023, respectively.

(2) Net of $3.1 million and $3.3 million of finance costs at December 31, 2024 and 2023, respectively.

The aggregate future maturities of long-term debt at December 31, 2024, excluding original issue discount of $9.6 million and finance costs of $6.9 million, were as follows (in thousands):

| | |
|---|---|
| Long-term debt instruments | |
| 2025 | $ 25,083 |
| 2026 | 27,856 |
| 2027 | 166,450 |
| 2028 | 1,309,686 |
| 2029 | 248 |
| Thereafter | 3,776 |
| Total | $ 1,533,099 |

*Senior Secured Credit Facilities*

As of December 31, 2024 and 2023, CWGS Group, LLC (the "Borrower"), a wholly-owned subsidiary of CWGS, LLC, was party to a credit agreement (the "Credit Agreement") for senior secured credit facilities (as amended from time to time, the "Senior Secured Credit Facilities"). The Senior Secured Credit Facilities consist of a $1.4 billion term loan facility (the "Term Loan Facility") and a $65.0 million revolving credit facility (the "Revolving Credit Facility"). Under the Senior Secured Credit Facilities, the Company has the ability to request to increase the amount of term loans or revolving loans in an aggregate amount not to exceed the greater of (a) a "fixed" amount set at $725.0 million and (b) 100% of consolidated EBITDA for the most recent four consecutive fiscal quarters on a pro forma basis (as defined in the Credit Agreement). The lenders under the Senior Secured Credit Facilities are not under any obligation to provide commitments in respect of any such increase.

Table of Contents

The Term Loan Facility requires mandatory principal payments in equal quarterly installments of $3.5 million. Additionally, the Company is required to prepay the borrowings under the Term Loan Facility in an aggregate amount up to 50% of excess cash flow, as defined in the Credit Agreement, for such fiscal year depending on the Total Leverage Ratio (as defined by the Credit Agreement) beginning with the year ended December 31, 2022. No additional excess cash flow payment was required relating to 2024 or 2023. The Term Loan Facility matures in June 2028.

The funds available under the Revolving Credit Facility may be utilized for borrowings or letters of credit; however, a maximum of $25.0 million may be allocated to such letters of credit. The Revolving Credit Facility matures at the earlier of (i) ninety-one days prior to the maturity date of the Floor Plan Facility (September 30, 2026 as of December 31, 2024 and amended in February 2025 to a maturity date of at least March 5, 2028 as detailed in Note 4 — Inventories and Floor Plan Payables) or (ii) March 3, 2028.

The following table details the outstanding amounts and available borrowings under the Senior Secured Credit Facilities as of (in thousands):

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Senior Secured Credit Facilities: | | |
| Term Loan Facility: | | |
| Principal amount of borrowings | $ 1,400,000 | $ 1,400,000 |
| Less: cumulative principal payments | (51,049) | (37,034) |
| Less: unamortized original issue discount | (9,600) | (12,016) |
| Less: unamortized finance costs | (3,816) | (4,721) |
| | 1,335,535 | 1,346,229 |
| Less: current portion | (14,015) | (14,015) |
| Long-term debt, net of current portion | $ 1,321,520 | $ 1,332,214 |
| Revolving Credit Facility: | | |
| Total commitment | $ 65,000 | $ 65,000 |
| Less: outstanding letters of credit | (4,902) | (4,930) |
| Less: total net leverage ratio borrowing limitation | (37,348) | (37,320) |
| Additional borrowing capacity | $ 22,750 | $ 22,750 |

As of December 31, 2024 and 2023, the average interest rate on the Term Loan Facility was 6.97% and 7.97%, respectively, and the effective interest rate on the Term Loan Facility was 7.43% and 8.21%, respectively.

The Senior Secured Credit Facilities are fully and unconditionally guaranteed, jointly and severally, on a senior secured basis by each of the Company's existing and future domestic restricted subsidiaries with the exception of FreedomRoads Intermediate Holdco, LLC, the direct parent of FR, and FR, and its subsidiaries. The Credit Agreement contains certain restrictive covenants pertaining to, but not limited to, mergers, changes in the nature of the business, acquisitions, additional indebtedness, sales of assets, investments, and the payment of dividends subject to certain limitations and minimum operating covenants. Additionally, management has determined that the Senior Secured Credit Facilities include subjective acceleration clauses, which could impact debt classification. Management believes that no events have occurred at December 31, 2024 that would trigger a subjective acceleration clause.

Table of Contents

The Credit Agreement requires the Borrower and its subsidiaries to comply on a quarterly basis with a maximum Total Net Leverage Ratio (as defined in the Credit Agreement), which covenant is in effect only if, as of the end of each calendar quarter, the aggregate amount of borrowings under the revolving credit facility, letters of credit and unreimbursed letter of credit disbursements outstanding at such time is greater than 35% of the total commitment on the Revolving Credit Facility (excluding (i) up to $15.0 million attributable to any outstanding undrawn letters of credit and (ii) any cash collateralized or backstopped letters of credit), as defined in the Credit Agreement. As of December 31, 2024, the Company was not subject to this covenant as borrowings under the Revolving Credit Facility did not exceed the 35% threshold, however the Company's borrowing capacity was reduced by $37.3 million in light of this covenant. The Company was in compliance with all applicable financial debt covenants at December 31, 2024 and 2023.

*Real Estate Facilities*

As of December 31, 2024 and 2023, subsidiaries of FRHP Lincolnshire, LLC ("FRHP"), an indirect wholly-owned subsidiary of CWGS, LLC, were party to a credit agreement with a syndication of banks for a real estate credit facility (as amended from time to time, the "M&T Real Estate Facility") with aggregate maximum principal capacity of $300.0 million (an increase from $250.0 million through an amendment entered into in August 2024) with an option that allows FRHP to request an additional $100.0 million of principal capacity. The lenders under the M&T Real Estate Facility are not under any obligation to provide commitments in respect of any such increase. The M&T Real Estate Facility bears interest at FRHP's option of either (as defined in the credit agreement for the M&T Real Estate Facility): (a) the Secured Overnight Financing Rate ("SOFR") plus the applicable rate of 2.30% or (b) the highest of (i) the Federal Funds Rate plus 1.80%, (ii) the Prime Rate plus 1.30%, or (iii) SOFR plus 2.30%. The M&T Real Estate Facility has an unused commitment fee of 0.20% of the aggregate unused principal amount and it matures in October 2027. Additionally, the M&T Real Estate Facility is subject to a debt service coverage ratio covenant (as defined in the credit agreement for the M&T Real Estate Facility). All obligations under the M&T Real Estate Facility and the guarantees of those obligations, are secured, subject to certain exceptions, by the mortgaged real property assets. During the years ended December 31, 2024 and 2023, FRHP borrowed an additional $55.6 million and $59.2 million under the M&T Real Estate Facility, respectively. During the year ended December 31, 2024, FRHP repaid $46.5 million of the M&T Real Estate Facility to pay off the remaining principal balances relating to eight properties.

In November 2018, September 2021, and December 2021, Camping World Property, Inc. (the ''Real Estate Borrower''), an indirect wholly-owned subsidiary of CWGS, LLC, and CIBC Bank USA ("Lender"), entered into loan and security agreements for real estate credit facilities (as amended from time to time, the "First CIBC Real Estate Facility", the "Second CIBC Real Estate Facility", and the "Third CIBC Real Estate Facility", respectively, and collectively the "CIBC Real Estate Facilities" and together with the M&T Real Estate Facility, the "Real Estate Facilities") with aggregate maximum principal capacities of $21.5 million, $9.0 million, and $10.1 million for the First CIBC Real Estate Facility, Second CIBC Real Estate Facility, and Third CIBC Real Estate Facility, respectively. Borrowings under the CIBC Real Estate Facilities are guaranteed by CWGS Group, LLC, a wholly-owned subsidiary of CWGS, LLC. The CIBC Real Estate Facilities may be used to finance the acquisition of real estate assets. The CIBC Real Estate Facilities are secured by a first priority security interest on the real estate assets acquired with the proceeds of the CIBC Real Estate Facilities ("CIBC Real Estate Facility Properties").

In June 2023, the Real Estate Borrower sold one of the CIBC Real Estate Facility Properties located in Franklin, Kentucky, which was secured by the Second CIBC Real Estate Facility. As part of the settlement of the property sale, the outstanding balance of the Second CIBC Real Estate Facility of $7.4 million was repaid and terminated by the Real Estate Borrower. In May 2024, the Real Estate Borrower repaid the outstanding balance of the Third Real Estate Facility of $8.9 million, which related to the facility for the operations of CWDS in Elkhart, Indiana (see Note 6 — Assets Held for Sale and Business Divestiture), and the Third Real Estate Facility was terminated. The First CIBC Real Estate Facility matures in October 2028.

Table of Contents

The following table shows a summary of the outstanding balances, remaining available borrowings, and weighted average interest rate under the Real Estate Facilities at December 31, 2024:

| (In thousands) | As of December 31, 2024 Outstanding[(1)] | Remaining Available[(2)] | Wtd. Average Interest Rate |
|---|---|---|---|
| Real Estate Facilities | | | |
| M&T Real Estate Facility | $ 169,756 | $ 57,390 (3) | 6.55% |
| First CIBC Real Estate Facility | 3,376 | — | 7.89% |
| | $ 173,132 | $ 57,390 | |

(1) Outstanding principal amounts are net of unamortized finance costs.
(2) Amounts cannot be reborrowed.
(3) Additional borrowings on the M&T Real Estate Facility are subject to a debt service coverage ratio covenant and to the property collateral requirements under the M&T Real Estate Facility.

Management has determined that the credit agreements governing the Real Estate Facilities include subjective acceleration clauses, which could impact debt classification. Management believes that no events have occurred at December 31, 2024 that would trigger a subjective acceleration clause. Additionally, the Real Estate Facilities are subject to certain cross default provisions, a debt service coverage ratio, and other customary covenants. The Company was in compliance with all financial debt covenants at December 31, 2024 and 2023.

*Other Long-Term Debt*

In December 2021, FRHP assumed a mortgage as part of a real estate purchase. This mortgage is secured by the acquired property and is guaranteed by CWGS Group, LLC, a wholly-owned subsidiary of CWGS, LLC and matures in December 2026. In June 2023, FRHP assumed a promissory note as part of a real estate purchase. This note is secured by the acquired property and matures in April 2041. As of December 31, 2024, the outstanding principal balance of these debt instruments was $7.9 million with a weighted average interest rate of 4.27%.

**11. Lease Obligations**

The Company leases most of the properties for its store locations through 236 operating leases and 18 finance leases. The Company also leases billboards and certain of its equipment. The related operating lease assets and finance lease assets are included in the operating lease assets and property and equipment, respectively, in the accompanying consolidated balance sheets.

As of December 31, 2024 and 2023, finance lease assets of $120.0 million and $100.4 million, respectively, were included in property and equipment, net in the accompanying consolidated balance sheets.

The following table presents certain information related to the costs for leases where the Company is the lessee (in thousands):

| | Year Ended December 31, 2024 | 2023 |
|---|---|---|
| Operating lease cost | $ 116,370 | $ 118,082 |
| Finance lease cost: | | |
| Amortization of finance lease assets | 11,160 | 3,253 |
| Interest on finance lease liabilities | 9,285 | 6,069 |
| Short-term lease cost | 1,839 | 1,940 |
| Variable lease cost | 23,874 | 22,913 |
| Sublease income | (3,355) | (2,726) |
| Net lease costs | $ 159,173 | $ 149,531 |

Table of Contents

The following table presents supplemental cash flow information related to leases (in thousands):

| | Year Ended December 31, 2024 | Year Ended December 31, 2023 |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows for operating leases | $ 118,848 | $ 117,160 |
| Operating cash flows for finance leases | 9,285 | 6,064 |
| Financing cash flows for finance leases | 7,520 | 5,496 |
| Lease assets obtained in exchange for lease liabilities: | | |
| New, remeasured and terminated operating leases | $ 63,228 | $ 59,858 |
| New, remeasured and terminated finance leases | 30,771 | 20,557 |

The following table presents other information related to leases:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| Weighted average remaining lease term: | | |
| Operating leases | 11.2 years | 11.3 years |
| Financing leases | 13.7 years | 17.4 years |
| Weighted average discount rate: | | |
| Operating leases | 7.1 % | 7.1 % |
| Financing leases | 6.4 % | 6.0 % |

The following reconciles the undiscounted cash flows for each of the first five years and total of the remaining years to the lease liabilities in the accompanying consolidated balance sheet as of December 31, 2024 (in thousands):

| | Operating Leases | Finance Leases |
|---|---|---|
| 2025 | $ 118,276 | $ 15,612 |
| 2026 | 117,606 | 15,531 |
| 2027 | 110,931 | 14,978 |
| 2028 | 107,374 | 14,598 |
| 2029 | 103,684 | 14,644 |
| Thereafter | 656,331 | 135,821 |
| Total lease payments | 1,214,202 | 211,184 |
| Less: Imputed interest | (388,096) | (73,136) |
| Total lease obligations | 826,106 | 138,048 |
| Less: current portion | (61,993) | (7,044) |
| Noncurrent lease obligations | $ 764,113 | $ 131,004 |

*Sale-Leaseback Arrangement Recorded as Financing Transaction*

On February 8, 2022, FRHP sold three properties for a total sale price of $28.0 million. Concurrent with the sale of these properties, the Company entered into three separate twenty-year lease agreements, whereby the Company agreed to lease back the properties from the acquiring company. Under each lease agreement, FR has four consecutive options to extend the lease term for additional periods of five years for each option. This transaction is accounted for as a financing transaction. The Company recorded a liability for the amount received, will continue to depreciate the non-land portion of the assets, and has imputed an interest rate so that the net carrying amount of the financial liability and remaining non-land assets will be zero at the end of the initial lease terms. The financial liability is included in other long-term liabilities in the consolidated balance sheets as of December 31, 2024 and 2023.

Table of Contents

**12. Income Taxes**

CWH is organized as a Subchapter C corporation ("C-Corp") and, as of December 31, 2024, is a 61.0% owner of CWGS, LLC (see Note 19 — Stockholders' Equity and Note 20 — Non-Controlling Interests). CWGS, LLC is organized as a limited liability company ("LLC") and treated as a partnership for U.S. federal and most applicable state and local income tax purposes and as such, is generally not subject to any U.S. federal entity-level income taxes. However, certain active CWGS, LLC subsidiaries, including Americas Road and Travel Club, Inc., Camping World, Inc. ("CW") prior to the LLC Conversion (defined below), and FreedomRoads RV, Inc. and their wholly-owned subsidiaries, are subject to entity-level taxes as they are C-Corps.

*Income Tax Expense*

The components of the Company's income tax (benefit) expense from operations for the years ended December 31, 2024, 2023 and 2022 consisted of (in thousands):

| | 2024 | 2023 | 2022 |
|---|---|---|---|
| Current: | | | |
| Federal | $ 880 | $ 9,123 | $ 44,613 |
| State | 689 | 1,558 | 11,170 |
| Deferred: | | | |
| Federal | (10,377) | (11,173) | 28,543 |
| State | (2,569) | (3,035) | 27,957 |
| Income tax (benefit) expense | $ (11,377) | $ (3,527) | $ 112,283 |

A reconciliation of income tax (benefit) expense from operations to the federal statutory rate for the years ended December 31, 2024, 2023 and 2022 were as follows (in thousands):

| | 2024 | 2023 | 2022 |
|---|---|---|---|
| Income taxes computed at federal statutory rate(1) | $ (18,955) | $ 10,374 | $ 94,524 |
| State income taxes – net of federal benefit(1) | (1,774) | (2,645) | 8,362 |
| Other differences: | | | |
| State and local taxes on pass-through entities | 674 | 1,948 | 3,736 |
| Income taxes computed at the effective federal and state statutory rate for pass-through entities not subject to tax for the Company(2) | 9,411 | (3,927) | (53,461) |
| Effect of LLC Conversion(3) | — | (85,790) | 208,833 |
| (Decrease) increase in valuation allowance(4) | (1,568) | 64,351 | (151,058) |
| Impact of other state tax rate changes | (241) | 4,900 | 967 |
| Accrual to return | 420 | 8,314 | (1,135) |
| Tax credits | (501) | (582) | (743) |
| Uncertain Tax Positions | (128) | (547) | 1,519 |
| Other | 1,285 | 77 | 739 |
| Income tax (benefit) expense | $ (11,377) | $ (3,527) | $ 112,283 |

(1) Federal and state income tax includes $0.6 million and $0.1 million of income tax expense relating to the revaluation in the Tax Receivable Agreement liability due to fluctuations in state income tax rates for 2023, and 2022, respectively. There were no changes to the Tax Receivable Agreement liability due to fluctuations in state tax rate for the year ended December 31, 2024.

(2) The related income is taxable to the non-controlling interest.

(3) For 2023, these amounts represent a reduction of $81.7 million to CWH's outside basis deferred tax assets as a result of the LLC Conversion and $4.1 million related to the entity classification election, which was filed in the third quarter of 2023 with an effective date of January 2, 2023 (defined and discussed below). For 2022, these amounts represent the tax impact of the LLC Conversion, which is comprised of a $209.4 million adjustment to CW's deferred tax assets inclusive of tax operating losses, net of a $0.6 million reduction to CWH's outside basis deferred tax asset.

(4) For 2024, the decrease in valuation allowance was primarily related to utilization of a portion of the capital loss carryforward. For 2023, the valuation allowance increased by $64.4 million. The valuation allowance increased by $132.2 million related to capital loss carryforward. Additionally, valuation allowance decreased by $52.5 million as a result of the LLC Conversion and its impact on realization of the CWH's outside basis deferred tax asset and decreased by $15.3 million for activities not related to the LLC Conversion. For 2022, these amounts include a $180.4 million decrease in valuation allowance associated with the LLC Conversion, partially offset by $16.8 million of increases to the valuation allowance for activity not related to the LLC conversion, which is primarily

Table of Contents

resulting from losses of CW for which no benefit is recognized for the U.S. federal and non-unitary states. Additionally, the valuation allowance increased by $12.5 million associated with CWH's outside basis deferred tax asset in CWGS, LLC.

*LLC Conversion*

Prior to 2023, CW, including certain of its subsidiaries, were taxable as C-Corps and subject to entity-level taxes. CW had historically generated operating losses for tax purposes. Only losses subject to taxes in certain state jurisdictions were available to offset taxable income generated by the Company's other businesses. The Company completed the steps necessary to convert CW and certain of its subsidiaries from C-Corps to LLCs with an effective date of January 2, 2023 (the "LLC Conversion"). All required filings for conversion to LLC were made by December 31, 2022. Accordingly, certain effects of the LLC Conversion were recorded during the year ended December 31, 2022, as the filings were perfunctory pursuant to the rules prescribed under ASC 740, Income Taxes. Beginning with the year ending December 31, 2023, the operating losses of CW and its subsidiaries have and will offset taxable income generated by the Company's other LLC businesses. As a result, both income tax expense recognized by CWH and the amount of required tax distributions paid to holders of common units in CWGS, LLC, under the CWGS LLC Agreement, have and will decrease. The LLC Conversion has allowed the Company to more easily integrate its retail and dealership operations and more seamlessly share resources within the RV and Outdoor Retail segment, while providing an expected future cash flow benefit for the operating companies.

For the year ended December 31, 2023, the Company recorded an additional tax benefit of $2.0 million related to the LLC Conversion. Additionally, the Company recorded an income tax benefit of $4.1 million related to an entity classification election that was filed in the third quarter of 2023 with a January 2, 2023 effective date. The LLC Conversion resulted in additional income tax expense in the year ended December 31, 2022 of $28.4 million, which was comprised of $208.8 million of gross deferred tax assets written off, partially offset by the release of $180.4 million of valuation allowance (see table above for reconciliation of income tax expense from operations to the federal statutory rate).

*Deferred Income Taxes*

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes and operating loss and tax credit carryforwards. Significant items comprising the net deferred tax assets at December 31, 2024 and 2023 were (in thousands):

| | 2024 | 2023 |
|---|---|---|
| **Deferred tax liabilities** | | |
| Operating lease assets | $ (6,068) | $ (5,375) |
| Other | (105) | (101) |
| | (6,173) | (5,476) |
| **Deferred tax assets** | | |
| Investment in partnership ("Outside Basis Deferred Tax Asset")[1] | 216,572 | 194,764 |
| Capital loss carryforward | 131,371 | 132,248 |
| Tax Receivable Agreement liability | 37,639 | 40,702 |
| Operating lease liabilities | 6,482 | 5,678 |
| Business interest expense carryforward | 21,164 | 5,597 |
| Net operating loss and tax credit carryforward | 17,472 | 2,061 |
| Other investments | 17,011 | 17,011 |
| Other reserves | 1,207 | 1,195 |
| | 448,918 | 399,256 |
| Valuation allowance | (227,605) | (192,686) |
| Net deferred tax assets | $ 215,140 | $ 201,094 |

(1) This amount is the deferred tax asset the Company recognizes for its book to tax basis difference in its investment in CWGS, LLC.

The Company evaluates its deferred tax assets on a quarterly basis to determine if they can be realized and establishes valuation allowances when it is not more likely than not that all or a portion of the deferred tax

assets can be realized. At December 31, 2024 and 2023, the Company recorded a valuation allowance on the Outside Basis Deferred Tax Asset and the capital loss carryforward that are not more likely than not to be realized. The capital loss has a five-year carryforward period. The Company maintains a valuation allowance against the Outside Basis Deferred Tax Asset pertaining to the portion that is not amortizable for tax purposes, since the Company would likely only realize the non-amortizable portion of the Outside Basis Deferred Tax Asset if the investment in CWGS, LLC was divested.

*Net Operating Loss and Tax Carryforwards*

As of January 2, 2023, certain subsidiaries of CWH had federal and state net operating loss carryforwards of approximately $151.7 million and $3.9 million, respectively, which are no longer available after the LLC Conversion. The conversion loss generated a net operating loss that was immediately written off as CW's net operating losses are lost as a result of the conversion. Accordingly, the tax effect of 2023 conversion loss was zero. At December 31, 2024, the Company accumulated $11.4 million of federal net operating losses which can be carried forward indefinitely and $5.5 million of state net operating losses which will begin to expire in 2028. At December 31, 2024, the Company had federal general business credit carryforwards of $0.5 million that can be carried forward through 2044.

*Tax Legislation*

On December 22, 2017, the Tax Cuts and Jobs Act ("TCJA") was signed into law. One of the provisions of the TCJA was to amend Section 163(j) of the Internal Revenue Code, which, beginning for tax years after December 31, 2021, limits the amount of net interest expense that can be deducted by a percentage of adjusted taxable income. For the years ended December 31, 2024 and 2023, the reduction in earnings along with an increase in interest expense resulted in excess business interest expense of $110.7 million and $42.6 million, respectively, at CWGS, LLC. Additionally, this limitation on net interest expense deductibility applied to the calculation of tax distributions to common unit holders of CWGS, LLC, including CWH, under the CWGS LLC Agreement in 2023, which increased the tax distributions required to be paid. During the years ended December 31, 2024 and 2023, the Company recorded an income tax benefit of $15.6 million and $5.6 million, respectively, related to its business interest expense carryforward.

On August 16, 2022, the Inflation Reduction Act of 2022 ("IRA") was signed into law. The IRA contains several revisions to the Internal Revenue Code, including a 15% corporate minimum income tax and a 1% excise tax on corporate stock repurchases in tax years beginning after December 31, 2022 with certain exclusions for (a) repurchased shares for withholding taxes on vested restricted stock units ("RSUs") and (b) treasury shares reissued in the same tax year for settlement of stock option exercises or vesting of RSUs. While these tax law changes have no immediate effect and are not expected to have a material adverse effect on our results of operations going forward, the Company will continue to evaluate its impact as further information becomes available.

*Uncertain Tax Positions*

As of December 31, 2024 and 2023, the balance of the Company's uncertain tax positions was $3.0 million and $3.3 million, respectively. The Company does not expect the total amount of unrecognized tax benefits to significantly change in the next 12 months.

*Tax Receivable Agreement*

The Company is party to a tax receivable agreement (the "Tax Receivable Agreement") that provides for the payment by the Company to the Continuing Equity Owners and Crestview Partners II GP, L.P. of 85% of the amount of tax benefits, if any, the Company actually realizes, or in some circumstances is deemed to realize, as a result of (i) increases in the tax basis from the purchase of common units from Crestview Partners II GP, L.P. in exchange for Class A common stock in connection with the consummation of the IPO and the related transactions and any future redemptions that are funded by the Company and any future redemptions of common units by Continuing Equity Owners as described above and (ii) certain other tax benefits attributable to payments made under the Tax Receivable Agreement. The above payments are predicated on CWGS, LLC making an election under Section 754 of the Internal Revenue Code effective for each tax year in which a

redemption of common units for cash or stock occur. These tax benefit payments are not conditioned upon one or more of the Continuing Equity Owners or Crestview Partners II GP, L.P. maintaining a continued ownership interest in CWGS, LLC. In general, the Continuing Equity Owners' or Crestview Partners II GP, L.P.'s rights under the Tax Receivable Agreement are assignable, including to transferees of its common units in CWGS, LLC (other than the Company as transferee pursuant to a redemption of common units in CWGS, LLC). The Company expects to benefit from the remaining 15% of the tax benefits, if any, which may be realized.

During the twelve months ended December 31, 2024 and 2023,149,143 and 2,000,000 common units in CWGS, LLC, respectively, were redeemed for Class A common stock subject to the provisions of the Tax Receivable Agreement. The Company recognized a liability for the Tax Receivable Agreement payments due to those parties that redeemed common units, representing 85% of the aggregate tax benefits the Company expects to realize from the tax basis increases related to the redemption, after concluding it was probable that the Tax Receivable Agreement payments would be paid based on estimates of future taxable income. During the year ended December 31, 2024 and 2023, the Tax Receivable Agreement liability increased $0.9 million and $5.6 million, respectively, as a result of common unit redemptions.

As of December 31, 2024, and December 31, 2023, the amount of Tax Receivable Agreement payments due under the Tax Receivable Agreement was $150.4 million and $162.8 million, respectively, of which $13.4 million of the December 31, 2023 balance was paid during the year ended December 31, 2024. The Company does not expect a cash tax reduction for tax benefits subject to the Tax Receivable Agreement during the year ended December 31, 2024 and, therefore, does not expect a payment under the Tax Receivable Agreement to be made during the year ending December 31, 2025.

*Income Tax Audits*

For tax years beginning on or after January 1, 2018, CWGS, LLC is subject to partnership audit rules enacted as part of the Bipartisan Budget Act of 2015 (the "Centralized Partnership Audit Regime"). Under the Centralized Partnership Audit Regime, any IRS audit of CWGS, LLC would be conducted at the CWGS, LLC level, and if the IRS determines an adjustment, the default rule is that CWGS, LLC would pay an "imputed underpayment" including interest and penalties, if applicable. CWGS, LLC may instead elect to make a "push-out" election, in which case the partners for the year that is under audit would be required to take into account the adjustments on their own personal income tax returns. If CWGS, LLC does not elect to make a "push-out" election, CWGS, LLC has agreements in place requiring former partners to indemnify CWGS, LLC for their share of the imputed underpayment. The partnership agreement does not stipulate how CWGS, LLC will address imputed underpayments. If CWGS, LLC receives an imputed underpayment, a determination will be made based on the relevant facts and circumstances that exist at that time. Any payments that CWGS, LLC ultimately makes on behalf of its current partners will be reflected as a distribution, rather than tax expense, at the time such distribution is declared.

The Company and its subsidiaries file U.S. federal income tax returns and tax returns in various states. During the year ended December 31, 2024, the Company was notified by the state of New York that its 2021 and 2022 state income tax returns were under examination. The Company finalized its 2020 and 2021 California income tax audits with no adjustments. The Company is not under any other material audits in any jurisdiction. With few exceptions, the Company is no longer subject to U.S. federal, state, and local income tax examinations by tax authorities for years before 2021.

**13. Fair Value Measurements**

Accounting guidance for fair value measurements establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

Table of Contents

*Recurring Fair Value Measurements*

The following table presents the reported carrying values and the fair values by level of the Company's assets and liabilities measured at fair value on a recurring basis:

| ($ in thousands) | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| | Carrying Value | Level 3 | Carrying Value | Level 3 |
| **Assets:** | | | | |
| Derived participation investment [1] | $ 156 | $ 156 | $ — | $ — |
| **Liabilities:** | | | | |
| Acquisition-related contingent consideration [2] | 368 | 368 | — | — |

(1) Derived participation investment was included in other assets in the accompanying consolidated balance sheets.

(2) The $0.2 million currently and $0.2 million non-current portions of acquisition-related contingent consideration were included in accrued liabilities and other long-term liabilities, respectively, in the accompanying balance sheets.

The following table presents fair value measurements using significant unobservable inputs (Level 3):

| ($ in thousands) | Year Ended December 31, 2024 | |
|---|---|---|
| | Derived Participation Investment | Acquisition-related contingent consideration |
| Beginning balance | $ — | $ — |
| Business combinations | — | 368 |
| Purchases | 5,269 | — |
| Settlements | (5,779) | — |
| Gains included in earnings | 666 | — |
| Ending balance | $ 156 | $ 368 |

*Derived Participation Investment*

The Company has entered into an arrangement with a consumer financing partner to invest in a participation interest in the cash flows of certain financing transactions under the white label financing program with such consumer financing partner. The fair value of this investment was estimated by discounting the projected cash flows subject to the participation interest. The assumptions in the analysis included loan losses, prepayments, and recoveries derived based on historical observation of such data pertaining to the RV industry, as well as other relevant industries with loan structure similar to that of the RV industry. This is categorized as a Level 3 measurement and there was no significant change in unrealized gains or losses during the year ended December 31, 2024.

