# EXHIBIT I

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2025

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ____________ to ______________

Commission file number: 001-37908

## CAMPING WORLD HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of incorporation or organization)

**81-1737145**
(I.R.S. Employer Identification No.)

**2 Marriott Drive**
**Lincolnshire, IL 60069**
(Address of principal executive offices) (Zip Code)

**Telephone: (847) 808-3000**
(Registrant's telephone number, including area code)

**N/A**
(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, $0.01 par value per share | CWH | New York Stock Exchange |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒
Accelerated filer ☐
Non-accelerated filer ☐
Smaller reporting company ☐
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of April 25, 2025, the registrant had 62,569,449 shares of Class A common stock, 39,466,964 shares of Class B common stock and one share of Class C common stock outstanding.

Table of Contents

**Camping World Holdings, Inc.**
**Quarterly Report on Form 10-Q**
**For the Quarterly Period Ended March 31, 2025**

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| | **PART I. FINANCIAL INFORMATION** | |
| Item 1 | Financial Statements (unaudited) | 5 |
| | Unaudited Condensed Consolidated Balance Sheets – March 31, 2025, December 31, 2024, and March 31, 2024 | 5 |
| | Unaudited Condensed Consolidated Statements of Operations – Three Months Ended March 31, 2025 and 2024 | 6 |
| | Unaudited Condensed Consolidated Statements of Stockholders' Equity – Three Months Ended March 31, 2025 and 2024 | 7 |
| | Unaudited Condensed Consolidated Statements of Cash Flows –Three Months Ended March 31, 2025 and 2024 | 8 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | 10 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 3 | Quantitative and Qualitative Disclosures About Market Risk | 49 |
| Item 4 | Controls and Procedures | 49 |
| | **PART II. OTHER INFORMATION** | |
| Item 1 | Legal Proceedings | 50 |
| Item 1A | Risk Factors | 50 |
| Item 2 | Unregistered Sales of Equity Securities and Use of Proceeds | 50 |
| Item 3 | Defaults Upon Senior Securities | 51 |
| Item 4 | Mine Safety Disclosures | 51 |
| Item 5 | Other Information | 51 |
| Item 6 | Exhibits | 51 |
| Signatures | | 54 |

Table of Contents

## BASIS OF PRESENTATION

As used in this Quarterly Report on Form 10-Q (this "Form 10-Q"), unless the context otherwise requires, references to:

- "we," "us," "our," "CWH," the "Company," "Camping World" and similar references refer to Camping World Holdings, Inc., and, unless referenced as "CWH" or otherwise stated, all of its subsidiaries, including CWGS Enterprises, LLC, which we refer to as "CWGS, LLC" and, unless otherwise stated, all of its subsidiaries.

- "Active Customer" refers to a customer who has transacted with us in any of the eight most recently completed fiscal quarters prior to the date of measurement. Unless otherwise indicated, the date of measurement is March 31, 2025, our most recently completed fiscal quarter.

- "Annual Report" refers to our Annual Report on Form 10-K for the year ended December 31, 2024 filed with the Securities and Exchange Commission ("SEC") on February 28, 2025.

- "Continuing Equity Owners" refers collectively to ML Acquisition, funds controlled by Crestview Partners II GP, L.P. and the Former Profits Unit Holders and each of their permitted transferees that own common units in CWGS, LLC and who may redeem at each of their options their common units for, at our election (determined solely by our independent directors within the meaning of the rules of the New York Stock Exchange who are disinterested), cash or newly-issued shares of our Class A common stock. Direct exchanges of common units in CWGS, LLC by the Continuing Equity Owners with CWH for Class A common stock are included in the reference to "redemptions" in relation to common units in CWGS, LLC.

- "Former Profits Unit Holders" refers collectively to Brent L. Moody, Andris A. Baltins and K. Dillon Schickli, who are members of our Board of Directors, and certain other current and former non-executive employees, former executive officers, and former directors, in each case, who held common units of CWGS, LLC pursuant to CWGS, LLC's equity incentive plan that was in existence prior to our IPO and received common units of CWGS, LLC in exchange for their profits units in CWGS, LLC.

- "ML Acquisition" refers to ML Acquisition Company, LLC, a Delaware limited liability company that is indirectly controlled by our Chairman and Chief Executive Officer, Marcus A. Lemonis.

- "RV" refers to recreational vehicles.

- "Tax Receivable Agreement" refers to the tax receivable agreement that the Company entered into with CWGS, LLC, each of the Continuing Equity Owners and Crestview Partners II GP, L.P. in connection with the Company's IPO.

Table of Contents

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Form 10-Q contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. All statements other than statements of historical facts contained in this Form 10-Q may be forward-looking statements. Statements regarding our future results of operations and financial position, business strategy and plans and objectives of management for future operations, including, among others, statements regarding expected new store location openings and closures, including greenfield locations and acquired locations; sufficiency of our sources of liquidity and capital and potential need for additional financing; our stock repurchase program; future capital expenditures and debt service obligations; refinancing, retirement or exchange of outstanding debt; expectations regarding industry trends and consumer behavior and growth; our product offerings and strategy; inventory management; volatility in sales and potential impact of miscalculating the demand for our products or our product mix; expectations regarding increase of certain expenses in connection with our growth and new or increased tariffs; expectations regarding acquisitions of RV dealerships; cost reduction initiatives and expected cost savings; our human capital initiatives; expectations regarding our pending litigation, and our plans related to dividend payments, are forward-looking statements. In some cases, you can identify forward-looking statements by terms such as “anticipate,” “believe,” “can,” “continue,” “could,” “designed,” “estimate,” “expect,” “forecast,” “goal,” “intend,” “may,” “might,” “plan,” “possible,” “potential,” “predict,” “project,” “should,” “target,” “will,” “would” or the negative of these terms or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including, but not limited to, the following:

- general economic conditions in our markets, including inflation and interest rates, as well as the health of the RV industry, and ongoing economic and financial uncertainties;
- the availability and cost of financing to us and our customers;
- fuel shortages, high prices for fuel, or changes in energy sources;
- the well-being, as well as the continued popularity and reputation for quality, of our manufacturers, particularly Thor Industries, Inc. and Forest River, Inc.;
- changes in consumer preferences for our products or our failure to gauge those preferences;
- competition in the market for services, protection plans, products and resources targeting the RV lifestyle or RV enthusiast;
- our expansion into new, unfamiliar markets, businesses, or product lines or categories, as well as delays in opening new RV dealership locations, including greenfield locations and acquisitions;
- unforeseen expenses, difficulties, and delays encountered in connection with acquisitions;
- our ability to maintain the strength and value of our brands;
- our ability to successfully order and manage our inventory to reflect consumer demand in a volatile market and anticipate changing consumer preferences and buying trends;
- fluctuations in our same store revenue and whether such revenue will be a meaningful indicator of future performance;
- the cyclical and seasonal nature of our business;

- our ability to operate and expand our business and to respond to changing business and economic conditions, which depends on the availability of adequate capital;
- the restrictive covenants imposed by our Senior Secured Credit Facilities and Floor Plan Facility;
- our ability to execute and achieve the expected benefits of our cost cutting initiatives and impairment charges incurred in connection with previous restructuring initiatives may be materially higher than expected or anticipated;
- our reliance on our fulfillment and distribution centers for our retail and e-commerce businesses, which may be susceptible to a natural disaster or other serious disruption at any such facility;
- natural disasters, whether or not caused by climate change, unusual weather conditions, epidemic outbreaks, terrorist acts and political events;
- our dependence on our relationships with third party providers of services, protection plans, products and resources and a disruption of these relationships or of these providers' operations;
- certain of the products that we sell are manufactured abroad and any delays, new or increased tariffs, increased cost or quality control deficiencies in the importation of these products;
- whether third-party lending institutions and insurance companies will continue to provide financing for RV purchases, insurance and extended service contracts that relate to a portion of our net income;
- our ability to retain senior executives and attract and retain other qualified employees;
- risks associated with leasing substantial amounts of space;
- our private brand offerings exposing us to various risks;
- whether we incur asset impairment charges for goodwill, intangible assets or other long-lived assets;
- our business is subject to numerous federal, state and local regulations and litigation risk;
- risks related to a failure in our e-commerce operations, security breaches and cybersecurity risks;
- our inability to maintain or upgrade our information technology systems or our inability to convert to alternate systems in an efficient and timely manner;
- risks related to disruptions or breaches involving our or our third-party providers' information technology systems or confidential information or our failure to meet increasingly demanding regulatory requirements;
- material weaknesses in our internal control over financial reporting;
- risks relating to our organizational structure and to ownership of shares of our Class A common stock; and
- the other factors set forth under "Risk Factors" in Item 1A of Part I of our Annual Report and in our other filings with the SEC.

These risks may cause our actual results, performance or achievements to differ materially and adversely from those expressed or implied by the forward-looking statements.

Any forward-looking statements made herein speak only as of the date of this Form 10-Q, and you should not rely on forward-looking statements as predictions of future events. Although we believe that the

expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that the future effects, results, performance, or achievements reflected in the forward-looking statements will be achieved or occur. We undertake no obligation to update any of these forward-looking statements for any reason after the date of this Form 10-Q or to conform these statements to actual results or revised expectations.

Table of Contents

**Part I – FINANCIAL INFORMATION**

**Item 1. Financial Statements**

Camping World Holdings, Inc. and Subsidiaries
Unaudited Condensed Consolidated Balance Sheets
(In Thousands Except Per Share Amounts)

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 20,916 | $ 208,422 | $ 29,718 |
| Contracts in transit | 149,113 | 61,222 | 154,231 |
| Accounts receivable, net | 118,800 | 120,412 | 100,246 |
| Inventories | 2,119,169 | 1,821,837 | 2,077,592 |
| Prepaid expenses and other assets | 74,418 | 58,045 | 68,833 |
| Assets held for sale | 20,536 | 1,350 | 6,276 |
| Total current assets | 2,502,952 | 2,271,288 | 2,436,896 |
| Property and equipment, net | 886,244 | 846,760 | 878,956 |
| Operating lease assets | 749,177 | 739,352 | 768,903 |
| Deferred tax assets, net | 210,586 | 215,140 | 197,484 |
| Intangible assets, net | 18,520 | 19,469 | 12,998 |
| Goodwill | 747,802 | 734,023 | 735,680 |
| Other assets | 31,929 | 37,245 | 36,013 |
| Total assets | $ 5,147,210 | $ 4,863,277 | $ 5,066,930 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 250,884 | $ 145,346 | $ 205,006 |
| Accrued liabilities | 160,711 | 118,557 | 148,674 |
| Deferred revenues | 89,084 | 92,124 | 95,854 |
| Current portion of operating lease liabilities | 65,653 | 61,993 | 60,663 |
| Current portion of finance lease liabilities | 7,646 | 7,044 | 19,014 |
| Current portion of Tax Receivable Agreement liability | 1,700 | — | 12,943 |
| Current portion of long-term debt | 23,147 | 23,275 | 25,651 |
| Notes payable – floor plan, net | 1,320,687 | 1,161,713 | 1,414,696 |
| Other current liabilities | 74,129 | 70,900 | 72,783 |
| Total current liabilities | 1,993,641 | 1,680,952 | 2,055,284 |
| Operating lease liabilities, net of current portion | 769,518 | 764,113 | 796,770 |
| Finance lease liabilities, net of current portion | 130,596 | 131,004 | 136,284 |
| Tax Receivable Agreement liability, net of current portion | 148,672 | 150,372 | 149,866 |
| Revolving line of credit | — | — | 31,885 |
| Long-term debt, net of current portion | 1,488,388 | 1,493,318 | 1,545,165 |
| Deferred revenues | 62,699 | 63,642 | 65,970 |
| Other long-term liabilities | 94,885 | 94,927 | 89,528 |
| Total liabilities | 4,688,399 | 4,378,328 | 4,870,752 |
| Commitments and contingencies | | | |
| Stockholders' equity: | | | |
| Preferred stock, par value $0.01 per share – 20,000 shares authorized; none issued and outstanding | — | — | — |
| Class A common stock, par value $0.01 per share – 250,000 shares authorized; 62,569, 62,502 and 49,571 shares issued and outstanding, respectively | 626 | 625 | 496 |
| Class B common stock, par value $0.0001 per share – 75,000 shares authorized; 39,466 shares issued and outstanding | 4 | 4 | 4 |
| Class C common stock, par value $0.0001 per share – 0.001 share authorized, issued and outstanding | — | — | — |
| Additional paid-in capital | 197,730 | 193,692 | 132,213 |
| Treasury stock, at cost; 4,499 shares at March 31, 2024 | — | — | (157,631) |
| Retained earnings | 112,140 | 132,241 | 167,686 |
| Total stockholders' equity attributable to Camping World Holdings, Inc. | 310,500 | 326,562 | 142,768 |
| Non-controlling interests | 148,311 | 158,387 | 53,410 |
| Total stockholders' equity | 458,811 | 484,949 | 196,178 |
| Total liabilities and stockholders' equity | $ 5,147,210 | $ 4,863,277 | $ 5,066,930 |

*See accompanying Notes to Unaudited Condensed Consolidated Financial Statements*

Table of Contents

Camping World Holdings, Inc. and Subsidiaries
Unaudited Condensed Consolidated Statements of Operations
(In Thousands Except Per Share Amounts)

| | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Revenue: | | |
| Good Sam Services and Plans | $ 46,208 | $ 45,681 |
| RV and Outdoor Retail | | |
| New vehicles | 621,432 | 656,086 |
| Used vehicles | 422,351 | 337,685 |
| Products, service and other | 164,992 | 177,894 |
| Finance and insurance, net | 148,667 | 135,454 |
| Good Sam Club | 9,874 | 11,217 |
| Subtotal | 1,367,316 | 1,318,336 |
| Total revenue | 1,413,524 | 1,364,017 |
| Costs applicable to revenue (exclusive of depreciation and amortization shown separately below): | | |
| Good Sam Services and Plans | 17,721 | 15,183 |
| RV and Outdoor Retail | | |
| New vehicles | 536,359 | 565,039 |
| Used vehicles | 343,961 | 278,533 |
| Products, service and other | 84,739 | 101,675 |
| Good Sam Club | 1,116 | 1,190 |
| Subtotal | 966,175 | 946,437 |
| Total costs applicable to revenue | 983,896 | 961,620 |
| Operating expenses: | | |
| Selling, general, and administrative | 387,445 | 371,473 |
| Depreciation and amortization | 22,544 | 19,290 |
| Long-lived asset impairment | 620 | 5,827 |
| (Gain) loss on sale or disposal of assets | (1,823) | 1,585 |
| Total operating expenses | 408,786 | 398,175 |
| Income from operations | 20,842 | 4,222 |
| Other expense: | | |
| Floor plan interest expense | (18,306) | (27,882) |
| Other interest expense, net | (30,531) | (36,094) |
| Other expense, net | (158) | (94) |
| Total other expense | (48,995) | (64,070) |
| Loss before income taxes | (28,153) | (59,848) |
| Income tax benefit | 3,471 | 9,042 |
| Net loss | (24,682) | (50,806) |
| Less: net loss attributable to non-controlling interests | 12,402 | 28,499 |
| Net loss attributable to Camping World Holdings, Inc. | $ (12,280) | $ (22,307) |
| | | |
| Loss per share of Class A common stock: | | |
| Basic | $ (0.20) | $ (0.50) |
| Diluted | $ (0.21) | $ (0.51) |
| Weighted average shares of Class A common stock outstanding: | | |
| Basic | 62,531 | 45,047 |
| Diluted | 102,426 | 85,092 |

*See accompanying Notes to Unaudited Condensed Consolidated Financial Statements*

Table of Contents

# Camping World Holdings, Inc. and Subsidiaries
## Unaudited Condensed Consolidated Statements of Stockholders' Equity
(In Thousands)

| | Class A Common Stock | | Class B Common Stock | | Class C Common Stock | | Additional Paid-In Capital | Treasury Stock | | Retained Earnings | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | Shares | Amounts | Shares | Amounts | | Shares | Amounts | | | |
| Balance at January 1, 2025 | 62,502 | $ 625 | 39,466 | $ 4 | — | $ — | $ 193,692 | — | $ — | $ 132,241 | $ 158,387 | $ 484,949 |
| Stock-based compensation | — | — | — | — | — | — | 4,438 | — | — | — | 2,832 | 7,270 |
| Vesting of restricted stock units | 109 | 1 | — | — | — | — | 446 | — | — | — | (447) | — |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | (41) | — | — | — | — | — | (871) | — | — | — | — | (871) |
| Distributions to holders of LLC common units | — | — | — | — | — | — | — | — | — | — | (34) | (34) |
| Dividends[1] | — | — | — | — | — | — | — | — | — | (7,821) | — | (7,821) |
| Non-controlling interest adjustment | — | — | — | — | — | — | 25 | — | — | — | (25) | — |
| Net loss | — | — | — | — | — | — | — | — | — | (12,280) | (12,402) | (24,682) |
| Balance at March 31, 2025 | 62,570 | $ 626 | 39,466 | $ 4 | — | $ — | $ 197,730 | — | $ — | $ 112,140 | $ 148,311 | $ 458,811 |

(1) The Company declared dividends per share of Class A common stock of $0.125 for the three months ended March 31, 2025.

| | Class A Common Stock | | Class B Common Stock | | Class C Common Stock | | Additional Paid-In Capital | Treasury Stock | | Retained Earnings | Non-Controlling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amounts | Shares | Amounts | Shares | Amounts | | Shares | Amounts | | | |
| Balance at January 1, 2024 | 49,571 | $ 496 | 39,466 | $ 4 | — | $ — | $ 131,665 | (4,551) | $ (159,440) | $ 195,627 | $ 89,623 | $ 257,975 |
| Stock-based compensation | — | — | — | — | — | — | 2,751 | — | — | — | 2,446 | 5,197 |
| Exercise of stock options | — | — | — | — | — | — | (30) | 2 | 81 | — | — | 51 |
| Non-controlling interest adjustment for capital contribution of proceeds from the exercise of stock options | — | — | — | — | — | — | (22) | — | — | — | 22 | — |
| Vesting of restricted stock units | — | — | — | — | — | — | (2,234) | 74 | 2,595 | — | (361) | — |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | — | — | — | — | — | — | 209 | (24) | (867) | — | — | (658) |
| Distributions to holders of LLC common units | — | — | — | — | — | — | — | — | — | — | (9,947) | (9,947) |
| Dividends[2] | — | — | — | — | — | — | — | — | — | (5,634) | — | (5,634) |
| Non-controlling interest adjustment | — | — | — | — | — | — | (126) | — | — | — | 126 | — |
| Net loss | — | — | — | — | — | — | — | — | — | (22,307) | (28,499) | (50,806) |
| Balance at March 31, 2024 | 49,571 | $ 496 | 39,466 | $ 4 | — | $ — | $ 132,213 | (4,499) | $ (157,631) | $ 167,686 | $ 53,410 | $ 196,178 |

(2) The Company declared dividends per share of Class A common stock of $0.125 for the three months ended March 31, 2024.

*See accompanying Notes to Unaudited Condensed Consolidated Financial Statements*

Table of Contents

Camping World Holdings, Inc. and Subsidiaries
Unaudited Condensed Consolidated Statements of Cash Flows
(In Thousands)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2025 | 2024 |
| **Operating activities** | | |
| Net loss | $ (24,682) | $ (50,806) |
| | | |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 22,544 | 19,290 |
| Stock-based compensation | 7,270 | 5,197 |
| Long-lived asset impairment | 620 | 5,827 |
| (Gain) loss on sale or disposal of assets | (1,823) | 1,585 |
| Provision for losses on accounts receivable | 659 | 47 |
| Noncash lease expense | 14,696 | 14,037 |
| Accretion of original debt issuance discount | 627 | 584 |
| Noncash interest | 1,004 | 746 |
| Deferred income taxes | 4,554 | 3,610 |
| Change in assets and liabilities, net of acquisitions: | | |
| Receivables and contracts in transit | (90,359) | (66,222) |
| Inventories | (230,772) | 6,026 |
| Prepaid expenses and other assets | (16,742) | (20,713) |
| Accounts payable and other accrued expenses | 101,608 | 25,194 |
| Deferred revenues | (3,983) | 2,678 |
| Operating lease liabilities | (15,455) | (14,440) |
| Other, net | (2,245) | (622) |
| Net cash used in operating activities | (232,479) | (67,982) |
| | | |
| **Investing activities** | | |
| Purchases of property and equipment | (23,511) | (25,927) |
| Proceeds from sale of property and equipment | 542 | 143 |
| Purchases of real property | (48,584) | (1,243) |
| Proceeds from the sale of real property | 6,689 | 23,853 |
| Purchases of businesses, net of cash acquired | (80,564) | (58,800) |
| Purchases of intangible assets | — | (119) |
| Proceeds from sale of intangible assets | — | 2,595 |
| Net cash used in investing activities | $ (145,428) | $ (59,498) |

Camping World Holdings, Inc. and Subsidiaries
Unaudited Condensed Consolidated Statements of Cash Flows
(In Thousands)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2025 | 2024 |
| **Financing activities** | | |
| Proceeds from long-term debt | $ — | $ 55,624 |
| Payments on long-term debt | (6,268) | (23,406) |
| Net proceeds on notes payable – floor plan, net | 207,781 | 93,273 |
| Borrowings on revolving line of credit | — | 43,000 |
| Payments on revolving line of credit | — | (32,000) |
| Payments on finance leases | (1,763) | (1,828) |
| Payments on sale-leaseback arrangement | (51) | (48) |
| Payment of debt issuance costs | — | (876) |
| Payments of stock offering costs | (572) | — |
| Dividends on Class A common stock | (7,821) | (5,634) |
| Proceeds from exercise of stock options | — | 51 |
| RSU shares withheld for tax | (871) | (658) |
| Distributions to holders of LLC common units | (34) | (9,947) |
| Net cash provided by financing activities | 190,401 | 117,551 |
| | | |
| Decrease in cash and cash equivalents | (187,506) | (9,929) |
| Cash and cash equivalents at beginning of the period | 208,422 | 39,647 |
| Cash and cash equivalents at end of the period | $ 20,916 | $ 29,718 |

*See accompanying Notes to Unaudited Condensed Consolidated Financial Statements*

**Camping World Holdings, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

**March 31, 2025**

## 1. Summary of Significant Accounting Policies

### Principles of Consolidation and Basis of Presentation

The condensed consolidated financial statements include the accounts of Camping World Holdings, Inc. and its subsidiaries, and are presented in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information and pursuant to the rules and regulations of the SEC. Accordingly, these interim financial statements do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring adjustments) necessary for a fair statement of the results of operations, financial position and cash flows for the periods presented have been reflected. All intercompany accounts and transactions of the Company and its subsidiaries have been eliminated in consolidation.

The condensed consolidated financial statements as of and for the three months ended March 31, 2025 and 2024 are unaudited. The condensed consolidated balance sheet as of December 31, 2024 has been derived from the audited financial statements at that date but does not include all of the disclosures required by GAAP. These interim condensed consolidated financial statements should be read in conjunction with the Company's Annual Report on Form 10-K for the year ended December 31, 2024 filed with the SEC on February 28, 2025 ("Annual Report"). Operating results for interim periods are not necessarily indicative of the results that may be expected for the full year.

CWH has sole voting power in and control of the management of CWGS, LLC. As of March 31, 2025, December 31, 2024, and March 31, 2024, CWH owned 61.1%, 61.0%, and 53.0%, respectively, of CWGS, LLC. Accordingly, the Company consolidates the financial results of CWGS, LLC and reports a non-controlling interest in its condensed consolidated financial statements.

The Company does not have any components of other comprehensive income recorded within its condensed consolidated financial statements, and, therefore, does not separately present a statement of comprehensive income in its condensed consolidated financial statements.

### Revisions to Prior Period Condensed Consolidated Financial Statements

Subsequent to the issuance of the Company's condensed consolidated financial statements for the quarter ended March 31, 2024, the Company's management identified prior period misstatements related to the measurement of the realizable portion of the Company's outside basis difference deferred tax asset in CWGS, LLC, including the associated valuation allowance. As a result, deferred tax assets, net, additional paid-in capital, and income tax benefit (expense) as of and for the years ended December 31, 2023 and 2022 were revised in the Company's Annual Report. The misstatements impacted the beginning balances of deferred taxes, net, additional paid-in capital, and retained earnings, which have been revised from the amounts previously reported as of March 31, 2024. The Company evaluated the materiality of these errors, both qualitatively and quantitatively, and determined the effect of these revisions was not material to the previously issued financial statements.

Table of Contents

The following table presents the effect of the immaterial misstatements on the Company's condensed consolidated balance sheet for the period indicated:

| | As of March 31, 2024 | | |
|---|---|---|---|
| ($ in thousands) | As Previously Reported | Adjustment | As Revised |
| Deferred tax assets, net | $ 153,716 | $ 43,768 | $ 197,484 |
| Total assets | 5,023,162 | 43,768 | 5,066,930 |
| Additional paid-in capital | 98,828 | 33,385 | 132,213 |
| Retained earnings | 157,303 | 10,383 | 167,686 |
| Total stockholders' equity attributable to Camping World Holdings, Inc. | 99,000 | 43,768 | 142,768 |
| Total stockholders' equity | 152,410 | 43,768 | 196,178 |
| Total liabilities and stockholders' equity | 5,023,162 | 43,768 | 5,066,930 |

The following table presents the effect of the immaterial misstatements on the condensed consolidated statements of stockholders' equity for the periods indicated:

| | Additional Paid-In Capital | | | Retained Earnings | | | Total Stockholders' Equity | | |
|---|---|---|---|---|---|---|---|---|---|
| ($ in thousands) | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised | As Previously Reported | Adjustment | As Revised |
| Balance at January 1, 2024 | $ 98,280 | $ 33,385 | $ 131,665 | $ 185,244 | $ 10,383 | $ 195,627 | $ 214,207 | $ 43,768 | $ 257,975 |
| Stock-based compensation | 2,751 | — | 2,751 | — | — | — | 5,197 | — | 5,197 |
| Exercise of stock options | (30) | — | (30) | — | — | — | 51 | — | 51 |
| Non-controlling interest adjustment for capital contribution of proceeds from the exercise of stock options | (22) | — | (22) | — | — | — | — | — | — |
| Vesting of restricted stock units | (2,234) | — | (2,234) | — | — | — | — | — | — |
| Repurchases of Class A common stock for withholding taxes on vested RSUs | 209 | — | 209 | — | — | — | (658) | — | (658) |
| Distributions to holders of LLC common units | — | — | — | — | — | — | (9,947) | — | (9,947) |
| Dividends | — | — | — | (5,634) | — | (5,634) | (5,634) | — | (5,634) |
| Non-controlling interest adjustment | (126) | — | (126) | — | — | — | — | — | — |
| Net income | — | — | — | (22,307) | — | (22,307) | (50,806) | — | (50,806) |
| Balance at March 31, 2024 | $ 98,828 | $ 33,385 | $ 132,213 | $ 157,303 | $ 10,383 | $ 167,686 | $ 152,410 | $ 43,768 | $ 196,178 |

## Seasonality

The Company has experienced, and expects to continue to experience, variability in revenue, net income, and cash flows as a result of annual seasonality in its business. Because RVs are used primarily by vacationers and campers, demand for services, protection plans, products, and resources generally declines during the winter season, while sales and profits are generally highest during the spring and summer months. In addition, unusually severe weather conditions in some geographic areas may impact demand.