*Contingent Consideration*

The Company's contingent consideration liability was established as part of the consideration for the acquisition of a tire rescue roadside assistance business in June 2024. The fair value of this liability was estimated as the present value of the probability weighted milestone payments at each of the first two anniversaries of the date of the acquisition for a maximum aggregate payment of $0.5 million if all milestones are reached. The assumptions in the analysis included the Company's assessment of the probability that the milestones will be reached and a discount rate based primarily on the Company's credit risk and its ability to pay. This is categorized as a Level 3 measurement and there was no significant change in unrealized gains or losses during the year ended December 31, 2024.

Table of Contents

*Other Fair Value Disclosures*

There have been no transfers of assets or liabilities between the fair value measurement levels and there were no material re-measurements to fair value during 2024 and 2023 of assets and liabilities that are not measured at fair value on a recurring basis.

For floor plan notes payable under the Floor Plan Facility, the amounts reported in the accompanying Consolidated Balance Sheets approximate the fair value due to their short-term nature or the existence of variable interest rates that approximate prevailing market rates.

The following table presents the reported carrying value and fair value information for the Company's debt instruments. The fair values shown below for the Term Loan Facility, as applicable, are based on quoted prices in the inactive market for identical assets (Level 2) and the fair values shown below for the Floor Plan Facility, the Revolving Line of Credit, the Real Estate Facilities and the Other Long-Term Debt are estimated by discounting the future contractual cash flows at the current market interest rate that is available based on similar financial instruments.

| | Fair Value | December 31, 2024 | | December 31, 2023 | |
|---|---|---|---|---|---|
| ($ in thousands) | Measurement | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Term Loan Facility | Level 2 | $ 1,335,535 | $ 1,320,286 | $ 1,346,229 | $ 1,328,892 |
| Floor Plan Facility Revolving Line of Credit | Level 2 | — | — | 20,885 | 21,732 |
| Real Estate Facilities[(1)] | Level 2 | 173,132 | 176,684 | 183,892 | 195,029 |
| Other Long-Term Debt | Level 2 | 7,926 | 6,652 | 8,246 | 6,702 |

(1) The carrying value of Real Estate Facilities at December 31, 2023 includes the $17.3 million reported as liabilities related to assets held for sale in the consolidated balance sheet.

**14. Commitments and Contingencies**

**Sponsorship and Other Agreements**

The Company enters into sponsorship and brand licensing agreements from time to time. Current sponsorship agreements run through 2028. The sponsorship and brand licensing agreements consist of annual fees payable in the aggregate of $2.6 million in 2025, $1.8 million in 2026, $0.4 million in 2027, and $0.4 million in 2028, which are recognized to expense over the expected benefit period.

The Company enters into subscription agreements from time to time. Currently there are subscription agreements for future software services consisting of annual fees payable as follows: $26.0 million in 2025, $20.9 million in 2026, $12.7 million in 2027, $3.0 million in 2028, and $1.2 million in 2029. Expense is recognized ratably over the term of the agreement.

**Self-Insurance Program**

Self-insurance reserves represent amounts established as a result of insurance programs under which the Company self-insures portions of the business risks. The Company carries substantial premium-paid, traditional risk transfer insurance for various business risks. The Company self-insures and establishes reserves for the retention on workers' compensation insurance, general liability, automobile liability, and employee health claims. The self-insured claims liability was approximately $34.7 million and $29.4 million at December 31, 2024 and 2023, respectively. The determination of such claims and expenses and the appropriateness of the related liability are continually reviewed and updated. The self-insurance accruals are calculated by actuaries and are based on claims filed and include estimates for claims incurred but not yet reported. Projections of future losses, including incurred but not reported losses, are inherently uncertain because of the varying nature of insurance claims and could be substantially affected if occurrences and claims differ significantly from these assumptions and historical trends. In addition, the Company has obtained letters of credit as required by insurance carriers. As of December 31, 2024 and December 31, 2023, these letters of credit were $19.2 million and $17.2 million, respectively. This includes $14.3 million and $12.3 million for December 31, 2024 and December 31, 2023, respectively, issued under the Floor Plan Facility (see Note 4 —

Table of Contents

Inventories and Floor Plan Payables), and the balance issued under the Company's Senior Secured Credit Facilities (see Note 10 — Long-Term Debt).

**Litigation**

*Weissmann Complaint*

On June 22, 2021, FreedomRoads Holding Company, LLC ("FR Holdco"), an indirect wholly-owned subsidiary of CWGS, LLC, filed a one-count complaint captioned FreedomRoads Holding Company, LLC v. Steve Weissmann in the Circuit Court of Cook County, Illinois against Steve Weissmann ("Weissmann") for breach of contractual obligation under note guarantee (the "Note") (the "Weissmann Complaint"). On October 8, 2021, Weissmann brought a counterclaim against FR Holdco and third-party defendants Marcus A. Lemonis, NBCUniversal Media, LLC, the Consumer National Broadcasting Company, Camping World, Inc. ("CW"), and Machete Productions ("Machete") (the "Weissmann Counterclaim"), in which he alleges claims in connection with the Note and his appearance on the reality television show The Profit. Weissmann alleges the following causes of action against FR Holdco and all third-party defendants, including CW: (i) fraud; (ii) fraud in the inducement; (iii) fraudulent concealment; (iv) breach of fiduciary duty; (v) defamation; (vi) defamation per se; (vii) false light; (viii) intentional infliction of emotional distress; (ix) negligence; (x) unjust enrichment; and (xi) RICO § 1962. Weissmann seeks costs and damages in an amount to be proven at trial but no less than the amount in the Note (approximately $2.5 million); in connection with his RICO claim, Weissmann asserts he is entitled to damages in the amount of three times the Note. On February 18, 2022, NBCUniversal, CNBC, and Machete filed a motion to compel arbitration (the "NBC Arbitration Motion"). On May 5, 2022, an agreed order was filed staying the litigation in favor of arbitration. On May 31, 2022, FR Holdco filed an arbitration demand against Weissmann for collection on the Note. Weissmann filed his response and counterclaims, and third-party claims against FR Holdco, CW, Marcus A. Lemonis, NBCUniversal, and Machete on July 7, 2022. On or about July 21, 2022, FR Holdco and the other respondents filed their responses and affirmative defenses. On March 11, 2024, FR Holdco's arbitration demand and the Weissmann arbitration demand were tried before a single arbitrator pursuant to the JAMS streamlined arbitration rules in a confidential arbitration hearing. On May 23, 2024, the arbitrator issued an interim award in favor of FR Holdco in the amount of $4,318,892, plus interest, costs, and attorneys' fees as set forth in the Tumbleweed bankruptcy plan and to be determined by the arbitrator in subsequent proceedings. On July 31, 2024, the arbitrator heard the parties' arguments on the amount of attorneys' fees and costs owed to FR Holdco, after Weissmann conceded in a written briefing the obligation to pay attorneys' fees and costs to FR Holdco as the prevailing party. On September 12, 2024, the arbitrator issued a final award in favor of FR Holdco in the amount of $4,990,006, in the manner described in the Tumbleweed bankruptcy plan. Weissmann is jointly and severally liable for $4,106,884 of that amount. On September 24, 2024, Weissmann and Tumbleweed filed a Petition to Vacate Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On September 27, 2024, FR Holdco, CW, Marcus A. Lemonis, NBCUniversal, and Machete filed a Petition to Confirm Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On January 16, 2025, Superior Court for the State of California, County of Los Angeles granted the Petition to Confirm Arbitration Award and denied the Petition to Vacate Arbitration Award, concluding the litigation. There can be no assurances that we will be able to collect amounts owed pursuant to the Arbitration Award.

*Tumbleweed Complaint*

On November 10, 2021, Tumbleweed Tiny House Company, Inc. ("Tumbleweed") filed a complaint against FR Holdco, CW, Marcus A. Lemonis, NBCUniversal Media, LLC, and Machete Productions in which Tumbleweed alleges claims in connection with the Note and its appearance on the reality television show The Profit (the "Tumbleweed Complaint"), seeking primarily monetary damages. Tumbleweed alleges the following claims against the defendants, including FR Holdco and CW: (i) fraud; (ii) false promise; (iii) breach of fiduciary duty (and aiding and abetting the same); (iv) breach of contract; (v) breach of oral contract; (vi) tortious interference with prospective economic advantage; (vii) fraud in the inducement; (viii) negligent misrepresentation; (ix) fraudulent concealment; (x) conspiracy; (xi) unlawful business practices; (xii) defamation; and (xiii) declaratory judgment. On April 21, 2022, the Court granted a motion to compel arbitration

Table of Contents

filed by NBCUniversal and joined by all defendants, including FR Holdco, CW, and Marcus A. Lemonis, compelling Tumbleweed's claims to arbitration. Tumbleweed served its arbitration demand on FR Holdco, CW, and Marcus A. Lemonis on May 17, 2022. FR Holdco, CW, and Marcus A. Lemonis filed responses and affirmative defenses on May 31, 2022. On July 20, 2022, pursuant to the JAMS streamlined arbitration rules, the Tumbleweed Complaint was consolidated together with the Weissmann Complaint. The parties have exchanged discovery. On March 11, 2024, FR Holdco's arbitration demand and the Weissman arbitration demand were tried before a single arbitrator pursuant to the JAMS streamlined arbitration rules in a confidential arbitration hearing. On May 23, 2024, the arbitrator issued an interim award in favor of all respondents, including FR Holdco, CW, and Lemonis. On July 31, 2024, the arbitrator heard the parties arguments on the amount of attorneys' fees and costs owed to FR Holdco, CW, Lemonis, and the other defendants, after Tumbleweed conceded the obligation to pay attorneys' fees and costs to the prevailing parties. On September 12, 2024, the arbitrator issued a final award in favor of FR Holdco, CW, Lemonis in the amount of $3,793,455 in attorneys' fees and $626,611 in costs. The arbitrator also awarded $4,990,006 in favor of FR Holdco. On September 24, 2024, Weissmann and Tumbleweed filed a Petition to Vacate Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On September 27, 2024, FR Holdco, CW, Marcus A. Lemonis, NBCUniversal, and Machete filed a Petition to Confirm Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On January 16, 2025, Superior Court for the State of California, County of Los Angeles granted the Petition to Confirm Arbitration Award and denied the Petition to Vacate Arbitration Award, concluding the litigation. There can be no assurances that we will be able to collect amounts owed pursuant to the Arbitration Award.

*Precise Complaint*

On May 3, 2022, Lynn E. Feldman, Esquire, in her capacity as the Chapter 7 Trustee (the "Trustee") for the Estate of Precise Graphix, LLC (the "Precise Estate") filed a complaint against NBCUniversal Media, LLC, Machete Corporation, and CW in which the Trustee alleges claims on behalf of the Precise Estate in connection with its appearance on The Profit and subsequent commercial relationship with CW (the "Precise Complaint"), seeking primarily monetary damages from CW. The Trustee alleges the following claims against defendants, including CW: (i) fraud; (ii) false promise; (iii) breach of fiduciary duty; (iv) breach of contract; (v) breach of oral contract; (vi) fraud in the inducement; (vii) negligent misrepresentation; (viii) fraudulent concealment; (ix) conspiracy; (x) unlawful business practices in violation of California Business and Professions Code §17200; (xi) aiding and abetting; (xii) breach of fiduciary duty; and (xiii) declaratory judgment. The Trustee did not serve the Precise Complaint on CW. On July 3, 2022, the Precise Estate filed its arbitration demand against CW, NBCUniversal, and Machete alleging substantially similar claims as the Precise Complaint. On April 4, 2023, the Precise Estate's arbitration demand was tried before a single arbitrator pursuant to the JAMS streamlined arbitration rules in a confidential arbitration hearing. On May 31, 2023, the Arbitration was concluded and an award was entered by the Arbitrator against the Precise Estate in the amount of $7.1 million (the "Final Award"), of which CW would be entitled to $3.7 million. On June 13, 2023, the Trustee filed a notice of appeal of the Final Award with JAMS. On June 29, 2023, CW advanced the Trustee's portion of the fee required by JAMS to advance the appeal. On July 5, 2023, CW filed an application in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "USBC") seeking an order, inter alia, allowing the JAMS fee as an administrative expense of the Precise Estate. On July 14, 2023, the Trustee and respondents, including CW, filed a stipulation and agreed order (the "Stipulation") as follows: (1) upon approval and entry of the Stipulation, CW's claim for $3,500 shall be allowed and reimbursed; (2) the Trustee will notify JAMS that she is irrevocably withdrawing and ending her pending appeal of the Final Award; and (3) the Trustee will not dispute the amount of the Final Award. On July 17, 2023, the USBC entered the Stipulation as an order, which became final upon the expiration of the ten (10) day appeal period. Precise withdrew its appeal and on August 14, 2023 JAMS closed the arbitration. On September 25, 2023, the Superior Court of the State of California, upon motion by defendants, confirmed the arbitration award. On October 6, 2023, defendants filed an application in the matter of In re: Precise Graphix, LLC, pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court") seeking to have the fee award deemed an administrative expense in the Precise Estate. On April 4, 2024, the Trustee, CW, and the Precise Estate entered into a settlement agreement which provides for, among other things, an allowed claim against the Precise

Table of Contents

Estate in favor of CW in the amount of $3.7 million, a portion of which is payable upon the entry of a final order of the Bankruptcy Estate approving the settlement agreement and mutual releases from the parties (the "Settlement Agreement"). On May 7, 2024, the Bankruptcy Court approved the Settlement Agreement. There can be no assurances that we will be able to collect amounts owed pursuant to the Settlement Agreement.

*General*

From time to time, the Company is involved in litigation arising in the normal course of business operations. While the outcome of litigation cannot be predicted with certainty, and some lawsuits, claims or proceedings may be determined adversely to the Company, management does not believe that the disposition of any pending matters is likely to have a material adverse effect on the Company's financial statements. The Company records a liability in its consolidated financial statements for these matters when a loss is known or considered probable and the amount can be reasonably estimated. The Company reviews these estimates each accounting period as additional information is known and adjusts the loss provision when appropriate. If a matter is both probable to result in a liability and the amounts of loss can be reasonably estimated, the Company estimates and discloses the possible loss or range of loss to the extent necessary to make the consolidated financial statements not misleading. If the loss is not probable or cannot be reasonably estimated, a liability is not recorded in its consolidated financial statements.

**Supplier Agreement**

In connection with the divestiture of CWDS, the Company entered into a Supplier Agreement with the buyer that requires the Company to purchase an aggregate $250.0 million of product over the approximately 10-year term of the Supplier Agreement. See Note 6 — Assets Held for Sale and Business Divestiture for a discussion of the divestiture of CWDS.

**Employment Agreements**

The Company has employment agreements with certain officers. The agreements include, among other things, an annual bonus based on certain performance-based criteria and certain severance benefits in the event of a qualifying termination.

**Financial Assurances**

In the normal course of business, the Company obtains standby letters of credit and surety bonds from financial institutions and other third parties. These instruments guarantee the Company's own future performance and provide third parties with financial and performance assurance in the event that the Company does not perform. These instruments support a wide variety of the Company's business activities. As of December 31, 2024 and December 31, 2023, outstanding standby letters of credit issued through our Floor Plan Facility were $14.3 million and $12.3 million, respectively, (see Note 4 — Inventories and Floor Plan Payables) and outstanding standby letters of credit issued through the Senior Secured Credit Facilities were $4.9 million and $4.9 million, respectively (see Note 10 — Long-Term Debt). As of December 31, 2024 and December 31, 2023, outstanding surety bonds were $26.6 million and $23.2 million, respectively. The underlying liabilities to which these instruments relate are reflected on the Company's accompanying consolidated balance sheets, where applicable. Therefore, no additional liability is reflected for the letters of credit and surety bonds themselves.

**15. Related Party Transactions**

**Transactions with Directors, Equity Holders and Executive Officers**

FR leases various RV dealership locations from managers and officers. During 2023 and 2022, the related party lease expense for these locations were $3.4 million and $3.4 million, respectively. For the year ended December 31, 2024 there was no related party lease expense.

Table of Contents

In January 2012, FR entered into a lease for what is now its previous corporate headquarters in Lincolnshire, Illinois, which was amended as of March 2013, November 2019, October 2020, and October 2021 (the “Lincolnshire Lease”). This lease expired in March 2024. For the years ended December 31, 2024, 2023, and 2022, rental payments for the Lincolnshire Lease, including common area maintenance charges, were $0.2 million, $0.9 million, and $0.9 million, respectively. The Company’s Chairman and Chief Executive Officer had personally guaranteed the Lincolnshire Lease.

In October 2022, the Company purchased a property to be used as office space in Lincolnshire, Illinois, for $4.5 million from the Company’s Chairman and Chief Executive Officer. This office space became the Company’s corporate headquarters in February 2024.

**Other Transactions**

The Company paid Adams Outdoor Advertising, Inc., an entity for which Andris A. Baltins serves as a member of its Board of Directors, $0.1 million for both of the years ended December 31, 2024 and December 31, 2023 for advertising services.

The Company paid Kaplan, Strangis and Kaplan, P.A., of which Andris A. Baltins is a member, and a member of the Company’s Board of Directors $0.1 million and $0.2 million for the years ended December 31, 2023, and 2022, respectively, for legal services. Amounts paid for the year ended December 31, 2024 were immaterial.

**16. Acquisitions**

In 2024 and 2023, subsidiaries of the Company acquired the assets of multiple RV dealerships that constituted businesses under GAAP. The Company used cash and borrowings under its Floor Plan Facility to complete the acquisitions. The Company considers acquisitions of independent dealerships to be a fast and capital efficient alternative to opening new greenfield store locations to expand its business and grow its customer base. The acquired businesses were recorded at their estimated fair values under the acquisition method of accounting. The balance of the purchase prices in excess of the fair values of net assets acquired were recorded as goodwill.

In 2024, the RV and Outdoor Retail segment acquired the assets of various RV dealerships comprised of nine locations for an aggregate purchase price of approximately $69.4 million. Separate from these acquisitions, during the year ended December 31, 2024, the Company purchased real property for an aggregate purchase price of $9.6 million. Additionally, in June 2024, the Good Sam Services and Plans segment acquired the assets of a tire rescue roadside assistance business for $1.8 million in cash and up to an aggregate $0.5 million of milestone payments of which half is potentially payable at each of the first two anniversaries of the date of the acquisition. These potential milestone payments were recorded as contingent consideration with a fair value of $0.4 million. The tire rescue roadside assistance business includes a robust dispatch platform and strong network of service providers, which provide an opportunity to serve our customer base more effectively and reduce cost.

In 2023, the RV and Outdoor Retail segment acquired the assets of various RV dealerships comprised of 18 locations for an aggregate purchase price of approximately $209.5 million, of which four RV dealerships had not opened by December 31, 2023. Separate from these acquisitions, during the year ended December 31, 2023, the Company purchased real property for an aggregate purchase price of $72.4 million, of which $5.2 million was paid through the assumption of the related promissory note (see Note 10 — Long-Term Debt — Other Long-Term Debt).

Table of Contents

The estimated fair values of the assets acquired and liabilities assumed for the acquisitions of dealerships and the outdoor publication consist of the following, net of insignificant measurement period adjustments relating to acquisitions from the respective previous year:

| ($ in thousands) | Year Ended December 31, 2024 | 2023 |
|---|---|---|
| Tangible assets (liabilities) acquired (assumed): | | |
| Accounts receivable, net | $ 4 | $ — |
| Inventories, net | 36,431 | 119,672 |
| Prepaid expenses and other assets | — | 170 |
| Property and equipment, net | 296 | 1,407 |
| Operating lease assets | 15,328 | 916 |
| Accounts payable | (5) | (6) |
| Accrued liabilities | (35) | (63) |
| Current portion of operating lease liabilities | (1,112) | (208) |
| Other current liabilities | (23) | (520) |
| Operating lease liabilities, net of current portion | (14,216) | (708) |
| Total tangible net assets acquired | 36,668 | 120,660 |
| Intangible assets acquired: | | |
| Supplier and customer relationships | 2,595 | — |
| Websites and developed technology | 600 | — |
| Total intangible assets acquired | 3,195 | — |
| Goodwill | 31,701 | 88,799 |
| Purchase price of acquisitions | 71,564 | 209,459 |
| Application of deposit paid in prior period | (8,873) | — |
| Contingent consideration | (368) | — |
| Lazydays acquisition deposit | 10,000 | — |
| Cash paid for acquisitions, net of cash acquired | 72,323 | 209,459 |
| Inventory purchases financed via floor plan | (49,162) | (100,331) |
| Cash payment net of floor plan financing | $ 23,161 | $ 109,128 |

The fair values above for the year ended December 31, 2024 are preliminary as they are subject to measurement period adjustments for up to one year from the date of acquisition as new information is obtained about facts and circumstances that existed as of the acquisition date relating to the valuation of the acquired assets, primarily the acquired inventories.

During the year ended December 31, 2024, the fair values include a measurement period adjustment to record $2.6 million of other intangible assets from a RV dealership acquisition that occurred during the year ended December 31, 2023. These intangible assets had an estimated useful life of 15 years; however, these intangible assets were sold for $2.6 million during the 2024. Developed technology intangible asset acquired of $0.6 million has an estimated useful life of five years.

The primary items that generated the goodwill are the value of the expected synergies between the acquired businesses and the Company and the acquired assembled workforce, neither of which qualify for recognition as a separately identified intangible asset. For the years ended December 31, 2024 and 2023, acquired goodwill of $31.7 million and $88.8 million is expected to be deductible for tax purposes.

Included in the consolidated financial results for the years ended December 31, 2024 and 2023 were $99.6 million and $99.8 million of revenue, respectively, and $0.2 million and $8.1 million of pre-tax loss, respectively, from the acquisitions as of their applicable acquisition dates. Pro forma information on these acquisitions has not been included, because the Company has deemed them to not be individually or cumulatively material.

Table of Contents

In November 2024, the Company entered into an agreement with Lazydays Holdings, Inc. ("Lazydays") to acquire the assets and certain real estate of seven RV dealerships from Lazydays, which the Company expects will close in March 2025. In November 2024, the Company paid a $10.0 million deposit to Lazydays that will convert to 9.7 million shares of Lazydays common stock upon closing of the transaction. At December 31, 2024, this deposit was included in other assets in the accompanying consolidated balance sheet. During February 2025, the Company closed on the purchase of three locations from the Lazydays transaction, which included the purchase of associated real estate of $35.5 million.

**17. Statements of Cash Flows**

Supplemental disclosures of cash flow information for the following periods (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2024** | **2023** | **2022** |
| Cash paid (received) during the period for: | | | |
| Interest | $ 238,553 | $ 214,082 | $ 106,997 |
| Income taxes | (116) | 3,352 | 54,579 |
| Noncash investing and financing activities: | | | |
| Leasehold improvements paid by lessor | — | 256 | 361 |
| Capital expenditures in accounts payable and accrued liabilities | 8,153 | 5,833 | 12,377 |
| Contingent consideration recognized as partial consideration for purchase of a business | 368 | — | — |
| Fair value of holdback receivable recognized as partial consideration for divestiture of a business | 933 | — | — |
| Supplier agreement intangible asset recognized as partial consideration for divestiture of a business | 9,500 | — | — |
| Prior period deposit applied to portion of purchase price of RV dealership acquisition | 8,873 | — | — |
| Purchase of real property through assumption of other long-term debt | — | 5,185 | — |
| Note receivable exchanged for amounts owed by other investment | — | 2,153 | |
| Par value of Class A common stock issued for redemption of common units in CWGS, LLC | 1 | 20 | 1 |
| Cost of treasury stock issued for vested restricted stock units | 15,320 | 29,542 | 42,640 |

**18. Benefit Plan**

The Freedom Roads 401(k) Defined Contribution Plan ("FreedomRewards 401(k) Plan") is qualified under Sections 401(a) and 401(k) of the Internal Revenue Service Code of 1986, as amended. All employees over age 18, including the executive officers, are eligible to participate in the Freedom Rewards 401(k) Plan. Any favorable vesting was permitted for any affected participants pursuant to FreedomRewards 401(k) Plan Amendment No. 3 signed December 15, 2011, and effective January 1, 2012. Non-highly compensated employees may defer up to 75% of their eligible compensation up to the Internal Revenue Service limits. Highly compensated employees may defer up to 15% of their eligible compensation up to the Internal Revenue Service limits. The Company contributed $2.8 million to the Company's 401(k) Plan for 2023. There were no contributions by the Company to the Company's 401(k) Plan for 2024 or 2022.

**19. Stockholders' Equity**

**CWGS, LLC Ownership**

CWH is the sole managing member of CWGS, LLC and has the sole voting power in, and controls the management of, CWGS, LLC (See Note 20 – Non-Controlling Interests for further information about the ownership of CWGS, LLC). The remaining interest in CWGS, LLC, was held by the Continuing Equity Owners, who may redeem at each of their options their common units for, at the Company's election (determined solely by the Company's independent directors (within the meaning of the rules of the New York Stock Exchange)

Table of Contents

who are disinterested), cash or newly issued shares of the Company's Class A common stock. Accordingly, the Company consolidated the financial results of CWGS, LLC and reported a non-controlling interest in its consolidated financial statements. In accordance with the CWGS LLC Agreement, CWGS, LLC has made cash distributions to all common unit holders of CWGS, LLC in an amount sufficient for 1) CWH to pay the portion of its regular quarterly cash dividend to holders of its Class A common stock that is unrelated to tax distributions, if any, and 2) the common unit holders of CWGS, LLC to pay their income tax obligation on their allocated portion of CWGS, LLC income at the highest tax rate for all common unit holders of CWGS, LLC. The payment of these cash distributions by CWGS, LLC to Continuing Equity Owners are recorded as distributions to holders of CWGS, LLC common units in the accompanying Consolidated Statements of Stockholders' Equity and Consolidated Statements of Cash Flows. The payment of these cash distributions by CWGS, LLC to CWH are within the consolidated group and, therefore, are not included in the distributions to holders of CWGS, LLC common units in the accompanying Consolidated Statements of Stockholders' Equity and Consolidated Statements of Cash Flows.

**Common Stock Economic and Voting Rights**

Each share of the Company's Class A common stock and Class B common stock entitles its holders to one vote per share on all matters presented to the Company's stockholders generally; provided that, for as long as ML Related Parties, directly or indirectly, beneficially own in the aggregate 27.5% or more of all of the outstanding common units of CWGS, LLC, the shares of Class B common stock held by the ML Related Parties will entitle the ML Related Parties to the number of votes necessary such that the ML Related Parties, in the aggregate, cast 47% of the total votes eligible to be cast by all of the Company's stockholders on all matters presented to a vote of the Company's stockholders generally. Additionally, the one share of Class C common stock entitles its holder to the number of votes necessary such that the holder casts 5% of the total votes eligible to be cast by all of the Company's stockholders on all matters presented to a vote of the Company's stockholders generally. The one share of Class C common stock is owned by ML RV Group, LLC, a Delaware limited liability company, wholly-owned by the Company's Chairman and Chief Executive Officer, Marcus A. Lemonis.

Holders of the Company's Class B and Class C common stock are not entitled to receive dividends and will not be entitled to receive any distributions upon the liquidation, dissolution or winding up of the Company. Shares of Class B common stock may only be issued to the extent necessary to maintain the one-to-one ratio between the number of common units of CWGS, LLC held by funds controlled by Crestview Partners II GP, L.P. and the ML Related Parties (the "Class B Common Owners") and the number of shares of Class B common stock held by the Class B Common Owners. Shares of Class B common stock are transferable only together with an equal number of common units of CWGS, LLC. Only permitted transferees of common units held by the Class B Common Owners will be permitted transferees of Class B common stock. Shares of Class B common stock will be canceled on a one-for-one basis upon the redemption of any of the outstanding common units of CWGS, LLC held by the Class B Common Owners. Upon the occurrence of certain change in control events, the Class C common stock would no longer have any voting rights, such share of the Company's Class C common stock will be cancelled for no consideration and will be retired, and the Company will not reissue such share of Class C common stock.

The Company must, at all times, maintain a one-to-one ratio between the number of outstanding shares of Class A common stock and the number of common units of CWGS, LLC owned by CWH (subject to certain exceptions for treasury shares and shares underlying certain convertible or exchangeable securities).

**November 2024 Public Offering**

On November 1, 2024, the Company completed a public offering (the "November 2024 Public Offering") in which the Company sold 14,634,146 shares of the Company's Class A common stock at a public offering price of $20.50 per share (or $19.81 per share after underwriting discounts and commissions). The Company received $289.9 million in proceeds, net of underwriting discounts and commissions, which were used to purchase 14,634,146 common units from CWGS, LLC at a price per unit equal to the public offering price per share of Class A common stock in the November 2024 Public Offering, less underwriting discounts and commissions.

Table of Contents

Additionally, in November 2024, the underwriters exercised their option to purchase an additional 2,195,121 shares of Class A common stock and the Company received $43.5 million in additional proceeds, net of underwriting discounts and commissions, which were used to purchase 2,195,121 common units from CWGS, LLC at a price per unit equal to the public offering price per share of Class A common stock in the November 2024 Public Offering, less underwriting discounts and commissions.

Of the 16,829,267 shares Class A common stock sold in the November 2024 Public Offering, 4,228,700 were issued from treasury stock and the remainder were newly-issued shares. The Company incurred approximately $1.0 million of offering costs that were recorded as a reduction in the additional paid-in capital recorded for the proceeds from the November 2024 Public Offering in the consolidated statement of stockholders' equity.

**Short-Swing Profit Disgorgement**

In November 2022, the Company received approximately $58,000 from short-swing profit disgorgement remitted by Marcus A. Lemonis, Chairman and Chief Executive Officer of the Company, which is included as an increase to additional paid-in capital in the consolidated statement of stockholders' equity and as a financing activity in the consolidated statement of cash flows.