The Company generates a disproportionately higher amount of its annual revenue in its second and third fiscal quarters, which include the spring and summer months. The Company incurs additional expenses in the second and third fiscal quarters due to higher sale volumes, increased staffing in its store locations and program costs. If, for any reason, the Company miscalculates the demand for its products or its product mix during the second and third fiscal quarters, its sales in these quarters could decline, resulting in higher labor costs as a percentage of gross profit, lower margins and excess inventory, which could cause the Company's annual results of operations to suffer and its stock price to decline.

Additionally, selling, general, and administrative ("SG&A") expenses as a percentage of gross profit tend to be higher in the first and fourth quarters due to the seasonality of the Company's business.

Due to the Company's seasonality, the possible adverse impact from other risks associated with its business, including atypical weather, consumer spending levels, changes in the costs of the Company's products including the impact of tariffs, and general business conditions, is potentially greater if any such risks occur during the Company's peak sales seasons.

## Recently Adopted Accounting Pronouncements

In December 2023, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2023-09, Income Taxes (Topic 740): Improvements to Income Tax Disclosures. This ASU requires that public business entities on an annual basis disclose (1) consistent categories and greater

disaggregation of information in the rate reconciliation, and (2) income taxes paid disaggregated by jurisdiction. The standard is effective for annual periods beginning after December 15, 2024, with early adoption permitted. The Company adopted the provisions of this ASU as of January 1, 2025, with respect to the annual disclosures beginning with the year ending December 31, 2025, including the presentation of the comparable prior periods. The adoption of this ASU will result in additional annual income tax disclosures and does not otherwise have a material impact on the Company's condensed consolidated financial statements.

**Recently Issued Accounting Pronouncements**

In November 2024, the FASB issued ASU 2024-03, Income Statement—Reporting Comprehensive Income—Expense Disaggregation Disclosures (Subtopic 220-40): Disaggregation of Income Statement Expenses. This ASU requires that at each interim and annual reporting period entities present a new tabular disclosure in the notes to the financial statements, presenting disaggregation of the amounts of purchases of inventory, employee compensation, depreciation, intangible asset amortization and depletion. Furthermore, the ASU requires entities to include certain amounts that are already required to be disclosed under GAAP in the same disclosure as other disaggregation requirements and disclose a qualitative description of the amounts remaining in relevant expense captions that are not separately disaggregated quantitatively. Additionally, entities are required to disclose the total amount of selling expenses and, in annual reporting period, an entity's definition of selling expenses. The standard is effective for fiscal years beginning after December 15, 2026 and interim periods within fiscal years beginning after December 15, 2027, with early adoption permitted. The Company is currently evaluating the impact that the adoption of the provisions of the ASU will have on its condensed consolidated financial statements.

**2. Revenue**

**Contract Assets**

As of March 31, 2025, December 31, 2024, and March 31, 2024 contract assets of $9.2 million, $10.0 million and $13.4 million, respectively, relating to RV service revenues, were included in accounts receivable in the accompanying condensed consolidated balance sheets.

**Deferred Revenues**

The Company records deferred revenues when cash payments are received or due in advance of the Company's performance, net of estimated refunds that are presented separately as a component of accrued liabilities. For the three months ended March 31, 2025, the Company estimates approximately $30.9 million of revenues recognized were included in the deferred revenue balance at the beginning of the period. These estimates consider factors including, but not limited to, average service term, cash received for the period, cancellations, contract extensions, and upgrades.

As of March 31, 2025, the Company had unsatisfied performance obligations primarily relating to plans for its roadside assistance, Good Sam Club memberships, Good Sam Club loyalty program, Coast to Coast memberships, the annual campground guide, and magazine publication revenue streams. The total unsatisfied performance obligations for these revenue streams at March 31, 2025 and the periods during which the Company expects to recognize the amounts as revenue are presented as follows (in thousands):

| | As of March 31, 2025 |
|---|---|
| 2025 | $ 74,131 |
| 2026 | 40,345 |
| 2027 | 19,717 |
| 2028 | 9,673 |
| 2029 | 4,966 |
| Thereafter | 2,951 |
| Total | $ 151,783 |

Table of Contents

### 3. Inventories and Floor Plan Payables

Inventories consisted of the following (in thousands):

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| Good Sam services and plans | $ 219 | $ 263 | $ 392 |
| New RVs | 1,509,594 | 1,241,533 | 1,469,193 |
| Used RVs | 406,728 | 413,546 | 389,810 |
| Products, parts, accessories and other | 202,628 | 166,495 | 218,197 |
| | $ 2,119,169 | $ 1,821,837 | $ 2,077,592 |

Substantially all of the Company's new RV inventory and certain of its used RV inventory, included in the RV and Outdoor Retail segment, is financed by a floor plan credit agreement ("Floor Plan Facility") with a syndication of banks ("Floor Plan Lenders").

In February 2025, FreedomRoads, LLC entered into an amendment to the Floor Plan Facility, which (a) increased the commitment for floor plan borrowings by $300.0 million to $2.15 billion, (b) increased the commitment for the letter of credit facility by $15.0 million to $45.0 million, and (c) extended the maturity date from September 30, 2026 to the earlier of, if applicable, (i) February 18, 2030 or (ii) March 5, 2028, if the Company's Term Loan Facility (as defined and discussed in Note 7 — Long-Term Debt) has not been repaid, refinanced, or defeased and the maturity has not been extended by at least 180 days after February 18, 2030.

As of March 31, 2025, December 31, 2024, and March 31, 2024, the applicable interest rate for the floor plan notes payable under the Floor Plan Facility was 6.34%, 6.72%, and 7.87%, respectively.

The outstanding balance of the revolving line of credit under the Floor Plan Facility was paid off in November 2024 and there was no balance outstanding as of March 31, 2025 and December 31, 2024. As of March 31, 2024, the applicable interest rate for revolving line of credit borrowings under the Floor Plan Facility was 7.62%. Additionally, under the Floor Plan Facility, the revolving line of credit borrowings are subject to a borrowing base calculation, which did not limit the borrowing capacity at March 31, 2025, December 31, 2024, and March 31, 2024.

Management has determined that the credit agreement governing the Floor Plan Facility includes subjective acceleration clauses, which could impact debt classification. Management believes that no events have occurred at March 31, 2025 that would trigger a subjective acceleration clause. Additionally, the credit agreement governing the Floor Plan Facility contains certain financial covenants. FreedomRoads, LLC was in compliance with all financial debt covenants at March 31, 2025, December 31, 2024, and March 31, 2024.

Table of Contents

The following table details the outstanding amounts and available borrowings under the Floor Plan Facility as of March 31, 2025 and December 31, 2024, and March 31, 2024 (in thousands):

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| Floor Plan Facility | | | |
| Notes payable - floor plan: | | | |
| Total commitment | $ 2,150,000 | $ 1,850,000 | $ 1,850,000 |
| Less: borrowings, net of FLAIR offset account | (1,320,687) | (1,161,713) | (1,414,696) |
| Less: FLAIR offset account[(1)] | (157,863) | (79,472) | (147,654) |
| Additional borrowing capacity | 671,450 | 608,815 | 287,650 |
| Less: short-term payable for sold inventory[(2)] | (81,959) | (33,152) | (91,299) |
| Less: purchase commitments[(3)] | (55,125) | (9,340) | (31,551) |
| Unencumbered borrowing capacity | $ 534,366 | $ 566,323 | $ 164,800 |
| | | | |
| Revolving line of credit: | $ 70,000 | $ 70,000 | $ 70,000 |
| Less: borrowings | — | — | (31,885) |
| Additional borrowing capacity | $ 70,000 | $ 70,000 | $ 38,115 |
| | | | |
| Letters of credit: | | | |
| Total commitment | $ 45,000 | $ 30,000 | $ 30,000 |
| Less: outstanding letters of credit | (14,300) | (14,300) | (12,300) |
| Additional letters of credit capacity | $ 30,700 | $ 15,700 | $ 17,700 |

(1) Flooring line aggregate interest reduction ("FLAIR") offset account that allows the Company to transfer cash to the Floor Plan Lenders as an offset to the payables under the Floor Plan Facility. The FLAIR offset account does not reduce the outstanding amount of loans under the Floor Plan Facility for purposes of determining the unencumbered borrowing capacity under the Floor Plan Facility.

(2) The short-term payable represents the amount due for sold inventory. A payment for any floor plan units sold is due within three to ten business days of sale. Due to the short-term nature of these payables, the Company reclassifies the amounts from notes payable–floor plan, net to accounts payable in the condensed consolidated balance sheets. Changes in the vehicle floor plan payable are reported as cash flows from financing activities in the condensed consolidated statements of cash flows.

(3) Purchase commitments represent vehicles approved for floor plan financing where the inventory has not yet been received by the Company from the supplier and no floor plan borrowing is outstanding.

**4. Long-Lived Asset Impairment**

During the three months ended March 31, 2025 and 2024, the Company had indicators of impairment of the long-lived assets for certain locations. Such indicators primarily included decreases in market rental rates or decreases in the market value of real property for closed locations, and the Company's review of location performance in the normal course of business. As a result of updating certain assumptions in the long-lived asset impairment analysis for these locations, the Company determined that the fair value of certain long-lived assets were below their carrying value and were impaired.

The long-lived asset impairment charges were calculated as the amount that the carrying value of these locations exceeded the estimated fair value, except that individual assets cannot be impaired below their individual fair values when that fair value can be determined without undue cost and effort. Estimated fair value is typically based on estimated discounted future cash flows, while property appraisals or market rent analyses are utilized for determining the fair value of certain assets related to properties and leases.

Table of Contents

The following table details long-lived asset impairment charges by type of long-lived asset, all of which relate to the RV and Outdoor Retail segment (in thousands):

| | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Long-lived asset impairment charges by type of long-lived asset: | | |
| Leasehold improvements | $ 190 | $ 2,285 |
| Operating lease right of use assets | — | 1,290 |
| Building and improvements | 430 | 2,252 |
| Total long-lived asset impairment charges | $ 620 | $ 5,827 |

**5. Assets Held for Sale**

As of March 31, 2025, December 31, 2024, and March 31, 2024, three, two, and three RV and Outdoor Retail segment properties, respectively, met the criteria to be classified as held for sale. Also, as of March 31, 2025, certain assets related to one RV dealership met the criteria to be classified as held for sale, which included an allocation of goodwill of the RV and Outdoor Retail reporting unit based on the RV dealership's relative fair value.

The following table presents the components of assets held for sale at March 31, 2025, December 31, 2024, and March 31, 2024 (in thousands):

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| Assets held for sale: | | | |
| Inventories | $ 7,588 | $ — | $ — |
| Goodwill | 3,414 | — | — |
| Property and equipment, net | 9,534 | 1,350 | 6,276 |
| | $ 20,536 | $ 1,350 | $ 6,276 |

**6. Goodwill and Intangible Assets**

**Goodwill**

The following table presents a summary of changes in the Company's goodwill by segment for the three months ended March 31, 2025 and 2024 and nine months ended December 31, 2024 (in thousands):

| | Good Sam Services and Plans | RV and Outdoor Retail | Consolidated |
|---|---|---|---|
| Balance at December 31, 2023 (excluding impairment charges) | $ 71,118 | $ 881,941 | $ 953,059 |
| Accumulated impairment charges | (46,884) | (194,953) | (241,837) |
| Balance at December 31, 2023 | 24,234 | 686,988 | 711,222 |
| Acquisitions | — | 24,458 | 24,458 |
| Balance at March 31, 2024 | 24,234 | 711,446 | 735,680 |
| Acquisitions | 1,561 | 5,682 | 7,243 |
| Divestiture (1) | — | (8,900) | (8,900) |
| Balance at December 31, 2024 | 25,795 | 708,228 | 734,023 |
| Acquisitions | — | 17,193 | 17,193 |
| Reclassification to assets held for sale (2) | — | (3,414) | (3,414) |
| Balance at March 31, 2025 | $ 25,795 | $ 722,007 | $ 747,802 |

(1) In May 2024, the Company closed on the sale of certain assets of the RV and Outdoor Retail segment's RV furniture business ("CWDS").
(2) See Note 5 – Assets Held for Sale for further details.

Table of Contents

**Intangible Assets**

Finite-lived intangible assets and related accumulated amortization consisted of the following at March 31, 2025, December 31, 2024 and March 31, 2024 (in thousands):

| | March 31, 2025 | | |
|---|---|---|---|
| | Carrying Value | Accumulated Amortization | Net |
| Good Sam Services and Plans: | | | |
| Membership, customer lists and other | $ 9,740 | $ (9,611) | $ 129 |
| Trademarks and trade names | 2,132 | (414) | 1,718 |
| Websites and developed technology | 3,650 | (1,753) | 1,897 |
| RV and Outdoor Retail: | | | |
| Customer lists, domain names and other | 4,154 | (2,853) | 1,301 |
| Supplier lists and agreements | 9,500 | (816) | 8,684 |
| Trademarks and trade names | 26,526 | (22,340) | 4,186 |
| Websites and developed technology | 6,348 | (5,743) | 605 |
| | $ 62,050 | $ (43,530) | $ 18,520 |

| | December 31, 2024 | | |
|---|---|---|---|
| | Carrying Value | Accumulated Amortization | Net |
| Good Sam Services and Plans: | | | |
| Membership, customer lists and other | $ 9,740 | $ (9,537) | $ 203 |
| Trademarks and trade names | 2,132 | (379) | 1,753 |
| Websites and developed technology | 3,650 | (1,614) | 2,036 |
| RV and Outdoor Retail: | | | |
| Customer lists and domain names | 4,154 | (2,752) | 1,402 |
| Supplier lists and agreements | 9,500 | (594) | 8,906 |
| Trademarks and trade names | 26,526 | (22,005) | 4,521 |
| Websites and developed technology | 6,348 | (5,700) | 648 |
| | $ 62,050 | $ (42,581) | $ 19,469 |

| | March 31, 2024 | | |
|---|---|---|---|
| | Cost or Fair Value | Accumulated Amortization | Net |
| Good Sam Services and Plans: | | | |
| Membership, customer lists and other | $ 9,740 | $ (9,316) | $ 424 |
| Trademarks and trade names | 2,132 | (273) | 1,859 |
| Websites and developed technology | 3,050 | (1,227) | 1,823 |
| RV and Outdoor Retail: | | | |
| Customer lists and domain names and other | 5,543 | (3,439) | 2,104 |
| Supplier lists and agreements | 1,696 | (1,187) | 509 |
| Trademarks and trade names | 27,251 | (21,725) | 5,526 |
| Websites and developed technology | 6,344 | (5,591) | 753 |
| | $ 55,756 | $ (42,758) | $ 12,998 |

Table of Contents

**7. Long-Term Debt**

Outstanding long-term debt consisted of the following (in thousands):

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| Term Loan Facility (1) | $ 1,332,960 | $ 1,335,535 | $ 1,343,580 |
| Real Estate Facilities (2) | 170,732 | 173,132 | 219,068 |
| Other Long-Term Debt | 7,843 | 7,926 | 8,168 |
| Subtotal | 1,511,535 | 1,516,593 | 1,570,816 |
| Less: current portion | (23,147) | (23,275) | (25,651) |
| Total | $ 1,488,388 | $ 1,493,318 | $ 1,545,165 |

(1) Net of $9.0 million, $9.6 million, and $11.4 million of original issue discount at March 31, 2025, December 31, 2024, and March 31, 2024, respectively, and $3.5 million, $3.8 million, and $4.4 million of finance costs at March 31, 2025, December 31, 2024, and March 31, 2024, respectively.

(2) Net of $2.8 million, $3.1 million, and $3.9 million of finance costs at March 31, 2025, December 31, 2024, and March 31, 2024, respectively.

*Senior Secured Credit Facilities*

As of March 31, 2025, December 31, 2024, and March 31, 2024, CWGS Group, LLC (the "Borrower"), a wholly-owned subsidiary of CWGS, LLC, was party to a credit agreement (the "Credit Agreement") for a term loan facility (the "Term Loan Facility") and a revolving credit facility (the "Revolving Credit Facility" and collectively the "Senior Secured Credit Facilities").

The following table details the outstanding amounts and available borrowings under the Senior Secured Credit Facilities as of (in thousands):

| | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| Senior Secured Credit Facilities: | | | |
| Term Loan Facility: | | | |
| Principal amount of borrowings | $ 1,400,000 | $ 1,400,000 | $ 1,400,000 |
| Less: cumulative principal payments | (54,553) | (51,049) | (40,538) |
| Less: unamortized original issue discount | (8,973) | (9,600) | (11,433) |
| Less: unamortized finance costs | (3,514) | (3,816) | (4,449) |
| | 1,332,960 | 1,335,535 | 1,343,580 |
| Less: current portion | (14,015) | (14,015) | (14,015) |
| Long-term debt, net of current portion | $ 1,318,945 | $ 1,321,520 | $ 1,329,565 |
| Revolving Credit Facility: | | | |
| Total commitment | $ 65,000 | $ 65,000 | $ 65,000 |
| Less: outstanding letters of credit | (4,902) | (4,902) | (4,930) |
| Less: total net leverage ratio borrowing limitation | (37,348) | (37,348) | (37,320) |
| Additional borrowing capacity | $ 22,750 | $ 22,750 | $ 22,750 |

As of March 31, 2025, December 31, 2024, and March 31, 2024, the average interest rate on the Term Loan Facility was 6.94%, 6.97%, and 7.94%, respectively, and the effective interest rate was 7.18%, 7.43%, and 8.18%, respectively.

Management has determined that the Senior Secured Credit Facilities include subjective acceleration clauses, which could impact debt classification. Management believes that no events have occurred at March 31, 2025 that would trigger a subjective acceleration clause.

The Credit Agreement requires the Borrower and its subsidiaries to comply on a quarterly basis with a maximum Total Net Leverage Ratio (as defined in the Credit Agreement), which covenant is in effect only if, as of the end of each calendar quarter, the aggregate amount of borrowings under the revolving credit facility, letters of credit and unreimbursed letter of credit disbursements outstanding at such time is greater than 35%

Table of Contents

of the total commitment on the Revolving Credit Facility (excluding (i) up to $15.0 million attributable to any outstanding undrawn letters of credit and (ii) any cash collateralized or backstopped letters of credit), as defined in the Credit Agreement. As of March 31, 2025, the Company was not subject to this covenant as borrowings under the Revolving Credit Facility did not exceed the 35% threshold, however the Company's borrowing capacity was reduced by $37.3 million in light of this covenant. The Company was in compliance with all applicable financial debt covenants at March 31, 2025, December 31, 2024, and March 31, 2024.

*Real Estate Facilities*

As of March 31, 2025, December 31, 2024 and March 31, 2024, subsidiaries of FRHP Lincolnshire, LLC ("FRHP"), an indirect wholly-owned subsidiary of CWGS, LLC, were party to a credit agreement with a syndication of banks for a real estate credit facility (as amended from time to time, the "M&T Real Estate Facility") with aggregate maximum principal capacity of $300.0 million with an option that allows FRHP to request an additional $100.0 million of principal capacity. During the three months ended March 31, 2025, FRHP had no additional borrowings under the M&T Real Estate facility, and during the three months ended March 31, 2024, FRHP borrowed an additional $55.6 million. During the three months ended March 31, 2024, FRHP repaid $17.3 million of the M&T Real Estate Facility to pay off the remaining principal balances relating to three properties. As of March 31, 2025, the remaining available borrowing capacity was $57.4 million.

As of March 31, 2025, December 31, 2024, and March 31, 2024, Camping World Property, LLC, successor by conversion to Camping World Property, Inc. (the "Real Estate Borrower"), an indirect wholly-owned subsidiary of CWGS, LLC, and CIBC Bank USA, were parties to loan and security agreements for real estate credit facilities ((as amended from time to time, the "First CIBC Real Estate Facility" and the "Third CIBC Real Estate Facility") and together with the M&T Real Estate Facility, the "Real Estate Facilities"). In May 2024, the Real Estate Borrower repaid the outstanding balance of the Third CIBC Real Estate Facility of $8.9 million, which related to the facility for the divested operations of CWDS in Elkhart, Indiana, and the Third CIBC Real Estate Facility was terminated. The First CIBC Real Estate Facility matures in October 2028.

The following table shows a summary of the outstanding balances, remaining available borrowings, and weighted average interest rate under the Real Estate Facilities at March 31, 2025:

| | As of March 31, 2025 | | |
|---|---|---|---|
| (In thousands) | Outstanding[(1)] | Remaining Available[(2)] | Wtd. Average Interest Rate |
| Real Estate Facilities | | | |
| M&T Real Estate Facility | $ 167,425 | $ 57,390 (3) | 6.55% |
| First CIBC Real Estate Facility | 3,307 | — | 7.30% |
| | $ 170,732 | $ 57,390 | |

(1) Outstanding principal amounts are net of unamortized finance costs.

(2) Amounts cannot be reborrowed.

(3) Additional borrowings on the M&T Real Estate Facility are subject to a debt service coverage ratio covenant and to the property collateral requirements under the M&T Real Estate Facility.

Management has determined that the credit agreements governing the Real Estate Facilities include subjective acceleration clauses, which could impact debt classification. Management believes that no events have occurred at March 31, 2025 that would trigger a subjective acceleration clause. Additionally, the Real Estate Facilities are subject to certain cross default provisions, a debt service coverage ratio, and other customary covenants. The Company was in compliance with all financial debt covenants at March 31, 2025, December 31, 2024, and March 31, 2024.

*Other Long-Term Debt*

As of March 31, 2025, the outstanding principal balance of other long-term debt was $7.8 million with a weighted average interest rate of 4.27%.

### 8. Lease Obligations

The following table presents certain information related to the costs for leases where the Company is the lessee (in thousands):

| | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Operating lease cost | $ 29,353 | $ 29,190 |
| Finance lease cost: | | |
| Amortization of finance lease assets | 2,591 | 2,860 |
| Interest on finance lease liabilities | 2,182 | 2,466 |
| Short-term lease cost | 308 | 377 |
| Variable lease cost | 6,704 | 5,329 |
| Sublease income | (846) | (654) |
| Net lease costs | $ 40,292 | $ 39,568 |

As of March 31, 2025, December 31, 2024, and March 31, 2024, finance lease assets of $119.4 million, $120.0 million, and $139.8 million, respectively, were included in property and equipment, net in the accompanying condensed consolidated balance sheets.

The following table presents supplemental cash flow information related to leases (in thousands):

| | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows for operating leases | $ 30,113 | $ 29,588 |
| Operating cash flows for finance leases | 2,182 | 2,466 |
| Financing cash flows for finance leases | 1,763 | 1,829 |
| Lease assets obtained in exchange for lease liabilities: | | |
| New, remeasured and terminated operating leases | 24,521 | 44,183 |
| New, remeasured and terminated finance leases | 1,957 | 42,228 |

During the three months ended March 31, 2025 and 2024, the Company entered into sale-leaseback transactions for one and two properties, respectively, associated with store locations in the RV and Outdoor Retail segment and received consideration of $3.5 million and $23.5 million of cash, respectively. The Company recorded no gain for the three months ended March 31, 2025, and recorded a gain of $0.1 million for the three months ended March 31, 2024 that was included in (gain) loss on sale or disposal of assets in the condensed consolidated statements of income. The Company entered into a 19-year lease agreement as the lessee with the buyer of the property in 2025 and 20-year lease agreements as the lessee with each buyer of the properties in 2024.

### 9. Fair Value Measurements

Accounting guidance for fair value measurements establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. These tiers include Level 1, defined as observable inputs such as quoted prices in active markets; Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable; and Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions.

Table of Contents

*Recurring Fair Value Measurements*

The following table presents the reported carrying values and the fair values by level of the Company's assets and liabilities measured at fair value on a recurring basis:

| ($ in thousands) | March 31, 2025 Carrying Value | March 31, 2025 Level 3 | December 31, 2024 Carrying Value | December 31, 2024 Level 3 | March 31, 2024 Carrying Value | March 31, 2024 Level 3 |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Derived participation investment [(1)] | $ 1,151 | $ 1,151 | $ 156 | $ 156 | $ — | $ — |
| **Liabilities:** | | | | | | |
| Acquisition-related contingent consideration [(2)] | 368 | 368 | 368 | 368 | — | — |

(1) Derived participation investment was included in other assets in the accompanying condensed consolidated balance sheets.

(2) The $0.2 million current and $0.2 million non-current portions of acquisition-related contingent consideration were included in accrued liabilities and other long-term liabilities, respectively, in the accompanying condensed consolidated balance sheets.

The following table presents fair value measurements using significant unobservable inputs (Level 3):

| ($ in thousands) | Three Months Ended March 31, 2025: Derived Participation Investment | Three Months Ended March 31, 2025: Acquisition-related contingent consideration |
|---|---|---|
| Beginning balance | $ 156 | $ 368 |
| Purchases | 1,018 | — |
| Settlements | (67) | — |
| Gains included in earnings | 44 | — |
| Ending balance | $ 1,151 | $ 368 |

*Derived Participation Investment*

The Company has entered into an arrangement with a consumer financing partner to invest in a participation interest in the cash flows of certain financing transactions under the white label financing program with such consumer financing partner (the "Derived Participation Investment"). The fair value of this investment was estimated by discounting the projected cash flows subject to the participation interest. The assumptions in the analysis included loan losses, prepayments, and recoveries derived based on historical observation of such data pertaining to the RV industry, as well as other relevant industries with loan structure similar to that of the RV industry. This is categorized as a Level 3 measurement and there was no significant change in unrealized gains or losses during the three months ended March 31, 2025. Based on loan activity by the consumer financing partner in March 2025, the Company was committed to invest an additional $1.6 million, which was paid in April 2025 and is not included in the carrying value or fair value amounts presented above.

*Contingent Consideration*

The Company's contingent consideration liability was established as part of the consideration for the acquisition of a tire rescue roadside assistance business in June 2024. The fair value of this liability was estimated as the present value of the probability weighted milestone payments at each of the first two anniversaries of the date of the acquisition for a maximum aggregate payment of $0.5 million if all milestones are reached. The assumptions in the analysis included the Company's assessment of the probability that the milestones will be reached and a discount rate based primarily on the Company's credit risk and its ability to pay. This is categorized as a Level 3 measurement and there was no significant change in unrealized gains or losses during the three months ended March 31, 2025.

*Other Fair Value Disclosures*

There have been no transfers of assets or liabilities between the fair value measurement levels and there were no material re-measurements to fair value during 2025 and 2024 of assets and liabilities that are not measured at fair value on a recurring basis.

Table of Contents

For floor plan notes payable under the Floor Plan Facility, the amounts reported in the accompanying condensed consolidated balance sheets approximate the fair value due to their short-term nature or the existence of variable interest rates that approximate prevailing market rates.