**Stock Repurchase Program**

In October 2020, the Company's Board of Directors initially authorized a stock repurchase program for the repurchase of up to $100.0 million of the Company's Class A common stock, expiring on October 31, 2022. In August 2021 and January 2022, the Company's Board of Directors authorized increases to the stock repurchase program for the repurchase of up to an additional $125.0 million and $152.7 million, respectively, of the Company's Class A common stock and extended the stock repurchase program to expire on August 31, 2023 and December 31, 2025, respectively. Repurchases under the program are subject to any applicable limitations on the availability of funds to be distributed to the Company by CWGS, LLC to fund repurchases and may be made in the open market, in privately negotiated transactions or otherwise, with the amount and timing of repurchases to be determined at the Company's discretion, depending on market conditions and corporate needs. Open market repurchases will be structured to occur in accordance with applicable federal securities laws, including within the pricing and volume requirements of Rule 10b-18 under the Securities Exchange Act of 1934, as amended. The Company may also, from time to time, enter into Rule 10b5-1 plans to facilitate repurchases of its shares under this authorization. This program does not obligate the Company to acquire any particular amount of Class A common stock and the program may be extended, modified, suspended or discontinued at any time at the Board's discretion. The Company expects to fund the repurchases using cash on hand.

During the years ended December 31, 2024 and 2023, the Company did not repurchase Class A common stock under the stock repurchase program. During the year ended December 31, 2022, the Company repurchased 2,592,524 shares of Class A common stock under this program for approximately $79.8 million including commissions paid, at a weighted average price per share of $30.76, which is recorded as treasury stock on the accompanying consolidated balance sheets. Class A common stock held as treasury stock is not considered outstanding. During the years ended December 31, 2024 and 2023, the Company reissued 322,271 and 579,176 shares of Class A common stock from treasury stock to settle the exercises of stock options, vesting of restricted stock units, and settlement of other stock-based awards under the Company's 2016 Incentive Award Plan (the "2016 Plan"), respectively, (see Note 21 — Stock-Based Compensation Plans). As discussed above, the Company reissued 4,228,700 shares of Class A common stock held as treasury in the November 2024 Public Offering. As of December 31, 2024 and 2023, the remaining approved amount for repurchases of Class A common stock under the share repurchase program was approximately $120.2 million.

Table of Contents

## 20. Non-Controlling Interests

As described in Note 19 — Stockholders' Equity, CWH is the sole managing member of CWGS, LLC and, as a result, consolidates the financial results of CWGS, LLC. The Company reports a non-controlling interest representing the common units of CWGS, LLC held by Continuing Equity Owners. Changes in CWH's ownership interest in CWGS, LLC while CWH retains its controlling interest in CWGS, LLC will be accounted for as equity transactions. As such, future redemptions of common units of CWGS, LLC by the Continuing Equity Owners will result in a change in ownership and reduce or increase the amount recorded as non-controlling interest and increase or decrease additional paid-in capital when CWGS, LLC has positive or negative net assets, respectively. At the end of each period, the Company will record a non-controlling interest adjustment to additional paid-in capital such that the non-controlling interest on the accompanying consolidated balance sheet is equal to the non-controlling interest's ownership share of the underlying CWGS, LLC net assets (see the consolidated statement of stockholders' equity).

The following table summarizes the CWGS, LLC common unit ownership by CWH and the Continuing Equity Owners:

| | As of December 31, 2024 | | As of December 31, 2023 | |
|---|---|---|---|---|
| | Common Units | Ownership % | Common Units | Ownership % |
| CWH | 62,502,096 | 61.0% | 45,020,116 | 52.9% |
| Continuing Equity Owners | 39,895,393 | 39.0% | 40,044,536 | 47.1% |
| Total | 102,397,489 | 100.0% | 85,064,652 | 100.0% |

During the year ended December 31, 2022, CWGS Holding, LLC, a wholly owned subsidiary of ML Acquisition Company, LLC, which is indirectly owned by each of the estate of Stephen Adams, a former member of the Company's Board of Directors, and Marcus A. Lemonis, the Company's Chairman and Chief Executive Officer gifted 2,000,000 common units of CWGS, LLC in total to a college and hospital in 2022 ("2022 Common Unit Giftees"), which resulted in the corresponding 2,000,000 of Class B common stock being transferred to the 2022 Common Unit Giftees. On January 1, 2023, the 2022 Common Unit Giftees redeemed the 2,000,000 common units of CWGS, LLC for 2,000,000 shares of the Company's Class A common stock, which also resulted in the cancellation of 2,000,000 shares of the Company's Class B common stock that had been transferred to the 2022 Common Unit Giftees with no additional consideration provided.

The following table summarizes the effects of changes in ownership in CWGS, LLC on the Company's equity:

| ($ in thousands) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| Net (loss) income attributable to Camping World Holdings, Inc. | $ (38,637) | $ 33,372 | $ 123,748 |
| Transfers to non-controlling interests: | | | |
| Decrease in additional paid-in capital as a result of the purchase of common units from CWGS, LLC with proceeds from the public offering | (118,798) | — | — |
| Decrease in additional paid-in capital as a result of the purchase of common units from CWGS, LLC with proceeds from the exercise of stock options | (239) | (485) | (245) |
| Decrease in additional paid-in capital as a result of the vesting of restricted stock units | (13,097) | (25,080) | (35,831) |
| (Decrease) increase in additional paid-in capital as a result of repurchases of Class A common stock for withholding taxes on vested RSUs | (487) | 3,016 | 2,371 |
| Increase in additional paid-in capital as a result of repurchases of Class A common stock for treasury stock | — | — | 27,561 |
| Increase in additional paid-in capital as a result of the redemption of common units of CWGS, LLC | 1,531 | 1,169 | 41,844 |
| Change from net (loss) income attributable to Camping World Holdings, Inc. and transfers to non-controlling interests | $ (169,727) | $ 11,992 | $ 159,448 |

Table of Contents

## 21. Stock-Based Compensation Plans

The following table summarizes the stock-based compensation that has been included in the following line items within the consolidated statements of operations during:

| | Year Ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2024 | 2023 | 2022 |
| **Stock-based compensation expense:** | | | |
| Costs applicable to revenue | $ 372 | $ 895 | $ 689 |
| Selling, general, and administrative | 21,213 | 23,191 | 33,158 |
| Total stock-based compensation expense | $ 21,585 | $ 24,086 | $ 33,847 |
| Total income tax benefit recognized related to stock-based compensation | $ 2,963 | $ 3,205 | $ 3,809 |

### 2016 Incentive Award Plan

In October 2016, the Company adopted the 2016 Plan under which the Company may grant up to 14,693,518 stock options, restricted stock units, and other types of stock-based awards to employees, consultants or non-employee directors of the Company through September 2026. The Company does not intend to use cash to settle any of its stock-based awards. Upon the exercise of a stock option award, the vesting of a restricted stock unit or the award of common stock or restricted stock, shares of Class A common stock are issued from authorized but unissued shares or from shares held in treasury. Stock options and restricted stock units granted to employees generally vest in equal annual installments over a three to five-year period and are canceled upon termination of employment, although vested stock options may generally be exercised for a limited period of time after termination. Stock options are granted with an exercise price equal to the fair market value of the Company's Class A common stock on the date of grant. Stock option grants expire after ten years unless canceled earlier due to termination of employment. Restricted stock units granted to non-employee directors vest in equal annual installments over a one-year or three-year period subject to voluntary deferral elections made prior to the grant.

The Company did not grant any stock options during the years ended December 31, 2024, 2023 and 2022. A summary of stock option activity for the year ended December 31, 2024 is as follows:

| | Stock Options (in thousands) | Weighted Average Exercise Price | Aggregate Intrinsic Value (in thousands) | Weighted Average Remaining Contractual Life (years) |
|---|---|---|---|---|
| Outstanding at December 31, 2023 | 193 | $ 21.92 | | |
| Exercised | (26) | $ 21.53 | | |
| Forfeited | (12) | $ 22.00 | | |
| Outstanding and exercisable at December 31, 2024 | 155 | $ 21.98 | $ — | 1.8 |

At December 31, 2024, 2023 and 2022, all stock options were fully vested. The intrinsic value of stock options exercised was insignificant, $0.1 million and $0.2 million for the years ended December 31, 2024, 2023 and 2022, respectively. The actual tax benefit for the tax deductions from the exercise of stock options was not significant for the years ended December 31, 2024, 2023 and 2022.

Table of Contents

A summary of restricted stock unit activity for the year ended December 31, 2024 is as follows:

| | Restricted Stock Units (in thousands) | Weighted Average Grant Date Fair Value |
|---|---|---|
| Outstanding at December 31, 2023 | 1,875 | $ 29.39 |
| Granted | 633 | $ 21.51 |
| Vested | (717) | $ 29.65 |
| Forfeited | (139) | $ 28.14 |
| Outstanding at December 31, 2024 | 1,652 | $ 25.61 |

The weighted-average grant date fair value of restricted stock units granted during the years ended December 31, 2024, 2023 and 2022 was $21.51, $19.72, and $23.12, respectively. At December 31, 2024, the intrinsic value of unvested restricted stock units was $34.8 million. At December 31, 2024, total unrecognized compensation cost related to unvested restricted stock units was $34.6 million and is expected to be recognized over a weighted-average period of 2.9 years.

The fair value of restricted stock units that vested during the years ended December 31, 2024, 2023 and 2022 was $16.2 million, $20.7 million, and $35.1 million, respectively. The actual tax benefit for the tax deductions from the vesting of restricted stock units was $2.2 million, $2.8 million, and $4.9 million for the years ended December 31, 2024, 2023, and 2022, respectively. A portion of the actual tax benefit for tax deductions from the vesting of restricted stock units relating to the year ended December 31, 2024 was subject to limitations on deductibility of executive compensation. The restricted stock units that vested were typically net share settled such that the Company withheld shares with value equivalent to the employees' statutory obligation for the applicable income and other employment taxes, and remitted the cash to the appropriate taxing authorities. The total shares withheld were based on the value of the restricted stock units on their respective vesting dates as determined by the Company's closing stock price. Total payments for the employees' tax obligations to taxing authorities are reflected as a financing activity within the Consolidated Statements of Cash Flows. These net share settlements had the effect of share repurchases by the Company as they reduced the number of shares that would have otherwise been issued as a result of the vesting and did not represent an expense to the Company.

In January 2025, the Company granted a total of 447,350 RSUs to employees with an aggregate grant date fair value of $9.8 million and weighted-average grant date fair value of $21.85 per RSU, which will be recognized, net of forfeitures, over a vesting period of five years.

In January 2025, pursuant to the approval of the amended and restated employment agreement with Marcus A. Lemonis, the Company granted Mr. Lemonis (i) an award of 600,000 RSUs with a grant date fair value of $22.13 per RSU, which will be recognized, net of forfeitures, over a vesting period of approximately three years, and (ii) an award of performance stock units ("PSU") under the 2016 Plan with respect to 750,000 PSUs if earned at "target" levels of performance, which will be eligible to vest based on the achievement of specified stock price hurdles over a three year performance period. The PSUs have a weighted-average grant date fair value of $13.84 per PSU, which will be recognized over a weighted-average derived service period of approximately one year if the respective derived service period and/or vesting conditions are satisfied.

**22. (Loss) Earnings Per Share**

Basic (loss) earnings per share of Class A common stock is computed by dividing net (loss) income available to Camping World Holdings, Inc. by the weighted-average number of shares of Class A common stock outstanding during the period. Diluted (loss) earnings per share of Class A common stock is computed by dividing net (loss) income available to Camping World Holdings, Inc. by the weighted-average number of shares of Class A common stock outstanding adjusted to give effect to potentially dilutive securities.

Table of Contents

The following table sets forth reconciliations of the numerators and denominators used to compute basic and diluted (loss) earnings per share of Class A common stock:

| | Year Ended December 31, | | |
|---|---|---|---|
| (In thousands except per share amounts) | 2024 | 2023 | 2022 |
| **Numerator:** | | | |
| Net (loss) income | $ (78,880) | $ 52,929 | $ 337,832 |
| Less: net (loss) income attributable to non-controlling interests | 40,243 | (19,557) | (214,084) |
| Net (loss) income attributable to Camping World Holdings, Inc. — basic | (38,637) | 33,372 | 123,748 |
| Add: reallocation of net income attributable to non-controlling interests from the assumed dilutive effect of stock options and RSUs | — | — | 938 |
| Add: reallocation of net income attributable to non-controlling interests from the assumed redemption of common units of CWGS, LLC for Class A common stock | — | 15,392 | — |
| Net (loss) income attributable to Camping World Holdings, Inc. — diluted | $ (38,637) | $ 48,764 | $ 124,686 |
| **Denominator:** | | | |
| Weighted-average shares of Class A common stock outstanding — basic | 48,005 | 44,626 | 42,386 |
| Dilutive options to purchase Class A common stock | — | 20 | 56 |
| Dilutive restricted stock units | — | 281 | 412 |
| Dilutive common units of CWGS, LLC that are convertible into Class A common stock | — | 40,045 | — |
| Weighted-average shares of Class A common stock outstanding — diluted | 48,005 | 84,972 | 42,854 |
| | | | |
| (Loss) earnings per share of Class A common stock — basic | $ (0.80) | $ 0.75 | $ 2.92 |
| (Loss) earnings per share of Class A common stock — diluted | $ (0.80) | $ 0.57 | $ 2.91 |
| | | | |
| Weighted-average anti-dilutive securities excluded from the computation of diluted (loss) earnings per share of Class A common stock: | | | |
| Stock options to purchase Class A common stock | 175 | 50 | — |
| Restricted stock units | 1,979 | 1,364 | 2,146 |
| Common units of CWGS, LLC that are convertible into Class A common stock | 40,007 | — | 42,045 |

Shares of the Company's Class B common stock and Class C common stock do not share in the earnings or losses of the Company and are therefore not participating securities. As such, separate presentation of basic and diluted (loss) earnings per share of Class B common stock or Class C common stock under the two-class method has not been presented.

## 23. Segment Information

The Company has the following two reportable segments: (i) Good Sam Services and Plans, and (ii) RV and Outdoor Retail (see Note 1 – Summary of Significant Accounting Policies – Description of the Business for a discussion of the primary revenue generating activities of each segment).

The reportable segments identified above represent operating segments that are the business activities of the Company for which discrete financial information is available and for which operating results are regularly reviewed by the Company's chief operating decision maker ("CODM") to allocate resources and assess performance. The Company's CODM is Marcus A. Lemonis, the Company's Chief Executive Officer.

The accounting policies of the reportable segments are the same as those described in Note 1 – Summary of Significant Accounting Policies except intersegment receivables and investments in intersegment entities, which are eliminated in the Company's consolidated balance sheets, are not included in segment assets. Intersegment revenues consist of segment revenues that are eliminated in the Company's consolidated statements of operations. Intersegment revenues include transactions with other segments and revenue recognition that differs between a segment standalone basis versus a consolidated basis, such as point-in-time recognition versus over-time recognition. The reportable segments generally account for intersegment revenues with other segments at prices that approximate wholesale prices or discounted pricing to a third party depending on the nature of the intersegment sale.

The Company evaluates performance for all of its reportable segments based on Segment Adjusted EBITDA. The Company defines "Segment Adjusted EBITDA" as the reportable segments' total revenue less segment expenses which are comprised of (i) adjusted costs applicable to revenue, (ii) intersegment costs applicable to revenues, (iii) adjusted selling, general, and administrative expense, (iv) floor plan interest expense, and (v) other segment items. Segment expenses exclude depreciation and amortization and certain

Table of Contents

noncash and other items that the CODM does not consider in his evaluation of ongoing operating performance. These excluded items include (a) stock-based compensation, (b) restructuring costs related to the Active Sports Restructuring and the 2019 Strategic Shift, and (c) loss and/or impairment on investments in equity securities. For periods beginning after December 31, 2022 for the 2019 Strategic Shift and for periods beginning after December 31, 2023 for the Active Sports Restructuring, the other associated costs category of expenses relating to those restructuring activities were not excluded from Segment Adjusted EBITDA as restructuring costs, since these costs are not expected to be significant in future periods. For periods ended on or before December 31, 2022, loss and/or impairment on investments in equity securities were not excluded from Segment Adjusted EBITDA and these expenses were not significant for the year ended December 31, 2022.

The CODM uses Segment Adjusted EBITDA to allocate resources (including employees, property, and financial or other capital resources) for each segment predominantly in the annual budget and forecasting process. The CODM considers budget-to-actual and/or forecast-to-actual Segment Adjusted EBITDA variances on a monthly basis when making decisions about allocating capital and personnel to the segments. The CODM will also use Segment Adjusted EBITDA as a component of the compensation for certain employees and when considering opening new greenfield or acquired RV dealership locations, new Good Sam services, or changes to Good Sam service partners.

Reportable segment revenue, Segment Adjusted EBITDA, depreciation and amortization, other interest expense, net, total assets, and capital expenditures are as follows:

| | Year Ended December 31, 2024 | | Year Ended December 31, 2023 | | Year Ended December 31, 2022 | |
|---|---|---|---|---|---|---|
| ($ in thousands) | Good Sam Services and Plans | RV and Outdoor Retail | Good Sam Services and Plans | RV and Outdoor Retail | Good Sam Services and Plans | RV and Outdoor Retail |
| **Revenue:** | | | | | | |
| Good Sam Services and Plans | $ 194,575 | $ — | $ 193,827 | $ — | $ 192,128 | $ — |
| New vehicles | — | 2,825,640 | — | 2,576,278 | — | 3,228,077 |
| Used vehicles | — | 1,613,849 | — | 1,979,632 | — | 1,877,601 |
| Products, service and other | — | 820,111 | — | 870,038 | — | 999,214 |
| Finance and insurance, net | — | 599,718 | — | 562,256 | — | 623,456 |
| Good Sam Club | — | 46,081 | — | 44,516 | — | 46,537 |
| Intersegment revenue[(1)] | 1,055 | 11,358 | 1,000 | 12,154 | 494 | 28,393 |
| Total revenue before intersegment eliminations | 195,630 | 5,916,757 | 194,827 | 6,044,874 | 192,622 | 6,803,278 |
| **Segment expenses:** | | | | | | |
| Adjusted costs applicable to revenue[(2)] | 70,557 | 4,203,549 | 58,765 | 4,283,700 | 71,518 | 4,632,523 |
| Intersegment costs applicable to revenue[(3)] | 784 | 9,780 | 909 | 9,814 | 244 | 24,174 |
| Adjusted selling, general and administrative[(4)] | 29,774 | 1,509,557 | 24,273 | 1,479,642 | 25,856 | 1,529,087 |
| Floor plan interest expense | — | 95,121 | — | 83,075 | — | 42,031 |
| Other segment items[(5)] | — | 188 | — | 314 | — | 1,502 |
| **Segment Adjusted EBITDA** | $ 94,515 | $ 98,562 | $ 110,880 | $ 188,329 | $ 95,004 | $ 573,961 |

(1) Intersegment revenue consists of segment revenue that is eliminated in our consolidated statements of operations.

(2) Adjusted costs applicable to revenue exclude stock-based compensation expense, restructuring costs, and intersegment costs applicable to revenue.

Table of Contents

(3) Intersegment costs applicable to revenue consist of segment costs applicable to revenue that are eliminated in our consolidated statements of operations.

(4) Adjusted selling, general, and administrative expenses excludes stock-based compensation expense, restructuring costs, and intersegment operating expenses.

(5) Other segment items include (i) intersegment operating expenses, which are eliminated in our consolidated statements of operations, and (ii) other expense, net excluding loss and/or impairment on investments in equity securities.

| | Year Ended December 31, | | |
|---|---|---|---|
| ($ in thousands) | 2024 | 2023 | 2022 |
| **Revenue:** | | | |
| Good Sam Services and Plans Segment | $ 195,630 | $ 194,827 | $ 192,622 |
| RV and Outdoor Retail Segment | 5,916,757 | 6,044,874 | 6,803,278 |
| Total segment revenue | 6,112,387 | 6,239,701 | 6,995,900 |
| Intersegment eliminations | (12,413) | (13,154) | (28,887) |
| Total revenue | 6,099,974 | 6,226,547 | 6,967,013 |
| **Segment Adjusted EBITDA:** | | | |
| Good Sam Services and Plans Segment | 94,515 | 110,880 | 95,004 |
| RV and Outdoor Retail Segment | 98,562 | 188,329 | 573,961 |
| Total Segment Adjusted EBITDA | 193,077 | 299,209 | 668,965 |
| Corporate selling, general, and administrative excluding stock-based compensation[1] | (12,573) | (10,880) | (11,856) |
| Depreciation and amortization | (81,190) | (68,643) | (80,304) |
| Long-lived asset impairment | (15,061) | (9,269) | (4,231) |
| Lease termination | 2,297 | 103 | (1,614) |
| (Gain) loss on sale or disposal of assets | (9,855) | 5,222 | (622) |
| Stock-based compensation[2] | (21,585) | (24,086) | (33,847) |
| Restructuring costs[3] | — | (5,540) | (7,026) |
| Loss and impairment on investments in equity securities[4] | (3,262) | (1,770) | — |
| Other interest expense, net | (140,444) | (135,270) | (75,745) |
| Tax Receivable Agreement liability adjustment | — | 2,442 | 114 |
| Corporate other expense, net | — | — | 139 |
| Intersegment eliminations[5] | (1,661) | (2,116) | (3,858) |
| (Loss) income before income taxes | $ (90,257) | $ 49,402 | $ 450,115 |

(1) Corporate selling, general, and administrative excluding stock-based compensation represents corporate selling, general, and administrative expenses that are not allocated to the segments and are comprised primarily of the costs associated with being a public company. This amount excludes the stock-based compensation relating to the Board of Directors for their service as board members that is not allocated to the segments, since it is presented as part of the stock-based compensation reconciling line item in this table.

(2) This stock-based compensation amount includes stock-based compensation allocated to the segments and stock-based compensation relating to the Board of Directors for their service as board members that is not allocated to the segments (See Note 21 — Stock-Based Compensation Plans).

(3) Represents restructuring costs relating to the Active Sports Restructuring for periods ended on or before December 31, 2023 and our 2019 Strategic Shift for the period ended December 31, 2022. These restructuring costs include one-time employee termination benefits, incremental inventory reserve charges, and other associated costs. These costs exclude lease termination costs, which are presented as a separate reconciling line item. See Note 5 – Restructuring and Long-Lived Asset Impairment for additional information.

(4) Represents loss and/or impairment on investments in equity securities and interest income relating to any notes receivables with those investments for periods beginning after December 31, 2022. Amounts relating to periods prior to 2023 were not significant. These amounts are included in other expense, net in the consolidated statements of operations. During the years ended December 31, 2024 and 2023, these amounts included $0.9 million and $1.3 million of impairment on an equity method investment, respectively.

(5) Represents the net impact of intersegment eliminations on (loss) income before income taxes.

Table of Contents

| ($ in thousands) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| **Depreciation and amortization:** | | | |
| Good Sam Services and Plans | $ 3,280 | $ 3,278 | $ 3,353 |
| RV and Outdoor Retail | 77,910 | 65,365 | 76,951 |
| Total depreciation and amortization | $ 81,190 | $ 68,643 | $ 80,304 |

| ($ in thousands) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| **Other interest expense, net:** | | | |
| Good Sam Services and Plans | $ (77) | $ (204) | $ 57 |
| RV and Outdoor Retail | 30,373 | 27,131 | 14,802 |
| Subtotal | 30,296 | 26,927 | 14,859 |
| Corporate & other | 110,148 | 108,343 | 60,886 |
| Total other interest expense, net | $ 140,444 | $ 135,270 | $ 75,745 |

| ($ in thousands) | As of December 31, 2024 | 2023 |
|---|---|---|
| **Assets:** | | |
| Good Sam Services and Plans | $ 121,876 | $ 113,619 |
| RV and Outdoor Retail | 4,509,509 | 4,568,372 |
| Subtotal | 4,631,385 | 4,681,991 |
| Corporate & other | 231,892 | 207,461 |
| Total assets | $ 4,863,277 | $ 4,889,452 |

| ($ in thousands) | Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| **Capital expenditures:** | | | |
| Good Sam Services and Plans | $ 8,534 | $ 4,040 | $ 5,099 |
| RV and Outdoor Retail | 91,905 | 194,234 | 205,491 |
| Subtotal | 100,439 | 198,274 | 210,590 |
| Corporate and other | — | — | 2 |
| Total capital expenditures | $ 100,439 | $ 198,274 | $ 210,592 |

Table of Contents

**Schedule I: Condensed Financial Information of Registrant**

Camping World Holdings, Inc.
Condensed Balance Sheets
(Parent Company Only)
(In Thousands Except Per Share Amounts)

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 10,141 | $ 1,905 |
| Affiliate Loan | 6,000 | 30,000 |
| Prepaid income taxes and other | 2,817 | 39 |
| Total current assets | 18,958 | 31,944 |
| | | |
| Deferred tax asset | 213,642 | 199,696 |
| Investment in subsidiaries | 248,127 | 100,759 |
| Total assets | $ 480,727 | $ 332,399 |
| | | |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accrued liabilities | 96 | 1,238 |
| Current portion of liabilities under Tax Receivable Agreement | — | 12,943 |
| Total current liabilities | 96 | 14,181 |
| | | |
| Liabilities under Tax Receivable Agreement, net of current portion | 150,372 | 149,866 |
| Other long-term liabilities | 3,697 | — |
| Total liabilities | 154,165 | 164,047 |
| | | |
| Commitments and contingencies | | |
| | | |
| Stockholders' equity: | | |
| Preferred stock, par value $0.01 per share – 20,000 shares authorized; none issued and outstanding as of December 31, 2024 and 2023 | — | — |
| Class A common stock, par value $0.01 per share – 250,000 shares authorized; 62,502 issued and 62,502 outstanding as of December 31, 2024 and 49,571 issued and 45,020 outstanding as of December 31, 2023 | 625 | 496 |
| Class B common stock, par value $0.0001 per share – 75,000 shares authorized; 39,466 issued and outstanding as of December 31, 2024; 39,466 issued and outstanding as of December 31, 2023 | 4 | 4 |
| Class C common stock, par value $0.0001 per share – 0.001 share authorized, issued and outstanding as of December 31, 2024 and 2023 | — | — |
| Additional paid-in capital | 193,692 | 131,665 |
| Treasury stock, at cost; none and 4,551 shares as of December 31, 2024 and 2023, respectively | — | (159,440) |
| Retained earnings | 132,241 | 195,627 |
| Total stockholders' equity | 326,562 | 168,352 |
| Total liabilities and stockholders' equity | $ 480,727 | $ 332,399 |

*See accompanying Notes to Condensed Financial Information*

Table of Contents

**Schedule I: Condensed Financial Information of Registrant (continued)**

Camping World Holdings, Inc.
Condensed Statements of Operations
(Parent Company Only)
(In Thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Revenue: | | | |
| Intercompany revenue | $ 12,637 | $ 10,584 | $ 10,069 |
| Total revenue | 12,637 | 10,584 | 10,069 |
| Operating expenses: | | | |
| Selling, general, and administrative | 12,715 | 10,646 | 10,069 |
| Total operating expenses | 12,715 | 10,646 | 10,069 |
| Loss from operations | (78) | (62) | — |
| Interest income, net | 1,209 | 1,426 | 477 |
| Affiliate Loan interest income | 141 | 39 | — |
| Tax Receivable Agreement liability adjustment | — | 2,442 | 114 |
| Other income, net | — | — | 139 |
| Equity in net (loss) income of subsidiaries | (53,442) | 21,463 | 215,271 |
| (Loss) income before income taxes | (52,170) | 25,308 | 216,001 |
| Income tax benefit (expense) | 13,533 | 8,064 | (92,253) |
| Net (loss) income | $ (38,637) | $ 33,372 | $ 123,748 |

*See accompanying Notes to Condensed Financial Information*

Table of Contents

**Schedule I: Condensed Financial Information of Registrant (continued)**

Camping World Holdings, Inc.
Condensed Statements of Cash Flows
(Parent Company Only)
(In Thousands)

| | For the Year Ended December 31, 2024 | 2023 | 2022 |
|---|---|---|---|
| **Operating activities** | | | |
| Net (loss) income | $ (38,637) | $ 33,372 | $ 123,748 |
| | | | |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | | |
| Equity in net income of subsidiaries | 53,442 | (21,463) | (215,271) |
| Deferred tax expense | (12,846) | (14,229) | 41,871 |
| Tax Receivable Agreement liability adjustment | — | (2,442) | (114) |
| Change in assets and liabilities, net of acquisitions: | | | |
| Prepaid income taxes and other assets | (2,590) | 6,219 | 2,914 |
| Accounts payable and other accrued liabilities | (1,238) | 1,238 | — |
| Payment pursuant to Tax Receivable Agreement | (13,350) | (10,937) | (11,322) |
| Other, net | 3,697 | — | — |
| Net cash used in operating activities | (11,522) | (8,242) | (58,174) |
| | | | |
| **Investing activities** | | | |
| Purchases of LLC Interest from CWGS, LLC | (333,905) | (389) | (541) |
| Return of LLC Interest to CWGS, LLC for funding of treasury stock purchases | — | — | 79,757 |
| Distributions received from CWGS, LLC | 20,507 | 36,716 | 162,767 |
| Lent funds under Affiliate Loan | (79,000) | (30,000) | — |
| Repaid funds under Affiliate Loan | 103,000 | — | — |
| Net cash (used in) provided by investing activities | (289,398) | 6,327 | 241,983 |
| | | | |
| **Financing activities** | | | |
| Proceeds from issuance of Class A common stock sold in a public offering net of underwriter discounts and commissions | 333,356 | — | — |
| Dividends paid to Class A common stockholders | (24,749) | (66,831) | (105,387) |
| Proceeds from exercise of stock options | 549 | 389 | 541 |
| Repurchases of Class A common stock to treasury | — | — | (79,757) |
| Disgorgement of short-swing profits by Section 16 officer | — | — | 58 |
| Net cash provided by (used in) financing activities | 309,156 | (66,442) | (184,545) |
| | | | |
| Increase (decrease) in cash and cash equivalents | 8,236 | (68,357) | (736) |
| Cash and cash equivalents at beginning of year | 1,905 | 70,262 | 70,998 |
| Cash and cash equivalents at end of the year | $ 10,141 | $ 1,905 | $ 70,262 |

*See accompanying Notes to Condensed Financial Information*

Table of Contents

**Schedule I: Condensed Financial Information of Registrant (continued)**

**Camping World Holdings, Inc.**
**Notes to Condensed Financial Information**
**(Parent Company Only)**
**December 31, 2024**

### 1. Organization

Camping World Holdings, Inc. (the "Parent Company") was formed on March 8, 2016 as a Delaware corporation and is a holding company with no direct operations. The Parent Company's assets consist primarily of cash and cash equivalents, its equity interest in CWGS Enterprises, LLC ("CWGS, LLC"), its Affiliate Loan (as defined in Note 4 – Affiliate Loan), and certain deferred tax assets.