The following table presents the reported carrying value and fair value information for the Company's debt instruments. The fair values shown below for the Term Loan Facility, as applicable, are based on quoted prices in the inactive market for identical assets (Level 2) and the fair values shown below for the Floor Plan Facility Revolving Line of Credit, the Real Estate Facilities and the Other Long-Term Debt are estimated by discounting the future contractual cash flows at the current market interest rate that is available based on similar financial instruments.

| | Fair Value | March 31, 2025 | | December 31, 2024 | | March 31, 2024 | |
|---|---|---|---|---|---|---|---|
| ($ in thousands) | Measurement | Carrying Value | Fair Value | Carrying Value | Fair Value | Carrying Value | Fair Value |
| Term Loan Facility | Level 2 | $ 1,332,960 | $ 1,294,993 | $ 1,335,535 | $ 1,320,286 | $ 1,343,580 | $ 1,322,077 |
| Floor Plan Facility Revolving Line of Credit | Level 2 | — | — | — | — | 31,885 | 33,134 |
| Real Estate Facilities | Level 2 | 170,732 | 173,557 | 173,132 | 176,684 | 219,068 | 230,710 |
| Other Long-Term Debt | Level 2 | 7,843 | 6,616 | 7,926 | 6,652 | 8,168 | 6,708 |

## 10. Commitments and Contingencies

### Litigation

*Weissmann Complaint*

On June 22, 2021, FreedomRoads Holding Company, LLC ("FR Holdco"), an indirect wholly-owned subsidiary of CWGS, LLC, filed a one-count complaint captioned FreedomRoads Holding Company, LLC v. Steve Weissmann in the Circuit Court of Cook County, Illinois against Steve Weissmann ("Weissmann") for breach of contractual obligation under note guarantee (the "Note") (the "Weissmann Complaint"). On October 8, 2021, Weissmann brought a counterclaim against FR Holdco and third-party defendants Marcus A. Lemonis, NBCUniversal Media, LLC, the Consumer National Broadcasting Company, Camping World, Inc. ("CW"), and Machete Productions ("Machete") (the "Weissmann Counterclaim"), in which he alleges claims in connection with the Note and his appearance on the reality television show The Profit. Weissmann alleges the following causes of action against FR Holdco and all third-party defendants, including CW: (i) fraud; (ii) fraud in the inducement; (iii) fraudulent concealment; (iv) breach of fiduciary duty; (v) defamation; (vi) defamation per se; (vii) false light; (viii) intentional infliction of emotional distress; (ix) negligence; (x) unjust enrichment; and (xi) RICO § 1962. Weissmann seeks costs and damages in an amount to be proven at trial but no less than the amount in the Note (approximately $2.5 million); in connection with his RICO claim, Weissmann asserts he is entitled to damages in the amount of three times the Note. On February 18, 2022, NBCUniversal, CNBC, and Machete filed a motion to compel arbitration (the "NBC Arbitration Motion"). On May 5, 2022, an agreed order was filed staying the litigation in favor of arbitration. On May 31, 2022, FR Holdco filed an arbitration demand against Weissmann for collection on the Note. Weissmann filed his response and counterclaims, and third-party claims against FR Holdco, CW, Marcus A. Lemonis, NBCUniversal, and Machete on July 7, 2022. On or about July 21, 2022, FR Holdco and the other respondents filed their responses and affirmative defenses. On March 11, 2024, FR Holdco's arbitration demand and the Weissmann arbitration demand were tried before a single arbitrator pursuant to the JAMS streamlined arbitration rules in a confidential arbitration hearing. On May 23, 2024, the arbitrator issued an interim award in favor of FR Holdco in the amount of $4,318,892, plus interest, costs, and attorneys' fees as set forth in the Tumbleweed bankruptcy plan and to be determined by the arbitrator in subsequent proceedings. On July 31, 2024, the arbitrator heard the parties' arguments on the amount of attorneys' fees and costs owed to FR Holdco, after Weissmann conceded in a written briefing the obligation to pay attorneys' fees and costs to FR Holdco as the prevailing party. On September 12, 2024, the arbitrator issued a final award in favor of FR Holdco in the amount of $4,990,006, in the manner described in the Tumbleweed bankruptcy plan. Weissmann is jointly and severally liable for $4,106,884 of that amount. On September 24, 2024, Weissmann and Tumbleweed filed a Petition to Vacate Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On September 27, 2024, FR Holdco, CW, Marcus A. Lemonis, NBCUniversal, and Machete filed a Petition to Confirm Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On January 16, 2025, Superior Court for the State of California, County of Los Angeles granted the Petition to Confirm Arbitration Award and denied the Petition to Vacate Arbitration Award, concluding the litigation. On April 17, 2025, FR Holdco, CW, Marcus A. Lemonis,

Table of Contents

NBCUniversal, and Machete filed a Notice Regarding Bankruptcy Order and Request to Enter Judgment. There can be no assurances that we will be able to collect amounts owed pursuant to the Arbitration Award.

*Tumbleweed Complaint*

On November 10, 2021, Tumbleweed Tiny House Company, Inc. ("Tumbleweed") filed a complaint against FR Holdco, CW, Marcus A. Lemonis, NBCUniversal Media, LLC, and Machete Productions in which Tumbleweed alleges claims in connection with the Note and its appearance on the reality television show The Profit (the "Tumbleweed Complaint"), seeking primarily monetary damages. Tumbleweed alleges the following claims against the defendants, including FR Holdco and CW: (i) fraud; (ii) false promise; (iii) breach of fiduciary duty (and aiding and abetting the same); (iv) breach of contract; (v) breach of oral contract; (vi) tortious interference with prospective economic advantage; (vii) fraud in the inducement; (viii) negligent misrepresentation; (ix) fraudulent concealment; (x) conspiracy; (xi) unlawful business practices; (xii) defamation; and (xiii) declaratory judgment. On April 21, 2022, the Court granted a motion to compel arbitration filed by NBCUniversal and joined by all defendants, including FR Holdco, CW, and Marcus A. Lemonis, compelling Tumbleweed's claims to arbitration. Tumbleweed served its arbitration demand on FR Holdco, CW, and Marcus A. Lemonis on May 17, 2022. FR Holdco, CW, and Marcus A. Lemonis filed responses and affirmative defenses on May 31, 2022. On July 20, 2022, pursuant to the JAMS streamlined arbitration rules, the Tumbleweed Complaint was consolidated together with the Weissmann Complaint. The parties have exchanged discovery. On March 11, 2024, FR Holdco's arbitration demand and the Weissman arbitration demand were tried before a single arbitrator pursuant to the JAMS streamlined arbitration rules in a confidential arbitration hearing. On May 23, 2024, the arbitrator issued an interim award in favor of all respondents, including FR Holdco, CW, and Lemonis. On July 31, 2024, the arbitrator heard the parties arguments on the amount of attorneys' fees and costs owed to FR Holdco, CW, Lemonis, and the other defendants, after Tumbleweed conceded the obligation to pay attorneys' fees and costs to the prevailing parties. On September 12, 2024, the arbitrator issued a final award in favor of FR Holdco, CW, Lemonis in the amount of $3,793,455 in attorneys' fees and $626,611 in costs. The arbitrator also awarded $4,990,006 in favor of FR Holdco. On September 24, 2024, Weissmann and Tumbleweed filed a Petition to Vacate Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On September 27, 2024, FR Holdco, CW, Marcus A. Lemonis, NBCUniversal, and Machete filed a Petition to Confirm Arbitration Award in the Superior Court for the State of California, County of Los Angeles. On January 16, 2025, Superior Court for the State of California, County of Los Angeles granted the Petition to Confirm Arbitration Award and denied the Petition to Vacate Arbitration Award, concluding the litigation. On April 17, 2025, FR Holdco, CW, Marcus A. Lemonis, NBCUniversal, and Machete filed a Notice Regarding Bankruptcy Order and Request to Enter Judgment. There can be no assurances that we will be able to collect amounts owed pursuant to the Arbitration Award.

*General*

From time to time, the Company is involved in litigation arising in the normal course of business operations. While the outcome of litigation cannot be predicted with certainty, and some of these lawsuits, claims or proceedings may be determined adversely to the Company, management does not believe that the disposition of any such pending matters is likely to have a material adverse effect on the Company's financial statements. No assurance can be made that these or similar suits will not result in a material financial exposure in excess of insurance coverage, which could have a material adverse effect upon the Company's financial condition and results of operations.

**Supplier Agreement**

In connection with the divestiture of CWDS in May 2024, the Company entered into a supplier agreement (the "Supplier Agreement") with the buyer that requires the Company to purchase an aggregate $250.0 million of product over the approximately 10-year term of the Supplier Agreement. Any shortfall under this aggregate purchase threshold results in an extension of the term of the Supplier Agreement and does not otherwise result in financial penalties.

Table of Contents

**Employment Agreements**

The Company has employment agreements with certain officers. The agreements include, among other things, an annual bonus based on certain performance-based criteria and certain severance benefits in the event of a qualifying termination.

**Financial Assurances**

In the normal course of business, the Company obtains standby letters of credit and surety bonds from financial institutions and other third parties. These instruments guarantee the Company's future performance and provide third parties with financial and performance assurance in the event that the Company does not perform. These instruments support a wide variety of the Company's business activities. As of March 31, 2025, December 31, 2024, and March 31, 2024, outstanding standby letters of credit issued through our Floor Plan Facility were $14.3 million, $14.3 million, and $12.3 million, respectively (see Note 3 — Inventories and Floor Plan Payables). The outstanding standby letters of credit issued through the Senior Secured Credit Facilities as of March 31, 2025, December 31, 2024, and March 31, 2024 were $4.9 million (see Note 7 — Long-Term Debt). As of March 31, 2025, December 31, 2024, and March 31, 2024, outstanding surety bonds were $25.3 million, $26.6 million, and $24.4 million, respectively. The underlying liabilities to which these instruments relate are reflected on the Company's condensed consolidated balance sheets, where applicable. Therefore, no additional liability is reflected for the letters of credit and surety bonds themselves.

## 11. Statement of Cash Flows

Supplemental disclosures of cash flow information for the following periods (in thousands) were as follows:

| | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Cash paid (received) during the period for: | | |
| Interest | $ 46,441 | $ 61,812 |
| Income taxes | (1,015) | (111) |
| Noncash investing and financing activities: | | |
| Leasehold improvements paid by lessor | 79 | — |
| Capital expenditures in accounts payable and accrued liabilities | 8,616 | 6,203 |
| Prior period deposit applied to portion of purchase price of RV dealership acquisition | 11,000 | 8,873 |
| Cost of treasury stock issued for vested restricted stock units | — | 2,595 |

## 12. Acquisitions

During the three months ended March 31, 2025 and 2024, subsidiaries of the Company acquired the assets of multiple RV dealerships that constituted businesses under GAAP. The Company used cash and borrowings under its Floor Plan Facility to complete the acquisitions. The Company considers acquisitions of independent dealerships to be a fast and capital efficient alternative to opening new store locations to expand its business and grow its customer base. The acquired businesses were recorded at their estimated fair values under the acquisition method of accounting. The balance of the purchase prices in excess of the fair values of net assets acquired were recorded as goodwill.

During the three months ended March 31, 2025, the RV and Outdoor Retail segment acquired the assets of various RV dealerships comprised of eight locations for an aggregate purchase price of approximately $91.6 million, of which one RV dealership had not opened by March 31, 2025. As a component of the aggregate purchase price to acquire certain of these locations, $10.0 million was paid as a deposit in November 2024, which would convert into shares of Lazydays Holdings, Inc. ("Lazydays") common stock if the Company completed the acquisition of all seven RV dealerships originally contemplated under the November 2024 agreement with Lazydays. However, the Company acquired only five of the seven Lazydays RV dealerships, so the deposit did not convert to shares of Lazydays common stock. Instead, the deposit was considered a component of the purchase price of those acquisitions and ultimately recognized as goodwill. Additionally, a $1.0 million deposit was made in December 2024 for non-Lazydays RV dealership acquisitions that were completed during the three months ended March 31, 2025. Separate from these acquisitions, during the three months ended March 31, 2025, the Company purchased real property for an aggregate purchase price of $48.6 million.

During the three months ended March 31, 2024, the RV and Outdoor Retail segment acquired the assets of various RV dealerships comprised of nine locations for an aggregate purchase price of approximately $67.7 million, of which one RV dealerships had not opened by March 31, 2024. Separate from these acquisitions, during the three months ended March 31, 2024, the Company purchased real property for an aggregate purchase price of $1.2 million.

The estimated fair values of the assets acquired and liabilities assumed for the acquisitions discussed above consist of the following, net of insignificant measurement period adjustments relating to acquisitions from the respective previous year:

| ($ in thousands) | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Tangible assets (liabilities) acquired (assumed): | | |
| Inventories, net | $ 73,507 | $ 40,394 |
| Prepaid expenses and other assets | 58 | — |
| Property and equipment, net | 1,414 | 287 |
| Operating lease assets | 9,366 | 15,328 |
| Accrued liabilities | (144) | (40) |
| Current portion of operating lease liabilities | (1,055) | (1,112) |
| Other current liabilities | (463) | (21) |
| Operating lease liabilities, net of current portion | (8,312) | (14,216) |
| Total tangible net assets acquired | 74,371 | 40,620 |
| Intangible assets acquired: | | |
| Supplier and customer relationships | — | 2,595 |
| Total intangible assets acquired | — | 2,595 |
| Goodwill | 17,193 | 24,458 |
| Purchase price of acquisitions | 91,564 | 67,673 |
| Application of deposit paid in prior period | (11,000) | (8,873) |
| Cash paid for acquisitions, net of cash acquired | 80,564 | 58,800 |
| Inventory purchases financed via floor plan | (71,181) | (48,684) |
| Cash payment net of floor plan financing | $ 9,383 | $ 10,116 |

The fair values above for the three months ended March 31, 2025 are preliminary as they are subject to measurement period adjustments for up to one year from the date of acquisition as new information is obtained about facts and circumstances that existed as of the acquisition date relating to the valuation of the acquired assets, primarily the acquired inventories. For the three months ended March 31, 2024, the fair values include a measurement period adjustment to record $2.6 million of other intangible assets from a RV dealership acquisition that occurred during the year ended December 31, 2023. These intangible assets had an estimated useful life of 15 years; however, these intangible assets were sold for $2.6 million during 2024.

The primary items that generated the goodwill are the value of the expected synergies between the acquired businesses and the Company and the acquired assembled workforce, neither of which qualify for recognition as a separately identified intangible asset. For the three months ended March 31, 2025 and 2024,

acquired goodwill of $17.2 million and $24.5 million, respectively, was expected to be deductible for tax purposes.

Included in the condensed consolidated financial statements for the three months ended March 31, 2025 were revenue of $11.8 million and pre-tax income of $0.1 million from the acquired dealerships from the applicable acquisition dates. Included in the condensed consolidated financial statements for the three months ended March 31, 2024 were revenue of $7.0 million and insignificant pre-tax income from the acquired dealerships from the applicable acquisition dates. Pro forma information on these acquisitions has not been included, because the Company has deemed them to not be individually or cumulatively material.

**13. Income Taxes**

CWH is organized as a Subchapter C corporation and, as of March 31, 2025, is a 61.1% owner of CWGS, LLC (see Note 15 — Non-Controlling Interests). CWGS, LLC is organized as a limited liability company and treated as a partnership for U.S. federal and most applicable state and local income tax purposes and as such, is generally not subject to any U.S. federal entity-level income taxes. However, certain active CWGS, LLC subsidiaries, including Americas Road and Travel Club, Inc. and FreedomRoads RV, Inc. and their wholly-owned subsidiaries, are subject to entity-level taxes as they are Subchapter C corporations.

*Effective Income Tax Rate*

For the three months ended March 31, 2025 and 2024, the Company's effective income tax rate was 12.3% and 15.1%, respectively. The effective tax rate differed from the federal statutory rate of 21.0% primarily due to state taxes, changes in our uncertain tax position reserves, non-deductible executive compensation, and a portion of the Company's earnings being attributable to non-controlling interests in limited liability companies, which are not subject to entity level taxes.

*Tax Receivable Agreement*

The Company is party to a tax receivable agreement (the "Tax Receivable Agreement") that provides for the payment by the Company to the Continuing Equity Owners and Crestview Partners II GP, L.P. of 85% of the amount of tax benefits, if any, the Company actually realizes, or in some circumstances is deemed to realize, as a result of (i) increases in the tax basis from the purchase of common units from Crestview Partners II GP, L.P in exchange for Class A common stock in connection with the consummation of the IPO and the related transactions and any future redemptions that are funded by the Company and any further redemptions of common units by Continuing Equity Owners and (ii) certain other tax benefits attributable to payments made under the Tax Receivable Agreement. The above payments are predicated on CWGS, LLC making an election under Section 754 of the Internal Revenue Code effective for each tax year in which a redemption of common units for cash or stock occurs. These tax benefit payments are not conditioned upon one or more of the Continuing Equity Owners or Crestview Partners II GP, L.P. maintaining a continued ownership interest in CWGS, LLC. In general, the Continuing Equity Owners' or Crestview Partners II GP, L.P.'s rights under the Tax Receivable Agreement are assignable, including to transferees of its common units in CWGS, LLC (other than the Company as transferee pursuant to a redemption of common units in CWGS, LLC). The Company expects to benefit from the remaining 15% of the tax benefits, if any, which may be realized.

During the three months ended March 31, 2025 and 2024, there were no redemptions of common units by Continuing Equity Owners.

**14. Related Party Transactions**

**Transactions with Directors, Equity Holders and Executive Officers**

From January 2012 until its expiration in March 2024, FreedomRoads, LLC was the lessee of what is now its previous corporate headquarters in Lincolnshire, Illinois (as amended from time to time, the "Lincolnshire Lease"). For the three months ended March 31, 2024, rental payments for the Lincolnshire Lease, including common area maintenance charges, were $0.2 million, which were included in SG&A expenses in

the condensed consolidated statements of operations. The Company's Chairman and Chief Executive Officer had personally guaranteed the Lincolnshire Lease.

## 15. Non-Controlling Interests

The following table summarizes the CWGS, LLC common unit ownership by CWH and the Continuing Equity Owners:

| | As of March 31, 2025 | | As of December 31, 2024 | | As of March 31, 2024 | |
|---|---|---|---|---|---|---|
| | Common Units | Ownership % | Common Units | Ownership % | Common Units | Ownership % |
| CWH | 62,569,449 | 61.1% | 62,502,096 | 61.0% | 45,071,762 | 53.0% |
| Continuing Equity Owners | 39,895,393 | 38.9% | 39,895,393 | 39.0% | 40,044,536 | 47.0% |
| Total | 102,464,842 | 100.0% | 102,397,489 | 100.0% | 85,116,298 | 100.0% |

The following table summarizes the effects of changes in ownership in CWGS, LLC on the Company's equity:

| | Three Months Ended March 31, | |
|---|---|---|
| ($ in thousands) | 2025 | 2024 |
| Net loss attributable to Camping World Holdings, Inc. | $ (12,280) | $ (22,307) |
| Transfers to non-controlling interests: | | |
| Decrease in additional paid-in capital as a result of the purchase of common units from CWGS, LLC with proceeds from the exercise of stock options | — | (22) |
| Increase (decrease) in additional paid-in capital as a result of the vesting of restricted stock units | 446 | (2,234) |
| (Decrease) increase in additional paid-in capital as a result of repurchases of Class A common stock for withholding taxes on vested RSUs | (871) | 209 |
| Change from net loss attributable to Camping World Holdings, Inc. and transfers to non-controlling interests | $ (12,705) | $ (24,354) |

## 16. Stock-Based Compensation Plans

The following table summarizes the stock-based compensation ("SBC") that has been included in the following line items within the condensed consolidated statements of operations during:

| | Three Months Ended March 31, | |
|---|---|---|
| ($ in thousands) | 2025 | 2024 |
| **Stock-based compensation expense:** | | |
| Costs applicable to revenue | $ 125 | $ 92 |
| Selling, general, and administrative | 7,145 | 5,105 |
| Total stock-based compensation expense | $ 7,270 | $ 5,197 |

The following table summarizes stock option, restricted stock unit ("RSU") and performance stock unit ("PSU") activities for the three months ended March 31, 2025:

| (in thousands) | Stock Options | Restricted Stock Units | Performance Stock Units |
|---|---|---|---|
| Outstanding at December 31, 2024 | 155 | 1,652 | — |
| Granted | — | 1,069 | 750 |
| Vested | — | (109) | — |
| Forfeited | (1) | (71) | — |
| Outstanding at March 31, 2025 | 154 | 2,541 | 750 |
| Exercisable at March 31, 2025 | 154 | n/a | n/a |

Table of Contents

During the three months ended March 31, 2025, the Company granted a total of 469,004 RSUs to non-executive employees with an aggregate grant date fair value of $10.1 million and weighted-average grant date fair value of $21.57 per RSU, which will be recognized, net of forfeitures, over a vesting period of five years.

In January 2025, pursuant to the amended and restated employment agreement entered into with Marcus A. Lemonis, the Company granted Mr. Lemonis (i) an award of 600,000 RSUs with a grant date fair value of $22.13 per RSU, which will be recognized, net of forfeitures, over a vesting period through November 15, 2027, and (ii) an award of PSUs under the 2016 Plan with respect to 750,000 PSUs if earned at "target" levels of performance, which will be eligible to vest based on the achievement of specified stock price hurdles over a three-year performance period ending on December 31, 2027.

The PSUs are comprised of four tranches of 187,500 PSUs with hurdles ranging from $32.50 per share to $47.50 per share in $5.00 per share increments. The achievement of the stock price hurdles is based on the average 30 consecutive trading day closing stock price of the Company's Class A common stock. The grant date fair value was estimated using a Monte Carlo simulation to simulate stock price trajectories over the performance period. Key inputs to the model as of the date of grant included the duration of the performance period, the risk-free interest rate, and the closing stock price, volatility and dividend yield of the Company's Class A common stock. The PSUs had a weighted-average grant date fair value of $13.84 per PSU, which will be recognized over a weighted-average derived service period of approximately one year, net of any forfeitures for termination of employment prior to the completion of the derived service period for any tranches with unsatisfied vesting conditions.

## 17. Loss Per Share

Basic loss per share of Class A common stock is computed by dividing net loss attributable to Camping World Holdings, Inc. by the weighted-average number of shares of Class A common stock outstanding during the period. Diluted loss per share of Class A common stock is computed by dividing net loss attributable to Camping World Holdings, Inc. by the weighted-average number of shares of Class A common stock outstanding adjusted to give effect to potentially dilutive securities.

The following table sets forth reconciliations of the numerators and denominators used to compute basic and diluted loss per share of Class A common stock:

| (In thousands except per share amounts) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **Numerator:** | | |
| Net loss | $ (24,682) | $ (50,806) |
| Less: net loss attributable to non-controlling interests | 12,402 | 28,499 |
| Net loss attributable to Camping World Holdings, Inc. — basic | $ (12,280) | $ (22,307) |
| Add: reallocation of net loss attributable to non-controlling interests from the assumed redemption of common units of CWGS, LLC for Class A common stock | (9,191) | (21,275) |
| Net loss attributable to Camping World Holdings, Inc. — diluted | $ (21,471) | $ (43,582) |
| **Denominator:** | | |
| Weighted-average shares of Class A common stock outstanding — basic | 62,531 | 45,047 |
| Dilutive common units of CWGS, LLC that are convertible into Class A common stock | 39,895 | 40,045 |
| Weighted-average shares of Class A common stock outstanding — diluted | 102,426 | 85,092 |
| | | |
| Loss per share of Class A common stock — basic | $ (0.20) | $ (0.50) |
| Loss per share of Class A common stock — diluted | $ (0.21) | $ (0.51) |
| | | |
| Weighted-average anti-dilutive securities excluded from the computation of diluted loss per share of Class A common stock: | | |
| Stock options to purchase Class A common stock | 155 | 189 |
| Restricted stock units | 2,383 | 1,841 |
| | | |
| Weighted-average contingently issuable shares excluded from the computation of diluted loss per share of Class A common stock since all necessary conditions had not been satisfied: | | |
| Performance stock units[(1)] | 750 | — |

(1) See Note 16 – Stock-Based Compensation Plans for further details of PSUs.

Table of Contents

Shares of the Company's Class B common stock and Class C common stock do not share in the earnings or losses of the Company and are therefore not participating securities. As such, separate basic and diluted loss per share of Class B common stock or Class C common stock under the two-class method has not been presented.

**18. Segments Information**

The Company has the following two reportable segments: (i) Good Sam Services and Plans, and (ii) RV and Outdoor Retail. The Company evaluates performance for all of its reportable segments based on Segment Adjusted EBITDA. The Company defines "Segment Adjusted EBITDA" as the reportable segments' total revenue less segment expenses which are comprised of (i) adjusted costs applicable to revenue, (ii) intersegment costs applicable to revenues, (iii) adjusted SG&A expense, (iv) floor plan interest expense, and (v) other segment items. Segment expenses exclude depreciation and amortization and certain noncash and other items that the Chief Operating Decision Maker does not consider in his evaluation of ongoing operating performance. These excluded items include (a) SBC and (b) loss and/or impairment on investments in equity securities.

Reportable segment revenue; segment adjusted EBITDA; depreciation and amortization; other interest expense, net; total assets; and capital expenditures are as follows:

| | Three Months Ended March 31, 2025 | | Three Months Ended March 31, 2024 | |
|---|---|---|---|---|
| ($ in thousands) | Good Sam Services and Plans | RV and Outdoor Retail | Good Sam Services and Plans | RV and Outdoor Retail |
| **Revenue:** | | | | |
| Good Sam Services and Plans | $ 46,208 | $ — | $ 45,681 | $ — |
| New vehicles | — | 621,432 | — | 656,086 |
| Used vehicles | — | 422,351 | — | 337,685 |
| Products, service and other | — | 164,992 | — | 177,894 |
| Finance and insurance, net | — | 148,667 | — | 135,454 |
| Good Sam Club | — | 9,874 | — | 11,217 |
| Intersegment revenue(1) | 808 | 2,404 | 930 | 2,721 |
| Total revenue before intersegment eliminations | 47,016 | 1,369,720 | 46,611 | 1,321,057 |
| **Segment expenses:** | | | | |
| Adjusted costs applicable to revenue(2) | 17,677 | 966,094 | 15,138 | 946,390 |
| Intersegment costs applicable to revenue(3) | 587 | 2,625 | 930 | 2,206 |
| Adjusted selling, general and administrative(4) | 7,642 | 369,732 | 7,288 | 356,186 |
| Floor plan interest expense | — | 18,306 | — | 27,882 |
| Other segment items(5) | — | (40) | — | 34 |
| **Segment Adjusted EBITDA** | $ 21,110 | $ 13,003 | $ 23,255 | $ (11,641) |

(1) Intersegment revenue consists of segment revenue that is eliminated in our condensed consolidated statements of operations.

(2) Adjusted costs applicable to revenue exclude SBC expense and intersegment costs applicable to revenue.

(3) Intersegment costs applicable to revenue consist of segment costs applicable to revenue that are eliminated in our condensed consolidated statements of operations.

(4) Adjusted SG&A expenses excludes SBC expense and intersegment operating expenses.

(5) Other segment items include (i) intersegment operating expenses, which are eliminated in our condensed consolidated statements of operations, and (ii) other expense, net excluding loss and/or impairment on investments in equity securities.