The Parent Company's cash inflows are primarily from cash dividends or distributions and other transfers from CWGS, LLC. The amounts available to the Parent Company to fulfill cash commitments and pay cash dividends on its common stock are subject to certain restrictions in CWGS, LLC's Senior Secured Credit Facilities. See Note 10 to the consolidated financial statements.

### 2. Basis of Presentation

These condensed parent company financial statements should be read in conjunction with the consolidated financial statements of Camping World Holdings, Inc. and the accompanying notes thereto, included in this Form 10-K. For purposes of this condensed financial information, the Parent Company's interest in CWGS, LLC is recorded based upon its proportionate share of CWGS, LLC's net assets (similar to presenting them on the equity method).

The Parent Company is the sole managing member of CWGS, LLC, and pursuant to the Amended and Restated LLC Agreement of CWGS, LLC (the "LLC Agreement"), receives compensation in the form of reimbursements for all costs associated with being a public company. Intercompany revenue consists of these reimbursement payments and is recognized when the corresponding expense to which it relates is recognized.

Certain intercompany balances presented in these condensed Parent Company financial statements are eliminated in the consolidated financial statements. For the years ended December 31, 2024, 2023, and 2022, the full amounts of intercompany revenue and equity in net income of subsidiaries in the accompanying Parent Company Statements of Operations were eliminated in consolidation. No intercompany receivable was owed to the Parent Company by CWGS, LLC at December 31, 2024 and 2023 (see Note 4 – Affiliate Loan for other amounts owed to the Parent Company). Related party amounts that were not eliminated in the consolidated financial statements include the Parent Company's liabilities under the tax receivable agreement, which totaled $150.4 million and $162.8 million as of December 31, 2024 and 2023, respectively.

### 3. Revisions to Prior Period Condensed Financial Statements

Subsequent to the issuance of the Parent Company's condensed financial statements for the year ended December 31, 2023, the Parent Company's management identified prior period misstatements related to the measurement of the realizable portion of the Parent Company's outside basis difference deferred tax asset in CWGS, LLC, including the associated valuation allowance. As a result, deferred tax assets, net, additional paid-in capital, and income tax benefit (expense) have been revised from the amounts previously reported as of and for the years ended December 31, 2023 and 2022. The Parent Company evaluated the materiality of these errors both qualitatively and quantitatively in accordance with Staff Accounting Bulletin ("SAB") No. 99, Materiality, and SAB No. 108, Considering the Effects of Prior Year Misstatements When Quantifying Misstatements in Current Year Financial Statements, and determined the effect of these revisions was not material to the previously issued financial statements. However, correcting the cumulative error during the year ended December 31, 2024 would have been material to the current period. Therefore, the Parent Company has revised the condensed financial statements for the prior periods presented, including the comparative prior period amounts in the applicable notes to the condensed financial statements.

The following table presents the effect of the immaterial misstatements on the Parent Company's condensed balance sheet for the period indicated:

Table of Contents

| ($ in thousands) | As of December 31, 2023 As Previously Reported | Adjustment | As Revised |
|---|---|---|---|
| Deferred tax assets, net | $ 155,928 | $ 43,768 | $ 199,696 |
| Total assets | 288,631 | 43,768 | 332,399 |
| Additional paid-in capital | 98,280 | 33,385 | 131,665 |
| Retained earnings | 185,244 | 10,383 | 195,627 |
| Total stockholders' equity | 124,584 | 43,768 | 168,352 |
| Total liabilities and stockholders' equity | 288,631 | 43,768 | 332,399 |

The following table presents the effect of the immaterial misstatements on the Parent Company's condensed statement of income (loss) for the periods indicated:

| | Year Ended December 31, 2023 | | | Year Ended December 31, 2022 | | |
|---|---|---|---|---|---|---|
| ($ in thousands) | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised |
| Income tax benefit (expense) | $ 5,736 | $ 2,328 | $ 8,064 | $ (79,054) | $ (13,199) | $ (92,253) |
| Net income | 31,044 | 2,328 | 33,372 | 136,947 | (13,199) | 123,748 |

The following table presents the effect of the immaterial misstatements on the Parent Company's condensed statement of cash flows for the periods indicated. These immaterial misstatements resulted in no change in net cash used in operating activities for the periods indicated:

| | Year Ended December 31, 2023 | | | Year Ended December 31, 2022 | | |
|---|---|---|---|---|---|---|
| ($ in thousands) | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised |
| Net income | $ 31,044 | $ 2,328 | $ 33,372 | $ 136,947 | $ (13,199) | $ 123,748 |
| Deferred income taxes | (11,901) | (2,328) | (14,229) | 28,672 | 13,199 | 41,871 |

### 4. Affiliate Loan

In December 2023, the Parent Company (the "Lender") and CWGS Group, LLC (the "Borrower"), a wholly-owned subsidiary of CWGS, LLC, entered into a loan agreement (the "Affiliate Loan") whereby the Borrower may borrow up to $40.0 million from the Lender at an interest rate of the Secured Overnight Financing Rate ("SOFR") plus 6.50% per annum. The Lender may demand repayment with thirty-day notice, there are no prepayment restrictions or penalties, and the Affiliate Loan expires in December 2025.

At December 31, 2024 and 2023, the Borrower had outstanding balances of $6.0 million and $30.0 million, respectively, under the Affiliate Loan that were each repaid with accrued interest early in January of the following year. At December 31, 2024 and 2023, the interest rate on the Affiliate Loan was 10.86% and 11.86%, respectively, and accrued interest was less than $0.1 million at December 31, 2024 and 2023.

### 5. Commitments and Contingencies

The Parent Company is party to a tax receivable agreement with certain holders of common units in CWGS, LLC (the "Continuing Equity Owners") that provides for the payment by the Parent Company to the Continuing Equity Owners of 85% of the amount of any tax benefits that the Parent Company actually realizes, or in some cases are deemed to realize, as a result of certain transactions. See Note 12 to the consolidated financial statements for more information regarding the Parent Company's tax receivable agreement. As described in Note 12 to the consolidated financial statements, amounts payable under the tax receivable agreement are contingent upon, among other things, (i) generation of future taxable income of Camping World Holdings, Inc. over the term of the tax receivable agreement and (ii) future changes in tax laws. As of December 31, 2024 and 2023, liabilities under the tax receivable agreement totaled $150.4 million and $162.8 million, respectively. The Parent Company does not expect a cash tax reduction for tax benefits subject to the Tax Receivable Agreement during the year ended December 31, 2024 and, therefore, does not expect a payment under the Tax Receivable Agreement to be made during the year ending December 31, 2025.

See Note 14 to the consolidated financial statements for information regarding pending and threatened litigation. Pursuant to the LLC Agreement, the Parent Company receives reimbursements for all costs associated with being a public company, which includes costs of litigation and cybersecurity incidents.

**6. Income Taxes**

CWGS, LLC completed the steps necessary to convert Camping World, Inc. ("CW") and certain of its subsidiaries from Subchapter C Corporations to limited liability companies ("LLCs") with an effective date of January 2, 2023 (the "LLC Conversion"). All required filings for conversion to LLC were made by December 31, 2022. Accordingly, the effect of the LLC Conversion was recorded during the year ended December 31, 2022, as the filings were perfunctory pursuant to the rules prescribed under ASC 740, Income Taxes. Beginning with the year ending December 31, 2023, the operating losses of CW and its subsidiaries will offset taxable income generated by CWGS, LLC's other LLC businesses. As a result, both income tax expense recognized by the Parent Company and the amount of required tax distributions paid to holders of common units in CWGS, LLC, under the CWGS LLC Agreement, will decrease. The LLC Conversion will allow CWGS, LLC to more easily integrate its retail and dealership operations and more seamlessly share resources within the RV and Outdoor Retail segment, while providing an expected future cash flow benefit for the operating companies.

During the year ended December 31, 2023, the above LLC Conversion resulted in additional income tax benefit for the Parent Company of $3.1 million. Additionally, the Parent Company recorded an income tax benefit of $4.1 million related to an entity classification election that was filed in the third quarter of 2023 with a January 2, 2023 effective date.

**7. November 2024 Public Offering**

On November 1, 2024, the Parent Company completed a public offering (the "November 2024 Public Offering") in which the Parent Company sold 14,634,146 shares of the Parent Company's Class A common stock at a public offering price of $20.50 per share (or $19.81 per share after underwriting discounts and commissions). The Parent Company received $289.9 million in proceeds, net of underwriting discounts and commissions, which were used to purchase 14,634,146 common units from CWGS, LLC at a price per unit equal to the public offering price per share of Class A common stock in the November 2024 Public Offering, less underwriting discounts and commissions.

Additionally, in November 2024, the underwriters exercised their option to purchase an additional 2,195,121 shares of Class A common stock and the Parent Company received $43.5 million in additional proceeds, net of underwriting discounts and commissions, which were used to purchase 2,195,121 common units from CWGS, LLC at a price per unit equal to the public offering price per share of Class A common stock in the November 2024 Public Offering, less underwriting discounts and commissions.

Of the 16,829,267 shares Class A common stock sold in the November 2024 Public Offering, 4,228,700 were issued from treasury stock and the remainder were newly-issued shares. CWGS, LLC, on behalf of the Parent Company, incurred approximately $1.0 million of offering costs that were recorded as a reduction in the additional paid-in capital recorded by the Parent Company for the proceeds from the November 2024 Public Offering.

**8. Stock Repurchase Program**

During the years ended December 31, 2024 and 2023, the Parent Company did not repurchase Class A common stock under the stock repurchase program. During the year ended December 31, 2022, the Parent Company repurchased 2,592,524 shares of Class A common stock, under this program for approximately $79.8 million, including commissions paid, at a weighted average price per share of $30.76, which is recorded as treasury stock on the Parent Company's balance sheet. During the year ended December 31, 2022, the $79.8 million was concurrently funded by CWGS, LLC in exchange for the return of 2,592,524 common units in CWGS, LLC, which reduced the Parent Company's ownership interest in CWGS, LLC. Class A common stock held as treasury stock is not considered outstanding. During the years ended December 31, 2024, 2023 and 2022, the Parent Company reissued 322,271, 579,176 and 852,508 shares of Class A common stock, respectively, from treasury stock to settle the exercises of stock options, vesting of restricted stock units, and settlement of other stock-based awards under the Parent Company's 2016 Incentive Award Plan. As discussed in Note 7 — November 2024 Public Offering, the Company reissued 4,228,700 shares of Class A common stock held as treasury in the November 2024 Public Offering. As of December 31, 2024, the remaining approved

Table of Contents

amount for repurchases of Class A common stock under the share repurchase program was approximately $120.2 million.

**9. Statements of Cash Flows**

Supplemental disclosures of cash flow information are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2024 | 2023 | 2022 |
| Cash (refunded) paid during the period for: | | | |
| Interest | $ — | $ — | $ — |
| Income taxes | (4,989) | (646) | 47,601 |
| Noncash financing activities: | | | |
| Par value of Class A common stock issued for redemption of common units in CWGS, LLC | 1 | 20 | 1 |
| Cost of treasury stock issued for vested restricted stock units | 15,320 | 29,542 | 42,640 |

Table of Contents

**Schedule II: Valuation and Qualifying Accounts**

| (In Thousands) | Balance at Beginning of Period | Additions Charged to Expense[1] | Charged to Other Accounts[2] | Charges Utilized (Write-offs) | Balance at End of Period |
|---|---|---|---|---|---|
| **Accounts receivable allowance[3]:** | | | | | |
| Year ended December 31, 2024 | $ 2,978 | $ 754 | $ — | $ (984) | $ 2,748 |
| Year ended December 31, 2023 | 4,222 | (954) | 14 | (304) | 2,978 |
| Year ended December 31, 2022 | 4,711 | 675 | 297 | (1,461) | 4,222 |

(1) Additions to allowance for credit losses are charged to expense.
(2) Additions to returns allowances are credited against revenue.
(3) Accounts receivable allowance includes the allowance for credit losses and the allowance for returns.

| (In Thousands) | Balance at Beginning of Period | Additions Charged to Expense | Charged to Other Accounts | Charges Utilized (Write-offs) | Balance at End of Period |
|---|---|---|---|---|---|
| **Noncurrent other assets allowance:** | | | | | |
| Year ended December 31, 2024 | $ 61 | $ — | $ — | $ (61) | $ — |
| Year ended December 31, 2023 | 37 | 61 | — | (37) | 61 |
| Year ended December 31, 2022 | 42 | (5) | — | — | 37 |

| (In Thousands) | Balance at Beginning of Period | Tax Valuation Allowance Charged to Income Tax Provision | Tax Valuation Allowance Credited to Income Tax Provision | Charged or (Credited) to Other Accounts[1] | Balance at End of Period |
|---|---|---|---|---|---|
| **Valuation allowance for deferred tax assets:** | | | | | |
| Year ended December 31, 2024 | $ 192,686 | $ — | $ (1,568) | $ 36,487 | $ 227,605 |
| Year ended December 31, 2023 | 106,052 | 64,351 | — | 22,283 | 192,686 |
| Year ended December 31, 2022 | 291,386 | — | (151,058) | (34,276) | 106,052 |

(1) Amounts charged to additional paid-in capital relating to the outside basis in the investment in CWGS, LLC.

Table of Contents

## ITEM 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## ITEM 9A. Controls and Procedures

*Limitations on Effectiveness of Controls and Procedures*

All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

*Evaluation of Disclosure Controls and Procedures*

Our management carried out an evaluation, under the supervision and participation of our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial officer), of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act")) as of December 31, 2024. Based on our management's evaluation, our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial officer) concluded that our disclosure controls and procedures were not effective as of December 31, 2024 as a result of the material weakness discussed below. Notwithstanding this material weakness, our management concluded that our consolidated financial statements included in Part II, Item 8 of this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, results of operations and cash flows as of and for the periods presented in conformity with accounting principles generally accepted in the United States ("U.S. GAAP").

*Management's Annual Report on Internal Control over Financial Reporting*

Our management is responsible for establishing and maintaining adequate internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act. Internal control over financial reporting is a process designed under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP.

Under the supervision and participation of our Chief Executive Officer and our Chief Financial Officer, our management conducted an assessment of the effectiveness of our internal control over financial reporting as of December 31, 2024, based on the criteria set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Our management identified control deficiencies that, individually or in the aggregate, constitute a material weakness in our internal control over financial reporting and has concluded that our internal control over financial reporting was not effective as of December 31, 2024.

Our management has excluded from its assessment of internal control over financial reporting at December 31, 2024 the internal control over financial reporting of our recently acquired tire rescue roadside assistance business in 2024 (the "2024 Excluded Acquisition"). The 2024 Excluded Acquisition constituted $0.7 million and $0.1 million of total assets and net assets, respectively, as of December 31, 2024, and $1.3 million and $0.3 million of revenues and pre-tax loss, respectively, for the year then ended. Goodwill is held at the reporting unit level and is not excluded from our assessment of internal control over financial reporting nor is goodwill included in the preceding total assets or net assets for the 2024 Excluded Acquisition.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the preparation of our financial statements for the year ended December 31, 2024, we identified a material weakness in the design and operation of our income tax controls, including over the review of the measurement of the realizable portion of the Company's outside basis difference deferred tax asset in the operating partnership, CWGS, LLC. This material weakness remains unremediated as of December 31, 2024.

Deloitte & Touche LLP, the independent registered public accounting firm that audited the consolidated financial statements included in this Form 10-K, has issued an attestation report on our internal control over financial reporting, which expressed an adverse opinion as stated in their report which is included in this Item 9A.

*Changes in Internal Control over Financial Reporting*

During the quarter ended December 31, 2024, we completed the process of incorporating the internal controls for the businesses we acquired in 2023, comprised of 18 dealerships (the "2023 Excluded Acquisitions"), into our internal control over financial reporting and extending our Section 404 compliance program under the Sarbanes-Oxley Act of 2002 and the applicable rules and regulations under such Act to include the 2023 Excluded Acquisitions.

Except as otherwise described above, there was no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) identified in connection with the evaluation of our internal control performed during the fiscal quarter ended December 31, 2024, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

*Remediation Efforts to Address Material Weakness*

Our management is committed to maintaining a strong internal control environment. In response to the identified material weakness above, management with the oversight of the Audit Committee of the Board of Directors, is taking comprehensive actions to remediate the above material weakness. Our remediation plans include the following:

- Implementing separate specific controls over the review of the quantification of realizable tax basis in CWGS, LLC;
- Redesigning the reports utilized to calculate the gross outside basis difference to enhance management's review of the calculation; and
- Developing and conducting training for individuals responsible for reviewing calculation and measurement of the realizable tax basis in CWGS, LLC.

We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting, which may necessitate additional implementation and evaluation time. We will continue to assess the effectiveness of our internal control over financial reporting and take steps to remediate the material weakness expeditiously. The material weakness will not be considered remediated until the applicable remediated controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the stockholders and the Board of Directors of Camping World Holdings, Inc., and subsidiaries

### Opinion on Internal Control over Financial Reporting

We have audited the internal control over financial reporting of Camping World Holdings, Inc., and subsidiaries (the "Company") as of December 31, 2024, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, because of the effect of the material weakness identified below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2024, based on criteria established in *Internal Control — Integrated Framework (2013)* issued by COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2024, of the Company and our report dated February 28, 2025, expressed an unqualified opinion on those financial statements.

As described in Management's Annual Report on Internal Control over Financial Reporting in Item 9A, management excluded from its assessment the internal control over financial reporting at the Company's recently acquired tire rescue roadside assistance business in 2024 (the "Excluded Acquisition"). The Excluded Acquisition constituted $0.7 million and $0.1 million of total assets and net assets, respectively, as of December 31, 2024. It represented $1.3 million of revenue and pre-tax loss of $0.3 million for the year ended December 31, 2024.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

### Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized

acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Material Weakness**

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

The following material weakness has been identified and included in management's assessment: The controls over the review of the measurement of the realizable portion of the Company's outside basis difference deferred tax asset in the operating partnership, CWGS, LLC, were not designed effectively. This material weakness remains unremediated as of December 31, 2024. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements as of and for the year ended December 31, 2024, of the Company, and this report does not affect our report on such financial statements.

/s/ Deloitte & Touche LLP

Chicago, Illinois

February 28, 2025

**ITEM 9B. Other Information**

(a) As disclosed above, this Form 10-K reflects the correction of an error to previously issued financial statements that required a recovery analysis of incentive-based compensation received by the Company's executive officers. The Company has determined that no recovery of incentive-based compensation is required as the correction resulted in no changes to the performance metrics used to determine incentive-based compensation for executive officers during the last three completed fiscal years.

(b) During the three months ended December 31, 2024, no director or officer of the Company adopted or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

**ITEM 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable

Table of Contents

## PART III

### ITEM 10. Directors, Executive Officers and Corporate Governance

We have adopted a written code of business conduct and ethics, which applies to all of our directors, officers and employees, including our principal executive officer and our principal financial and accounting officer. Our Code of Business Conduct and Ethics is available on our website www.campingworld.com in the "Investor Relations" section under "Governance." In addition, we intend to post on our website all disclosures that are required by law or New York Stock Exchange listing rules concerning any amendments to, or waivers from, any provision of our Code of Business Conduct and Ethics. The information contained on our website is not incorporated by reference into this Form 10-K.

The information concerning our executive officers and directors in response to this item is contained above in part under the caption "Information About Our Executive Officers and Directors" at the end of Part I of this Form 10-K. Other Information required by this item will be included under the captions "Proposal 1: Election of Directors", "Corporate Governance", "Committees of the Board", and, if applicable, "Delinquent Section 16(a) Reports" in our Proxy Statement for our 2025 Annual Meeting of Stockholders and, upon filing, is incorporated herein by reference.

### ITEM 11. Executive Compensation

The information required by this item will be included under the captions "Executive Compensation", "Director Compensation", "Compensation Committee Report", and "Compensation Committee Interlocks and Insider Participation" in our Proxy Statement for our 2025 Annual Meeting of Stockholders and, upon filing, is incorporated herein by reference.

### ITEM 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The following table provides information about our compensation plans under which our Class A common stock is authorized for issuance, as of December 31, 2024:

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuances under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by security holders[(1)] | 1,806,958 | $21.98 | 6,666,534 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 1,806,958 | $21.98 | 6,666,534 |

(1) Includes awards granted and available to be granted under our 2016 Plan.

Other information required by this item with respect to security ownership of certain beneficial owners and management will be included under the caption "Security Ownership of Certain Beneficial Owners and

Table of Contents

Management" and "Equity Compensation Plan Information" in our Proxy Statement for our 2025 Annual Meeting of Stockholders and, upon filing, is incorporated herein by reference.

**ITEM 13. Certain Relationships and Related Transactions, and Director Independence**

The information required by this item will be included under the captions "Certain Relationships and Related Person Transactions" and "Corporate Governance—Director Independence" in our Proxy Statement for our 2025 Annual Meeting of Stockholders and, upon filing, is incorporated herein by reference.

**ITEM 14. Principal Accountant Fees and Services**

The information required by this item will be included under the caption "Independent Registered Public Accounting Firm Fees and Other Matters" in our Proxy Statement for our 2025 Annual Meeting of Stockholders and, upon filing, is incorporated herein by reference.

Table of Contents

## PART IV

### ITEM 15. Exhibits, Financial Statements and Schedules

(a)(1) Financial Statements.

See the table of contents under “Item 8. Financial Statements and Supplementary Data” in Part II of this Form 10-K above for the list of financial statements filed as part of this report.

(a)(2) Financial Statement Schedules.


Schedule I: Condensed Financial Information of Registrant 149
Schedule II: Valuation and Qualifying Accounts 156


All other schedules have been omitted because they are not required or because the required information is given in the Consolidated Financial Statements or Notes thereto set forth above under “Item 8. Financial Statements and Supplementary Data” in Part II of this Form 10-K, beginning on page 92.

(a)(3) Exhibits.

### INDEX TO EXHIBITS

| Exhibit Number | Exhibit Description | Incorporated by Reference | | | | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date | |
| 3.1 | Amended and Restated Certificate of Incorporation of Camping World Holdings, Inc. | 10-Q | 001-37908 | 3.1 | 11/10/16 | |
| 3.2 | Amended and Restated Bylaws of Camping World Holdings, Inc. | 8-K | 001-37908 | 3.1 | 12/26/23 | |
| 4.1 | Specimen Stock Certificate evidencing the shares of Class A common stock | S-1/A | 333-211977 | 4.1 | 9/13/16 | |
| 4.2 | Description of Capital Stock | 10-K | 001-37908 | 4.2 | 2/26/24 | |
| 10.1 | Tax Receivable Agreement, dated October 6, 2016 | 10-K | 001-37908 | 10.1 | 3/13/17 | |
| 10.2 | Amendment No. 1 to Tax Receivable Agreement, dated December 22, 2023 | 10-K | 001-37908 | 10.22 | 2/26/24 | |
| 10.3 | Voting Agreement, dated October 6, 2016 | 10-K | 001-37908 | 10.2 | 3/13/17 | |
| 10.4 | Amended and Restated LLC Agreement of CWGS Enterprises, LLC, dated October 6, 2016 | 10-K | 001-37908 | 10.3 | 3/13/17 | |
| 10.5 | Registration Rights Agreement, dated October 6, 2016 | 10-K | 001-37908 | 10.4 | 3/13/17 | |
| 10.6 | Eighth Amended and Restated Credit Agreement, dated September 30, 2021, among FreedomRoads, LLC, as the company and a borrower, certain subsidiaries of FreedomRoads, LLC, as subsidiary borrowers, Bank of America, N.A., as administrative agent and letter of credit issuer, and the other lenders party thereto | 8-K | 001-37908 | 10.1 | 10/6/21 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference: Form | File No. | Exhibit | Filing Date | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| 10.7 | Amendment No. 1 to the Eighth Amended and Restated Credit Agreement, dated July 18, 2023, among FreedomRoads, LLC, as the company and a borrower, certain subsidiaries of FreedomRoads, LLC, as subsidiary borrowers, Bank of America, N.A., as administrative agent, and the lenders party thereto | 8-K | 001-37908 | 10.1 | 7/20/23 | |
| 10.8 | Credit Agreement, dated June 3, 2021, by and among CWGS Enterprises, LLC, as holdings, CWGS Group, LLC, as borrower, the lenders party thereto and Goldman Sachs Bank USA, as administrative agent | 8-K | 001-37908 | 10.1 | 6/8/21 | |
| 10.9 | Amendment No. 1 to Credit Agreement, dated December 20, 2021, by and among CWGS Enterprises, LLC, as holdings, CWGS Group, LLC, as borrower, the lenders party thereto and Goldman Sachs Bank USA, as administrative agent | 8-K | 001-37908 | 10.1 | 12/23/21 | |
| 10.10 | Amendment No. 3 to Credit Agreement, dated December 2, 2024, by and among CWGS Enterprises, LLC, as holdings, CWGS Group, LLC, as borrower, the lenders party thereto and Goldman Sachs Bank USA, as administrative agent | 8-K | 001-37908 | 10.1 | 12/5/24 | |
| 10.11 | Credit Agreement, dated as of October 27, 2022, by and among certain subsidiaries of FRHP Lincolnshire, LLC, as Holdings, certain subsidiaries of Holdings, as Borrowers, CWGS Group, LLC as Guarantor, Manufacturers and Traders Trust Company, as Administrative Agent, and the Financial Institutions Party thereto, as Lenders | 10-Q | 001-37908 | 10.1 | 11/2/22 | |
| 10.12 | Amendment No. 1 to Credit Agreement and Incremental Amendment, dated August 27, 2024, by and among subsidiaries of FRHP Lincolnshire, LLC, CWGS Group, LLC (as guarantor), Manufacturers and Traders Trust Company, as administrative agent, and the other lenders party thereto | 8-K | 001-37908 | 10.1 | 8/30/24 | |
| #10.13 | Camping World Holdings, Inc. 2016 Incentive Award Plan | S-8 | 333-214040 | 4.4 | 10/11/16 | |
| #10.14 | Camping World Holdings, Inc. Non-Employee Director Compensation Policy | 10-Q | 001-37908 | 10.1 | 5/3/24 | |
| #10.15 | Camping World Holdings, Inc. Director Stock Ownership Policy | 10-K | 001-37908 | 10.21 | 3/13/17 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference: Form | File No. | Exhibit | Filing Date | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| #10.16 | Camping World Holdings, Inc. Executive Officer Stock Ownership Policy | 10-K | 001-37908 | 10.22 | 3/13/17 | |
| #10.17 | Form of Employee Stock Option Agreement | S-1/A | 333-211977 | 10.28 | 9/20/16 | |
| #10.18 | Form of Employee Restricted Stock Unit Agreement | 10-Q | 001-37908 | 10.2 | 8/10/17 | |
| #10.19 | Form of Director Restricted Stock Unit Agreement | 10-Q | 001-37908 | 10.3 | 8/10/17 | |
| #10.20 | Performance Stock Unit Award Grant Notice and Award Agreement, dated January 26, 2025 with Marcus A. Lemonis | | | | | * |
| #10.21 | Form of Indemnification Agreement | S-1/A | 333-211977 | 10.31 | 9/26/16 | |
| #10.22 | Amended and Restated Employment Agreement with Marcus A. Lemonis effective January 1, 2025 | | | | | * |
| #10.23 | Amended and Restated Employment Agreement with Brent L. Moody effective as of July 1, 2024 | 10-Q | 001-37908 | 10.1 | 8/1/24 | |
| #10.24 | Amended and Restated Employment Agreement with Karin L. Bell effective as of July 1, 2024 | 10-Q | 001-37908 | 10.2 | 8/1/24 | |
| #10.25 | Amended and Restated Employment Agreement with Matthew D. Wagner effective as of July 1, 2024 | 10-Q | 001-37908 | 10.3 | 8/1/24 | |
| #10.26 | Amended and Restated Employment Agreement with Thomas E. Kirn effective as of July 1, 2024 | 10-Q | 001-37908 | 10.4 | 8/1/24 | |
| #10.27 | Amended and Restated Employment Agreement with Lindsey J. Christen effective as of July 1, 2024 | 10-Q | 001-37908 | 10.5 | 8/1/24 | |
| 10.28 | Ninth Amended and Restated Credit Agreement, dated February 18, 2025, among FreedomRoads, LLC, as the company and a borrower, certain subsidiaries of FreedomRoads, LLC, as subsidiary borrowers, Bank of America, N.A., as administrative agent, and the lenders party thereto | 8-K | 001-37908 | 10.1 | 2/19/25 | |
| 19.1 | Insider Trading Compliance Policy | | | | | * |
| 21.1 | List of Subsidiaries of Camping World Holdings, Inc. | | | | | * |
| 23.1 | Consent of Independent Registered Public Accounting Firm | | | | | * |
| 24.1 | Power of Attorney | | | | | * |

Table of Contents

| | | Incorporated by Reference | | | | |
|---|---|---|---|---|---|---|
| Exhibit Number | Exhibit Description | Form | File No. | Exhibit | Filing Date | Filed/ Furnished Herewith |
| 31.1 | Rule 13a-14(a) / 15d-14(a) Certification of Chief Executive Officer | | | | | * |
| 31.2 | Rule 13a-14(a) / 15d-14(a) Certification of Chief Financial Officer | | | | | * |
| 32.1 | Section 1350 Certification of Chief Executive Officer | | | | | ** |
| 32.2 | Section 1350 Certification of Chief Financial Officer | | | | | ** |
| 97.1 | Policy For Recovery of Erroneously Awarded Compensation | 10-K | 001-37908 | 97.1 | 2/26/24 | |
| 101.INS | Inline XBRL Instance Document – the Instance Document does not appear in the interactive data file because its XBRL tags are embedded within the Inline XBRL document | | | | | *** |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | | | *** |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | | *** |
| 101.DEF | Inline XBRL Extension Definition Linkbase Document | | | | | *** |
| 101.LAB | Inline XBRL Taxonomy Label Linkbase Document | | | | | *** |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | | | *** |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | | | | | *** |

* Filed herewith

** Furnished herewith

*** Submitted electronically herewith

# Indicates management contract or compensatory plan

**ITEM 16. Form 10-K Summary**

None

Table of Contents

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Camping World Holdings, Inc.