Table of Contents

| ($ in thousands) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **Revenue:** | | |
| Good Sam Services and Plans Segment | $ 47,016 | $ 46,611 |
| RV and Outdoor Retail Segment | 1,369,720 | 1,321,057 |
| Total segment revenue | 1,416,736 | 1,367,668 |
| Intersegment eliminations | (3,212) | (3,651) |
| Total revenue | 1,413,524 | 1,364,017 |
| **Segment Adjusted EBITDA:** | | |
| Good Sam Services and Plans Segment | 21,110 | 23,255 |
| RV and Outdoor Retail Segment | 13,003 | (11,641) |
| Total Segment Adjusted EBITDA | 34,113 | 11,614 |
| Corporate SG&A excluding SBC(1) | (2,926) | (2,894) |
| Depreciation and amortization | (22,544) | (19,290) |
| Long-lived asset impairment | (620) | (5,827) |
| Gain (loss) on sale or disposal of assets | 1,823 | (1,585) |
| Stock-based compensation(2) | (7,270) | (5,197) |
| Loss and impairment on investments in equity securities(3) | (157) | (94) |
| Other interest expense, net | (30,531) | (36,094) |
| Intersegment eliminations(4) | (41) | (481) |
| Loss before income taxes | $ (28,153) | $ (59,848) |

(1) Corporate SG&A excluding SBC represents corporate SG&A expenses that are not allocated to the segments and are comprised primarily of the costs associated with being a public company. This amount excludes the SBC relating to the Board of Directors for their service as board members that is not allocated to the segments, since it is presented as part of the SBC reconciling line item in this table.

(2) This SBC amount includes SBC allocated to the segments and SBC relating to the Board of Directors for their service as board members that is not allocated to the segments (See Note 16 — Stock-Based Compensation Plans).

(3) Represents loss and/or impairment on investments in equity securities and interest income relating to any notes receivables with those investments. These amounts are included in other expense, net in the condensed consolidated statements of operations.

(4) Represents the net impact of intersegment eliminations on (loss) income before income taxes.

| ($ in thousands) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **Depreciation and amortization:** | | |
| Good Sam Services and Plans | $ 901 | $ 848 |
| RV and Outdoor Retail | 21,643 | 18,442 |
| Total depreciation and amortization | $ 22,544 | $ 19,290 |

| ($ in thousands) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **Other interest expense, net:** | | |
| Good Sam Services and Plans | $ (52) | $ (18) |
| RV and Outdoor Retail | 6,409 | 8,114 |
| Subtotal | 6,357 | 8,096 |
| Corporate & other | 24,174 | 27,998 |
| Total other interest expense, net | $ 30,531 | $ 36,094 |

| ($ in thousands) | March 31, 2025 | December 31, 2024 | March 31, 2024 |
|---|---|---|---|
| **Assets:** | | | |
| Good Sam Services and Plans | $ 88,377 | $ 121,876 | $ 83,411 |
| RV and Outdoor Retail | 4,818,291 | 4,509,509 | 4,744,164 |
| Subtotal | 4,906,668 | 4,631,385 | 4,827,575 |
| Corporate & other | 240,542 | 231,892 | 239,355 |
| Total assets | $ 5,147,210 | $ 4,863,277 | $ 5,066,930 |

Table of Contents

| ($ in thousands) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **Capital expenditures:** | | |
| Good Sam Services and Plans | $ 2,905 | $ 1,857 |
| RV and Outdoor Retail | 69,190 | 25,313 |
| Total capital expenditures | $ 72,095 | $ 27,170 |

## Item 2: Management's Discussion and Analysis of Financial Condition and Results of Operations

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read together with our condensed consolidated financial statements and related notes included in Part I, Item 1 of this Form 10-Q, as well as our Annual Report on Form 10-K for the year ended December 31, 2024, filed with the SEC on February 28, 2025 (the "Annual Report"). This discussion contains forward-looking statements based upon current plans, expectations and beliefs involving risks and uncertainties. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various important factors, including those set forth under "Risk Factors" included in Part I, Item 1A of our Annual Report, the "Cautionary Note Regarding Forward-Looking Statements" in this Form 10-Q and in other parts of this Form 10-Q. Except to the extent that differences among reportable segments are material to an understanding of our business taken as a whole, we present the discussion in Management's Discussion and Analysis of Financial Condition and Results of Operations on a consolidated basis.*

*For purposes of this Form 10-Q, we define an "Active Customer" as a customer who has transacted with us in any of the eight most recently completed fiscal quarters prior to the date of measurement. Unless otherwise indicated, the date of measurement is March 31, 2025, our most recently completed fiscal quarter.*

### Overview

Camping World Holdings, Inc. (together with its subsidiaries) is the world's largest retailer of RVs and related products and services. Through our Camping World and Good Sam brands, our vision is to build a business that makes RVing and other outdoor adventures fun and easy. We strive to build long-term value for our customers, employees, and stockholders by combining a unique and comprehensive assortment of RV products and services with a national network of RV dealerships, service centers and customer support centers along with the industry's most extensive online presence and a highly-trained and knowledgeable team of associates serving our customers, the RV lifestyle, and the communities in which we operate. We also believe that our Good Sam organization and family of highly specialized services and plans, including roadside assistance, protection plans and insurance, uniquely enables us to connect with our customers as stewards of an outdoor and recreational lifestyle. On March 31, 2025, we operated a total of 209 locations, with all of them selling and/or servicing RVs. See Note 1 – Summary of Significant Accounting Policies to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q.

A summary of the changes in quantities and types of retail stores and changes in same stores from March 31, 2024 to March 31, 2025, are in the table below:

| | RV Dealerships | RV Service & Retail Centers | Total | Same Store[(1)] |
|---|---|---|---|---|
| Number of store locations as of March 31, 2024 | 211 | 4 | 215 | 182 |
| Opened | 11 | — | 11 | — |
| Converted | 1 | (1) | — | (1) |
| Temporarily closed | (1) | — | (1) | (1) |
| Closed | (14) | (2) | (16) | (9) |
| Achieved designation of same store [(1)] | — | — | — | 15 |
| Number of store locations as of March 31, 2025 | 208 | 1 | 209 | 186 |

Table of Contents

(1) Our same store revenue and units calculations for a given period include only those stores that were open both at the end of the corresponding period and at the beginning of the preceding fiscal year.

**Industry Trends**

According to the RV Industry Association's ("RVIA") survey of manufacturers, which almost entirely focuses on North America, wholesale shipments of new RVs for 2024 were 333,733 units, 6.6% greater than in 2023. The Spring 2025 edition of RV *RoadSigns*, the quarterly forecast prepared by ITR Economics for the RVIA, projected RV wholesale shipments to be approximately 350,100 in 2025, or 4.9% higher than 2024. RV wholesale shipments for the first three months of 2025 were 97,848 units, up 13.9% compared to the same timeframe last year per the March 2025 survey of manufacturers prepared by the RVIA.

The per unit cost of new vehicles in fiscal year 2023 was significantly higher than we experienced prior to the COVID-19 pandemic, due to the RV manufacturers' supply constraints during the pandemic, strong demand for new vehicles during the pandemic, higher inflation, and higher interest rates. We focused on clearing out a significant portion of our higher cost pre-2024 model year new vehicles in late 2023 and the first quarter of 2024. The increased mix of lower cost recent model year vehicles during the first quarter of 2025 resulted in lower average selling prices and average cost per unit of new vehicles with little impact to gross margins. Additionally, residual values of used vehicles had declined during 2024 as a result of a decrease in new vehicle costs, which resulted in the first quarter of 2025 having lower average selling prices and average cost per unit of used vehicles and a 104 basis point improvement in used vehicle gross margins.

We had experienced lower used vehicle inventory levels for much of 2024 as we slowed procurement to allow RV owner pricing expectations to adjust as a result of 2024 model year pricing declines. Beginning in the fourth quarter of 2024, we took steps to reverse the trend of decreasing used vehicle revenue and unit sales, including the increase in the procurement of used vehicles, which resulted in a 25.1% increase in used vehicle revenue and 30.3% increase in used vehicle unit sales in the first quarter of 2025. Accordingly, we expect used vehicle revenue and unit sales to outpace comparative 2024 periods for much of 2025.

We are closely monitoring U.S. trade policy developments with countries from which we source product and equipment, such as China, Mexico, and Canada. There is uncertainty as to the extent and duration of additional tariffs that have or may be imposed on imports from these countries. We have made adjustments to our procurement practices to partially mitigate certain of the potential negative effects that additional tariffs may impose on the sourcing of our inventory and equipment. Additionally, many of our U.S.-based suppliers source some of their components from these countries, which could result in higher procurement costs from U.S.-based suppliers. In 2024, our costs applicable to revenue included the costs of directly sourced inventory from China, Mexico, and Canada of approximately $27.0 million, $10.0 million and $2.0 million, respectively.

**Financial Institutions**

The Company maintains the majority of its cash and cash equivalents in accounts with major U.S. and multi-national financial institutions, and our deposits at certain of these institutions exceed insured limits. Market conditions can impact the viability of these institutions. In the event of failure of any of the financial institutions where we maintain our cash and cash equivalents, there can be no assurance that we will be able to access uninsured funds in a timely manner or at all.

Table of Contents

### Inflation

As noted in "Industry Trends" above, we have experienced, and continue to experience, reduced cost and average selling prices with respect to new vehicles and, as a byproduct of the new vehicle pricing decrease, used vehicles. New and used vehicles regularly represent a majority of our costs. However, inflationary factors, such as increases to our product costs, or tariffs on imported product or components used by RV manufacturers, have in the past adversely affected and may in the future adversely affect our operating results if the selling prices of our products and services do not increase proportionately with those increased costs or if demand for our products and services declines as a result of price increases to address inflationary costs. We finance substantially all of our new vehicle inventory and certain of our used vehicle inventory through revolving floor plan arrangements. Inflationary increases in the costs of new and/or used vehicles financed through the revolving floor plan arrangement result in an increase in the outstanding principal balance of the revolving floor plan arrangement. Additionally, our leases require us to pay taxes, maintenance, repairs, insurance and utilities, all of which are generally subject to inflationary increases. Further, the cost of remodeling acquired RV dealership locations and constructing new RV dealership locations is subject to inflationary increases in the costs of labor and material, which results in higher rent expense on new RV dealership locations. Finally, our credit agreements include interest rates that vary based on various benchmarks. Such rates have historically increased during periods of increasing inflation.

### Our Corporate Structure Impact on Income Taxes

Our corporate structure is commonly referred to as an "Up-C" structure and typically results in a different relationship between income before income taxes and income tax expense than would be experienced by most public companies with a more traditional corporate structure. More traditional structures are typically comprised predominately of Subchapter C corporations ("C-Corps") and/or lacking significant non-controlling interests with holdings through limited liability companies or partnerships. Typically, most of our income tax expense is recorded at the CWH level, our public holding company, based on its allocation of taxable income from CWGS, LLC.

More specifically, CWH is organized as a C-Corp and, as of March 31, 2025, is a 61.1% owner of CWGS, LLC. CWGS, LLC is organized as a limited liability company and treated as a partnership for U.S. federal and most applicable state and local income tax purposes and, as such is generally not subject to any U.S. federal entity-level income taxes ("Pass-Through"), with the exception of Americas Road and Travel Club, Inc. and FreedomRoads RV, Inc., and their wholly-owned subsidiaries, which are active C-Corps embedded within the CWGS, LLC structure.

CWH receives an allocation of its share of the net income of CWGS, LLC based on CWH's weighted-average ownership of CWGS, LLC for the period. CWH recognizes income tax expense on its pre-tax income including its portion of this income allocation from CWGS, LLC primarily relating to Pass-Through entities. The income tax relating to the net income of CWGS, LLC allocated to CWH that relates to separately taxed C-Corp entities is recorded within the consolidated results of CWGS, LLC. No income tax expense is recognized by the Company for the portion of net income of CWGS, LLC allocated to non-controlling interests other than income tax expense recorded by CWGS, LLC. Rather, tax distributions are paid to the non-controlling interest holders which are recorded as distributions to holders of LLC common units in the condensed consolidated statements of cash flows. CWH is subject to U.S. federal, state and local income taxes with respect to its allocable share of any taxable income of CWGS, LLC and is taxed at the prevailing corporate tax rates. For the three months ended March 31, 2025 and 2024, the Company used a blended statutory tax rate assumption of 25.0%, for income adjustments applicable to CWH when calculating the adjusted net loss attributable to Camping World Holdings, Inc. — basic and diluted (see "Non-GAAP Financial Measures" in Part I, Item 2 of this Form 10-Q). CWGS, LLC may be liable for various other state and local taxes.

Table of Contents

The following table presents the allocation of CWGS, LLC's C-Corp and Pass-Through net loss to CWH, the allocation of CWGS, LLC's net loss to non-controlling interests, income tax benefit recognized by CWH, and other items:

| | Three Months Ended March 31, | |
|---|---|---|
| ($ in thousands) | 2025 | 2024 |
| C-Corp portion of CWGS, LLC net income allocated to CWH | $ 695 | $ 446 |
| Pass-Through portion of CWGS, LLC net loss allocated to CWH | (20,134) | (32,505) |
| CWGS, LLC net loss allocated to CWH | (19,439) | (32,059) |
| CWGS, LLC net loss allocated to noncontrolling interests | (12,402) | (28,499) |
| CWGS, LLC net loss | (31,841) | (60,558) |
| Income tax benefit recorded by CWH | 6,989 | 9,362 |
| Other incremental CWH net income | 170 | 390 |
| Net loss | $ (24,682) | $ (50,806) |

The following table presents further information on income tax benefit:

| | Three Months Ended March 31, | |
|---|---|---|
| ($ in thousands) | 2025 | 2024 |
| Income tax benefit recorded by CWH | $ 6,989 | $ 9,362 |
| Income tax expense recorded by CWGS, LLC | (3,518) | (320) |
| Income tax benefit | $ 3,471 | $ 9,042 |

Table of Contents

## Results of Operations

### Three Months Ended March 31, 2025 Compared to Three Months Ended March 31, 2024

Unless otherwise indicated, all financial comparisons in this section of Results of Operations compare our financial results for the three months ended March 31, 2025 to our financial results from the three months ended March 31, 2024. The following table sets forth information comparing the components of net loss for the three months ended March 31, 2025 and 2024:

| | Three Months Ended | | | | | |
|---|---|---|---|---|---|---|
| | March 31, 2025 | | March 31, 2024 | | Favorable/ (Unfavorable) | |
| ($ in thousands) | Amount | Percent of Revenue | Amount | Percent of Revenue | $ | % |
| Revenue: | | | | | | |
| Good Sam Services and Plans | $ 46,208 | 3.3% | $ 45,681 | 3.3% | $ 527 | 1.2% |
| RV and Outdoor Retail | | | | | | |
| New vehicles | 621,432 | 44.0% | 656,086 | 48.1% | (34,654) | (5.3%) |
| Used vehicles | 422,351 | 29.9% | 337,685 | 24.8% | 84,666 | 25.1% |
| Products, service and other | 164,992 | 11.7% | 177,894 | 13.0% | (12,902) | (7.3%) |
| Finance and insurance, net | 148,667 | 10.5% | 135,454 | 9.9% | 13,213 | 9.8% |
| Good Sam Club | 9,874 | 0.7% | 11,217 | 0.8% | (1,343) | (12.0%) |
| Subtotal | 1,367,316 | 96.7% | 1,318,336 | 96.7% | 48,980 | 3.7% |
| Total revenue | 1,413,524 | 100.0% | 1,364,017 | 100.0% | 49,507 | 3.6% |
| | | | | | | |
| Gross profit (exclusive of depreciation and amortization shown separately below): | | | | | | |
| Good Sam Services and Plans | 28,487 | 2.0% | 30,498 | 2.2% | (2,011) | (6.6%) |
| RV and Outdoor Retail | | | | | | |
| New vehicles | 85,073 | 6.0% | 91,047 | 6.7% | (5,974) | (6.6%) |
| Used vehicles | 78,390 | 5.5% | 59,152 | 4.3% | 19,238 | 32.5% |
| Products, service and other | 80,253 | 5.7% | 76,219 | 5.6% | 4,034 | 5.3% |
| Finance and insurance, net | 148,667 | 10.5% | 135,454 | 9.9% | 13,213 | 9.8% |
| Good Sam Club | 8,758 | 0.6% | 10,027 | 0.7% | (1,269) | (12.7%) |
| Subtotal | 401,141 | 28.4% | 371,899 | 27.3% | 29,242 | 7.9% |
| Total gross profit | 429,628 | 30.4% | 402,397 | 29.5% | 27,231 | 6.8% |
| | | | | | | |
| Operating expenses: | | | | | | |
| Selling, general, and administrative | 387,445 | 27.4% | 371,473 | 27.2% | (15,972) | (4.3%) |
| Depreciation and amortization | 22,544 | 1.6% | 19,290 | 1.4% | (3,254) | (16.9%) |
| Long-lived asset impairment | 620 | 0.0% | 5,827 | 0.4% | 5,207 | 89.4% |
| (Gain) loss on sale or disposal of assets | (1,823) | (0.1%) | 1,585 | 0.1% | 3,408 | 215.0% |
| Total operating expenses | 408,786 | 28.9% | 398,175 | 29.2% | (10,611) | (2.7%) |
| Income from operations | 20,842 | 1.5% | 4,222 | 0.3% | 16,620 | 393.7% |
| Other expense | | | | | | |
| Floor plan interest expense | (18,306) | (1.3%) | (27,882) | (2.0%) | 9,576 | 34.3% |
| Other interest expense, net | (30,531) | (2.2%) | (36,094) | (2.6%) | 5,563 | 15.4% |
| Other expense, net | (158) | (0.0%) | (94) | (0.0%) | (64) | (68.1%) |
| Total other expense | (48,995) | (3.5%) | (64,070) | (4.7%) | 15,075 | 23.5% |
| Loss before income taxes | (28,153) | (2.0%) | (59,848) | (4.4%) | 31,695 | 53.0% |
| Income tax benefit | 3,471 | 0.2% | 9,042 | 0.7% | (5,571) | (61.6%) |
| Net loss | (24,682) | (1.7%) | (50,806) | (3.7%) | 26,124 | 51.4% |
| Less: net loss attributable to non-controlling interests | 12,402 | 0.9% | 28,499 | 2.1% | (16,097) | (56.5%) |
| Net loss attributable to Camping World Holdings, Inc. | $ (12,280) | (0.9%) | $ (22,307) | (1.6%) | $ 10,027 | 45.0% |

Table of Contents

**Supplemental Data**

| | Three Months Ended March 31, 2025 | 2024 | Increase (decrease) | Percent Change |
|---|---|---|---|---|
| Unit sales | | | | |
| New vehicles | 16,726 | 16,882 | (156) | (0.9%) |
| Used vehicles | 13,939 | 10,694 | 3,245 | 30.3% |
| Total | 30,665 | 27,576 | 3,089 | 11.2% |
| Average selling price | | | | |
| New vehicles | $ 37,154 | $ 38,863 | $ (1,709) | (4.4%) |
| Used vehicles | 30,300 | 31,577 | (1,277) | (4.0%) |
| Same store unit sales[1] | | | | |
| New vehicles | 15,791 | 16,116 | (325) | (2.0%) |
| Used vehicles | 13,157 | 10,239 | 2,918 | 28.5% |
| Total | 28,948 | 26,355 | 2,593 | 9.8% |
| Same store revenue[1] ($ in 000s) | | | | |
| New vehicles | $ 587,456 | $ 628,813 | $ (41,357) | (6.6%) |
| Used vehicles | 398,862 | 321,354 | 77,508 | 24.1% |
| Products, service and other | 139,506 | 149,776 | (10,270) | (6.9%) |
| Finance and insurance, net | 141,129 | 130,144 | 10,985 | 8.4% |
| Total | $ 1,266,953 | $ 1,230,087 | $ 36,866 | 3.0% |
| Average gross profit per unit | | | | |
| New vehicles | $ 5,086 | $ 5,393 | $ (307) | (5.7%) |
| Used vehicles | 5,624 | 5,531 | 93 | 1.7% |
| Finance and insurance, net per vehicle unit | 4,848 | 4,912 | (64) | (1.3%) |
| Total vehicle front-end yield[2] | 10,179 | 10,359 | (180) | (1.7%) |
| Gross margin | | | | |
| Good Sam Services and Plans | 61.6% | 66.8% | (511) bps | |
| New vehicles | 13.7% | 13.9% | (19) bps | |
| Used vehicles | 18.6% | 17.5% | 104 bps | |
| Products, service and other | 48.6% | 42.8% | 580 bps | |
| Finance and insurance, net | 100.0% | 100.0% | unch | |
| Good Sam Club | 88.7% | 89.4% | (69) bps | |
| Subtotal RV and Outdoor Retail | 29.3% | 28.2% | 113 bps | |
| Total gross margin | 30.4% | 29.5% | 89 bps | |
| Retail locations | | | | |
| RV dealerships | 208 | 211 | (3) | (1.4%) |
| RV service & retail centers | 1 | 4 | (3) | (75.0%) |
| Total | 209 | 215 | (6) | (2.8%) |
| RV and Outdoor Retail inventories ($ in 000s) | | | | |
| New vehicles | $ 1,509,594 | $ 1,469,193 | $ 40,401 | 2.7% |
| Used vehicles | 406,728 | 389,810 | 16,918 | 4.3% |
| Products, parts, accessories and misc. | 202,628 | 218,197 | (15,569) | (7.1%) |
| Total RV and Outdoor Retail inventories | $ 2,118,950 | $ 2,077,200 | $ 41,750 | 2.0% |
| Vehicle inventory per location ($ in 000s) | | | | |
| New vehicle inventory per dealer location | $ 7,258 | $ 6,963 | $ 295 | 4.2% |
| Used vehicle inventory per dealer location | 1,955 | 1,847 | 108 | 5.8% |
| Vehicle inventory turnover[3] | | | | |
| New vehicle inventory turnover | 1.8 | 1.7 | 0.1 | 4.7% |
| Used vehicle inventory turnover | 3.5 | 3.0 | 0.5 | 17.4% |
| Other data | | | | |
| Active Customers[4] | 4,140,985 | 4,827,623 | (686,638) | (14.2%) |
| Good Sam Club members [5] | 1,702,017 | 1,961,112 | (259,095) | (13.2%) |
| Service bays [6] | 2,911 | 2,857 | 54 | 1.9% |
| Finance and insurance gross profit as a % of total vehicle revenue | 14.2% | 13.6% | 61 bps | n/a |
| Same store locations | 186 | n/a | n/a | n/a |

Table of Contents

unch – unchanged

bps – basis points

n/a – not applicable

(1) Our same store revenue and units calculations for a given period include only those stores that were open both at the end of the corresponding period and at the beginning of the preceding fiscal year.

(2) Front end yield is calculated as gross profit from new vehicles, used vehicles and finance and insurance (net), divided by combined new and used vehicle unit sales.

(3) Inventory turnover is calculated as vehicle costs applicable to revenue over the last twelve months divided by the average quarterly ending vehicle inventory over the last twelve months.

(4) An Active Customer is a customer who has transacted with us in any of the eight most recently completed fiscal quarters prior to the date of measurement.

(5) Excludes Good Sam Club members under the free basic plan, which was introduced in November 2023 and provides for limited participation in the loyalty point program without access to the remaining member benefits.

(6) A service bay is a fully-constructed bay dedicated to service, installation, and/or collision offerings.

*Revenue and Gross Profit*

*Good Sam Services and Plans*

Good Sam Services and Plans revenue increased primarily from increased Good Sam branded extended vehicle warranty program sales through retail finance and insurance offerings, partially offset by reduced contracts in force for our roadside assistance programs.

Good Sam Services and Plans gross profit and margin decreased primarily due to incremental roadside assistance claims costs in 2025, partially offset by increased Good Sam branded extended vehicle warranty program sales through retail finance and insurance offerings.

*RV and Outdoor Retail*

New vehicles

New vehicles revenue decreased primarily due to a 4.4% decrease in the average selling price per new vehicle sold, and to a lesser extent, the 0.9% reduction in volume of vehicles sold. On a same store basis, new vehicles revenue decreased 6.6% to $587.5 million from a decrease in new vehicles sold of 2.0%, in addition to a 4.7% decrease in the average selling price per new vehicle sold.

New vehicles gross profit decreased primarily due to a 5.7% lower gross profit per new vehicle sold resulting from a lower average sales price per vehicle sold. New vehicles gross margin decreased 19 basis points to 13.7%, primarily driven by the 4.4% decrease in the average selling price per new vehicle sold, partially offset by a 4.2% reduction in the average cost per new vehicle sold.

Used vehicles

Used vehicles revenue increased primarily due to a 30.3% increase in used vehicles unit sales, partially offset by a 4.0% decrease in the average selling price per used vehicle sold. On a same store basis, used vehicles revenue increased 24.1% to $398.9 million from an increase in the number of used vehicles sold of 28.5% partially offset by a 3.4% decrease in average sales price per used vehicle sold.

Used vehicles gross profit increased primarily due to the 30.3% increase in used vehicles sold and increased gross profit per used vehicle sold. Used vehicle gross margin increased 104 basis points primarily

due to a 5.3% decrease in the average cost per unit sold, partially offset by the average price per used vehicle sold decreasing 4.0%.

Products, service and other

Products, service and other revenue decreased primarily due to a reduction in sales activity resulting from the divestiture of our RV furniture business in May 2024, which contributed $6.6 million of revenue, outside of the RV furniture sold through our store locations, for the three months ended March 31, 2024, and a reallocation of service labor in 2025 toward used inventory reconditioning. On a same store basis, products, service and other revenue decreased 6.9% to $139.5 million.

The increase in products, service and other gross profit and the 580 basis point increase in products, service and other gross margin to 48.6% was driven by the divestiture of the RV furniture business, which had negative gross margins for the three months ended March 31, 2024, higher billing rates for service labor, and improved gross margins on our aftermarket part assortment.

Finance and insurance, net

Finance and insurance revenue and gross profit is recorded net, since the Company is acting as an agent in the transaction, and commission is recognized when a finance and insurance product contract payment has been received or financing has been arranged. Finance and insurance, net revenue increased $13.2 million, which was primarily a result of an increased number of contracts sold resulting from increased vehicles sold and an increase in revenue per contract. Finance and insurance, net revenue as a percentage of new and used vehicle revenue was 14.2%, an increase from 13.6%. On a same store basis, finance and insurance, net revenue increased 8.4%.

Good Sam Club

Good Sam Club revenue, gross profit, and gross margin decreased primarily from the 13.2% decrease in Good Sam Club members, excluding free basic plan members. The decline in Good Sam Club members was a result of the availability of the free basic plan that was introduced in late 2023, which provides for limited participation in the loyalty point program without access to the remaining member benefits, and price increases introduced by early 2024 that impacted renewal rates.

*Operating Expenses and Other*

Selling, general and administrative expenses

Selling, general and administrative expenses increased primarily due to a $9.6 million increase in employee cash compensation costs, $7.3 million of additional advertising expenses, and a $2.0 million increase in employee SBC expense, partially offset by $4.2 million of reduced legal fees.

Long-lived asset impairment

As discussed in Note 4 – Long-Lived Asset Impairment to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q, we recognized $0.6 million of long-lived asset impairments, a decrease of $5.2 million. These long-lived asset impairments related to decreases in market rental rates or market value of real property for closed locations, or based on the Company's review of location performance in the normal course of business.

Floor plan interest expense

The decrease in floor plan interest expense was due both to a 134 basis point decrease in the average floor plan borrowing rate and a lower average floor plan notes payable balance. The average interest rate for

Table of Contents

the Floor Plan Facility for the three months ended March 31, 2025 and 2024 was 6.35% and 7.68%, respectively.

Other interest expense, net

Other interest expense, net decreased primarily due to the reduced interest rate on our Term Loan Facility, reduced borrowings on the Company's Real Estate Facilities, and no outstanding balance on the revolving line of credit under the Floor Plan Facility (see Note 7 – Long-Term Debt and Note 3 – Inventories and Floor Plan Payables to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q). The average interest rate for the Term Loan Facility for the three months ended March 31, 2025 and 2024 was 6.96% and 7.97%, respectively. The average interest rate on the M&T Real Estate Facility for three months ended March 31, 2025 and 2024 was 6.64% and 7.73%, respectively.