Date: February 28, 2025

By: /s/ MARCUS A. LEMONIS
Marcus A. Lemonis
*Chairman and Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities set forth opposite to their names and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ MARCUS A. LEMONIS<br>Marcus A. Lemonis | Chairman, Chief Executive Officer and Director (Principal Executive Officer) | February 28, 2025 |
| /s/ THOMAS E. KIRN<br>Thomas E. Kirn | Chief Financial Officer (Principal Financial Officer and Principal Accounting Officer) | February 28, 2025 |
| *<br>Andris A. Baltins | Director | |
| *<br>Brian P. Cassidy | Director | |
| *<br>Mary J. George | Director | |
| *<br>Kathleen S. Lane | Director | |
| *<br>Michael W. Malone | Director | |
| *<br>Brent L. Moody | Director | |
| *<br>K. Dillon Schickli | Director | |

*By: /s/ MARCUS A. LEMONIS
Marcus A. Lemonis
*Attorney-in-fact*

February 28, 2025

**Exhibit 10.20**

**CAMPING WORLD HOLDINGS, INC.**
**2016 INCENTIVE AWARD PLAN**

**PERFORMANCE STOCK UNIT AWARD GRANT NOTICE**

Camping World Holdings, Inc., a Delaware corporation, (the "Company"), pursuant to its 2016 Incentive Award Plan, as amended from time to time (the "Plan"), hereby grants to the holder listed below (the "Participant"), an award of performance stock units ("Performance Stock Units" or "PSUs"). Each vested Performance Stock Unit represents the right to receive, in accordance with the Performance Stock Unit Award Agreement attached hereto as Exhibit A (the "Agreement"), a number of shares of Common Stock (each, a "Share") based on the Company's achievement of certain performance goals over the applicable performance period. This award of Performance Stock Units is subject to all of the terms and conditions set forth herein and in the Agreement and the Plan, each of which are incorporated herein by reference. Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Performance Stock Unit Award Grant Notice (the "Grant Notice") and the Agreement.

| | |
|---|---|
| **Grant Number:** | ________________ |
| **Participant:** | Marcus A. Lemonis |
| **Grant Date:** | January 26, 2025 |
| **Target Number of PSUs:** | 750,000 |
| **Vesting Schedule:** | The PSUs shall vest as provided in Exhibit B. |

By Participant's acceptance hereof (whether written, electronic or otherwise), Participant agrees, to the fullest extent permitted by law, that in lieu of receiving documents in paper format, Participant accepts the electronic delivery of any documents the Company, or any third party involved in administering the Plan which the Company may designate, may deliver in connection with this grant (including the Plan, this Grant Notice, the Agreement, account statements, or other communications or information) whether via the Company's intranet or the Internet site of such third party or via email or such other means of electronic delivery specified by the Company.

By Participant's acceptance hereof (whether written, electronic or otherwise), Participant and the Company agree that the PSUs are granted under and governed by the terms and conditions of the Plan, this Grant Notice and the Agreement.

| **CAMPING WORLD HOLDINGS, INC.:** | | **PARTICIPANT:** | |
|---|---|---|---|
| By: | /s/ Matthew D. Wagner | By: | /s/ Marcus A. Lemonis |
| Print Name: | Matthew D. Wagner | Print Name: | Marcus A. Lemonis |
| Title: | President | | |
| Address: | 2 Marriott Drive Lincolnshire | Address: | |

**EXHIBIT A**
**TO PERFORMANCE STOCK UNIT AWARD GRANT NOTICE**

**PERFORMANCE STOCK UNIT AWARD AGREEMENT**

Pursuant to the Grant Notice to which this Agreement is attached, the Company has granted to Participant the number of PSUs set forth in the Grant Notice.

**ARTICLE I.**

**GENERAL**

1.1 Incorporation of Terms of Plan. The PSUs and the shares of Class A Common Stock ("Stock") issued to Participant hereunder ("Shares") are subject to the terms and conditions set forth in this Agreement and the Plan, which is incorporated herein by reference. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan shall control.

**ARTICLE II.**

**AWARD OF PERFORMANCE STOCK UNITS**

2.1 Award of PSUs. In consideration of Participant's past and/or continued employment with or service to the Company or a Subsidiary and for other good and valuable consideration, effective as of the grant date set forth in the Grant Notice (the "Grant Date"), the Company has granted to Participant the number of PSUs set forth in the Grant Notice, upon the terms and conditions set forth in the Grant Notice, the Plan and this Agreement, subject to adjustment as provided in Section 13.2 of the Plan. Each PSU represents the right to receive one Share at the times and subject to the conditions set forth herein. However, unless and until the PSUs have vested, Participant will have no right to the payment of any Shares subject thereto. Prior to the actual delivery of any Shares, the PSUs will represent an unsecured obligation of the Company, payable only from the general assets of the Company.

2.2 Vesting Schedule.

(a) The PSUs shall vest and become non-forfeitable with respect to the applicable portion thereof in accordance with Exhibit B to the Grant Notice.

(b) Except as provided in Exhibit B, and except as may be otherwise provided by the Administrator or as set forth in a written agreement between Participant and the Company, including, without limitation, that certain Employment Agreement dated January 1, 2025, between Participant and the Company, as amended from time to time (the "Employment Agreement"), Participant shall immediately forfeit any and all PSUs granted under this Agreement which have not been earned and vested or do not vest on or prior to the date on which such Termination of Service occurs, and Participant's rights in any such PSUs which are not so vested shall lapse and expire. For the avoidance of doubt, the PSUs shall be subject to any more favorable accelerated vesting as set forth in the Employment Agreement.

2.3 Distribution of PSUs. Participant's PSUs shall be distributed in Shares (either in book-entry form or otherwise) as soon as administratively practicable following the Vesting Date of the applicable PSU pursuant to Section 2.2, and, in any event, within sixty (60) days following such vesting (for the avoidance of doubt, this deadline is intended to comply with the "short-term deferral" exemption from Section 409A of the Code). Notwithstanding the foregoing, the Company may delay a distribution of PSUs if it reasonably determines that such distribution will violate Federal securities laws or any other Applicable Law, *provided* that such distribution shall be made at the earliest date at which the Company reasonably determines that the making of such distribution will not cause such violation, as required by Treasury Regulation Section 1.409A-2(b)(7)(ii), and *provided further* that no distribution shall be delayed under this Section 2.3 if such delay will result in a violation of Section 409A of the Code.

2.4 Conditions to Issuance of Certificates. The Company shall not be required to issue or deliver any certificate or certificates for any Shares or to cause any Shares to be held in book-entry form prior to the fulfillment of all of the following conditions: (A) the admission of the Shares to listing on all stock exchanges on which such Shares are then listed, (B) the completion of any registration or other qualification of the Shares under any state or federal law or under rulings or regulations of the Securities and Exchange Commission or other governmental regulatory body, which the Administrator shall, in its absolute discretion, deem necessary or advisable, and (C) the obtaining of any approval or other clearance from any state or federal governmental agency that the Administrator shall, in its absolute discretion, determine to be necessary or advisable.

2.5 Tax Withholding. Notwithstanding any other provision of this Agreement:

(a) The Company and its Subsidiaries have the authority to deduct or withhold, or require Participant to remit to the Company or the applicable Subsidiary, an amount sufficient to satisfy any applicable federal, state, local and foreign taxes (including the employee portion of any FICA obligation) required by law to be withheld with respect to any taxable event arising pursuant to this Agreement. The Company or its Subsidiaries shall, with respect to any withholding taxes arising in connection with the distribution of any of the Participant's PSUs, withhold a net number of vested shares of Stock otherwise issuable pursuant to such PSUs having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Company and its Subsidiaries based on the maximum statutory withholding rates for Participant's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes; provided, however, that Participant may alternatively elect, in writing or electronically, not less than 5 days prior to any distribution date, to remit payment in one or more of the forms specified below:

(i) by cash or check made payable to the Company or the Subsidiary with respect to which the withholding obligation arises;

(ii) with the consent of the Administrator, by the deduction of such amount from other compensation payable to Participant;

(iii) by tendering to the Company vested shares of Stock having a then current Fair Market Value not exceeding the amount necessary to satisfy the withholding obligation of the Company and its Subsidiaries based on the maximum statutory withholding rates for federal, state, local and foreign income tax and payroll tax purposes;

(iv) with respect to any withholding taxes arising in connection with the distribution of the PSUs, through the delivery of a notice that Participant has placed a market sell order with a broker acceptable to the Company with respect to shares of Stock then issuable to Participant pursuant to the PSUs, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company or the Subsidiary with respect to which the withholding obligation arises in satisfaction of such withholding taxes; *provided* that payment of such proceeds is then made to the Company or the applicable Subsidiary at such time as may be required by the Administrator, but in any event not later than the settlement of such sale; or

(v) with the consent of the Administrator, in any combination of the foregoing.

(b) With respect to any withholding taxes arising in connection with the PSUs, in the event Participant fails to provide timely payment of all sums required pursuant to Section 2.5(a), the Company shall have the right and option, but not the obligation, to treat such failure as an election by Participant to satisfy all or any portion of Participant's required payment obligation pursuant to the first paragraph of Section 2.5(a) or Section 2.5(a)(ii) above, or any combination of the foregoing as the Company may determine to be appropriate. The Company shall not be obligated to deliver any certificate representing shares of Stock issuable with respect to the PSUs to, or to cause any such shares of Stock to be held in book-entry form by, Participant or his or her legal representative unless and until Participant or his or her legal representative shall have paid or otherwise satisfied in full the amount of all federal, state, local and foreign taxes applicable with respect to the taxable income of Participant resulting from the vesting or settlement of the PSUs or any other taxable event related to the PSUs.

(c) In the event any tax withholding obligation arising in connection with the PSUs will be satisfied under the first paragraph of Section 2.5(a), then the Company may elect to instruct any brokerage firm determined acceptable to the Company for such purpose to sell on Participant's behalf a whole number of shares from those shares of Stock then issuable to Participant pursuant to the PSUs as the Company determines to be appropriate to generate cash proceeds sufficient to satisfy the tax withholding obligation and to remit the proceeds of such sale to the Company or the Subsidiary with respect to which the withholding obligation arises. Participant's acceptance of this Award constitutes Participant's instruction and authorization to the Company and such brokerage firm to complete the transactions described in this Section 2.5(c), including the transactions described in the previous sentence, as applicable. The Company may refuse to issue any shares of Stock in settlement of the PSUs to Participant until the foregoing tax withholding obligations are satisfied, *provided* that no payment shall be delayed under this Section 2.5(c) if such delay will result in a violation of Section 409A of the Code.

(d) Participant is ultimately liable and responsible for all taxes owed in connection with the PSUs, regardless of any action the Company or any Subsidiary takes with respect to any tax withholding obligations that arise in connection with the PSUs. Neither the Company nor any Subsidiary makes any representation or undertaking regarding the treatment of any tax withholding in connection with the awarding, or vesting of the PSUs or the subsequent sale of Shares. The Company and the Subsidiaries do not commit and are under no obligation to structure the PSUs to reduce or eliminate Participant's tax liability.

2.6 Rights as Stockholder. Neither Participant nor any person claiming under or through Participant will have any of the rights or privileges of a stockholder of the Company in respect of any Shares deliverable hereunder unless and until certificates representing such Shares (which may be in book-entry form) will have been issued and recorded on the records of the Company or its transfer agents or registrars, and delivered to Participant (including through electronic delivery to a brokerage account). Except as otherwise provided herein, after such issuance, recordation and delivery, Participant will have all the rights of a stockholder of the Company with respect to such Shares, including, without limitation, the right to receipt of dividends and distributions on such Shares.

**ARTICLE III.**

**OTHER PROVISIONS**

3.1 Administration. The Administrator shall have the power to interpret the Plan and this Agreement and to adopt such rules for the administration, interpretation and application of the Plan as are consistent therewith and to interpret, amend or revoke any such rules. All actions taken and all interpretations and determinations made by the Administrator in good faith shall be final and binding upon the Participant, the Company and all other interested persons. To the extent allowable pursuant to Applicable Law, no member of the Committee or the Board will be personally liable for any action, determination or interpretation made with respect to the Plan, the Grant Notice or this Agreement.

3.2 PSUs Not Transferable. The PSUs may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution, unless and until the Shares underlying the PSUs have been issued, and all restrictions applicable to such Shares have lapsed. No PSUs or any interest or right therein or part thereof shall be liable for the debts, contracts or engagements of Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence. Notwithstanding the foregoing, with the consent of the Administrator, the PSUs may be transferred to Permitted Transferees pursuant to any conditions and procedures the Administrator may require.

3.3 Tax Consultation. The Participant represents that the Company has not provided the Participant with any tax advice in connection with the PSUs and that the Participant is not relying on the Company for any tax advice in connection with the PSUs.

3.4 Binding Agreement. Subject to the limitation on the transferability of the PSUs contained herein, this Agreement will be binding upon and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

3.5 Adjustments. The Administrator may accelerate the vesting of all or a portion of the PSUs in such circumstances as it, in its sole discretion, may determine. Participant acknowledges that the PSUs and the Shares subject to the PSUs are subject to adjustment, modification and termination in certain events as provided in this Agreement and the Plan, including Section 13.2 of the Plan.

3.6 Notices. Any notice to be given under the terms of this Agreement to the Company shall be addressed to the Company in care of the Secretary of the Company at the Company's principal office, and any notice to be given to the Participant shall be addressed to the Participant at the Participant's last address reflected on the Company's records. By a notice given pursuant to this Section 3.6, either party may hereafter designate a different address for notices to be given to that party. Any notice shall be deemed duly given when sent via email or when sent by certified mail (return receipt requested) and deposited (with postage prepaid) in a post office or branch post office regularly maintained by the United States Postal Service.

3.7 Titles. Titles are provided herein for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

3.8 Governing Law. The laws of the State of Delaware shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

3.9 Conformity to Securities Laws. Participant acknowledges that the Plan, the Grant Notice and this Agreement are intended to conform to the extent necessary with all Applicable Laws, including, without limitation, the provisions of the Securities Act and the Exchange Act, and any and all regulations and rules promulgated thereunder by the Securities and Exchange Commission, and state securities laws and regulations. Notwithstanding anything herein to the contrary, the Plan shall be administered, and the PSUs are granted, only in such a manner as to conform to Applicable Law. To the extent permitted by Applicable Law, the Plan and this Agreement shall be deemed amended to the extent necessary to conform to Applicable Law.

3.10 Amendment, Suspension and Termination. To the extent permitted by the Plan, this Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Administrator or the Board; *provided, however,* that, except as may otherwise be provided by the Plan, no amendment, modification, suspension or termination of this Agreement shall adversely affect the PSUs in any material way without the prior written consent of the Participant.

3.11 Successors and Assigns. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth in Section 3.2 and the Plan, this Agreement shall be binding upon

and inure to the benefit of the heirs, legatees, legal representatives, successors and assigns of the parties hereto.

3.12 Limitations Applicable to Section 16 Persons. Notwithstanding any other provision of the Plan or this Agreement, if the Participant is subject to Section 16 of the Exchange Act, then the Plan, the PSUs and this Agreement shall be subject to any additional limitations set forth in any applicable exemptive rule under Section 16 of the Exchange Act (including any amendment to Rule 16b-3 of the Exchange Act) that are requirements for the application of such exemptive rule. To the extent permitted by Applicable Law, this Agreement shall be deemed amended to the extent necessary to conform to such applicable exemptive rule.

3.13 Not a Contract of Employment. Nothing in this Agreement or in the Plan shall confer upon Participant any right to continue to serve as an employee or other service provider of the Company or any Subsidiary or shall interfere with or restrict in any way the rights of the Company and its Subsidiaries, which rights are hereby expressly reserved, to discharge or terminate the services of Participant at any time for any reason whatsoever, with or without cause, except to the extent expressly provided otherwise in a written agreement between the Company or a Subsidiary and Participant.

3.14 Entire Agreement. The Plan, the Grant Notice and this Agreement (including any exhibit hereto) constitute the entire agreement of the parties and supersede in their entirety all prior undertakings and agreements of the Company and Participant with respect to the subject matter hereof.

3.15 Section 409A. This Award is not intended to constitute "nonqualified deferred compensation" within the meaning of Section 409A of the Code (together with any Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the date hereof, "Section 409A"). However, notwithstanding any other provision of the Plan, the Grant Notice or this Agreement, if at any time the Administrator determines that this Award (or any portion thereof) may be subject to Section 409A, the Administrator shall have the right in its sole discretion (without any obligation to do so or to indemnify Participant or any other person for failure to do so) to adopt such amendments to the Plan, the Grant Notice or this Agreement, or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, as the Administrator determines are necessary or appropriate for this Award either to be exempt from the application of Section 409A or to comply with the requirements of Section 409A.

3.16 Agreement Severable. In the event that any provision of the Grant Notice or this Agreement is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of the Grant Notice or this Agreement.

3.17 Limitation on Participant's Rights. Participation in the Plan confers no rights or interests other than as herein provided. This Agreement creates only a contractual obligation on the part of the Company as to amounts payable and shall not be construed as creating a trust. Neither the Plan nor any underlying program, in and of itself, has any assets. The Participant

shall have only the rights of a general unsecured creditor of the Company and its Subsidiaries with respect to amounts credited and benefits payable, if any, with respect to the PSUs, and rights no greater than the right to receive the Common Stock as a general unsecured creditor with respect to PSUs, as and when payable hereunder.

3.18 Counterparts. The Grant Notice may be executed in one or more counterparts, including by way of any electronic signature, subject to Applicable Law, each of which shall be deemed an original and all of which together shall constitute one instrument.

3.19 Broker-Assisted Sales. In the event of any broker-assisted sale of shares of Stock in connection with the payment of withholding taxes as provided in the first paragraph of Section 2.5(a), Section 2.5(a)(iv) or Section 2.5(b): (a) any shares of Stock to be sold through a broker-assisted sale will be sold on the day the tax withholding obligation arises or as soon thereafter as practicable; (b) such shares of Stock may be sold as part of a block trade with other participants in the Plan in which all participants receive an average price; (b) Participant will be responsible for all broker's fees and other costs of sale, and Participant agrees to indemnify and hold the Company harmless from any losses, costs, damages, or expenses relating to any such sale; (d) to the extent the proceeds of such sale exceed the applicable tax withholding obligation, the Company agrees to pay such excess in cash to Participant as soon as reasonably practicable; (e) Participant acknowledges that the Company or its designee is under no obligation to arrange for such sale at any particular price, and that the proceeds of any such sale may not be sufficient to satisfy the applicable tax withholding obligation; and (f) in the event the proceeds of such sale are insufficient to satisfy the applicable tax withholding obligation, Participant agrees to pay immediately upon demand to the Company or its Subsidiary with respect to which the withholding obligation arises an amount in cash sufficient to satisfy any remaining portion of the Company's or the applicable Subsidiary's withholding obligation.

**EXHIBIT B**
**TO PERFORMANCE STOCK UNIT AWARD GRANT NOTICE**

**VESTING SCHEDULE**

1. Definitions.

(a) "Cause" shall have the meaning given to such term in the Employment Agreement.

(b) "CIC Price" shall mean the greater of (i) the amount of cash and the fair market value of any securities or other property paid as consideration, on a per Share basis, to the Company's stockholders (and if less than all of the Company's stockholders' Shares are impacted by such Change in Control, then the consideration paid, on a per Share basis, to the Company stockholders who receive consideration) in a Change in Control (or to be paid as consideration to the Company in a Change in Control instead of to Company stockholders, for example in a Change in Control pursuant to the sale of Company assets, measured on a per Share basis had such amounts been paid to the Company's stockholders), or (ii) the average of the closing market prices of a Share on the New York Stock Exchange for the 30 consecutive trading day-period ending on the last trading day prior to the closing of the Change in Control. For purposes of clause (i) of the preceding sentence, publicly-traded securities that are readily tradeable ("Marketable Securities") shall be valued at the greater of (A) the average of the closing trading prices of a share of such Marketable Securities on the principal exchange on which such shares are then traded for each trading day during the five consecutive trading days ending on and including the date on which a Change in Control occurs, or (B) at closing price per shares as of the closing date of the Change in Control. If any such consideration consists in whole or in part of non-cash consideration other than Marketable Securities, the Administrator will determine the value of the non-cash per-Share consideration for purposes of the Agreement in its reasonable good faith discretion.

(c) "Disability" shall have the meaning given to such term in the Employment Agreement.

(d) "Good Reason" shall have the meaning given to such term in the Employment Agreement.

(e) "Performance Period" means the period beginning on January 1, 2025 and ending on December 31, 2027.

(f) "Stock Price" shall mean the average of the closing market prices of a Share on the New York Stock Exchange for any 30 consecutive trading day-period commencing during the Performance Period and ending on or prior to the final day of the Performance Period. For purposes of the foregoing, if there is no trading in Shares on a trading day during any 30 consecutive trading day period, the per-Share closing price on such date shall be deemed to be the per-Share closing price on the most recent date prior to such trading date on which trading in the Shares occurred.

2. Performance Achievement.

(a) Subject to Sections 3 and 4, the PSUs will be earned and vest during the Performance Period based on the achievement of the applicable Stock Price Hurdle(s) set forth below (any PSUs which are so earned, the "Vested PSUs"), subject to Participant's continued employment or service through the applicable Vesting Date (as defined below).

(b) Such number of PSUs will be earned upon the achievement of the corresponding "Stock Price Hurdle" during the Performance Period as set forth in the table below (each, a "Tranche"). Subject to Sections 3 and 4, the number of PSUs in a Tranche shall become Vested PSUs and vest on the date the Stock Price first equals or exceeds the corresponding Stock Price Hurdle set forth opposite such Tranche in the table below during the Performance Period (each such date, the "Vesting Date"). The Tranches represent the incremental number of PSUs that will become Vested PSUs upon the achievement of each Stock Price Hurdle. If the $32.50 Stock Price Hurdle is achieved, 187,500 PSUs will become Vested PSUs. If the $37.50 Stock Price Hurdle is later achieved, an additional 187,500 PSUs will become Vested PSUs. If the $42.50 Stock Price Hurdle is later achieved, an additional 187,500 PSUs will become Vested PSUs. If the $47.50 Stock Price Hurdle is later achieved, an additional 187,500 PSUs will become Vested PSUs. With respect to each Tranche, the Administrator shall determine in its sole discretion whether the applicable Stock Price Hurdle has been exceeded.

| TRANCHE | STOCK PRICE HURDLE | PSUS THAT WILL VEST UPON ACHIEVEMENT OF STOCK PRICE HURDLE |
|---|---|---|
| Tranche 1 | $32.50 per share | 187,500 |
| Tranche 2 | $37.50 per share | 187,500 |
| Tranche 3 | $42.50 per share | 187,500 |
| Tranche 4 ("Target") | $47.50 per share | 187,500 |

(c) In the event of any transaction or event described in Section 13.2(a) of the Plan or an Equity Restructuring, the Stock Price Hurdles set forth above shall be equitably adjusted by the Administrator.

(d) For the avoidance of doubt, (i) each Stock Price Hurdle may be achieved only once during the Performance Period and (ii) more than one Stock Price Hurdle (or any achievement level between Stock Price Hurdles) may be achieved on a particular date. For example, if the $37.50 Stock Price Hurdle is achieved but the Stock Price drops below $37.50 and again exceeds $37.50 at a later date, no additional PSUs will become Vested PSUs because a total of 375,000 PSUs would have already become Vested PSUs when the Stock Price initially equaled or exceeded $37.50.

3. Effect of a Change in Control During Performance Period. Notwithstanding anything to the contrary herein, in the event a Change in Control occurs during the Performance Period, with respect to any Tranche for which the Stock Price Hurdle has not been achieved prior

to the date of the Change in Control, if the CIC Price equals or exceeds the applicable Stock Price Hurdle, the Stock Price Hurdle shall be deemed achieved as of the date of the Change in Control and the corresponding Tranche of PSUs shall become Vested PSUs; provided that if the CIC Price falls between any two Stock Price Hurdles set forth above, then the number of Vested PSUs shall be determined using linear interpolation based on the CIC Price actually achieved. Any PSUs which become Vested PSUs as of the date of the Change in Control under this Section 3 shall vest immediately prior to the Change in Control, subject (except with respect to any Change in Control that occurs during the Post-Termination Measurement Period following a Qualifying Termination) to Participant's continued employment or service through the date immediately prior to the Change in Control. Any Tranches for which the Stock Price Hurdle has not been met upon a Change in Control shall thereupon be automatically forfeited.

4. Effect of Termination of Service.

(a) Subject to Section 4(b), notwithstanding anything else to the contrary herein, if Participant incurs a Termination of Service due to (x) the Participant's death or Disability or (y) the Participant's Termination of Service without Cause or as a result of a resignation for Good Reason during the Performance Period and prior to a Change in Control (a termination in clauses (x) and (y), a "Qualifying Termination"):

(i) With respect to any Tranche for which the Stock Price Hurdle has not been achieved prior to the date of such Qualifying Termination, if the corresponding Stock Price Hurdle is achieved during the 30 consecutive trading day-period commencing on the date immediately following such Qualifying Termination (including as a result of a Change in Control during such period pursuant to Section 3, but in all events during the Performance Period) (such period, the "Post-Termination Measurement Period"), the corresponding Tranche of PSUs shall become Vested PSUs upon the achievement of such Stock Price Hurdle (or Change in Control) during such Post-Termination Measurement Period.

(ii) If the Stock Price Hurdle for a Tranche has not been achieved prior to the date of the Qualifying Termination and is not achieved during the Post-Termination Measurement Period, the corresponding Tranche shall be forfeited as of the last day of the Post-Termination Measurement Period.

(b) Notwithstanding anything to the contrary herein, in the event Participant incurs a termination of employment under the Employment Agreement other than as a result of a termination for Cause during the Performance Period and prior to a Change in Control, and Participant continues to provide services to the Company or a Subsidiary as a member of the Board immediately following such termination, Section 4(a) shall not apply in the event of any such termination and the PSUs will remain outstanding and eligible to vest pursuant to Sections 2 and/or 3 above; provided, that if Participant's service on the Board is subsequently terminated due to Participant's involuntary removal from the Board, Participant's failure to be nominated for reelection to the Board or the failure of the stockholders to reelect Participant to the Board, in each case other than for Cause, such termination will be considered a Qualifying

Termination for purposes of this Agreement and the PSUs will be eligible for accelerated vesting as provided for in Section 4(a) above.

(c) Unless otherwise determined by the Board, the vesting set forth in Section 4(a) (except as a result of a Qualifying Termination under clause (x) above) shall be subject to Participant's execution of an effective release of claims in a form reasonably acceptable to the Board (which release of claims must become effective in accordance with its terms within sixty (60) days following the date of Participant's Qualifying Termination).

5. Distribution of PSUs. Any Shares issuable with respect to the earned and vested PSUs will be distributed to the Participant in accordance with Section 2.3 of the Agreement.

6. Forfeiture. Any portion of the PSUs that do not become Vested PSUs as a result of less than the "Target" Number of PSUs becoming Vested PSUs during the Performance Period or upon a Change in Control, or any PSUs that do not vest as a result of Participant's Termination of Service (or during any Post-Termination Measurement Period, if applicable), shall automatically and without further action be cancelled and forfeited by Participant on the last day of the Performance Period, the date of a Change in Control or the date of Participant's Termination of Service (or the last day of the Post-Termination Measurement Period, if applicable), as applicable, and Participant shall have no further right or interest in or with respect to such PSUs. In no event will more than the "Target" Number of PSUs subject to this award vest pursuant to this Exhibit B.

**Exhibit 10.22**

**AMENDED AND RESTATED EMPLOYMENT AGREEMENT**

THIS AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "Agreement") is entered into and effective as of January 1, 2025 (the "Effective Date"), by and between Marcus Lemonis ("Employee"), Camping World Holdings, Inc., a Delaware corporation ("Camping World"), and CWGS Enterprises, LLC, a Delaware limited liability company (the "Partnership" and, together with Camping World and any of the Affiliates of Camping World and the Partnership as may employ the Employee from time to time, and any successor(s) thereto, the "Company").