Income tax benefit

The decrease of income tax benefit was primarily due to lower losses generated from CWGS, LLC for which the Company is subject to U.S. federal and state taxes on its allocable share and changes in reserves for uncertain tax positions.

*Segment Results*

The following table sets forth a reconciliation of total segment income to consolidated income before income taxes for each of our segments for the periods presented:

| | Three Months Ended March 31, | | | | Favorable / (Unfavorable) | |
|---|---|---|---|---|---|---|
| | 2025 | | 2024 | | | |
| ($ in thousands) | Amount | Percent of Revenue | Amount | Percent of Revenue | $ | % |
| **Good Sam Services and Plans:** | | | | | | |
| Revenue: | | | | | | |
| External revenue | $ 46,208 | 98.3% | $ 45,681 | 98.0% | $ 527 | 1.2% |
| Intersegment revenue[1] | 808 | 1.7% | 930 | 2.0% | (122) | (13.1%) |
| Total revenue before intersegment eliminations | 47,016 | 100.0% | 46,611 | 100.0% | 405 | 0.9% |
| Segment expenses: | | | | | | |
| Adjusted costs applicable to revenue[2] | 17,677 | 37.6% | 15,138 | 32.5% | (2,539) | (16.8%) |
| Intersegment costs applicable to revenue[3] | 587 | 1.2% | 930 | 2.0% | 343 | 36.9% |
| Adjusted selling, general and administrative[4] | 7,642 | 16.3% | 7,288 | 15.6% | (354) | (4.9%) |
| Segment Adjusted EBITDA | $ 21,110 | 44.9% | $ 23,255 | 49.9% | $ (2,145) | (9.2%) |
| **RV and Outdoor Retail:** | | | | | | |
| Revenue: | | | | | | |
| External revenue | $ 1,367,316 | 99.8% | $ 1,318,336 | 99.8% | $ 48,980 | 3.7% |
| Intersegment revenue[1] | 2,404 | 0.2% | 2,721 | 0.2% | (317) | (11.7%) |
| Total revenue before intersegment eliminations | 1,369,720 | 100.0% | 1,321,057 | 100.0% | 48,663 | 3.7% |
| Segment expenses: | | | | | | |
| Adjusted costs applicable to revenue[2] | 966,094 | 70.5% | 946,390 | 71.6% | (19,704) | (2.1%) |
| Intersegment costs applicable to revenue[3] | 2,625 | 0.2% | 2,206 | 0.2% | (419) | (19.0%) |
| Adjusted selling, general and administrative[4] | 369,732 | 27.0% | 356,186 | 27.0% | (13,546) | (3.8%) |
| Floor plan interest expense | 18,306 | 1.3% | 27,882 | 2.1% | 9,576 | 34.3% |
| Other segment items[5] | (40) | (0.0%) | 34 | 0.0% | 74 | 217.6% |
| Segment Adjusted EBITDA | $ 13,003 | 0.9% | $ (11,641) | (0.9%) | $ 24,644 | 211.7% |

(1) Intersegment revenue consists of segment revenue that are eliminated in our consolidated statements of operations.

(2) Adjusted costs applicable to revenue excludes stock-based compensation expense and intersegment costs applicable to revenue.

(3) Intersegment costs applicable to revenue consist of segment costs applicable to revenue that are eliminated in our consolidated statements of operations.

(4) Adjusted selling, general, and administrative expenses excludes stock-based compensation expense and intersegment operating expenses.

Table of Contents

(5) Other segment items include (i) intersegment operating expenses, which are eliminated in our consolidated statements of operations, and (ii) other expense, net excluding loss and/or impairment on investments in equity securities.

Good Sam Services and Plans Segment

See the "Revenue and Gross Profit" section above for a discussion of impacts to revenue for Good Sam Services and Plans. Adjusted costs applicable to segment revenues reflected increased roadside assistance claims costs and costs associated with developing new services and plans. Adjusted selling, general and administrative expense increased primarily from increased employee cash compensation expense. The Good Sam Services and Plans Segment Adjusted EBITDA decrease was driven primarily by the increase to adjusted costs applicable to revenue and adjusted selling, general and administrative expense, partially offset by the increase to external revenue discussed above. Intersegment revenue and intersegment costs applicable to revenue did not have a significant impact on the decrease in Segment Adjusted EBITDA.

RV and Outdoor Retail Segment

See the "Revenue and Gross Profit" section above for a discussion of impacts to revenue for RV and Outdoor Retail and "Floor plan interest expense" section above for a discussion of the decrease in floor plan interest expense. Adjusted costs applicable to segment revenue increased from (i) higher total vehicle costs driven by 11.2% higher total unit sales, partially offset by the reductions in cost per new and used vehicles discussed above, and (ii) lower products, service and other costs applicable to revenue primarily from the same drivers of the decrease in revenue discussed above. Adjusted selling, general and administrative expense increased primarily due to approximately $7.7 million of increased advertising expenses, $5.2 million of increased commissions costs, and $3.9 million of increased employee cash compensation expense, partially offset by a $4.3 million reduction in legal fees. The RV and Outdoor Retail Segment Adjusted EBITDA increased from the increases in revenue and reduction in floor plan interest expense, partially offset by the increase in segment expenses discussed above. Intersegment revenue, intersegment costs applicable to revenue, and intersegment operating expenses did not have a significant impact on the increase in Segment Adjusted EBITDA.

**Non-GAAP Financial Measures**

To supplement our condensed consolidated financial statements, which are prepared and presented in accordance with accounting principles generally accepted in the United States ("GAAP"), we use the following non-GAAP financial measures: EBITDA; Adjusted EBITDA; Adjusted EBITDA Margin; Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Basic; Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Diluted; Adjusted Loss Per Share – Basic; Adjusted Loss Per Share – Diluted; and Selling, General, and Administrative Expense ("SG&A") Excluding SBC (collectively the "Non-GAAP Financial Measures"). We believe that these Non-GAAP Financial Measures, when used in conjunction with GAAP financial measures, provide useful information about operating results, enhance the overall understanding of past financial performance and future prospects, and allow for greater transparency with respect to the key metrics we use in our financial and operational decision making. Certain of these Non-GAAP Financial Measures are also frequently used by analysts, investors and other interested parties to evaluate companies in the Company's industry and are used by management to evaluate our operating performance, to evaluate the effectiveness of strategic initiatives, and for planning purposes. By providing these Non-GAAP Financial Measures, together with reconciliations, we believe we are enhancing investors' understanding of our business and our results of operations, as well as assisting investors in evaluating how well we are executing our strategic initiatives. In addition, our Senior Secured Credit Facilities use Adjusted EBITDA, as calculated for our subsidiary CWGS Group, LLC, to measure our compliance with covenants such as the consolidated leverage ratio. The Non-GAAP Financial Measures have limitations as analytical tools, and the presentation of this financial information is not intended to be considered in isolation or as a substitute for, or superior to, the financial information prepared and presented in accordance with GAAP. They should not be construed as an inference that the Company's future results will be unaffected by any items adjusted for in these Non-GAAP Financial Measures. In evaluating these Non-GAAP Financial Measures, it is reasonable to expect that certain of these items will occur in future periods. However, we believe these adjustments are appropriate because the amounts recognized can vary significantly from period to period, do not directly relate to the ongoing operations of our business and complicate comparisons of our internal operating results and operating results of other companies over time. Each of the normal recurring adjustments and other adjustments described in this section

Table of Contents

and in the reconciliation tables below help management with a measure of our core operating performance over time by removing items that are not related to day-to-day operations.

The Non-GAAP Financial Measures that we use are not necessarily comparable to similarly titled measures used by other companies due to different methods of calculation.

*EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin*

We define “EBITDA” as net loss before other interest expense, net (excluding floor plan interest expense), provision for income tax benefit and depreciation and amortization. We define “Adjusted EBITDA” as EBITDA further adjusted for the impact of certain noncash and other items that we do not consider in our evaluation of ongoing operating performance. These items include, among other things, long-lived asset impairment, gains and losses on sale or disposal of assets, net, SBC, losses and gains and impairment on investments in equity securities, and other unusual or one-time items. We define “Adjusted EBITDA Margin” as Adjusted EBITDA as a percentage of total revenue. We caution investors that amounts presented in accordance with our definitions of EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin may not be comparable to similar measures disclosed by our competitors, because not all companies and analysts calculate EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin in the same manner. We present EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin because we consider them to be important supplemental measures of our performance and believe they are frequently used by securities analysts, investors and other interested parties in the evaluation of companies in our industry. Management believes that investors’ understanding of our performance is enhanced by including these Non-GAAP Financial Measures as a reasonable basis for comparing our ongoing results of operations.

The following table reconciles Segment Adjusted EBITDA to consolidated Adjusted EBITDA:

| | Three Months Ended March 31, | |
|---|---|---|
| ($ in thousands) | 2025 | 2024 |
| Good Sam Services and Plans Segment Adjusted EBITDA | $ 21,110 | $ 23,255 |
| RV and Outdoor Retail Segment Adjusted EBITDA | 13,003 | (11,641) |
| Total Segment Adjusted EBITDA | 34,113 | 11,614 |
| Corporate and Other Adjusted EBITDA | (2,967) | (3,375) |
| Total Adjusted EBITDA | $ 31,146 | $ 8,239 |

The following table reconciles EBITDA, Adjusted EBITDA, and Adjusted EBITDA Margin to the most directly comparable GAAP financial performance measures:

| | Three Months Ended March 31, | |
|---|---|---|
| ($ in thousands) | 2025 | 2024 |
| **EBITDA and Adjusted EBITDA:** | | |
| Net loss | $ (24,682) | $ (50,806) |
| Other interest expense, net | 30,531 | 36,094 |
| Depreciation and amortization | 22,544 | 19,290 |
| Income tax benefit | (3,471) | (9,042) |
| Subtotal EBITDA | 24,922 | (4,464) |
| Long-lived asset impairment (a) | 620 | 5,827 |
| (Gain) loss on sale or disposal of assets, net (b) | (1,823) | 1,585 |
| SBC (c) | 7,270 | 5,197 |
| Loss and/or impairment on investments in equity securities (d) | 157 | 94 |
| Adjusted EBITDA | $ 31,146 | $ 8,239 |

Table of Contents

| (as percentage of total revenue) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **Adjusted EBITDA margin:** | | |
| Net loss margin | (1.7%) | (3.7%) |
| Other interest expense, net | 2.2% | 2.6% |
| Depreciation and amortization | 1.6% | 1.4% |
| Income tax benefit | (0.2%) | (0.7%) |
| Subtotal EBITDA margin | 1.8% | (0.3%) |
| Long-lived asset impairment (a) | 0.0% | 0.4% |
| (Gain) loss on sale or disposal of assets, net (b) | (0.1%) | 0.1% |
| SBC (c) | 0.5% | 0.4% |
| Loss and/or impairment on investments in equity securities (d) | 0.0% | 0.0% |
| Adjusted EBITDA margin | 2.2% | 0.6% |

(a) Represents long-lived asset impairment charges related to the RV and Outdoor Retail segment. See Note 4 – Long-Lived Asset Impairment to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q for additional information.

(b) Represents an adjustment to eliminate the gains and losses on disposals and sales of various assets.

(c) Represents noncash SBC expense relating to employees, directors, and consultants of the Company.

(d) Represents losses and gains and impairment on investments in equity securities and interest income relating to any notes receivables with those investments.

*Adjusted Net Loss Attributable to Camping World Holdings, Inc. and Adjusted Loss Per Share*

We define "Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Basic" as net loss attributable to Camping World Holdings, Inc. adjusted for the impact of certain noncash and other items that we do not consider in our evaluation of ongoing operating performance. These items include, among other things, long-lived asset impairment, gains and losses on sale or disposal of assets, net, SBC, loss and impairment on investments in equity securities, other unusual or one-time items, the income tax benefit effect of these adjustments, and the effect of net loss attributable to non-controlling interests from these adjustments.

We define "Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Diluted" as Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Basic adjusted for the reallocation of net loss attributable to non-controlling interests from stock options and restricted stock units, if dilutive, or the assumed redemption, if dilutive, of all outstanding common units in CWGS, LLC for shares of newly-issued Class A common stock of Camping World Holdings, Inc.

We define "Adjusted Loss Per Share – Basic" as Adjusted Net Loss Attributable to Camping World Holdings, Inc. - Basic divided by the weighted-average shares of Class A common stock outstanding. We define "Adjusted Loss Per Share – Diluted" as Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Diluted divided by the weighted-average shares of Class A common stock outstanding, assuming (i) the redemption of all outstanding common units in CWGS, LLC for newly-issued shares of Class A common stock of Camping World Holdings, Inc., if dilutive, and (ii) the dilutive effect of stock options and restricted stock units, if any. We present Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Basic, Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Diluted, Adjusted Loss Per Share – Basic, and Adjusted Loss Per Share – Diluted because we consider them to be important supplemental measures of our performance and we believe that investors' understanding of our performance is enhanced by including these Non-GAAP financial measures as a reasonable basis for comparing our ongoing results of operations.

Table of Contents

The following table reconciles Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Basic, Adjusted Net Loss Attributable to Camping World Holdings, Inc. – Diluted, Adjusted Loss Per Share – Basic, and Adjusted Loss Per Share – Diluted to the most directly comparable GAAP financial performance measure:

| (In thousands except per share amounts) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **Numerator:** | | |
| Net loss attributable to Camping World Holdings, Inc. | $ (12,280) | $ (22,307) |
| Adjustments related to basic calculation: | | |
| Long-lived asset impairment (a): | | |
| Gross adjustment | 620 | 5,827 |
| Income tax expense for above adjustment (b) | (95) | (771) |
| (Gain) loss on sale or disposal of assets (c): | | |
| Gross adjustment | (1,823) | 1,585 |
| Income tax benefit (expense) for above adjustment (b) | 278 | (210) |
| SBC (d): | | |
| Gross adjustment | 7,270 | 5,197 |
| Income tax expense for above adjustment (b) | (1,114) | (695) |
| Loss and/or impairment on investments in equity securities (e): | | |
| Gross adjustment | 157 | 94 |
| Income tax expense for above adjustment (b) | (24) | (12) |
| Adjustment to net loss attributable to non-controlling interests resulting from the above adjustments (f) | (2,420) | (5,971) |
| Adjusted net loss attributable to Camping World Holdings, Inc. – basic | (9,431) | (17,263) |
| Adjustments related to diluted calculation: | | |
| Reallocation of net loss attributable to non-controlling interests from the dilutive redemption of common units in CWGS, LLC (g) | (9,982) | (22,528) |
| Income tax on reallocation of net loss attributable to non-controlling interests from the dilutive redemption of common units in CWGS, LLC (h) | 2,609 | 5,736 |
| Adjusted net loss attributable to Camping World Holdings, Inc. – diluted | $ (16,804) | $ (34,055) |
| **Denominator:** | | |
| Weighted-average Class A common shares outstanding – basic | 62,531 | 45,047 |
| Adjustments related to diluted calculation: | | |
| Dilutive redemption of common units in CWGS, LLC for shares of Class A common stock (i) | 39,895 | 40,045 |
| Adjusted weighted average Class A common shares outstanding – diluted | 102,426 | 85,092 |
| | | |
| Adjusted loss per share - basic | $ (0.15) | $ (0.38) |
| Adjusted loss per share - diluted | $ (0.16) | $ (0.40) |
| | | |
| **Anti-dilutive amounts (j):** | | |
| **Denominator:** | | |
| Anti-dilutive options to purchase Class A common stock (i) | — | 29 |
| Anti-dilutive restricted stock units (i) | 254 | 264 |
| | | |
| **Reconciliation of per share amounts:** | | |
| Loss per share of Class A common stock — basic | $ (0.20) | $ (0.50) |
| Non-GAAP Adjustments (k) | 0.05 | 0.12 |
| Adjusted loss per share - basic | $ (0.15) | $ (0.38) |
| | | |
| Loss per share of Class A common stock — diluted | $ (0.21) | $ (0.51) |
| Non-GAAP Adjustments (k) | 0.05 | 0.11 |
| Adjusted loss per share - diluted | $ (0.16) | $ (0.40) |

(a) Represents long-lived asset impairment charges related to the RV and Outdoor Retail segment. See Note 4 – Long-Lived Asset Impairment to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q for additional information.

(b) Represents the current and deferred income tax expense or benefit effect of the above adjustments. This assumption uses a blended statutory tax rate of 25.0% for the adjustments for the 2025 and 2024 periods, which represent the estimated tax rates that would apply had the above adjustments been included in the determination of our non-GAAP metric.

(c) Represents an adjustment to eliminate the gains and losses on disposals and sales of various assets.

(d) Represents noncash SBC expense relating to employees, directors, and consultants of the Company.

(e) Represents losses and/or impairment on investments in equity securities and interest income relating to any notes receivables with those investments.

(f) Represents the adjustment to net loss attributable to non-controlling interests resulting from the above adjustments that impact the net loss of CWGS, LLC. This adjustment uses the non-controlling interest's weighted average ownership of CWGS, LLC of 39.0% and 47.1% for the three months ended March 31, 2025 and 2024, respectively.

(g) Represents the reallocation of net loss attributable to non-controlling interests from the impact of the assumed change in ownership of CWGS, LLC from stock options, restricted stock units, and/or common units of CWGS, LLC.

Table of Contents

(h) Represents the income tax expense effect of the above adjustment for reallocation of net loss attributable to non-controlling interests. This assumption uses a blended statutory tax rate of 25.0% for the adjustments for the 2025 and 2024 periods.

(i) Represents the impact to the denominator for stock options, restricted stock units, and/or common units of CWGS, LLC.

(j) The below amounts have not been considered in our adjusted loss per share – diluted amounts as the effect of these items are anti-dilutive. Additionally, 750,000 performance stock units granted in January 2025 were excluded from the calculation of our adjusted loss per share– diluted, since they represent contingently issuable shares for which all of the necessary conditions had not been satisfied (see Note 16 — Stock-Based Compensation Plans to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q).

(k) Represents the per share impact of the Non-GAAP adjustments to net loss detailed above (see (a) through (f) above).

*SG&A Excluding SBC*

We define "SG&A Excluding SBC" as SG&A before SBC relating to SG&A. We caution investors that amounts presented in accordance with our definition of SG&A Excluding SBC may not be comparable to similar measures disclosed by our competitors, because not all companies and analysts calculate SG&A Excluding SBC in the same manner. We present SG&A Excluding SBC because we believe that investors' understanding of our performance and drivers of our other Non-GAAP Financial Measures, such as Adjusted EBITDA, is enhanced by including this Non-GAAP Financial Measure. We believe it provides a reasonable basis for comparing our ongoing results of operations.

The following table reconciles SG&A Excluding SBC to the most directly comparable GAAP financial performance measure:

| ($ in thousands) | Three Months Ended March 31, 2025 | 2024 |
|---|---|---|
| **SG&A Excluding SBC:** | | |
| SG&A | $ 387,445 | $ 371,473 |
| SBC - SG&A | (7,145) | (5,105) |
| SG&A Excluding SBC: | $ 380,300 | $ 366,368 |
| As a percentage of gross profit | 88.5% | 91.0% |

## Liquidity and Capital Resources

***General***

Our primary requirements for liquidity and capital have been working capital, inventory management, acquiring and building new store locations, the improvement and expansion of existing store locations, debt service, distributions/dividends to holders of equity interests in CWGS, LLC and our Class A common stock, and general corporate needs. These cash requirements have historically been met through cash provided by operating activities, cash and cash equivalents, proceeds from registered offerings of our Class A common stock, borrowings under our Senior Secured Credit Facilities (as defined in Part I, Item 1 of this Form 10-Q), borrowings under our Floor Plan Facility (as defined in Part I, Item 1 of this Form 10-Q), and borrowings under our Real Estate Facilities (as defined in Part I, Item 1 of this Form 10-Q).

Our additional liquidity needs are expected to include public company costs, payment of cash dividends, any exercise of the redemption right by the Continuing Equity Owners from time to time (should we elect to redeem common units for a cash payment), our stock repurchase program as described below, payments under the Tax Receivable Agreement, and state and federal taxes to the extent not reduced as a result of the tax deductions generated by (i) payments under the Tax Receivable Agreement and (ii) redemptions of common units by the Continuing Equity Owners. The Continuing Equity Owners may exercise such redemption right for as long as their common units remain outstanding. Although the actual timing and amount of any payments that may be made under the Tax Receivable Agreement will vary, we expect that the payments that we will be required to make to the Continuing Equity Owners, Former Profits Unit Holders and Crestview Partners II GP, L.P. will be significant. Any payments made by us to Continuing Equity Owners, Former Profits Unit Holders and Crestview Partners II GP, L.P. under the Tax Receivable Agreement will generally reduce the amount of overall cash flow that might have otherwise been available to us or to CWGS, LLC and, to the extent that we are unable to make payments under the Tax Receivable Agreement for any reason, the unpaid amounts generally will be deferred and will accrue interest until paid by us; provided,

however, that nonpayment for a specified period may constitute a material breach of a material obligation under the Tax Receivable Agreement and therefore may accelerate payments due under the Tax Receivable Agreement. For a discussion of the Tax Receivable Agreement, see Note 13 — Income Taxes to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q.

*Stock Repurchase Program*

During the three months ended March 31, 2025, we did not repurchase Class A common stock under our stock repurchase program, which expires on December 31, 2025. As of March 31, 2025, $120.2 million was available under the stock repurchase program to repurchase additional shares of our Class A common stock.

*Dividends*

Since December 2016, we have paid our quarterly cash dividend to holders of Class A common stock. Since September 2023, the quarterly cash dividend has been $0.125 per share of Class A common stock, and we paid $7.8 million, in the aggregate, for dividends for the first quarter of 2025. This dividend was funded entirely from the Excess Tax Distribution (as defined under "Dividend Policy" included in Part II, Item 5 of our Annual Report), with no portion funded by other common unit cash distributions from CWGS, LLC. Since CWGS, LLC has not funded these recent quarterly cash dividends with dividend distributions outside of required tax distributions, we believe that this will help us utilize our capital to continue to execute our expansion plans through accretive RV dealership acquisitions.

Our ability to pay cash dividends on our Class A common stock depends on, among other things, our results of operations, financial condition, level of indebtedness, capital requirements, contractual restrictions, restrictions in our debt agreements and in any preferred stock, restrictions under applicable law, the extent to which such distributions would render CWGS, LLC insolvent, our business prospects and other factors that our Board of Directors may deem relevant. Our dividend policy has certain risks and limitations particularly with respect to liquidity, and we may not pay future dividends according to our policy, or at all. See "Dividend Policy" included in Part II, Item 5 of our Annual Report and "Risk Factors — Risks Relating to Ownership of Our Class A Common Stock — Our ability to pay regular and special dividends on our Class A common stock is subject to the discretion of our Board of Directors and may be limited by our structure and statutory restrictions" included in Part I, Item 1A of our Annual Report.

*Acquisitions and Capital Expenditures*

During the three months ended March 31, 2025, the RV and Outdoor Retail segment purchased real property for an aggregate purchase price of $48.6 million.

Over the next twelve months, our expansion of existing and new dealerships through construction and acquisition is expected to cost between $45.0 million and $55.0 million from a combination of business acquisitions and capital expenditures relating to land, buildings, and improvements. Included in this range is $3.0 million related to business acquisitions where, at a minimum, we have already signed a letter of intent with the seller. These cost estimates exclude amounts for acquired inventories, which are primarily financed through our Floor Plan Facility. Additionally, the cost estimates do not consider potential funding received through sale leaseback transactions or other means for real estate and construction activities. We will update our cost estimates in future periodic reports, if necessary, as there are further developments. Factors that could impact the quantity of future locations or the cost to acquire or open those locations include, but are not limited to, our ability to locate potential acquisition targets or greenfield locations in a geographic area and at a cost that meets our success criteria; continued strong cash flow generation to fund these acquisitions and new locations; and availability of financing.

*Other Cash Requirements or Commitments*

Substantially all of our new RV inventory and, at times, certain of our used RV inventory is financed under our Floor Plan Facility (defined in Note 3 – Inventories and Floor Plan Payables to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q). See "Summary of Credit

Facilities, Other Long-Term Debt, and Finance Lease Arrangements" for a summary of the cash requirements related to our indebtedness.

Based on loan activity by our consumer financing partner in March 2025 for our arrangement to invest in a participation interest in the cash flows of certain financing transactions under the white label financing program with such consumer financing partner ("Derived Participation Investment"), we were committed to invest an additional $1.6 million, which was paid in April 2025 (see Note 9 – Fair Value Measurements to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q). We expect to invest an additional $2.0 million to $8.0 million in the Derived Participation Investment during the remainder of 2025 for loan activity after March 2025.

Cash requirements relating to the Tax Receivable Agreement liability, supplier agreement, operating and finance lease obligations, and service and marketing sponsorship agreements have not materially changed since our Annual Report.

*Sources of Liquidity and Capital*

We believe that our sources of liquidity and capital including cash provided by operating activities, equity offerings and borrowings under our various credit facilities, other long-term debt, and finance lease arrangements (see "Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements" below), including additional borrowing capacity where applicable, will be sufficient to finance our continued operations, growth strategy, including the opening of any additional store locations, quarterly cash dividends (as described above), required payments for our obligations under the Tax Receivable Agreement, and additional expenses we expect to incur for at least the next twelve months.

However, we cannot assure you that our cash provided by operating activities, cash and cash equivalents, registered offerings of equity under our Registration Statement on Form S-3, or cash available under our Revolving Credit Facility, our Floor Plan Facility, and our Real Estate Facilities, will be sufficient to meet our future needs. If we are unable to generate sufficient cash flows from operations in the future and if availability under our Revolving Credit Facility, our Floor Plan Facility, and our Real Estate Facilities is not sufficient, we may have to obtain additional financing. If we obtain additional capital by issuing equity, the interests of our existing stockholders will be diluted. If we incur additional indebtedness, that indebtedness may impose significant financial and other covenants that may significantly restrict our operations. We cannot assure you that we could obtain refinancing or additional financing on favorable terms or at all, including the expected additional borrowings noted above and particularly in light of the current macroeconomic uncertainty. See "Risk Factors — Risks Related to our Business — Our ability to operate and expand our business and to respond to changing business and economic conditions will depend on the availability of adequate capital" included in Part I, Item 1A of our Annual Report.

As of March 31, 2025, December 31, 2024, and March 31, 2024, we had working capital of $509.4 million, $590.3 million, and $381.6 million, respectively, including $20.9 million, $208.4 million, and $29.7 million, respectively, of cash and cash equivalents. Within current liabilities, which are deducted from current assets to calculate our working capital, we had deferred revenues of $89.1 million, $92.1 million, and $95.9 million as of March 31, 2025, December 31, 2024, and March 31, 2024, respectively. Deferred revenues primarily consists of cash collected for club memberships and roadside assistance contracts in advance of services to be provided, which is deferred and recognized as revenue over the life of the membership, deferred revenues for the annual campground guide, and our Good Sam Club loyalty points liability. We use net proceeds from this deferred membership revenue to lower our long-term borrowings and finance our working capital needs. Our Floor Plan Facility includes a flooring line aggregate interest reduction ("FLAIR") offset account that allows us to transfer cash as an offset to the payables under the Floor Plan Facility. The FLAIR offset account at March 31, 2025 was $157.9 million, $140.2 million of which could have been withdrawn while remaining in compliance with the financial covenants of the Floor Plan Facility.