RECITALS

**WHEREAS**, the Employee is currently employed by the Company as its Chairman and Chief Executive Officer pursuant to the terms of that certain Employment Agreement by and between Employee and the Company, dated as of June 10, 2016 (the "Prior Agreement");

**WHEREAS**, the Company desires to continue to employ Employee as its Chairman and Chief Executive Officer pursuant to the terms set forth in this Agreement, and Employee desires to be employed by Company pursuant to the terms and conditions of this Agreement; and

**WHEREAS**, the Company and Employee desire to amend and restate the Prior Agreement, effective as of the Effective Date.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Employment. The Company agrees to continue to employ Employee as the Company's Chairman and Chief Executive Officer on the terms and conditions set forth in this Agreement and Employee agrees to accept such continued employment and agrees to perform the services and duties for the Company as herein provided for the period and upon the other terms and conditions set forth in this Agreement. Employee shall be subject to the direction of the Company's Board of Directors. Employee shall continue to serve as Chairman of the Board of Directors (the "Board") until the earlier of his resignation, removal from the Board or death, or his successor as Chairman of the Board is duly appointed by the Board. For the avoidance of doubt, if during the Term (as defined below) of this Agreement, Employee ceases to serve as Chief Executive Officer but continues serving as Executive Chairman, he will continue to be employed by the Company pursuant to the terms and conditions of this Agreement in such position following such transition (a "Role Conversion"). The termination of this Agreement and Employee's employment hereunder will not affect Employee's continuing service as a non-employee Chairman of the Board or otherwise as a member of the Board, which shall be governed by the Company's organizational documents.

2. Term. Subject to termination of Employee's employment pursuant to Section 7 below, the initial term of Employee's employment hereunder shall be for a period commencing as of the Effective Date and ending on the third anniversary of the Effective Date (the "Initial Expiration Date"), provided, however, Employee's employment shall automatically renew for an additional

period of one year on the Initial Expiration Date and each one year anniversary of the Initial Expiration Date thereafter, unless and until either the Company or Employee provides written notice of non-renewal to the other party at least 90 days before the Initial Expiration Date or such applicable anniversary thereof; provided, further, that Employee's employment under this Agreement may be terminated at any time pursuant to the provisions of Section 7. Notwithstanding the foregoing, if Employee's Role Conversion occurs during the Term of this Agreement, the remaining Term of this Agreement shall continue for a period commencing as of the date of such Role Conversion and ending on the first anniversary of the date thereof, and such Term shall not be automatically renewed, unless otherwise mutually agreed by Employee and the Company. The period of time from the Effective Date through the termination of this Agreement and Employee's employment hereunder pursuant to its terms is herein referred to as the "Term." For purposes of this Agreement, (1) a non-renewal of the Term by either party shall constitute a termination of Employee's employment and, if the Company elects not to renew the Term, such non-renewal of Employee's employment due to the Company's non-renewal of the Term shall constitute a termination by the Company without Cause; and (2) an expiration of the Term following Employee's Role Conversion shall constitute a termination of Employee's employment by the Company without Cause.

3. Position and Duties.

3.01 Title. During the Term, Employee agrees to serve as the Company's Chairman and Chief Executive Officer and undertake such additional duties as may be directed by the Company's Board of Directors.

3.02 Duties.

(a) During the Term, Employee shall serve as Chairman and Chief Executive Officer of the Company with such duties and responsibilities commensurate with his title and position as directed from time to time by the Board. Subject to Section 3.02(b), Employee agrees to devote such time and attention to the Company and the promotion of its interests as is reasonably necessary to effectuate the performance of Employee's duties and responsibilities hereunder, upon the terms and conditions of this Agreement.

(b) During the Term, Employee shall faithfully and diligently serve the Company and shall not engage in, provide services to (directly or indirectly), invest in or possess interests in other business ventures, independently or with others, that are Competitive Activities of the Company. Notwithstanding the foregoing, Employee shall be permitted to pursue other interests and opportunities during the Term, including, without limitation, (a) investments in and/or involvement with other businesses outside of the Company which are not involved in Competitive Activities, (b) reality television shows, (c) speaking and/or promotional engagements and (d) endorsement arrangements. For the avoidance of doubt, Employee shall have the right to invest in or be involved with any business which is not a Competitive Activity, including, without limitation, as the Executive Chairman of Beyond, Inc.

4. Compensation.

4.01 Base Salary. During the term of this Agreement, the Company shall pay to Employee a base annual salary of One Million and Five Hundred Thousand and No/100 Dollars ($1,500,000) ("Base Salary"), which salary shall be paid in accordance with the Company's normal payroll procedures and policies.

4.02 Annual Bonus. During the Term, for each fiscal year, Employee shall have the opportunity to earn an annual bonus ("Annual Bonus") based on performance against specified performance objectives established prior to or as soon as practicable following the commencement of each fiscal year. Employee's target annual bonus for each such fiscal year shall be 150% of Employee's Base Salary ("Target Bonus"), based upon the achievement of target-level performance objectives to be established each year by the Company's Board of Directors or the Compensation Committee thereof (the "Target Performance Objectives"). For each fiscal year during the Term, Employee may earn up to 200% of Employee's Base Salary, based upon the achievement of maximum performance targets to be established each year by the Company's Board of Directors or the Compensation Committee thereof that exceed the Target Performance Objectives. Employee's Annual Bonus shall be paid within two and one-half months following the end of the fiscal year to which it relates. Except as provided in Section 7, Employee must remain employed by the Company through the date of payment of such Annual Bonus to be entitled to the Annual Bonus. Such Annual Bonus shall be paid in the form of cash or, upon the prior written request of Employee and subject to approval by the Company's Board of Directors or the Compensation Committee thereof, in fully vested shares of the Company's Class A common stock with a fair market value on the date of issuance equal to the amount of such Annual Bonus issued under the Camping World Holdings, Inc. 2016 Incentive Award Plan (the "2016 Plan") or any successor equity plan. In the event the Annual Bonus will be paid in the form of shares of the Company's Class A Common Stock, in the event Employee fails to provide timely payment of all tax withholding arising as a result of such payment, the Company shall have the right and option, but not the obligation, to treat such failure as an election by Employee to satisfy all of Employee's required tax withholding obligation by withholding a net number of vested shares of Class A common stock otherwise issuable to Employee having a then current fair market value not exceeding the amount necessary to satisfy the applicable required tax withholding obligation based on the maximum statutory withholding rates for Employee's applicable jurisdictions for federal, state, local and foreign income tax and payroll tax purposes.

4.03 Benefits. Employee may participate in all employee benefit plans or programs of Company consistent with such plans and programs of the Company. The Company does not guarantee the adoption or continuance of any particular employee benefit plan or program during the term of this Agreement, and Employee's participation in any such plan or program shall be subject to the provisions, rules and regulations applicable thereto.

4.04 Expenses; Contributions. Company agrees to reimburse all reasonable business expenses incurred by Employee consistent with the Company's policies regarding reimbursement in the performance of Employee's duties under this Agreement.

4.05 Vehicle. During the Term, Employee shall receive a Company owned vehicle selected by the Company after consultation with Employee suitable for Employee's position for

his business and personal use, as mutually agreed by Employee. The Company shall pay the property taxes, insurance and any license fees or tags for such vehicles.

4.06 Vacation and Sick leave. The Employee shall be entitled to vacation during each year of employment consistent with other senior executives of the Company. The Employee shall be entitled to sick leave and holidays in accordance with the policy of the Company as to its employees.

4.07 Indemnification and Additional Insurance. The Company shall indemnify Employee with respect to matters relating to Employee's services as an officer and director of the Company, or any of the entities directly or indirectly owned or controlled by, or under common ownership or control with, the Company ("Affiliates"), occurring during the course and scope of Employee's employment or service with the Company to the extent and pursuant to the provisions in the Delaware law. The foregoing indemnity is contractual and will survive any adverse amendment to or repeal of this Agreement. The Company will also cover Employee under a policy of officers' and directors' liability insurance providing coverage that is comparable to that provided now or hereafter to other senior executives of the Company. The provisions of this Section will survive the termination of this Agreement for any reason. In furtherance of the foregoing, the Company and Employee have entered into that certain Indemnification Agreement dated January 1, 2025 and attached hereto as Exhibit A (the "Indemnification Agreement").

4.08 Equity Awards.

(a) RSU Award. On the Effective Date, subject to approval by the Company's Board of Directors or the Compensation Committee thereof, Employee shall be eligible to receive an award of 600,000 restricted stock units ("RSUs") under the 2016 Plan. Such RSU award will vest in three installments as follows: (a) 200,000 RSUs shall vest on November 15, 2025, (b) 200,000 RSUs shall vest on November 15, 2026, and (c) 200,000 RSUs shall vest on November 15, 2027, subject to the Employee's continued service through the applicable vesting date(s) and the terms of the applicable RSU award agreement, substantially in the form attached hereto as Exhibit B (the "RSU Agreement"). The RSUs shall also be eligible for accelerated vesting as set forth in Section 7 below.

(b) PSU Award. On the Effective Date, subject to approval by the Company's Board of Directors or the Compensation Committee thereof, Employee shall be eligible to receive an award of performance-based stock units ("PSUs") under the 2016 Plan. Employee shall be granted 750,000 "target" PSUs which shall be eligible to vest based on the achievement of specified stock price hurdles over a three year performance period, as specified in the form of PSU award agreement substantially in the form attached hereto as Exhibit C (the "PSU Agreement").

(c) Effect of Continued Service. If Employee's employment terminates other than as a result of a termination for Cause and which does not otherwise result in the vesting of the RSUs and PSUs under this Agreement, and Employee continues to provide services to the Company or a subsidiary as a member of the Board immediately following such termination, the RSUs and PSUs will remain outstanding and eligible to vest on the remaining applicable vesting dates as are set forth in the RSU Agreement and the PSU Agreement, subject to the acceleration terms set forth therein.

5. Confidential Information and Proprietary Information.

5.01 Confidential Information. During the Term and at all times thereafter, Employee shall not divulge, furnish or make accessible to anyone or use in any way (other than in the ordinary course of the business of the Company or any of its Affiliates) any confidential or secret knowledge or information of the Company or any of its Affiliates which Employee has acquired or become acquainted with prior to the termination of the period of his employment by the Company (including employment by the Company or any affiliated companies prior to the date of this Agreement), whether developed by himself or by others, including, without limitation, any trade secrets, confidential or secret designs, processes, formulae, plans, devices or material (whether or not patented or patentable) directly or indirectly useful in any aspect of the business of the Company or any of the Affiliates, any customer or supplier lists of the Company or any of the Affiliates, any confidential or secret development or research work of the Company or any of the Affiliates, or any other confidential information or secret aspect of the business of the Company or any of the Affiliates (collectively, "Confidential Information"). Employee acknowledges that (a) the Company and its Affiliates have expended and shall continue to expend substantial amounts of time, money and effort to develop business strategies, employee and customer relationships and goodwill and build an effective organization, (b) Employee is and shall become familiar with the Company's and its Affiliate's Confidential Information, including trade secrets, and that Employee's services are of special, unique and extraordinary value to the Company and its Affiliates, (c) the above-described knowledge or information constitutes a unique and valuable asset of the Company and its Affiliates and the Company and its Affiliates have a legitimate business interest and right in protecting its Confidential Information, business strategies, employee and customer relationships and goodwill and (d) any disclosure or other use of such knowledge or information other than for the sole benefit of the Company and any of the Affiliates would be wrongful and would cause irreparable harm to the Company and any of the Affiliates. However, the foregoing shall not apply to any knowledge or information which is now published, or which subsequently becomes generally publicly known in the form in which it was obtained from the Company or any of the Affiliates, other than as a direct or indirect result of the breach of this Agreement by Employee.

5.02 Proprietary Information. (a) Employee agrees that the results and proceeds of Employee's services for the Company or its Affiliates (including, but not limited to, any trade secrets, products, services, processes, know-how, designs, developments, innovations, analyses, drawings, reports, techniques, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, programs, matters of a literary, musical, dramatic or otherwise creative nature, writings and other works of authorship) resulting from services performed while an employee of the Company and any works in progress, whether or not patentable or registrable under copyright or similar statutes, that were made, developed, conceived or reduced to practice or learned by Employee, either alone or jointly with others (collectively, "Inventions"), shall be works-made-for-hire and the Company (or, if applicable or as directed by the Company or any of its Affiliates) shall be deemed the sole owner throughout the universe of any and all trade secret, patent, copyright and other intellectual property rights (collectively, "Proprietary Rights") of whatsoever nature therein, whether or not now or hereafter known, existing, contemplated, recognized or developed, with the right to use the same in perpetuity in any manner the Company determines in its sole discretion, without any further

payment to Employee whatsoever. If, for any reason, any of such results and proceeds shall not legally be a work-made-for-hire and/or there are any Proprietary Rights which do not accrue to the Company (or, as the case may be, any of its Affiliates) under the immediately preceding sentence, then Employee hereby irrevocably assigns and agrees to assign any and all of Employee's right, title and interest thereto, including any and all Proprietary Rights of whatsoever nature therein, whether or not now or hereafter known, existing, contemplated, recognized or developed, to the Company (or, if applicable or as directed by the Company or any of its Affiliates), and the Company or its Affiliates shall have the right to use the same in perpetuity throughout the universe in any manner determined by the Company or such Affiliates without any further payment to Employee whatsoever. As to any Invention that Employee is required to assign, Employee shall promptly and fully disclose to the Company all information known to Employee concerning such Invention.

(b) Employee agrees that, from time to time, as may be requested by the Company and at the Company's sole cost and expense, Employee shall do any and all things that the Company may reasonably deem useful or desirable to establish or document the Company's exclusive ownership throughout the United States of America or any other country of any and all Proprietary Rights in any such Inventions, including the execution of appropriate copyright and/or patent applications or assignments. To the extent Employee has any Proprietary Rights in the Inventions that cannot be assigned in the manner described above, Employee unconditionally and irrevocably waives the enforcement of such Proprietary Rights. This Section 5.02 is subject to and shall not be deemed to limit, restrict or constitute any waiver by the Company of any Proprietary Rights of ownership to which the Company may be entitled by operation of law by virtue of the Company's being Employee's employer. Employee further agrees that, from time to time, as may be requested by the Company and at the Company's sole cost and expense, Employee shall assist the Company in every proper and lawful way to obtain and from time to time enforce Proprietary Rights relating to Inventions in any and all countries. To this end, Employee shall execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining, and enforcing such Proprietary Rights and the assignment thereof. In addition, Employee shall execute, verify, and deliver assignments of such Proprietary Rights to the Company or its designees. Employee's obligation to assist the Company with respect to Proprietary Rights relating to such Inventions in any and all countries shall continue beyond the termination of Employee's employment with the Company.

(c) Employee hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, that Employee now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

5.03 Cooperation. Employee agrees that, upon reasonable notice and without the necessity of the Company obtaining a subpoena or court order, Employee shall provide reasonable cooperation in connection with any suit, action or proceeding (or any appeal from any suit, action or proceeding), and any investigation and/or defense of any claims asserted against the Company, its subsidiaries and Affiliates, its predecessors and successors, and all of the respective current or former directors, officers, employees, shareholders, partners, members, agents or representatives of any of the foregoing, which relates to events occurring during Employee's employment with

the Company, its subsidiaries and Affiliates as to which Employee may have relevant information (including but not limited to furnishing relevant information and materials to the Company, or its designee and/or providing testimony at depositions and at trial), provided that with respect to such cooperation occurring following termination of employment, the Company shall reimburse Employee for expenses reasonably incurred in connection therewith, and further provided that any such cooperation occurring after the termination of Employee's employment shall be scheduled to the extent reasonably practicable so as not to unreasonably interfere with Employee's business or personal affairs.

6. Non-competition and Non-solicitation Covenants and Adversarial Restrictions.

6.01 Non-competition. Employee agrees that, during the Term and for twelve months after the termination of Employee's employment for any reason (the "Non-Compete Period"), other than by virtue of a resignation by Employee for Good Reason by reason of clause (e) under Section 7.04 below, Employee shall not, directly or indirectly, (a) engage in activities or businesses (including without limitation by owning any interest in, managing, controlling, participating in, consulting with, advising, rendering services for, or in any manner engaging in the business of owning, operating or managing any business) in any geographic location in which the Company, its subsidiaries or Affiliates engage in, whether through selling, distributing, manufacturing, marketing, purchasing, or otherwise, that compete directly or indirectly with the Company or any of its subsidiaries or Affiliates ("Competitive Activities"), it being understood that Competitive Activities as of the date hereof include, without limitation, the publication, campground, online marketplace, and membership businesses of the Company or any subsidiary of Affiliate of the Company; the sale, rental, repair or service of recreational vehicles or parts and accessories for recreational vehicles or the sale of any ancillary products that are sold in connection with the sale of recreational vehicles, including but not limited to credit life insurance, roadside assistance programs and mechanical breakdown and extended service contracts, in the recreational vehicle, camping and outdoor living markets; the business of developing, marketing, providing and implementing products and services (including insurance, financing, warranties and road-side assistance) to owners of recreational vehicles, automobiles, and motorcycles; the business of providing consumer shows to owners of recreational vehicles; and the business of publishing digital and print media, including magazines, periodicals, books, and blogs and online communities directed to owners of recreational vehicles, all-terrain vehicles, and outdoor enthusiasts; or (b) assist any person in any way to do, or attempt to do, anything prohibited by Section 6.01(a) above. Employee acknowledges (i) that the business of the Company and its Affiliates is national in scope and without geographical limitation within the United States and (ii) notwithstanding the jurisdiction of formation or principal office of the Company and its Affiliates, or the location of any of their respective executives or employees (including, without limitation, Employee), it is expected that the Company and its Affiliates will have business activities and have valuable business relationships within their respective industries throughout the United States.

6.02 Indirect Competition. Employee further agrees that, during the Term and the Non-Compete Period, he will not, directly or indirectly, assist or encourage any other person in carrying out, direct or indirectly, any activity that would be prohibited by the above provisions of this Section 6 if such activity were carried out by Employee, either directly or indirectly; and in

particular Employee agrees that he will not, directly or indirectly, induce any employee of the Company to carry out, directly or indirectly, any such activity.

6.03 Non-solicitation. Employee further agrees that, during the Term and for a period of one year after the termination of his employment (the "Non-Solicitation Period"), he will not, directly or indirectly, assist or encourage any other person in seeking to employ or hire any employee, consultant, advisor or agent of the Company or any of its Affiliates or encouraging any such employee, consultant, advisor or agent to discontinue employment with the Company or any of its Affiliates.

6.04 Adversarial Restrictions. During the Term and at any time thereafter, Employee shall not voluntarily aid, assist, or cooperate with any actual or potential claimants or plaintiffs or their attorneys or agents in any claims or lawsuits proposed to be asserted, pending or commenced on the date hereof or in the future against the Company or any of the Affiliates; provided, however, that nothing in this Section 6.04 will be construed to prevent Employee from testifying at an administrative hearing, a deposition, or in court in response to a lawful subpoena in any litigation or proceeding involving the Company or any Affiliate.

6.05 Tolling of Periods and Enforceability. The Non-Compete Period and Non-Solicitation Period shall be tolled during (and shall be deemed automatically extended by) any period in which Employee is in violation of the provisions of this Section 6. If a final and non-appealable judicial determination is made that any of the provisions of this Section 6 constitutes an unreasonable or otherwise unenforceable restriction against Employee, the provisions of this Section 6 will not be rendered void but will be deemed to be modified to the minimum extent necessary to remain in force and effect for the longest period and largest geographic area that would not constitute such an unreasonable or unenforceable restriction. Moreover, and without limiting the generality of Section 6, notwithstanding the fact that any provision of this Section 6 is determined to not be enforceable through specific performance, the Company will nevertheless be entitled to recover monetary damages as a result of Employee's breach of such provision.

6.06 Passive Ownership. The provisions of Section 6 shall not be deemed breached as a result of Employee's passive ownership of: (i) less than an aggregate of 5% of any class of securities of a person engaged, directly or indirectly, in Competitive Activities, so long as Employee does not actively participate in the business of such person; provided, however, that such stock is listed on a national securities exchange; or (ii) less than an aggregate of 5% in value of any instrument of indebtedness of a person engaged, directly or indirectly, in Competitive Activities.

6.07 Nondisparagement. Neither party hereto shall, whether in writing or orally, malign, denigrate or disparage Employee, the Company, its subsidiaries or Affiliates, predecessors and successors, or any of the current or former directors, officers, employees, shareholders, partners, members, agents or representatives of any of the foregoing, with respect to any of their respective past or present activities, or otherwise publish (whether in writing or orally) statements that tend to portray any of the aforementioned parties in an unfavorable light. The Company's obligations under the preceding sentence shall be limited to instructing its and its direct subsidiaries' senior corporate executives having the rank of Senior Vice President or above to refrain from, whether

in writing or orally, maligning, denigrating or disparaging Employee with respect to any of his past or present activities, or otherwise publish (whether in writing or orally) statements that tend to portray Employee in an unfavorable light.

6.08 Acknowledgement. Employee acknowledges that Employee has carefully read this Agreement and has given careful consideration to the restraints imposed upon Employee by this Agreement and is in full accord as to the necessity of such restraints for the reasonable and proper protection of the Confidential Information, business strategies, employee and customer relationships and goodwill of the Company and its subsidiaries and Affiliates now existing or to be developed in the future. Employee expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area. Employee further acknowledges that although Employee's compliance with the covenants contained in Sections 5 and 6 may prevent Employee from earning a livelihood in a business similar to the business of the Company, Employee's experience and capabilities are such that Employee has other opportunities to earn a livelihood and adequate means of support for Employee and Employee's dependents.

7. Termination.

7.01 Grounds for Termination. Employee's employment with the Company shall terminate under any of the circumstances set forth below.

(a) If Employee shall die or due to Employee's Disability (as defined in Section 7.03 below);

(b) By mutual agreement of the Company and Employee;

(c) By Employee for any reason upon notice to the Company, or upon non-renewal of the Term by Employee;

(d) By the Company for Cause (as defined in Section 7.02 below);

(e) By the Company without Cause;

(f) By Employee for Good Reason (as defined in Section 7.04 below);

(g) At the expiration of the Term due to the Company's non-renewal of the Term pursuant to Section 2 above (which, for the avoidance of doubt, shall constitute a termination by the Company without Cause under Section 7.01(e)); and

(h) At the expiration of the Term following a Role Conversion pursuant to Section 2 above (which, for the avoidance of doubt, shall constitute a termination by the Company without Cause under Section 7.01(e)).

Notwithstanding any termination of this Agreement and Employee's employment by the Company, Employee, in consideration of his employment hereunder to the date of such termination, shall remain bound by the provisions of this Agreement which specifically relate to periods, activities or obligations upon or subsequent to the termination of Employee's employment including without limitation the provisions of Sections 5, 6 and 8 hereof.

7.02 For Cause Defined. Termination of Employee's employment by the Company for any of the following reasons shall be deemed termination for "Cause":

(a) Employee shall have breached this Agreement in any material respect, which breach in the case of this clause is not cured by, or is not capable of being cured, within ten (10) days after written notice of such breach is delivered to Employee; or

(b) Employee has engaged in misconduct (including violation of the Company's policies) that is materially injurious to the Company as reasonably determined by the Company's Board of Directors; or

(c) Employee has been convicted of (i) any felony or (ii) any misdemeanor involving a crime of moral turpitude, theft or fraud; or

(d) Employee uses illegal substances; or

(e) Employee knowingly falsifies or causes to be falsified, in any material respect, the financial records and financial statements of the Company.

7.03 "Disability" Defined. For purposes of this Agreement, "Disability" shall mean Employee's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that can be expected to last for a continuous period of not less than twelve (12) months.

7.04 "Good Reason" Defined. For purposes of this Agreement, "Good Reason" shall mean the occurrence of any of the following without the Employee's written consent:

(a) A material reduction of the Employee's duties, title, authority or responsibilities, relative to the Employee's duties, title, authority or responsibilities as in effect immediately prior to such reduction, or the assignment to Employee of such reduced duties, title, authority or responsibilities; provided, however, that, prior to a Change in Control (as defined in the Camping World 2016 Incentive Award Plan, as amended from time to time), an event occurring under this clause (a) as a result of Employee's cessation of service as Chief Executive Officer will not constitute Good Reason if Employee continues in employment serving as Executive Chairman under this Agreement following such transition and clauses (b) – (e) of this definition of Good Reason are not triggered as a result of such transition, including, without limitation, following a Change in Control, Employee ceasing to report to the board of directors of the ultimate parent entity of the Company (or its successor), and/or Employee ceasing to serve as the chief executive officer of such ultimate parent entity;

(b) Employee's involuntary removal from the Board or the failure of the stockholders to reelect Employee to the Board, other than for Cause;

(c) A material reduction by the Company in the Base Salary or Target Bonus as in effect immediately prior to such reduction or, following a Change in Control, a material reduction in Employee's compensation;

(d) A material change in the principal geographic location at which Employee must perform services by more than 35 miles from the Company's principal executive offices; or

(e) The Company's material breach of this Agreement or any other written agreement between the Employee and the Company.

Notwithstanding the foregoing, the Employee will not be deemed to have resigned for Good Reason unless (1) Employee provides the Company with written notice setting forth in reasonable detail the facts and circumstances claimed by the Employee to constitute Good Reason within sixty (60) days after the date of the occurrence of any event that the Employee knows or should reasonably have known to constitute Good Reason, (2) the Company fails to cure such acts or omissions within thirty (30) days following its receipt of such notice, and (3) the effective date of the Employee's termination for Good Reason occurs no later than sixty (60) days after the expiration of the cure period.

7.05 Surrender of Records and Property. Upon termination of his employment with the Company for any reason, Employee shall deliver promptly to the Company all records, manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, data, tables, calculations or copies thereof, which are the property of the Company or any of its Affiliates or which relate in any way to the business, products, practices or techniques of the Company or any of its Affiliates, and all other property, trade secrets and confidential information of the Company or any of its Affiliates, including, but not limited to, all documents which in whole or in part contain any trade secrets or confidential information of the Company or any of its Affiliates, which in any of these cases are in his possession or under his control.

7.06 Payments Upon Termination.

(a) Accrued Obligations. If this Agreement is terminated for any reason set forth in Section 7, then Employee shall be entitled to receive (a) his Base Salary and any accrued but unpaid vacation or paid time off through the date of the termination and (b) reimbursement of any business expenses incurred in the ordinary course of business through the date of termination that have not yet been reimbursed pursuant to Section 4.04 (the amounts in this clause (a), the "Accrued Obligations").

(b) Termination of Employment Due to Death or Disability. If Employee's employment is terminated pursuant to Section 7.01(a) then Employee, or Employee's heirs and assigns, as the case may be, shall be entitled to receive, in addition to the Accrued Obligations: (i) any Annual Bonus pursuant to Section 4.02 for the preceding calendar year to the extent not yet paid when such amount would have been payable pursuant to Section 4.02 if his employment had not terminated, which payment shall be made in the form of cash within the time period set forth

in Section 4.02; (ii) the Annual Bonus for the calendar year in which Employee's employment is terminated which for purposes hereof shall be equal to Employee's Target Bonus for such year, multiplied by a fraction, (A) the numerator of which shall be the number of days Employee was employed during the then such current calendar year and (B) the denominator of which shall be three hundred sixty-five (365), which payment shall be made in the form of cash within 75 days following the date on which the Employee's employment was so terminated and (iii) any outstanding unvested time-based equity awards (including the RSUs) held by Employee will accelerate and vest as of such termination date (with the vesting of any equity awards that is tied in whole or in part to performance to be governed by the terms of the applicable award agreement).

(c) Termination Without Cause or Resignation for Good Reason. If Employee's employment is terminated pursuant to Section 7.01(e) or (f) and provided that Employee shall have executed and delivered to the Company the Company's standard form of release of claims (a "Release") and the Release Effective Date (as defined below) shall have occurred within the time period set forth in Section 8.06(e), in addition to the Accrued Obligations, Employee shall be entitled to receive: (i) any Annual Bonus pursuant to Section 4.02 for the preceding calendar year to the extent not yet paid when such amount would have been payable pursuant to Section 4.02 if his employment had not terminated, which payment shall be made in the form of cash within the time period set forth in Section 4.02; (ii) the Annual Bonus for the calendar year in which Employee's employment is terminated which for purposes hereof shall be equal to the Employee's Target Bonus for such year, multiplied by a fraction, (A) the numerator of which shall be the number of days Employee was employed during the then such current calendar year and (B) the denominator of which shall be three hundred sixty-five (365), which payment shall be made in the form of cash within 75 days following such termination of employee's employment; (iii) any outstanding unvested time-based equity awards (including the RSUs) held by Employee will accelerate and vest as of such termination date (with the vesting of any equity awards that is tied in whole or in part to performance to be governed by the terms of the applicable award agreement); provided, that, this clause (iii) shall not apply if Employee's employment is terminated pursuant to Section 7.01(e) or (f) but Employee continues to serve as a member of the Board (including, without limitation, as executive or non-executive Chairman) following such termination (with the acceleration, if any, of any such equity awards to be governed by the terms of the applicable award agreement); (iv) payment by the Company for COBRA benefits for a period of eighteen (18) months following termination for Employee and any dependents covered immediately prior to termination; and (v) the Severance Amount (as defined below), which Severance Amount shall be paid over a twelve (12) month period at the same times and in the same manner as Employee's Base Salary had been paid to Employee prior to the termination of his employment hereunder, with the first such payment to occur on the First Payment Date (as defined below) (and any installment payments that would have been made to Employee prior to the First Payment Date shall be paid to Employee in a lump sum on the First Payment Date and the remaining payments shall be made as provided in this clause (v)). As used herein, the "Severance Amount" shall be equal to the sum of (a) Employee's Base Salary as in effect on the date of termination for one year and (b) the Annual Bonus, which for purposes hereof shall be equal to the Employee's Target Bonus for the year in which the date of termination occurs.

8. Miscellaneous.

8.01 Governing Law; Venue. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Delaware.

8.02 Prior Agreements. This Agreement, together with the Indemnification Agreement, the RSU Agreement and the PSU Agreement, contains the entire agreement of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings with respect to such subject matter (including, without limitation, the Prior Agreement), and the parties hereto have made no agreement, representations or warranties relating to the subject matter of this Agreement which are not set forth herein.