***Seasonality***

We have experienced, and expect to continue to experience, variability in revenue, net income, and cash flows as a result of annual seasonality in our business (see Note 1 — Summary of Significant Accounting

Table of Contents

Policies — Seasonality to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q).

***Cash Flow***

The following table shows summary cash flow information for the three months ended March 31, 2025 and 2024:

| (In thousands) | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Net cash used in operating activities | $ (232,479) | $ (67,982) |
| Net cash used in investing activities | (145,428) | (59,498) |
| Net cash provided by financing activities | 190,401 | 117,551 |
| Net decrease in cash and cash equivalents | $ (187,506) | $ (9,929) |

*Operating activities.* Our cash flows from operating activities are primarily collections from contracts in transit and customers following the sale of new and used vehicles, as well as from the sale of retail products and services and Good Sam services and plans. Contracts in transit represent amounts due from third-party lenders from whom pre-arranged agreements have been determined, and to whom the retail installment sales contracts have been assigned. Our primary uses of cash from operating activities are repayments of vehicle floor plan payables, payments to retail product suppliers, personnel-related expenditures, payments related to leased property, advertising, and various services and program costs.

Net cash used in operating activities was $232.5 million in the three months ended March 31, 2025, an increase of $164.5 million from $68.0 million of net cash used in operating activities in the three months ended March 31, 2024. The increase was primarily due to a $236.8 million decrease in the working capital adjustment for inventory, a $24.1 million decrease in the working capital adjustment for receivables and contracts in transit, a $6.7 million decrease in the working capital adjustment for deferred revenue, a $5.2 million decrease in long-lived asset impairment, and a $3.4 million reduction in loss on sale or disposal of assets, partially offset by a $76.4 million increase in working capital adjustment for accounts payable and other accrued expenses, a $26.1 million decrease in net loss, a $4.0 million increase in working capital adjustment for prepaid expenses and other assets, a $3.3 million increase in depreciation and amortization, and a $2.1 million increase in SBC.

*Investing activities.* Our investment in business activities primarily consists of expanding our operations through organic growth and the acquisition of RV dealership locations. Substantially all of our new RV dealership locations and capital expenditures have been financed using cash provided by operating activities and borrowings under our various credit facilities, other long-term debt, proceeds from registered offerings of our Class A common stock, and finance lease arrangements, as applicable (see Liquidity and Capital Resources — Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements in Part I, Item 2 of this Form 10-Q).

The table below summarizes our capital expenditures for the three months ended March 31, 2025 and 2024:

| (In thousands) | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| IT hardware and software | $ 5,628 | $ 5,146 |
| Greenfield and acquired dealership locations | 4,692 | 3,999 |
| Existing store locations | 13,040 | 12,916 |
| Corporate and other | 151 | 3,866 |
| Total capital expenditures | $ 23,511 | $ 25,927 |

Our capital expenditures consist primarily of investing in acquired and greenfield retail and RV dealership locations, existing retail locations, information technology, hardware, and software. The expected minimum capital expenditures relating to new dealerships and real estate purchases through March 31, 2026 are discussed above. As of March 31, 2025, we had entered into contracts for construction of new dealership buildings for an aggregate future commitment of capital expenditures of $3.0 million. There were no other material commitments for capital expenditures as of March 31, 2025.

Net cash used in investing activities was $145.4 million for the three months ended March 31, 2025. The $145.4 million of cash used in investing activities was primarily comprised of $80.6 million for the acquisition of RV dealerships, net of cash acquired and the $11.0 million of deposits paid in 2024 for these 2025 acquisitions; $48.6 million for the purchase of real property; and $23.5 million of capital expenditures primarily related to retail locations; partially offset by $6.7 million of proceeds from the sale of real property.

Net cash used in investing activities was $59.5 million for the three months ended March 31, 2024. The $59.5 million of cash used in investing activities was primarily comprised of $58.8 million for the acquisition of RV dealerships, net of cash acquired and the $8.9 million of deposits paid in 2023 for these 2024 acquisitions; $25.9 million of capital expenditures primarily related to retail locations; and $1.2 million for the purchase of real property; partially offset by $23.9 million of proceeds from the sale of real property and $2.6 million of proceeds from the sale of intangible assets.

*Financing activities.* Our financing activities primarily consist of proceeds from the issuance of debt, the repayment of principal, cash dividends to holders of Class A common stock, and cash distributions to holders of CWGS, LLC common units**.**

Our net cash provided by financing activities was $190.4 million for the three months ended March 31, 2025. The $190.4 million of cash provided by financing activities was primarily due to $207.8 million of net proceeds on borrowings under the Floor Plan Facility, partially offset by $7.8 million of dividends paid on Class A common stock, $6.3 million of payments on long-term debt, and $1.8 million for finance lease payments.

Our net cash provided by financing activities was $117.6 million for the three months ended March 31, 2024. The $117.6 million of cash provided by financing activities was primarily due to $93.3 million of net proceeds from borrowings under the Floor Plan Facility, $55.6 million of proceeds from long-term debt, and $43.0 million from borrowings on revolving line of credit, partially offset by $32.0 million of payments on the revolving line of credit, $23.4 million payments on long-term debt, $9.9 million of member distributions, $5.6 million of dividends paid on Class A common stock, and $1.8 million for finance lease payments.

***Summary of Credit Facilities, Other Long-Term Debt, and Finance Lease Arrangements***

As of March 31, 2025, we had outstanding debt in the form of our Senior Secured Credit Facilities, our Floor Plan Facility, our Real Estate Facilities, other long-term debt, and finance lease obligations. We may from time to time seek to refinance, retire or exchange our outstanding debt. Such refinancings, repayments or exchanges, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors. The amounts involved may be material.

The following table shows a summary of the outstanding balances, current portion, and remaining available borrowings under our credit facilities, other long-term debt and finance lease arrangements (see definitions and further details in Note 3 – Inventories and Floor Plan Payables, Note 7 – Long-Term Debt, and Note 8 – Lease Obligations to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q) at March 31, 2025:

| (In thousands) | Outstanding | Current Portion | Remaining Available |
|---|---|---|---|
| Floor Plan Facility: | | | |
| Notes payable - floor plan | $ 1,320,687 | $ 1,320,687 | $ 534,366 (1) |
| Revolving line of credit | — | — | 70,000 (2) |
| Senior Secured Credit Facilities: | | | |
| Term Loan Facility | 1,332,960 | 14,015 | — |
| Revolving Credit Facility | — | — | 22,750 (3) |
| Other: | | | |
| Real Estate Facilities | 170,732 (4) | 8,794 | 57,390 (4) |
| Other long-term debt | 7,843 | 338 | — |
| Finance lease obligations | 138,242 | 7,646 | — |
| | $ 2,970,464 | $ 1,351,480 | $ 684,506 |

(1) The unencumbered borrowing capacity for the Floor Plan Facility represents the additional borrowing capacity less any accounts payable for sold inventory and less any purchase commitments. Additional borrowings are subject to the vehicle collateral requirements under the Floor Plan Facility. The Floor Plan Facility also includes an accordion feature allowing us, at our option, to request to increase the aggregate

amount of the floor plan notes payable in $50.0 million increments up to a maximum amount of $300.0 million. The Floor Plan Lenders are not under any obligation to provide commitments in respect of any future increase under the accordion feature. In February 2025, FreedomRoads, LLC entered into an amendment to the Floor Plan Facility, which (a) increased the commitment for floor plan borrowings by $300.0 million to $2.15 billion, (b) increased the commitment for the letter of credit facility by $15.0 million to $45.0 million, and (c) extended the maturity date from September 30, 2026 to the earlier of, if applicable, (i) February 18, 2030 or (ii) March 5, 2028, if the Company's Term Loan Facility (as defined and discussed in Note 7 — Long-Term Debt) has not been repaid, refinanced, or defeased and the maturity has not been extended by at least 180 days after February 18, 2030.

(2) The revolving line of credit borrowings are subject to a borrowing base calculation but were not limited as of March 31, 2025.

(3) The Revolving Credit Facility remaining available balance was reduced by outstanding undrawn letters of credit. The Credit Agreement requires compliance with a Total Net Leverage Ratio covenant when borrowings on the Revolving Credit Facility (excluding certain amounts relating to letters of credit) is over a 35%, or $22.8 million, threshold (Note 7 – Long-Term Debt to our condensed consolidated financial statements included in Part I, Item 1 of this Form 10-Q). The otherwise remaining available borrowings of $60.1 million were reduced by $37.3 million to $22.8 million in light of this financial covenant at March 31, 2025.

(4) Additional borrowings on the Real Estate Facilities are subject to a debt service coverage ratio covenant and to the property collateral requirements under the Real Estate Facilities. In August 2024, we amended the M&T Real Estate Facility to increase the borrowing capacity by $50.0 million, which was not deducted from our option to request an additional $100.0 million of principal capacity. The lenders under the M&T Real Estate Facility are not under any obligation to provide commitments in respect of any such increase.

As of March 31, 2025 and 2024, the applicable interest rate for the floor plan notes payable under the Floor Plan Facility was 6.34% and 7.87%, respectively. As of March 31, 2025 and 2024, the average interest rate for the Term Loan Facility was 6.94% and 7.94%, respectively. The decrease in interest rates and lower average outstanding principal balances for our floor plan, Real Estate Facilities, and revolving line of credit have resulted in a combined year-over-year decrease of our floor plan interest expense and other interest expense, net of $15.1 million for the three months ended March 31, 2025 compared to the three months ended March 31, 2024.

***Sale/Leaseback Arrangements***

We have in the past and may in the future enter into sale-leaseback transactions to finance certain property acquisitions and capital expenditures, pursuant to which we sell property and/or leasehold improvements to third parties and agree to lease those assets back for a certain period of time. Such sales generate proceeds which vary from period to period. In the first quarter of 2025 and 2024, we entered into sale-leaseback transactions for one and two properties, respectively, associated with store locations in the RV and Outdoor Retail segment and received consideration of $3.5 million and $23.5 million of cash, respectively. We recorded no gain for the first quarter of 2025 and recorded a gain of $0.1 million for the first quarter of 2024 that was included in (gain) loss on sale or disposal of assets in the condensed consolidated statements of income. We entered into a 19-year lease agreement as the lessee with the buyer of the property in 2025 and 20-year lease agreements as the lessee with each buyer of the properties in 2024.

***Deferred Revenue***

Deferred revenue consists of our sales for products not yet recognized as revenue at the end of a given period. Our deferred revenue as of March 31, 2025 was $151.8 million.

**Critical Accounting Policies and Estimates**

We prepare our condensed consolidated financial statements in accordance with GAAP, and in doing so, we have to make estimates, assumptions and judgments affecting the reported amounts of assets, liabilities, revenues and expenses, as well as the related disclosure of contingent assets and liabilities. We base our estimates, assumptions and judgments on historical experience and on various other factors we believe to be reasonable under the circumstances. Different assumptions and judgments would change estimates used in the preparation of our condensed consolidated financial statements, which, in turn, could change our results from those reported. We evaluate our critical accounting estimates, assumptions and judgments on an ongoing basis.

There has been no material change in our critical accounting policies and estimates from those previously reported and disclosed in our Annual Report.

Table of Contents

**Recent Accounting Pronouncements**

See Note 1 – Summary of Significant Accounting Policies to our condensed consolidated financial statements in Item 1, Part I of this Form 10-Q.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

For a discussion of the Company's quantitative and qualitative disclosures about market risks, see Item 7A. Quantitative and Qualitative Disclosures About Market Risks, in our Annual Report. As of March 31, 2025, there have been no material changes in this information.

**Item 4. Controls and Procedures**

*Limitations on Effectiveness of Controls and Procedures*

In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply judgment in evaluating the benefits of possible controls and procedures relative to their costs.

*Evaluation of Disclosure Controls and Procedures*

Our management, carried out an evaluation, under the supervision and participation of our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial officer), of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this Form 10-Q. Based on our management's evaluation, our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial officer) concluded that our disclosure controls and procedures were not effective as of March 31, 2025 as a result of the material weakness described in our Annual Report and below.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the preparation of our financial statements for the year ended December 31, 2024, we identified a material weakness in the design and operation of our income tax controls, including over the review of the measurement of the realizable portion of the Company's outside basis difference deferred tax asset in the operating partnership, CWGS, LLC. This material weakness remains unremediated as of March 31, 2025.

*Remediation Efforts to Address Material Weakness*

Our management is committed to maintaining a strong internal control environment. In response to the identified material weakness above, management with the oversight of the Audit Committee of the Board of Directors, is taking comprehensive actions to remediate the above material weakness. Our remediation plans include the following:

- Implementing separate specific controls over the review of the quantification of realizable tax basis in CWGS, LLC;
- Redesigning the reports utilized to calculate the gross outside basis difference to enhance management's review of the calculation; and
- Developing and conducting training for individuals responsible for reviewing calculation and measurement of the realizable tax basis in CWGS, LLC.

Table of Contents

We may also conclude that additional measures may be required to remediate the material weakness in our internal control over financial reporting, which may necessitate additional implementation and evaluation time. We will continue to assess the effectiveness of our internal control over financial reporting and take steps to remediate the material weakness expeditiously. The material weakness will not be considered remediated until the applicable remediated controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.

*Changes in Internal Control over Financial Reporting*

We are taking actions to remediate the material weaknesses relating to our internal control over financial reporting, as described above. Except as discussed above, there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) identified in connection with the evaluation of our internal control performed during the fiscal quarter ended March 31, 2025, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## Part II. Other Information

### Item 1. Legal Proceedings

See Note 10 – Commitments and Contingencies to our condensed consolidated financial statements in Item 1, Part I of this Form 10-Q.

### Item 1A. Risk Factors

There have been no material changes to our risk factors as previously disclosed in Item 1A of Part I of our Annual Report.

### Item 2. Unregistered Sales of Equity Securities and Use of Proceeds

The following table presents information related to our repurchases of Class A common stock for the periods indicated:

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Programs[(1)] | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Programs[(1)] |
|---|---|---|---|---|
| January 1, 2025 to January 31, 2025 | — | $— | — | $120,166,000 |
| February 1, 2025 to February 28, 2025 | — | — | — | 120,166,000 |
| March 1, 2025 to March 31, 2025 | — | — | — | 120,166,000 |
| Total | — | $— | — | $120,166,000 |

(1) On October 30, 2020, our Board of Directors authorized a stock repurchase program for the repurchase of up to $100.0 million of the Company's Class A common stock, expiring on October 31, 2022. In August 2021 and January 2022, our Board of Directors authorized increases to the stock repurchase program for the repurchase of up to an additional $125.0 million and $152.7 million of the Company's Class A common stock, respectively. Following these extensions, the stock repurchase program now expires on December 31, 2025. This program does not obligate the Company to acquire any particular amount of Class A common stock and the program may be extended, modified, suspended or discontinued at any time at the board's discretion.

The table above excludes shares net settled by the Company in connection with tax withholdings associated with the vesting of restricted stock units as these shares were not issued and outstanding.

Since we are a holding company, our ability to pay cash dividends on our Class A common stock depends on our receipt of cash distributions from CWGS, LLC and, through CWGS, LLC, cash distributions and dividends from its operating subsidiaries, which may restrict our ability to pay dividends as a result of the laws of their jurisdiction of organization, agreements of our subsidiaries or covenants under any existing and future outstanding indebtedness we or our subsidiaries incur. In particular, our ability to pay any cash dividends on our Class A common stock is limited by restrictions on the ability of CWGS, LLC and our other subsidiaries and us to pay dividends or make distributions to us under the terms of our Senior Secured Credit Facilities and

Table of Contents

Floor Plan Facility. See “Dividend Policy” included in Part II, Item 5 of our Annual Report and “Risk Factors — Risks Relating to Ownership of Our Class A Common Stock — Our ability to pay regular and special dividends on our Class A common stock is subject to the discretion of our Board of Directors and may be limited by our structure and statutory restrictions” included in Part I, Item 1A of our Annual Report.

**Item 3. Defaults Upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

(a) Disclosure in lieu of reporting on a Current Report on Form 8-K.

On April 30, 2025, our Board of Directors approved Amended and Restated Bylaws that were amended to provide, among other things, (i) that the Chairperson and Vice Chairperson roles of the Board are not required to be officer roles and (ii) for the officer role of “Senior Vice President.” A copy of the Amended and Restated Bylaws is filed as Exhibit 3.2 hereto in this Form 10-Q.

(b) Material changes to the procedures by which security holders may recommend nominees to the board of directors.

None.

(c) Insider trading arrangements and policies.

During the three months ended March 31, 2025, no director or officer of the Company adopted or terminated a “Rule 10b5-1 trading arrangement” or “non-Rule 10b5-1 trading arrangement,” as each term is defined in Item 408(a) of Regulation S-K.

**Item 6. Exhibits**

**Exhibits Index**

| | | Incorporated by Reference | | | | |
|---|---|---|---|---|---|---|
| **Exhibit Number** | **Exhibit Description** | **Form** | **File No.** | **Exhibit** | **Filing Date** | **Filed/ Furnished Herewith** |
| 3.1 | Amended and Restated Certificate of Incorporation of Camping World Holdings, Inc. | 10-Q | 001-37908 | 3.1 | 11/10/16 | |
| 3.2 | Amended and Restated Bylaws of Camping World Holdings, Inc. | | | | | * |
| 4.1 | Specimen Stock Certificate evidencing the shares of Class A common stock | S-1/A | 333-211977 | 4.1 | 9/13/16 | |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference Form | File No. | Exhibit | Filing Date | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| 10.1 | Ninth Amended and Restated Credit Agreement, dated February18, 2025, among FreedomRoads, LLC, as the company and a borrower, certain subsidiaries of FreedomRoads, LLC, as a subsidiary borrowers, Bank of America, N.A., as administrative agent, and the lenders party thereto | 8-K | 001-37908 | 10.1 | 2/19/25 | |
| 10.2 | Performance Stock Unit Award Grant Notice and Award Agreement, dated January 26, 2025 with Marcus A. Lemonis | 10-K | 001-37908 | 10.20 | 2/28/25 | |
| 10.3 | Amended and Restated Employment Agreement with Marcus A. Lemonis effective January 1, 2025 | 10-K | 001-37908 | 10.22 | 2/28/25 | |
| 31.1 | Rule 13a-14(a) / 15d-14(a) Certification of Chief Executive Officer | | | | | * |
| 31.2 | Rule 13a-14(a) / 15d-14(a) Certification of Chief Financial Officer | | | | | * |
| 32.1 | Section 1350 Certification of Chief Executive Officer | | | | | ** |
| 32.2 | Section 1350 Certification of Chief Financial Officer | | | | | ** |
| 101.INS | Inline XBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. | | | | | *** |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | | | | | *** |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | | | | | *** |
| 101.DEF | Inline XBRL Extension Definition Linkbase Document | | | | | *** |
| 101.LAB | Inline XBRL Taxonomy Label Linkbase Document | | | | | *** |

Table of Contents

| Exhibit Number | Exhibit Description | Incorporated by Reference: Form | File No. | Exhibit | Filing Date | Filed/ Furnished Herewith |
|---|---|---|---|---|---|---|
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | | | | | *** |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | | | | | *** |

* Filed herewith
** Furnished herewith
*** Submitted electronically herewith

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: May 1, 2025

**Camping World Holdings, Inc.**

By: /s/ Thomas E. Kirn

Thomas E. Kirn
Chief Financial Officer
(Principal Financial Officer and Principal
Accounting Officer)

**Exhibit 3.2**

# AMENDED AND RESTATED BYLAWS

# OF

# CAMPING WORLD HOLDINGS, INC.

**Dated as of April 30, 2025**

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I. MEETINGS OF STOCKHOLDERS | | 2 |
| Section 1.01 | Place of Meetings | 2 |
| Section 1.02 | Annual Meetings | 3 |
| Section 1.03 | Special Meetings | 3 |
| Section 1.04 | Notice of Meetings | 3 |
| Section 1.05 | Adjournments | 3 |
| Section 1.06 | Quorum | 4 |
| Section 1.07 | Organization | 4 |
| Section 1.08 | Voting; Proxies | 5 |
| Section 1.09 | Fixing Date for Determination of Stockholders of Record | 5 |
| Section 1.10 | List of Stockholders Entitled to Vote | 6 |
| Section 1.11 | Action by Written Consent of Stockholders | 6 |
| Section 1.12 | Inspectors of Election | 7 |
| Section 1.13 | Conduct of Meetings | 7 |
| Section 1.14 | Notice of Business to be Brought Before a Meeting | 8 |
| Section 1.15 | Notice of Nominations for Election to the Board of Directors | 13 |
| Section 1.16 | Additional Requirements for Valid Nomination of Candidates to Serve as Director and, If Elected, to be Seated as Directors | 16 |
| ARTICLE II. BOARD OF DIRECTORS | | 18 |
| Section 2.01 | Number; Tenure; Qualifications | 18 |
| Section 2.02 | Election; Resignation; Removal; Vacancies | 18 |
| Section 2.03 | Regular Meetings | 18 |
| Section 2.04 | Special Meetings | 18 |
| Section 2.05 | Telephonic Meetings Permitted | 19 |
| Section 2.06 | Quorum; Vote Required for Action | 19 |
| Section 2.07 | Organization | 19 |
| Section 2.08 | Action by Unanimous Consent of Directors | 19 |
| Section 2.09 | Compensation of Directors | 19 |
| ARTICLE III. COMMITTEES | | 20 |
| Section 3.01 | Committees | 20 |
| Section 3.02 | Committee Rules | 20 |
| ARTICLE IV. OFFICERS | | 20 |
| Section 4.01 | Officers | 20 |
| Section 4.02 | Removal, Resignation and Vacancies | 21 |
| Section 4.03 | Chairperson | 21 |
| Section 4.04 | Chief Executive Officer | 21 |
| Section 4.05 | Chief Financial Officer | 21 |

| | | |
|---|---|---|
| Section 4.06 | Chief Operating Officer | 21 |
| Section 4.07 | Chief Legal Officer | 21 |
| Section 4.08 | President | 22 |
| Section 4.09 | Vice Presidents | 22 |
| Section 4.10 | Treasurer | 22 |
| Section 4.11 | Controller | 22 |
| Section 4.12 | Secretary | 22 |
| Section 4.13 | Appointing Attorneys and Agents; Voting Securities of Other Entities | 23 |
| Section 4.14 | Additional Matters | 23 |
| ARTICLE V. STOCK | | 24 |
| Section 5.01 | Certificates | 24 |
| Section 5.02 | Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates | 24 |
| ARTICLE VI. INDEMNIFICATION AND ADVANCEMENT OF EXPENSES | | 24 |
| Section 6.01 | Right to Indemnification | 24 |
| Section 6.02 | Advancement of Expenses | 25 |
| Section 6.03 | Claims | 25 |
| Section 6.04 | Non-exclusivity of Rights | 25 |
| Section 6.05 | Other Sources | 25 |
| Section 6.06 | Amendment or Repeal | 25 |
| Section 6.07 | Other Indemnification and Advancement of Expenses | 25 |
| ARTICLE VII. MISCELLANEOUS | | 26 |
| Section 7.01 | Fiscal Year | 26 |
| Section 7.02 | Seal | 26 |
| Section 7.03 | Manner of Notice | 26 |
| Section 7.04 | Waiver of Notice of Meetings of Stockholders, Directors and Committees | 27 |
| Section 7.05 | Form of Records | 27 |
| Section 7.06 | Amendment of Bylaws | 27 |
| Section 7.07 | Forum Selection | 28 |


ARTICLE I.
MEETINGS OF STOCKHOLDERS

Section 1.01 Place of Meetings. Meetings of stockholders of Camping World Holdings, Inc., a Delaware corporation (the "***Corporation***"; and such stockholders, the "***Stockholders***"), may be held at any place, within or without the State of Delaware, as may be designated by the board of directors of the Corporation (the "***Board of Directors***"). In the absence of such designation, meetings of Stockholders shall be held at the principal executive office of the Corporation. The Board of Directors may, in its sole discretion, determine that a meeting of

Stockholders shall not be held at any place, but may instead be held solely by means of remote communication authorized by and in accordance with Section 211(a) of the General Corporation Law of the State of Delaware ("***Delaware General Corporation Law***").

Section 1.02 Annual Meetings. The annual meeting of Stockholders shall be held for the election of directors at such date and time as may be designated by resolution of the Board of Directors from time to time. Any other business as may be properly brought before the annual meeting may be transacted at the annual meeting. The Board of Directors may postpone, reschedule or cancel any annual meeting of Stockholders previously scheduled by the Board of Directors.

Section 1.03 Special Meetings. Special meetings of Stockholders for any purpose or purposes may be called only by the majority of the Board of Directors or the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation ("***Stock***") for as long as the ML Related Parties (as defined in the Amended and Restated Certificate of Incorporation of the Corporation effective as of October 6, 2016 (as the same may be further amended, restated, amended and restated or otherwise modified from time to time, the "***Certificate of Incorporation***")) beneficially own, directly or indirectly, twenty-seven and five-tenths percent (27.5%) or more of all Common Units (as defined in the Certificate of Incorporation) issued and outstanding, and only by the majority of the Board of Directors if the ML Related Parties beneficially own, directly or indirectly, less than twenty-seven and-five tenths percent (27.5%) of all Common Units issued and outstanding. Special meetings validly called in accordance with this Section 1.03 of these amended and restated bylaws adopted by the Board of Directors as of October 6, 2016 (as the same may be further amended, restated, amended and restated or otherwise modified from time to time, these "***Bylaws***") may be held at such date and time as specified in the applicable notice. Business transacted at any special meeting of Stockholders shall be limited to the purposes stated in the notice. The Corporation may postpone, reschedule or cancel any special meeting of Stockholders previously scheduled by the chairperson of the Board of Directors (the "***Chairperson***") or Board of Directors.

Section 1.04 Notice of Meetings. Whenever Stockholders are required or permitted to take any action at a meeting, a notice of the meeting shall be given that shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the Stockholders entitled to vote at the meeting (if such date is different from the record date for Stockholders entitled to notice of the meeting) and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by law, the Certificate of Incorporation or these Bylaws, the notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each Stockholder entitled to vote at the meeting as of the record date for determining the Stockholders entitled to notice of the meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the Stockholder at such Stockholder's address as it appears on the records of the Corporation.

Section 1.05 Adjournments. Any meeting of Stockholders, annual or special, may be adjourned from time to time by the chairperson of the meeting (or by the Stockholders in accordance with Section 1.06) to reconvene at the same or some other place, if any, and notice

need not be given of any such adjourned meeting if the time and place, if any, thereof and the means of remote communications, if any, by which Stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken or are provided in any other manner permitted by the Delaware General Corporation Law. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each Stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for determination of Stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix the record date for determining Stockholders entitled to notice of such adjourned meeting as provided in Section 1.09(a) of these Bylaws, and shall give notice of the adjourned meeting to each Stockholder of record as of the record date so fixed for notice of such adjourned meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the Stockholder at such Stockholder's address as it appears on the records of the Corporation.