8.03 Withholding Taxes. The Company may withhold from any benefits payable under this Agreement all federal, state, city or other taxes as shall be required pursuant to any law or governmental regulation or ruling.

8.04 Amendments. No amendments or modifications of this Agreement shall be deemed effective unless made in writing and signed by the parties hereto.

8.05 No Waiver. No term or condition of this Agreement shall be deemed to have been waived, nor shall there by an estoppel to enforce any provisions of this Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought. Any written waiver shall not be deemed a continuing waiver unless specifically stated, shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

8.06 Section 409A.

(a) For purposes of this Agreement, "Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), and the Treasury Regulations promulgated thereunder (and such other Treasury or Internal Revenue Service guidance) as in effect from time to time. The parties intend that any amounts payable hereunder will be compliant with Section 409A, or will be exempt from Section 409A. Notwithstanding the foregoing, Employee shall be solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on or for the account of Employee in connection with this Agreement (including any taxes and penalties under Section 409A of the Code), and neither the Company nor any of its Affiliates shall have any obligation to indemnify or otherwise hold Employee (or any beneficiary) harmless from any or all of such taxes or penalties. No provision of this Agreement shall be interpreted or construed to transfer any liability for failure to comply with the requirements of Section 409A from the Employee or any other individual to the Company or any of its affiliates, employees or agents.

(b) Notwithstanding anything in this Agreement to the contrary, the following special rule shall apply, if and to the extent required by Section 409A, in the event that (i) Employee is deemed to be a "specified employee" within the meaning of Section 409A(a)(2)(B)(i), (ii) amounts or benefits under this Agreement or any other program, plan or arrangement of the Company or a controlled group affiliate thereof are due or payable on account of "separation from service" within the meaning of Treasury Regulations Section 1.409A-l(h) and (iii) Employee

is employed by a public company or a controlled group affiliate thereof, then no payments hereunder that are "nonqualified deferred compensation" subject to Section 409A shall be made to Employee prior to the date that is six (6) months after the date of Employee's separation from service or, if earlier, Employee's date of death, and following any applicable six (6) month delay, all such delayed payments will be paid in a single lump sum on the earliest permissible payment date.

(c) Each payment made under this Agreement (including each separate installment payment in the case of a series of installment payments) shall be deemed to be a separate payment for purposes of Section 409A. Amounts payable under this Agreement shall be deemed not to be a "deferral of compensation" subject to Section 409A to the extent provided in the exceptions in Treasury Regulation §§ 1.409A-1(b)(4) ("short-term deferrals") and (b)(9) ("separation pay plans," including the exception under subparagraph (iii)) and other applicable provisions of Section 409A. For purposes of this Agreement, with respect to payments of any amounts that are considered to be "non-qualified deferred compensation" subject to Section 409A or exempt from Section 409A under Treasury Regulation §§ 1.409A-1(b)(9) ("separation pay plans"), references to "termination of employment," "termination," or words and phrases of similar import, shall be deemed to refer to Employee's "separation from service" as defined in Section 409A, and shall be interpreted and applied in a manner that is consistent with the requirements of Section 409A.

(d) Notwithstanding anything to the contrary in this Agreement, any payment or benefit under this Agreement or otherwise that is exempt from Section 409A pursuant to Treasury Regulation § 1.409A-l(b)(9)(v)(A) or (C) (relating to certain reimbursements and in-kind benefits) shall be paid or provided to Employee only to the extent that the expenses are not incurred, or the benefits are not provided, beyond the last day of the second calendar year following the calendar year in which Employee's "separation from service" occurs; and provided further that such expenses are reimbursed no later than the last day of the third calendar year following the calendar year in which Employee's "separation from service" occurs. To the extent any indemnification payment, expense reimbursement, or the provision of any in-kind benefit is determined to be subject to Section 409A (and not exempt pursuant to the prior sentence or otherwise), the amount of any such indemnification payment or expenses eligible for reimbursement, or the provision of any in-kind benefit, in one calendar year shall not affect the indemnification payment or provision of in-kind benefits or expenses eligible for reimbursement in any other calendar year (except for any life-time or other aggregate limitation applicable to medical expenses), and in no event shall any indemnification payment or expenses be reimbursed after the last day of the calendar year following the calendar year in which Employee incurred such indemnification payment or expenses, and in no event shall any right to indemnification payment or reimbursement or the provision of any in-kind benefit be subject to liquidation or exchange for another benefit.

(e) Notwithstanding anything to the contrary in this Agreement, to the extent that any payments due under this Agreement as a result of the Employee's termination of employment with the Company are subject to the Employee's execution and delivery and non-revocation of the Release, (i) no such payments shall be made unless the Release Effective Date (as defined below) occurs on or prior to the sixtieth (60th) day immediately following the Termination Date, (ii) the Company shall deliver the Release to the Employee within seven (7)

days immediately following the Termination Date, and (iii) if, as of the Release Expiration Date (as defined below), the Employee has failed to execute the Release or has timely revoked his acceptance of the Release thereafter, the Employee shall not be entitled to any payments or benefits otherwise conditioned on the Release. Subject to Section 8.06(b), to the extent that any payments due under this Agreement as a result of the Employee's termination of employment with the Company are "nonqualified deferred compensation" (within the meaning of Section 409A), no such payments shall be paid (or, in the case of installments, shall commence) until the sixtieth (60th) day following the Termination Date (the "First Payment Date") (and any payments that are delayed pursuant to this Section 8.06(e)(iv) shall be paid in a lump sum on such First Payment Date and the remaining payments shall be made as provided in this Agreement). For purposes of this Agreement, the "Release Effective Date" shall mean the date on which the Release becomes effective and irrevocable in accordance with its terms. For purposes of this Section 8.06, "Release Expiration Date" shall mean the date that is twenty-one (21) days following the date upon which the Company timely delivers the Release to the Employee, or, in the event that the Employee's termination of employment is "in connection with an exit incentive or other employment termination program" (as such phrase is defined in the Age Discrimination in Employment act of 1967), the date that is forty-five (45) days following such delivery date.

8.07 <u>280G Parachute Payments</u>.

(a) Notwithstanding any other provision in this Agreement to the contrary, in the event that any payment or benefit received or to be received by you (including any payment or benefit received in connection with a Change in Control or the termination of your employment, whether pursuant to the terms of this Agreement or any other plan, arrangement or agreement) (all such payments and benefits being hereinafter referred to as the "Total Payments") would be subject (in whole or part), to the excise tax imposed under Section 4999 of the Code (the "Excise Tax"), then, after taking into account any reduction in the Total Payments provided by reason of Section 280G of the Code in such other plan, arrangement or agreement, the cash severance payments shall first be reduced, and the noncash severance payments shall thereafter be reduced, to the extent necessary so that no portion of the Total Payments is subject to the Excise Tax but only if (i) the net amount of such Total Payments without such reduction (but after subtracting the net amount of federal, state and local income taxes on such reduced Total Payments and after taking into account the phase out of itemized deductions and personal exemptions attributable to such reduced Total Payments) is greater than or equal to (ii) the net amount of such Total Payments without such reduction (but after subtracting the net amount of federal, state and local income taxes on such Total Payments and the amount of Excise Tax to which the Employee would be subject in respect of such unreduced Total Payments and after taking into account the phase out of itemized deductions and personal exemptions attributable to such unreduced Total Payments).

(b) For purposes of determining whether and the extent to which the Total Payments will be subject to the Excise Tax, (i) no portion of the Total Payments the receipt or enjoyment of which the Employee shall have waived at such time and in such manner as not to constitute a "payment" within the meaning of Section 280G(b) of the Code shall be taken into account, (ii) no portion of the Total Payments shall be taken into account which, in the written opinion of independent auditors or consultants of nationally recognized standing ("Independent Advisors") selected by the Company, does not constitute a "parachute payment" within the

meaning of Section 280G(b)(2) of the Code (including by reason of Section 280G(b)(4)(A) of the Code) and, in calculating the Excise Tax, no portion of such Total Payments shall be taken into account which, in the opinion of the Independent Advisors, constitutes reasonable compensation for services actually rendered, within the meaning of Section 280G(b)(4)(B) of the Code, in excess of the Base Amount (as defined in Section 280G(b)(3) of the Code) allocable to such reasonable compensation, and (iii) the value of any non-cash benefit or any deferred payment or benefit included in the Total Payments shall be determined by the Independent Advisors in accordance with the principles of Section 280G(d)(3) and (4) of the Code.

8.08 Compensation Recovery Policy. The Employee acknowledges and agrees that he shall take all action necessary or appropriate to comply with the clawback or similar policy adopted by the Company pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act or any other clawback or similar policy otherwise adopted by the Company, and any rules and regulations promulgated thereunder, (including, without limitation, entering into any further agreements, amendments or policies necessary or appropriate to implement and/or enforce such policy with respect to past, present and future compensation, as appropriate).

8.09 Severability. To the extent any provision of this Agreement shall be invalid or unenforceable, it shall be considered deleted herefrom and the remainder of such provision and of this Agreement shall be unaffected and shall continue in full force and effect. In furtherance and not in limitation of the foregoing, should the duration or geographical extent of, or business activities covered by, any provision of this Agreement be in excess of that which is valid and enforceable under applicable law, then such provision shall be construed to cover only that duration, extent or activities which may validly and enforceably be covered. Employee acknowledges the uncertainty of the law in this respect and expressly stipulates that this Agreement be given the construction which renders its provisions valid and enforceable to the maximum extent (not exceeding its express terms) possible under applicable law.

8.10 Assignment. This Agreement shall not be assignable, in whole or in part, by either party without the written consent of the other party. After any such assignment by the Company, the Company shall be discharged from all further liability hereunder and such assignee shall thereafter be deemed to be the Company for the purposes of all provisions of this Agreement including this Section 8.

8.11 Injunctive Relief. Employee agrees that it would be difficult to compensate the Company fully for damages for any violation of the provisions of this Agreement, including without limitation the provisions of Sections 5 and 6. Accordingly, Employee specifically agrees that the Company shall be entitled to temporary and permanent injunctive relief to enforce the provisions of this Agreement and that such relief may be granted without the necessity of proving actual damages. This provision with respect to injunctive relief shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief.

8.12 Attorneys' Fees and Costs. The Company and Employee agree that in the event any litigation arises out of this Agreement between Company and Employee, the prevailing party in such litigation shall be entitled to recover its attorney's fees and costs brought relating to such litigation.

8.13 No Mitigation Obligation. All amounts paid to Employee under this Agreement following Employee's termination of employment and this Agreement are acknowledged by the Company and Employee to be reasonable and to be liquidated damages, and Employee will not be required to reduce the amount of such payments by seeking other employment or otherwise, nor will any profits, income, earnings or other benefits from any source whatsoever (including from other employment) create any mitigation, offset, reduction or any other obligation on the part of Employee under this Agreement.

8.14 Notices. Any notice, payment, demand or communication required or permitted to be given by the provisions of this Agreement shall be deemed to have been effectively given and received as follows: (i) by personal delivery when delivered personally; (ii) by overnight courier upon written verification of receipt; (iii) by email, telecopy or facsimile transmission upon acknowledgment of receipt of electronic transmission; or (iv) by certified or registered mail, return receipt requested, upon verification of receipt. Notice shall be sent to Executive at the address listed on the Company's personnel records and to the Company at its principal place of business, to the attention of the General Counsel, or such other address as either party may specify in writing. Any party may change its address by delivering a written change of address to all of the other parties in the manner set forth in this Section 8.14.

8.15 Notice of Immunity. Notwithstanding any provision of this Agreement to the contrary, (i) Employee shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in confidence to a Federal, State, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law; (ii) Employee shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (iii) if Employee files a lawsuit for retaliation by an employer for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's attorney and use the trade secret information in the court proceeding, if Employee files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

8.16 Survival. The rights and obligations of the parties under the provisions of this Agreement shall survive, and remain binding and enforceable, notwithstanding the expiration of the Term, the termination of this Agreement, the termination of Employee's employment hereunder or any settlement of the financial rights and obligations arising from Employee's employment hereunder, to the extent necessary to preserve the intended benefits of such provisions.

8.17 Counterparts; Facsimile or .pdf Signatures. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. This Agreement may be executed and delivered by facsimile or by .pdf file and upon such delivery the facsimile or .pdf signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

[*Signatures on following page*]

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date set forth in the first paragraph.

**CAMPING WORLD HOLDINGS, INC.**

By: /s/ Matthew D. Wagner
Matthew D. Wagner
President

**CWGS ENTERPRISES, LLC**

By: /s/ Matthew D. Wagner
Matthew D. Wagner
President

**EMPLOYEE**

By: /s/ Marcus A. Lemonis
Marcus A. Lemonis

**EXHIBIT A**

**Indemnification Agreement**

[Attached]

**EXHIBIT B**

**RSU Agreement**

[Attached]

**EXHIBIT C**

**PSU Agreement**

[Attached]

**Exhibit 19.1**

**CAMPING WORLD HOLDINGS, INC.**

**INSIDER TRADING COMPLIANCE POLICY**

This Insider Trading Compliance Policy (this "***Policy***") consists of seven sections:

- Section I provides an overview;
- Section II sets forth the policies of Camping World Holdings, Inc. prohibiting insider trading;
- Section III explains insider trading;
- Section IV consists of procedures that have been put in place by Camping World Holdings, Inc. to prevent insider trading;
- Section V sets forth additional transactions that are prohibited by this Policy;
- Section VI explains Rule 10b5-1 trading plans; and
- Section VII refers to the execution and return of a certificate of compliance.

## I. SUMMARY

Preventing insider trading is necessary to comply with securities laws and to preserve the reputation and integrity of Camping World Holdings, Inc. (the "***Company***") as well as that of all persons affiliated with the Company. "Insider trading" occurs when any person purchases or sells a security while in possession of inside information relating to the security. As explained in Section III below, "inside information" is information that is both "material" and "non-public." Insider trading is a crime. The penalties for violating insider trading laws include imprisonment, disgorgement of profits, civil fines, and significant criminal fines. Insider trading is also prohibited by this Policy, and violation of this Policy may result in Company-imposed sanctions, including termination of employment for cause.

This Policy applies to all officers, directors and certain designated employees of the Company as identified on a list maintained by the General Counsel ("***Designated Employees***"). Individuals subject to this Policy are responsible for ensuring that members of their households also comply with this Policy. This Policy also applies to any entities controlled by individuals subject to the Policy, including any corporations, limited liability companies, partnerships or trusts (such entities, together with all officers, directors and employees of the Company and members of their households, are referred to as the "***Covered Persons***"), and transactions by these entities should be treated for the purposes of this Policy and applicable securities laws as if they were for the individual's own account. This Policy extends to all activities within and outside an individual's Company duties. Every officer, director and Designated Employee must review this Policy. Questions regarding the Policy should be directed to the Company's General Counsel.

## II. STATEMENT OF POLICIES PROHIBITING INSIDER TRADING

No Covered Person shall purchase or sell any type of security while in possession of material, non-public information relating to the security, whether the issuer of such security is the Company or any other company. For example, if a director, officer or employee learns material non-public information about another company with which the Company does business, including a business partner or collaborator, that person may not trade in such other company's securities until the information becomes public or is no longer material. Further, no Covered Person shall purchase or sell any security of any other company in the Company's industry or the industry of a company that is the subject of a potential strategic transaction with the Company, while in possession of material nonpublic information that was obtained in the course of the Covered Person's employment or service with the Company.

**Additionally, no officer, director or Designated Employee shall purchase or sell any security of the Company during the period beginning on the 14th calendar day before the end of any fiscal quarter of the Company and ending upon the completion of the second full trading day after the public release of earnings data for such fiscal quarter or during any other trading suspension period declared by the Company.** For the purposes of this Policy, a "trading day" is a day on which national stock exchanges are open for trading.

These prohibitions do not apply to:

- purchases of the Company's securities by a Covered Person from the Company or sales of the Company's securities by a Covered Person to the Company;

- exercises of stock options or other equity awards or the surrender of shares to the Company in payment of the exercise price or in satisfaction of any tax withholding obligations in a manner permitted by the applicable equity award agreement, or vesting of equity-based awards, that in each case do not involve a market sale of the Company's securities (the "cashless exercise" of a Company stock option through a broker <u>does</u> involve a market sale of the Company's securities, and therefore would not qualify under this exception);

- *bona fide* gifts of the Company's securities, unless the person making the gift knows, or is reckless in not knowing, that the recipient intends to sell the securities while the donor is in possession of material, non-public information about the Company;

- purchases or sales of the Company's securities made pursuant to any binding contract, specific instruction or written plan entered into outside of a black-out period and while the purchaser or seller, as applicable, was unaware of any material, non-public information and which contract, instruction or plan (i) meets all of the requirements of the affirmative defense provided by Rule 10b5-1 ("***Rule 10b5-1***") promulgated under the Securities Exchange Act of 1934, as amended (the "***1934 Act***"), (ii) was pre-cleared in advance pursuant to this Policy and (iii) has not been amended or modified in any respect after such initial pre-clearance without such amendment or modification being pre-cleared in advance pursuant to

this Policy. For more information about Rule 10b5-1 trading plans, see Section VI below; or

- purchases or sales of the Company's securities made pursuant to a "non-Rule 10b5-1 trading arrangement" as defined in Item 408 of Regulation S-K that (i) was entered into outside of a black-out period and while the Covered Person was unaware of any material, non-public information, (ii) has been pre-cleared by the General Counsel and (iii) has not been modified after such initial pre-clearance without such amendment or modification being pre-cleared in advance by the General Counsel.

No officer, director or Designated Employee shall directly or indirectly communicate (or "***tip***") material, non-public information to anyone outside of the Company (except in accordance with the Company's policies regarding the protection or authorized external disclosure of Company information) or to anyone within the Company other than on a need-to-know basis.

## III. EXPLANATION OF INSIDER TRADING

***"Insider trading"*** refers to the purchase or sale of a security while in possession of "material," "non-public" information relating to the security or its issuer.

***"Securities"*** includes stocks, bonds, notes, debentures, options, warrants and other convertible securities, as well as derivative instruments.

***"Purchase"*** and ***"sale"*** are defined broadly under the federal securities law. ***"Purchase"*** includes not only the actual purchase of a security, but any contract to purchase or otherwise acquire a security. ***"Sale"*** includes not only the actual sale of a security, but any contract to sell or otherwise dispose of a security. These definitions extend to a broad range of transactions, including conventional cash-for-stock transactions, conversions, the exercise of stock options, and acquisitions and exercises of warrants or puts, calls or other derivative securities.

It is generally understood that insider trading includes the following:

- trading by insiders while in possession of material, non-public information;
- trading by persons other than insiders while in possession of material, non-public information, if the information either was given in breach of an insider's fiduciary duty to keep it confidential or was misappropriated; and
- communicating or tipping material, non-public information to others, including recommending the purchase or sale of a security while in possession of such information.

### A. What Facts are Material?

The materiality of a fact depends upon the circumstances. A fact is considered "material" if there is a substantial likelihood that a reasonable investor would consider it important in

making a decision to buy, sell or hold a security, or if the fact is likely to have a significant effect on the market price of the security. Material information can be positive or negative and can relate to virtually any aspect of a company's business or to any type of security, debt or equity.

Examples of material information include (but are not limited to) information about corporate earnings or earnings forecasts; possible mergers, acquisitions, tender offers or dispositions; major new products or product developments; important business developments, such as entry into or loss of significant contracts or developments regarding strategic collaborations; management or control changes; significant financing developments including pending public sales or offerings of debt or equity securities; defaults on borrowings; bankruptcies; and significant litigation or regulatory actions. Moreover, material information does not have to be related to a company's business. For example, the contents of a forthcoming newspaper column that is expected to affect the market price of a security can be material.

A good general rule of thumb: **When in doubt, do not trade.**

**B. What is Non-Public?**

Information is "non-public" if it is not available to the general public. In order for information to be considered public, it must be widely disseminated in a manner making it generally available to investors through such media as Dow Jones, Business Wire, Reuters, The Wall Street Journal, Associated Press, or United Press International, a broadcast on widely available radio or television programs, publication in a widely available newspaper, magazine or news web site, a Regulation FD-compliant conference call, or public disclosure documents filed with the Securities and Exchange Commission ("***SEC***") that are available on the SEC's web site.

The circulation of rumors, even if accurate and reported in the media, does not constitute effective public dissemination. In addition, even after a public announcement, a reasonable period of time must lapse in order for the market to react to the information. Generally, one should allow two full trading days following publication as a reasonable waiting period before such information is deemed to be public. If, for example, the Company were to make an announcement on a Monday prior to 9:30 a.m. Eastern time, the information would be deemed public after the close of trading on Tuesday. If an announcement were made on a Monday after 9:30 a.m. Eastern time, the information would be deemed public after the close of trading on Wednesday. If you have any question as to whether information is publicly available, please direct an inquiry to the General Counsel.

**C. Who is an Insider?**

"Insiders" include officers, directors and employees of a company and anyone else who has material non-public information about a company. Insiders have independent fiduciary duties to their company and its stockholders not to trade on material, non-public information relating to the company's securities. All officers, directors and Designated Employees of the Company should consider themselves insiders with respect to material, non-public information about the Company's business, activities and securities. Officers, directors and Designated Employees may not trade in the Company's securities while in possession of material, non-public information relating to the Company, nor may they tip such information to anyone outside

the Company (except in accordance with the Company's policies regarding the protection or authorized external disclosure of Company information) or to anyone within the Company other than on a need-to-know basis.

**D. Trading by Persons Other than Insiders**

Insiders may be liable for communicating or tipping material, non-public information to a third party ("***tippee***"), and insider trading violations are not limited to trading or tipping by insiders. Persons other than insiders also can be liable for insider trading, including tippees who trade on material, non-public information tipped to them or individuals who trade on material, non-public information that has been misappropriated.

Tippees inherit an insider's duties and are liable for trading on material, non-public information illegally tipped to them by an insider. Similarly, just as insiders are liable for the insider trading of their tippees, so are tippees who pass the information along to others who trade. In other words, a tippee's liability for insider trading is no different from that of an insider. Tippees can obtain material, non-public information by receiving overt tips from others or through, among other things, conversations at social, business, or other gatherings.

**E. Penalties for Engaging in Insider Trading**

Penalties for trading on or tipping material, non-public information can extend significantly beyond any profits made or losses avoided, both for individuals engaging in such unlawful conduct and their employers. The SEC and Department of Justice have made the civil and criminal prosecution of insider trading violations a top priority. Enforcement remedies available to the government or private plaintiffs under the federal securities laws include:

- SEC administrative sanctions;
- securities industry self-regulatory organization sanctions;
- civil injunctions;
- damage awards to private plaintiffs;
- disgorgement of all profits;
- civil fines for the violator of up to three times the amount of profit gained or loss avoided;
- civil fines for the employer or other controlling person of a violator (i.e., where the violator is an employee or other controlled person) of up to the greater of $2,479,282 (subject to adjustment for inflation) or three times the amount of profit gained or loss avoided by the violator;
- criminal fines for individual violators of up to $5,000,000 ($25,000,000 for an entity); and
- jail sentences of up to 20 years.

In addition, insider trading could result in serious sanctions by the Company, including dismissal. Insider trading violations are not limited to violations of the federal securities laws. Other federal and state civil or criminal laws, such as the laws prohibiting mail and wire fraud and the Racketeer Influenced and Corrupt Organizations Act (RICO), also may be violated in connection with insider trading.

**F. Size of Transaction and Reason for Transaction Do Not Matter**

The size of the transaction or the amount of profit received does not have to be significant to result in prosecution. The SEC has the ability to monitor even the smallest trades, and the SEC performs routine market surveillance. Brokers and dealers are required by law to inform the SEC of any possible violations by people who may have material, non-public information. The SEC aggressively investigates even small insider trading violations.

**G. Examples of Insider Trading**

Examples of insider trading cases include actions brought against corporate officers, directors, and employees who traded in a company's securities after learning of significant confidential corporate developments; friends, business associates, family members and other tippees of such officers, directors, and employees who traded in the securities after receiving such information; government employees who learned of such information in the course of their employment; and other persons who misappropriated, and took advantage of, confidential information from their employers.

The following are illustrations of insider trading violations. These illustrations are hypothetical and, consequently, not intended to reflect on the actual activities or business of the Company or any other entity.

Trading by Insider

An officer of X Corporation learns that earnings to be reported by X Corporation will increase dramatically. Prior to the public announcement of such earnings, the officer purchases X Corporation's stock. The officer, an insider, is liable for all profits as well as penalties of up to three times the amount of all profits. The officer also is subject to, among other things, criminal prosecution, including up to $5,000,000 in additional fines and 20 years in jail. Depending upon the circumstances, X Corporation and the individual to whom the officer reports also could be liable as controlling persons.

Trading by Tippee

An officer of X Corporation tells a friend that X Corporation is about to publicly announce that it has signed an agreement for a major acquisition. This tip causes the friend to purchase X Corporation's stock in advance of the announcement. The officer is jointly liable with his friend for all of the friend's profits, and each is liable for all civil penalties of up to three times the amount of the friend's profits. The officer and his friend are also subject to criminal prosecution and other remedies and sanctions, as described above.

### H. Prohibition of Records Falsification and False Statements

Section 13(b)(2) of the 1934 Act requires companies subject to the Act to maintain proper internal books and records and to devise and maintain an adequate system of internal accounting controls. The SEC has supplemented the statutory requirements by adopting rules that prohibit (1) any person from falsifying records or accounts subject to the above requirements and (2) officers or directors from making any materially false, misleading, or incomplete statement to any accountant in connection with any audit or filing with the SEC. These provisions reflect the SEC's intent to discourage officers, directors and other persons with access to the Company's books and records from taking action that might result in the communication of materially misleading financial information to the investing public.

## IV. STATEMENT OF PROCEDURES PREVENTING INSIDER TRADING

The following procedures have been established, and will be maintained and enforced, by the Company to prevent insider trading. Every officer, director and Designated Employee is required to follow these procedures.

### A. Pre-Clearance of All Trades by All Officers, Directors and Designated Employees

To provide assistance in preventing inadvertent violations of applicable securities laws and to avoid the appearance of impropriety in connection with the purchase and sale of the Company's securities, **all transactions in the Company's securities (including without limitation, acquisitions and dispositions of Company stock, gifts, the exercise of stock options and the sale of Company stock issued upon exercise of stock options) by officers, directors and Designated Employees (each, a "*Pre-Clearance Person*") must be pre-cleared** by the Company's General Counsel or his or her designee. Pre-clearance does not relieve anyone of his or her responsibility under SEC rules.

A request for pre-clearance may be oral or in writing (including without limitation by e-mail), should be made at least two business days in advance of the proposed transaction and should include the identity of the Pre-Clearance Person, the type of proposed transaction (for example, an open market purchase, a privately negotiated sale, an option exercise, etc.), the proposed date of the transaction and the number of shares, options or other securities to be involved. In addition, unless otherwise determined by the General Counsel, the Pre-Clearance Person must execute a certification (in the form approved by the General Counsel) that he, she or it is not aware of material, non-public information about the Company. The General Counsel shall have sole discretion to decide whether to clear any contemplated transaction, provided that the President shall have sole discretion to decide whether to clear transactions by the General Counsel or persons or entities subject to this policy as a result of their relationship with the General Counsel). All trades that are pre-cleared must be effected within five business days of receipt of the pre-clearance unless a specific exception has been granted by the General Counsel (or the President, in the case of the General Counsel or persons or entities subject to this policy as a result of their relationship with the General Counsel). A pre-cleared trade (or any portion of a pre-cleared trade) that has not been effected during the five business day period must be pre-cleared again prior to execution. Notwithstanding receipt of pre-clearance, if the Pre-Clearance Person becomes aware of material,

non-public information or becomes subject to a black-out period before the transaction is effected, the transaction may not be completed.

**B. Black-Out Periods**

**Additionally, no officer, director or Designated Employee shall purchase or sell any security of the Company during the period beginning on the 14th calendar day before the end of any fiscal quarter of the Company and ending upon the completion of the second full trading day after the public release of earnings data for such fiscal quarter or during any other trading suspension period declared by the Company,** except for purchases and sales made pursuant to the permitted transactions described in Section II.

Exceptions to the black-out period policy may be approved only by the Company's General Counsel (or, in the case of an exception for the General Counsel or persons or entities subject to this policy as a result of their relationship with the General Counsel, the President or, in the case of exceptions for directors or persons or entities subject to this policy as a result of their relationship with a director, the Board of Directors).

From time to time, the Company, through the Board of Directors, the Company's disclosure committee, the President or the General Counsel, may recommend that officers, directors, Designated Employees or others suspend trading in the Company's securities because of developments that have not yet been disclosed to the public. Subject to the exceptions noted above, all of those affected should not trade in the Company's securities while the suspension is in effect, and should not disclose to others that the Company has suspended trading. Any trading suspension will remain effective until revoked by the General Counsel.

If the Company is required to impose a "pension fund black-out period" under Regulation BTR, each director and executive officer shall not, directly or indirectly sell, purchase or otherwise transfer during such black-out period any equity securities of the Company acquired in connection with his or her service as a director or officer of the Company, except as permitted by Regulation BTR.

**C. Post-Termination Transactions**

If an individual is in possession of material, non-public information when his or her service terminates, that individual may not trade in the Company's securities until that information has become public or is no longer material.

**D. Information Relating to the Company**

1. Access to Information

Access to material, non-public information about the Company, including the Company's business, earnings or prospects, should be limited to officers, directors and Designated Employees of the Company on a need-to-know basis. In addition, such information should not be communicated to anyone outside the Company under any circumstances (except in accordance with the Company's policies regarding the protection or authorized external disclosure of Company information) or to anyone within the Company on an other than need-to-know basis.

In communicating material, non-public information to employees of the Company, all officers, directors and Designated Employees must take care to emphasize the need for confidential treatment of such information and adherence to the Company's policies with regard to confidential information.