Section 1.06 Quorum. Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, at each meeting of Stockholders the presence or participation in person or by remote communication, if applicable, or by proxy of the holders of a majority in voting power of the outstanding shares of Stock entitled to vote at the meeting shall be necessary and sufficient to constitute a quorum for the transaction of business. In the absence of a quorum, then either (i) the chairperson of the meeting or (ii) a majority in voting power of the Stockholders entitled to vote thereon, present in person, or by remote communication, if applicable, or represented by proxy, shall have the power to adjourn the meeting from time to time in the manner provided in Section 1.05 of these Bylaws until a quorum is present or represented. Shares of Stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; *provided, however*, that the foregoing shall not limit the right of the Corporation or any subsidiary of the Corporation to vote shares of Stock held by it in a fiduciary capacity. Where a separate vote by a class or classes or series of capital stock is required by law or the Certificate of Incorporation, the holders of a majority in voting power of the shares of such class or classes or series of the capital stock of the Corporation issued and outstanding and entitled to vote on such matter, present in person, or by remote communication, if applicable, or represented by proxy, shall constitute a quorum entitled to take action with respect to the vote on such matter. A quorum, once established at a meeting, shall not be broken by the withdrawal of enough votes to leave less than a quorum.

Section 1.07 Organization. Meetings of Stockholders shall be presided over by the Chairperson or by the person whom the Chairperson shall appoint, or in the absence of such person or such appointment, by any Vice Chairperson, if any, or in his or her absence by the Chief Executive Officer, or in his or her absence, by a person designated by the Board of Directors, or in the absence of such designation by a chairperson chosen at the meeting by vote of a majority of the Stockholders present or represented at the meeting and entitled to vote at the meeting (provided there is a quorum). The Secretary shall act as secretary of the meeting, but in his or her absence the chairperson of the meeting may appoint any person to act as secretary of the meeting.

Section 1.08 Voting; Proxies. Each Stockholder entitled to vote at any meeting of Stockholders shall be entitled to the number of votes, if any, for each share of Stock held of record by such Stockholder which has voting power upon the matter in question that is set forth in the Certificate of Incorporation. Each Stockholder entitled to vote at a meeting of Stockholders or express consent to corporate action in writing without a meeting (if permitted by the Certificate of Incorporation) may authorize another person or persons to act for such Stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. The revocability of a proxy that states on its face that it is irrevocable shall be governed by the provisions of Section 212 of the Delaware General Corporation Law. A proxy may be in the form of an electronic transmission which sets forth or is submitted with information from which it can be determined that the transmission was authorized by the Stockholder. Voting at meetings of Stockholders need not be by written ballot. Unless otherwise provided in the Certificate of Incorporation, at all meetings of Stockholders for the election of directors at which a quorum is present a plurality of the votes cast shall be sufficient to elect directors. All other elections and questions presented to the Stockholders at a meeting at which a quorum is present shall be decided by the affirmative vote of the holders of a majority in voting power of the shares of Stock which are present in person or by proxy and entitled to vote thereon, unless a different or minimum vote is required by the Certificate of Incorporation, these Bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or applicable law or pursuant to any regulation applicable to the Corporation or its securities in which case such different or minimum vote shall be the applicable vote on the matter. Any Stockholder directly or indirectly soliciting proxies from other Stockholders must use a proxy card color other than white, which shall be reserved for the exclusive use by the Board of Directors.

Section 1.09 Fixing Date for Determination of Stockholders of Record.

(a) In order that the Corporation may determine the Stockholders entitled to notice of any meeting of Stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the Stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining Stockholders entitled to notice of or to vote at a meeting of Stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of Stockholders of record entitled to notice of or to vote at a meeting of Stockholders shall apply to any adjournment of the meeting; *provided, however*, that the Board of Directors may fix a new record date for determination of Stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for Stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of Stockholders entitled to vote in accordance herewith at the adjourned meeting.

(b) In order that the Corporation may determine the Stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of Stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall not be more than sixty (60) days prior to such action. If no such record date is fixed, the record date for determining Stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c) Unless otherwise restricted by the Certificate of Incorporation, in order that the Corporation may determine the Stockholders entitled to express consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. If no record date for determining Stockholders entitled to express consent to corporate action in writing without a meeting is fixed by the Board of Directors, (i) when no prior action of the Board of Directors is required by law or the Certificate of Incorporation, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation (or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of Stockholders are recorded) in accordance with applicable law, and (ii) if prior action by the Board of Directors is required by law or the Certificate of Incorporation, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

Section 1.10 List of Stockholders Entitled to Vote. The Corporation shall prepare and make, no later than the tenth day before each meeting of Stockholders, a complete list of the Stockholders entitled to vote at the meeting (*provided, however*, if the record date for determining the Stockholders entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the Stockholders entitled to vote as of the tenth day (10th) before the meeting date), arranged in alphabetical order, and showing the address of each Stockholder and the number of shares registered in the name of each Stockholder as of the record date (or such other date). Such list shall be open to the examination of any Stockholder, for any purpose germane to the meeting for a period of ten (10) days ending on the day before the meeting date (i) on a reasonably accessible electronic network, *provided* that the information required to gain access to such list is provided with the notice of meeting or (ii) during ordinary business hours at the principal place of business of the Corporation. Except as otherwise provided by law, the stock ledger shall be the only evidence as to who are the Stockholders entitled to examine the list of Stockholders required by this Section 1.10 or to vote in person, or by means of remote communication, or by proxy at any meeting of Stockholders.

Section 1.11 Action by Written Consent of Stockholders. Any action required or permitted to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, are signed by the holders of outstanding shares of the relevant class(es) or series of stock of the Corporation representing not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of stock of

the Corporation then issued and outstanding (other than treasury stock) entitled to vote thereon were present and voted and delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded; *provided, however*, that, subject to the rights of any series of preferred stock, par value $0.01 per share of the Corporation ("***Preferred Stock***") permitting the holders of such series of Preferred Stock to act by written consent, and except as otherwise provided in Section 6.4 of the Certificate of Incorporation, after the date on which the ML Related Parties beneficially own, directly or indirectly, less than twenty-seven and five-tenths percent (27.5%) of all Common Units issued and outstanding, any action required or permitted to be taken by stockholders of the Corporation must be effected at a duly called annual or special meeting of the stockholders and may not be effected by written consent in lieu of a meeting.

Section 1.12 Inspectors of Election. The Corporation may, and shall if required by law, in advance of any meeting of Stockholders, appoint one or more inspectors of election, who may be employees of the Corporation, to act at the meeting or any adjournment thereof and to make a written report thereof. The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act. In the event that no inspector so appointed or designated is able to act at a meeting of Stockholders, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath to execute faithfully the duties of inspector with strict impartiality and according to the best of his or her ability. The inspector or inspectors so appointed or designated shall (i) ascertain the number of shares of Stock outstanding and the voting power of each such share, (ii) determine the shares of Stock represented at the meeting and the validity of proxies and ballots, (iii) count all votes and ballots, (iv) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and (v) certify their determination of the number of shares of Stock represented at the meeting and such inspectors' count of all votes and ballots. Such certification and report shall specify such other information as may be required by law. In determining the validity and counting of proxies and ballots cast at any meeting of Stockholders, the inspectors may consider such information as is permitted by applicable law. No person who is a candidate for an office at an election may serve as an inspector at such election.

Section 1.13 Conduct of Meetings. The date and time of the opening and the closing of the polls for each matter upon which the Stockholders will vote at a meeting shall be announced at the meeting by the person presiding over the meeting designated in accordance with Section 1.07 of these Bylaws. After the polls close, no ballots, proxies or votes or any revocations or changes thereto may be accepted. The Board of Directors may adopt by resolution such rules and regulations for the conduct of the meeting of Stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the person presiding over any meeting of Stockholders shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such presiding person, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the presiding person of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the

safety of those present; (iii) limitations on attendance at or participation in the meeting to Stockholders entitled to vote at the meeting, their duly authorized and constituted proxies or such other persons as the presiding person of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (v) limitations on the time allotted to questions or comments by participants. The presiding person at any meeting of Stockholders, in addition to making any other determinations that may be appropriate to the conduct of the meeting, shall, if the facts warrant, determine and declare to the meeting that a matter or business was not properly brought before the meeting and if such presiding person should so determine, such presiding person shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board of Directors or the person presiding over the meeting, meetings of Stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.

Section 1.14 Notice of Business to be Brought Before a Meeting.

(a) At an annual meeting of the Stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, business must be (i) specified in a notice of meeting given by or at the direction of the Board of Directors, (ii) if not specified in a notice of meeting, otherwise brought before the meeting by or at the direction of the Board of Directors or the Chairperson or (iii) otherwise properly brought before the meeting by a Stockholder present in person who (A) (1) was a record owner of shares of capital stock of the Corporation both at the time of giving the notice provided for in this Section 1.14 and at the time of the meeting, (2) is entitled to vote at the meeting, and (3) has complied with this Section 1.14 in all applicable respects or (B) properly made such proposal in accordance with Rule 14a-8 under the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "***Exchange Act***"). The foregoing clause (iii) shall be the exclusive means for a Stockholder to propose business to be brought before an annual meeting of the Stockholders. The only matters that may be brought before a special meeting are the matters specified in the notice of meeting given by or at the direction of the person calling the meeting pursuant to Section 1.3, and Stockholders shall not otherwise be permitted to propose business to be brought before a special meeting of the Stockholders. For purposes of this Section 1.14, "***present in person***" shall mean that the Stockholder proposing that the business be brought before the annual meeting of the Corporation, or a qualified representative of such proposing Stockholder, appear at such annual meeting, either in person or by means of remote communication. A "***qualified representative***" of such proposing Stockholder shall be a duly authorized officer, manager or partner of such Stockholder or any other person authorized by a writing executed by such Stockholder or an electronic transmission delivered by such Stockholder to act for such Stockholder as proxy at the meeting of Stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at or before the meeting of stockholders in writing or by electronic transmission. Stockholders seeking to nominate persons for election to the Board of Directors must comply with Section 1.15 and Section 1.16 and this Section 1.14 shall not be applicable to nominations except as expressly provided in Section 1.15 and Section 1.16.

(b) Without qualification, for business to be properly brought before an annual meeting by a Stockholder, the Stockholder must (i) provide Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation and (ii) provide any updates or supplements to such notice at the times and in the forms required by this Section 1.14. To be timely, a Stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the one-year anniversary of the preceding year's annual meeting; *provided, however*, that if the date of the annual meeting is more than thirty (30) days before or more than sixty (60) days after such anniversary date, notice by the Stockholder to be timely must be so delivered, or mailed and received, not more than the hundred twentieth (120th) day prior to such annual meeting and not later than (i) the ninetieth (90th) day prior to such annual meeting or, (ii) if later, the tenth (10th) day following the day on which public disclosure of the date of such annual meeting was first made by the Corporation (such notice within such time periods, "***Timely Notice***"). In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period for the giving of Timely Notice as described above.

(c) To be in proper form for purposes of this Section 1.14, a Stockholder's notice to the Secretary shall set forth:

(i) As to each Proposing Person (as defined below), (A) the name and address of such Proposing Person (including, if applicable, the name and address that appear on the Corporation's books and records); (B) the class or series and number of shares of capital stock of the Corporation that are, directly or indirectly, owned of record or beneficially owned (within the meaning of Rule 13d-3 under the Exchange Act) by such Proposing Person, except that such Proposing Person shall in all events be deemed to beneficially own any shares of any class or series of capital stock of the Corporation as to which such Proposing Person has a right to acquire beneficial ownership at any time in the future; (C) the date or dates such shares were acquired; (D) the investment intent of such acquisition and (E) any pledge by such Proposing Person with respect to any of such shares (the disclosures to be made pursuant to the foregoing clauses (A) through (E) are referred to as "***Stockholder Information***");

(ii) As to each Proposing Person, (A) the material terms and conditions of any "derivative security" (as such term is defined in Rule 16a-1(c) under the Exchange Act) that constitutes a "call equivalent position" (as such term is defined in Rule 16a-1(b) under the Exchange Act) or a "put equivalent position" (as such term is defined in Rule 16a-1(h) under the Exchange Act) or other derivative or synthetic arrangement in respect of any class or series of shares of capital stock of the Corporation ("***Synthetic Equity Position***") that is, directly or indirectly, held or maintained by, held for the benefit of, or involving such Proposing Person, including, without limitation, (1) any option, warrant, convertible security, stock appreciation right, future or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of capital stock of the Corporation or with a value derived in whole or in part from the value of any shares of any class or series of shares of capital stock of the Corporation, (2) any derivative or synthetic arrangement having the characteristics of a long position or a short position in any class or series of shares of capital stock of the

Corporation, including, without limitation, a stock loan transaction, a stock borrow transaction, or a share repurchase transaction or (3) any contract, derivative, swap or other transaction or series of transactions designed to (x) produce economic benefits and risks that correspond substantially to the ownership of any class or series of shares of capital stock of the Corporation, (y) mitigate any loss relating to, reduce the economic risk (of ownership or otherwise) of, or manage the risk of share price decrease in, any class or series of shares of capital stock of the Corporation, or (z) increase or decrease the voting power in respect of any class or series of shares of capital stock of the Corporation held or maintained by, held for the benefit of, or involving such Proposing Person, including, without limitation, due to the fact that the value of such contract, derivative, swap or other transaction or series of transactions is determined by reference to the price, value or volatility of any class or series of shares of capital stock of the Corporation, whether or not such instrument, contract or right shall be subject to settlement in the underlying class or series of shares of capital stock of the Corporation, through the delivery of cash or other property, or otherwise, and without regard to whether the holder thereof may have entered into transactions that hedge or mitigate the economic effect of such instrument, contract or right, or any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the price or value of any shares of any class or series of shares of capital stock of the Corporation; provided that, for the purposes of the definition of "Synthetic Equity Position," the term "derivative security" shall also include any security or instrument that would not otherwise constitute a "derivative security" as a result of any feature that would make any conversion, exercise or similar right or privilege of such security or instrument becoming determinable only at some future date or upon the happening of a future occurrence, in which case the determination of the amount of securities into which such security or instrument would be convertible or exercisable shall be made assuming that such security or instrument is immediately convertible or exercisable at the time of such determination; and, provided, further, that any Proposing Person satisfying the requirements of Rule 13d-1(b)(1) under the Exchange Act (other than a Proposing Person that so satisfies Rule 13d-1(b)(1) under the Exchange Act solely by reason of Rule 13d-1(b)(1)(ii)(E)) shall not be deemed to hold or maintain the notional amount of any securities that underly any Synthetic Equity Position that is, directly or indirectly, held or maintained by, held for the benefit of, or involving such Proposing Person as a hedge with respect to a bona fide derivatives trade or position of such Proposing Person arising in the ordinary course of such Proposing Person's business as a derivatives dealer, (B) any rights to dividends on the shares of any class or series of shares of capital stock of the Corporation owned beneficially by such Proposing Person that are separated or separable from the underlying shares of capital stock of the Corporation, (C) any material pending or threatened legal proceeding in which such Proposing Person is a party or material participant involving the Corporation or any of its officers or directors, or any affiliate of the Corporation, (D) any other material relationship between such Proposing Person, on the one hand, and the Corporation or any affiliate of the Corporation, on the other hand, (E) any direct or indirect material interest in any material contract or agreement of such Proposing Person with the Corporation or any affiliate of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement), (F) any proportionate interest in shares of capital stock of the Corporation or a Synthetic

Equity Position held, directly or indirectly, by a general or limited partnership, limited liability company or similar entity in which any such Proposing Person (1) is a general partner or, directly or indirectly, beneficially owns an interest in a general partner of such general or limited partnership or (2) is the manager, managing member or, directly or indirectly, beneficially owns an interest in the manager or managing member of such limited liability company or similar entity, (G) a representation that such Proposing Person intends or is part of a group that intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve or adopt the proposal or otherwise solicit proxies from Stockholders in support of such proposal and (H) any other information relating to such Proposing Person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies or consents by such Proposing Person in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act (the disclosures to be made pursuant to the foregoing clauses (A) through (H) are referred to as "***Disclosable Interests***"); *provided*, *however*, that Disclosable Interests shall not include any such disclosures with respect to the ordinary course business activities of any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the Stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner; and

(iii) As to each item of business that the Stockholder proposes to bring before the annual meeting, (A) a brief description of the business desired to be brought before the annual meeting, the reasons for conducting such business at the annual meeting and any material interest in such business of each Proposing Person, (B) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend the Bylaws, the language of the proposed amendment), (C) a reasonably detailed description of all agreements, arrangements and understandings (x) between or among any of the Proposing Persons or (y) between or among any Proposing Person and any other record or beneficial holder(s) or persons(s) who have a right to acquire beneficial ownership at any time in the future of the shares of any class or series of capital stock of the Corporation (including their names) in connection with the proposal of such business by such Stockholder, and (D) any other information relating to such item of business that would be required to be disclosed in a proxy statement or other filing required to be made in connection with solicitations of proxies in support of the business proposed to be brought before the meeting pursuant to Section 14(a) of the Exchange Act; *provided*, *however*, that the disclosures required by this paragraph (iii) shall not include any disclosures with respect to any broker, dealer, commercial bank, trust company or other nominee who is a Proposing Person solely as a result of being the Stockholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner.

For purposes of this Section 1.14, the term "***Proposing Person***" shall mean (i) the Stockholder providing the notice of business proposed to be brought before an annual meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the business proposed to be brought before the annual meeting is made, and (iii) any participant (as

defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such Stockholder in such solicitation.

(d) The Board of Directors may request that any Proposing Person furnish such additional information as may be reasonably required by the Board of Directors. Such Proposing Person shall provide such additional information within ten (10) days after it has been requested by the Board of Directors.

(e) A Proposing Person shall update and supplement its notice to the Corporation of its intent to propose business at an annual meeting, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 1.14 shall be true and correct as of the record date for Stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for Stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these Bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a Stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a Stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding matters, business or resolutions proposed to be brought before a meeting of the Stockholders.

(f) Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at an annual meeting that is not properly brought before the meeting in accordance with this Section 1.14. The chairperson of the meeting shall, if the facts warrant, determine that the business was not properly brought before the meeting in accordance with this Section 1.14, and if he or she should so determine, he or she shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted.

(g) This Section 1.14 is expressly intended to apply to any business proposed to be brought before an annual meeting of Stockholders other than any proposal made in accordance with Rule 14a-8 under the Exchange Act and included in the Corporation's proxy statement. In addition to the requirements of this Section 1.14 with respect to any business proposed to be brought before an annual meeting, each Proposing Person shall comply with all applicable requirements of the Exchange Act with respect to any such business. Nothing in this Section 1.14 shall be deemed to affect the rights of Stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act.

(h) For purposes of these Bylaws, "***public disclosure***" shall mean disclosure in a press release reported by a national news service or in a document publicly filed by the

Corporation with the Securities and Exchange Commission pursuant to Sections 13, 14 or 15(d) of the Exchange Act.

Section 1.15 Notice of Nominations for Election to the Board of Directors.

(a) Nominations of any person for election to the Board of Directors at an annual meeting or at a special meeting (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting) may be made at such meeting only (i) by or at the direction of the Board of Directors, including by any committee or persons authorized to do so by the Board of Directors or these Bylaws, (ii) by or at the direction of any party to that certain voting agreement, dated as of October 6, 2016, by and among the Corporation and the other persons party thereto (as may be amended from time to time, the "***Voting Agreement***"), provided that such right shall only pertain to an annual meeting, the Voting Agreement remains in effect and only to the extent permitted by, and subject to any limitations set forth in, Section 1 and Section 2 thereof, or (iii) by a Stockholder present in person who (A) was a record owner of shares of capital stock of the Corporation both at the time of giving the notice provided for in this Section 1.15 and at the time of the meeting, (B) is entitled to vote at the meeting, and (C) has complied with this Section 1.15 and Section 1.16 as to such notice and nomination. For purposes of this Section 1.15, "***present in person***" shall mean that the Stockholder nominating any person for election to the Board of Directors at the meeting of the Corporation, or a qualified representative of such Stockholder, appear at such meeting in person or by means of remote communication. A "***qualified representative***" of such proposing Stockholder shall be a duly authorized officer, manager or partner of such Stockholder or any other person authorized by a writing executed by such Stockholder or an electronic transmission delivered by such Stockholder to act for such Stockholder as proxy at the meeting of Stockholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at or before the meeting of Stockholders in writing or by electronic transmission. The foregoing clauses (ii) and (iii) shall be the exclusive means for a Stockholder to make any nomination of a person or persons for election to the Board of Directors at an annual meeting or special meeting, as applicable.

(b) (i) Without qualification, for a Stockholder to make any nomination of a person or persons for election to the Board of Directors at an annual meeting in accordance with Section 1.15(a)(iii), the Stockholder must (1) provide Timely Notice (as defined in Section 1.14) thereof in writing and in proper form to the Secretary of the Corporation, (2) provide the information, agreements and questionnaires with respect to such Stockholder and its candidate for nomination as required to be set forth by this Section 1.15 and Section 1.16 and (3) provide any updates or supplements to such notice at the times and in the forms required by this Section 1.15 and Section 1.16.

(ii) Without qualification, if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling a special meeting, then for a Stockholder to make any nomination of a person or persons for election to the Board of Directors at a special meeting in accordance with Section 1.15(a)(iii), the Stockholder must (A) provide Special Meeting Timely Notice (as defined below) thereof in writing and in proper form to the Secretary of the Corporation at the principal executive offices of the Corporation, (B) provide the information with respect to each

Nominating Person (as defined below) and its candidate for nomination as required by this Section 1.15 and Section 1.16 and (C) provide any updates or supplements to such notice at the times and in the forms required by this Section 1.15 and Section 1.16. To be timely, a Stockholder's notice for nominations to be made at a special meeting must be delivered to, or mailed and received at, the principal executive offices of the Corporation not earlier than the one hundred twentieth (120th) day prior to such special meeting and not later than the ninetieth (90th) day prior to such special meeting or, if later, the tenth (10th) day following the day on which public disclosure (as defined in Section 1.14) of the date of such special meeting was first made (such notice within such time periods, "***Special Meeting Timely Notice***").

(iii) In no event shall any adjournment or postponement of an annual meeting or special meeting or the announcement thereof commence a new time period for the giving of a Stockholder's notice as described in this Section 1.15.

(iv) In no event may a Nominating Person (as defined below) provide Timely Notice or Special Meeting Timely Notice, as applicable, with respect to a greater number of director candidates than are subject to election by Stockholders at the applicable meeting. If the Corporation shall, subsequent to such notice, increase the number of directors subject to election at the meeting, such notice as to any additional nominees shall be due on the later of (A) the conclusion of the time period for Timely Notice or Special Meeting Timely Notice, as applicable, or (B) the tenth day following the date of public disclosure (as defined in Section 1.14) of such increase.

(c) To be in proper form for purposes of this Section 1.15, a Stockholder's notice to the Secretary shall set forth:

(i) As to each Nominating Person, the Stockholder Information (as defined in Section 1.14(c)(i), except that, for purposes of this Section 1.15, the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 1.14(c)(i));

(ii) As to each Nominating Person, any Disclosable Interests (as defined in Section 1.14(c)(ii), except that for purposes of this Section 1.15 the term "Nominating Person" shall be substituted for the term "Proposing Person" in all places it appears in Section 1.14(c)(ii) and the disclosure with respect to the business to be brought before the meeting in Section 1.14(c)(ii) shall be made with respect to the election of directors at the meeting); and provided that, in lieu of including the information set forth in Section 1.14(c)(ii)(G), the Nominating Person's notice for purposes of this Section 1.15 shall include a representation as to whether the Nominating Person intends or is part of a group that intends to deliver a proxy statement and solicit the holders of shares representing at least 67% of the voting power of shares entitled to vote on the election of directors in support of director nominees other than the Corporation's nominees in accordance with Rule 14a-19 promulgated under the Exchange Act; and

(iii) As to each candidate whom a Nominating Person proposes to nominate for election as a director, (A) all information relating to such candidate for nomination that is

required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors in a contested election pursuant to Section 14(a) under the Exchange Act (including such candidate's written consent to being named in a proxy statement and accompanying proxy card relating to the Corporation's next meeting of Stockholders at which directors are to be elected and to serving as a director if elected), (B) a description of any direct or indirect material interest in any material contract or agreement between or among any Nominating Person, on the one hand, and each candidate for nomination or his or her respective associates (as defined in Rule 14a-1(a) promulgated under the Exchange Act) or any other participants (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) in such solicitation, on the other hand, including, without limitation, all information that would be required to be disclosed pursuant to Item 404 under Regulation S-K if such Nominating Person were the "registrant" for purposes of such rule and the candidate for nomination were a director or executive officer of such registrant, and (C) a completed and signed questionnaire, representation and agreement as provided in Section 1.16.

For purposes of this Section 1.15, the term "***Nominating Person***" shall mean (i) the Stockholder providing the notice of the nomination proposed to be made at the meeting, (ii) the beneficial owner or beneficial owners, if different, on whose behalf the notice of the nomination proposed to be made at the meeting is made, and (iii) any participant (as defined in paragraphs (a)(ii)-(vi) of Instruction 3 to Item 4 of Schedule 14A) with such Stockholder in such solicitation.

(d) The Board of Directors may request that any Nominating Person furnish such additional information as may be reasonably required by the Board of Directors. Such Nominating Person shall provide such additional information within ten (10) days after it has been requested by the Board of Directors.

(e) A Stockholder providing notice of any nomination proposed to be made at a meeting shall further update and supplement such notice or the materials delivered pursuant to this Section 1.15, as applicable, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 1.15 shall be true and correct as of the record date for Stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for Stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these Bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a Stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a Stockholder who has previously submitted notice hereunder to amend or update any nomination, including by changing or adding nominees, or to submit any new nomination.

(f) In addition to the requirements of this Section 1.15 with respect to any nomination proposed to be made at a meeting, each Nominating Person shall comply with all applicable requirements of the Exchange Act with respect to any such nominations. Notwithstanding the foregoing provisions of this Section 1.15, unless otherwise required by law, (i) no Nominating Person shall solicit proxies in support of director nominees other than the Corporation's nominees unless such Nominating Person has or is part of a group that has complied with Rule 14a-19 promulgated under the Exchange Act in connection with the solicitation of such proxies, including the provision to the Corporation of notices required thereunder, in accordance with the time frames required in this Section 1.15 or by Rule 14a-19, as applicable and (ii) if (1) any Nominating Person provides notice in accordance with Rule 14a-19(b) promulgated under the Exchange Act and (2) (x) such notice in accordance with Rule 14a-19(b) is not provided within the time period for Timely Notice or Special Meeting Timely Notice, as applicable, (y) such Nominating Person subsequently fails to comply with the requirements of Rule 14a-19(a)(2) or Rule 14a-19(a)(3) promulgated under the Exchange Act or (z) such Nominating Person fails to timely provide reasonable evidence sufficient to satisfy the Corporation that such Nominating Person has met the requirements of Rule 14a-19(a)(3) promulgated under the Exchange Act in accordance with the following sentence, then the nomination of such Nominating Person's proposed nominees shall be disregarded, notwithstanding that each such nominee is included as a nominee in the Corporation's proxy statement, notice of meeting or other proxy materials for any meeting of Stockholders (or any supplement thereto) and notwithstanding that proxies or votes in respect of the election of such proposed nominees may have been received by the Corporation (which proxies and votes shall be disregarded). If any Nominating Person provides notice in accordance with Rule 14a-19(b) promulgated under the Exchange Act, such Nominating Person shall deliver to the Corporation, no later than seven (7) business days prior to the applicable meeting, reasonable evidence that it has met the requirements of Rule 14a-19(a)(3) promulgated under the Exchange Act.