2. Inquiries From Third Parties

Inquiries from third parties, such as industry analysts or members of the media, about the Company should be directed to the General Counsel.

**E. Limitations on Access to Company Information**

The following procedures are designed to maintain confidentiality with respect to the Company's business operations and activities.

All officers, directors and Designated Employees should take all steps and precautions necessary to restrict access to, and secure, material, non-public information by, among other things:

- maintaining the confidentiality of Company-related transactions;
- conducting their business and social activities so as not to risk inadvertent disclosure of confidential information. Review of confidential documents in public places should be conducted so as to prevent access by unauthorized persons;
- restricting access to documents and files (including computer files) containing material, non-public information to individuals on a need-to-know basis (including maintaining control over the distribution of documents and drafts of documents);
- promptly removing and cleaning up all confidential documents and other materials from conference rooms following the conclusion of any meetings;
- disposing of all confidential documents and other papers, after there is no longer any business or other legally required need, through shredders when appropriate;
- restricting access to areas likely to contain confidential documents or material, non-public information;
- safeguarding laptop computers, mobile devices, tablets, memory sticks, CDs and other items that contain confidential information; and
- avoiding the discussion of material, non-public information in places where the information could be overheard by others such as in elevators, restrooms, hallways, restaurants, airplanes or taxicabs.

Personnel involved with material, non-public information, to the extent feasible, should conduct their business and activities in areas separate from other Company activities.

## V. ADDITIONAL PROHIBITED TRANSACTIONS

The Company has determined that there is a heightened legal risk and/or the appearance of improper or inappropriate conduct if the persons subject to this Policy engage in certain types of transactions. Therefore, officers, directors and Designated Employees shall comply with the following policies with respect to certain transactions in the Company securities:

### A. Short Sales

Short sales of the Company's securities evidence an expectation on the part of the seller that the securities will decline in value, and therefore signal to the market that the seller has no confidence in the Company or its short-term prospects. In addition, short sales may reduce the seller's incentive to improve the Company's performance. For these reasons, short sales of the Company's securities are prohibited by this Policy. In addition, Section 16(c) of the 1934 Act absolutely prohibits Section 16 reporting persons from making short sales of the Company's equity securities, *i.e.*, sales of shares that the insider does not own at the time of sale, or sales of shares against which the insider does not deliver the shares within 20 days after the sale.

### B. Options

A transaction in options is, in effect, a bet on the short-term movement of the Company's stock and therefore creates the appearance that an officer, director or Designated Employee is trading based on inside information. Transactions in options, whether traded on an exchange, on any other organized market or on an over-the-counter market, also may focus an officer's, director's or Designated Employee's attention on short-term performance at the expense of the Company's long-term objectives. Accordingly, transactions in puts, calls or other derivative securities involving the Company's equity securities, on an exchange, on or in any other organized market or on an over-the-counter market, are prohibited by this Policy.

### C. Hedging Transactions

Purchasing financial instruments, such as prepaid variable forward contracts, equity swaps, collars, and exchange funds, or otherwise engaging in transactions that hedge or offset, or are designed to hedge or offset, any decrease in the market value of the Company's equity securities, may cause an officer, director, or employee to no longer have the same objectives as the Company's other stockholders. Therefore, all such transactions involving the Company's equity securities, whether such securities were granted as compensation or are otherwise held, directly or indirectly, are prohibited by this Policy.

### D. Purchases of the Company's Securities on Margin; Pledging the Company's Securities to Secure Margin or Other Loans

Purchasing on margin means borrowing from a brokerage firm, bank or other entity in order to purchase the Company's securities (other than in connection with a cashless exercise of stock options through a broker under the Company's equity plans). Officers, directors and Designated Employees are prohibited from purchasing the Company's securities on margin, i.e. holding the Company's securities in a "margin account" (which would allow you to borrow against your holdings to buy securities), or otherwise pledging the Company's securities to secure loans,

unless the transaction is preapproved by (i) by the Audit Committee, in case of officers and directors, or (ii) General Counsel for Designated Employees. All requests for preapproval should be submitted at least ten days prior to the proposed date of execution of the margin purchase or pledge. Any officer, director or Designated Employee who intends to pledge the Company's securities must clearly demonstrate the financial capacity to repay the loan without resort to the pledged securities.

**E. Partnership Distributions**

Nothing in this Policy is intended to limit the ability of a private equity partnership or other similar entity with which a director is affiliated to distribute Company securities to its partners, members or other similar persons. It is the responsibility of each affected director and the affiliated entity, in consultation with their own counsel (as appropriate), to determine the timing of any distributions, based on all relevant facts and circumstances and applicable securities laws.

## VI. RULE 10B5-1 TRADING PLANS, SECTION 16 AND RULE 144

**A. Rule 10b5-1 Trading Plans**

1.

Rule 10b5-1 presents an opportunity for insiders to establish arrangements to sell (or purchase) Company stock without the restrictions of trading windows and black-out periods, even when there is undisclosed material information. Rule 10b5-1 will protect officers, directors, and employees from insider trading liability under Rule 10b5-1 for transactions under a previously established contract, plan or instruction to trade in the Company's stock entered into and conducted in good faith and in accordance with the terms of Rule 10b5-1 (a "***Trading Plan***") and all applicable state laws and will be exempt from the trading restrictions set forth in this Policy. Each such Trading Plan, and any proposed modification or termination thereof, must be submitted to and pre-approved by the Company's General Counsel, or such other person as the Board of Directors may designate from time to time (the "***Authorizing Officer***"), who may impose such conditions on the implementation and operation of the Trading Plan as the Authorizing Officer deems necessary or advisable. However, compliance of the Trading Plan to the terms of Rule 10b5-1 and the execution of transactions pursuant to the Trading Plan are the sole responsibility of the person initiating the Trading Plan, not the Company or the Authorizing Officer.

**Trading Plans do not exempt individuals subject to Section 16 of the 1934 Act from complying with Section 16 reporting obligations or from short-swing profit rules or liability. Furthermore, Trading Plans only provide an "affirmative defense" in the event there is an insider trading lawsuit. It does not prevent someone from bringing a lawsuit.**

An officer, director or Designated Employee may enter into a Trading Plan only when he or she is not in possession of material, non-public information, and only during a trading window period outside of the trading black-out period. Although transactions effected under a Trading Plan will not require further pre-clearance at the time of the trade, any transaction (including the quantity and price) made pursuant to a Trading Plan of a Section 16 reporting person must be

reported to the Company promptly on the day of each trade to permit the Company's filing coordinator to assist in the preparation and filing of a required Form 4. Such reporting should be in writing (including by e-mail) and should include the identity of the reporting person, the type of transaction, the date of the transaction, the number of shares involved and the purchase or sale price. However, the ultimate responsibility, and liability, for timely filing remains with the Section 16 reporting person.

The Company reserves the right from time to time to suspend, discontinue or otherwise prohibit any transaction in the Company's securities, even pursuant to a previously approved Trading Plan, if the Authorizing Officer or the Board of Directors, in its discretion, determines that such suspension, discontinuation or other prohibition is in the best interests of the Company. Any Trading Plan submitted for approval hereunder should explicitly acknowledge the Company's right to prohibit transactions in the Company's securities. Failure to discontinue purchases and sales as directed shall constitute a violation of the terms of this Section VI and result in a loss of the exemption set forth herein.

Officers, directors and Designated Employees may adopt Trading Plans with brokers that outline a pre-set plan for trading of the Company's stock, including the exercise of options. Trades pursuant to a Trading Plan generally may occur at any time. However, the Trading Plan must include a minimum "cooling-off period" between the establishment of a Trading Plan and commencement of any transactions under such plan for:

- Section 16 reporting persons that extends to the later of 90 days after adoption or modification of a Trading Plan or two business days after filing the Form 10-K or Form 10-Q covering the fiscal quarter in which the Trading Plan was adopted or modified, as applicable, up to a maximum of 120 days; and

- employees who are not Section 16 reporting persons and any other persons, other than the Company, that extends 30 days after adoption or modification of a Trading Plan.

Individuals may not adopt more than one Trading Plan at a time except under the limited circumstances permitted by Rule 10b5-1 and subject to pre-approval by the Authorizing Officer.

2. Termination of and Modifications to Trading Plans

Termination of Trading Plans should occur only in unusual circumstances. Effectiveness of any termination or modification of a Trading Plan will be subject to the prior review and approval of the Authorizing Officer. Termination is effected upon written notice to the broker.

A person acting in good faith may modify a prior Trading Plan so long as such modifications are made outside of a quarterly trading black-out period and at a time when the Trading Plan participant does not possess material, non-public information. Modifications to a Trading Plan are subject to pre-approval by the Authorizing Officer. If you make changes to the amount, price, or timing of the purchase or sale of securities underlying a Trading Plan, it is considered a termination of the Trading Plan and the adoption of a new Trading Plan, triggering a new cooling-off period (as described above).

Under certain circumstances, a Trading Plan *must* be terminated. This may include circumstances such as the announcement of a merger or the occurrence of an event that would

cause the transaction either to violate the law or to have an adverse effect on the Company. The Authorizing Officer or administrator of the Company's stock plans is authorized to notify the broker in such circumstances, thereby insulating the insider in the event of termination.

3. Discretionary Plans

Although non-discretionary Trading Plans are preferred, discretionary Trading Plans, where the discretion or control over trading is transferred to a broker, are permitted if pre-approved by the Authorizing Officer.

The Authorizing Officer of the Company must pre-approve any Trading Plan, arrangement or trading instructions, etc., involving potential sales or purchases of the Company's stock or option exercises, including but not limited to, blind trusts, discretionary accounts with banks or brokers, or limit orders. The actual transactions effected pursuant to a pre-approved Trading Plan will not be subject to further pre-clearance for transactions in the Company's stock once the Trading Plan or other arrangement has been pre-approved.

4. Reporting (if Required)

If required, an SEC Form 144 will be filled out and filed by the individual/brokerage firm in accordance with the existing rules regarding Form 144 filings. A footnote at the bottom of the Form 144 should indicate that the trades "are in accordance with a Trading Plan that complies with Rule 10b5-1 and was adopted on ____." For Section 16 reporting persons, Form 4s should be filed before the end of the second business day following the date that the broker, dealer or plan administrator informs the individual that a transaction was executed, provided that the date of such notification is not later than the third business day following the trade date. The Form 4 must indicate that the transaction was made pursuant to a Trading Plan.

5. Options

Exercises of options for cash may be executed at any time. "Cashless exercise" option exercises through a broker are subject to trading windows. However, the Company will permit same day sales under Trading Plans. If a broker is required to execute a cashless exercise in accordance with a Trading Plan, then the Company must have exercise forms attached to the Trading Plan that are signed, undated and with the number of shares to be exercised left blank. Once a broker determines that the time is right to exercise the option and dispose of the shares in accordance with the Trading Plan, the broker will notify the Company in writing and the administrator of the Company's stock plans will fill in the number of shares and the date of exercise on the previously signed exercise form. The insider should not be involved with this part of the exercise.

6. Trades Outside of a Trading Plan

During an open trading window, trades differing from Trading Plan instructions that are already in place are allowed as long as the Trading Plan continues to be followed.

7. Public Disclosure

The Company reserves the right to publicly disclose, announce, or respond to inquiries from the media regarding the adoption, modification, or termination of a Trading Plan and non-Rule 10b5-1 trading arrangements, or the execution of transactions made under a Trading Plan.

8. Prohibited Transactions

The transactions prohibited under Section V of this Policy, including among others short sales and hedging transactions, may not be carried out through a Trading Plan or other arrangement or trading instruction involving potential sales or purchases of the Company's securities.

9. Limitation on Liability

None of the Company, the General Counsel, the President, the Authorizing Officer, the Company's other employees or any other person will have any liability for any delay in reviewing, or refusal of, a Trading Plan submitted pursuant to this Section VI or a request for pre-clearance submitted pursuant to Section IV of this Policy. Notwithstanding any review of a Trading Plan pursuant to this Section VI or pre-clearance of a transaction pursuant to Section IV of this Policy, none of the Company, the General Counsel, the President, the Authorizing Officer, the Company's other employees or any other person assumes any liability for the legality or consequences of such Trading Plan or transaction to the person engaging in or adopting such Trading Plan or transaction.

**B. Section 16: Insider Reporting Requirements, Short-Swing Profits and Short Sales**

1. Reporting Obligations Under Section 16(a): SEC Forms 3, 4 and 5

Section 16(a) of the 1934 Act generally requires all officers, directors and 10% stockholders ("***insiders***"), within 10 days after the insider becomes an officer, director or 10% stockholder, to file with the SEC an "Initial Statement of Beneficial Ownership of Securities" on SEC Form 3 listing the amount of the Company's stock, options and warrants which the insider beneficially owns. Following the initial filing on SEC Form 3, changes in beneficial ownership of the Company's stock, options and warrants must be reported on SEC Form 4, generally within two business days after the date on which such change occurs, or in certain cases on Form 5, within 45 days after fiscal year end. A Form 4 must be filed even if, as a result of balancing transactions, there has been no net change in holdings. In certain situations, purchases or sales of Company stock made within six months *prior* to the filing of a Form 3 must be reported on Form 4. Similarly, certain purchases or sales of Company stock made within six months *after* an officer or director ceases to be an insider must be reported on Form 4.

2. Recovery of Profits Under Section 16(b)

For the purpose of preventing the unfair use of information which may have been obtained by an insider, any profits realized by any officer, director or 10% stockholder from any "purchase" and "sale" of Company stock during a six-month period, so called "short-swing profits," may be recovered by the Company. When such a purchase and sale occurs, good faith is no defense. The insider is liable even if compelled to sell for personal reasons, and even if the sale takes place after full disclosure and without the use of any inside information.

The liability of an insider under Section 16(b) of the 1934 Act is only to the Company itself. The Company, however, cannot waive its right to short swing profits, and any Company stockholder can bring suit in the name of the Company. Reports of ownership filed with the SEC on Form 3, Form 4 or Form 5 pursuant to Section 16(a) (discussed above) are readily available to the public, and certain attorneys carefully monitor these reports for potential Section 16(b) violations. In addition, liabilities under Section 16(b) may require separate disclosure in the Company's annual report to the SEC on Form 10-K or its proxy statement for its annual meeting of stockholders. No suit may be brought more than two years after the date the profit was realized. However, if the insider fails to file a report of the transaction under Section 16(a), as required, the two-year limitation period does not begin to run until after the transactions giving rise to the profit have been disclosed. Failure to report transactions and late filing of reports require separate disclosure in the Company's proxy statement.

Officers and directors should consult the attached "Short-Swing Profit Rule Section 16(b) Checklist" attached hereto as "Attachment A" in addition to consulting the General Counsel prior to engaging in any transactions involving the Company's securities, including without limitation, the Company's stock, options or warrants.

3. Short Sales Prohibited Under Section 16(c)

Section 16(c) of the 1934 Act prohibits insiders absolutely from making short sales of the Company's equity securities. Short sales include sales of stock which the insider does not own at the time of sale, or sales of stock against which the insider does not deliver the shares within 20 days after the sale. Under certain circumstances, the purchase or sale of put or call options, or the writing of such options, can result in a violation of Section 16(c). Insiders violating Section 16(c) face criminal liability.

The General Counsel should be consulted if you have any questions regarding reporting obligations, short-swing profits or short sales under Section 16.

**C. Rule 144**

Rule 144 provides a safe harbor exemption to the registration requirements of the Securities Act of 1933, as amended, for certain resales of "restricted securities" and "control securities." "Restricted securities" are securities acquired from an issuer, or an affiliate of an issuer, in a transaction or chain of transactions not involving a public offering. "Control securities" are *any* securities owned by directors, executive officers or other "affiliates" of the issuer, including stock purchased in the open market and stock received upon exercise of stock options. Sales of Company restricted and control securities must comply with the requirements of Rule 144, which are summarized below:

- ***Holding Period***. Restricted securities must be held for at least six months before they may be sold in the market.
- ***Current Public Information.*** The Company must have filed all SEC-required reports during the last 12 months or such shorter period that the Company was required to file such reports.

- ***Volume Limitations.*** For affiliates, total sales of Company common stock for any three-month period may not exceed the *greater* of: (i) 1% of the total number of outstanding shares of Company common stock, as reflected in the most recent report or statement published by the Company, or (ii) the average weekly reported volume of such shares traded during the four calendar weeks preceding the filing of the requisite Form 144.

- ***Method of Sale.*** For affiliates, the shares must be sold either in a "broker's transaction" or in a transaction directly with a "market maker." A "broker's transaction" is one in which the broker does no more than execute the sale order and receive the usual and customary commission. Neither the broker nor the selling person can solicit or arrange for the sale order. In addition, the selling person or Board member must not pay any fee or commission other than to the broker. A "market maker" includes a specialist permitted to act as a dealer, a dealer acting in the position of a block positioner, and a dealer who holds himself out as being willing to buy and sell Company common stock for his own account on a regular and continuous basis.

- ***Notice of Proposed Sale.*** For affiliates, a notice of the sale (a Form 144) may be required to be filed with the SEC at the time of the sale. Brokers generally have internal procedures for executing sales under Rule 144 and will assist you in completing the Form 144 and in complying with the other requirements of Rule 144.

If you are subject to Rule 144, you must instruct your broker who handles trades in Company securities to follow the brokerage firm's Rule 144 compliance procedures in connection with all trades.

## VII. EXECUTION AND RETURN OF CERTIFICATION OF COMPLIANCE

After reading this Policy and on an annual basis, all officers, directors and Designated Employees should execute and return to the Company's General Counsel the Certification of Compliance form attached hereto as "Attachment B."

*****

**Effective Date: February 24, 2023**

**ATTACHMENT A**

SHORT-SWING PROFIT RULE SECTION 16(B) CHECKLIST

Note: ANY combination of PURCHASE AND SALE or SALE AND PURCHASE within six months of each other by an officer, director or 10% stockholder (or any family member living in the same household or certain affiliated entities) results in a violation of Section 16(b), and the "profit" must be recovered by Camping World Holdings, Inc. (the "***Company***"). It makes no difference how long the shares being sold have been held or, for officers and directors, that you were an insider for only one of the two matching transactions. The highest priced sale will be matched with the lowest priced purchase within the six-month period.

**Sales**

If a sale is to be made by an officer, director or 10% stockholder (or any family member living in the same household or certain affiliated entities):

1. Have there been any purchases by the insider (or family members living in the same household or certain affiliated entities) within the past six months?

2. Have there been any option grants or exercises not exempt under Rule 16b-3 within the past six months?

3. Are any purchases (or non-exempt option exercises) anticipated or required within the next six months?

4. Has a Form 4 been prepared?

Note: If a sale is to be made by an affiliate of the Company, has a Form 144 been prepared and has the broker been reminded to sell pursuant to Rule 144?

**Purchases And Option Exercises**

If a purchase or option exercise for Company stock is to be made:

1. Have there been any sales by the insider (or family members living in the same household or certain affiliated entities) within the past six months?

2. Are any sales anticipated or required within the next six months (such as tax-related or year-end transactions)?

3. Has a Form 4 been prepared?

**Before proceeding with a purchase or sale, consider whether you are aware of material, non-public information which could affect the price of the Company stock. All transactions in the Company's securities by officers and directors must be pre-cleared by contacting the Company's General Counsel.**

**ATTACHMENT B**

CERTIFICATION OF COMPLIANCE

RETURN BY [_________] *[insert return deadline]*

TO: __________________, General Counsel

FROM: __________________________

RE: INSIDER TRADING COMPLIANCE POLICY OF CAMPING WORLD HOLDINGS, INC.

I have received, reviewed and understand the above-referenced Insider Trading Compliance Policy and undertake, as a condition to my present and continued employment with (or, if I am not an employee, affiliation with) Camping World Holdings, Inc., to comply fully with the policies and procedures contained therein.

[I hereby certify, to the best of my knowledge, that during the calendar year ending December 31, 20[__], I have complied fully with all policies and procedures set forth in the above-referenced Insider Trading Compliance Policy.][1]

___________________________ _______________
SIGNATURE DATE

___________________________
TITLE

1 NTD: This language should be excluded from an initial certification.

**Exhibit 21.1**

| Legal Name | State of Incorporation |
|---|---|
| Active Sports, LLC | Minnesota |
| Affinity Brokerage, LLC | Delaware |
| Affinity Group Holding, LLC | Delaware |
| Affinity Guest Services, LLC | Delaware |
| Affinity Road & Travel Club, LLC | Texas |
| Affinity Service Plans, Inc. | Illinois |
| Affinity Service Plans, LLC | Illinois |
| AGI Intermediate Holdco, LLC | Minnesota |
| AGI Productions, LLC | Delaware |
| American RV Centers, LLC | Minnesota |
| Americas Road & Travel Club, Inc. | Texas |
| Arizona RV Centers, LLC | Minnesota |
| Atlantic RV Centers, LLC | Minnesota |
| B & B RV, Inc. | California |
| Blaine Jensen RV Centers, LLC | Minnesota |
| Bodily RV II, Inc. | Idaho |
| Bodily RV, Inc. | Idaho |
| Burnside Brokers, LLC | Minnesota |
| Burnside Finance, LLC | Minnesota |
| Burnside RV Centers, LLC | Minnesota |
| Camp Coast to Coast, LLC | Delaware |
| Camping Time RV Centers, LLC | Minnesota |
| Camping World Card Services, LLC | Ohio |
| Camping World Insurance Services of Kentucky, LLC | Delaware |
| Camping World Insurance Services of Texas, LLC | Texas |
| Camping World Leasing Company, LLC | Minnesota |
| Camping World Property, LLC | Delaware |
| Camping World RV Sales, LLC | Minnesota |
| Camping World, LLC | Kentucky |
| Coast Marketing Group, LLC | Delaware |
| Cullum & Maxey Camping Center, Inc. | Tennessee |
| CWDS, LLC | Delaware |
| CWFR Capital LLC | Delaware |
| CWGS Enterprises, LLC | Delaware |
| CWGS Group, LLC | Delaware |
| CWGS Ventures, LLC | Delaware |
| CWH BR, LLC | Delaware |
| CWI, LLC | Kentucky |
| CWRV Birch Run Brokers, LLC | Minnesota |
| CWRV Birch Run Finance, LLC | Minnesota |
| CWRV Broker Escanaba, LLC | Minnesota |
| CWRV Broker Ishpeming, LLC | Minnesota |
| CWRV Brokers Belleville, LLC | Minnesota |
| CWRV Brokers, LLC | Minnesota |
| CWRV Finance, LLC | Minnesota |
| CWRV Finance Belleville, LLC | Minnesota |
| CWRV Finance Chelsea, LLC | Minnesota |

| Legal Name | State of Incorporation |
|---|---|
| CWRV Finance Escanaba, LLC | Minnesota |
| CWRV Finance Ishpeming, LLC | Minnesota |
| CWRV Finance, LLC | Minnesota |
| CWRV Quincy Brokers, LLC | Minnesota |
| CWRV Quincy Finance, LLC | Minnesota |
| Dusty's Camper World, LLC | Minnesota |
| Ehlert Publishing Group, LLC | Delaware |
| Emerald Coast RV Center, LLC | Minnesota |
| F2 Creative, LLC | Minnesota |
| Foley RV Center, LLC | Minnesota |
| FreedomCare Insurance Services, LLC | Minnesota |
| FreedomRoads Finance Company, LLC | Minnesota |
| FreedomRoads Holding Company, LLC | Minnesota |
| FreedomRoads Intermediate Holdco, LLC | Minnesota |
| FreedomRoads Operations Company, LLC | Minnesota |
| FreedomRoads Property Company, LLC | Minnesota |
| FreedomRoads RV, Inc. | Delaware |
| FreedomRoads, LLC | Minnesota |
| FRHP 1, LLC | Delaware |
| FRHP 2, LLC | Delaware |
| FRHP 3, LLC | Delaware |
| FRHP 4, LLC | Delaware |
| FRHP 5, LLC | Delaware |
| FRHP 6, LLC | Delaware |
| FRHP 7, LLC | Delaware |
| FRHP 8, LLC | Delaware |
| FRHP 9, LLC | Delaware |
| FRHP Holding 1, LLC | Delaware |
| FRHP Holding 2, LLC | Delaware |
| FRHP Holding 3, LLC | Delaware |
| FRHP Holding 4, LLC | Delaware |
| FRHP Holding 5, LLC | Delaware |
| FRHP Holding 6, LLC | Delaware |
| FRHP Holding 7, LLC | Delaware |
| FRHP Holding 8, LLC | Delaware |
| FRHP Holding 9, LLC | Delaware |
| FRHP Lincolnshire, LLC | Minnesota |
| FRI, LLC | Minnesota |
| Gary's RV Centers, LLC | Minnesota |
| Golf Card International, LLC | Delaware |
| Golf Card Resort Services, LLC | Delaware |
| Good Sam Digital Solutions, LLC | Delaware |
| Good Sam Enterprises, LLC | Delaware |
| Good Sam Outdoors, LLC | Delaware |
| GSS Enterprises, LLC | Delaware |
| Hart City RV Center, LLC | Minnesota |
| Holiday Kamper Company of Columbia, LLC | Minnesota |
| ITM Holding Company #2, LLC | Minnesota |
| ITM Holding Company, LLC | Minnesota |

| Legal Name | State of Incorporation |
|---|---|
| K&C RV Centers, LLC | Minnesota |
| Meyer’s RV Centers, LLC | Minnesota |
| Northwest RV Centers, LLC | Minnesota |
| Olinger RV Centers, LLC | Minnesota |
| Outdoor Buys, LLC | Kentucky |
| Power Sports Media, LLC | Delaware |
| RV World, LLC | Minnesota |
| RV’S.com, LLC | Minnesota |
| Shipp’s RV Centers, LLC | Minnesota |
| Sirpilla RV Centers, LLC | Minnesota |
| Southwest RV Centers, LLC | Minnesota |
| Stier’s RV Centers, LLC | Minnesota |
| Stout’s RV Center, LLC | Minnesota |
| TL Enterprises, LLC | Delaware |
| Tom Johnson Camping Center Charlotte, Inc. | North Carolina |
| Tom Johnson Camping Center, Inc. | North Carolina |
| VBI, LLC | Delaware |
| Venture Out RV Centers, Inc. | California |
| Wheeler RV Las Vegas, LLC | Minnesota |

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement No. 333-214040 on Form S-8 and Registration Statement No. 333-282897 on Form S-3 of our reports dated February 28, 2025, relating to the financial statements of Camping World Holdings, Inc. (the “Company”) and the effectiveness of the Company's internal control over financial reporting appearing in this Annual Report on Form 10-K for the year ended December 31, 2024.

/s/ Deloitte & Touche LLP

Chicago, Illinois
February 28, 2025

**Exhibit 24.1**

## POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS, that CAMPING WORLD HOLDINGS, INC., a Delaware corporation (the "Company"), and each of the undersigned directors of the Company, hereby constitutes and appoints Marcus A. Lemonis and Thomas E. Kirn, and each of them (with full power to each of them to act alone), his or her true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for him or her and on his or her behalf in his or her name, place and stead, in any and all capacities to sign, execute, affix his or her seal thereto and file, or cause such actions to be taken with regards to, the Company's Annual Report on Form 10-K for the year ended December 31, 2024 under the Securities Exchange Act of 1934, as amended, including any amendment or amendments thereto, with all exhibits and any all documents required to be filed with respect thereto with any regulatory authority.

There is hereby granted to said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing, requisite and necessary to be done in respect of the foregoing as fully as he or she might or could do if personally present, thereby ratifying and confirming all that said attorneys-in-fact and agents, or their substitute or substitutes may lawfully do or cause to be done by virtue hereof.

This Power of Attorney may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same instrument and any of the undersigned directors may execute this Power of Attorney by signing any such counterpart.

| Signature | Title | Date |
|---|---|---|
| /s/ Andris A. Baltins<br>Andris A. Baltins | Director | February 24, 2025 |
| /s/ Brian P. Cassidy<br>Brian P. Cassidy | Director | February 24, 2025 |
| /s/ Mary J. George<br>Mary J. George | Director | February 24, 2025 |
| /s/ Kathleen S. Lane<br>Kathleen S. Lane | Director | February 24, 2025 |
| /s/ Michael W. Malone<br>Michael W. Malone | Director | February 24, 2025 |
| /s/ Brent L. Moody<br>Brent L. Moody | Director | February 24, 2025 |
| /s/ K. Dillon Schickli<br>K. Dillon Schickli | Director | February 24, 2025 |

**Exhibit 31.1**

**CERTIFICATIONS**

I, Marcus A. Lemonis, certify that:

1. I have reviewed this Annual Report on Form 10-K of Camping World Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2025

By: /s/ Marcus A. Lemonis
Marcus A. Lemonis
Chairman and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATIONS**

I, Thomas E. Kirn, certify that:

1. I have reviewed this Annual Report on Form 10-K of Camping World Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2025

By: /s/ Thomas E. Kirn
Thomas E. Kirn
Chief Financial Officer
(Principal Financial Officer and Principal Accounting Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**

**18 U.S.C. SECTION 1350,**

**AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Camping World Holdings, Inc. (the "Company") for the period ended December 31, 2024, as filed with the U.S. Securities and Exchange Commission on the date hereof (the "Report"), I, Marcus A. Lemonis, Chairman and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 28, 2025

By: /s/ Marcus A. Lemonis

Marcus A. Lemonis
Chairman and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**

**18 U.S.C. SECTION 1350,**

**AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Camping World Holdings, Inc. (the "Company") for the period ended December 31, 2024, as filed with the U.S. Securities and Exchange Commission on the date hereof (the "Report"), I, Thomas E. Kirn, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 28, 2025

By: /s/ Thomas E. Kirn
Thomas E. Kirn
Chief Financial Officer
(Principal Financial Officer and Principal Accounting Officer)