Section 1.16 Additional Requirements for Valid Nomination of Candidates to Serve as Director and, If Elected, to be Seated as Directors.

(a) To be eligible to be a nominee for election or reelection as a director of the Corporation, the candidate must be nominated in the manner prescribed in Section 1.15 and the candidate for nomination must have previously delivered (in accordance with the time periods prescribed for delivery in a notice to such candidate given by or on behalf of the Board of Directors), to the Secretary at the principal executive offices of the Corporation, (a) a completed written questionnaire (in a form provided by the Corporation upon written request of any Stockholder of record therefor) with respect to the background, qualifications, stock ownership and independence of such proposed nominee and (b) a written representation and agreement (in the form provided by the Corporation upon written request of any Stockholder of record therefor) that such candidate for nomination (i) is not and, if elected as a director during his or her term of office, will not become a party to (A) any agreement, arrangement or understanding with, and has not given and will not give any commitment or assurance to, any person or entity as to how such proposed nominee, if elected as a director of the Corporation, will act or vote on any issue or question (a "***Voting Commitment***") or (B) any Voting Commitment that could limit or interfere with such proposed nominee's ability to comply, if elected as a director of the Corporation, with such proposed nominee's fiduciary duties under applicable law, (ii) is not, and will not become a party to, any agreement, arrangement or understanding with any person or

entity other than the Corporation with respect to any direct or indirect compensation or reimbursement for service as a director that has not been disclosed to the Corporation, (iii) if elected as a director of the Corporation, will comply with all applicable corporate governance, conflict of interest, confidentiality, stock ownership and trading and other policies and guidelines of the Corporation applicable to directors and in effect during such person's term in office as a director of the Corporation (and, if requested by any candidate for nomination, the Secretary shall provide to such candidate for nomination all such policies and guidelines then in effect) and (iv) agrees to serve as a director of the Corporation, if elected.

(b) The Board of Directors may also require any proposed candidate for nomination as a director to furnish such other information as may reasonably be requested by the Board of Directors in writing prior to the meeting of Stockholders at which such candidate's nomination is to be acted upon. Without limiting the generality of the foregoing, the Board of Directors may request such other information in order for the Board of Directors to determine the eligibility of such candidate for nomination to be an independent director of the Corporation or to comply with the director qualification standards and additional selection criteria in accordance with the Corporation's Corporate Governance Guidelines. Such other information shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation (or any other office specified by the Corporation in any public announcement) not later than five (5) business days after the request by the Board of Directors has been delivered to, or mailed and received by, the Nominating Person.

(c) A candidate for nomination as a director shall further update and supplement the materials delivered pursuant to this Section 1.16, if necessary, so that the information provided or required to be provided pursuant to this Section 1.16 shall be true and correct as of the record date for Stockholders entitled to vote at the meeting and as of the date that is ten (10) business days prior to the meeting or any adjournment or postponement thereof, and such update and supplement shall be delivered to, or mailed and received by, the Secretary at the principal executive offices of the Corporation (or any other office specified by the Corporation in any public announcement) not later than five (5) business days after the record date for Stockholders entitled to vote at the meeting (in the case of the update and supplement required to be made as of such record date), and not later than eight (8) business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof (and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed) (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting or any adjournment or postponement thereof). For the avoidance of doubt, the obligation to update and supplement as set forth in this paragraph or any other Section of these Bylaws shall not limit the Corporation's rights with respect to any deficiencies in any notice provided by a Stockholder, extend any applicable deadlines hereunder or enable or be deemed to permit a Stockholder who has previously submitted notice hereunder to amend or update any nomination or to submit any new proposal, including by changing or adding nominees, matters, business or resolutions proposed to be brought before a meeting of the Stockholders.

(d) No candidate shall be eligible for nomination as a director of the Corporation under Section 1.15 unless such candidate for nomination and the Nominating Person seeking to place such candidate's name in nomination, if applicable, has complied with Section 1.15 and this Section 1.16, as applicable. The chairperson of the meeting shall, if the facts warrant,

determine that a nomination was not properly made in accordance with Section 1.15 and this Section 1.16, and if he or she should so determine, he or she shall so declare such determination to the meeting, the defective nomination shall be disregarded and any ballots cast for the candidate in question (but in the case of any form of ballot listing other qualified nominees, only the ballots cast for the nominee in question) shall be void and of no force or effect.

(e) Notwithstanding anything in these Bylaws to the contrary, no candidate for nomination shall be eligible to be seated as a director of the Corporation unless nominated in accordance with Section 1.15 and this Section 1.16 and elected as a director.

## ARTICLE II.
## BOARD OF DIRECTORS

Section 2.01 Number; Tenure; Qualifications. Subject to the Certificate of Incorporation, the rights of holders of any series of Preferred Stock to elect directors and the Voting Agreement, the total number of directors constituting the entire Board of Directors shall be fixed from time to time exclusively by resolutions adopted by the Board of Directors. The directors shall be classified in the manner provided in the Certificate of Incorporation. Each director shall hold office until such time as provided in the Certificate of Incorporation. Directors need not be Stockholders.

Section 2.02 Election; Resignation; Removal; Vacancies. Except as otherwise provided in the Certificate of Incorporation or these Bylaws, directors shall be elected at the annual meeting of Stockholders by such Stockholders as have the right to vote on such election. Any director may resign at any time upon written or electronic notice to the Corporation. Such resignation shall be effective upon delivery unless it is specified to be effective at some later time or upon the happening of some later event. Subject to the rights of holders of any series of Preferred Stock, directors of the Corporation may be removed only as expressly provided in the Certificate of Incorporation. Except as otherwise required by law and subject to the rights of the holders of any series of Preferred Stock then outstanding, unless the Board of Directors otherwise determines, newly created directorships resulting from any increase in the authorized number of directors or any vacancies on the Board of Directors resulting from the death, resignation, retirement, disqualification, removal from office or other cause shall be filled only by a majority vote of the directors then in office, though less than a quorum, or by a sole remaining director entitled to vote thereon, and not by the Stockholders. Any director so chosen shall hold office until the next election of the class for which such director shall have been chosen and until his successor shall be elected and qualified.

Section 2.03 Regular Meetings. Regular meetings of the Board of Directors may be held at such places, if any, within or without the State of Delaware and at such times as the Board of Directors may from time to time determine; provided that any director who is absent when such a determination is made shall be given notice of the determination.

Section 2.04 Special Meetings. Special meetings of the Board of Directors may be held at any time or place, if any, within or without the State of Delaware whenever called by the Chairperson, the Chief Executive Officer or a majority of the directors then in office. Notice to directors of the date, place and time of any special meeting of the Board of Directors shall be

given to each director by the Secretary or by the officer or one of the directors calling the meeting. Notice may be given in person, by mail or by e-mail, telephone, telecopier or other means of electronic transmission. If the notice is delivered in person, by e-mail, telephone, telecopier or other means of electronic transmission, it shall be delivered or sent at least twenty-four (24) hours before the time of holding of the meeting. If the notice is sent by mail, it shall be deposited in the United States mail at least four (4) days before the time of the holding of the meeting.

Section 2.05 Telephonic Meetings Permitted. Members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 2.05 shall constitute presence in person at such meeting.

Section 2.06 Quorum; Vote Required for Action. At all meetings of the Board of Directors a majority of the number of directors fixed by the Board of Directors pursuant to Section 2.01 shall constitute a quorum for the transaction of business; *provided* that, solely for the purposes of filling vacancies pursuant to Section 2.02 of these Bylaws, a meeting of the Board of Directors may be held if a majority of the directors then in office participate in such meeting. Except in cases in which the Certificate of Incorporation, these Bylaws or applicable law otherwise provides, a majority of the votes entitled to be cast by the directors present at a meeting duly held at which a quorum is present shall be the act of the Board of Directors.

Section 2.07 Organization. Meetings of the Board of Directors shall be presided over by the Chairperson, or in his or her absence by the person whom the Chairperson shall appoint, or in the absence of the foregoing persons by a chairperson chosen at the meeting by the affirmative vote of a majority of the directors present at the meeting. The Secretary shall act as secretary of the meeting, but in his or her absence the chairperson of the meeting may appoint any person to act as secretary of the meeting.

Section 2.08 Action by Unanimous Consent of Directors. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmissions are filed with the minutes of proceedings of the Board of Directors or such committee in accordance with applicable law.

Section 2.09 Compensation of Directors. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary or other compensation as a director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings. Any director of the Corporation may decline any or all such compensation payable to such director in his or her discretion.

ARTICLE III.
COMMITTEES

Section 3.01 Committees. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee. In the absence or disqualification of a member of any committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member. Any such committee, to the extent permitted by law and to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it. Except as otherwise provided in the Certificate of Incorporation, these Bylaws, or the resolution of the Board of Directors designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee. Except as otherwise provided in the Certificate of Incorporation, these Bylaws, or the resolution of the Board of Directors designating the committee (or resolution of the committee designating the subcommittee, if applicable), a majority of the directors then serving on a committee or subcommittee shall constitute a quorum for the transaction of business, and the vote of a majority of the members of the committee or subcommittee present at a meeting at which a quorum is present shall be the act of the committee or subcommittee.

Section 3.02 Committee Rules. Unless the Board of Directors otherwise provides, each committee designated by the Board of Directors may make, alter and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article II of these Bylaws.

ARTICLE IV.
OFFICERS

Section 4.01 Officers. The officers of the Corporation may consist of a chief executive officer (the "***Chief Executive Officer***"), a president (the "***President***"), a chief financial officer (the "***Chief Financial Officer***"), a chief operating officer (the "***Chief Operating Officer***"), a chief legal officer (the "***Chief Legal Officer***"), one or more vice presidents (each, a "***Vice President***"), a Secretary (the "***Secretary***"), a treasurer (the "***Treasurer***"), a controller (the "***Controller***") and such other officers with such other titles as the Board of Directors may from time to time determine, including a Chairperson, each of whom shall be appointed by the Board of Directors, each to have such authority, functions or duties as set forth in these Bylaws or as determined by the Board of Directors. Subject to obtaining any written approval(s) under Section 4(a) of the Voting Agreement in connection with the appointment of the chief executive officer of the Corporation, each officer shall be chosen by the Board of Directors and shall hold office for such term as may be prescribed by the Board of Directors and until such person's successor shall have been duly chosen and qualified, or until such person's earlier death, disqualification,

resignation or removal. The Board of Directors, in its discretion, from time to time may determine not to appoint one or more of the officers identified in the first sentence of this Section 4.01 or to leave such officer position vacant. Any number of offices may be held by the same person.

Section 4.02 Removal, Resignation and Vacancies. Any officer of the Corporation may be removed, with or without cause, by the Board of Directors, without prejudice to the rights, if any, of such officer under any contract to which it is a party. Any officer may resign at any time upon written or electronic notice to the Corporation, without prejudice to the rights, if any, of the Corporation under any contract to which such officer is a party. If any vacancy occurs in any office of the Corporation, the Board of Directors may appoint a successor to fill such vacancy for the remainder of the unexpired term and until a successor shall have been duly chosen and qualified or until such officer's earlier death, resignation, disqualification or removal.

Section 4.03 Chairperson. The Board of Directors may appoint from its members a Chairperson of the Board of Directors. The Board of Directors may, in its sole discretion, from time to time appoint one or more vice chairpersons (each, a "***Vice Chairperson***").

Section 4.04 Chief Executive Officer. The Chief Executive Officer shall have general supervision and direction of the business and affairs of the Corporation, shall be responsible for corporate policy and strategy, and shall report directly to the Board of Directors. Unless otherwise provided in these Bylaws, all other officers of the Corporation shall report directly to the Chief Executive Officer or as otherwise determined by the Chief Executive Officer. The Chief Executive Officer shall, if present and in the absence of the Chairperson or any Vice Chairperson, preside at meetings of the Stockholders and of the Board of Directors.

Section 4.05 Chief Financial Officer. The Chief Financial Officer shall exercise all the powers and perform the duties of the office of the chief financial officer and in general have overall supervision of the financial operations of the Corporation. The Chief Financial Officer shall have the power to affix the signature of the Corporation to all contracts that have been authorized by the Board of Directors or the Chief Executive Officer. The Chief Financial Officer shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or as the Board of Directors may from time to time determine.

Section 4.06 Chief Operating Officer. The Chief Operating Officer shall exercise all the powers and perform the duties of the office of the chief operating officer and shall be responsible for the management and control of the operations of the Corporation. The Chief Operating Officer shall have the power to affix the signature of the Corporation to all contracts that have been authorized by the Board of Directors or the Chief Executive Officer. The Chief Operating Officer shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or as the Board of Directors may from time to time determine.

Section 4.07 Chief Legal Officer. The Chief Legal Officer shall be the principal legal officer of the Corporation and exercise all the powers and perform the duties of the office of the legal department and shall be responsible for the general direction of and supervision over the

legal affairs of the Corporation and advising the Board of Directors and the officers of the Corporation on all legal matters. The Chief Legal Officer shall have the power to affix the signature of the Corporation to all contracts that have been authorized by the Board of Directors or the Chief Executive Officer. The Chief Legal Officer shall perform such other duties as such officer may agree with the Chief Executive Officer or as the Board of Directors may from time to time determine.

Section 4.08 President. The President shall have such powers and duties as shall be prescribed by the Chief Executive Officer. The President shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or as the Board of Directors may from time to time determine.

Section 4.09 Vice Presidents. The Vice President shall have such powers and duties as shall be prescribed by his or her superior officer or the Chief Executive Officer. A Vice President shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or as the Board of Directors may from time to time determine. In accordance with Sections 4.01 and 4.14 of these Bylaws, the Board of Directors, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Legal Officer and/or the President may, in his, her or their discretion, from time to time appoint one or more executive vice presidents of the Corporation (each, an "***Executive Vice President***"), senior vice presidents of the Corporation (each, a "***Senior Vice President***") and/or assistant vice presidents of the Corporation (each, an "***Assistant Vice President***").

Section 4.10 Treasurer. The Treasurer shall supervise and be responsible for all the funds and securities of the Corporation, the deposit of all moneys and other valuables to the credit of the Corporation in depositories of the Corporation, borrowings and compliance with the provisions of all indentures, agreements and instruments governing such borrowings to which the Corporation is a party, the disbursement of funds of the Corporation and the investment of its funds, and in general shall perform all of the duties incident to the office of the Treasurer. The Treasurer shall report to the Chief Financial Officer and, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer, the Chief Financial Officer or as the Board of Directors may from time to time determine. In accordance with Sections 4.01 and 4.14 of these Bylaws, the Board of Directors, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Legal Officer and/or the President may, in his, her or their discretion, from time to time appoint one or more assistant treasurers of the Corporation (each, an "***Assistant Treasurer***").

Section 4.11 Controller. The Controller shall report to the Chief Financial Officer and, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or the Chief Financial Officer or as the Board of Directors may from time to time determine.

Section 4.12 Secretary. The powers and duties of the Secretary are: (i) to act as Secretary at all meetings of the Board of Directors, of the committees of the Board of Directors

and of the Stockholders and to record the proceedings of such meetings in a book or books to be kept for that purpose; (ii) to see that all notices required to be given by the Corporation are duly given and served; (iii) to act as custodian of the seal of the Corporation and affix the seal or cause it to be affixed to all certificates of Stock and to all documents, the execution of which on behalf of the Corporation under its seal is duly authorized in accordance with the provisions of these Bylaws; (iv) to have charge of the books, records and papers of the Corporation and see that the reports, statements and other documents required by law to be kept and filed are properly kept and filed; and (v) to perform all of the duties incident to the office of Secretary. The Secretary shall, when requested, counsel with and advise the other officers of the Corporation and shall perform such other duties as such officer may agree with the Chief Executive Officer or as the Board of Directors may from time to time determine. In accordance with Sections 4.01 and 4.14 of these Bylaws, the Board of Directors, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Legal Officer and/or the President may, in his, her or their discretion, from time to time appoint one or more assistant secretaries of the Corporation (each, an "***Assistant Secretary***").

Section 4.13 Appointing Attorneys and Agents; Voting Securities of Other Entities. Unless otherwise provided by resolution adopted by the Board of Directors, the Chairperson, any Vice Chairperson, the Chief Executive Officer, the Chief Financial Officer or the Chief Legal Officer may from time to time appoint an attorney or attorneys or agent or agents of the Corporation, in the name and on behalf of the Corporation, to (a) cast the votes which the Corporation may be entitled to cast as the holder of stock or other securities in any other corporation or other entity, any of whose stock or other securities may be held by the Corporation, at meetings of the holders of the stock or other securities of such other corporation or other entity, or to consent in writing, in the name of the Corporation as such holder, to any action by such other corporation or other entity, and may instruct the person or persons so appointed as to the manner of casting such votes or giving such consents, and may execute or cause to be executed in the name and on behalf of the Corporation and under its corporate seal or otherwise, all such written proxies or other instruments as he or she may deem necessary or proper and (b) exercise the rights of the Corporation in its capacity as a general partner of a partnership or in its capacity as a managing member of a limited liability company as to which the Corporation, in such capacity, is entitled to exercise pursuant to the applicable partnership agreement or limited liability company operating agreement, including without limitation to take or refrain from taking any action, or to consent in writing, in each case in the name of the Corporation as such general partner or managing member, to any action by such partnership or limited liability company, and may instruct the person or persons so appointed as to the manner of taking such actions or giving such consents, and may execute or cause to be executed in the name and on behalf of the Corporation and under its corporate seal or otherwise, all such written proxies or other instruments as he or she may deem necessary or proper. Unless otherwise provided by resolution adopted by the Board of Directors, any of the rights set forth in this Section 4.13 which may be delegated to an attorney or agent may also be exercised directly by the Chairperson, a Vice Chairperson, the Chief Executive Officer, the Chief Financial Officer or the Chief Legal Officer.

Section 4.14 Additional Matters. The Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Chief Legal Officer and/or the President shall have the authority to designate employees of the Corporation to have the title of Executive Vice President,

Senior Vice President, Vice President, Assistant Vice President, Assistant Treasurer or Assistant Secretary. Any employee so designated shall have the powers and duties determined by the officer making such designation. A person designated as an Executive Vice President, Senior Vice President, Vice President, Assistant Vice President, Assistant Treasurer or Assistant Secretary shall not be deemed to be an officer of the Corporation for the purposes of Article VI of these Bylaws unless the Board of Directors has adopted a resolution approving such person in such capacity as an officer of the Corporation (including by means of direct appointment by the Board of Directors pursuant to Section 4.01 of these Bylaws).

## ARTICLE V.
## STOCK

Section 5.01 Certificates. The shares of Stock shall be represented by certificates, *provided* that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of Stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation. Every holder of Stock represented by certificates shall be entitled to have a certificate, in such form as may be prescribed by law and by the Board of Directors, representing the number of shares held by such holder registered in certificate form. Each such certificate shall be signed in a manner that complies with Section 158 of the Delaware General Corporation Law.

Section 5.02 Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates. The Corporation may issue a new certificate for shares of Stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

## ARTICLE VI.
## INDEMNIFICATION AND ADVANCEMENT OF EXPENSES

Section 6.01 Right to Indemnification. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law (including as it presently exists or may hereafter be amended), any person (a "***Covered Person***") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (any such action, suit or proceeding, a "***proceeding***"), by reason of the fact that he or she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Covered Person. Notwithstanding the preceding sentence, except as otherwise provided in Section 6.03 of these Bylaws, the Corporation shall be required to indemnify a Covered Person in connection with a proceeding (or part thereof) commenced by such Covered Person only if the

commencement of such proceeding (or part thereof) by the Covered Person was authorized in the specific case by the Board of Directors.

Section 6.02 Advancement of Expenses. The Corporation shall to the fullest extent not prohibited by applicable law pay the expenses (including attorneys' fees) incurred by a Covered Person in defending any proceeding in advance of its final disposition, *provided, however*, that, to the extent required by law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking by the Covered Person to repay all amounts advanced if it should be ultimately determined that the Covered Person is not entitled to be indemnified under this Article VI or otherwise.

Section 6.03 Claims. If a claim for indemnification under this Article VI (following the final disposition of such proceeding) is not paid in full within sixty (60) days after the Corporation has received a claim therefor by the Covered Person, or if a claim for any advancement of expenses under this Article VI is not paid in full within thirty (30) days after the Corporation has received a statement or statements requesting such amounts to be advanced, the Covered Person shall thereupon (but not before) be entitled to file suit to recover the unpaid amount of such claim. If successful in whole or in part, the Covered Person shall be entitled to be paid the expense of prosecuting such claim to the fullest extent permitted by law. In any such action, the Corporation shall have the burden of proving that the Covered Person is not entitled to the requested indemnification or advancement of expenses under applicable law.

Section 6.04 Non-exclusivity of Rights. The rights conferred on any Covered Person by this Article VI shall not be exclusive of any other rights which such Covered Person may have or hereafter acquires under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of Stockholders or disinterested directors or otherwise.

Section 6.05 Other Sources. The Corporation's obligation, if any, to indemnify or to advance expenses to any Covered Person who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust, enterprise or nonprofit entity shall be reduced by any amount such Covered Person may collect as indemnification or advancement of expenses from such other corporation, partnership, limited liability company, joint venture, trust, enterprise or non-profit enterprise.

Section 6.06 Amendment or Repeal. Any right to indemnification or to advancement of expenses of any Covered Person arising hereunder shall not be eliminated or impaired by an amendment to or repeal of these Bylaws after the occurrence of the act or omission that is the subject of the proceeding for which indemnification or advancement of expenses is sought.

Section 6.07 Other Indemnification and Advancement of Expenses. This Article VI shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Covered Persons when and as authorized by appropriate corporate action.

ARTICLE VII.
MISCELLANEOUS

Section 7.01 Fiscal Year. The fiscal year of the Corporation shall be determined by resolution of the Board of Directors.

Section 7.02 Seal. The corporate seal shall have the name of the Corporation inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors.

Section 7.03 Manner of Notice.

(a) *Delivery of Notice; Notice by Electronic Transmission.*

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provisions of the Delaware General Corporation Law, the Certificate of Incorporation, or these bylaws may be given in writing directed to the stockholder's mailing address (or by electronic transmission directed to the stockholder's electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given (1) if mailed, when the notice is deposited in the U.S. mail, postage prepaid, (2) if delivered by courier service, the earlier of when the notice is received or left at such stockholder's address or (3) if given by electronic mail, when directed to such stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail. A notice by electronic mail must include a prominent legend that the communication is an important notice regarding the Corporation.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under any provision of the Delaware General Corporation Law, the Certificate of Incorporation or these bylaws shall be effective if given by a form of electronic transmission in a manner consistent with Section 232 of the Delaware General Corporation Law.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(ii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and

(iii) if by any other form of electronic transmission, when directed to the stockholder.

Notwithstanding the foregoing, a notice may not be given by an electronic transmission from and after the time that (1) the Corporation is unable to deliver by such electronic transmission two (2) consecutive notices given by the Corporation and (2) such inability

becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice, provided, however, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

An affidavit of the Secretary or an Assistant Secretary of the Corporation or of the transfer agent or other agent of the Corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

For the purposes of these Bylaws, an "***electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

(b) *Notice to Stockholders Sharing an Address*. Without limiting the manner by which notice otherwise may be given effectively to Stockholders, and except as prohibited by applicable law, any notice to Stockholders given by the Corporation under any provision of applicable law, the Certificate of Incorporation, or these Bylaws shall be effective if given by a single written notice to Stockholders who share an address if consented to by the Stockholders at that address to whom such notice is given. Any such consent shall be revocable by the Stockholder by written notice to the Corporation. Any Stockholder who fails to object in writing to the Corporation, within sixty (60) days of having been given written notice by the Corporation of its intention to send the single notice permitted under this Section 7.03, shall be deemed to have consented to receiving such single written notice.

Section 7.04 Waiver of Notice of Meetings of Stockholders, Directors and Committees. Any waiver of notice, given by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Stockholders, Board of Directors, or members of a committee or subcommittee of the Board of Directors need be specified in a waiver of notice.

Section 7.05 Form of Records. Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or by means of, or be in the form of, any information storage device or method, provided that the records so kept can be converted into clearly legible paper form within a reasonable time.

Section 7.06 Amendment of Bylaws. Subject to the Voting Agreement, these Bylaws may be altered, amended or repealed, and new bylaws made, only by the affirmative vote of (a) a majority of the Board of Directors or (b) Stockholders representing at least a majority of the votes eligible to be cast in an election of directors of the Corporation; *provided, however*, that

after the date on which the ML Related Parties beneficially own, directly or indirectly, less than twenty-seven and five-tenths percent (27.5%) of all Common Units issued and outstanding, these Bylaws may be altered, amended or repealed, and new bylaws made, only by the affirmative vote of (a) a majority of the Board of Directors or (b) Stockholders representing at least sixty-six and two-thirds percent (662/3%) of the votes eligible to be cast in an election of directors of the Corporation.

Section 7.07 Forum Selection.

Unless the Corporation consents in writing to the selection of an alternative forum, to the fullest extent permitted by law, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause or causes of action arising under the Securities Act of 1933, as amended, including all causes of action asserted against any defendant to such complaint.

If any action the subject matter of which is within the scope of Article XIII of the Certificate of Incorporation is filed in a court other than the courts in the State of Delaware (a "***Foreign Action***") in the name of any Stockholder, such Stockholder shall be deemed to have consented to (a) the personal jurisdiction of the state and federal courts in the State of Delaware in connection with any action brought in any such court to enforce the provisions of Article XIII of the Certificate of Incorporation and (b) having service of process made upon such Stockholder in any such action by service upon such Stockholder's counsel in the Foreign Action as agent for such Stockholder.

This Section 7.07 and Article XIII of the Certificate of Incorporation are intended to benefit and may be enforced by the Corporation, its officers and directors, the underwriters to any offering giving rise to such complaint, and any other professional or entity whose profession gives authority to a statement made by that person or entity and who has prepared or certified any part of the documents underlying the offering.

**Exhibit 31.1**

**CERTIFICATIONS**

I, Marcus A. Lemonis, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Camping World Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2025

By: /s/ Marcus A. Lemonis
Marcus A. Lemonis
Chairman and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATIONS**

I, Thomas E. Kirn, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Camping World Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 1, 2025

By: /s/ Thomas E. Kirn
Thomas E. Kirn
Chief Financial Officer
(Principal Financial Officer and Principal Accounting Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**

**18 U.S.C. SECTION 1350,**

**AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Camping World Holdings, Inc. (the “Company”) for the period ended March 31, 2025, as filed with the U.S. Securities and Exchange Commission on the date hereof (the “Report”), I, Marcus A. Lemonis, Chairman and Chief Executive Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 1, 2025

By: /s/ Marcus A. Lemonis
Marcus A. Lemonis
Chairman and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**

**18 U.S.C. SECTION 1350,**

**AS ADOPTED PURSUANT TO**

**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report on Form 10-Q of Camping World Holdings, Inc. (the “Company”) for the period ended March 31, 2025, as filed with the U.S. Securities and Exchange Commission on the date hereof (the “Report”), I, Thomas E. Kirn, Chief Financial Officer of the Company, hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

(1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: May 1, 2025

By: /s/ Thomas E. Kirn
Thomas E. Kirn
Chief Financial Officer
(Principal Financial Officer and Principal Accounting Officer)